No. 25-1170

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts

## MOTION FOR STAY PENDING APPEAL

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT......................................................................................................2

ARGUMENT .......................................................................................................7

I.     The States Lack Standing to Challenge Alleged Violations of Individuals'
Rights Under the Citizenship Clause. ........................................................7

II.    Even If the States Have Standing, the Nationwide Injunction Is
Overbroad................................................................................................. 16

III.   The Remaining Factors Favor a Stay.................................................... 18

CONCLUSION ................................................................................................. 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# INTRODUCTION

Defendants-appellants President Donald J. Trump, et al., respectfully move this Court for a stay pending appeal of the district court's nationwide preliminary injunction, which enjoins "enforcing or implementing" the Executive Order addressing the meaning of the Citizenship Clause of the Fourteenth Amendment. *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025). Under the Citizenship Clause, "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Executive Order explains that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States or whose presence is lawful but temporary. Text, history, and precedent demonstrate that the Executive Order's interpretation of the Citizenship Clause is correct, as the government will explain in its merits brief in this Court.

This motion does not require the Court to address the merits. For the present, the government asks only that this Court address the plaintiffs' lack of standing and the overbroad scope of the injunction. The district court believed that, because of purported injuries to eighteen plaintiff States, a political subdivision of one of those states, and the District of Columbia (collectively, the "States"), it was appropriate to enjoin the operation of the Executive Order nationwide. That step was plainly unjustified, and a stay is warranted. Citizenship

is an *individual* right, and the States have no ability to assert, against the federal government, individual-rights claims of their residents, much less—as the States' theory of relief here implies—individual-rights claims of residents of other States. Well-established limits on *parens patriae* standing and third-party standing dictate this result.

Moreover, the injuries the States themselves claim, such as added expenditures and purported lost revenue, are precisely the sorts of downstream injuries the Supreme Court has rejected as too attenuated to confer Article III standing or are self-inflicted results of States' voluntary spending decisions. Finally, even if the States could overcome these hurdles, precedent from the Supreme Court and this Court makes clear that nationwide relief is improper.

Plaintiffs informed us they plan to oppose this motion and file a response.

## STATEMENT

### A.  Background

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S.

Const. amend. XIV, § 1.  Similarly, 8 U.S.C. § 1401(a) makes citizens of any "person born in the United States, and subject to the jurisdiction thereof."[1]

On January 20, 2025, President Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States.  *See* Add. 84-85, § 1.  The Executive Order recognizes that the Constitution and the corresponding statute extend birthright citizenship to most people born in the United States but they do not automatically extend the privilege when, at the time of said person's birth: (1) the mother was unlawfully present and the father was not a citizen or lawful permanent resident, or (2) the mother's presence was lawful but temporary and the father was not a citizen or lawful permanent resident.  *Id.*  The Executive Order also directs the Executive Branch not to issue documents recognizing U.S. citizenship to persons born in the United States after February 19, 2025 under those conditions, and not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons.  Add. 85-86, § 2(a).

The Executive Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to "ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and further directs the heads of all federal agencies to issue public

_____

[1] Plaintiffs assert claims under both the Citizenship Clause and this statute. The reasons States lack standing to bring their constitutional claim apply equally to their statutory claim.

3

guidance by February 19 "regarding this order's implementation with respect to their operations and activities." Add. 86, § 3.

## B. Procedural History

1. The plaintiff States filed suit the day after the Executive Order issued. *See* Add. 34. Their complaint alleges that the Executive Order violates the individual rights of those people covered by the order. The Citizenship Clause "confers citizenship on" certain "*individuals*." Add. 46, ¶ 78 (emphasis added). The States claim that the individuals affected by the Executive Order come within the Citizenship Clause's grant of citizenship, Add. 46-53, ¶¶ 78-105, and that accordingly "the President acted without legal authority in purporting to strip" those "*individuals* of *their* U.S. Citizenship," Add. 51 (capitalization altered and emphases added).

The States claim they "will be irreparably injured by the Order separate and apart from" those whose citizenship rights were allegedly violated, "principally by forcing [the States] to assume a greater fiscal burden for providing essential services and assistance to tens of thousands of residents." Add. 56, ¶ 121. Because the Executive Order will, they claim, "strip[] individuals of their citizenship," those individuals will become "ineligible to receive" "benefits" the States administer—such as Medicaid, Children's Health Insurance Program (CHIP), early intervention programs for speech and occupational therapy, and welfare—that are "partially federally funded." *Id.* ¶ 122; *see* Add. 56-66, ¶¶ 121-163. The loss of eligibility will

4

also cause some of the States to correspondingly spend more on state programs that provide similar services.  Add. 57, ¶¶ 125-126; *see* Add. 56-63, ¶¶ 121-148.  In addition, the States contended that they would lose the fee they receive under a contract with the Social Security Administration for each new social security application they process.  Add. 68-70, ¶¶ 176-182.  Finally, the States contended that they would incur costs adjusting administrative and operational processes to adapt to the new federal policy.  Add. 70-75, ¶¶ 183-200.

2.  On February 13, the district court granted a nationwide preliminary injunction.  Add. 1.  The district court's opinion addresses both this case and a related case brought by an individual and two organizations.  *See* Add. 3-8.  This stay motion concerns only the injunction in the States' case.

The court held that the States have Article III standing whenever "an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which [the States] would be entitled."  Add. 10.  Because "fewer children will be recognized as citizens" under the Executive Order, "the number of persons" "eligible" for the federal programs the States administer "will fall," and as a result, "the reimbursements and grants the State plaintiffs receive for these services will decrease."  Add. 11.

In a footnote, the district court said it did "not consider a *parens patriae* theory of standing, because the State plaintiffs are not pursuing it."  Add. 12 n.7.  It further reasoned that the States "probably have standing based on their sovereign interests …

in which persons are their citizens" but concluded that it "need not resolve" the question because the States' "showing of direct financial harms" satisfied Article III. *Id.* (citation omitted).

As to the scope of its injunction, the district court concluded that "universal or nationwide relief is necessary to prevent [the States] from suffering irreparable harm." Add. 31. The court was concerned that "children born in states that are not parties to this lawsuit … would theoretically lack birthright citizenship even after returning or moving to—and seeking various services in—a state that is among the plaintiffs here." *Id.*

The district court entered a preliminary injunction barring "implementing and enforcing" the Executive Order. Add. 2. On February 19, the government moved in district court for a stay pending appeal. Add. 98. On February 26, the district court denied the motion, primarily citing the reasons it gave in its order granting the injunction. Add. 112.

3. Two other district courts have enjoined the Executive Order nationwide. *CASA, Inc. v. Trump*, Civ. No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025); *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025). The defendants appealed those injunctions and sought partial stays pending appeal as to their nationwide scope. A Ninth Circuit motions panel denied a stay, and the Acting Solicitor General has authorized a petition seeking en banc review of that

decision. *See Washington v. Trump*, No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025). As of filing this motion, the Fourth Circuit has not acted on the stay motion.[2]

## ARGUMENT

Because the States lack standing, there is no proper basis for equitable relief, and the familiar factors governing the grant of a stay pending appeal—likelihood of success on the merits, irreparable injury, the balance of the equities, and the public interest—strongly counsel in favor of a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). At a minimum, this Court should limit relief to what is necessary to prevent the States' alleged financial harms.

## I. The States Lack Standing to Challenge Alleged Violations of Individuals' Rights Under the Citizenship Clause.

States cannot directly assert Citizenship Clause claims, which are fundamentally individual-rights claims held by individuals. Nor can the States properly litigate the Citizenship Clause claims of their residents as *parens patriae*. Nor does any other theory of third-party standing plausibly support the States' claims here. Moreover, the

---

[2] Two other narrower injunctions have also been issued. The government has appealed the narrower injunction the district court entered in the related case here, preventing application of the Executive Order to one individual plaintiff or to the association plaintiffs' members. *See* Add. 30; *see also Doe v. Trump*, No. 25-1169 (1st Cir. filed Feb. 19, 2025). Another district court in the First Circuit has issued a narrower injunction, which the government has sought to clarify before its planned appeal. *See* Preliminary Injunction Order, *New Hampshire Indonesian Cmty. Support v. Trump*, No. 1:25-cv-38 (D.N.H. Feb. 11, 2025), Dkt. 79; Motion for Clarification of Preliminary Injunction, *New Hampshire Indonesian Cmty. Support*, No. 1:25-cv-28 (Feb. 18, 2025), Dkt. 81.

States' own alleged injuries rest on speculative and attenuated claims about the downstream effects of federal policy on state expenditures and revenues—precisely the sort of assertions the Supreme Court and courts of appeals have rejected as a basis for Article III standing.

**A.** The States claim that their future residents may be denied the rights or privileges of citizenship by the federal government and that this will indirectly cost the States money. The States, of course, have no Citizenship Clause rights of their own and thus necessarily seek to litigate the constitutional rights of potential future residents. Nor do the States contend that there is any impediment to their residents' ability to bring suits against the federal government asserting rights under that Clause. Nonetheless, the district court permitted the States to litigate Citizenship Clause claims on behalf of their future residents, lest the States incur certain downstream costs.

The Supreme Court has repeatedly held that States cannot bring claims based on the individual rights of their residents. "[I]t is no part of [a State's] duty or power to enforce [its people's] rights in respect of their relations with the Federal Government," *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and thus a "State does not have standing as *parens patriae* to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982). The Supreme Court likewise has refused to countenance States' "thinly

veiled attempt[s] to circumvent the limits on *parens patriae* standing," *Haaland v. Brackeen*, 599 U.S. 255, 295 n.11 (2023), by asserting derivative injuries from the alleged violations of other individuals' rights.

In *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), South Carolina lacked standing to claim that a federal statute violated its citizens' due-process rights because the "States of the Union" have no rights of their own under "the Due Process Clause of the Fifth Amendment" and also could not invoke its citizens' rights "against the Federal Government, the ultimate *parens patriae* of every American citizen." *Id.* at 323-24. Similarly, in *Haaland v. Brackeen*, 599 U.S. 255 (2023), Texas lacked standing to claim that a federal statute violated its citizens' equal-protection rights because Texas "ha[d] no equal protection rights of its own," lacked "standing as *parens patriae* to bring an action against the Federal Government" on behalf of its citizens, and could not "assert third-party standing" to bring such a suit. *Id.* at 294-95 & n.11 (citation omitted). And in *Murthy v. Missouri*, 603 U.S. 43 (2024), Missouri lacked standing to claim that the federal government had violated the Free Speech Clause by censoring the speech of its citizens, as Missouri could not bring a *parens patriae* suit or invoke third-party standing on behalf of residents whose views Missouri was allegedly prevented from hearing. *Id.* at 76.

Ordinary third-party standing principles reinforce the point. A plaintiff generally "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S.

490, 499 (1975). In other words, a constitutional claim should ordinarily be brought by the person "at whom the constitutional protection is aimed," that is, "the party with the right." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted). Crucially, this rule precludes litigating others' claims even when the putative plaintiff "has alleged injury sufficient to meet" Article III requirements. *Warth*, 422 U.S. at 499. In *Kowalski*, for example, the Court addressed a challenge by criminal defense attorneys to a state statute that limited the appointment of appellate counsel for indigent defendants who pleaded guilty. 543 U.S. at 127. The Court assumed that the attorneys had established Article III standing through allegations that the law "has reduced the number of cases in which they could be appointed and paid as assigned appellate counsel" for future "hypothetical indigents." *Id.* at 127, 129 n.2 (citation omitted). But the Court held that notwithstanding that pocketbook injury, the attorneys could not sue to assert their putative clients' constitutional right to have the government pay for their services. *Id.* at 134.

The States argued in district court that third-party standing was not a barrier so long as they had "fiscal harm from an [allegedly] unlawful executive order." Dkt. 123, at 2. But third-party standing limitations, as *Kowalski* and *Warth* explain, require States to allege more. The States need to allege fiscal injuries because the Executive Order violates *their own rights*, not just fiscal injuries resulting from an order which, they allege, unlawfully violates someone else's rights.

10

Without addressing *Kowalski*, *Warth*, or third-party standing limitations generally, the district court appeared to accept the States' position in a footnote, stating that the States' "showing of direct financial harms" was sufficient.[3] Add. 12 n.7.

That conclusion conflicts with the Supreme Court precedents about third-party standing that control here. Just as South Carolina, Texas, and Missouri could not sue the federal government to vindicate individuals' rights under the Due Process, Equal Protection, and Free Speech Clauses, the States here may not sue the federal government to vindicate individuals' asserted rights under the Citizenship Clause. The States "ha[ve] no [citizenship] rights of [their] own," *Brackeen*, 599 U.S. at 294. That should have been dispositive. Just as lawyers cannot assert indigent defendants' constitutional rights to government-funded attorneys because those

---

[3] The footnote suggests that the States "probably" have a sovereign interest in this case because the "Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside." Add. 12 n.7. The court further reasoned that the States have a sovereign interest in whether individuals in their states are U.S. citizens because "state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship." *Id.* That suggestion suffers from multiple flaws. First, States do not have a sovereign interest in whether individuals are citizens, and certainly not in whether they are *federal* citizens. Second, any interest States may have in whether individuals are *state* citizens is not relevant to their claim, which focuses entirely on the fiscal consequences of whether the federal government recognizes individuals as *federal* citizens. Finally, the Executive Order directs federal officials to interpret the Citizenship Clause a particular way and does not purport to compel state officials to interpret it the same way.

lawyers would lose out on fees, *Kowalski*, 543 U.S. at 134, the plaintiff States here cannot assert the Citizenship Clause rights of future state residents on the theory that those residents' citizenship status may affect States' eligibility for certain federal reimbursements.

**B.** The district court's conclusion was wrong even on its own terms. Apart from the error in allowing the States to raise the individual-rights claims of others, the States have failed to establish Article III standing to sue.

To establish Article III standing, the States must show that they have suffered a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The States' showing of causation "must not be too speculative or too attenuated," an inquiry that includes examining whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

The States' claim that the Executive Order will indirectly reduce the federal funding they receive, and thus cause greater expenditures of state funds in other programs, does not satisfy Article III. The Supreme Court recently rejected nearly identical claims in *United States v. Texas*, where two States challenged federal actions that, in their view, increased the number of noncitizens in their States, thereby imposing costs to "supply social services such as healthcare and education to

noncitizens." 599 U.S. 670, 674 (2023). The Supreme Court held those costs insufficient to confer standing:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated. In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

*Id.* at 680 n.3 (citations omitted).

That holding was only the most recent in a series of cases rejecting state standing based on downstream effects of federal policy on state revenues or expenditures. The Supreme Court long ago rejected claims that States had standing to challenge federal policy on the theory that it "induc[ed] potential taxpayers to withdraw property" and thereby diminished the State's tax base, explaining that such harms are "purely speculative, and, at most, only remote and indirect." *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927).

These principles foreclose the States' standing here. Just as in *Texas*, where it was insufficient for the challenger States to point to expenses stemming from the presence of aliens within their borders, the plaintiff States cannot rely on social services expenditures to challenge the federal government's citizenship determinations. The Executive Order simply regulates how the federal government will approach certain individuals' citizenship status. No State has a legally cognizable

interest in whether the federal government recognizes the U.S. citizenship of a particular individual. Any incidental downstream economic benefits or burdens that may flow from the number of citizens residing in a State are insufficient to establish standing. *See Washington v. FDA*, 108 F.4th 1163, 1174-76 (9th Cir. 2024) (reasoning that increased state Medicaid costs were the sort of "indirect" fiscal injuries that fell short of Article III). To conclude otherwise would imply that every State of the Union has Article III standing to litigate the citizenship status of every person residing within its borders. As the precedents discussed above make clear, that is not the law.

The States likewise cannot rely on "administrative and operational burdens" they claim will result from the Executive Order. Add. 70, ¶ 183. The order itself does not require the States to change their systems or impose any penalty for failing to do so. Because the States' claimed injuries are not attributable to the federal policy itself, the States' voluntary expenditures in response to federal policy are not sufficient to confer standing. *See Alliance for Hippocratic Med.*, 602 U.S. at 394-95.

Indeed, the States' theory of standing here illustrates the concern that no "limits on state standing" would remain if "any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). That is particularly salient in the immigration context, where, as noted, the Supreme Court has rejected claims of state standing premised on the economic effects

14

of the presence or absence of noncitizens. *Texas*, 599 U.S. at 680 n.3. While illegal aliens generally are not eligible for federal benefits, certain "qualified aliens," such as lawful permanent residents, asylees, or refugees, may qualify for federal benefits in certain circumstances (including Medicaid coverage and CHIP). *See, e.g.*, 8 U.S.C. § 1612. On the States' theory, every State would have standing to challenge any change in the federal government's policies for conferring any "qualified alien" status, as the grant or withholding of such status would affect eligibility for federal programs and thus impose "operational disruptions and administrative burdens" on States as they administer those programs.

More generally, the States' theory would confer standing to sue over any federal policy that results in an increase in state expenditures or loss of state revenues. For example, the States' claimed interest in future fees from the Social Security Administration, Add. 68-70, ¶¶ 176-182, would, if sufficient to confer standing, imply that the States would equally have standing to challenge any federal action that conceivably lowers the birthrate within their borders (*e.g.*, enhanced immigration enforcement). Neither this Court nor the Supreme Court has ever endorsed such a boundless theory.

Finally, the States' asserted injuries regarding health, social, and administrative services are not traceable to the Executive Order, because the Order does not require the States to provide those services. *See, e.g.*, Add. 57, ¶ 125. The States have

15

*voluntarily* chosen to provide certain benefits without regard to the recipient's

citizenship, and the costs they incur to do so are self-inflicted costs that do not confer

standing to sue in federal court. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)

(per curiam) ("No State can be heard to complain about damage inflicted by its own

hand."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013).

## II. Even If the States Have Standing, the Nationwide Injunction Is Overbroad.

In all events, the district court erred in granting nationwide injunctive relief.

Such injunctions exceed "the power of Article III courts," conflict with "longstanding

limits on equitable relief," and impose a severe "toll on the federal court system."

*Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see DHS v. New

York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay).

Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that

produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation

omitted); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that

improperly granted "a remedy beyond what was necessary to provide relief" to the

injured parties). Similarly, traditional principles of equity require that an injunction be

"no more burdensome to the defendant than necessary to provide complete relief to

the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Nationwide injunctions

flout these principles. They also circumvent the carefully calibrated rules governing

class actions in federal courts. *See* Fed. R. Civ. P. 23. Nationwide injunctions

encourage forum shopping. *Arizona*, 40 F.4th at 396 (Sutton, J., concurring). They empower a single district court to pretermit meaningful litigation on the same issue in other courts, thereby preventing further percolation of the issues. *See DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring in the grant of stay). And they operate asymmetrically, granting relief to strangers around the nation if a single plaintiff prevails but not precluding litigation by others if the plaintiff loses. *Cf. United States v. Mendoza*, 464 U.S. 154, 159-60 (1984) (holding that non-mutual collateral estoppel does not apply against the federal government).

The district court agreed that "injunctive relief should be tailored to the parties before it." Add. 30. But it erroneously concluded that the least burdensome way to remedy the States' alleged injuries was to enjoin the Executive Order nationwide. The district court reasoned that the States' "harms … stem from the [Order's] impact on the citizenship status—and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction." Add. 31. Because children will move between States, the court reasoned, the least burdensome injunction required it to compel the conferral of citizenship on any child born anywhere in the country.

That misconceives of the States' injuries and lays bare the States' third-party standing problems. The States claim only a fiscal injury: Because fewer children will be citizens, those children will be ineligible for programs the States administer, and

17

the States will receive less federal funding. Complete relief to the States would be afforded by a narrower injunction that required the federal defendants to treat the children covered by the Executive Order as eligible for the services the States administer. The States cannot have it both ways. They disclaim litigating the citizenship rights of others and focus on their own alleged fiscal injuries for standing. Any relief must, accordingly, be no more burdensome than necessary to remedy those specific fiscal injuries.

At a minimum, given the well-documented problems with nationwide relief and the opposition to a preliminary injunction from nineteen other States, *see* Dkt. 122; Dkt. 127, the district court should have declined to enter sweeping relief; a court's equitable discretion includes the power to withhold the full measure of relief in light of other considerations. *See Texas v. United States*, 126 F.4th 392, 421 (5th Cir. 2025) (narrowing a nationwide injunction because, in part, "22 states and the District of Columbia" opposed it); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

## III.    The Remaining Factors Favor a Stay.

The remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the requested stay. The States' claims of irreparable injury simply mirror their claims of injury for standing—lost reimbursements or compliance costs. But as discussed above, *see supra* pp. 12-16, those injuries are not cognizable for

standing purposes and thus cannot form the basis of a valid claim of irreparable harm to the States (much less to nonparties nationwide).

In any event, even if the States' claim of lost reimbursements were sufficient for standing, they have failed to show that any such injuries occurring between now and final judgment would be irreparable. Plaintiffs have not shown—and the district court did not find—that any purported missed reimbursements for expenditures under Medicaid, CHIP, or the Social Security Enumeration at Birth programs could not be recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs. Courts routinely reject arguments that requiring exhaustion of claims through an administrative process that could result in payment of contested claims constitutes irreparable harm. *See, e.g.,* *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 581 (6th Cir. 1995).

The States thus face no prospect of irreparable harm from a stay of the injunction. By contrast, allowing the full scope of the injunction to continue for the duration of the appeal threatens irreparable injuries to the government and the public,[4] whose interests "merge" in this context. *Nken*, 556 U.S. at 435. An

---

[4] While two other district courts have enjoined the Executive Order nationwide, the government is seeking stays from both of those orders. *See supra* pp. 6-7. The *Washington* injunction suffers from the same state-standing defects as this injunction. The *CASA, Inc.* injunction granted nationwide relief based on a complaint that identified Article III standing for 16 individuals. That court reasoned that hundreds of thousands of other members of the plaintiff organizations were entitled

*Continued on next page.*

injunction that prevents the President from carrying out his broad authority over and responsibility for immigration matters is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). Those harms are particularly manifest given the breadth of the injunction. The injunction applies nationwide to all implementation and enforcement. The order thus prevents (and has prevented) the Executive Branch as a whole from beginning the process of formulating relevant policies and guidance for implementing the President's Order. The States cannot plausibly claim any injury from those internal operations, and delaying advance preparations for the policies of a democratically elected government imposes its own "form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

The injunction is especially harmful as the challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. That immigration policy is designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443, 8443 (Jan. 29, 2025); *see also* Exec. Order No. 14,165, 90 Fed. Reg.

---

to relief regardless of whether they had Article III standing, and that nationwide injunctive relief was appropriate because those members were geographically dispersed.

8467 (Jan. 30, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025). Addressing the Executive Branch's prior misinterpretation of the Citizenship Clause is one component of that broader effort, removing incentives to unlawful immigration and closing exploitable loopholes.

Nor can the plaintiff States plausibly claim to represent the public interest, particularly for an injunction of nationwide scope. As noted, nineteen other States filed amicus briefs opposing a preliminary injunction here, *see* Dkt. 122; Dkt. 127, and the district court's order thus imposes an injunction on those non-party States to which they object. The court erred in granting injunctive relief concerning the citizenship of individuals anywhere in the country at the behest of States who lacked standing and whose claim narrowly related only to their own, alleged financial harms.

## CONCLUSION

For the foregoing reasons, this Court should stay the district court's nationwide preliminary injunction or, alternatively, partially stay the injunction to the extent it addresses more than the States' alleged financial harms.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*
DEREK WEISS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7256*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5365*
   *derek.l.weiss@usdoj.gov*

February 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this motion complies with the requirements of Federal Rules of Appellate Procedure 27(d)(2)(E) and 32(a)(5)-(6) because it has been prepared in 14-point Garamond, a proportionally spaced font. I further certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,138 words, according to the count of Microsoft Word.

*s/ Derek Weiss*
Derek Weiss

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I also hereby certify that the participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

*s/ Derek Weiss*
Derek Weiss

**ADDENDUM**

# TABLE OF CONTENTS

**Relevant Record Materials:**

Preliminary Injunction (Feb. 13, 2025) (Dkt. 145)......................................................Add. 1

Memorandum of Decision on Motions for Preliminary Injunction .................................
    (Feb. 13, 2025) (Dkt. 144) ................................................................................Add. 3

Complaint (Jan. 21, 2025) (Dkt. 1) ...........................................................................Add. 34

Complaint Exhibit: Executive Order (Dkt. 1-1).......................................................Add. 84

**District Court Motion for a Stay and its Outcome:**

Motion to Stay Preliminary Injunction Pending Appeal ...................................................
    (Feb. 19, 2025) (Dkt. 157) ...............................................................................Add. 98

Memorandum of Law in Support of Defendants' Motion to Stay Preliminary
    Injunction Pending Appeal (Feb. 19, 2025) (Dkt. 158) ........................... Add. 101

Order on Motion to Stay Preliminary Injunction Pending Appeal .....................................
    (Feb. 26, 2025) (Dkt. 165) ........................................................................... Add. 112

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil No. 25-10139-LTS |
| | ) |
| DONALD J. TRUMP et al., | ) |
| | ) |
| Defendants. | ) |

PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

     For the reasons set forth in the Memorandum of Decision issued today, Doc. No. 144, the plaintiffs' motion for preliminary injunction (Doc. No. 3) is ALLOWED.  As explained in the Memorandum, the plaintiffs have advanced valid causes of action seeking equitable relief, and they have standing to pursue such claims.  They also have demonstrated that each factor governing their request for preliminary injunctive relief weighs strongly in their favor.  The plaintiffs are likely to succeed on the merits of their claims under the Citizenship Clause and 8 U.S.C. § 1401, they are likely to suffer irreparable harm in the absence of relief, the balance of harms tips overwhelmingly in their favor, and the public interest favors an injunction. Additionally, the record establishes that universal relief is required in order to provide complete relief to the eighteen states and two cities that have brought this case.

     Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), this Court ORDERS as follows:

1.  The United States Department of State, the Secretary of State, the United States Department of Homeland Security, the Secretary of Homeland Security, the United States Department of Health and Human Services, the Acting Secretary of Health and Human Services, the United States Social Security Administration, the Acting Commissioner of Social Security, and all officers, agents, employees, attorneys, and any other persons acting in concert with or behalf of any named defendant in this action (including agents, employees, and other representatives of President Donald J. Trump), are ENJOINED from implementing and enforcing Executive Order No. 14,160, "Protecting the Meaning and Value of American Citizenship."

2.  No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case, where the plaintiffs seek to vindicate an important constitutional and federal statutory right, and the injunction will not expose the defendants to financial loss.  See da Silva Medeiros v. Martin, 458 F. Supp. 3d 122, 130 (D.R.I. May 1, 2020) (citing Crowley v. Loc. No. 82, 679 F.2d 978, 1000-01 (1st Cir. 1982)).

3.  This preliminary injunction shall take effect immediately upon the docketing of this Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the United States Court of Appeals for the First Circuit, or the United States Supreme Court order otherwise.

                                        SO ORDERED.


                                         /s/ Leo T. Sorokin
                                        United States District Judge

Add. 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

O. DOE et al.,                              )
                                           )
        Plaintiffs,                        )
                                           )
v.                                         )     Civil No. 25-10135-LTS
                                           )
DONALD J. TRUMP et al.,                    )
                                           )
        Defendants.                        )
                                           )
STATE OF NEW JERSEY et al.,                )
                                           )
        Plaintiffs,                        )
                                           )
v.                                         )     Civil No. 25-10139-LTS
                                           )
DONALD J. TRUMP et al.,                    )
                                           )
        Defendants.                        )
                                           )

MEMORANDUM OF DECISION ON MOTIONS FOR PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

        In this pair of lawsuits, two groups of plaintiffs advance similar challenges to the legality

of one executive order among many issued by President Donald Trump on January 20, 2025.

The executive order is titled "Protecting the Meaning and Value of American Citizenship" ("the

EO").  Exec. Order No. 14,160 (Jan. 20, 2025).[1]  The EO identifies two "categories of

---

[1] Multiple copies of the EO have been made part of the record before the Court.  When
referencing submissions filed in Doe et al. v. Trump et al., No. 25-cv-10135, the Court will cite
to "Doe, Doc. No. __ at __."  For submissions filed in New Jersey et al. v. Trump et al., No. 25-
cv-10139, the Court will cite to "New Jersey, Doc. No. __ at __."  All such citations use the
document and page numbering appearing in the ECF header, except where pinpoint citations

Add. 3

individuals born in the United States" to whom the EO says "the privilege of United States citizenship does not automatically extend," then directs federal departments and agencies to cease issuing or accepting "documents recognizing United States citizenship" for such individuals born after February 19, 2025.  Doe, Doc. No. 1-1 §§ 1-3.

Both groups of plaintiffs assert that the EO violates the Citizenship Clause of the Fourteenth Amendment to the United State Constitution, along with other constitutional provisions and federal statutes.  Each group seeks a preliminary injunction preventing the EO from taking effect.  Doe, Doc. No. 10; New Jersey, Doc. No. 3.  The motions are fully briefed and were the subject of a motion hearing.[2]

In opposing the requests for injunctions, the defendants assert an array of arguments, which the Court addresses briefly here and in detail below.  For starters, each plaintiff has standing to sue, because the uncontested facts establish each would suffer direct injury from the EO's implementation.  The plaintiffs are also likely to succeed on the merits of their claims.  In a lengthy 1898 decision, the Supreme Court examined the Citizenship Clause, adopting the interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO.  The rule and reasoning from that decision were reiterated and applied in later decisions, adopted by

reference enumerated sections or paragraphs within the document.  The EO appears at Doe, Doc. No. 1-1, and New Jersey, Doc. No. 1-1.

[2] The Court has accepted amicus curiae briefs from the following groups: a collection of local governments and officials representing seventy-two jurisdictions in twenty-four states; eighteen members of Congress serving on the House Judiciary Committee; the Immigration Reform Law Institute; the State of Iowa along with seventeen other states; the State of Tennessee; and former U.S. Attorney General Edwin Meese III.  Doe, Doc. Nos. 32, 38, 40; New Jersey, Doc. Nos. 88, 118, 120, 122, 127, 129.  The Court has considered these submissions only insofar as they concern legal issues and positions advanced by the parties.  See United States v. Sturm, Ruger & Co., 84 F.3d 1, 6 (1st Cir. 1996) (explaining "an amicus cannot introduce a new argument into a case").  While several of these briefs were helpful, the submission by the State of Tennessee was especially well written.

Congress as a matter of federal statutory law in 1940, and followed consistently by the Executive Branch for the past 100 years, at least. A single district judge would be bound to apply that settled interpretation, even if a party were to present persuasive arguments that the long-established understanding is erroneous.

The defendants, however, have offered no such arguments here. Their three main contentions are flawed. First, allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents, nor must it be exclusive, as the defendants contend. Applying the defendants' view of allegiance would mean children of dual citizens and lawful permanent residents would not be birthright citizens—a result even the defendants do not support. Next, the defendants argue birthright citizenship requires the mutual consent of the person and the Nation. This theory disregards the original purpose of the Fourteenth Amendment: to recognize as birthright citizens the children of enslaved persons who did not enter the country consensually, but were brought to our shores in chains. There is no basis to think the drafters imposed a requirement excluding the very people the Amendment aimed to make citizens. Simply put, the Amendment is the Nation's consent to accept and protect as citizens those born here, subject to the few narrow exceptions recognized at the time of enactment, none of which are at issue here. Finally, the Amendment requires states to recognize birthright citizens as citizens of their state of residence. The text includes no domicile requirement at all.

Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake. In so doing, these interpretations stray from the text of the Citizenship Clause. The Fourteenth Amendment says nothing of the birthright citizen's parents, and efforts

to import such considerations at the time of enactment and when the Supreme Court construed the text were rejected.  This Court is likewise bound to reject such theories now.

The plaintiffs have also satisfied the other preliminary-injunction factors.  Each plaintiff faces irreparable harm, the defendants face none, and the public interest favors enjoining the EO. Accordingly, the plaintiffs in each case are entitled to an injunction preventing implementation of the EO.  The individual and two associations who are plaintiffs in the earlier-filed action will be fully protected by an injunction limited to the individual and the members of the associations. The later-filed case, brought by eighteen states and two cities, requires a broader, nationwide injunction.  Applying traditional equity principles, such relief is necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions.

For these reasons, the plaintiffs' motions are ALLOWED.  This ruling, explained further below and memorialized in separate Orders issued concurrently with this Memorandum, is based on straightforward application of settled Supreme Court precedent reiterated and reaffirmed in various ways for more than a century by all three branches of the federal government.

I.    BACKGROUND

Within hours of taking office, the President signed the EO, which he describes as "an integral part of [his] broader effort to repair the United States' immigration system and to address the ongoing crises at the southern border."  Doe, Doc. No. 22 at 14.  The EO, however, does not directly concern immigration; rather, it seeks to define the scope of birthright citizenship in the United States.  In the section stating its purpose, the EO acknowledges that the Citizenship Clause and a section of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1401, confer citizenship on any person born in the United States and "subject to the jurisdiction thereof."  Doe, Doc. No. 1-1 § 1.  The EO goes on to identify two "categories of individuals born

in the United States" but "not subject to the jurisdiction thereof," to whom birthright citizenship "does not automatically extend." Id. A child falls within one of the identified categories if, at the time of their birth, their father was neither a citizen nor a lawful permanent resident ("LPR") of the United States, and their mother was 1) "unlawfully present in the United States," or 2) lawfully but temporarily present in the United States "(such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)." Id.

The second section announces that it is "the policy of the United States that no department or agency" of the federal "government shall issue [or accept] documents recognizing United States citizenship" of children within the identified categories. Id. § 2. The stated policy "shall apply only to persons who are born" after February 19, 2025. Id. The EO expressly does not restrict the ability of U.S.-born children of LPRs to receive or use documents recognizing "their United States citizenship." Id. Next, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with" the EO, and that no one within any identified department "act[s], or forbear[s] from acting, in any manner inconsistent with" the EO. Id. § 3(a). The EO further requires "[t]he heads of all executive departments and agencies" to "issue public guidance" by February 19, 2025, regarding implementation of the EO. Id. § 3(b).

In a complaint filed the day the EO issued, an individual plaintiff and two nonprofit associations challenged its legality and sought equitable relief preventing its implementation. See generally Doe, Doc. No. 1. The individual plaintiff, proceeding under the pseudonym "O. Doe," is "an expectant mother" who is lawfully present in the United States "through Temporary

Protected Status" ("TPS").  Id. ¶ 13.  Doe's husband, the father of the child due to be born next

month, is neither a citizen nor LPR of this country.  Id.  The baby will be Doe's second child; her

first, now seven years old, also was born in the United States.  Doe, Doc. No. 11-1 ¶ 3.

Doe's co-plaintiffs are La Colaborativa and the Brazilian Worker Center, two

membership organizations located in eastern Massachusetts who provide immigration-related

assistance, among other services.  Doe, Doc. No. 1 ¶¶ 14-15.  Both organizations have members

who are unlawfully present in the United States, some of whom "are either pregnant or plan to

grow their families in the future."  Id.; see Doe, Doc. No. 11-2 ¶ 4; Doe, Doc. No. 11-3 ¶¶ 8-10.

Though the present record does not conclusively establish where the organizations' members

live, counsel at the motion hearing suggested the Court could view the members as located

"primarily" (though perhaps not exclusively) in Massachusetts.  Mot. Hr'g Tr. at 10, 76.[3]  Doe

and the organizations' members have submitted unrebutted declarations describing the harms

they allege the EO will cause the children it targets, who will be treated as noncitizens lacking

any recognized, lawful immigration status.  See generally Doe, Doc. Nos. 11-1 to -3.

The day after Doe and her co-plaintiffs filed suit, New Jersey and a group of seventeen

other states, along with the District of Columbia and San Francisco (collectively, "the State

plaintiffs"), instituted a separate action also challenging the EO under provisions of the

Constitution and other federal statutes.[4]  New Jersey, Doc. No. 1.  Along with their complaint,

---

[3] The transcript of the February 7, 2025, hearing on the motions appears on both dockets.  Doe, Doc. No. 44; New Jersey, Doc. No. 142.
[4] Besides New Jersey, the plaintiffs in this action are Massachusetts, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan (through its Attorney General), Minnesota, Nevada, New Mexico, New York, North Carolina, Rhode Island, Vermont, and Wisconsin.  Venue is proper in the District of Massachusetts because the defendants are all officers or agencies of the United States, and at least one plaintiff in each case resides in Massachusetts.  See 28 U.S.C. § 1391(e)(1)(C).

the State plaintiffs filed a motion for a preliminary injunction supported by a memorandum and more than two dozen exhibits.  New Jersey, Doc. Nos. 3, 5, 5-1 to -27.  The exhibits include declarations by various representatives of state agencies describing financial and administrative burdens they anticipate will result from the EO.  See, e.g., New Jersey, Doc. Nos. 5-2, 5-8, 5-14, 5-18 (describing impacts of EO on federal funding related to state health insurance programs, education, foster care, and hospital-based process for acquiring Social Security numbers at birth).

Both complaints name as defendants the President, the State Department, the Secretary of State, the Social Security Administration, and the Acting Commissioner of Social Security.  The State plaintiffs also sued the United States, the Department of Homeland Security, the Secretary of Homeland Security, the Department of Health and Human Services, and the Acting Secretary of Health and Human Services.

On January 23, 2025, the Doe plaintiffs filed their own motion for a preliminary injunction, supporting memorandum, declarations, and other exhibits.  Doe, Doc. Nos. 10, 11, 11-1 to -10.  After hearing from the parties, the Court deemed the cases related to one another and set a consolidated briefing schedule.  New Jersey, Doc. No. 71; Doe, Doc. No. 12.  The defendants opposed both motions, challenging the State plaintiffs' standing to sue, arguing no plaintiff has advanced a valid cause of action, and urging that the plaintiffs have not satisfied the test governing preliminary-injunctive relief.  See generally Doe, Doc. No. 22.  Both sets of plaintiffs replied.  Doe, Doc. No. 33; New Jersey, Doc. No. 123.  The Court heard argument from all parties on February 7, 2025.

II.  DISCUSSION

Before addressing the factors governing requests for injunctive relief, the Court disposes of two preliminary challenges that the defendants suggest foreclose consideration of the merits of the plaintiffs' motions.  As the Court will explain, the defendants' opening pair of procedural

challenges, like their substantive arguments opposing the motions, wither in the face of settled and binding Supreme Court precedent.

    A.   <u>Threshold Issues</u>

       1.  *Standing*

The defendants first argue that the State plaintiffs lack standing to bring the claims alleged in their complaint.  <u>See New Jersey</u>, Doc. No. 92 at 18-22.  They are wrong.

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies'" in which a plaintiff can "demonstrate [a] personal stake." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021).  To establish standing under Article III, a "plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).  This test is satisfied if state- or local-government plaintiffs show that an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which they otherwise would be entitled.  <u>See</u> <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 767 (2019).  Such a showing establishes injury that is "sufficiently concrete and imminent" and "fairly traceable" to the challenged action, thereby satisfying Article III.  <u>Id.</u>

The State plaintiffs easily meet this standard.[5]  Uncontested declarations from officials representing several State plaintiffs articulate various forms of federal funding that will be

---

[5] The defendants direct their standing challenge against the State plaintiffs as a group.  They have not contested the showing made by any individual State plaintiff or subset of State plaintiffs.  Even if the defendants had done so, the result would be the same.  The record before the Court includes sworn declarations establishing standing on the part of at least several State plaintiffs.  No more is required at this juncture.  <u>See</u> <u>Nebraska</u>, 143 S. Ct. at 2365 ("If at least one plaintiff has standing, the suit may proceed."); <u>United States v. Texas</u>, 599 U.S. 670, 709 n.1 (2023) (Alito, J., dissenting) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.").

diminished as a direct result of the EO.  States receive federal funding to cover portions of services like health insurance, special education, and foster care in amounts that depend on how many "eligible" children receive such services.  Citizenship is one component of eligibility for purposes of these programs.  Pursuant to the EO, fewer children will be recognized as citizens at birth.  That means the number of persons receiving services who are "eligible" under the identified federal programs will fall—and, as a direct result, the reimbursements and grants the State plaintiffs receive for these services will decrease.  The reduction to such funding is a concrete and imminent injury directly and fairly traceable to the EO, redressable by the injunctive relief the State plaintiffs seek.

This is all the Constitution requires.  Two decisions of the Supreme Court, both authored by Chief Justice Roberts, make the point.  In 2023, the Chief Justice, joined by five other Justices, explained that Missouri had standing to challenge executive action discharging federal student loans, where a quasi-state agency stood to lose fees it would have collected for servicing the forgiven loans.  Nebraska, 143 S. Ct. at 2366.  A few years earlier, the Chief Justice conveyed the Supreme Court's unanimous conclusion that "at least some" states had standing to challenge executive action revising the United States census.  New York, 588 U.S. at 767-68.[6] The proposed changes at issue raised the likelihood that persons without lawful immigration status would be undercounted, and states faced reductions in federal funds allocated according to population.  Id.  The State plaintiffs here challenge the EO based on precisely the same sort of direct financial impacts.  They have identified federal grants and reimbursements to which they

---

[6] Though some Justices parted ways as to other issues in the case, all agreed as to standing.

are entitled that will diminish under the EO.  As in <u>Nebraska</u> and <u>New York</u>, therefore, the State plaintiffs have Article III standing.[7]

The defendants have neither disputed the State plaintiffs' showing of harm nor materially distinguished the Chief Justice's analysis.  Their standing challenge hinges on an attempt to analogize this case to <u>United States v. Texas</u>.  There, the Supreme Court held state plaintiffs lacked standing to compel the federal government to pursue more "arrests and prosecutions" for violations of immigration laws.  599 U.S. at 678-79.  The analogy is inapt.[8] <u>Texas</u> involved "novel" theories of standing and a "highly unusual" claim that the Executive Branch was not sufficiently vigorous in exercising its prosecutorial discretion.  <u>Id.</u> at 681, 684. This case, however, concerns the bounds of citizenship guaranteed by the Constitution—not an

---

[7] The Court does not consider a *parens patriae* theory of standing, because the State plaintiffs are not pursuing it.  The State plaintiffs also probably have standing based on their sovereign interests.  The Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside.  U.S. Const. amend. XIV, § 1. States have general sovereign interests in which persons are their citizens.  They very likely also have sovereign interests in which persons are U.S. citizens, as state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship.  <u>E.g.</u>, N.J. Stat. Ann. § 2B:20-1(c); Mass. Gen. Laws ch. 234A, § 4.  The defendants essentially conceded at the motion hearing that the State plaintiffs would have standing under these theories, but suggested the theories were "forfeited," at least "[f]or purposes of deciding [the pending] motion[s]," because they were not advanced in the State plaintiffs' submissions thus far.  Mot. Hr'g Tr. at 40, 63.  The defendants cited no authority for their forfeiture theory.  The plaintiffs generally endorsed the sovereign-interest theories during the hearing.  Given the strength of the plaintiffs' showing of direct financial harms, the Court need not resolve whether the State plaintiffs' sovereign interests supply an alternative basis for satisfying Article III.
[8] In fact, the defendants' discussion of <u>Texas</u> in their papers verges on misleading.  The language upon which they most heavily rely appears in a footnote quoted in their opposition memorandum and referenced during the motion hearing.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 18-19 (quoting <u>Texas</u>, 599 U.S. at 680 n.3).  Contrary to the defendants' characterization, that footnote is not a "holding," and it does not "foreclose[]" the State plaintiffs' standing in this case.  <u>Id.</u>  Rather, it acknowledges that "States sometimes have standing to sue . . . an executive agency or officer," and though it warns that "standing can become more attenuated" when based on "indirect effects" of federal action, it stops short of saying such effects could never satisfy Article III.  <u>Id.</u> This case, in any event, concerns direct effects.

area typically reserved for executive discretion.  The theory of standing advanced by the State

plaintiffs—direct financial harm—is ordinary.[9]  Texas simply does not aid the defendants here.

The defendants have not challenged the standing of Doe or her co-plaintiffs to sue—nor

could they.  Doe has plainly established injury, to herself and her unborn child, that is concrete,

imminent, traceable to the EO, and redressable by the relief she seeks in this lawsuit.  The same

is true of the association plaintiffs, which provide services impacted by the EO and have

described one or more members facing the same type of injury as Doe.  See Summers v. Earth

Island Inst., 555 U.S. 488, 498 (2009) (requiring, for associational standing, "specific allegations

establishing that at least one identified member had suffered or would suffer harm"); see also

United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 551-53 (1996)

(describing test for associational standing).

Accordingly, the defendants' standing challenge fails.  All plaintiffs before the Court

have satisfied Article III.

2.  *Cause of Action*

Next, the defendants assert the Court must deny the pending motions because no plaintiff

has a valid cause of action under the Citizenship Clause or the identified federal statutes.  This is

meritless.

As Justice Scalia observed, "[t]he ability to sue to enjoin unconstitutional actions by state

and federal officers is the creation of courts of equity, and reflects a long history of judicial

---

[9] The harms the State plaintiffs have identified are not "indirect"—indeed, when specifically
asked, the defendants failed to identify any "extra step" separating the loss of funding identified
by the State plaintiffs from the EO's direct effects.  Mot. Hr'g Tr. at 37-39.  Nor do they arise, as
defendants argue, exclusively from services "the states have *voluntarily* chosen to provide."
New Jersey, Doc. No. 92 at 20; see Plyler v. Doe, 457 U.S. 202, 230 (1982) (holding states are
required by federal law to provide public education services to all children, regardless of
immigration status).

review of illegal executive action, tracing back to England." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief" to prevent "violations of federal law" planned or committed by "state officers" or "by federal officials." Id. at 326-27. The plaintiffs here ask the Court to do just that.[10]

Limitations that apply where plaintiffs seek damages, rather than equitable relief, have no bearing on the claims pending here. See New Jersey, Doc. No. 92 at 24 (citing DeVillier v. Texas, 601 U.S. 285, 291 (2024)). Nor can the defendants short-circuit this lawsuit by pointing to a narrow provision of the INA providing an avenue for a "national of the United States" to challenge discrete denials of rights or privileges. See id. (invoking 8 U.S.C. § 1503(a)). That statute does not facially create an exclusive remedy for such claims, nor does it offer an adequate alternative to the claims advanced in these actions—including, but not only, because it is not a mechanism through which the State plaintiffs can obtain relief. Cf. Rusk v. Cort, 369 U.S. 367, 375 (1962) (considering related provisions of same statute and concluding they were not exclusive means of asserting rights associated with citizenship).

The defendants' threshold challenges fail under clear Supreme Court precedent. The plaintiffs assert valid causes of action and have standing to pursue them. The Court, therefore, turns to the substance of the pending motions.

---

[10] In fact, the Department of Justice is doing precisely what it says the plaintiffs cannot do. The day before this Court's motion hearing, the United States sued Illinois and various state and local officials, seeking equitable relief via claims brought directly under the Supremacy Clause. See Compl., United States v. Illinois, No. 25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1; cf. New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (discussing equitable doctrine of "judicial estoppel," which in some circumstances prevents parties that have taken one legal position from reversing course "simply because [their] interests have changed" (cleaned up)). During the motion hearing, the State plaintiffs raised this issue, and the defendants offered no response.

B.    <u>Preliminary Injunction Analysis</u>[11]

The familiar standard governs the plaintiffs' requests for interlocutory relief. To secure the "extraordinary remedy" provided by preliminary injunctions, each group of plaintiffs "must establish" that: 1) they are "likely to succeed on the merits," 2) they are "likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their] favor," and 4) "an injunction is in the public interest." <u>Winter v. Nat. Def. Res. Council, Inc.</u>, 555 U.S. 7, 20 (2008).

"The first two factors of the traditional standard are the most critical." <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009). Courts consider them in tandem. <u>See</u> <u>Vaqueria Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (noting "irreparable harm is not a rigid" factor, but rather "a sliding scale, working in conjunction with" the first factor); <u>EEOC v. Astra U.S.A., Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996) ("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief."). The third and fourth factors of the injunction test "merge when the Government is the opposing party." <u>Nken</u>, 556 U.S. at 435.

---

[11] The defendants proposed, in a footnote, that the Court proceed now to enter or deny a final, permanent injunction. <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 50 n.6. The plaintiffs expressed no objection to this proposal during the motion hearing, agreeing that the Court could now enter a final injunction if it concluded an injunction was warranted. After consideration, the Court resolves now only the plaintiffs' original requests for preliminary relief. The defendants are correct that the plaintiffs' causes of action "are purely legal," <u>id.</u>, but they are wrong to imply that facts are immaterial here. The test for injunctive relief requires the plaintiffs to prove, and the Court to evaluate, questions of harm that bear on the scope of any permanent relief ultimately awarded. Though the defendants have leveled no challenges to the plaintiffs' factual submissions, the Court has an independent duty to ensure that any relief provided is appropriately tailored to address the harms established by the parties before it. <u>Cf.</u> <u>DraftKings Inc. v. Hermalyn</u>, 118 F.4th 416, 423 (1st Cir. 2024) (noting trial judge is "uniquely placed to design" injunctive relief that corresponds to "specific harm" proven based on facts found by judge). To that end, further factual development may be required before the Court crafts a final judgment.

Measured against these standards, the plaintiffs' submissions support entry of the injunctions they seek, with only minor adjustments explained below.

1. *Likelihood of Success*

"The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor: "likelihood of success on the merits." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). This factor weighs strongly in the plaintiffs' favor. The plain language of the Citizenship Clause—as interpreted by the Supreme Court more than a century ago and routinely applied by all branches of government since then— compels a finding that the plaintiffs' challenges to the EO are nearly certain to prevail.

The Citizenship Clause speaks in plain and simple terms. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The words chosen by the drafters and ratified by the states, understood "in their normal and ordinary" way, United States v. Sprague, 282 U.S. 716, 731 (1931), bestow birthright citizenship broadly to persons born in the United States. The text is directed at the person born (or naturalized). It does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents. So, at the outset, the EO and its focus on the immigration status of a child's parents find no support in the text.

One phrase in the Citizenship Clause is at the heart of the parties' disagreement. The constitutionality of the EO, and the success of the plaintiffs' claims, turns on the meaning of "subject to the jurisdiction thereof." To understand that phrase, however, this Court need look no further than United States v. Wong Kim Ark, 169 U.S. 649 (1898).[12] In that case, the

---

[12] In a line of cases not directly relevant here, courts have considered whether a person born in an unincorporated territory of the United States—such as American Samoa or, for a time, the

Supreme Court meticulously reviewed the contours of citizenship under English and early American common law, under the 1866 Civil Rights Act and the Fourteenth Amendment, and as reflected in legal scholarship and court decisions in the decades leading up to the turn of the twentieth century. See generally id. at 653-704. From these sources, the Supreme Court concluded that "subject to the jurisdiction thereof" was meant "to exclude, by the fewest and fittest words," the following categories of persons: "children of members of the Indian tribes," "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state."[13] Id. at 682. As to all other persons, "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents," applied. Id. at 689.[14]

Applying this longstanding and "fundamental rule of citizenship," the Supreme Court held that the petitioner—born in the United States to Chinese-citizen parents, who were living and working in the United States at the time of the child's birth, but who were prevented by law from naturalizing and eventually returned to China—was a citizen "by virtue of the

Philippines—was born "in the United States" for purposes of the Citizenship Clause. E.g., Tuaua v. United States, 788 F.3d 300, 302 (D.C. Cir. 2015). That language is not the focus of the present dispute, nor was it the Supreme Court's focus in Wong Kim Ark.

[13] Neither the EO nor the defendants' brief has suggested that all (or any) persons within the EO's categories are "children born of alien enemies in hostile occupation," specified which portions of the country are presently so occupied, or identified which foreign powers or organizations are the "enemies" presently controlling those areas. See New Jersey, Doc. No. 92 at 38 (quoting another Executive Order and summarily stating that plaintiffs' view might grant citizenship to children of "unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks"). Accordingly, the Court need not consider this exception to birthright citizenship.

[14] This rule has been reiterated by the Supreme Court. See, e.g., Perkins v. Elg, 307 U.S. 325, 329 (1939) (citing Wong Kim Ark majority's "comprehensive review" supporting "decision . . . that a child born here of alien parentage becomes a citizen of the United States"); Weedin v. Chin Bow, 274 U.S. 657, 660, 670 (1927) (stating "learned and useful opinion" of Wong Kim Ark majority "held that . . . one born in the United States, although . . . of a parentage denied naturalization under the law, was nevertheless . . . a citizen" under Fourteenth Amendment).

[C]onstitution itself."  Wong Kim Ark, 169 U.S. at 652-53, 703-05.  This holding followed "irresistibly" from the extensive analysis the majority articulated.  Id. at 693.  Throughout that analysis, the availability of birthright citizenship "irrespective of parentage" was repeatedly emphasized.  E.g., id. at 690.  The duration of the parents' residency in the United States was not assessed, nor did laws preventing the parents from seeking naturalization influence the Court's determination of the petitioner's status.  The question was resolved, for purposes of the Citizenship Clause, by the location of the petitioner's birth, and the inapplicability of the narrow exceptions to birthright citizenship that had been identified by the Court.  Understood this way— indeed, the way all branches of government have understood the decision for 125 years—Wong Kim Ark leaves no room for the defendants' proposed reading of the Citizenship Clause.  Of course, the defendants can seek to revisit this long-settled rule of law, but that is a matter for the Supreme Court, not a district judge.

The defendants accept that this Court is bound by the prior holdings of the Supreme Court.  See New Jersey, Doc. No. 92 at 44; Mot. Hr'g Tr. at 48.  Nevertheless, they urge the Court to essentially ignore all but a handful of sentences from Wong Kim Ark, arguing the bulk of the majority's lengthy opinion is dicta.  See New Jersey, Doc. No. 92 at 44 (urging Wong Kim Ark resolved only whether Citizenship Clause extended to "children of parents with 'a permanent domicile and residence in the United States,'" and that "[t]he case should not be read as doing anything more than answering that question" (quoting 169 U.S. at 653)).  At the motion hearing, the defendants doubled down on this point, brazenly claiming that "dicta can be disregarded."  Mot. Hr'g Tr. at 75.  That position reflects a serious misunderstanding at best— and a conscious flouting at worst—of the judicial process and the rule of law.

Lower federal courts are not merely obligated to apply the holdings of Supreme Court decisions; they also "are bound by the Supreme Court's 'considered dicta.'" United Nurses & Allied Prof'ls v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)). "Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). If such a statement "bears the earmarks of deliberative thought purposefully expressed," concerns an issue that was "thoroughly debated in the recent past," and "has not been diluted by any subsequent pronouncement" of the Supreme Court, a lower federal court must adhere to it. Id.

To the extent the thorough analysis in Wong Kim Ark of the Fourteenth Amendment's common-law foundations, the purpose and intent of its drafters, and its application during the first thirty years after its ratification can be called "dicta" at all, it is undoubtedly the "considered" and "authoritative" sort that this Court is bound to apply. The sheer detail and length of the discussion by the Court's majority make this plain. Add to that the fact that the opposite view—the one the defendants advance to justify the EO—was rejected by the majority in Wong Kim Ark (in the portions of the decision now labeled "dicta" by the defendants) and endorsed only by the dissent. See 169 U.S. at 705-32. The plaintiffs are not relying on a stray "remark" that lacks "care and exactness," standing "wholly aside from the question in judgment" and "unsupported by any argument, or by any reference to authorities," that might not "control the judgment" of a lower court. 169 U.S. at 678. They are "leaning into" the central reasoning of the Supreme Court in support of its holding. Mot. Hr'g Tr. at 48. The defendants' argument to the contrary invites the Court to commit legal error.

Whether "holding" or "considered dicta," the straightforward rule and limited exceptions identified in Wong Kim Ark and summarized above have been applied repeatedly and without hesitation, including by the Supreme Court and the First Circuit.  For example:

- In Morrison v. California, despite statutes that then rendered Japanese persons "ineligible" for citizenship via naturalization, the Supreme Court stated without qualification: "A person of the Japanese race is a citizen of the United State if he was born within the United States."  291 U.S. 82, 85 (1934).

- In Dos Reis ex rel. Camara v. Nicolls, the First Circuit described a person "born in Massachusetts" as having become "an American citizen, not by gift of Congress, but by force of the constitution," despite his parents' status as foreign nationals "never naturalized in the United States," and despite his own "dual nationality" that led to his "service as a draftee in the Portuguese army."  161 F.2d 860, 861-62 (1st Cir. 1947).

- In Kawakita v. United States, a person "born in this country in 1921 of Japanese parents who were citizens of Japan" was "a citizen of the United States by birth"—a status the person did not lose despite later committing treason by acts of cruelty undertaken while working at a Japanese camp for American prisoners during World War II.  343 U.S. 717, 720 (1952).  See also Nishikawa v. Dulles, 356 U.S. 129, 131 (1958) (finding Japanese military service during World War II was basis for expatriation of U.S.-born citizen of Japanese-citizen parents only if service was voluntary); Hirabayashi v. United States, 320 U.S. 81, 96-97 (1943) (noting, in context of World War II, that tens of thousands of "persons of Japanese descent" living on Pacific coast "are citizens because born in the United States," even though "under many circumstances" they also were citizens of Japan "by Japanese law").

- In United States ex rel. Hintopoulous v. Shaughnessy, all members of the Supreme Court considered a child born to foreigners, both of whom had entered the U.S. with temporary permission but remained after their authorization expired, to be "of course[] an American citizen by birth," despite the parents' "illegal presence."  353 U.S. 72, 73 (1957); see id. at 79 (reflecting dissent's agreement that the child was a citizen).

- In INS v. Errico, two different children "acquired United States citizenship at birth" despite their parents having gained admission to this country by misrepresenting material facts about themselves and thereby evading statutory restrictions on lawful immigration. 385 U.S. 214, 215-16 (1966).

- In INS v. Rios-Pineda, a unanimous Supreme Court viewed a child "born in the United States" as "a citizen of this country," even though the father had entered the country "illegally" on his own and "returned to Mexico . . . under threat of deportation"; both parents had then "paid a professional smuggler . . . to transport them" across the border; and the father, when apprehended again, had failed to depart voluntarily "as promised." 471 U.S. 444, 446 (1985).

- In <u>Hamdi v. Rumsfeld</u>, at least six Justices treated the petitioner as a citizen of the United States based on his birth in Louisiana, without even discussing his parents' status (they were present lawfully but temporarily), despite the petitioner's active participation in a foreign terrorist organization.  542 U.S. 507, 510 (2004).[15]

- In <u>Mariko v. Holder</u>, a panel of the First Circuit considered a child "born in the United States" to be "a United State citizen" despite the parents' concession that both of them "were here illegally" and therefore removable.  632 F.3d 1, 3, 8 n.4 (1st Cir. 2011).

- In <u>Hasan v. Holder</u>, a different panel of the First Circuit similarly viewed as "a U.S. citizen" a child born in California to foreign-national parents who had overstayed their nonimmigrant visas.  673 F.3d 26, 28 & n.1 (1st Cir. 2012).

This line of decisions—which is not limited to the cases described above—further undermines the defendants' proposed interpretation.[16]

If that were not enough to find that the plaintiffs are likely to succeed on the merits (and it is), the fact that Congress incorporated the language of the Citizenship Clause into provisions of the INA passed more than forty years after <u>Wong Kim Ark</u> cements the meaning of the disputed phrase and provides the plaintiffs an independent avenue to prevailing here.  In the INA, Congress conferred birthright citizenship via statute on several categories of individuals, the first of which is described using language mirroring the Citizenship Clause.  8 U.S.C.

---

[15] Justice Scalia, joined by Justice Stevens, referred to Hamdi as a "presumed American citizen." 542 U.S. at 554 (Scalia, J., dissenting); <u>see</u> <u>Hamdi v. Rumsfeld</u>, 243 F. Supp. 2d 527, 534 (E.D. Va. 2002) (noting Hamdi had "identified himself as a Saudi citizen who had been born in the United States" when detained and interrogated by the American military).  No justice took up the invitation of one amicus in the case to revisit the meaning of the Citizenship Clause, correct the "erroneous interpretation" adopted in <u>Wong Kim Ark</u>, and conclude Hamdi was not a citizen because his parents, though living in Louisiana lawfully at the time of his birth, had only temporary work visas authorizing their presence in this country.  <u>See</u> Br. Amicus Curiae The Claremont Inst. Ctr. Const. Jurisprudence at 2-3, 5, <u>Hamdi v. Rumsfeld</u>, No. 03-6696, 2004 WL 871165 (U.S. Mar. 29, 2004).

[16] So does the fact that the Supreme Court has cited <u>Wong Kim Ark</u> as an example of how to properly assess the original meaning of language in the Constitution or a federal statute.  <u>See</u> <u>Standard Oil Co. v. United States</u>, 221 U.S. 1, 59 & n.6 (1911); <u>cf.</u> <u>BNSF Ry. Co. v. Loos</u>, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (citing <u>Wong Kim Ark</u> majority opinion as authority reflecting "everyone agrees" that "record of *enacted* changes Congress made" to relevant text "over time" is "textual evidence" that "can sometimes shed light on meaning").

§ 1401(a) (confirming citizenship of "a person born in the United States, and subject to the jurisdiction thereof").  As the plaintiffs point out, this provision was enacted in 1940 and "re-codified" in 1952.  See Doe, Doc. No. 33 at 2; see also Doe, Doc. No. 11 at 15 (raising statutory claim and advancing brief but distinct argument about likelihood of success thereunder). Because it uses the same language chosen by the Fourteenth Amendment's drafters—words that had been studied in Wong Kim Ark decades earlier—the statute must be understood to have incorporated the Supreme Court's interpretation of those words.  See Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020) (explaining statute "normally" is interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment").[17]

Here, the fundamental rule conveyed by the Citizenship Clause was clear by the time § 1401 was enacted, and the legislators who chose to include the same phrase the Supreme Court already had examined presumably intended the same words would be accorded the same meaning in both contexts.  See Taggart v. Lorenzen, 587 U.S. 554, 560 (2019) (recognizing "longstanding interpretive principle" that if statutory term "is obviously transplanted from another legal source, it brings the old soil with it" (cleaned up)).  Thus, the statute supports a related but distinct claim upon which the plaintiffs are likely to succeed.[18]

---

[17] Justice Gorsuch went on to explain why this is so: "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, . . . we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations."  Bostock, 590 U.S. at 654-55.

[18] The defendants advance no separate challenge to the plaintiffs' statutory claim, choosing to "focus . . . on the constitutional provision" which is "coterminous" with the statute.  New Jersey, Doc. No. 92 at 25 n.4.  By opting not to address the statute, or the manner in which its enactment necessarily strengthens the plaintiffs' interpretation of the relevant language, the defendants have waived any discrete argument related to the statutory claim for purposes of the pending motions. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived").

Beyond sidestepping <u>Wong Kim Ark</u>, the defendants urge the Court to read three specific requirements into the phrase "subject to the jurisdiction thereof." The defendants contend these requirements are necessary to ensure adherence to the phrase's original meaning. None of these requirements, however, find support in the text itself or the cases construing and applying it. And, more importantly, each of them, if applied as argued, would prevent the Citizenship Clause from reaching groups of persons to whom even the defendants concede it must apply.

<u>First</u>, the defendants suggest the "jurisdiction" phrase is satisfied only by persons who owe the United States "allegiance" that is "direct," "immediate," "complete," and "unqualified by allegiance to any alien power." <u>New Jersey</u>, Doc. No. 92 at 27-28 (cleaned up). Certainly, allegiance matters. Various sources link the "jurisdiction" phrase and concepts of allegiance, including <u>Wong Kim Ark</u>. <u>See, e.g.</u>, 169 U.S. at 654 (noting English common law provided citizenship to those "born within the king's allegiance, and subject to his protection"). The defendants veer off course, however, by suggesting allegiance must be exclusive, and that it derives from the status of a child's parents. If that were so, then the children of dual citizens or LPRs could not receive birthright citizenship via the Fourteenth Amendment. A dual citizen necessarily bears some allegiance to both the United States and the second nation of which they are a citizen. LPRs, unless and until naturalized, remain foreign nationals who are citizens of other countries bearing some allegiance to their places of origin. This principle would also rule out the petitioner in <u>Wong Kim Ark</u>, whose parents resided for years in the United States but remained "subjects of the emperor of China" (and, indeed, returned to China when their U.S.-born son was a teenager). 169 U.S. at 652-53. The defendants, however, agree that children of dual citizens and LPRs are entitled to birthright citizenship, and that the petitioner in <u>Wong Kim Ark</u> was as well.

These anomalies are avoided by focusing on the allegiance of the child, not the parents. As noted earlier, the Citizenship Clause itself speaks only of the child. A child born in the United States necessarily acquires at birth the sort of allegiance that justified birthright citizenship at the common law. That is, they are born "locally within the dominions of" the United States and immediately "derive protection from" the United States. Id. at 659. A child born here is both entitled to the government's protection and bound to adhere to its laws. This is true regardless of the characteristics of the child's parents, subject only to the narrow exceptions identified in Wong Kim Ark. Allegiance, in this context, means nothing more than that. See id. at 662 ("Birth and allegiance go together."). As James Madison explained:

> It is an established maxim that birth is a criterion of allegiance. Birth however derives its force sometimes from place and sometimes from parentage, but in general place is the most certain criterion; it is what applies in the United States; it will be therefore unnecessary to investigate any other.

Founders Online, Citizenship, Nat'l Archives (May 22, 1789), https://founders.archives.gov /documents/Madison/01-12-02-0115 [https://perma.cc/ZC4B-NS9R]. So, "allegiance" does not mean what the defendants think it means, and their first proposed rule founders.[19]

Next, the defendants seek to graft concepts of social-contract theory onto the "jurisdiction" clause of the Fourteenth Amendment by arguing birthright citizenship requires "mutual consent between person and polity." New Jersey, Doc. No. 92 at 45. The defendants again center their argument on the parents at the expense of the child whose birthright is at stake—perhaps, in part, because infants are incapable of consent in the legal sense. In the

---

[19] To the extent the defendants believe temporary, lawful visitors to this country are people who "do not owe an allegiance to the United States," Mot. Hr'g Tr. at 55, the Supreme Court disagrees, see Wong Kim Ark, 169 U.S. at 685 (quoting Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 144 (1812), and its description of the "temporary and local allegiance" private visitors from other countries owe the United States while passing through or doing business here).

defendants' view, mutual consent is lacking where a person (the parent) has entered the United States without permission to do so, or without permission to remain here permanently. The absence of "mutual consent" in those circumstances means, according to the defendants, that the children of such parents fall beyond the "jurisdiction" of the United States for Fourteenth Amendment purposes.

This argument fares even worse than the first. The Fourteenth Amendment enshrined in the Constitution language ensuring "the fundamental principle of citizenship by birth" in the United States applied regardless of race—including, and especially, to formerly enslaved persons. 169 U.S. at 675; see Afroyim v. Rusk, 387 U.S. 253, 262-63 (1967). The defendants do not (and could not) deny this. Enslaved persons, of course, did not "consent" to come to the United States or to remain here. They were brought here violently, in chains, without their consent. These conditions persisted after their arrival. Against this backdrop, it verges on frivolous to suggest that Congress drafted, debated, and passed a constitutional amendment, thereafter enacted by the states, that imposed a consent requirement necessarily excluding the one group of people the legislators and enactors most specifically intended to protect.

Finally, the defendants seek to transform the use of the term "reside" at the end of the Citizenship Clause into a basis for finding that the "jurisdiction" phrase eliminates any person without a lawful "domicile" in the United States. The defendants contend that persons here with temporary visas retain "domiciles" in their native countries, and persons here without lawful status cannot establish a true "domicile." And so, the argument goes, they cannot "reside" in any state, and they remain outside the "jurisdiction" of the United States for Fourteenth Amendment purposes. This, once again, shifts the focus away from the child and the location of birth to the parents and the status and duration of their presence in this country.

The word "reside" appears in the Citizenship Clause only in the phrase specifying that a person entitled to birthright citizenship becomes a citizen not only of the United States, but also of the state where they live.  For example, a state within the former Confederacy (or any other state) could not constitutionally deny state citizenship to the child of a formerly enslaved person who lived and gave birth there.  The word "reside" does not inject a "domicile" requirement limiting the reach of the Citizenship Clause as a whole and justifying examination of the immigration status of a child's parents.  See New Jersey, Doc. No. 123 at 11-12 (articulating the flaws in this theory).  In any event, it is not so clear that "illegal entry into the country would . . . , under traditional criteria, bar a person from obtaining domicile within a State." Plyler, 457 U.S. at 227 n.22.

In sum, the defendants invite the Court to adopt a set of rules that work (except when they don't).  None of the principles the defendants advance are sturdy enough to overcome the settled interpretation and longstanding application of the Citizenship Clause described above. Each principle, applied uniformly, would lead to unintended results at odds with the text, meaning, and intent of the Fourteenth Amendment—and, in some instances, with the parameters set out in the EO itself.

For all these reasons, the Court finds the plaintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims.  This conclusion would allow the plaintiffs to "show somewhat less in the way of irreparable harm."  Astra U.S.A., 94 F.3d at 743.  That relaxed burden, however, is not essential, as the second factor also favors the plaintiffs strongly.

### 2. *Irreparable Harm*

The plaintiffs have supported their assertions of irreparable harm with numerous declarations detailing the imminent and damaging impacts they anticipate will flow from the EO.

See Doe, Doc. Nos. 11-1 to -10; New Jersey, Doc. Nos. 5-2 to -21, -23.[20]  Upon review, the

Court accepts and credits those declarations, which the defendants have not disputed or rebutted

in any way.  The declarations establish that the State plaintiffs do not stand to lose discrete

amounts of one-time funds; they face unpredictable, continuing losses coupled with serious

administrative upheaval.  They have established irreparable harm.

    As for the Doe plaintiffs, what is at stake is a bedrock constitutional guarantee and all of

its attendant privileges.  The loss of birthright citizenship—even if temporary, and later restored

at the conclusion of litigation—has cascading effects that would cut across a young child's life

(and the life of that child's family), very likely leaving permanent scars.  The record before the

Court establishes that children born without a recognized or lawful status face barriers to

accessing critical healthcare, among other services, along with the threat of removal to countries

they have never lived in and possible family separation.[21]  That is irreparable harm.[22]

---

[20] Not every State plaintiff has submitted its own declarations, but the complaint alleges that all
face the same categories of harm.  E.g., New Jersey, Doc. No. 1 ¶ 122.  The record supports that
allegation, for example, by reflecting that each official attesting to health-insurance-related
impacts describes the same federal programs used the same way and forecasts the loss of the
same types of federal reimbursements.  See, e.g., Doc. Nos. 5-2, -6, -11, -12, -16, -19.  At this
stage, that is enough to find that all State plaintiffs would suffer irreparable harm absent
injunctive relief.  The defendants do not contend otherwise.
[21] Doe, for example, has a pending asylum petition and an older child who is a U.S. citizen by
birthright—assuming the defendants do not later reconsider the effective date contained in the
EO and opt to apply their reading of the Citizenship Clause retroactively, a possibility they did
not definitively rule out during the motion hearing.  Mot. Hr'g Tr. at 45-47.  Her family would be
placed at a distressing crossroads if her new baby were to face removal from the country.
[22] The defendants' only responses are to suggest that the plaintiffs wait and see how the EO will
be implemented, and hope that Doe's asylum application is granted.  Or, in the worst case, "if
any removal action were initiated against the children of any of the private plaintiffs at issue in
this case, the [child] subject of the action could assert their claim to citizenship as defense in that
proceeding."  New Jersey, Doc. No. 92 at 48.  That answer is not persuasive.  Cf. Texas v.
EEOC, 933 F.3d 433, 448 & n.29 (5th Cir. 2019) (stating "it would strain credulity to find that
an agency action targeting" conduct the agency has deemed "presumptively unlawful" would not
trigger implementation "immediately enough to constitute" nonspeculative injury).

The plaintiffs in both cases have shown they are likely to suffer substantial and irreparable harm in the absence of a preliminary injunction. Thus, the two most important factors strongly favor the plaintiffs.

3.    *Balance of Harms and Public Interest*

The final merged factors also support the plaintiffs' requests for relief. On the plaintiffs' side of the scales, there is a grave risk of significant and irreparable harm arising from the EO. Children not yet born will be stripped of birthright citizenship constitutionally guaranteed to them, as confirmed by settled law and practice spanning more than a dozen decades. They will be deprived of a "title" that is, as "Justice Brandeis observed, . . . superior to the title of President." Tuaua, 788 F.3d at 301. And that harm will arise from an EO that is unconstitutional on its face—an assessment that has now been echoed by multiple federal courts in different jurisdictions. E.g., Prelim. Inj. Order at 6, N.H. Indonesian Cmty. Support v. Trump, No. 25-cv-38 (D.N.H. Feb. 11, 2025), ECF No. 79.

It is difficult to imagine a government or public interest that could outweigh the harms established by the plaintiffs here. Perhaps that is why the defendants have identified none. Instead, they point only to the Executive Branch's discretion in matters of immigration. New Jersey, Doc. No. 92 at 49. But this case is not about how "to manage the immigration system." Id. It is about the Constitution's guarantee of citizenship by virtue of birth. When this right was enshrined in the Fourteenth Amendment, it was moved firmly beyond the bounds of the "core executive authority" the defendants invoke. Id.; see Afroyim, 387 U.S. at 263 (noting framers of Fourteenth Amendment "wanted to put citizenship beyond the power of any governmental unit to destroy"). The defendants' only argument, therefore, adds nothing to their side of the scales.

Though the government has waived any other arguments on these final factors by not developing them in its opposition memorandum, see Zannino, 895 F.2d at 17, the Court makes

two more observations.  First, the government has no legitimate interest in pursuing unconstitutional agency action; "it is always in the public interest to prevent the violation of a party's constitutional rights." Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned up); accord League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).  Second, an injunction will do no more than maintain a status quo that has been in place for well over a century.  The defendants have not even attempted to demonstrate how they or the public will be harmed by continuing, for the duration of this action, to adhere to the interpretation of birthright citizenship that has been consistently applied by the Executive Branch throughout that time period—including under this President during his first term in office.

The scales tip decisively toward the plaintiffs.  Because all factors favor entry of injunctive relief, the Court ends by explaining the appropriate parameters of such relief.

C.    Scope of Injunction

Both sets of plaintiffs ask the Court to universally enjoin the defendants from implementing the EO.  That is, they seek an order that prevents the defendants from applying the EO not only to them—to Doe, to members of the plaintiff associations, and to the State plaintiffs—but at all, to anyone, anywhere.  Orders like those the plaintiffs seek here have become "increasingly common" over the last twenty years.  Dep't of Homeland Sec. v. New York, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring in grant of stay); see generally Developments in the Law—District Court Reform: Nationwide Injunctions, 137 Harv. L. Rev. 1701, 1703-15 (2024) (quantifying rise in such injunctions and examining consequences).  That trend raises meaningful concerns about the appropriate scope of a single district judge's equitable powers.  See Trump v. Hawaii, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring) (examining reasons to be "skeptical that district courts have the authority to enter universal injunctions").

Alluding to such concerns, the defendants urge the Court to enter relief that is limited in scope. New Jersey, Doc. No. 92 at 49-50. Though the defendants have not proposed specific terms, two of the limitations they urge merit consideration.[23] First, the defendants argue "the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief." Id. at 50. As explained above, the Court has concluded all plaintiffs are so entitled. But that conclusion does not alone justify relief that is universal in scope. The Court still must confront the general principle that injunctive relief should be tailored to the parties before it. Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs"). Here, the Court finds this principle leads to different results for the two sets of plaintiffs.

For Doe and the members of the two plaintiff organizations, the record before the Court does not demonstrate that universal relief is necessary to "provide complete relief to," and protect the rights of, those parties. An injunction that prevents the defendants and their agents from implementing and applying the EO against Doe or any member of either plaintiff organization suffices to protect them from harm during the pendency of this lawsuit. The record does not establish how awarding similar relief to other persons or organizations that are not parties to this lawsuit is necessary to provide complete relief to the Doe plaintiffs.

---

[23] The third, which urges the Court to reject any facial challenge to the EO and require "individual as-applied challenges," can be rejected out of hand. The plaintiffs have advanced substantial facial challenges that the Court has deemed likely to succeed. The defendants do not explain how their third proposal, which is supported only by a citation to general language from a criminal case in which injunctive relief was not at issue, has anything to do with the scope of injunctive relief. See New Jersey, Doc. No. 92 at 50.

Different considerations arise as to the State plaintiffs.  They have identified harms that do not hinge on the citizenship status of one child, or even of all children born within their borders.  The harms they have established stem from the EO's impact on the citizenship status— and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction.  For example, Massachusetts will suffer the identified harms not only if children born and living there are unlawfully denied citizenship, but also if a pregnant woman living in the northeastern part of the Commonwealth gives birth across the border in a nearby New Hampshire hospital, or if a family moves to Massachusetts from Pennsylvania (or any other state that has not joined this lawsuit) after welcoming a new baby.  These examples illustrate why injunctive relief limited to the State plaintiffs is inadequate.  In both, children born in states that are not parties to this lawsuit (such as New Hampshire and Pennsylvania) would theoretically lack birthright citizenship even after returning or moving to—and seeking various services in—a state that is among the plaintiffs here.

That result not only fails in providing complete relief to the State plaintiffs, but also risks creating a new set of constitutional problems.  See Saenz v. Roe, 526 U.S. 489, 500-04 (1999) (identifying as component of "right to travel" protected by Fourteenth Amendment "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State").  For the State plaintiffs, then, universal or nationwide relief is necessary to prevent them from suffering irreparable harm.  Cf. Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579-83 (2017) (narrowing in part but upholding in part injunction that protected nonparties similarly situated to the plaintiffs).

Only one issue remains.  The defendants assert the Court may not enjoin the President.[24] New Jersey, Doc. No. 92 at 50.  The Doe plaintiffs offer no response to this point, see generally Doe, Doc. No. 33, but the State plaintiffs disagree in a footnote citing instances where executive orders have been enjoined, see New Jersey, Doc. No. 123 at 15 n.8.  Assuming without deciding that this Court is empowered to issue an injunction directly constraining the President's actions in any set of circumstances, nothing in the record suggests such relief is necessary here.  The President has signed the EO.  No further action by him is described by the EO or predicted by the plaintiffs.  Other officers and agencies within the Executive Branch are responsible for implementing the EO, and it is their conduct that the plaintiffs really seek to restrain.  Thus, for purposes of the preliminary injunction, the relief will be awarded against all other defendants besides the President, and against any other officers or agents acting on behalf of the President, but not against the President himself.[25]

## III.    CONCLUSION

"What the Constitution has conferred neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert, may strip away."  Nishikawa, 356 U.S. at 138 (Black, J., concurring).  Here, the Constitution confers birthright citizenship broadly, including to persons within the categories described in the EO.  Under the plain language of the Citizenship Clause and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to the EO are likely to prevail, the plaintiffs face serious and irreparable harm in the absence of relief,

---

[24] They also suggest the Court should dismiss the President as a defendant, New Jersey, Doc. No. 92 at 50, but a request like that is properly advanced in a motion (not an opposition brief), after conferral and in compliance with the Local Rule governing motion practice in this Court.  See generally L.R. 7.1.

[25] Should circumstances arise that merit reconsideration of this aspect of the injunction, the plaintiffs may bring them to the Court's attention via an appropriate motion.

the defendants face no cognizable harm from a preliminary injunction, and the public interest is served by preventing the implementation of a facially unconstitutional policy.

Accordingly, the plaintiffs' motions (<u>Doe</u>, Doc. No. 10, and <u>New Jersey</u>, Doc. No. 3) are ALLOWED as described herein.  Separate orders will issue in each case memorializing the preliminary injunctions entered by the Court.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW JERSEY;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAI'I; STATE OF MAINE;
STATE OF MARYLAND; ATTORNEY
GENERAL DANA NESSEL FOR THE
PEOPLE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE OF
NEW YORK; STATE OF NORTH
CAROLINA; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF
WISCONSIN; and CITY & COUNTY OF
SAN FRANCISCO,

                          *Plaintiffs*,

          v.

DONALD J. TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; U.S. DEPARTMENT OF
HOMELAND SECURITY; BENJAMINE
HUFFMAN, in his official capacity as
Acting Secretary of Homeland Security; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY FINK, in
her official capacity as Acting Secretary of
Health and Human Services; U.S. SOCIAL
SECURITY ADMINISTRATION;
MICHELLE KING, in her official capacity
as Acting Commissioner of U.S. Social
Security Administration, and UNITED
STATES OF AMERICA,

                          *Defendants.*

No. 1:25-cv-10139

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs bring this action to protect their states, localities, and residents from the President's flagrantly unlawful attempt to strip hundreds of thousands American-born children of their citizenship based on their parentage.

2.      The principle of birthright citizenship has been enshrined in the Constitution for more than 150 years. The Citizenship Clause of the Fourteenth Amendment unambiguously and expressly confers citizenship on "[a]ll persons born" in and "subject to the jurisdiction" of the United States.  More than 125 years ago, the Supreme Court confirmed that this entitles a child born in the United States to noncitizen parents to automatic citizenship. *See United States v. Wong Kim Ark*, 169 U.S. 649 (1898). Congress subsequently codified that understanding in the Immigration and Nationality Act (8 U.S.C. § 1401). And the Executive Branch has long recognized that any attempt to deny citizenship to children based on their parents' citizenship or immigration status would be "unquestionably unconstitutional."

3.      President Trump now seeks to abrogate this well-established and longstanding Constitutional principle by executive fiat.  Just hours after taking office, he signed an executive order titled "Protecting the Meaning and Value of American Citizenship," (attached hereto as Exhibit A), which declares that birthright citizenship does not extend to any child born in the United States to a mother who is unlawfully present or lawfully present on a temporary basis and a father who is neither a U.S. citizen nor a lawful permanent resident. On the basis of this unlawful declaration, the President prescribes that the federal government shall not issue or recognize any document recognizing citizenship for any such child born after February 19, 2025. The President has no authority to rewrite or nullify a constitutional amendment or duly enacted statute. Nor is he empowered by any other source of law to limit who receives United States citizenship at birth.

4.      If this unprecedented executive action is allowed to stand, both Plaintiffs and their residents will suffer immediate and irreparable harm. Every year, thousands of children are born in Plaintiffs' jurisdictions to parents who lack legal status or have a lawful status on a temporary basis. Under the Order, such children born after February 19, 2025—who would have been unquestionably deemed citizens had they been born two days ago—will lack any legal status in the eyes of the federal government. They will all be deportable, and many will be stateless. They will lose the ability to access myriad federal services that are available to their fellow Americans. And despite the Constitution's guarantee of their citizenship, they will lose their rights to participate in the economic and civic life of their own country—to work, vote, serve on juries, and run for certain offices.

5.      The Order will also cut federal funding on which Plaintiff States rely to provide essential services to the most vulnerable children living within their borders:  basic healthcare access for low-income children, foster care services for neglected and abused kids, and early interventions for infants, toddlers, and students with disabilities.  Plaintiffs will also be required—on no notice and at considerable expense—to immediately begin modifying their administration of benefits programs to account for this change.

6.      The Court should declare that the policy announced by the Order is unlawful and enjoin any actions taken to implement it.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The

Commonwealth of Massachusetts is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Massachusetts.

## PARTIES

**A.    Plaintiffs**

9.      The Commonwealth of Massachusetts is a sovereign state of the United States of America.

10.     The Attorney General of Massachusetts is the Commonwealth's chief lawyer and law enforcement officer and is authorized to act in federal court on behalf of the Commonwealth on matters of public concern.

11.     Massachusetts is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Massachusetts, receiving benefits in Massachusetts, and receiving government services in Massachusetts, harms Massachusetts' sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

12.     The State of New Jersey is a sovereign state of the United States of America.

13.     The Attorney General of New Jersey is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

14.     New Jersey is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in New Jersey, receiving benefits in New Jersey, and receiving government services in New Jersey, harms New Jersey's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

15.     The State of California is a sovereign state of the United States of America.

16.    The Attorney General of California is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

17.    California is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in California, receiving benefits in California, and receiving government services in California, harms California's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

18.    The State of Colorado is a sovereign state of the United States of America.

19.    The Attorney General of Colorado is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

20.    Colorado is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Colorado, receiving benefits in Colorado, and receiving government services in Colorado, harms Colorado's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

21.    The State of Connecticut is a sovereign state of the United States of America.

22.    The Attorney General of Connecticut is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

23.    Connecticut is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Connecticut, receiving benefits in Connecticut, and receiving government services in Connecticut, harms Connecticut's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

24.    The State of Delaware is a sovereign state of the United States of America.

25.    The Attorney General of Delaware is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

26.    Delaware is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Delaware, receiving benefits in Delaware, and receiving government services in Delaware, harms Delaware's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

27.    The District of Columbia (the "District") is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.

28.    The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

29.    The District of Columbia is aggrieved and has standing to bring this action because Defendants' efforts to strip citizenship from United States citizens born and residing in the District, receiving benefits in the District, and receiving government services in the District, harms the District's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

30.    The State of Hawai'i is a sovereign state of the United States of America.

31.    The Attorney General of Hawai'i is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

32.     Hawai'i is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Hawai'i, receiving benefits in Hawai'i, and receiving government services in Hawai'i, harms Hawai'i's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

33.     The State of Maine is a sovereign state of the United States of America.

34.     The Attorney General of Maine is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

35.     Maine is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Maine, receiving benefits in Maine, and receiving government services in Maine, harms Maine's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

36.     The State of Maryland is a sovereign state of the United States of America.

37.     The Attorney General of Maryland is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

38.     Maryland is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Maryland, receiving benefits in Maryland, and receiving government services in Maryland, harms Maryland's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

39.     The State of Michigan is a sovereign state of the United States of America.

40.     The Attorney General of Michigan is the State's chief law enforcement officer and is authorized to act in federal court on behalf of the People of the State on matters of public concern.  M.C.L. 14.28.

41.     The People of Michigan are aggrieved and have standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in Michigan, receiving benefits in Michigan, and receiving government services in Michigan, harms the People of Michigan's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

42.     The State of Minnesota is a sovereign state of the United States of America.

43.     The Attorney General of Minnesota is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

44.     Minnesota is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Minnesota, receiving benefits in Minnesota, and receiving government services in Minnesota, harms Minnesota's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

45.     The State of Nevada is a sovereign state of the United States of America.

46.     The Attorney General of Nevada is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

47.     Nevada is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Nevada, receiving benefits in Nevada, and receiving government services in Nevada, harms Nevada's sovereign,

Add. 41

proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

48.    The State of New Mexico is a sovereign state of the United States of America.

49.    The Attorney General of New Mexico is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

50.    New Mexico is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in New Mexico, receiving benefits in New Mexico, and receiving government services in New Mexico, harms New Mexico's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

51.    The State of New York is a sovereign state of the United States of America.

52.    The Attorney General of New York is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

53.    New York is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing in New York, receiving benefits in New York, and receiving government services in New York, harms New York's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

54.    The State of North Carolina is a sovereign state of the United States of America.

55.    The Attorney General of North Carolina is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

56.    North Carolina is aggrieved and has standing to bring this action because Defendants' action of purporting to strip citizenship from United States citizens born and residing

in North Carolina, receiving benefits in North Carolina, and receiving government services in North Carolina, harms North Carolina's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

57.    The State of Rhode Island is a sovereign state of the United States of America.

58.    The Attorney General of Rhode Island is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

59.    Rhode Island is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Rhode Island, receiving benefits in Rhode Island, and receiving government services in Rhode Island, harms Rhode Island's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

60.    The State of Vermont is a sovereign state of the United States of America.

61.    The Attorney General of Vermont is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

62.    Vermont is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Vermont, receiving benefits in Vermont, and receiving government services in Vermont, harms Vermont's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

63.    The State of Wisconsin is a sovereign state of the United States of America.

64.    The Attorney General of Wisconsin is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

65.     Wisconsin is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in Wisconsin, receiving benefits in Wisconsin, and receiving government services in Wisconsin, harms Wisconsin's sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

66.     Plaintiff the City and County of San Francisco, represented by and through its City Attorney, is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

67.     San Francisco is aggrieved and has standing to bring this action because Defendants' effort to strip citizenship from United States citizens born and residing in San Francisco, receiving benefits in San Francisco, and receiving government services in San Francisco, harms San Francisco's interests and will continue to cause injury unless and until enforcement of the Order is permanently enjoined.

**B.     Defendants**

68.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

69.     Defendant Department of Homeland Security (DHS) is a federal cabinet agency responsible for implementing the Order. DHS is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1)

70.     Defendant Benjamine Huffman is the Acting Secretary of Homeland Security. He is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees USCIS and ICE. He is sued in his official capacity.

71.     Defendant U.S. Social Security Administration (SSA) is a federal agency responsible for administering federal retirement, survivors, and disability income programs, as

well as the program of supplemental security income (SSI) for the aged, blind, and disabled. SSA is responsible for implementing the Order.  SSA processes applications for and issues Social Security Numbers (SSNs) to eligible applicants. SSA is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552.

72.     Defendant Michelle King is the Acting Commissioner of the SSA. The Office of the Commissioner is directly responsible for all programs administered by the SSA, including the development of policy, administrative and program direction, and program interpretation and evaluation. She is sued in her official capacity.

73.     Defendant U.S. Department of State is a federal cabinet agency responsible for implementing the Order. The State Department is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1). It is authorized by law to grant and issue passports. 22 U.S.C. § 211a.

74.     Defendant Marco Rubio is the Secretary of State. He is responsible for carrying out the President's foreign policies through the State Department and Foreign Service of the United States. Among other duties, the Secretary of State administers the State Department and grants and issues passports to American citizens. 22 U.S.C. § 211a. He is sued in his official capacity.

75.     Defendant U.S. Department of Human & Health Services (HHS) is a federal cabinet agency responsible for implementing the Order. HHS is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1). HHS is the federal cabinet agency responsible for the Medicaid and CHIP health insurance programs.

76.     Defendant Dorothy Fink is the Acting Secretary of HHS. She is responsible for overseeing and administering all HHS programs through the Office of the Secretary and HHS's Operating Divisions. She is sued in her official capacity.

77.     Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Order.

## ALLEGATIONS

### A.      The Constitution Guarantees Citizenship to All Individuals Born in the United States and Subject to its Jurisdiction

78.     Section 1 of the Fourteenth Amendment to the United States Constitution states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. This provision is known as the Citizenship Clause. The Citizenship Clause's text and history—as well as judicial precedent and longstanding Executive Branch interpretation—confirm that the clause automatically confers citizenship on all individuals born in the United States and subject to its jurisdiction, regardless of the citizenship or immigration status of their parent(s).

79.     Prior to the Fourteenth Amendment's adoption, the Constitution referenced U.S. citizenship, *see, e.g.*, U.S. Const. art. I, §§ 2-3; *id.* art. IV, § 2, including the concept of citizenship by birth, *see id.* art. II, § 1, without defining who was entitled to it, leaving that instead to common law. In the early nineteenth century, most U.S. judges had adopted the British common law tradition of *jus soli*, that is, that anyone born within the territorial limits of a nation, was thereby a subject of that nation.

80.     By the mid-nineteenth century, however, disagreement percolated regarding the citizenship status of freed slaves, culminating in the Supreme Court's notorious pronouncement in *Dred Scott v. Sandford*, 60 U.S. 393, 404-05 (1857), that descendants of slaves could not be U.S. citizens.

81.     In the wake of the Civil War, the Fourteenth Amendment's Citizenship Clause was proposed to overrule *Dred Scott* and to comprehensively define who was entitled to United States

citizenship. In adopting the language of the Citizenship Clause, the 39th Congress chose to return to the pre-*Dred Scott* common law rule that birth within the United States conveys United States citizenship. Indeed, when proposing the language of the Citizenship Clause to the Senate, Senator Jacob M. Howard of Michigan explained that, "[t]his amendment … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is … a citizen of the United States."

82.    While the intent to overrule *Dred Scott* was apparent, the Congressional debate over whether to adopt the Citizenship Clause focused on individuals *other* than descendants of slaves who would be entitled to citizenship were the proposal adopted.

83.    Though some senators disagreed, the majority view was that Native American tribal members living on tribal territory or unincorporated lands would not become citizens by virtue of the Citizenship Clause because they belonged to their own sovereign nations. By contrast, no one contested that the Clause would confer citizenship on American-born children of foreigners, such as Chinese immigrants living in California or so-called "Gypsy" settlers living in Pennsylvania— though some senators opposed the Clause for this very reason.

84.    Undergirding the debate was the universal understanding that the Citizenship Clause, if adopted, would confer citizenship upon anyone born in the United States and "subject to its jurisdiction," excluding only persons not fully subject to the sovereign authority of the United States, such as tribal members and the children of foreign ministers, who enjoyed common law immunity from local law.

85.    Ultimately the Citizenship Clause was passed and ratified as part of the Fourteenth Amendment. The Citizenship Clause reaffirmed the longstanding common law principle of *jus soli* as the default rule of citizenship in the United States: All individuals born in the United States and

subject to its jurisdiction are citizens. Its operation is automatic. No further action is required for individuals born in the United States to "become" citizens and no additional limitations are imposed.

86.     Unlike the Naturalization Clause, U.S. Const. art. I, § 8, cl. 4, which empowers Congress to set rules for naturalization, the Constitution nowhere else speaks to citizenship by birth in the United States and nowhere empowers the President or Congress to set additional requirements that override or conflict with the Citizenship Clause's plain and broad grant of automatic citizenship to individuals born in the United States.

87.     The Citizenship Clause contains no exceptions based on the citizenship or immigration status of one's parent(s). Rather, the Citizenship Clause's only requirements are that an individual be born "in the United States" and "subject to the jurisdiction thereof."

88.     There is no exception to the Citizenship Clause's plain and unconditional grant of U.S. citizenship to all born on American soil and subject to the United States' sovereign authority. Only those not fully subject to United States law fail to acquire U.S. citizenship by virtue of being born on U.S. soil. This includes members of Native American tribes, who are subject to tribal law; the children of agents of foreign sovereigns and those born on foreign public ships, to the extent that they enjoy immunity from United States law; and the children of foreign enemies within and during a hostile occupation, who are subject to martial law on account of the occupation.

89.     The Supreme Court cemented this longstanding and established understanding of the Citizenship Clause more than 125 years ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). There, the Court forcefully rejected a challenge to the citizenship of a man who had been born in San Francisco, California to parents who were Chinese nationals. Residing primarily in the United States, Ark briefly left the United States for China in 1894, and upon his return in August

1895, was detained at the Port of San Francisco by the Collector of Customs, denying him entry by contending he was not a U.S. citizen despite having been born in the United States. The Court explained that the "clear words and ... manifest intent" of the Citizenship Clause confers citizenship upon "all children here born of resident aliens," "whatever [the] race or color" of their parents.

90.     The Executive Branch has embraced this understanding of the Citizenship Clause for more than a century. Indeed, in 1995, the Office of Legal Counsel (OLC) provided a statement to Congress opining that proposed legislation that would deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be "unquestionably unconstitutional." *See* 19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990, at *1-2 (1995). The OLC's statement recognizes that "[t]hroughout this country's history, the fundamental legal principle governing citizenship has been that birth within the territorial limits of the United States confers United States citizenship." *Id.* at *1. As OLC explained: "Congress and the States adopted the Fourteenth Amendment in order to place the right of citizenship based on birth within the jurisdiction of the United States *beyond question*. Any restriction on that right contradicts both the Fourteenth Amendment and the underlying principle that the amendment safeguards." *Id.* (emphasis added). Indeed, the OLC statement and opinion explain that "children born in the United States of aliens are subject to the full jurisdiction of the United States," and that "as consistently recognized by courts and the Attorneys General for over a century, most notably by the Supreme Court in *United States v. Wong Kim Ark*, there is no question that they possess constitutional citizenship under the Fourteenth Amendment." *Id.*

91.     In 1952, Congress enacted the Immigration and Nationality Act, codifying the Citizenship Clause's language into statute. *See* Pub. L. No. 82-414, § 301, 66 Stat. 163, 235.

Mirroring the language of the Citizenship Clause, Section 301(a) of the Act, codified at 8 U.S.C. § 1401(a), provides that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth."

92.    Federal, state, and local agencies rely on this fundamental and longstanding constitutional grant of birthright citizenship in implementing various federal programs. For example, federal law gives the United States Department of State the authority to issue U.S. passports. 22 U.S.C. § 211(a). As explained in the State Department's Foreign Affairs Manual, "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth." 8 F.A.M. 301.1(d) (Acquisition by Birth in the United States). Indeed, the U.S. State Department's Application for a U.S. Passport confirms that for "Applicants Born in the United States," a U.S. birth certificate alone is sufficient to prove one's citizenship. USCIS likewise confirms in public guidance that "[i]f you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship."[1]

93.    The SSA also has long accepted that all children born in the United States are citizens. Under current public guidance, SSA states that "[t]he easiest way to get a Social Security Number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital."[2] With respect to citizenship, SSA explains that for children born in the United States, the child's U.S. birth certificate is proof of U.S. citizenship.[3]

---

[1] Available at: https://perma.cc/RY93-S2DR .
[2] Available at: https://perma.cc/MN8K-Y3V6.
[3] *Id.* at 2-3.

94.    SSA's guidance is consistent with federal regulations, which establish that "[g]enerally, an applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate or other evidence ... that shows a U.S. place of birth." 20 C.F.R. § 422.107(d). Indeed, for newborn babies, SSA utilizes what is called "Enumeration at Birth." Under that program, SSA enters into agreements with States to streamline the process for obtaining SSNs. Where a parent requests an SSN as part of an official birth registration process, the States' vital statistics offices electronically transmit the request to SSA along with the child's name, date and place of birth, sex, mother's maiden name, father's name, address of the mother, and birth certificate number. That information alone is used to establish the age, identity, and U.S. citizenship of the newborn child. 20 C.F.R. § 422.103.

**B.    The President Acted Without Legal Authority in Purporting to Strip Individuals of Their U.S. Citizenship**

95.    President Trump's public statements make clear that he wishes to end birthright citizenship purely as a policy tactic to purportedly deter immigration to the United States. Despite a President's broad powers to set immigration policy, however, the Citizenship Stripping Order falls far outside the legal bounds of the President's authority.

96.    During his most recent campaign for President, for example, then-candidate Trump made clear that an Executive Order would issue "[o]n Day One" to "stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens."[4] As he explained, the goal is for this Executive Order to "eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal

---

[4] Available at: https://www.donaldjtrump.com/agenda47/agenda47-day-one-executive-order-ending-citizenship-for-children-of-illegals-and-outlawing-birth-tourism

aliens in the U.S. to return home."[5] It is also designed to stop what President Trump calls "Birth Tourism."

97.    After the 2024 election, President-Elect Trump continued to state that birthright citizenship should be ended. In December 2024, for example, President-Elect Trump again promised an executive order "directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen."[6]

98.    The Order declares that birthright citizenship does not extend to any individual born to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.  On the basis of this unconstitutional declaration, the Order announces a new federal policy:  no federal agency "shall issue documents recognizing United States citizenship, or accept documents ... purporting to recognize United States citizenship" for such individuals who are born after February 19, 2025 ("Affected Children").

99.    The Order instructs all executive departments and agencies to implement this policy and specifically directs the Departments of State, Justice, and Homeland Security, and Social Security Administration, to act in accordance with this policy.

100.    Not only does the Order strip the Affected Children of their citizenship, it does not confer on them any lawful status and therefore renders their presence in the United States unauthorized.  Because the Order instructs all federal agencies to refuse to issue or accept any written recognition of an Affected Child's citizenship, it leaves the Affected Children ineligible for a range of federal services and programs that are unavailable to undocumented individuals.

---

[5] *Id.*
[6] Available at: https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291

101.    The Constitution does not empower the President to set rules regarding citizenship at birth.

102.    The Constitution does not empower the President to condition citizenship at birth on the citizenship or immigration status of one's parents.

103.    The Constitution does not empower the President to unilaterally amend the Fourteenth Amendment.

104.    The Constitution does not empower the President to deny citizenship to individuals born in the United States.

105.    The Constitution and federal law confer automatic citizenship to individuals born in the United States and subject to its jurisdiction. The Constitution removes control over the grant of citizenship from the category of legitimate policy options the President and Congress may exercise to address immigration policy issues. As the Office of Legal Counsel explained when discussing the unconstitutionality of such proposals, "the text and legislative history of the citizenship clause as well as consistent judicial interpretation make clear that the amendment's purpose was to remove the right of citizenship by birth from transitory political pressures." 19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990, at *5.

## C.    United States Citizens Are Entitled to All Rights and Benefits of Citizenship as Defined by Law

106.    United States citizens are entitled to a broad array of rights and benefits as a result of their citizenship. Stripping individuals of their citizenship will result in an immediate and irreparable harm to those individuals and to Plaintiffs.

107.    Natural born United States citizens are not subject to deportation from the United States. They may obtain a U.S. passport, travel abroad, and re-enter the United States as they wish.

108.     Individuals over 18 years of age who are United States citizens are eligible to vote in federal, state, and local elections. U.S. Const. amend. XXVI; *see, e.g.*, N.J. Const. Art. II § 1, ¶3, as amended; Cal. Const. art. II, § 2; Mass. Const. amend. III, as amended; N.Y. Const. Art. II, § 1; N.Y. Elec. Law § 5-102(1). The right to vote is a fundamental political right.

109.     Individuals over 18 years of age who are United States citizens are eligible to serve on federal and state juries. 28 U.S.C. § 1865(b)(1); *see, e.g.*, N.J. Stat. Ann. § 2B:20-1; Cal. Code Civ. Proc., § 203; Mass. G.L. c. 234A, §§ 2-4.

110.     Individuals who are United States citizens may petition for immigration status for family members including spouses, children, parents, and siblings. *See* 8 U.S.C. §§ 1151(b)(2)(A), 1153(a).

111.     Individuals who are natural born United States citizens are eligible for election to the offices of President and Vice President of the United States. U.S. Const. art. 2, § 1; U.S. Const. amend. XII.

112.     Individuals who are United States citizens are eligible for election to the United States House of Representatives and the United States Senate. U.S. Const. art. 1, §§ 2-3.

113.     Individuals who are United States citizens or nationals are eligible for appointment to competitive service Federal jobs. Executive Order 11935 (Sept. 2, 1976); 5 C.F.R. § 7.3(b).

114.     Depending on immigration or citizenship status, Plaintiffs' residents may also be eligible to participate in a number of federal and state programs that ensure the health and welfare of individuals, families, and communities. Those include programs administered by the States and jointly funded by federal and state dollars. These programs provide healthcare coverage, foster care and custodial services, and economic assistance to vulnerable children and those in need.

**D.      Those Stripped of Citizenship Will be Grievously Harmed.**

115.    The Order will deny over one hundred and fifty thousand children nationwide their birthright to citizenship over the course of a year. According to a 2025 analysis by the National Demographics Corporation, in 2022, an estimated 153,000 children nationwide were born to two parents who were noncitizens and lacked legal status.  Many of these births were in the Plaintiffs' jurisdictions—for example, an estimated 4,200 such births in Massachusetts, 6,200 in New Jersey, and 24,500 in California in 2022.

116.    Further, a report by the Center for Immigration Studies estimated that, in 2014, more than 125,000 children were born to undocumented mothers in the Plaintiff States alone. *See* https://cis.org/Report/Births-Legal-and-Illegal-Immigrants-US#2.

117.    These many thousands of children may never be able to naturalize, nor to obtain citizenship from any other nation. They will be ineligible for most federal public benefits, including federal student financial aid, and they will live under a constant threat of deportation. And as they age, they will be unable to work lawfully, or to participate in American political life as voters or elected officials.

118.    Their ability to travel will be limited. They will be ineligible for a REAL ID Act compliant driver's license or identification card, which will be required for all air travel, including domestic flights, as of May 7, 2025. *See* 49 U.S.C. § 30301. They will be ineligible for a United States passport. And if they depart the country, they will be unable lawfully to reenter.

119.    Further, as compared to citizens and lawfully present immigrants, children without lawful status within a country suffer myriad negative impacts on their health and wellbeing. Such children may fail to access health services for which they may be eligible on account of fear of deportation and harassment from authorities. As a result, they may not receive critical preventive care, such as screenings and vaccinations, which has negative impacts on the broader public health.

Further, undocumented children face anxiety over arrest, and detention, and removal of family members due to immigration status, leading to increased child trauma and harm.

120.    If these American-born children without lawful status remain in the country and themselves have children, those children will inherit their parents' lack of lawful status. The result will be a multigenerational class of marginalized families, who with each generation grow increasingly disconnected from any country but the United States, yet will remain forever outsiders.

**E.    Plaintiffs Will be Irreparably Injured by the Order.**

121.    Plaintiffs will be irreparably injured by the Order separate and apart from the grievous harms their residents will suffer as a result of the Order, principally by forcing Plaintiffs to assume a greater fiscal burden for providing essential services and assistance to tens of thousands of residents.

122.    Plaintiffs administer numerous programs for the benefit of their residents, including for newborns and young children. Some of these programs are funded in part by federal dollars, with federal funding frequently tied to the citizenship and immigration status of the individuals served. As detailed below, stripping individuals of their citizenship and rendering them without a qualifying immigration status will render them ineligible to receive partially federally funded benefits.  In many Plaintiffs' jurisdictions, these individuals will be left to rely on state-only funded benefits, causing direct and measurable financial harm to Plaintiffs.  In other cases, the individuals may be left without adequate assistance, imposing other harms on Plaintiffs.

**Healthcare Expenditures**

123.    The Medicaid and CHIP health insurance programs were created by federal law and are jointly funded by the federal government. Medicaid provides health insurance for individuals, including children, whose household incomes fall below certain eligibility thresholds that vary

slightly by state. CHIP provides health insurance coverage for children whose household incomes exceed the eligibility thresholds for Medicaid but fall below a separate threshold. Medicaid and CHIP are administered by States, but the Federal Government covers a substantial portion of the costs, reimbursing States for between 50 and 75 percent of expenditures on eligible children.

124.    Individuals who are not U.S. citizens and lack a qualifying immigration status are ineligible for Medicaid and CHIP (except for certain emergency medical services). 8 U.S.C. § 1611(a), (c)(1)(B); 8 U.S.C. § 1612(b)(3)(C); 42 U.S.C. § 1396b(v); 42 C.F.R. § 435.406. Consequently, States do not receive federal reimbursement for healthcare expenditures for such individuals.

125.    Nonetheless, many Plaintiff States, including New Jersey, Massachusetts, California, New York, and Connecticut provide State-funded healthcare coverage for children who would be eligible for Medicaid or CHIP but for the fact that they are not United States citizens or qualifying noncitizens.   These States do so because ensuring healthcare access for all their residents improves public health. Access to health insurance increases utilization of preventative healthcare, limits the spread of communicable illnesses, and minimizes financial burdens on healthcare providers.

126.    In States that ensure affordable healthcare for children regardless of immigration or citizenship status, the Order will not change the fact that all income-eligible children residing in these States can access public healthcare. But it will increase the fiscal burden on these States of ensuring this critical access. As a result of the Order, newborns who would otherwise be eligible for federally-funded Medicaid or CHIP will lack that eligibility, causing States like New Jersey, Massachusetts, California, New York, and Connecticut to bear the full cost of ensuring that these newborns receive healthcare.

127.    For example, New Jersey fully funds public health insurance for children who meet the income eligibility guidelines for federal Medicaid or CHIP, but who do not qualify for those programs because they are not United States citizens or qualifying noncitizens. New Jersey receives no federal funding for providing such coverage, with the exception of certain limited emergency medical services that may be covered by federal Medicaid.

128.    By contrast, when New Jersey funds public health insurance for children who meet Medicaid or CHIP eligibility guidelines and are United States citizens or qualifying noncitizens, then New Jersey receives a federal reimbursement of 50 to 65 percent of its expenditures.

129.    New Jersey will continue to provide health insurance to children who would have been citizens but for the Order, but it will bear the full cost of doing so, losing millions of dollars per year in federal reimbursement it would have received if the citizenship of these children were still recognized by the federal government.

130.    Similarly, the Order will force California to bear direct and substantial financial costs and administrative burdens to its Medicaid and related programs.

131.    Since 2015, California has also provided full-scope, state-funded health insurance coverage to all children who meet the income eligibility guidelines for federal Medicaid or CHIP but do not qualify for those programs because they are not United States citizens or qualifying noncitizens. California receives no federal funding for providing such coverage, with the exception of certain limited emergency medical services that may be covered by federal Medicaid.

132.    By contrast, when California funds public health insurance for children who meet Medicaid or CHIP eligibility guidelines and are United States citizens or qualifying noncitizens, California receives a federal reimbursement of 50 to 65 percent of its expenditures.

133. California will continue to provide health insurance to children who would have been citizens but for the Order, but it will bear the full cost of doing so, losing tens of millions of dollars per year in federal reimbursement it would have received if the citizenship of these children were still recognized by the federal government.

134. The same circumstances exist in Massachusetts: the Order will cause financial harm to the Commonwealth in connection with public healthcare programs.

135. Massachusetts funds public health insurance for children who meet the income eligibility guidelines for federal Medicaid or CHIP, but who do not qualify for those programs because they are not United States citizens or qualifying noncitizens. Massachusetts receives no federal matching funds for providing such coverage, with the exception of certain limited emergency medical services that may be covered by Federal-State Medicaid.

136. By contrast, when Massachusetts funds public health insurance for children who meet Medicaid or CHIP eligibility guidelines and are United States citizens or qualifying noncitizens, then Massachusetts receives a federal reimbursement of 50 to 65 percent of its expenditures.

137. Massachusetts currently spends an average of approximately $4,800 per year per child enrolled in Massachusetts' partially federally-funded public health insurance program.

138. Massachusetts will continue to provide health insurance to children who would have been citizens but for the Order, but it will bear the full cost of doing so, losing federal reimbursements it would have received if the citizenship of these children were still recognized by the federal government.

139. Similarly, New York has a program for ensuring healthcare coverage for its most vulnerable residents known as Child Health Plus. Child Health Plus predates the federal CHIP

program, and was one of three state health insurance plans for low-income children whose benefit package was grandfathered in after the creation of CHIP. Child Health Plus is available to children who (i) are under the age of 19, (ii) reside in New York, (iii) are not eligible for Medicaid, and (iv) do not have any other health insurance coverage or access to or enrollment in state health benefits, the New York State Health Insurance Program (NYSHIP). Depending on household income, children's coverage may be fully or partially subsidized. Children in households above the income threshold for subsidized coverage, 400% of the federal poverty level, may purchase the program at full cost if otherwise eligible. New York's Child Health Plus program offers coverage through twelve health plans throughout the state with an extensive network of participating providers and covers a host of services including well-child care, immunizations, emergency care, prescription and non-prescription drugs if ordered by a licensed provider, outpatient surgery, and more. Child Health Plus is available regardless of immigration status.

140.    New York children that are United States citizens or have a qualifying immigration status under federal law are eligible for federal financial participation (FFP) in the Medicaid or CHIP programs. Children eligible for FFP in Medicaid generally receive a 50% federal match, while children enrolled in Child Health Plus receive a 65% federal match. Children enrolled in the Medicaid expansion group (ages 6-18, and whose families are living at 100-154% of the federal poverty level) receive the enhanced CHIP match of 65%, which is funded under Title XXI of the Social Security Act. For undocumented children, the State pays the entirety of the cost of coverage through the Child Health Plus program. As of October of 2024, a combined 2.4 million children under age 19 in New York State had been enrolled in either Medicaid or Child Health Plus, of whom 571,386 were enrolled Child Health Plus.

141.    Under the Order, thousands of babies born in New York each year will only qualify for the state-funded program, resulting in a loss of millions of dollars in federal funding. New York instead will be forced to bear the direct and substantial costs and administrative burdens to its Medicaid and Child Health Plus programs as a result of the Order. Children who previously would be eligible for the Medicaid and/or CHIP healthcare programs that are currently eligible for FFP will no longer be eligible for federally subsidized coverage. Instead, their health care coverage will be entirely state-funded, or they may forego healthcare coverage altogether and may instead seek only emergency healthcare.

142.    Similarly, the Order will force Connecticut to bear direct and substantial financial costs and administrative burdens to its Medicaid and related programs.

143.    Connecticut's HUSKY Health is the State's program that provides comprehensive health insurance coverage to all qualifying Connecticut residents, and it includes Connecticut's partially federally-funded Medicaid and CHIP programs. Connecticut's DSS is Connecticut's Medicaid authority and functions as one of the largest providers of health coverage in Connecticut. It is a leader in ensuring Connecticut residents have access to high-quality, affordable healthcare, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut. DSS provides healthcare for over 1 million state residents annually through HUSKY.

144.    Any child through age 15, regardless of immigration status, residing in Connecticut whose family income is at or below 323 percent of the Federal Poverty Level is eligible for free or low-cost healthcare coverage under HUSKY. HUSKY also covers all citizen children and non-citizens with qualifying immigration statuses up to 323% FPL through age 18.

145.    Connecticut children that are United States citizens or have a qualifying immigration status under federal law are eligible through HUSKY for the partially federally-funded Medicaid or CHIP programs. Federal funding for children enrolled in Medicaid or CHIP in Connecticut provided at different rates. Historically, CHIP federal match has been 65 percent. It was increased as high as 88 percent for a period of time in recent years, but now is at 65 percent. This means that coverage provided to eligible children under the CHIP funding structure results in federal funds covering a higher portion of the expenses compared to Medicaid, where federal funding normally covers 50 percent of the expenses.

146.    Children who would have been eligible for Connecticut's Medicaid or CHIP-funded coverage programs had they met immigration status requirements receive coverage through the 100 percent state-funded State HUSKY program. Connecticut law requires such coverage to be provided to all children who apply and are eligible.

147.    Based on DSS's most recent data for 2024, there were over 5,500 children born who were eligible for HUSKY and born to mothers who qualified for state-funded postpartum coverage because the mother could not qualify for Medicaid due to their immigration status. If the children covered under Medicaid and CHIP became ineligible due to a loss of citizenship and moved to State-funded coverage, that would result in a loss of over $10,000,000 in federal reimbursements to Connecticut and a corresponding increase to State expenditures of the same amount.

148.    Some Plaintiff States, including Michigan, do not have a fully state-funded health insurance program for children who do not meet the citizenship or immigration status eligibility requirements for Medicaid or CHIP. In those states, healthcare facilities and medical providers

who provide treatment to these children, including public providers, will incur greater costs in the form of uncompensated care.

### Special Education Expenditures

149.    That thousands of children born in Plaintiffs' jurisdictions over the next year will lose Medicaid eligibility as a consequence of the Order also increases education expenditures.

150.    Plaintiffs are required by the U.S. Individuals with Disabilities in Education Act (IDEA) to provide certain early intervention and special education services to infants, toddlers, and students with disabilities. *See* 20 U.S.C. § 1400(d)(1)(A); 20 U.S.C. § 1412(a)(1). Consistent with constitutional and statutory requirements, Plaintiffs provide these services to all children who need them, regardless of the child's immigration status. *See* 20 U.S.C. § 1400 et seq.; *Plyler v. Doe*, 457 U.S. 202 (1982).

151.    The federal government reimburses a percentage of these costs when the services are provided to a child who is enrolled in Medicaid. By contrast, when the services are provided to a noncitizen child who is ineligible for Medicaid because they lack any lawful immigration status, the federal government provides no reimbursement. By stripping children born in Plaintiffs' jurisdictions of citizenship they otherwise would acquire at birth, the Order thus causes Plaintiffs to lose federal reimbursement for providing IDEA-required services to such children.

152.    For example, the IDEA requires States to provide Early Intervention Services (EIS), such as speech or occupational therapy, to children up to three years old with certain disabilities or developmental delays. And, New Jersey, for example, ensures that *all* infants and toddlers within its borders who need EIS receive it, regardless of citizenship or immigration status. The federal government reimburses New Jersey for 50% of its EIS expenditures—but only for EIS provided to Medicaid-enrolled children.

153.    As noted above, of the estimated 6,200 children who will be born in New Jersey over the next year yet denied citizenship pursuant to the Order, New Jersey estimates that at least 4,000 would be eligible for Medicaid, and several more for CHIP, but for their loss of citizenship status.

154.    It is highly likely that some of these children will receive EIS over the next year. In a 2023 report, the United States Government Accountability Office found that about 7 percent of children nationwide received EIS at some point in the most recent 12-month period.[7] Applying that percentage to New Jersey's estimate of the number of children who will be born in the State over the next year, yet denied citizenship pursuant to the Order, and be eligible for Medicaid or CHIP, New Jersey estimates that it will provide EIS to approximately 280 such children born in the State over the next year.

155.    New Jersey, for example, will provide EIS to these infants and toddlers, but it will bear the full cost of doing so, losing the 50% federal reimbursement it would receive if the citizenship of these children were still recognized by the federal government.

156.    Plaintiffs will also lose federal funding related to the provision of certain required medical services provided at school to students with disabilities. 34 C.F.R. § 300.101(c).

157.    The Social Security Act authorizes the federal Medicaid program to reimburse local education agencies, such as school districts, for medically necessary health services that are covered in the State's Medicaid plan and provided at school to Medicaid-enrolled students with disabilities in accordance with the student's individualized education program (IEP). An IEP identifies special education and related services, and program modifications and supports, that a

---

[7] *See* GAO, Special Education, Additional Data Could Help Early Intervention Programs Reach More Eligible Toddlers, GAO-24-106019, at 9 (Oct. 2023).

school must provide for a child with a disability. Children as young as three years old can have IEPs which require that the child be provided school-based health services (SBHS).

158.    To receive reimbursement for the provision of special education SBHS provided to Medicaid-enrolled students, a local education agency submits a reimbursement claim to the federal government, and the federal government partially reimburses the State and the local education agency for that expenditure.

159.    New Jersey, for example, retains 65% of the reimbursement provided by the federal government for a local education agency's provision of special education SBHS. Connecticut, as another example, retains 50% of the reimbursement provided by the federal government for a local education agency's provision of special education SBHS.

160.    In New Jersey and Connecticut, local education agencies are required to provide any special education SBHS that are specified in a student's IEP to that student free of charge, regardless of the student's citizenship or immigration status. However, the federal government will not provide any reimbursement for special education SBHS provided to students without lawful status, because such students are not Medicaid-eligible.

161.    The Order will render students who would have been enrolled in Medicaid ineligible for Medicaid. For any such students who have an IEP that requires special education SBHS, local education agencies will not be able to submit reimbursement claims to the federal government to help cover the costs of providing the student's special education SBHS.

162.    New Jersey, in turn, will not receive its 65% share of the federal reimbursement for special education SBHS provided by its local education agencies. And Connecticut likewise will not receive its 50% share of the federal reimbursement for special education SBHS provided by its local education agencies.

163.    Thus, the Order will cause Plaintiffs, including New Jersey and Connecticut, not to receive funding they would have received but for the Order.

**Child Welfare Expenditures**

164.    In addition to causing Plaintiff States to lose federal funding related to children's healthcare and education, the Order will cause Plaintiff States to lose federal funding related to the provision of foster care, adoption, and guardianship services.

165.    Many Plaintiff States' child welfare systems are funded in part by the U.S. Department of Health and Human Services Federal Foster Care Program, known as "Title IV-E." Federal funding under Title IV-E reimburses a portion of a State's administrative expenses and maintenance payments for children in State care. Maintenance payments include foster care assistance, adoption assistance, and guardianship assistance, and cover the cost of providing children in State care with basic necessities, including food, clothing, shelter, daily supervision, and school supplies.

166.    The amount of each type of reimbursement depends on the number of children to whom a State has provided foster care and related services and who meet Title IV-E eligibility criteria. As to administrative expenses, States are reimbursed for a portion of such expenditures based on a formula that is tied to the percentage of children in the State's care who meet Title IV-E eligibility criteria. As to maintenance payments, State are reimbursed only for expenditures on maintenance provided to Title IV-E eligible children.

167.    Children who are neither citizens nor have a lawful immigration status are not Title IV-E eligible. 8 U.S.C. §§ 1611 (a), (c)(1)(A).

168.    Nonetheless, many Plaintiff States, including New Jersey, Connecticut, and Massachusetts, provide child welfare services to any child in their borders who need them

regardless of their citizenship or immigration status. This will include children who would have been U.S. citizens but for the Order.

169.    Plaintiff States will provide any child welfare services needed by such children, but they will not receive any Title IV-E funding to do so. By contrast, if the Order were enjoined and the citizenship of these children recognized, Plaintiff States would receive Title IV-E funding for providing them with care. Thus, the Order results in a loss to the States equivalent to the amount of Title IV-E funding Plaintiff States would receive but for the Order.

170.    For example, New Jersey provides child welfare services to at-risk children in the State regardless of citizenship or immigration status, as required by law. Hundreds of at-risk children enter into the care of New Jersey's child welfare agency within twelve months of birth. For example, in 2023, 268 children entered State care within three months of birth, and 364 children entered State care within twelve months of birth. Given that an estimated 6,200 newborns in New Jersey will be denied citizenship pursuant to the Order in the next year—about 6 percent of all New Jersey newborns—it is highly likely that a significant number of children entering DCF's care within the first three months and 12 months of their birth will be denied citizenship by the Order.

171.    New Jersey will still care for these children, but it will bear the full cost of doing so, losing the Title IV-E federal reimbursement it would receive if the citizenship of these children were still recognized by the federal government.

172.    In addition to this loss of Title IV-E funds, the Order will cause some of Plaintiffs' child welfare agencies to expend additional resources assisting families whose children are at risk of entering the foster care system.

173.    Some of Plaintiffs' child welfare agencies, including those of New Jersey and Connecticut, provide targeted financial and resource assistance to families whose children are at risk of entering the foster care system, including for necessities such as rent, baby supplies, and groceries, to ensure adequate care for these children.

174.    Many families with at-risk children also receive assistance for their children through federal programs, including the Supplemental Nutrition Assistance Program (SNAP) and SSI, for which their children are eligible because they are United States citizens.

175.    If these children are deprived of birthright citizenship and therefore ineligible for these federal programs, the child welfare agencies of Plaintiffs like New Jersey and Connecticut will have to increase their expenditures to ensure that these at-risk children receive adequate care.

**Social Security Number Funding**

176.    The Order will also cause Plaintiff States to lose federal funding that they receive in connection with an SSA program called Enumeration at Birth (EAB). Through EAB, parents may apply for an SSN for their newborn child at the healthcare facility where the child was born, folded into the process for registering the child's birth with the State.

177.    A parent's participation in EAB is optional, but, nationwide, about 99% of infants who obtain SSNs obtain them through this program. Further, it can reasonably be expected that most parents will obtain SSNs for their newborn children, given that an SSN is required to claim a child as a dependent on a federal income tax return, and is often required to get medical coverage for the child and apply for government services for the child. *See* SSA, Social Security Numbers for Children, Pub. No. 05-10023, at 1 (Jan. 2024), ssa.gov/pubs/EN-05-10023.pdf.

178.    To enable the EAB process, SSA enters into contracts with States. Pursuant to those agreements, when a parent wishes to obtain an SSN for a newborn child, the parent completes a

form at the hospital which the hospital then transmits to the State agency that registers births. That agency then transmits to the SSA the child's SSN application along with verification of the child's place of birth and identity. In return for assisting with EAB, States receive a payment from SSA of $4.82 per SSN issued. These funds are then used to support general administrative expenses for state agencies. Plaintiff States—including, for example, New Jersey, Massachusetts, California, New York, Connecticut, and Michigan—participate in EAB.

179.    All U.S. citizen children are eligible to receive SSNs. Noncitizen children without any lawful immigration status are not eligible to receive SSNs. Consequently, the Order precludes newborns who otherwise would have been eligible to obtain SSNs through EAB from doing so.

180.    SSA does not issue SSNs to undocumented individuals. The Order will therefore result in a loss of funding to Plaintiffs. For every child born in one of the Plaintiff States who would have obtained an SSN through EAB but for the Order, that State will lose the $4.82 SSA payment that the State would have received had the child obtained an SSN through EAB.

181.    As noted above, Plaintiffs estimate that the Order will result in the wrongful denial of citizenship to, for example, approximately 6,200 children born in New Jersey, 24,500 children born in California, 4,200 children born in Massachusetts, and 7,400 children in Connecticut each year. Assuming that all these newborns would have obtained SSNs through EAB but for the Order, the Order will cause New Jersey, California, Massachusetts, and Connecticut to lose approximately $30,000, $120,000, $20,000, and $35,000, respectively, per year in EAB payments they would have received but for the Order.

182.    Last year, New York State, exclusive of New York City, collected approximately $445,000 through the EAB program. New York will suffer a substantial loss of revenue under this

program because of the Order, both because some babies will no longer be eligible for SSNs, but also because some parents will decline to participate in the EAB program out of fear.

**Administrative Burdens**

183.    The Order will impose, and is already imposing, administrative and operational burdens on the Plaintiffs, in particular relating to their systems for verifying residents' eligibility of federally-funded programs including, but not limited to, Medicaid, CHIP, Title IV-E, and EAB.

184.    As explained above, the amount of federal funding that Plaintiffs may receive through programs such as Medicaid, CHIP, and Title IV-E depends on the citizenship or immigration status of individuals to whom the States provide social services through these programs. Because federal law provides that Plaintiffs may only seek federal reimbursement for services provided to individuals who are citizens or qualified noncitizens, Plaintiffs need systems for determining whether individuals they serve are citizens or qualified noncitizens.

185.    Prior to the Order, confirming the citizenship of American-born children for purposes of seeking reimbursement from the federal government was simple: all an agency needed was a U.S. birth certificate. Now, that straightforward path will be unavailable beginning February 20, 2025. Instead, Plaintiffs will have to determining the citizenship or immigration status of each of a child's parents in order to confirm the child's citizenship status.

186.    This has consequences for Plaintiff States' agencies that administer Medicaid and CHIP. These agencies must update their eligibility verification systems to incorporate information about every U.S.-born child's parents, and to determine citizenship based on that information. These agencies must identify the kinds of evidence sufficient to prove citizenship pursuant to the Order, and to modify the IT systems they use to process applications and verify eligibility. Plaintiff States' will have to train staff, partners, and healthcare facilities on the new eligibility system and

procedures, and to revise existing guidance documents and manuals regarding eligibility rules and procedures.

187.    New Jersey estimates that this process will take its health agency approximately 6 months to develop and implement a new eligibility system and undertake the necessary training to ensure that it can be deployed effectively.

188.    These burdens will be compounded if birthright citizenship rules vary by state.  For example, children residing in New Jersey are eligible for public health insurance programs regardless of where they were born. Children residing in New Jersey who moved into the State from other States are frequently enrolled in these health insurance programs. Presently, the State agencies who administer these programs have no reason to track the State of birth of U.S.-born child applicants.

189.    However, if the rules governing birthright citizenship varied by State of birth, New Jersey agencies' eligibility verification systems will have to start tracking State of birth so that they can accurately determine whether a child is a citizen and therefore eligible for Federal-State Medicaid or CHIP, or whether they are not a citizen and thus only eligible for fully state-funded health insurance.  This will further complicate the process of redesigning eligibility verification systems described above, requiring additional expenditure of time and resources.

190.    Similar administrative burdens will fall on Plaintiff States' child welfare agencies in connection with Title IV-E. Prior to the Order, these agencies relied on a child's birth certificate as evidence of U.S. citizenship for the purposes of determining eligibility for Title IV-E funding and applying for certain federal assistance for which a child in its care may be eligible, including Medicaid and SSI benefits. Using a birth certificate to prove U.S. citizenship is administratively simple, especially with respect to newborns that a State's child welfare agency's caseworkers may

interact with shortly after birth. Because of the Order, these agencies must now expend considerable time and resources to develop, implement, and train its workers on a new system to determine the citizenship and immigration status of U.S.-born children in their care.

191.    For example, Connecticut DCF must determine the citizenship of the children to whom they provide services in order to assist them with any matters related to their immigration status. The system developed to ascertain citizenship of children born to undocumented or noncitizen parents would have to involve the cooperation of the embassies and consulates of the parents' countries of origin in order to obtain the parents' documentation of citizenship. A system to verify citizenship would impose significant administrative burdens on DCF. DCF would have to expend considerable resources to develop and implement a system to determine, verify, and document the citizenship and immigration status of children whose citizenship could not be presumed on the basis of a birth certificate showing their birth in the United States.  It would also incur significant costs to train and provide support services to DCF social workers to implement that system, which would be dependent upon already overburdened embassies and consulates.

192.    Plaintiffs will also face new administrative burdens and increased costs in assisting with SSN applications for newborn children through the EAB process.

193.    Before the Order, a newborn child's eligibility for an SSN did not need to be verified by the healthcare facility that assists the parent with the SSN application or the State agency that registers the child's birth; that eligibility flowed from the fact of the child's U.S. birth.

194.    Following the Order, whether SSA will issue a newborn an SSN will depend on the citizenship or immigration status of the newborn's parents. Consequently, to assist with EAB, State-run healthcare facilities now must verify parents' immigration statuses. These facilities will

need to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish citizenship or lawful immigration status.

195.    State agencies that register births will need to redesign the systems through which they receive applications from the healthcare facilities. And they will have to train their staff on the new citizenship rules and how to use the redesigned systems. Vital records jurisdictions may need to create two different birth certificates to differentiate between children whose citizenship will be recognized by the federal government and those whose citizenship will not be recognized by the federal government. This requires enhanced information gathering about parents' citizenship and technology advancements to capture the new workflow, data modifications and verification processes.

196.    Additionally, SSA will need to revise the electronic system it uses for receiving SSN applications from the State agencies participating in EAB, as well as the guidelines for using that system, which are currently detailed in a 59-page SSA manual. And State agency staff will have to study these new guidelines and receive training on using this revised system.

197.    That Plaintiffs' agencies will incur substantial administrative costs verifying newborns' citizenship under the new requirements of the Order is evidenced by the amount that USCIS charges to certify the U.S. citizenship of children born abroad. Because USCIS receives nearly all of its funding from application and petition fees, and is required to set fees "at a level that will ensure recovery of the full costs of providing … services," 8 U.S.C. § 1356(m), the fee that USCIS charges for a service reflects the cost to the agency of providing that service.

198.    Although USCIS has not previously certified citizenship for children born in the United States, given that a U.S. birth certificate has, until now, sufficed as proof of citizenship, USCIS does certify citizenship for children born abroad to at least one U.S. citizen parent, *see*

USCIS, Form N-600, Instructions, OMB No. 1615-0057, at 1-2 (ed. Apr. 1, 2024). And USCIS

charges $1,335 per online application to determine whether such a child is indeed a U.S. citizen.

*See* USCIS, Form G-1055, Fee Schedule, at 34-35 (ed. Jan. 17, 2025). This hefty fee reflects the

administrative complexity of determining and verifying a parent's citizenship status, a burden now

falling on Plaintiffs' agencies every time they seek federal funding for services they provide to

children newly born within their borders.

199.    Additionally, Plaintiff San Francisco, California—the home of Wong Kim Ark—

will be irreparably harmed if the Order stands. As a California county government, San Francisco

bears responsibility for administering federal-state public benefits programs like Temporary

Assistance to Needy Families (TANF) and Supplemental Nutrition Assistance Program (SNAP),

which in California are called CalWORKS and CalFresh, respectively.   These programs are

administered by the San Francisco Human Services Agency (SF HSA).   Federal funding to

California, in turn distributed to SF HSA, comprises a substantial portion of the aid administered

through those assistance programs.  *See* 42 U.S.C. § 603(a)(1)(B); 7 C.F.R. § 277.4(b).  Funding

is only provided to administer aid to those eligible under federal criteria, which includes proof of

a valid social security number (SSN) for both CalWORKS, *see* 45 C.F.R. § 205.52; Cal. Welf. &

Inst. Code §§ 11268(a), (d); Cal. Dep't of Soc. Servs., Eligibility and Assistance Standards,

Manual Letter No. EAS-14-02, § 40-105.2, and CalFresh, *see* 7 C.F.R. § 273.6(b)(4); Cal. Dep't

of Soc. Servs., Manual of Policies & Procs., Food Stamps, Manual Letter No. FS-00-03, § 63-

404.3.

200.    San Francisco faces numerous pocketbook injuries as a result the Executive Order.

Deprived of SSNs, fewer individuals will qualify for CalWORKS and CalFresh assistance, and so

San Francisco will lose funding from the federal government both to administer those programs

and to distribute aid and assistance to its eligible residents. Numerous San Franciscans will be deprived of the aid they are presently entitled to, financially impacting San Francisco's economy as a whole. *See* Rosanna Mentzer Morrison & Patrick Canning, USDA, Quantifying the Impact of SNAP Benefits on the U.S. Economy and Jobs (July 18, 2019), https://www.ers.usda.gov/amber-waves/2019/july/quantifying-the-impact-of-snap-benefits-on-the-u-s-economy-and-jobs. Such individuals will predictably seek and be eligible for other forms of public assistance, such as in-kind food assistance and free diaper programs, which are provided by San Francisco's general fund, and in accordance with its broader responsibility for the care of its poor and indigent residents who are not otherwise supported by other aid programs.

201.    In sum, the Order, if allowed to stand, will work direct and substantial injuries to the Plaintiffs themselves, in addition to their residents.

## FIRST CAUSE OF ACTION
### (Fourteenth Amendment – Citizenship Clause)
### All Defendants

202.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

203.    The Fourteenth Amendment declares: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

204.    Contrary to the Fourteenth Amendment, the Order declares a federal policy of refusing to recognize or accept the citizenship of individuals born in the United States to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.

205.    The Order expressly violates the Fourteenth Amendment's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

206.    The President has no authority to override or ignore the Fourteenth Amendment's Citizenship Clause or otherwise amend the Constitution unilaterally, and therefore lacks authority to strip individuals of their right to citizenship.

207.    The Order will cause harm to Plaintiffs and their residents.

**SECOND CAUSE OF ACTION**
**(Separation of Powers – U.S. Const., Art. I, § 1; U.S. Const., Art. II, § 3)**
**All Defendants**

1.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

2.    Article I, Section I of the U.S. Constitution states that "[a]ll legislative Powers herein shall be vested in Congress."

3.    Article II, Section 3 of the United States Constitution requires that the President "shall take Care that the Laws be faithfully executed."

4.    The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Moreover, there is no provision in the United States Constitution that authorizes the President to enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

5.    Section 301 of the Immigration and Nationality Act, 8 U.S.C. § 1401, states that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth."

6.    Contrary to the INA, the Order declares a federal policy of refusing to recognize or accept the citizenship of individuals born in the United States to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.

7.     The President has no authority to override Section 301's statutory guarantee of citizenship, and his Executive Order directly contradicting Section 301's requirements usurps Congress's legislative authority and violates the Constitution's separation of powers.

8.     The Order will cause harm to Plaintiffs and their residents.

## THIRD CAUSE OF ACTION
### (Immigration and Nationality Act – 8 U.S.C. § 1401)
### All Defendants

9.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

10.     Section 301 of the Immigration and Nationality Act, 8 U.S.C. § 1401, states that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth."

11.     Contrary to the INA, the Order declares a federal policy of refusing to recognize or accept the citizenship of individuals born in the United States to (i) a mother who is unlawfully present or lawfully present in the United States on a temporary basis, and (ii) a father who was neither a citizen nor a lawful permanent resident.

12.     The Order expressly violates Section 301's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

13.     The President has no authority to override Section 301's statutory guarantee of citizenship, and therefore lacks any authority to unilaterally strip individuals of their right to citizenship. Such action is ultra vires.

14.     The Order will cause harm to Plaintiffs and their residents.

## FOURTH CAUSE OF ACTION
### (Administrative Procedure Act – 5 U.S.C. § 706(2)(A)-(D))
### Agency Defendants

15.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

16.     The Order directs federal agencies, including SSA, to take actions that are contrary to the constitution and federal statutes.

17.     The Administrative Procedure Act (APA), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary and capricious, unconstitutional, contrary to statute, and without observance of procedure recognize by law. In implementing the Order, federal agencies are taking unconstitutional, unlawful, and arbitrary and capricious action, as alleged herein, in violation of the APA.

18.     Defendants' violations will cause harm to Plaintiffs and their residents.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.     Declare that the Order is contrary to the Constitution and laws of the United States;

b.     Declare that actions taken by Defendant agencies to implement or enforce the Order violate the Administrative Procedure Act;

c.     Preliminarily and permanently enjoin Defendants from implementing or enforcing the Order;

d.     Vacate any actions taken by Defendant agencies to implement or enforce the Order; and

e.     Award such additional relief as the interests of justice may require.

January 21, 2025

Respectfully submitted.

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum *
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Viviana M. Hanley*
Shefali Saxena*
Elizabeth R. Walsh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Jeremy.feigenbaum@njoag.gov

*Counsel for the State of New Jersey*

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

*/s/ Denise Levey*
Denise Levey*
  *Deputy Attorney General*
Michael Newman
  *Senior Assistant Attorney General*
Marissa Malouff*
Irina Trasovan*
  *Supervising Deputy Attorneys General*
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
  *Deputy Attorneys General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
Denise.Levey@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

*/s/ Gerard J. Cedrone*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
jared.b.cohen@mass.gov

*Counsel for the Commonwealth of
  Massachusetts*

**PHIL WEISER**
  ATTORNEY GENERAL OF COLORADO

*/s/ Shannon Stevenson*
Shannon Stevenson
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*

Add. 79

**WILLIAM M. TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ *William M. Tong*
William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860)-808-5020
Janelle.Medeiros@ct.gov

*Counsel for the State of Connecticut*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ *Nicole S. Hill*
Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ *Vanessa L. Kassab*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ *Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Sean D. Magenis
Sean D. Magenis
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sean.d.magenis@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Toni L. Harris
Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov
ServiceS3@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Attorney General Dana Nessel on
behalf of the People of Michigan*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ Jessica M. Finberg
Jessica M. Finberg*
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jfinberg@oag.state.md.us
410-576-6921

*Counsel for the State of Maryland*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ John C. Keller
John C. Keller*
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

*/s/ Zoe Levine*
Zoe Levine*
  *Special Counsel for Immigrant Justice*
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

*Counsel for the State of New York*

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

*/s/ James W. Grayson*
James W. Grayson*
  *Chief Deputy Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

*/s/ Daniel P. Mosteller*
Daniel P. Mosteller*
  *Associate Deputy Attorney General*
Laura Howard
  *Chief Deputy Attorney General*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

*/s/ Katherine Connolly Sadeck*
Katherine Connolly Sadeck (MA Bar No. 681501)
  *Solicitor General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2480
Fax: (401) 222-2995
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*


**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

*/s/ Gabe Johnson-Karp*
Gabe Johnson-Karp*
  *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*


**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

*/s/ Julio A. Thompson*
Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for State of Vermont*


**DAVID CHIU***
  CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO

*/s/ David Chiu*
Yvonne R. Meré*
  *Chief Deputy City Attorney*
Sara J. Eisenberg*
  *Chief of Complex and Affirmative Litigation*
Mollie M. Lee*
  *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
  *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 6th Fl.
San Francisco, California 94102-5408
(415) 505-0844
David.Louk@sfcityatty.org

*Counsel for City and County of San Francisco*


*Application for pro hac vice admission forthcoming*

Menu  Search

# PROTECTING THE MEANING AND VALUE OF AMERICAN CITIZENSHIP

EXECUTIVE ORDER

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  The privilege of United States citizenship is a priceless and profound gift.  The Fourteenth Amendment states:  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which

misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race. But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States.  The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof."  Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text. Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States:  (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Sec. 2.  Policy.  (a)  It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons:  (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the

person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b)  Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c)  Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

Sec. 3.  Enforcement.  (a)  The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b)  The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

Sec. 4.  Definitions.  As used in this order:

(a)  "Mother" means the immediate female biological progenitor.

(b)  "Father" means the immediate male biological progenitor.

Sec. 5.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against

the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

    January 20, 2025.

News

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

JS 44 (Rev. 10/20)       **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

State of New Jersey et al. (see attached)

**(b)** County of Residence of First Listed Plaintiff   n/a
      *(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

    (see attached)

**DEFENDANTS**

Donald J. Trump et al. (see attached)

County of Residence of First Listed Defendant   Washington, D.C.
      *(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
      THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

United States Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530, 202-514-2000

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*
    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [x] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S. Constitution amend. XIV; 8 U.S.C. §1401; 5 U.S.C. §706(2)

Brief description of cause:
Challenge to executive order in violation of constitutional and statutory guarantees

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*

JUDGE   Leo T. Sorokin                       1:25-cv-10135-LTS
                F. Dennis Saylor, IV                     DOCKET NUMBER   1:25-cv-10136-FDS

DATE   01/21/2025         SIGNATURE OF ATTORNEY OF RECORD   /s/ Gerard J. Cedrone

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Question I (Plaintiffs' Attorneys), continued:**

MATTHEW J. PLATKIN
  ATTORNEY GENERAL OF NEW JERSEY

Jeremy M. Feigenbaum *
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Viviana M. Hanley*
Shefali Saxena*
Elizabeth R. Walsh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Jeremy.feigenbaum@njoag.gov

*Counsel for the State of New Jersey*

ROB BONTA
  ATTORNEY GENERAL OF CALIFORNIA

Denise Levey*
  *Deputy Attorney General*
Michael Newman
  *Senior Assistant Attorney General*
Marissa Malouff*
Irina Trasovan*
  *Supervising Deputy Attorneys General*
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
  *Deputy Attorneys General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
Denise.Levey@doj.ca.gov

*Counsel for the State of California*

ANDREA JOY CAMPBELL
  ATTORNEY GENERAL OF MASSACHUSETTS

Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
jared.b.cohen@mass.gov

*Counsel for the Commonwealth of*
  *Massachusetts*

PHIL WEISER
  ATTORNEY GENERAL OF COLORADO

Shannon Stevenson
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*

**WILLIAM M. TONG**
  ATTORNEY GENERAL OF CONNECTICUT

William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860)-808-5020
Janelle.Medeiros@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAI'I

Kaliko'onālani D. Fernandes
  *Solicitor General*
425 Queen Street
Honolulu, Hawai'i 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

Sean D. Magenis
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sean.d.magenis@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov
ServiceS3@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Attorney General Dana Nessel on behalf of the People of Michigan*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

Jessica M. Finberg*
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jfinberg@oag.state.md.us
410-576-6921

*Counsel for the State of Maryland*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

John C. Keller*
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

Zoe Levine*
  *Special Counsel for Immigrant Justice*
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

*Counsel for the State of New York*

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

James W. Grayson*
  *Chief Deputy Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

Daniel P. Mosteller*
  *Associate Deputy Attorney General*
Laura Howard
  *Chief Deputy Attorney General*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

Katherine Connolly Sadeck (MA Bar No. 681501)
  *Solicitor General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI  02903
Tel: (401) 274-4400, Ext. 2480
Fax: (401) 222-2995
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*

**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

Gabe Johnson-Karp*
  *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for State of Vermont*

**DAVID CHIU***
  CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO

Yvonne R. Meré*
  *Chief Deputy City Attorney*
Sara J. Eisenberg*
  *Chief of Complex and Affirmative Litigation*
Mollie M. Lee*
  *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
  *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 6th Fl.
San Francisco, California 94102-5408
(415) 505-0844
David.Louk@sfcityatty.org

*Counsel for City and County of San Francisco*

*Application for pro hac vice admission forthcoming

**Question II (Defendants), continued:**

Defendants:

    DONALD J. TRUMP, in his official capacity as President of the United States;
    U.S. DEPARTMENT OF STATE;
    MARCO RUBIO, in his official capacity as Secretary of State;
    U.S. DEPARTMENT OF HOMELAND SECURITY;
    BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security;
    U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES;
    DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services;
    U.S. SOCIAL SECURITY ADMINISTRATION;
    MICHELLE KING, in her official capacity as Acting Commissioner of Social Security;
    UNITED STATES OF AMERICA

Attorneys:

    United States Department of Justice, 950 Pennsylvania
    Avenue NW, Washington, DC 20530, 202-514-2000

**Question VIII (Related Cases), continued:**

This case is related to no. 1:25-cv-10135-LTS, *Doe et al. v. Trump et al.*, and to no. 1:25-cv-10136-FDS, *Doe et al. v. Trump et al.*, because some of the parties are the same (specifically, defendants Trump, Rubio, King, U.S. Department of State, and U.S. Social Security Administration), and because the cases involve the same or substantially similar issues of fact and/or arise out of the same occurrence, specifically, the issuance by defendant Trump of an executive order purporting to eliminate birthright citizenship for certain persons born in the United States.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  Title of case (name of first party on each side only) State of New Jersey et al. v. Donald J. Trump et al.

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

    ☐   I.   160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

    ☐   II.   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

    ☑   III.   120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
            *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
    n/a

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
    YES ☐   NO ☑

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
    YES ☐   NO ☑
    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
    YES ☐   NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
    YES ☐   NO ☑

7.  Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
    n/a - The parties are the Commonwealth of Massachusetts, other U.S. states, and U.S. government agencies and officials residing outside Massachusetts    YES ☐   NO ☐

    A.   If yes, in which division do all of the non-governmental parties reside?
        Eastern Division ☐   Central Division ☐   Western Division ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
        Eastern Division ☐   Central Division ☐   Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
    YES ☐   NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Gerard J. Cedrone, Counsel for the Commonwealth of Massachusetts
ADDRESS Office of the Attorney General, 1 Ashburton Place, 20th Floor, Boston, MA 02108
TELEPHONE NO. (617) 963-2282

(CategoryForm11-2020.wpd )

Add. 97

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-10139-LTS |

## <u>MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL</u>

Pursuant to Federal Rule of Civil Procedure 62, Defendants respectfully move for a stay pending appeal of the of the Court's February 13, 2025 Order, ECF No. 145, which preliminarily enjoins Defendants on a nationwide basis from implementing and enforcing Executive Order No. 14160, Protecting the Meaning and Value of American Citizenship (Jan. 20, 2025). The reasons for this motion are set forth in the accompanying memorandum of law.

Dated: February 19, 2025

Respectfully submitted

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

LEAH B. FOLEY
United States Attorney

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

Add. 98

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar No. 89400)
YURI S. FUCHS
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone:  202-616-8098
Fax: 202-616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

## **LOCAL RULE 7.1 CERTIFICATION**

I hereby certify that I conferred with counsel for the Plaintiffs and that the parties were unable to resolve or narrow the issues presented by this motion.

Dated: February 19, 2025

_/s/ R. Charlie Merritt_
R. Charlie Merritt
Trial Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: February 19, 2025

_/s/ R. Charlie Merritt_
R. Charlie Merritt
Trial Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| STATE OF NEW JERSEY, *et al.*, |
| *Plaintiffs*, |
| v. |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, |
| *Defendants*. |

Case No. 1:25-cv-10139-LTS

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62, Defendants respectfully move for a stay pending appeal of the Court's February 13, 2025 Order, ECF No. 145, which preliminarily enjoins Defendants on a nationwide basis from implementing and enforcing Executive Order No. 14160, Protecting the Meaning and Value of American Citizenship (Jan. 20, 2025) ("EO"). Defendants have appealed the Court's injunction and expect to ultimately prevail on their merits arguments. But those arguments are not at issue here: irrespective of the Court's views on the merits, it should stay the injunction because it provides relief to parties—both in this litigation and across the country—who have not demonstrated their entitlement to the extraordinary remedy of a preliminary injunction.

On appeal, Defendants are likely to succeed on their argument that the states lack standing. Fundamentally, the states lack any rights under the Citizenship Clause and cannot assert such claims on behalf of their third-party residents. And they cannot otherwise claim standing based on their own purported financial injuries because the downstream effects of federal immigration policies on voluntary state expenditures do not inflict an Article III injury. Even setting that aside, the Court's extension of relief to non-party individuals across the nation violates the well-established principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). At minimum, the Court should stay the injunction insofar as it applies beyond the plaintiff states.

The equities similarly weigh in favor of staying an injunction that intrudes into internal executive branch affairs, preventing Defendants from taking even preparatory steps to implement the EO in the event that it is eventually permitted to take effect, and extends to states and non-parties who have not demonstrated a likelihood of irreparable harm or entitlement to injunctive

relief.

Defendants respectfully request a ruling by the close of business on February 26, 2025. After that time, if relief has not been granted, Defendants intend to seek relief from the U.S. Court of Appeals for the First Circuit.

## ARGUMENT

Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 43 (1st Cir. 2021). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.    Defendants Are Likely to Prevail On The Merits Of Their Argument That The Preliminary Injunction Was Improperly Issued.

"At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see also, e.g., Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (to establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision").

1.    As Defendants have explained, the state plaintiffs have failed to carry this burden here. *See* Doc. No. 92 at 18-22. The Court disagreed, but it did not acknowledge or rebut Defendants' argument that the states lack third-party standing to assert Citizenship Clause claims on behalf of their residents, much less the residents of other states. *See id.* at 20-22.

A plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties."

2

*Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Even assuming the states had made an adequate showing of direct economic injury to support Article III standing (which they have not), this argument would provide an independent basis to deny their Citizenship Clause claim.  In *Kowalski v. Tesmer*, for example, the Supreme Court assumed that the criminal defense attorney plaintiffs had established Article III standing through allegations that the challenged state law "reduced the number of cases in which they could be appointed and paid as assigned appellate counsel."  543 U.S. 125, 129 n.2 (2004) (citation omitted).  But the Court held that notwithstanding that pocketbook injury, the attorneys could not sue to assert their putative clients' constitutional right to have the government pay for their services.  *Id*. at 134.  Here, for the same reason that states lack standing to assert claims that individuals' Due Process and Equal Protection rights are harmed, *see South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966); *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023), they lack standing to assert that other individuals' rights under the Citizenship Clause are impaired.

While the Court did not address Defendants' third-party standing arguments, it found that the plaintiff states had standing because they were able to "articulate various forms of federal funding that will be diminished as a direct result of the EO."  Doc. No. 144 at 8-9.  But the challenged EO does not directly regulate the states, set standards for determining federal funding, or otherwise require that states provide any services or incur any expenditures.  It merely regulates how the federal government will approach certain individuals' immigration status.  Whatever impacts that federal policy might have on state programs are necessarily the kind of "indirect effects on state revenues or state spending" that the Supreme Court recently warned should not confer standing in "cases brought by States against an executive agency or officer."  *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

This Court found the standing analysis in *Texas* "inapt," Doc. No. 144 at 10, but its rejection of state standing based on the downstream effects of a federal policy on state budgets is based on "bedrock Article III constraints," *Texas*, 599 U.S. at 680 n.3, that courts have consistently applied to deny similar attempts at state standing as are at issue here. *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927); *Washington v. FDA*, 108 F.4th 1163, 1175-76 (9th Cir. 2024); *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). To find standing here would imply that every state has Article III standing to litigate the citizenship status of every person residing within its borders, but that is not the law and the Court should decline to adopt such a "boundless conception of Article III's injury requirement." *Washington*, 108 F.4th at 1176.[1]

2.     Defendants are also likely to prevail on their argument that nationwide relief is improper. *See* Doc. No. 92 at 49-50. A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill*, 585 U.S. at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Indeed, nationwide injunctions "take a toll on the federal court system," and "prevent[] legal questions from percolating through the federal courts." *Trump v. Hawaii*, 585

---

[1] Without fully resolving the issue, the Court suggested in a footnote that the states "also probably have standing based on their sovereign interests" that were not asserted in their preliminary injunction briefing. *See* Doc. No. 144 at 10 n.7. But the Court cited no authority for the proposition that states have a sovereign interest in "which persons are U.S. citizens," *id*., and indeed federal citizenship status is an issue over which the federal government has plenary control. *See, e.g.*, *Foley v. Connelie*, 435 U.S. 291, 312 n.5 (1978) ("For it is the Federal Government that exercises plenary control over naturalization and immigration."); *cf. Arizona*, 40 F.4th at 386-87 ("The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States.").

U.S. 667, 713 (2018) (Thomas, J., concurring).  These general principles foreclose relief to anyone in this case, and that is especially true for individuals outside of the plaintiff states who are not only non-parties but do not even live in the states that are parties to this case.

The Court acknowledged that "universal relief" is not generally necessary to "provide complete relief to" parties affected by the EO.  Doc No. 144 at 28.  But it nonetheless fashioned nationwide relief in this case because of the possibility that "children born in states that are not parties to this lawsuit" would move to a plaintiff state, "seek[] various services," and necessitate state funding.  *Id*. at 29.   But the mere prospect of such remote future impacts on state revenue streams is insufficient to justify the breadth of the Court's order here, which prevents implementation or enforcement *anywhere* in the United States.  Particularly in this preliminary injunction posture, the remote concern that babies will be born after the effective date of the EO but also move into the plaintiff states while this case is pending is too speculative to justify such sweeping relief.  It is not necessary to provide complete relief to the plaintiff states, whose claimed injuries would be substantially remedied by an order that provided relief only within their borders (assuming that they were proper parties, which again they are not).  *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  This is particularly so when the injunction covers states who asked this Court not to issue an injunction.  *See* Doc. No. 122 (amicus brief filed by 18 states); Doc. No. 127 (Tennessee amicus brief); *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring) ("Nationwide injunctions … sometimes give States victories they do not want.").

The Court also suggested that an injunction limited to the plaintiff states would "risk[] creating a new set of constitutional problems."  Doc. No. 144 at 29.  But the authority on which the Court relied—recognizing a Fourteenth Amendment "right to travel" allowing a United States citizen traveling to a new state to enjoy therein the "same privileges and immunities enjoyed by

other citizens of the same State," *Saenz v. Roe*, 526 U.S. 489, 502 (1999)—provides no basis for nationwide relief to non-parties here.  That line of cases prevents states from discriminating against U.S. citizens from other states; it does not have anything to say about the United States' recognition of citizenship under the Citizenship Clause.  *See, e.g.*, *id*.; at 502-04; *Hope v. Comm'r of Ind. Dep't of Corrs.*, 9 F.4th 513, 525 (7th Cir. 2021) (noting that the Supreme Court's right to travel decisions each involved a state "rule that explicitly discriminated between old and new residents").  It would not violate anyone's right to travel for the Court, for the limited period of time until this case can be resolved and in accordance with traditional equitable principles, to limit any preliminary injunctive relief to the parties before it.

3.    The Court's injunction is also overbroad to the extent it enjoins not only enforcement of the EO, but also internal steps relating to its implementation.  As noted below, that causes harm to the government, and it is inconsistent with the well-established principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  At minimum, the Court should limit its injunction to permit the government to implement the EO in ways that cause no harm to the plaintiff states, including by taking internal, preparatory steps regarding the EO's application and formulating relevant policies and guidance.

## II.    The Balance Of Equities, Including The Irreparable Harm Defendants Will Suffer, Favors a Stay.

The balance of the equities likewise favors staying injunctive relief to parties who have not demonstrated their entitlement to it.  Providing relief to states that lack standing and individuals in all 50 states who have not demonstrated their entitlement to such relief conflicts with the principles articulated above and allows "one district court [to] make a binding judgment for the entire country."  *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021).  That is especially inappropriate

in the context of this litigation, where multiple states have argued that the EO should not be universally enjoined.  *See* Doc Nos. 122, 127 (state amicus briefs).

In addition, an injunction that interferes with the President's ability to carry out his broad authority over immigration matters is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government."  *INS v. Legalization Assistance Project of L.A. County Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers).  Indeed, any injunction that prevents the President from exercising his core authorities is "itself an irreparable injury."  *Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

As noted above, the injunction causes further harm to the Defendants because its breadth— applying to all implementation and enforcement—prevents the executive branch as a whole from even beginning the process of formulating relevant policies and guidance for implementing the EO.  If Defendants are successful on their appeal and the EO is eventually allowed to take effect, but the injunction is not stayed in its overbroad applications while that appeal is pending, the Defendants will be unable to make preparations necessary to implement the EO, thus further delaying its implementation.[2]  Such a delay in effectuating a policy enacted by a politically

---

[2] The EO is also subject to two other preliminary injunctions preventing implementation and enforcement of the EO on a nationwide basis.  *See Washington v. Trump*, No. 2:25-cv-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025); *CASA, Inc. v. Trump*, No. 8:25-cv-201-DLB, 2025 WL 408636 (D. Md. Feb. 5, 2025).  Defendants have appealed both preliminary injunctions and, in both cases, filed motions to stay their overbroad applications in both district court and with the relevant courts of appeal.  *See Washington v. Trump*, No. 25-807, ECF No. 21.1 (9th Cir. Feb. 12, 2025); *Casa, Inc. v. Trump*, No. 25-1153, ECF No. 9 (4th Cir. Feb. 19, 2025).  Two narrower injunctions have also been entered against the EO.  *See N. H. Indonesian Comm. Supp. v. Trump* ("*NHICS*"), No. 1:25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025); *Doe v. Trump*, No. 25-CV-10135-LTS, ECF No. 47 (D. Mass. Feb. 13, 2025).  Defendants have sought clarification regarding the NHICS injunction's scope, *see NHICS*, ECF No. 81, and filed a notice of appeal in the *Doe* case, *see Doe*, ECF No. 48.

7

accountable branch of the government imposes its own "form of irreparable injury." *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (citation omitted). This is especially harmful in this context where, as Defendants have explained, the challenged EO is part of a larger immigration policy designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Doc. No. 92 at 14.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' opposition to Plaintiffs' motions for preliminary injunction, Doc. No. 92, Defendants respectfully request that this Court stay its preliminary injunction. Defendants respectfully request a ruling on this motion by no later than the close of business on February 26, 2025, after which time, if relief has not been granted, Defendants intend to seek relief from the First Circuit.


Dated: February 19, 2025                    Respectfully submitted

                                            BRETT A. SHUMATE
                                            Acting Assistant Attorney General
                                            Civil Division

                                            LEAH B. FOLEY
                                            United States Attorney

                                            ALEXANDER K. HAAS
                                            Branch Director

                                            BRAD P. ROSENBERG
                                            Special Counsel

                                            */s/ R. Charlie Merritt*
                                            R. CHARLIE MERRITT (VA Bar No. 89400)
                                            YURI S. FUCHS
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005

Phone:  202-616-8098
Fax: 202-616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: February 19, 2025

*/s/ R. Charlie Merritt*
R. Charlie Merritt
Trial Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

STATE OF NEW JERSEY et al.,                )
                                           )
        Plaintiffs,                        )
                                           )
v.                                         )        Civil No. 25-10139-LTS
                                           )
DONALD J. TRUMP et al.,                    )
                                           )
        Defendants.                        )
_____)

ORDER ON MOTION TO STAY PRELIMINARY
INJUNCTION PENDING APPEAL (DOC. NO. 157)

February 26, 2025

SOROKIN, J.

The defendants have appealed this Court's order preliminarily enjoining implementation of President Donald Trump's Executive Order redefining birthright citizenship in the United States. Doc. No. 154. They now seek an order staying the preliminary injunction until their appeal is resolved. Doc. Nos. 157, 158. The plaintiffs have opposed the defendants' motion in a thoughtful and persuasive memorandum. Doc. No. 160. Though the Court permitted the defendants an opportunity to reply, see Doc. No. 159 (setting deadline of February 25, 2025), they have not done so. For reasons the Court will briefly explain, the defendants' motion for a stay (Doc. No. 157) is DENIED.

The standard applicable to the defendants' request requires consideration of essentially the same four equitable factors that governed the plaintiffs' original motion. See Doc. No. 158 at 3 (describing standard); Doc. No. 160 at 3 (same). As the Court explained in detail in its recent Memorandum Decision, those factors favor the plaintiffs here. See generally Doc. No. 144. And,

Add. 112

as the Court also made clear, this was not a close case.  The equitable scale did not tip ever so slightly in the plaintiffs' direction; the four factors favor the plaintiffs lopsidedly.  That was so in the preliminary-injunction analysis, where the plaintiffs bore a high burden of persuasion and decisively satisfied it.  If the defendants could not succeed in that context, then they certainly cannot prevail now.  On the present motion, the burden shifts to the defendants to establish entitlement to the extraordinary relief they seek, and they have endeavored to meet it primarily by repastinating the same facts and legal theories the Court has already considered and rejected.

Challenges to the plaintiffs' standing, the nationwide scope of the injunction, and the evaluation of irreparable injury fail for reasons the Court has already explained and the plaintiffs ably address in their opposition memorandum.  See Doc. No. 144 at 8-11, 13, 24-29; Doc. No. 160 at 4-15.  The only new issue raised by the defendants concerns the scope of conduct enjoined by the prohibition on "implementation" of the Executive Order.  See Doc. No. 158 at 7.  The defendants did not address this nuance in their earlier papers, nor is it meaningfully developed in the single paragraph they devote to it now.  Id.  For example, the defendants have not identified what "internal steps" they wish to take, but are prevented from taking, by the plain terms of the injunction.  Thus, the Court cannot evaluate whether such steps would or should be foreclosed and what harms may flow from their temporary prohibition.  When asked at the preliminary-injunction hearing about this issue, the defendants' lawyer was "not able to answer questions about implementation."  Doc. No. 142 at 61.  On this issue, then, the motion to stay is denied both for failure to specify what changes the defendants propose making to the injunction and because, as the plaintiffs point out, the Executive Order itself contemplates "implementation" within a relatively brief, thirty-day period.

"To say more would be to paint the lily." <u>Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.</u>, 126 F.4th 773, 783 (1st Cir. 2025) (Selya, J.).  The defendants' motion for a stay (Doc. No. 157) is DENIED.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge