**No. 25-1170**

**In the**
**United States Court of Appeals for the First Circuit**

STATE OF NEW JERSEY, ET AL.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, ET AL.,
*Defendants-Appellants*.

**On Appeal from the**
**United States District Court for**
**the District of Massachusetts**

Brief *Amicus Curiae* of
America's Future,
Gun Owners of America, Inc., Gun Owners Foundation,
Citizens United,
U.S. Constitutional Rights Legal Defense Fund,
Leadership Institute, and
Conservative Legal Defense and Education Fund
in Support of Defendants-Appellants'
Motion for Stay Pending Appeal

JEFFREY C. TUOMALA
 114 Creekside Ln.
 Winchester VA  22602

RICK BOYER
 INTEGRITY LAW FIRM
 P.O. Box 10953
 Lynchburg, VA 24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
 WILLIAM J. OLSON, P.C.
 370 Maple Avenue West, Suite 4
 Vienna, VA  22180-5615
 (703) 356-5070
*Attorney of Record
*Attorneys for Amici Curiae*
March 4, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    THE DISTRICT COURT'S DECISION WAS PREDICATED ON
      SEVERAL ERRORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE ORIGINAL
      INTENT OF THE FOURTEENTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  THE DISTRICT COURT'S CONCLUSION THAT BIRTHRIGHT CITIZENSHIP
      SHOULD BE HANDED OUT IRRESPECTIVE OF ALLEGIANCE HAS
      BIZARRE RESULTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   THE CASE AGAINST PRESIDENT TRUMP SHOULD
      BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

Page

U.S. CONSTITUTION

Article III, Sec. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Article IV, Sec. 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Amendment XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 7, 11, 12, 14


STATUTES

Civil Rights Act of 1866 (14 *Stat.* 27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12


CASES

*Carlisle v. United States*, 83 U.S. 147 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 14

*Elk v. Wilkins*, 112 U.S. 94 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Franklin v. Massachusetts*, 505 U.S. 788 (1992). . . . . . . . . . . . . . . . . . . . . 20, 21

*Kendall v. United States*, 37 U.S. 524 (1838) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Korematsu v. United States*, 323 U.S. 214 (1944). . . . . . . . . . . . . . . . . . . . . . . . 3

*Marbury v. Madison,* 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Minor v. Happersett*, 88 U.S. 162 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Mississippi v. Johnson*, 71 U.S. 475 (1866). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Roe v. Wade*, 410 U.S. 113 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Slaughter-House Cases*, 83 U.S. 36 (1873) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898). . . . . . . . . . . . . . . . 4-8, 19

*Van Ness v. Pacard*, 27 U.S. 137 (1829) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9


MISCELLANEOUS

R. Berger, Government by the Judiciary: The Transformation of the
    Fourteenth Amendment (Liberty Fund: 1997). . . . . . . . . . . . . . . . . . . . . . 11

Congressional Globe, 39th Cong, 1st Sess, 2890-97. . . . . . . . . . . . . . . 14, 15, 16

J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*," 22 CHAP. L.
    REV. 301 (Spring 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet
    Daily News* (Mar. 12, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E.J. Erler, The Founders on Citizenship and Immigration (Claremont
    Inst: 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

J. Feere, "Birthright Citizenship in the United States: A Global Comparison," *Center for Immigration Studies* (Aug. 31, 2010) . . . . . . . . . . . . . . . . . . . 19

D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian Practice," *This Day* (Aug. 16, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say Trump's action illegal," *Vanguard* (Jan. 23, 2025) . . . . . . . . . . . . . . . . . . . . . . . . 19

Office of the Inspector General, "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks," (Nov. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

W. Olson, H. Titus & A. Woll, "Children Born in the United States to Aliens Should Not, by Constitutional Right, Be U.S. Citizens," *U.S. Border Control* (Jan. 2001; rev'd 2003; rev'd 2005, rev'd 2018) . . . . . . . . . . . . . . 9

K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful lure," *Washington Post* (July 18, 2010) . . . . . . . . . . . . . . . . . . 19

U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System" (June 9, 2009) . . . . . . . . . . 19

U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human smuggling scheme" (Oct. 30, 2024). . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTEREST OF *AMICI CURIAE*[1]

The interest of the *Amici Curiae* is set out in the motion for leave to file *amicus* brief.

## STATEMENT OF THE CASE

One January 20, 2025, President Donald Trump issued an executive order entitled, "Protecting the Meaning and Value of American Citizenship"[2] ("the Order"). The Order noted that being born on American soil has never by itself automatically conferred American citizenship. The Order stated that "[t]he Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'" *Id.* Accordingly, the Order contained a narrowly defined directive to federal agencies that federal agencies are not to consider a person born on U.S. soil a citizen when, "at the time of said person's birth," the father "was not a United States citizen or lawful permanent resident..." and:

> "when that person's **mother**" was:
> (1) "**unlawfully present** in the United States" ... or

---

[1]  No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2]  The White House, "Protecting the Meaning and Value of American Citizenship" (Jan. 20, 2025).

(2) ... when [the mother's presence] ... was **lawful but temporary** (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa).... [*Id.* (emphasis added).]

The Order provided, *inter alia*, that "no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" for persons in the two narrowly defined categories. *Id.*

Critics of President Trump quickly responded with multiple federal lawsuits seeking injunctive relief. This challenge was filed January 21, 2025, the day after the Order was issued. In this case, 18 States, Washington, D.C., and the City and County of San Francisco, sued President Trump and several other federal defendants.

Plaintiffs allege that the Order violates the Fourteenth Amendment's "Citizenship Clause," the constitutional separation of powers, the Immigration and Nationality Act (8 U.S.C. § 1401(a)), and the Administrative Procedure Act. The district court consolidated this case with *Doe v. Trump*, a case brought by O. Doe, an alien expectant mother, and two nonprofit organizations, La Colaborativa and the Brazilian Worker Center. *Doe v. Trump*, 2025 U.S. Dist. LEXIS 27582 at *15 (D. Ma. 2025).

2

# ARGUMENT

## I.    THE DISTRICT COURT'S DECISION WAS PREDICATED ON SEVERAL ERRORS.

To be sure, the district court's opinion is consistent with what is, in many legal circles, the prevailing view of U.S. Citizenship.  To the extent that citizenship is addressed in modern constitutional law classes, the district court's view was the same as that taught in the schools attended by most judges and lawyers.  However, the district court's opinion is fundamentally wrong on the law as to virtually every point in its understanding of citizenship in the United States under the Citizenship Clause.  There was a time that *Dred Scott v. Sandford*[3] was good law, and so also was *Korematsu v. United States*,[4] and more recently *Roe v. Wade*.[5]  This is a time not to reflect on what was once learned, but for courts to engage the issues and seriously re-examine what they had assumed to be true. This *amicus* brief seeks to present a comprehensive opposing view which demonstrates the errors of the district court's opinion, summarized briefly here.

First, the court assumed that the **text** resolves the legal issue without any more analysis, stating:

---

[3]  60 U.S. 383 (1857).

[4]  323 U.S. 214 (1944).

[5]  410 U.S. 113 (1973).

Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake.  In so doing, these interpretations **stray from the text** of the Citizenship Clause.  [*Doe* at *11 (emphasis added).]

The text states:  "All persons born or naturalized in the United States, **and subject to the jurisdiction thereof**, are citizens of the United States and of the State wherein they reside."  Fourteenth Amendment, Sec. 1 (emphasis added).  The district court did not actually deal with the text, but simply adopted what it thought was the Court's view in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), which it characterized as:

the Supreme Court concluded that "subject to the jurisdiction thereof" was meant "to exclude, by the fewest and fittest words," the following categories of persons:  "children of members of the Indian tribes," "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state."  [*Doe* at *26.]

The court never addressed why such persons would not be U.S. Citizens according to the text.  Does it matter that the persons covered by the Executive Order are also citizens of other countries as well as the United States, under the law of other nations?  Does a person become "subject to the jurisdiction thereof" simply by being subject to arrest for the commission of a crime?  If so, then what about the children born to those working in foreign embassies who do not have diplomatic immunity, are they U.S. Citizens?  What about those born to a woman who is from and a citizen of a nation on our State Department's State Sponsors of

4

Terrorism[6] (Cuba, North Korean, Iran, and Syria) or others like Russia or China, which are not here "in hostile occupation"?  As of this date, are there any children born who would not be citizens under the district court's "hostile occupation" test? With all these unanswered question, what is the validity of the district court's contention that the text resolves the issue for the Plaintiffs?

Second, the district court stated:

> In a lengthy 1898 decision, the **Supreme Court** examined the Citizenship Clause, **adopting** the interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO.  [*Doe* at 9-10 (emphasis added).]

However, the *Wong Kim Ark* decision did not in any way decide the issue presented here, and on the issues it addressed, it was fundamentally flawed. Consider the several cases decided during that time frame.  In 1873, just five years after ratification of the Fourteenth Amendment, the Court interpreted the Citizenship Clause:

> That its main purpose was to establish the citizenship of the negro can admit of no doubt.  The phrase, "**subject to its jurisdiction**" was intended to **exclude** from its operation children of ministers, consuls, and **citizens or subjects of foreign States born within the United States**.  [*Slaughter-House Cases*, 83 U.S. 36, 73 (1873) (emphasis added).]

---

[6] https://www.state.gov/state-sponsors-of-terrorism/

Two years later, the Court again questioned acquiring citizenship, focusing on British citizenship:

> At **common-law**, ... it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also. These were natives, or natural-born citizens, as distinguished from aliens or foreigners. **Some authorities go further** and include as citizens children born within the jurisdiction without reference to the citizenship of their parents. **As to this class there have been doubts**.... [*Minor v. Happersett*, 88 U.S. 162, 167-68 (1874) (emphasis added).]

Just 12 years before *Wong Kim Ark*, writing for the Court, Justice Gray again highlighted the critical difference between the children of citizens and the children of aliens owing allegiance to foreign powers. The Court declared:

> [t]he main object of the opening sentence of the Fourteenth Amendment was to settle the question ... as to the citizenship of free negroes ... and to put it beyond doubt that all persons, white or black, and whether formerly slaves or not, born or naturalized in the United States, and **owing no allegiance to any alien power**, should be citizens of the United States.... [*Elk v. Wilkins*, 112 U.S. 94, 101 (1884) (emphasis added).]

Because the Plaintiff in *Elk v. Wilkins* was a member of a Native American tribe to which he owed allegiance, and had never been naturalized, the Court found that he was **not a citizen** despite being born on U.S. soil. Should *Wong Kim Ark* be read to overrule these cases?

Despite some unduly broad dicta, *Wong Kim Ark* did not even address those specific children covered by the Executive Order — those born to a mother either

6

**illegally or temporarily present** in the United States.  The question addressed in

*Wong Kim Ark* was:

> whether a child born in the United States, of parents of [foreign]
> descent, who, at the time of his birth, are subjects of [a foreign
> government], but have a **permanent domicil** and residence in the
> United States, and are there carrying on business, and are not
> employed in any diplomatic or official capacity under the [foreign
> government], becomes at the time of his birth a citizen of the United
> States.  [*Wong Kim Ark* at 653 (emphasis added).]

However, if *Wong Kim Ark* viewed that "subject to the jurisdiction" of the

United States simply meant to be present "within the jurisdiction" thereof,

equating (i) children born to aliens who owe allegiance to foreign governments to

(ii) children of citizens, that decision was in error, an outlier, inconsistent with the

Supreme Court's decisions in the *Slaughter-House Cases, Minor,* and *Elk.*

Third, the district court assumed that *Wong Kim Ark* was **later validated** by

the courts and Congress, stating:

> The rule and reasoning from that decision were reiterated and applied
> in later decisions, adopted by Congress as a matter of federal statutory
> law in 1940....  [*Doe* at 10.]

There is no reason to believe that, when Congress enacted a law which used

the same words as the Fourteenth Amendment, it was ratifying a decision of the

Supreme Court which did not resolve the issue, and certainly did not equate the

Citizenship Clause's commandment with a mistaken reading of *Wong Kim Ark*,

rather than the Clause itself.  As Plaintiffs concede, the language of the INA,

"subject to the jurisdiction thereof" "[m]irror[s] the language of the Citizenship

Clause."  Complaint ¶ 91.  Thus, it could be said to incorporate that Amendment,

but not Plaintiffs' mistaken reading of *Wong Kim Ark*.

Fourth, the district court demonstrated a fundamental misunderstanding of

citizenship in finding that allegiance and parentage are irrelevant:

> First, allegiance in the United States arises from the fact of birth.  It
> does not depend on the status of a child's parents....  [*Doe* at *10.]

The district court's position is identical to the common-law principle of *jus soli*

(*see also* Complaint ¶ 79), but that common law is completely inapplicable, as it

was developed under the British view of citizenship.  In *Wong Kim Ark*, Justice

Gray accurately described the English common law's presumption that everyone

born on English soil was a subject of the King for life, whether he wished to be or

not.  "By the common law of England, every person born within the dominions of

the Crown, no matter whether of English or of foreign parents, and, in the latter

case, whether the parents were settled, or merely temporarily sojourning, in the

country, was an English subject."  *Wong Kim Ark* at 657.

However, Justice Gray incorrectly assumed the British rule of citizenship

that he described also applied in America when it does not.  As Justice Story

explained in 1829, "The common law of England is not to be taken in all respects

8

to be that of America.  Our ancestors brought with them its general principles, and claimed it as their birthright.  But they brought with them, and adopted only that portion which was applicable to their situation." *Van Ness v. Pacard*, 27 U.S. 137, 145 (1829).

This distinction between British and American citizenship was addressed in an article originally published in January 2001 by a nonprofit organization, U.S. Border Control.  As the authors explained, the legal principle of *jus soli* was based on the idea that the king owned the land, and thus anyone born on the land, whether to a citizen or an alien, became by birth a subject of the king, to whom that person now owed allegiance for life, being permanently a subject by accident of birth on the King's land.[7]

Constitutional scholar John Eastman explained when that shift to an American notion of citizenship occurred.  He stated that, by declaring their land and persons independent of the King in 1776, the Framers expressly rejected the notion of being unalterably subjects by birth:  "The Declaration of Independence is not just a thorough repudiation of that old feudal idea of 'permanent allegiance' [to the king by accident of birth], but perhaps the most eloquent repudiation of it

---

[7] W. Olson, H. Titus & A. Woll, "Children Born in the United States to Aliens Should Not, by Constitutional Right, Be U.S. Citizens," *U.S. Border Control* (January 2001; rev'd 2003; rev'd 2005, rev'd 2018).

ever written....  The notion that the English common law of *jus soli* therefore continued unabated after the Declaration of Independence could not be more mistaken."[8]

Actually, citizenship is a reciprocal duty of protection.  Only those persons who can be expected to have a "**permanent allegiance**" to our country can become citizens, because only on that permanent allegiance does the country's reciprocal duty of protection arise.  No such relationship exists with the two classes of persons addressed by the EO:

> By **allegiance** is meant the obligation of **fidelity and obedience** which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives.  It may be an absolute and permanent obligation, or it may be a qualified and temporary one.  The citizen or subject owes an **absolute and permanent allegiance** to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign.  The alien, whilst domiciled in the country, owes a **local and temporary allegiance**, which continues during the period of his residence. [*Carlisle v. United States*, 83 U.S. 147, 154 (1872) (emphasis added).]

These and other flaws with the extreme theory advanced by plaintiffs and adopted by the district court that everyone born on U.S. soil — but for two tiny exceptions which might cover a infinitesimal fraction of 1 percent of births

---

[8]  J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*," 22 CHAP. L. REV. 301, 308-309 (Spring 2019).

covered by the Executive Order — are U.S. citizens are discussed in the following sections.

## II.  "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE ORIGINAL INTENT OF THE FOURTEENTH AMENDMENT.

The district court opinion gives little consideration to the views of the Framers of the Fourteenth Amendment but rather cites to case law.  Following the Civil War, Congress took action to overrule *Dred Scott v. Sandford*, 60 U.S. 393 (1857), which held that slaves and their descendants, even as freedmen, were excluded from U.S. citizenship.  Congress first moved to override *Dred Scott* by enacting the **Civil Rights Act of 1866**, which provided that "all persons born in the United States and **not subject to any foreign power**, excluding Indians not taxed, are hereby declared to be **citizens** of the United States."  14 *Stat*. 27 (emphasis added).

Due to concerns that the Supreme Court might rule the Civil Rights Act unconstitutional or that a subsequent Congress might repeal the Act, Congress initiated the process required to amend the Constitution.  *See* Raoul Berger, Government by the Judiciary: The Transformation of the Fourteenth Amendment at 48 (Liberty Fund: 1997).  The resulting Fourteenth Amendment included this language:

11

Section 1.  All persons born or naturalized in the United States, and **subject to the jurisdiction thereof**, are citizens of the United States and of the State wherein they reside....  No State shall ... deny to any person **within its jurisdiction** the equal protection of the law. [Emphasis added.]

The language "**subject to the jurisdiction thereof**" in the Fourteenth Amendment was understood as conveying the same meaning as the language "**and not subject to any foreign power**" as used in the Civil Rights Act of 1866.  Most countries claim as citizens those children born to parents who are their citizens.  Consequently, even if born on American soil, those children are **subjects of a foreign power** and thus **not subject to the jurisdiction of the United States**.  That being the case, children born in the United States of parents who are not U.S. citizens have no lawful claim of citizenship simply because they are born in U.S. territory.

The Declaration of Independence not only freed the new country from the notion that persons born in America were British citizens with allegiance to England, it demonstrated the solemn, binding, and covenantal action undertaken on behalf of the people, which was later confirmed by the People's ratification of the Constitution which begins "We the People."

We, therefore, the Representatives of the united States of America, in General Congress, Assembled, **appealing to the Supreme Judge of the world for the rectitude of our intentions**, do, in the Name, and by Authority of the good People of these

Colonies, solemnly publish and declare, That these United Colonies are, and of Right ought to be **Free and Independent States**; that they are **Absolved from all Allegiance to the British Crown**, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved…. [Declaration of Independence (emphasis added).]

The Declaration of Independence declared that Americans were shifting from their previous "**allegiance to the British Crown**" to allegiance to the new nation formed of "**Free and Independent States**."  Likewise, the ratification history of the Fourteenth Amendment, discussed *infra*, demonstrates that "**subject to the jurisdiction**" entails an obligation of allegiance to the United States and not simply an obligation of obedience to the laws of the United States.  The **obligation of allegiance** signified in the Citizenship Clause is different in kind from the obligation of every person in the territory of the United States to obey the laws of the land.

Citizens subject to the jurisdiction of the United States are entitled to corresponding privileges and immunities of citizenship.  Constitution, Article IV, Sec. 2, cl. 1.  On the other hand, all persons who "come within its jurisdiction" have a duty to obey the law, together with a corresponding right to the equal protection of the law.  The meaning of the phrase "subject to the jurisdiction" as used in the Fourteenth Amendment context is very different from the meaning of "within its jurisdiction."

13

The record of Congress's deliberations on the Fourteenth Amendment identifies the limited objective for which the Citizenship Clause was adopted — to reverse *Dred Scott* and to ensure that the citizenship of freedmen was recognized on the same basis as other Americans born in the United States. The purpose was not to change the law regarding citizenship, but rather to affirm its proper understanding. The deliberations specifically addressed the issue of children born in the United States to non-citizens and assumed that they did not qualify as natural born citizens. It was understood by the Amendment's Framers that the best evidence that a person will bear true faith and allegiance to America is birth in the United States to American parents.

Senator Jacob Howard of Michigan, who authored the Citizenship Clause, explained its meaning:

> This … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. **This will not, of course, include persons born in the United States who are foreigners, aliens**, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. [Congressional Globe, 39th Cong., 1st Sess., 2890 (emphasis added).]

Senator Howard also explained what he meant by use of the term "jurisdiction":

> "jurisdiction" as here employed, ought to be construed so as to imply a **full and complete jurisdiction** on the part of the United States ...

14

that is to say, the **same jurisdiction in extent and quality** as applies
to every citizen of the United States now.  [*Id*. at 2895 (emphasis
added).]

Senator Lyman Trumbull of Illinois, Chairman of the Senate Judiciary Committee,

concurred with Senator Howard regarding his characterization of the meaning of

"jurisdiction":

That means "subject to the complete jurisdiction thereof".... **Not
owing allegiance to anybody else**.  That is what it means....  It
cannot be said of any [person] who owes allegiance, partial allegiance
if you please, to some other Government that he is "subject to the
jurisdiction of the United States…."
It is only those persons who are completely within our jurisdiction,
who are subject to our laws, that we think of making citizens; and
there can be no objection to the proposition that such persons should
be citizens.  [*Id*. at 2893 (emphasis added).]

Senator George Williams of Oregon concurred:

In one sense, all persons born within the geographical limits of the
United States, are subject to the jurisdiction of the United States, but
they are not subject to the jurisdiction of the United States in every
sense....  I understand the words here, "subject to the jurisdiction of
the United States," to mean fully and completely subject to the
jurisdiction of the United States.  [*Id*. at 2897 (emphasis added).]

Senator Edgar Cowan of Pennsylvania specifically expressed concern that

the amendment should not be interpreted to grant citizenship to Chinese immigrant

workers in California and went on to discuss the rights of travelers in the United

States from foreign nations:

15

> If a **traveler** comes here from Ethiopia, from Australia, or from Great Britain, he is entitled to a certain extent, to the protection of the laws. You cannot murder him with impunity.  It is murder to kill him, the same as it is to kill another man.  You cannot commit an assault and battery on him, I apprehend.  He has a right to the protection of the laws; but he is **not a citizen** in the ordinary acceptation of the word. [*Id*. at 2890 (emphasis added).]

Before the debate on Senator Howard's proposal to add the qualifying phrase "subject to the jurisdiction thereof," Senator Saulsbury concisely stated the Senate's object with regard to this amendment, and in so doing, removed all doubt as to the limited purpose of the amendment as drafted.

> I do not presume that any one will pretend to disguise the fact that the object of this first section is simply to declare that negroes shall be citizens of the United States.  [*Id.* at 2897.]

## III.    THE DISTRICT COURT'S CONCLUSION THAT BIRTHRIGHT CITIZENSHIP SHOULD BE HANDED OUT IRRESPECTIVE OF ALLEGIANCE HAS BIZARRE RESULTS.

The district court's preliminary injunction omits discussion of one of the most important aspects of Citizenship — the **allegiance** that a person owes to his own country, sometimes described as loyalty or fidelity to the nation.  Most countries recognize citizenship based on the principle of *jus sanguinis* — that a child acquires the citizenship of the child's natural parents.  *See* Edward J. Erler, The Founders on Citizenship and Immigration (Claremont Inst: 2007) at 28-29. Thus, children born anywhere in the world to citizens of most other countries

16

acquire the citizenship of their parents at birth.  Under Plaintiffs' notion of "birthright citizenship" — a term of recent origin that cannot be sourced to the Declaration, Constitution, or statute — almost all such children automatically would be citizens of multiple countries.  To which country do these children owe their allegiance?

The United States has long required naturalized citizens to disavow allegiance to all foreign sovereigns, but not so with those covered by Plaintiffs' assertion of birthright citizenship.  Because most children born in the United States to parents with foreign citizenship are recognized as foreign nationals under international law, they are not any more "subject to the jurisdiction" of the United States than are the children of diplomats, Native Americans, or foreign invaders, who Plaintiffs concede cannot benefit from citizenship by birth alone.

The importance of allegiance is most acutely felt during time of war when the obligations of citizenship are most consequential.  An American citizen is "subject to the jurisdiction" of the United States and may be drafted into the military even if outside the country.  Citizens who take up arms against the United States may be prosecuted for treason.  *See* U.S. Constitution Article III, Sec. 3. Non-citizens who take up arms against the United States are prisoners of war if captured, and they are not subject to prosecution simply for waging war against

17

the United States.  A person who is a citizen of two different countries that are at war will be placed in an untenable position.  The problems that arise with dual citizenship were acutely felt by U.S. citizens who were impressed into service with the British navy leading up to the War of 1812.

Neither of the two categories of children born to aliens in the United States that are addressed by the Executive Order can be expected to demonstrate allegiance to our nation.  First, those children born of parents who are not legally in the United States cannot be expected to be nurtured in the values of American citizenship by parents who entered the country illegally — being here not "subject to" but rather "in defiance of" our nation's laws.  Second are those children of parents, birth tourists, who travel to the United States for the purpose of giving birth and thereby obtaining cheap and easy citizenship for their children.  They too are unlikely to have any allegiance to nurture their children in values of American citizenship.

Indeed, as explained *supra*, only those persons who can be expected to have a "**permanent allegiance**" to our country can become citizens, because based on that permanent allegiance, the country then owes to its citizens a reciprocal duty of protection.  But no such relationship can be said to be established with the two classes of persons covered by the EO.

18

If *Wong Kim Ark* is read to support the district court's preliminary injunction, it contravenes common sense and our sense of justice.  According to the district court's theory, under *Wong Kim Ark*, a person born in the United States of alien parents is constitutionally entitled to American citizenship, whereas a person born outside the United States to American citizens is entitled to such citizenship only by statute.  Why should there be an irrebuttable legal presumption of allegiance in the former case, but not in the latter?

Under the Plaintiffs' theory of the case and the district court's preliminary injunction, children of the 9/11 hijackers, human traffickers, and enemy combatants captured overseas and held in the United States born on U.S. territory would be entitled to citizenship.[9]  Birth tourism from Turkey, China, Nigeria, and Mexico has received considerable attention.[10]  The problems associated with the

---

[9]  *See, e.g.*, Office of the Inspector General, "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks," ch. 5 (Nov. 2004); U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human smuggling scheme" (Oct. 30, 2024); U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System" (June 9, 2009).

[10]  *See, e.g.*, J. Feere, "Birthright Citizenship in the United States: A Global Comparison," *Center for Immigration Studies* (Aug. 31, 2010); I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet Daily News* (Mar. 12, 2010); K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful lure," *Washington Post* (July 18, 2010); D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian Practice," *This Day* (Aug. 16, 2010); N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick,

theory of birthright citizenship are exacerbated by statutes that facilitate immigration of family members of lawfully naturalized citizens, known as "chain migration."

## IV.  THE CASE AGAINST PRESIDENT TRUMP SHOULD BE DISMISSED.

The Plaintiffs named President Trump in his official capacity as the lead defendant.  Compl.  ¶ 68.  The government's opposition to plaintiffs' TRO motion raised the impropriety of seeking relief against the President (*see* Opposition at 39), and the district court properly did not extend its injunction against the President.  *See Doe* at *48.  Indeed, the district court was correct because had no jurisdiction to enter an injunction against the President, but left the issue unresolved.  This is not a close question, and refusal to address the issue allows the case to continue to be known as *Doe v. Trump*.

In *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), the Supreme Court explained that, while a district court could enjoin an executive branch official, it could not enjoin the President himself.  In striking down an injunction against a President, the Court bluntly stated that "the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows."  *Id*. at 802.  Concurring in *Franklin*, Justice Scalia went even

_____

say Trump's action illegal," *Vanguard* (Jan. 23, 2025).

further, asserting that "[i]t is a commentary upon the level to which judicial understanding — indeed, even judicial awareness — of the doctrine of separation of powers has fallen, that the District Court entered this order against the President without blinking an eye." *Id*. at 826.  Justice Scalia noted that, up until at least 1984, "'[n]o court has ever issued an injunction against the president himself or held him in contempt of court.'" *Id*. at 827.

In 1838, the High Court observed that "[t]he executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Kendall v. United States*, 37 U.S. 524, 610 (1838).  The specific issue of an injunction against the President was considered by the U.S. Supreme Court in *Mississippi v. Johnson*, 71 U.S. 475 (1866), involving Mississippi's suit to enjoin President Andrew Johnson from enforcing the Reconstruction Acts.  Although leaving open the question of whether the President could be ordered to perform mere ministerial acts, the Court made clear that "this court has no jurisdiction ... to enjoin the President in the performance of his official duties...." *Id.* at 501.

Clearly, President Trump's issuance and enforcement of his Executive Order was an act in the performance of his official duties.  *See Marbury v.*

21

*Madison*, 5 U.S. 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion.  Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.").  *See also Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).  For his official acts, the President cannot be subjected to the jurisdiction of the judiciary — which is not a superior, but coequal, branch of government.

## CONCLUSION

For the foregoing reasons, the district court's February 13, 2025 Preliminary Injunction should be stayed pending appeal.

Respectfully submitted,

   /s/ *William J. Olson*

JEFFREY C. TUOMALA
  114 Creekside Ln.
  Winchester, VA  22602

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA 24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West,
  Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record
*Attorneys for Amici Curiae*
March 4, 2025

22

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Defendants-Appellants' Motion for Stay Pending Appeal contains 5,181 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

 /s/ *William J. Olson*     
William J. Olson
Attorney for *Amici Curiae*

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Defendants-Appellants' Motion for Stay Pending Appeal, was made, this 4th day of March, 2025, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

      /s/ *William J. Olson*
William J. Olson
Attorney for *Amici Curiae*