No. 25-1170

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS;
STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI;
STATE OF MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL, on
behalf of the People of Michigan; STATE OF MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA;
STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND
COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of
State; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official
capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as
Secretary of Health and Human Services; U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND DUDEK, in his official capacity as Acting
Commissioner of Social Security; UNITED STATES OF AMERICA,

*Defendants-Appellees,*

On Appeal from an Order of the United States District Court
for the District of Massachusetts (Sorokin, J.) in No. 25-cv-10139

# APPELLEES' OPPOSITION TO APPELLANTS' MOTION
# FOR STAY PENDING APPEAL

## TABLE OF CONTENTS

Page

**INTRODUCTION**.................................................................................... 1

**BACKGROUND** .................................................................................... 2

    A.   Executive Order 14160. ...........................................................3

    B.   The Order's Impacts on Plaintiffs. ..........................................4

    C.   This Litigation. .......................................................................6

    D.   Parallel Litigation ..................................................................8

**ARGUMENT** ........................................................................................ 8

  I.   Defendants Will Not Suffer Irreparable Harm Absent A Stay. ...................9

  II.  Defendants' Arguments Are Unlikely To Succeed. .................................10

    A.   Plaintiffs Have Standing. ......................................................11

        1.   Plaintiffs Directly Suffer Article III Injuries From The Order. .........................................................................11

        2.   Plaintiffs Are Not Barred From Litigating Their Claims Because They Also Implicate Residents' Rights. .......................13

            a.   Plaintiffs Are Not Suing In A *Parens Patriae* Capacity. ....14

            b.   No Prudential Limitation Bars Plaintiffs From Litigating To Redress Their Article III Injuries. .......................................15

    B.   Nationwide Relief Is Proper...................................................19

  III.  The Equitable Balance Weighs Decisively Against A Stay. ......................21

    **CONCLUSION**.................................................................................... 22

## INTRODUCTION

The federal government has recognized the citizenship of children born in the United States to undocumented or non-permanent immigrants for over 100 years, a practice that was unchallenged until January 2025. In granting a preliminary injunction below, the district court did no more than maintain the century-old status quo pending resolution of this case on the merits. Every court to consider a challenge to the recent Executive Order upending birthright citizenship has granted preliminary relief, given both the irreparable and profound harms to the challengers and the Order's flagrant illegality. And both circuits to consider Defendants' applications for stays pending appeal have appropriately denied them.

This Court should likewise deny this motion for at least two independent reasons. First, the equitable factors sharply disfavor a stay. The federal government would not be harmed, much less irreparably, by maintaining that century-long status quo during the short pendency of this appeal. By contrast, abruptly terminating that longstanding practice would irreparably harm Plaintiffs and the public. Plaintiffs immediately would have to redesign their systems for determining eligibility for federally funded children's health, education, and foster care services, and they would lose substantial federal funding for those and other services. And the public interest would be seriously harmed as thousands of children would lose their

1

citizenship rights. Defendants fail to show how these severe and irreparable harms are outweighed by the supposed urgency of denying children citizenship.

Second, Defendants are unlikely to succeed on the merits of their arguments. Strikingly, they seek a stay without even *attempting* to defend the Order's lawfulness. And the arguments Defendants do advance—that Plaintiffs lack standing and the injunction is overbroad—are not likely to succeed. Defendants' Article III standing objection is foreclosed by binding caselaw. Their argument that Plaintiffs cannot assert claims implicating the constitutional rights of third parties misapprehends Plaintiffs' standing argument and overextends principles of prudential standing. Finally, nationwide relief is indisputably necessary to avoid irreparable harm to Plaintiffs because children born in other States may reside or move into Plaintiffs' jurisdictions—requiring Plaintiffs to incur considerable administrative costs. On both the equities and the law, Defendants fail to satisfy their heavy burden in seeking a stay pending appeal.

## BACKGROUND

The Fourteenth Amendment promises that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, §1. For well over a century, every branch of government has recognized that this clause means what it says: children born here are U.S. citizens simply by virtue of their "birth within the territory." *United States*

2

*v. Wong Kim Ark,* 169 U.S. 649, 693 (1898). Only those newborns not "subject to [U.S.] jurisdiction"—a narrow category encompassing only those children not fully subject to U.S. sovereign power at birth, such as Native American tribal members and children with diplomatic immunity—are excluded. *Id.* The Supreme Court has long affirmed that this exclusion does not turn on parental immigration status, *see id.* at 705 (individual born here entitled to U.S. citizenship even though his parents were permanently ineligible for U.S. citizenship); *see also Plyler v. Doe*, 457 U.S. 202, 211 n.10 (1982) (Fourteenth Amendment's jurisdictional language does not exclude undocumented immigrants).

This understanding of birthright citizenship has permeated executive agency guidance for decades—and no prior administration has deviated from it. *See* PA350; PA361.[1] It has been embraced repeatedly by the Supreme Court. *See, e.g.*, *Wong Kim Ark*, 169 U.S. at 693; *Perkins v. Elg*, 307 U.S. 325, 329 (1939); *INS v. Errico*, 385 U.S. 214, 215-16 (1966); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985). And it has been codified by Congress. *See* 8 U.S.C. §1401(a).

### A.    Executive Order 14160.

Hours after inauguration, President Trump issued Executive Order 14160 ("Order"), declaring the Constitution does not extend citizenship to any individual,

---

[1] "PA#" refers to Plaintiffs' Addendum appended to this Opposition, and "Mot.#" refers to Defendants' Stay Motion filed with this Court, using the page numbers in the ECF header.

born in this country, whose mother, at the time of the individual's birth, was unlawfully present or lawfully present on a temporary basis, and whose father, at the time of the individual's birth, was neither a citizen nor lawful permanent resident. *See* Exec. Order No. 14160, §1, 90 Fed. Reg. 8449 (Jan. 20, 2025). As to any such children born after February 19, 2025 ("Affected Children"), the Order prohibits federal agencies from "issu[ing] documents recognizing United States citizenship, or accept[ing] documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship." *Id.* §2(a). The Order directs the Social Security Administration and the Departments of State, Justice, and Homeland Security to align their policies to the Order, *id.* §3(a), and instructs all agencies to "issue public guidance within 30 days" regarding implementation, *id.* §3(b).

### B.    The Order's Impacts on Plaintiffs.

If the Order takes effect, Plaintiffs will lose millions of dollars in federal funding, incur the burden of revising their eligibility verification systems for countless services, and suffer a decreased pool of residents eligible to participate in essential civic functions such as jury duty, holding certain public offices, and voting.

***Funding***. Plaintiffs receive significant federal funding for providing health, education, and foster care services to children who are citizens or have a qualifying immigration status. *See*, *e.g.*, 8 U.S.C. §§1611(a), (c)(1)(B), 1612(b)(3)(C); 42 U.S.C. §1396b; 42 C.F.R. §435.406. Because the Order would leave the Affected

Children without citizenship or any qualifying immigration status, Plaintiffs will lose millions of dollars in funding under a range of federal programs, including Medicaid, the Children's Health Insurance Program (CHIP), the Individuals with Disabilities in Education Act (IDEA), and Title IV-E funding for child welfare services. *See, e.g.*, PA48-49, 57, 64, 79-80, 120; 20 U.S.C. §§1400(d)(1)(A), 1412(a)(1). And under the Enumeration at Birth (EAB) program, Plaintiffs help families with newborn children apply for Social Security Numbers (SSNs) shortly after birth, and receive a fee from the Social Security Administration for each SSN issued. *See, e.g.*, PA55-57, 75, 89-90, 129, 136, 184. Because the Affected Children will not be eligible to receive SSNs, Plaintiffs will lose tens of thousands of dollars in EAB fees. *Id.*

*Administrative burdens.* Further, because a child's birth in this country would no longer prove citizenship if the Order takes effect, Plaintiffs will incur significant administrative burdens as they revamp their eligibility determination systems for federally funded public benefits programs like Medicaid, CHIP, Title IV-E, TANF, and SNAP; and the EAB program for SSN issuance. PA42, 56, 67-68, 84, 113-14, 129, 162-63, 174-76; *see also* 42 U.S.C. §1396a(a)(5) (requiring States who participate in Medicaid to make eligibility determinations); 42 U.S.C. §671 (requiring States who accept Title IV-E funds to have "procedures for verifying the citizenship" of foster care children). As part of that overhaul, Plaintiffs will need to

train staff, partner organizations, and healthcare providers on these new procedures and revise existing guidance. *See* PA12-15, 43, 57, 67-68, 84, 113 129, 162-63, 176.

*Sovereign functions.* Finally, the Order impacts Plaintiffs by narrowing the pool of their residents eligible to participate in critical state functions. This is because State laws and constitutions frequently include U.S. citizenship as an eligibility requirement for civic activities like serving as a juror, *see* N.J. Stat. Ann. §2B:20-1(c); Mass. Gen. Laws Ann. ch. 234A, §4; Cal. Civ. Proc. Code §203, voting in state elections, *see* N.J. Const. art. 2, §1, cl. 3; Mass. Const. Amend. art. 3; Cal. Const. art 2, §2, and serving as governor, *see* N.J. Const. art. 5, §1, cl. 2; Cal. Const. art. 5, §2; N.Y. Const. art. 4, §2.

## C.    This Litigation.

Plaintiffs—eighteen states, the District of Columbia, and San Francisco—challenged the Order and sought a preliminary injunction. The district court heard *New Jersey v. Trump* together with *Doe v. Trump*, *see* PA185, a challenge by two associations and an expectant mother, *see* No. 1:25-cv-10136, ECF No. 1 (Jan. 20, 2025). The district court granted preliminary relief, enjoining Defendants from "implementing and enforcing Executive Order No. 14,160." PA367

The court "easily" found that Plaintiffs had standing, because the Order would cause Plaintiffs to suffer "direct financial harms" and "administrative upheaval"—"precisely the same sort of direct financial impacts" as those that the Court found

sufficient for standing in *Biden v. Nebraska,* 143 S. Ct. 2355 (2023), and *Department of Commerce v. New York*, 588 U.S. 752 (2019). PA342-344; PA359. The court recognized that Plaintiffs' standing to sue is grounded in their own fiscal injuries— not in avoiding harms to their residents. PA344 at n.7, PA345; PA273:17-20. The court added that Plaintiffs likely also have standing based on independent sovereign injuries, as "state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship." PA344 at n.7.

The court determined that Plaintiffs satisfied all four requirements for preliminary relief: they are likely to succeed because Defendants' interpretation of the Citizenship Clause is foreclosed by Supreme Court precedents; Plaintiffs will face irreparable  harms through the loss of federal funds and new costs to overhaul existing birth registration systems; and the scales of equity "tip decisively toward the plaintiffs" as Defendants will suffer no harm if the longstanding status quo is maintained. PA341-42; PA358-61.

Finally, the court determined that a nationwide injunction was required to remedy Plaintiffs' injuries because Affected Children born elsewhere could move into, or already reside in, Plaintiffs' jurisdictions. PA363. If citizenship varied between plaintiff and non-party states, Plaintiffs would still have to devise a system to identify a child's citizenship status based on State of birth, and would suffer fiscal harm when children born in non-party States move within Plaintiffs' borders. *Id.*

**D.    Parallel Litigation**

Numerous challenges to the Order have been filed across the country. In each case in which a preliminary injunction motion has been resolved, the district court has granted the motion. *See N.H. Indonesian Cmty. Support v. Trump*, No. 25-cv-00038, --- F. Supp. 3d ---, 2025 WL 457609 (D.N.H. Feb. 11, 2025), ECF No. 79; *CASA, Inc. v. Trump,* No. 25-cv-00201, --- F. Supp. 3d ---, 2025 WL 545840 (D. Md. Feb. 18, 2025), ECF No. 66; *Washington v. Trump*, No. 25-cv-00127, --- F. Supp. 3d ---, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025), ECF No. 114. Every circuit to consider a stay-pending-appeal motion has likewise denied it. *See Washington*, No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025); *CASA*, No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025).

## ARGUMENT

A stay pending appeal is appropriate only if "the stay applicant has made a strong showing" that (1) its appeal will "likely … succeed on the merits"; (2) it "will be irreparably injured absent a stay"; (3) "issuance of the stay will [not] substantially injure the other parties"; and (4) the stay would be in "the public interest." *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022). "[T]he burden is on the … applicant to show" these factors "favor a stay." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024). And "the bar is harder to clear" when the movant seeks "alteration of the status quo." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of*

*Bos.*, 996 F.3d 37, 44 (1st Cir. 2021). Defendants fail to show that any factor favors a stay.

## I.     Defendants Will Not Suffer Irreparable Harm Absent A Stay.

Defendants' failure to demonstrate irreparable harm is sufficient reason to deny their stay request. *See, e.g.*, *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024); *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020); *see also Does 1-3*, 39 F.4th at 24-25 (noting that movants' irreparable harm absent a stay is one of "the most critical" factors in the calculus) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Because Defendants have not demonstrated that they will be irreparably harmed during the limited time in which it takes this Court to resolve their pending appeal, they cannot justify a stay pending that appeal.

As the court found below, "defendants face no cognizable harm from a preliminary injunction" that "do[es] no more than maintain a status quo that has been in place for well over a century." PA361, PA365; *cf. Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (denying stay where "order merely returned the nation temporarily to the position it has occupied for many previous years"). Defendants fail to explain how the same birthright citizenship rule that has applied for decades suddenly threatens *irreparable* harm throughout the few months it will take to resolve the pending appeal.

Defendants assert that the Order is important to public safety, Mot.22-23, but they fail to explain how this is so, let alone support that assertion with evidence that maintaining the status quo pending appeal harms public safety. They further argue the injunction prevents the President from exercising his authority over immigration, Mot.22, but that assumes the merits conclusion that they declined to present in this stay application. Children born here are not immigrants, *see* 8 U.S.C. §1101(a)(3), (15); 8 U.S.C. §1401(a), and the injunction does not prevent the President from executing immigration laws. Finally, Defendants argue that the injunction "delay[s] advance preparations" for the Order's implementation. Mot.22. But "delay, without more, [does] not support a finding of irreparable harm." *Harris v. Fort Oglethorpe State Bank*, 721 F.2d 1052, 1054 (6th Cir. 1983). That is especially apparent here, given that the Order contemplates Defendants needing only 30 days to prepare before the policy takes effect. *See* 90 Fed. Reg. 8449-50 (Order, §§2(b), 3(b)).

## II.    Defendants' Arguments Are Unlikely To Succeed.

Defendants neither attempt to defend the Order's constitutionality, nor cite any case in which a court granted a stay application that did not defend the challenged policy's lawfulness. Their attacks on Plaintiffs' standing and the injunction's scope fare no better. They advanced these same arguments in requesting stays from the Fourth and Ninth Circuits, and those requests were rejected. *See Washington*, 2025 WL 553485, at *1 (defendants unlikely to succeed in challenging

state standing and nationwide relief); *CASA*, 2025 WL 654902, at *1 (same as to nationwide relief). This Court should reach the same conclusion.

**A.    Plaintiffs Have Standing.**

**1.    Plaintiffs Directly Suffer Article III Injuries From The Order.**

Binding precedents establish that Plaintiffs have standing to challenge the Order. Defendants concede that the Order would deprive Plaintiffs of federal funds they otherwise would receive. Plaintiffs will lose millions of dollars in Medicaid, CHIP, and Title IV-E funding for providing health, education, and foster care services to Affected Children because, by federal law, that funding is not available for services provided to them. Likewise, Plaintiffs will lose fees that they receive through the EAB program because Affected Children will no longer be eligible for SSNs at birth. And Plaintiffs will incur substantial costs to create new verification systems to comply with federal eligibility rules. *See supra* at 4-6.

As the district court explained, PA343-44, these injuries are "precisely the same sort of direct financial impacts" that conferred standing in *Nebraska*, 143 S. Ct. at 2366, and *New York*, 588 U.S. 752. *See also Massachusetts v. HHS*, 923 F.3d 209, 222-27 (1st Cir. 2019). In *Nebraska*, the challenged federal loan forgiveness program injured Missouri (via its instrumentality MOHELA) by depriving it of fees for administering student loans, *see* 143 S. Ct. at 2366, just as this Executive Order causes Plaintiffs to lose funding and incur administrative costs. Defendants do not

even attempt to distinguish *Nebraska*. And although they dismiss Plaintiffs' injuries as "indirect[]" and "attenuated," Mot.14-16, they are not: the Order flips the citizenship status of Affected Children, instantaneously eliminating Plaintiffs' ability to receive federal funding for serving them by direct operation of federal law. Nor are these injuries in any way "speculative," Mot.15. As Defendants have conceded, *see* PA294, they would certainly occur.

Ignoring *Nebraska*, Defendants resort to a single footnote in *United States v. Texas*, 599 U.S. 670 (2023), Mot.14-15, but "*Texas* simply does not aid the defendants." PA345. There, the Court held that Article III precludes "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute," 599 U.S. at 677, and that Texas's "theories of standing" failed to "overcome[] th[at] fundamental Article III problem," *id.* at 680 n.3. Because Plaintiffs do not ask the Executive to arrest or prosecute anyone, *Texas* is inapposite.

Defendants' final Article III objections fall flat. They worry *Nebraska* enables States to challenge numerous federal policies that impact state revenues. Mot.16-17. But that policy concern does not justify contravening Supreme Court precedent. Regardless, that precedent provides a ready distinction: States maintain standing to challenge actions that directly and predictably impact them, *see New York*, 588 U.S. 752 (holding States had standing based on predictable effects of a new question on 2020 Census), but cannot rest on remote or speculative harms, *see FDA v. Alliance*

12

*for Hippocratic Med.*, 602 U.S. 367, 383 (2024); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). As *Nebraska* establishes, there is nothing remote or attenuated about the injuries here. Nor can Plaintiffs' injuries fairly be characterized as "self-inflicted." Mot.17-18. "[N]othing here indicates that" Plaintiffs administer Medicaid and other critical programs "in order to manufacture standing." *See New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021); *see also id.* at 1046 ("[A] state's ability to change its laws to evade injury [does not] preclud[e] standing"); *California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018) ("Courts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid injury by enacting new legislation.").

Furthermore, PA344 n.7, Plaintiffs likely also have standing based on an independent sovereign injury, as the Order shrinks the pool of individuals eligible to participate in core sovereign functions such as the election of state leaders and the operation of Plaintiffs' criminal justice systems. *See supra* at 6. Defendants' only response is to suggest state officials could define U.S. citizenship differently from the U.S. Government in interpreting state laws and constitutions. Mot.13 n.3 But the Federal Government may well, in future cases, view its determination of U.S. citizenship as preemptive.

## 2. Plaintiffs Are Not Barred From Litigating Their Claims Because They Also Implicate Residents' Rights.

Apart from their Article III objections, Defendants principally argue that

Plaintiffs categorically are barred from litigating a claim that implicates individual rights under the Citizenship Clause. Mot.10, 13-14. But Plaintiffs seek to redress Article III injuries that *they* suffer, not injuries that their residents suffer, and prudential considerations do not bar their claims.

### a.    Plaintiffs Are Not Suing In A *Parens Patriae* Capacity.

Although Defendants argue that States cannot sue the federal government on their residents' behalf in a *parens patriae* capacity, Mot.10-11, Plaintiffs are not suing in that capacity. *See* PA344 n.7. Rather, Plaintiffs seek to redress their own Article III proprietary and sovereign injuries caused by the Order. *See supra* at 11-14. Plaintiffs' standing is not predicated on the injuries suffered by their residents.

The cases rejecting *parens patriae* theories are thus irrelevant. *See* Mot.11. In those cases, the States' claims were impermissible because the States did not allege any injuries that they suffered from the federal action, and absent any such injuries to themselves, injury to their residents failed to fill the Article III gap. *See Haaland v. Brackeen*, 599 U.S. 255, 294-96 (2023) (Texas lacked standing where "not injured by the placement preferences" it challenged); *Murthy v. Missouri*, 603 U.S. 43, 75-76 (2024) (Missouri lacked standing where not injured by content moderation activities it challenged); *Massachusetts v. Mellon*, 262 U.S. 447, 479-80, 482 (1923) (Massachusetts lacked standing where challenged law did not "require the states to

do or to yield anything" and imposed no "burden" on them).[2] The bar on *parens patriae* standing does not preclude states from bring claims based on their own injuries. *See Kentucky v. Biden*, 23 F.4th 585, 594, 596 (6th Cir. 2022) (States have standing when they "assert[] some injury to their *own* interests separate and apart from their citizens' interests" notwithstanding bar on *parens patriae* standing).

### b. No Prudential Limitation Bars Plaintiffs From Litigating To Redress Their Article III Injuries.

Defendants' contention that Plaintiffs nevertheless lack standing to redress their Article III injuries because constitutional claims must be brought "by the [party] 'at whom the constitutional protection is aimed,'" Mot.12, also fails. As an initial matter, Defendants do not cite a single case in which a State that had established an Article III injury traceable to a federal action and redressable by an order enjoining that action was nevertheless barred from seeking relief. For good reason: the cases on which Defendants rely turn on purported prudential limitations, not Article III. *See* Mot.11-13 (citing *Kowalski v. Tesmer*, 543 U.S. 125 (2004); *Warth v. Seldin*, 422 U.S. 490 (1975)). And prudential limitations must be applied

---

[2] *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), is further afield. *Katzenbach* concerned South Carolina's challenge to provisions of the Voting Rights Act that determined whether a State was subject to the Act's remedies designed to redress voting discrimination. *Id.* at 307, 315-16. The Court dismissed South Carolina's due process claim for the simple reason that States lack due process rights, *id.* at 323. *Katzenbach* has nothing to do with whether a State that suffers *financial* harm from the federal government's violations of its residents' constitutional rights has Article III standing to challenge that conduct.

sparingly because "declin[ing] to adjudicate" valid claims "on grounds that are prudential, rather than constitutional" is in "tension with … the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 125-26 (2014) (cleaned up).

Consistent with that caution, this Court and others have recognized that States can litigate claims that federal action violates individual constitutional rights where the State establishes its own Article III injury. In *Massachusetts*, this Court held that Massachusetts had standing to challenge federal regulations based on pocketbook injuries, *see* 923 F.3d at 222, including on the ground that the regulations violated equal protection, *see* 301 F. Supp. 3d 248, 250 (D. Mass. 2018). *See also, e.g.*, *California v. Azar*, 911 F.3d 558, 568, 570 (9th Cir. 2018) (States had standing based on fiscal injuries to litigate equal protection and establishment clause claims). Because invalidating those regulations would allow the Commonwealth to avoid fiscal harm, it had standing. *See Massachusetts*, 923 F.3d at 222. That residents' rights would *also* be vindicated did not alter that result. *Id.*

Defendants' assertion that parties with Article III standing cannot litigate the constitutionality of an action that *also* implicates another party's interests is also at odds with recent Supreme Court precedent. In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the Court held a corporation could challenge agency action based on a

violation of the *President's* constitutional removal authority, expressly rejecting the argument that the issue can only be litigated through a contested removal. *Id*. at 212; *see also INS v. Chadha*, 462 U.S. 919, 935-36 (1983) ("reject[ing] the contention that Chadha lacks standing because a consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests"). It is unclear how Defendants' argument squares with these precedents.

Even if some pre-*Lexmark* prudential bar remains relevant, *Kowalski* does not help Defendants. There, the Court explained that a prudential limit on claims based on the rights of third parties reflects concerns that the plaintiff may lack "the appropriate incentive to challenge" the action "with the necessary zeal and appropriate presentation," or that such claims may require courts "to decide abstract questions … even though judicial intervention may be unnecessary to protect individual rights." 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 500). But Plaintiffs here have every "incentive to challenge" the Order with the same "zeal and appropriate presentation" as the Affected Children, given the significant injuries Plaintiffs face. *Id.*; *see supra* at 11-14*.* And there is nothing abstract here; the Order undisputedly will deny citizenship to hundreds of thousands of children in the first year alone.

In these ways, Plaintiffs' suit is no different from *Kozera v. Spirito*, 723 F.2d 1003, 1006 (1st Cir. 1983), where this Court held that prudential considerations did not bar the Commissioner of the Massachusetts Department of Public Welfare from challenging a federal regulation as violating the constitutional rights of children to whom Massachusetts provided financial assistance. Because the Commonwealth's interests were consistent with those of the affected children, and the suit did "not entail 'unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative,'" the Commonwealth could litigate its claim. *Id.* at 1006.

Defendants' prudential theory runs into another problem: even under pre-*Lexmark* case law, parties may protect their own Article III interests based on third parties' constitutional rights if "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (cleaned up); *see also*, *e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-84 (1977) (seller had standing to litigate purchasers' constitutional privacy rights); *Craig v. Boren*, 429 U.S. 190, 193-97 (1976) (same regarding purchasers' equal protection rights); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (private schools had standing to litigate parental rights). Here, the Order operates by prohibiting agencies from "accept[ing] documents issued by State, local, or other governments or authorities"—*i.e.*, issued by the Plaintiffs—"purporting to recognize

18

[the] United States citizenship" of Affected Children. 90 Fed. Reg. 8449 (Order, §2(a)). In other words, Plaintiffs are intermediaries against whom the Order's limitations on birthright citizenship are directly enforced. Permitting such claims to proceed thus falls squarely within even the pre-*Lexmark* framework.[3]

## B.    Nationwide Relief Is Proper.

Defendants are equally unlikely to succeed in arguing that the district court abused its discretion in fashioning nationwide relief. *See García-Rubiera v. Fortuno*, 727 F.3d 102, 108 (1st Cir. 2013) (this Court reviews "terms of an injunction … for abuse of discretion only," because district court is "best position[ed] to tailor the scope of injunctive relief to [its] factual findings"); *DeNovellis v. Shalala*, 135 F.3d 58, 62 (1st Cir. 1998) ("The party appealing a grant … of a preliminary injunction bears the heavy burden" of showing district court "abused its discretion").

Preliminarily, although Defendants argue from concurring opinions and

_____

[3] *Kowalski* also recognizes that prudential limits on standing do not apply where "the party asserting the right has a 'close' relationship with the person who possesses the right," and "there is 'hindrance' to the possessor's ability to protect his own interests." 543 U.S. at 130. Plaintiffs have a close relationship with Affected Children as a provider of medical, educational, and other services for which federal funding depends on the citizenship status. And there is an obvious hindrance: to forestall the Order's deprivation of their rights—with potential consequences for their ability to access critical public benefits— each of the hundreds of Affected Children born each day promptly would have to sue. *Compare CASA*, No. 25-1153, ECF No. 9, 1-2 (In seeking stay from Fourth Circuit, Defendants arguing that relief must be limited to individual named plaintiffs). This "practical" limitation on "the likelihood and ability of … third parties … to assert their own rights," *Powers v. Ohio*, 499 U.S. 400, 414 (1991), further supports this suit.

policy considerations that nationwide relief is never proper, Mot.18-19, binding precedent is to the contrary. This Court, consistent with the Supreme Court, has held that nationwide relief is appropriate where necessary to remedy a plaintiff's injuries. *See DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423-24 (1st Cir. 2024); *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580-82 (2017) (declining to stay nationwide injunction except to extent it barred immigration policy's enforcement "against foreign nationals abroad who have no connection to the United States at all"); *accord Missouri v. Trump*, --- F.4th ----, 2025 WL 518130, *11 (8th Cir. Feb. 18, 2025) (affirming nationwide injunction where state-by-state variation in availability of loan forgiveness program "would create chaos" given that "loan accounts can shift between servicers").

Consistent with these cases, nationwide relief is appropriate because Plaintiffs will be harmed if the Order takes effect outside their jurisdictions. *See* PA363. Children routinely cross state lines and may be born in States in which they do not reside. *Id.* Consequently, Plaintiffs would have to redesign their eligibility verification systems for federally funded benefits as long as children born anywhere in the country are not automatically citizens by virtue of birth. *See, e.g.*, PA43; PA68. And Plaintiffs would not receive federal funding for providing services to any such children born outside their jurisdictions. *See* PA26. Accordingly, the district court acted well within its discretion in crediting Plaintiffs' uncontroverted evidence that

they would suffer harm absent nationwide relief and fashioning its injunction accordingly.

Defendants' responses are unpersuasive. Mot.19-20. Defendants never asked the district court to consider the "narrower injunction" they now gesture at. Mot.20 (arguing "[c]omplete relief to the States would be afforded by a narrower injunction that required the federal defendants to treat the children covered by the Executive Order as eligible for the services the States administer"). They did not raise this in their preliminary injunction response brief, *compare* PA234, at the hearing, *compare* PA318, or in their request below for a stay pending appeal, *compare* PA372-74. Plaintiffs are uncertain how such an injunction would be designed or enforced, and Defendants offer no details. Regardless, the district court hardly abused its discretion in not *sua sponte* adopting it.

## III. The Equitable Balance Weighs Decisively Against A Stay.

The balance of the equities disfavors a stay because the harms are wholly one-sided. Denying Defendants' request would cause no harm; it would merely extend by a few months a century-old status quo. *See supra* at 2-3. By contrast, granting a stay would result in Plaintiffs losing funds for providing critical services to children, require Plaintiffs to alter eligibility verification systems for federally-funded programs, and deny citizenship to hundreds of thousands of children born during the pendency of this appeal. *See* PA359; *supra* at 4-6. And it would work all these harms

based on a stay motion in which Defendants decline to even defend the Order's constitutionality.

Defendants' arguments fail to shift the equitable balance in their favor. Their unsubstantiated speculation that Plaintiffs could recover reimbursements through unspecified administrative proceedings, Mot.21, falls far short of their burden of proving that "issuance of the stay will [not] substantially injure" Plaintiffs. *Does 1-3*, 39 F.4th at 24; *see* ECF123 at 14-15 & n.7 (explaining why Plaintiffs' fiscal injuries would not be recoverable). Moreover, Defendants ignore the administrative costs Plaintiffs will incur. Mot.20-23. Finally, that some States support the Order likewise fails to satisfy Defendants' burden to establish that a stay is in "the public interest," *Does 1-3*, 39 F.4th at 24, given the extensive public harms, detailed in Plaintiffs' declarations and credited by the district court, that necessarily require nationwide relief to redress fully. *See, e.g.*, PA40-42, 43, 56, 68, 73, 99, 359.

## CONCLUSION

This Court should deny a stay pending appeal.

March 4, 2025

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

Gerard J. Cedrone
  *Deputy State Solicitor*
Jared B. Cohen
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

Viviana M. Hanley
  *Deputy Attorney General*
Jeremy M. Feigenbaum
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

*Counsel for the*
  *Commonwealth of Massachusetts*

*Counsel for the*
  *State of New Jersey*

ROB BONTA
  *Attorney General of California*

Denise Levey
  *Deputy Attorney General*
Michael L. Newman\*
  *Senior Assistant Attorney General*
Marissa Malouff
Irina Trasovan
  *Supervising Deputy*
  *Attorneys General*
Lorraine López\*
Delbert Tran\*
Annabelle Wilmott
  *Deputy Attorneys General*
Christopher D. Hu
  *Deputy Solicitor General*
Office of the Attorney General
300 S. Spring St., Ste. 1702
Los Angeles, CA 90013
(213) 269-6269
Denise.Levey@doj.ca.gov

*Counsel for the State of California*

PHIL WEISER
  *Attorney General of Colorado*

Shannon Stevenson
  *Solicitor General*
Office of the Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

WILLIAM M. TONG
  *Attorney General of Connecticut*

Janelle Rose Medeiros
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
janelle.medeiros@ct.gov

*Counsel for the
  State of Connecticut*

KATHLEEN JENNINGS
  *Attorney General of Delaware*

Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

BRIAN L. SCHWALB
  *Attorney General
  for the District of Columbia*

Caroline S. Van Zile
  *Solicitor General*
Jeremy R. Girton
  *Assistant Attorney General*
Office of the Attorney General
400 Sixth Street, N.W.
Washington, DC 20001
(202) 724-6609
caroline.vanzile@dc.gov

*Counsel for the
  District of Columbia*

ANNE E. LOPEZ
  *Attorney General of Hawaiʻi*

Kalikoʻonālani D. Fernandes
  *Solicitor General*
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

AARON M. FREY
  *Attorney General of Maine*

Thomas A. Knowlton
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
thomas.a.knowlton@maine.gov

*Counsel for the State of Maine*

DANA NESSEL
  *Attorney General of Michigan*

Toni L. Harris
Neil Giovanatti
Stephanie M. Service
  *Assistant Attorneys General*
Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
harrist19@michigan.gov

*Counsel for Attorney General
  Dana Nessel on behalf of
  the People of Michigan*

ANTHONY G. BROWN
  *Attorney General of Maryland*

Adam D. Kirschner
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
akirschner@oag.state.md.us
(410) 576-6424

*Counsel for the State of Maryland*

KEITH ELLISON
  *Attorney General of Minnesota*

John C. Keller
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
(651) 757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

AARON D. FORD
  *Attorney General of Nevada*

Heidi Parry Stern
  *Solicitor General*
Office of the Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*


LETITIA JAMES
  *Attorney General of New York*

Matthew William Grieco
  *Senior Assistant Solicitor General*
Ester Murdukhayeva
  *Deputy Solicitor General*
Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8014
matthew.grieco@ag.ny.gov

*Counsel for the
  State of New York*

RAÚL TORREZ
  *Attorney General of New Mexico*

James W. Grayson
  *Chief Deputy Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

*Counsel for the
  State of New Mexico*


JEFF JACKSON
  *Attorney General of North Carolina*

Daniel P. Mosteller
  *Associate Deputy Attorney General*
Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the
  State of North Carolina*

PETER F. NERONHA
  *Attorney General of Rhode Island*

Katherine Connolly Sadeck
  *Solicitor General*
Office of the Attorney General
150 South Main Street
Providence, RI  02903
(401) 274-4400, Ext. 2480
ksadeck@riag.ri.gov

*Counsel for the*
  *State of Rhode Island*


JOSHUA L. KAUL
  *Attorney General of Wisconsin*

Gabe Johnson-Karp*
  *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*

CHARITY R. CLARK
  *Attorney General of Vermont*

Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov


*Counsel for the State of Vermont*


DAVID CHIU
  *City Attorney of San Francisco*

David S. Louk
  *Deputy City Attorney*
1390 Market Street, 6th Floor
City Attorney of San Francisco
San Francisco, CA 94102
(415) 505-0844
david.louk@sfcityatty.org

*Counsel for the City and*
  *County of San Francisco*

\* Application for admission forthcoming or pending

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1. This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 5,191 words and thus does not exceed the 5,200-word limit.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

/s/ *Viviana Hanley*

Viviana M. Hanley
Deputy Attorney General

Dated: March 4, 2025

# ADDENDUM

## TABLE OF CONTENTS

Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction

(Jan. 21, 2025) (Dkt. No. 5)................................................................ PA1

Exhibit A (Dkt. No. 5-2) ........................................................ PA34

Exhibit B (Dkt. No. 5-3)......................................................... PA45

Exhibit C (Dkt. No. 5-4)......................................................... PA52

Exhibit D (Dkt. No. 5-5) ........................................................ PA60

Exhibit E (Dkt. No. 5-6)......................................................... PA69

Exhibit H (Dkt. No. 5-9) ........................................................ PA77

Exhibit I (Dkt. No. 5-10)......................................................... PA85

Exhibit J (Dkt. No. 5-11)......................................................... PA92

Exhibit K (Dkt. No. 5-12) ...................................................... PA103

Exhibit L (Dkt. No. 5-13)....................................................... PA116

Exhibit M (Dkt. No. 5-14)....................................................... PA123

Exhibit N (Dkt. No. 5-15) ...................................................... PA132

Exhibit O (Dkt. No. 5-16) ...................................................... PA154

Exhibit R (Dkt. No. 5-19)....................................................... PA164

Exhibit S (Dkt. No.5-20) ........................................................ PA179

Electronic Order Relating New Jersey v. Trump with Doe v. Trump

(Jan. 24, 2025) (Dkt. No. 71)........................................................ PA185

Defendants' Memorandum of Law in Opposition to Plaintiffs' Motions

for Preliminary Injunction
    (Jan. 31, 2025) (Dkt. No. 92).........................................................PA186

Reply in Support of Plaintiffs' Motion for a Preliminary Injunction
    (Feb. 4, 2025) (Dkt. No. 123).......................................................PA238

Transcript of Hearing on Motion for Preliminary Injunction
    (Feb. 7, 2025)...............................................................................PA257

Memorandum of Decision on Motions for Preliminary Injunction
    (Feb. 13, 2025) (Dkt. No. 144).....................................................PA335

Preliminary Injunction
    (Feb. 13, 2025) (Dkt. No. 145).....................................................PA366

Memorandum of Law in Support of Defendants' Motion to Stay Preliminary
Injunction Pending Appeal
    (Feb. 19, 2025) (Dkt. No. 158).....................................................PA368

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF CALIFORNIA; STATE OF
COLORADO; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAI'I; STATE OF
MAINE; STATE OF MARYLAND;
ATTORNEY GENERAL DANA NESSEL FOR
THE PEOPLE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE
OF NEW MEXICO; STATE OF NEW YORK;
STATE OF NORTH CAROLINA; STATE OF
RHODE ISLAND; STATE OF VERMONT;
STATE OF WISCONSIN; and CITY &
COUNTY OF SAN FRANCISCO,

　　　　　　　*Plaintiffs*,

　　v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF STATE; MARCO RUBIO,
in his official capacity as Secretary of State; U.S.
DEPARTMENT OF HOMELAND SECURITY;
BENJAMINE HUFFMAN, in his official
capacity as Acting Secretary of Homeland
Security; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; DOROTHY FINK,
in her official capacity as Acting Secretary of
Health and Human Services; U.S. SOCIAL
SECURITY ADMINISTRATION; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration, and UNITED STATES OF
AMERICA,

　　　　　　　*Defendants*.

No. 1:25-cv-10139

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

PA1

<u>**TABLE OF CONTENTS**</u>

<u>**Page(s)**</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

    A.    Terms of the Executive Order...............................................................2

    B.    The Impacts of the Order ......................................................................3

ARGUMENT

    I.    Plaintiffs Have Standing to Bring Suit....................................................8

    II.    Plaintiffs Are Highly Likely to Succeed on The Merits ........................9

        A.    The Order Violates the Fourteenth Amendment........................9

        B.    The Order Independently Violates Federal Law ......................14

    III.    The Equities Compel Preliminary Relief ...............................................15

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
    969 F.3d 12 (1st Cir. 2020)..........................................................................8

*City & Cnty. of S.F. v. USCIS*,
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ....................................................16

*CMM Cable Rep., Inc. v. Ocean Coast Props.*,
    48 F.3d 618 (1st Cir. 1995)........................................................................15

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,
    ___ F. Supp. 3d ___, 2024 WL 3650089 (D.N.H. Aug. 5, 2024)..........15

*Crowe & Dunlevy, P.C. v. Stidham*,
    640 F.3d 1140 (10th Cir. 2011) .................................................................15

*Does 1-6 v. Mills*,
    16 F.4th 20 (1st Cir. 2021).........................................................................17

*DraftKings Inc. v. Hermalyn*,
    118 F.4th 416 (1st Cir. 2024).............................................................18, 19

*Dred Scott v. Sandford*,
    60 U.S. 393 (1857)................................................................................1, 13

*E. Bay Sanctuary v. Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .....................................................................15

*Elk v. Wilkins*,
    112 U.S. 94 (1884).....................................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    110 F.4th 295 (1st Cir. 2024).......................................................................8

*Gonzalez-Alarcon v. Macias*,
    884 F.3d 1266 (10th Cir. 2018) ...................................................................3

*Gustavsen v. Alcon Labs, Inc.*,
    903 F.3d 1 (1st Cir. 2018)............................................................................8

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004)...................................................................................12

*HIAS v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...............................................................................19

*Inglis v. Trustees of Sailor's Snug Harbour*,
    28 U.S. 99 (1830) .................................................................................................11

*INS v. Rios-Pineda*,
    471 U.S. 444 (1985)..............................................................................................12

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ................................................................................15

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
    923 F.3d 209 (1st Cir. 2019) ..................................................................................8

*McBreairty v. Miller*,
    93 F.4th 513 (1st Cir. 2024) ...................................................................................8

*Miles v. Apex Marine Corp.*,
    498 U.S. 19 (1990)................................................................................................14

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................................17

*Plyler v. Doe*,
    457 U.S. 202 (1982)..............................................................................1, 11, 12, 19

*Pub. Int. Rsch. Grp. v. FCC*,
    522 F.2d 1060 (1st Cir. 1975).................................................................................9

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005) ..................................................................................15

*Savino v. Souza*,
    459 F. Supp. 3d 317 (D. Mass. 2020) ...................................................................17

*Schooner Exchange v. McFaddon*,
    11 U.S. 116 (1812)................................................................................................10

*Sindi v. El-Moslimany*,
    896 F.3d 1 (1st Cir. 2018) ....................................................................................20

*Tennessee v. Dep't of Education*,
    104 F.4th 577 (6th Cir. 2024) ..............................................................................16

*Texas v. Yellen*,
    105 F.4th 755 (5th Cir. 2024) ..............................................................................15

*Trump v. Int'l Refugee Assistance Project,*
    582 U.S. 571 (2017) ...................................................................18

*United States v. Abreu,*
    106 F.4th 1 (1st Cir. 2024) ........................................................14

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) .................................1, 10, 11, 12, 14, 18, 19

*Whitman-Walker Clinic, Inc., v. HHS,*
    485 F.Supp.3d 1 (D.D.C. 2020) ...............................................16

**Statutes and Regulations**

5 U.S.C. § 706 ...............................................................................9, 15

8 U.S.C. § 1356 ....................................................................................7

8 U.S.C. § 1401 ........................................................................1, 14, 15

8 U.S.C. § 1611 ..................................................................................4, 6

8 U.S.C. § 1612 ....................................................................................4

8 U.S.C. § 1641 ....................................................................................6

20 U.S.C. § 1400 ..................................................................................5

20 U.S.C. § 1412 ..................................................................................5

22 U.S.C. § 254 ..................................................................................11

42 U.S.C. § 405 ..................................................................................14

42 U.S.C. § 1396b ................................................................................4

42 U.S.C. § 1396d ................................................................................4

20 C.F.R. § 422.103(c)(2) ..................................................................13

20 C.F.R. § 422.107(d) ......................................................................13

42 C.F.R. § 435.406 ..............................................................................4

88 Fed. Reg. 81090 ..............................................................................4

## Other Authorities

Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*
    72 N.Y.U. L. Rev. 54 (1997) ....................................................................11

James C. Ho, *Defining "American:" Birthright Citizenship & the Original*
    *Understanding of the 14th Amendment*
    9 Green Bag 2d 367 (2006)........................................................................13

Jocelyn Kane, et al., *Health Care Experiences of Stateless People in Canada*
    1 J. Migration & Hum. Security (2023).......................................................3

Margaret Stock, *Is Birthright Citizenship Good for America*
    32 CATO J. 139 (Winter 2012) ...................................................................3

Michael Ramsey, *Originalism and Birthright Citizenship*
    109 Geo. L.J. 405 (2020)...........................................................................11

Noah Webster, An American Dictionary of the English Language 635 (George &
    Charles Merriam 1860)................................................................................9

Omar Martinez, et al, *Evaluating Impact of Immigration Policies on Health Status*
    *Among Undocumented Immigrants: A Systematic Review*
    J. Immigrant Minority Health 947 (2015)....................................................3

Polly J. Price, *Stateless in the United States: Current Reality and a Future*
    *Prediction*, 46 Vand. J. Transnat'l L. 443 (March 2013) ...........................3

U.S. Department of Justice, *Legislation Denying Citizenship at Birth to Certain*
    *Children Born in the United States*, 19 Op. O.L.C. 340 (1995) .................13, 18, 20

1 William Blackstone, *Commentaries on the Laws of England* 366 (6th ed., Co. of
    Booksellers, Dublin 1775) ........................................................................12

## INTRODUCTION

Few principles are stitched deeper into the American fabric than birthright citizenship—and few principles have clearer grounding in law. From the earliest days of this Nation's history, America followed the common law tradition of *jus soli*, that those born within the United States's sovereign territory are subject to its laws and citizens by birth. That tradition continued unimpeded until the Supreme Court's notorious pronouncement in *Dred Scott* that descendants of slaves were not citizens despite their birth in this country. But that aberration was short-lived: in the wake of the Civil War, our Nation adopted the Fourteenth Amendment to ensure citizenship for all who are born here. The Citizenship Clause thus promises "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Since its adoption, Congress has codified that guarantee, and the Supreme Court has twice confirmed that it means what it says. *See* 8 U.S.C. § 1401(b); *United States v. Wong Kim Ark*, 169 U.S. 649 (1898); *Plyler v. Doe*, 457 U.S. 202 (1982). For more than 150 years, the promise of the Citizenship Clause has never been undermined—until now.

This Court should step in to protect the centuries-old status quo from unprecedented attack. The President's decision last night to direct federal agencies to refuse to recognize children newly born in this country as citizens based on the immigration status of their parents is inconsistent with the Constitution and federal statutes alike. Indeed, because the Supreme Court has repeatedly held that the Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, this lawsuit is not just likely to succeed before this Court—is it all but certain. And this unlawful order works tremendous and irreparable harms, not only on more than 150,000 American babies born each year who will be deprived of the privileges of citizenship, but also on the Plaintiffs themselves: the order, which takes effect in 29 days, will

cause Plaintiffs to suffer direct losses of federal funds that turn on residents' citizenship and incur significant expenses to account for this radical change, none of which is remediable at the end of this case. Preliminary relief before February 19, 2025, including nationwide relief, is thus essential to protect the status quo from these profound and irretrievable injuries.

The President has no power to deny citizenship that the Fourteenth Amendment and federal statutes guarantee. This Court should grant a preliminary injunction.

## **BACKGROUND**

### A.     Terms of the Executive Order.

Within hours of taking office, President Trump issued an Executive Order, "Protecting the Meaning and Value of American Citizenship," (Ex. W) ("Order") to strip American-born children of citizenship. The Order declares that birthright citizenship does not extend to anyone born to (i) a mother who is unlawfully present or who is lawfully present on a temporary basis, and (ii) a father who is neither a citizen nor lawful permanent resident. Based on this declaration, the Order announces a new policy: no federal agency "shall issue documents recognizing United States citizenship, or accept documents ... purporting to recognize United States citizenship" for such children born after February 19, 2025 ("Affected Children"). Order, § 2. The Order instructs all executive departments and agencies to implement this policy and specifically directs the Social Security Administration and the Departments of State, Justice, and Homeland Security to "ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." *Id*., § 3(a).

Not only does the Order strip the Affected Children of their citizenship, but the Order does not confer on them any lawful status and renders their presence in the United States unauthorized. Because the Order instructs all federal agencies to refuse to issue or accept any written recognition

of an Affected Child's citizenship, it leaves the Affected Children ineligible for a range of federal services and programs that are unavailable to unauthorized individuals. As a result, in less than 30 days, Plaintiffs will begin to lose significant federal funding for various critical health and welfare services that they provide to newborns who will now be considered unauthorized.

**B.     The Impacts Of The Order.**

"Citizenship is unique"; "it is nothing less than the right to have rights." *Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1277 (10th Cir. 2018). The Order will deny this fundamental right to millions across the Nation, creating a class of American-born children who are excluded from most federal public benefits, who live under a constant, destabilizing threat of deportation, and who, as they age, will be unable to work lawfully or to participate in American political life as voters or officeholders. Margaret Stock, *Is Birthright Citizenship Good for America*, 32 CATO J. 139, 150 (Winter 2012). The impacts on their health and well-being will be profound. Not only will they be ineligible for many public services to which U.S. citizens and even "qualified aliens" are entitled, but they may be dissuaded from accessing services for which they are eligible based on a "fear of deportation and harassment from authorities." Omar Martinez, et al, *Evaluating Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, J. Immigrant Minority Health 947, 964 (2015) (describing resultant impacts on public health); *see also* Jocelyn Kane, et al., *Health Care Experiences of Stateless People in Canada* 1 J. Migration & Hum. Security 272-73 (2023). Further, as compared to U.S. citizens, undocumented immigrants are more likely to live in poverty and less likely to have a high school diploma. *See* Wong Decl. (Ex. T). And this newly subordinated class of American babies may be rendered stateless—unable to naturalize and potentially denied citizenship by any other nation. Stock, *supra*, at 148-49; *see* Polly J. Price, *Stateless in the United States: Current Reality and a Future Prediction*, 46 Vand. J. Transnat'l L. 443, 492-99 (March 2013). Our Nation will also suffer, losing the "the constructive

economic energies" of these American children: "engagement in [authorized] work, establishment of businesses, provision of services, [and] innovation." Price, *supra*, at 503.

In addition to the profound long-term impacts on these children, the Order will impose financial injury on Plaintiffs, principally by causing them to assume a greater fiscal responsibility for providing critical services and assistance to tens of thousands of their residents. The federal government has long provided funding to States to support provision of low-cost health insurance, certain educational services, and child welfare services. But eligibility for federal funding depends on the citizenship and immigration status of the children who are served. *See*, *e.g.*, 8 U.S.C. §§ 1611(a), (c)(1)(B), 1612(b)(3)(C); 42 U.S.C. § 1396b; 42 C.F.R. § 435.406. To comply with federal and state laws, as well as to maintain the health and safety of their overall communities, Plaintiffs must continue to provide services to the Affected Children, but will now solely bear the costs of doing so. Plaintiffs will also lose funding for their agencies as a direct effect of the Order's instruction to SSA to adopt the new citizenship policy. Consider the following examples:[1]

<u>Healthcare</u>. Medicaid and CHIP, created by federal law, provide low-cost health insurance to U.S. citizens or "qualified aliens" whose family incomes fall below certain thresholds. 42 C.F.R. § 435.406; 8 U.S.C. § 1611(a), (c)(1)(B). States administer the programs, but the federal government covers a substantial portion of the costs—between 50 and 75 percent for children across the States. *See* Adelman Decl. (Ex. A) at ¶15; 42 U.S.C. § 1396d(b); 88 Fed. Reg. 81090. But U.S. law prohibits federal reimbursement for non-emergency costs incurred on behalf of "an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." 42 U.S.C. § 1396b(v). To ensure that all children within

---

[1] While this brief focuses on the fiscal impacts the Order will have on States, the City and County of San Francisco's declaration spells out the impacts on localities as well. *See* Ex. V.

their jurisdictions have access to comprehensive health insurance, several Plaintiff States offer fully state-funded health insurance to unauthorized children who meet the income eligibility requirements for Medicaid or CHIP. *See* Ex. A at ¶¶5-11 (describing state program); Harrington Decl. (Ex. K) at ¶17. These programs expand access to preventative healthcare, limit the spread of communicable illnesses, and minimize the financial burdens on healthcare providers. *See* Ex. A at ¶¶12-14; Ex. K at ¶16-17. As a direct result of the Order, however, the federal government will refuse to recognize Affected Children as eligible for Medicaid or CHIP, so they will have to be enrolled in state-funded health insurance instead, a shift in coverage that will cost the Plaintiff States tens of millions of dollars. *See* Ex. A at ¶29; Boyle Decl. (Ex. E) at ¶¶9-11; Ex. K at ¶36; Armenia Decl. (Ex. O) at ¶¶23-25; Hadler Decl. (Ex. R) ¶¶26-27. Meanwhile, in Plaintiff States that do not provide such coverage to undocumented children, the loss of Medicaid and CHIP eligibility will place a financial strain on their public healthcare facilities, which will experience greater levels of uncompensated care. *See* Groen Decl. (Ex. J) at ¶¶19.

<u>Special Needs Education</u>. The same loss of Medicaid eligibility also has direct impacts on public health agencies and local schools, which must provide certain early intervention and special education services to infants, toddlers, and students with disabilities under the Individuals with Disabilities in Education Act (IDEA). *See* 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1). States and local school districts receive partial Medicaid reimbursement from the federal government for providing such services to Medicaid-enrolled children. Ehling Decl. (Ex. B) at ¶10; Baston Decl. (Ex. C) at ¶¶17-18; Heenan Decl. (Ex. L) at ¶12. Because the Order will eliminate this funding for Affected Children with special needs, the Plaintiffs will suffer direct financial harms.

<u>Child Welfare</u>. The Order will cause state child welfare agencies to lose significant federal Title IV-E funding, which covers a sizeable portion of States' expenses for foster care, adoption,

and guardianship assistance. *See*, *e.g.*, Jamet Decl. (Ex. D) at ¶¶14-15; Sesti Decl. (Ex. H) at ¶¶4-6. Plaintiff States incur costs to provide Affected Children with child welfare services as required by state law, and federal funds are used for both direct payments to families caring for children in foster care and to help cover States' administrative expenses. *See*, *e.g.*, Ex. D at ¶12; Ex. H at ¶5. But because this funding, too, is limited to citizens or "qualified aliens," *see* 8 U.S.C. §§ 1611(a), (c)(1)(B), 1641, States would lose access to Title IV-E funding for Affected Children and have to cover the costs themselves. *See*, *e.g.*, Ex. D at ¶15; Ex. H at ¶¶8-9; Avenia Decl. (Ex. Q) at ¶¶17-20. And the impacts do not stop there: to help keep children with their parents, some child welfare agencies provide targeted assistance for basic necessities to the families they serve. *See*, *e.g.*, Ex. D at ¶18; Ex. Q at ¶20. Here, too, the Order has a direct impact: because the quantum of assistance the State must provide to keep a child with their parents turns on the child's eligibility for federal programs like SNAP, TANF, and SSI, and the federal programs are again available to U.S. citizens and qualified aliens, the States would have to increase their assistance to families whose Affected Children are otherwise at risk of requiring foster care. *See*, *e.g.*, Ex. D at ¶18; Ex. Q at ¶20.

<u>SSN Funding</u>. The Order will also strip States of federal funding from the Social Security Administration (SSA). Pursuant to SSA's Enumeration At Birth ("EAB") program—under which 99% of newborns obtain their SSNs—participating States transmit SSN applications for newborns to SSA and receive $4.82 per SSN issued. *See*, *e.g.*, Ex. C at ¶¶10-11; Duncan Decl. (Ex. I) at ¶19; Nguyen Decl. (Ex. M) at ¶¶22-23. Consistent with the Order, however, SSA will issue fewer SSNs to newborns, because it can no longer recognize the citizenship of Affected Children—and thereby cost the States tens of thousands of dollars they use to support the work of their vital statistics and records agencies. *See*, *e.g.*, Ex. C at ¶¶12-16; Ex. E at ¶19; Ex. I at ¶¶20-21; Ex. M at ¶30; Villamil-Cummings Decl. (Ex. N) at ¶18; Gauthier Decl. (Ex. S) ¶19.

<u>Administrative/Operational Expenses</u>. Finally, the Order will impose direct administrative and operational burdens on Plaintiffs. Plaintiffs maintain systems to verify residents' eligibility for federally-funded programs such as Medicaid, CHIP, Title IV-E, TANF, and SNAP. *See*, *e.g.*, Ex. A at ¶17; Ex. D at ¶¶19-20; Ex. H at ¶¶7-8; Ex. K at ¶23. Before the Order, there was an easily administrable way to verify the citizenship of American-born children: confirming that they were born in America. *See*, *e.g.*, Ex. D at ¶21; Ex. J at ¶15. But because a child's birth in this country will no longer suffice as proof, Plaintiffs will have to develop new systems that incorporate information about the child's parents to determine eligibility for federally funded programs; identify and determine the kinds of evidence sufficient to prove citizenship; design and implement new systems for processing applications and tracking citizenship status; train staff, partner organizations, and healthcare providers on the new system and procedures; and revise existing guidance and manuals regarding eligibility. *See* Ex. A at ¶¶32-35 (detailing costs); Ex. D at ¶¶22-25 (same); Ex. H at ¶¶12-15 (same); Ex. K at ¶¶44-45 (same); Ex. O at ¶¶31-33 (same); Ex. R at ¶¶25-28 (same). Moreover, Plaintiffs—as well as public healthcare facilities—will face increased administrative burdens trying to secure SSNs for newborn children through the EAB program. *See* Ex. C at ¶14-16; Ex. M at ¶¶31-32. Here, again, state facilities will no longer be able to count on the fact of the child's birth at their facility—and will incur new costs to verify their parents' immigration statuses. Ex. C at ¶16.

The federal government's own practices confirm the substantial cost Plaintiffs will incur to determine a child's citizenship based on their parents' own immigration status. USCIS charges *$1,335 per application* to determine whether a child (who was not born in the United States) is entitled to U.S. citizenship because one of their parents is a U.S. citizen—an amount that was set "at a level that will ensure recovery of the full costs of providing … services." 8 U.S.C. § 1356(m);

*see* USCIS, Form G-1055, Fee Schedule, at 34-35 (ed. Jan. 17, 2025).

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.'" *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). All four factors overwhelmingly support granting a preliminary injunction.

## I.     PLAINTIFFS HAVE STANDING TO BRING SUIT.

Plaintiffs have standing to challenge this unprecedented Order because they will suffer an "injury in fact" that is "fairly traceable" to the Order and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). Plaintiffs can show standing based on a "substantial risk" that they will suffer proprietary harms, including fiscal injuries. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019) (State "established standing under a traditional Article III analysis" via its "demonstration of fiscal injury"); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) (agreeing financial losses are "a quintessential injury in fact"); *Gustavsen v. Alcon Labs, Inc.*, 903 F.3d 1, 7 (1st Cir. 2018) ("out-of-pocket loss of $500 to $1000 per year" is Article III injury). Even "small economic loss … is enough to confer standing." *Massachusetts*, 923 F.3d at 222.

Plaintiffs have more than cleared that bar here. As detailed both above and in the attached declarations, Plaintiffs have demonstrated that the Order will impose financial injuries directly on them: the loss of federal health funds and concomitant state healthcare expenses, *supra* at 4-5; loss of federal funding and concomitant expenses for special needs youth, *supra* at 5; loss of federal funding and concomitant governmental expenses for foster care, adoption, guardianship, and child

welfare assistance, *supra* at 5-6; loss of SSA reimbursements under the EAB, *supra* at 6; and major operational disruptions and administrative burdens across agencies and facilities, *supra* at 6-7. Each financial injury flows from the Order, which requires all federal agencies to comply with its unprecedented approach to citizenship, and would thus be redressed by a swift injunction.

## II.     PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are exceptionally likely to succeed on their claims that the Order contravenes the Constitution and a series of federal statutes, including the Immigration and Nationality Act (INA), and that any actions an executive agency takes to implement it would violate the APA. *See*, *e.g.*, *Pub. Int. Rsch. Grp. v. FCC*, 522 F.2d 1060, 1064 (1st Cir. 1975) (Executive is bound by "the twin external standards of statutory law and constitutional right"); 5 U.S.C. § 706(2) (requiring court invalidate agency action that is contrary to law). The President's decision to eliminate birthright citizenship contravenes the plain text of the Fourteenth Amendment, directly on-point Supreme Court decisions, centuries of history and practice, and a decades-old federal statute.

### A.     The Order Violates the Fourteenth Amendment.

Begin with the Fourteenth Amendment. The Citizenship Clause is clear: "All persons born … in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. The Constitution does not qualify this guarantee of citizenship, nor does it empower the President, or even Congress, to do so. The sole textual question is thus whether a child born in the United States to non-citizen parents is "subject to the jurisdiction" of the United States. That question admits of an easy answer: prior to the adoption of the Citizenship Clause in 1868, it was established that persons physically present in the United States, including non-citizens and their children, were subject to its sovereign power and control. *See*, *e.g.*, Noah Webster, An American Dictionary of the English Language 635 (George & Charles Merriam 1860) (Ex. X) (explaining legal term of art "subject to the jurisdiction" refers to the sovereign's "[p]ower of

governing or legislating" or "power or right of exercising authority" over the person); *Schooner Exchange v. McFaddon*, 11 U.S. 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself."); *Wong Kim Ark*, 169 U.S. at 693 (emphasizing "[i]t can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides").

The Supreme Court has twice held, in no uncertain terms, that children born in the United States to non-citizen parents fall within the Citizenship Clause's textual guarantee—regardless of their parents' immigration status. In *Wong Kim Ark*, decided 127 years ago, the Court forcefully rejected a challenge to the citizenship of an American born in California to parents of Chinese descent. 169 U.S. at 705. The Court reviewed the text of the Fourteenth Amendment, canvassed the history of birthright citizenship, and found that the Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory" and expressly "includ[es] all children here born of resident aliens." *Id.* at 693; As the Court explained:

> The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

*Id.* In short, the Court held, to "exclude[] from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons … who have always been considered and treated as citizens of the United States." *Id.* at 694.

The four circumscribed exceptions to birthright citizenship that *Wong Kim Ark* identified only confirm the Citizenship Clause extends broadly to those born in the United States and subject to U.S. authority. The exceptions are for children: (1) of active "members of the Indian tribes," (2) of "foreign sovereigns or their ministers," (3) "born on foreign public ships," and (4) of "enemies

within and during a hostile occupation of part of our territory." *Wong Kim Ark*, 169 U.S. at 693. Each describes individuals who are not fully subject to U.S. jurisdiction, that is, to U.S. law and governance, despite physical presence in the country. "[C]hildren of members of the Indian tribes" who maintain their tribal affiliations, *id.*, are subject to tribal law. *See Elk v. Wilkins*, 112 U.S. 94, 102 (1884). (Congress ultimately granted children of tribal members citizenship by statute in 1924. *See* 8 U.S.C. § 1401(b).) Children of foreign sovereigns and their ministers, and children born on foreign government ships, enjoy immunity from U.S. law, conferred by common law, *see Wong Kim Ark*, 169 U.S. at 658, 684-85; conferred by statute, *see* 22 U.S.C. §§ 254a–254e; or both. And children of foreign enemies "during and within [a] hostile occupation" are governed by martial law. *Wong Kim Ark*, 169 U.S. at 655; *see Inglis v. Trustees of Sailor's Snug Harbour*, 28 U.S. 99, 156 (1830) (Story, J., dissenting) (explaining common-law rule that "children of enemies, born in a place ... then occupied by them by conquest, are still aliens"); Michael Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 444 (2020) ("It was common ground that hostile armies were not subject to U.S. jurisdiction when within U.S. territory as a result of their practical condition as beyond U.S. civil authority"). The children born to foreign visitors or resident aliens fit none of these; they are bound by U.S. law, enjoying no immunity from its reach. *See* Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. Rev. 54, 65 (1997) ("[T]he children of illegal aliens are certainly 'subject to the jurisdiction of the United States' in the sense that they have no immunity from American law.").

The Supreme Court unanimously reached the same conclusion eight decades later in *Plyler v. Doe*, 457 U.S. 202 (1982). Although that case involved the threshold question of which persons fall "within [the United States's] jurisdiction" for purposes of the Fourteenth Amendment's Equal Protection Clause, U.S. Const. Amend XIV, § 1, the Supreme Court acknowledged that the phrase

bore the same meaning across the Amendment. *See Wong Kim Ark*, 169 U.S. at 687 (finding it "is impossible to construe the words 'subject to the jurisdiction thereof,' in the [Citizenship Clause], as less comprehensive than the words 'within its jurisdiction,' in the [Equal Protection Clause]"); *Plyler*, 457 U.S. at 211 n.10 (same). And in construing the term, the Court agreed that immigrants who are physically present in this country, regardless of their immigration status, fall within the Nation's "jurisdiction." *Compare Plyler*, 457 U.S. at 211 & n.10 (majority) (finding "no plausible" basis to distinguish "resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful," for purposes of who falls "within" U.S. "jurisdiction"), *with id.* at 243 (Burger, C.J., dissenting) (agreeing equal protection "applies to aliens who, after their illegal entry into this country, are indeed physically 'within the jurisdiction' of a state").[2]

Not only is this Court bound by *Wong Kim Ark* and *Plyler*, but these longstanding decisions follow inexorably from the history and original understanding of the Citizenship Clause. Prior to the Fourteenth Amendment, the Constitution referenced U.S. citizenship, *see, e.g.*, U.S. Const. art. I, §§ 2-3; *id.* art. IV, § 2, including the concept of citizenship by birth, *see id.* art. II, § 1, but left its precise scope to the common law. *See Slaughter-House Cases*, 83 U.S. 36, 72 (1872); Ramsey, *supra*, at 410-15. With respect to the acquisition of citizenship at birth, the prevailing view in the early nineteenth century was that the United States adopted "the English idea of subjectship by birth within the nation's territory (*jus soli*)," *id.* at 413, that "[n]atural-born subjects are such as are born within the dominions of the crown of England," 1 William Blackstone, *Commentaries on the Laws of England* 366 (6th ed., Co. of Booksellers, Dublin 1775) (Ex. Y); *accord Wong Kim*

---

[2] Nor was *Plyler* the last word: the Supreme Court has repeatedly acknowledged that children born in this country to noncitizens are citizens themselves. *See INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (unanimously noting undocumented resident "had given birth to a child, who, born in the United States, was a citizen of this country"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004).

*Ark*, 169 U.S. at 654-64 (detailing common law *jus soli* rule and surveying U.S. decisions holding that birth within United States sovereign territory conveys U.S. citizenship). And when the Supreme Court infamously declared that this citizenship right was unavailable to the descendants of slaves, *Dred Scott v. Sandford*, 60 U.S. 393, 404-05 (1857), the post-Civil War Nation adopted the Citizenship Clause "to establish a clear and comprehensive definition" of citizenship, *Slaughter-House Cases*, 83 U.S. at 73, by returning the Nation to the citizenship doctrine that had long prevailed. *See* Cong. Globe, 39th Cong., 1st Sess., 2890 (Ex. Z) (Sen. Howard of Michigan, introducing Citizenship Clause proposal and explaining "[t]his amendment … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is … a citizen of the United States"); *id.* at 2890-91 (Sen. Cowan) (opposing provision *because* it would ensure birthright citizenship); James C. Ho, *Defining "American:" Birthright Citizenship & the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 370 (2006) (canvassing Citizenship Clause debates and finding "[t]his understanding was universally adopted by other Senators," including by its opponents).

Beyond text, precedent, and history, centuries of practice are in accord. The Department of Justice's Office of Legal Counsel has found that "the text and legislative history of the citizenship clause as well as consistent judicial interpretation" all "place the right to citizenship based on birth within the jurisdiction of the United States beyond question." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 1995 WL 1767990, at *1-2 (1995) ("OLC Op."). And federal agencies have long accepted a U.S. birth certificate as evidence of citizenship. *See, e.g.*, 20 C.F.R. § 422.107(d) ("[A]n applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate … that shows a U.S. place of birth."); 20 C.F.R. § 422.103(c)(2) (same for issuance of

SSNs to newborns through State's birth registration process); Ex. U (State Department's Foreign Affairs Manual, involving issuance of passports, noting "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth"). Plaintiffs know of no contrary precedent, history, or practice that would undermine this bedrock principle.

### B.    The Order Independently Violates Federal Law.

Not only does the Order thus violate the Fourteenth Amendment, but it is contrary to the INA as well. The INA, enacted in 1952, parrots the Citizenship Clause's language by providing that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth." Pub. L. No. 82-414, §301(a)(1), 66 Stat. 163, 235 (codified at 8 U.S.C. § 1401(a)). "Under controlling precedent, [this Court] interpret[s] a statute's words based on their plain and ordinary meaning at the time of the statute's enactment." *United States v. Abreu*, 106 F.4th 1, 12 (1st Cir. 2024). And by 1952, the meaning of the term of art "subject to the jurisdiction thereof" was clear: it followed the "fundamental rule of citizenship by birth within the territory," and "includ[ed] all children here born of resident aliens." *Wong Kim Ark*, 169 U.S. at 693. So even if the federal government urges the Supreme Court to abandon its interpretation of the Citizenship Clause—notwithstanding its plain text, unanimous precedent, preexisting common law, originalist evidence, and a century of practice—the meaning of the law Congress enacted in 1952 would stay the same. *See, e.g.*, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). In abrogating birthright citizenship for the first time since the Civil War, the Order is unconstitutional and *ultra vires* alike.[3]

---

[3] Actions federal agencies will have to take in order to implement this Order likewise violate their governing laws, and so those actions must thus be enjoined on those bases too. For example, SSA is statutorily required to issue SSNs to persons eligible to apply for federal benefits, 42 U.S.C.

## III.   THE EQUITIES COMPEL PRELIMINARY RELIEF.

This Court should grant preliminary relief to protect the centuries-old status quo before the Order strips American children of citizenship in 30 days, not only because the Order is unlawful, but because relief is necessary to avoid irreparable harm and protect the equities and public interest. *See, e.g.*, *CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995) (noting salutary "purpose of a preliminary injunction is to preserve the status quo" and "freez[e] an existing situation" to avoid injuries while court engages in "full adjudication"); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if challengers would suffer "irreparable harm" because injuries "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy").

Absent relief from this Court before the Order takes effect, Plaintiffs' injuries here will be immediate and irreparable. *See, e.g.*, *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, ___ F. Supp. 3d ___, 2024 WL 3650089, at *24 (D.N.H. Aug. 5, 2024) (emphasizing financial costs cannot be recouped where the public defendant is protected from damages claims); *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011); *Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024); *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). As the record confirms, approximately 153,000 babies are born in this country to two undocumented parents every year—such that, on average, at least 420 Affected Children would be born, stripped of their citizenship,

---

§ 405(c)(2)(B), which necessarily includes Affected Children pursuant to the Citizenship Clause and 8 U.S.C. § 1401(a). SSA therefore cannot implement this Order and start categorically refusing to recognize as proof of citizenship documents showing that a child was born in the United States without running afoul of that statute and, consequently, the APA. *See* 5 U.S.C. §§ 706(2)(B)-(D); *E. Bay Sanctuary v. Covenant v. Trump*, 932 F.3d 742, 770-71 (9th Cir. 2018) (finding agency action implementing executive order is reviewable under the APA).

every day after the Order takes effect in a month. *See* Lapkoff Decl. (Ex. F), Ex. 2 at 1.[4]

Plaintiffs must thus contend with the operational chaos and financial losses that this Order imposes as soon as it takes effect—indeed they must start planning for its disruption now. *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1122 (N.D. Cal. 2019) (recognizing "burdens on … ongoing operations" for public entities constitute irreparable harm); *Tennessee v. Dep't of Education*, 104 F.4th 577, 613 (6th Cir. 2024) (same); *cf. Whitman-Walker Clinic, Inc., v. HHS*, 485 F.Supp.3d 1, 56 (D.D.C. 2020) (finding irreparable harm based upon "financial and operational burdens" imposed by a regulatory action). For Affected Children, Plaintiffs could no longer use their existing and longstanding procedures for verifying eligibility for federal funding for health and welfare programs. *See, e.g.*, Ex. D at ¶16 (noting, as immediate example in which verification is needed, that hundreds of New Jersey children unfortunately enter state care in first year of their lives, some of whom will be Affected Children); Ex. A at ¶30-31 (noting many States enroll low-income children in public health insurance immediately upon birth, likewise requiring verification). Instead of relying on a U.S. hospital's registration to confirm the newborn's eligibility for federal funding, Plaintiffs would need to develop eligibility verification systems that document and track the immigration status of the newborn's parents—an immediate change that demands significant expenditures and diversion of resources. *See* Ex. A at ¶¶31-35; Ex. D at ¶¶22-24; *see also* Stock, *supra*, at 152 ("Proving one's parents' citizenship or immigration status at the moment of one's birth can be difficult … apart from the simple birthright citizenship rule."); USCIS, Form G-1055, at 34-35 ($1,335 per application to certify citizenship based upon parentage). This disruption will be compounded if Plaintiffs prevail, despite having spent weeks

---

[4] This is a conservative estimate of the number of Affected Children, because it does not account for Affected Children whose parents are lawfully present on a temporary basis or whose fathers at birth are conditional permanent residents. *See* Order, § 2(a).

redesigning and reimplementing their system, as they would then have to expend resources to revert to the pre-existing system. A court order preserving the status quo that has been in effect since 1868 would prevent this chaos and harm.

Beyond the chaos for residents and Plaintiffs alike, the many financial harms laid out above are likewise imminent and irreparable. As explained above, many States enroll their low-income children in public health insurance immediately upon birth. *See, e.g.*, Ex. A at ¶30. That matters not only for basic operations, but for funding too: Federal Medicaid and CHIP funding are provided through an upfront quarterly grant. Ex. A at ¶17. States utilize these funds throughout the quarter— for example, New Jersey draws from the funds on a weekly basis—to fund health care expenditures for enrolled children. *Id.* ¶18. Once the Order takes effect, more and more Affected Children will be enrolled in state-funded health care rather than Medicaid or CHIP with each passing day, and States will be unable to use the federal funds to pay for their care—funds they would have received but for the Order. *Id.* ¶¶28-29. And the same is true for EAB funding associated with SSNs, which will also prove irreparable immediately upon the Order taking effect. Once any newborn leaves a hospital without securing an SSN through the EAB program, States will likely lose the opportunity to secure an EAB payment. And Title IV-E funding, for its part, is provided quarterly, meaning States must submit to the federal government their next reimbursement claims for eligible children soon after the end of the first quarter in 2025. *See, e.g.*, Ex. D at ¶12. There is no basis to require States to incur these costs where their legal success is so certain.

The equities and public interest overwhelmingly demand temporary and preliminary relief too. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (noting the balance of equities and the public interest "merge when the [g]overnment is the opposing party" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Savino v. Souza*, 459 F. Supp. 3d 317, 331 (D. Mass. 2020) (adding the

factors merge "in the immigration context"). The public interest could scarcely be clearer: today's Order undermines "the ancient and fundamental rule of citizenship by birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, a doctrine that reflects the post-*Dred Scott* lesson that "our country should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship," and that ensures there will "be no inquiry into whether or not one came from the right caste, or race, or lineage, or bloodline in establishing American citizenship," *OLC Op.* at *6. Without the fundamental citizenship to which their birth entitles them, Affected Children risk deportation before their right to citizenship may be adjudicated, even in the weeks and months in which this case is pending. Even if they are not removed during the pendency of this litigation, in many States, they will be unable to access non-emergency healthcare during the first few months of their lives on account of ineligibility for federal benefits like CHIP and Medicaid. Add to that the federal funds Plaintiffs will irreparably lose and the time and resources that their agencies must expend as they rush to redesign benefits eligibility systems to accord with the Executive Branch's new definition of citizenship, *supra* at 2-3, and the equities call powerfully for averting all these harms by preserving the status quo prior to February 19, 2025, while this litigation proceeds.

Consistent with the extraordinary nature of this case, the emergency relief this Court orders should apply nationwide. District court judges have discretion "to design 'the scope of injunctive relief'" so that it is tailored to the "specific harm alleged." *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) (affirming nationwide preliminary injunction enjoining ex-employee from competing with former employer anywhere in the country). Because there are times in which any narrower relief "would entirely undercut th[e] injunction's effectiveness," *id.* at 424, courts have found nationwide injunctions of federal policies can be appropriate if a more limited preliminary injunction would fail to remedy the irreparable harm. *See, e.g.*, *Trump v. Int'l Refugee Assistance*

PA24

*Project*, 582 U.S. 571, 579, 581 (2017) (declining to stay nationwide injunction insofar as it barred enforcement of travel ban "against foreign nationals who have a … relationship with a person or entity in the United States," given "the hardships identified by the courts below" that would flow to such persons absent nationwide preliminary relief); *HIAS v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021) (affirming nationwide injunction when state agencies "place[d] refugees throughout the country" and demonstrated irreparable harm from the order taking effect in other jurisdictions).

Such relief is appropriate here. Initially, the issue has already been settled for this Nation: the Supreme Court has twice, in decisions that apply to every State, expressly confirmed that the Constitution ensures birthright citizenship for all American-born children subject to our sovereign laws. *See Wong Kim Ark*, 169 U.S. 649; *Plyler*, 457 U.S. 202. Indeed, other than in the post-*Dred Scott* Civil War, that has been the clear status quo for the entire Nation since before the Fourteenth Amendment and in the 157 years since. And any order that grants narrower relief than established by *Wong Kim Ark* and *Plyler*—in which birthright citizenship would exist in some States but not others—would fail to fully remedy Plaintiffs' harms. After all, if children born in Plaintiff States acquire citizenship regardless of their parents' immigration status, but children born in other States do not, then Plaintiffs' agencies would still have to recalibrate how they determine eligibility for federal programs, and incur related administrative costs, due to the reality that infants born in other States can move to Plaintiff States and ultimately seek services. Ex. A at ¶36; Ex. D at ¶25. That is, given the reality that families move across state lines, Plaintiff States faced with any patchwork judicial order would still have to redesign and implement eligibility verification systems to account for this possibility—one of the irreparable harms laid out above, *see supra* at 7—which would "undercut th[e] injunction's effectiveness." *DraftKings*, 118 F.4th at 424.

There are further reasons that a patchwork court order fails "to provide complete relief" to

Plaintiffs. *Sindi v. El-Moslimany*, 896 F.3d 1, 31 (1st Cir. 2018). In addition to the operational chaos that would persist, if the challenged policies are enjoined within the Plaintiff States but not throughout the rest of the country, then Plaintiff States will still incur increased costs for providing state-funded healthcare and foster care to infants who move into their States after being born in non-Plaintiff States. For example, Plaintiff States provide foster care to infants regardless of the child's state of birth or of the parents' citizenship or immigration status, but they only receive Title IV-E matching funds for providing foster care to U.S. citizens or qualifying noncitizens. *See supra* at 5-6; Ex. D at ¶11. And many Plaintiff States likewise fund health care for children without regard to their immigration status or to the State in which they were born. *See supra* at 4-5. Without nationwide preliminary relief, Plaintiff States would have to spend more of their own funds providing foster care and healthcare to children born to undocumented parents in this country but outside of the Plaintiff States. Given the unprecedented and extraordinary nature of this Order, this court should preserve the centuries-old status quo to protect babies' fundamental citizenship rights and avoid profound irreparable harms while this case proceeds.

As the Department of Justice has acknowledged, "[t]o have citizenship in one's own right, by birth upon this soil, is fundamental to our liberty as we understand it." *OLC Op.* at *7. Although other Nations make other choices, "for us, for our nation, the simple, objective, bright-line fact of birth on American soil is fundamental." *Id.* at *6. Simply put, "All who have the fortune to be born in this land inherit the right, save by their own renunciation of it, to its freedoms and protections." *Id.* at *7. This Court should enjoin this assault on our fundamental American tradition.

## **CONCLUSION**

This Court should grant the motion for a preliminary injunction.

January 21, 2025

Respectfully submitted.

**MATTHEW J. PLATKIN**
 ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum *
 *Solicitor General*
Shankar Duraiswamy*
 *Deputy Solicitor General*
Viviana M. Hanley*
Shefali Saxena*
Elizabeth R. Walsh*
 *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Jeremy.feigenbaum@njoag.gov

*Counsel for the State of New Jersey*

**ROB BONTA**
 ATTORNEY GENERAL OF CALIFORNIA

*/s/ Denise Levey*
Denise Levey*
 *Deputy Attorney General*
Michael Newman
 *Senior Assistant Attorney General*
Marissa Malouff*
Irina Trasovan*
 *Supervising Deputy Attorneys General*
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
 *Deputy Attorneys General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
Denise.Levey@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
 ATTORNEY GENERAL OF MASSACHUSETTS

 */s/ Gerard J. Cedrone*
Gerard J. Cedrone (BBO No. 699674)
 *Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
 *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
jared.b.cohen@mass.gov

*Counsel for the Commonwealth of
 Massachusetts*

**PHIL WEISER**
 ATTORNEY GENERAL OF COLORADO

*/s/ Shannon Stevenson*
Shannon Stevenson
 *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*

PA27

**WILLIAM M. TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ *William M. Tong*
William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860)-808-5020
Janelle.Medeiros@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ *Vanessa L. Kassab*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

/s/ *Nicole S. Hill*
Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ *Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Sean D. Magenis
Sean D. Magenis
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sean.d.magenis@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Toni L. Harris
Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov
ServiceS3@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Attorney General Dana Nessel on behalf of the People of Michigan*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ Jessica M. Finberg
Jessica M. Finberg*
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jfinberg@oag.state.md.us
410-576-6921

*Counsel for the State of Maryland*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ John C. Keller
John C. Keller*
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

PA29

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern*
  Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

Counsel for the State of Nevada

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Zoe Levine
Zoe Levine*
  Special Counsel for Immigrant Justice
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

Counsel for the State of New York

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ James W. Grayson
James W. Grayson*
  Chief Deputy Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

Counsel for the State of New Mexico

**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

/s/ Daniel P. Mosteller
Daniel P. Mosteller*
  Associate Deputy Attorney General
Laura Howard
  Chief Deputy Attorney General
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

Counsel for State of North Carolina

PA30

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

*/s/ Katherine Connolly Sadeck*
Katherine Connolly Sadeck (MA Bar No. 681501)
 *Solicitor General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2480
Fax: (401) 222-2995
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

*/s/ Gabe Johnson-Karp*
Gabe Johnson-Karp*
 *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

*/s/ Julio A. Thompson*
Julio A. Thompson*
 *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for State of Vermont*

**DAVID CHIU***
 CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO

*/s/ David Chiu*
Yvonne R. Meré*
 *Chief Deputy City Attorney*
Sara J. Eisenberg*
 *Chief of Complex and Affirmative Litigation*
Mollie M. Lee*
 *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
 *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 6th Fl.
San Francisco, California 94102-5408
(415) 505-0844
David.Louk@sfcityatty.org

*Counsel for City and County of San Francisco*

*Application for pro hac vice admission forthcoming*

PA31

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | Declaration of Sarah Adelman, Commissioner of New Jersey Department of Human Services |
| B | Declaration of Kathy Ehling, Assistant Commissioner for the Division of Educational Services in the New Jersey Department of Education |
| C | Declaration of Kaitlan Baston, Commissioner of the New Jersey Department of Health |
| D | Declaration of Laura Jamet, Assistant Commissioner of New Jersey Department of Children and Families |
| E | Declaration of Sharon C. Boyle, General Counsel of the Massachusetts Executive Office of Health and Human Services (EOHHS) |
| F | Declaration of Shelley Lapkoff, Senior Demographer at NDC |
| G | Declaration of Michael F. Rice, Superintendent of Public Instruction within the Michigan Department of Education (MDE) |
| H | Declaration of Kelly Sesti, Director for the Bureau of Administration within the Children's Services Administration (CSA) of the Michigan Department of Health and Human Services (MDHHS) |
| I | Declaration of Jeffrey Duncan, State Registrar and the Director of the Division of Vital Records and Health Statistics (VRHS) within the Michigan Department of Health and Human Services (MDHHS) |
| J | Declaration of Meghan Groen, Senior Deputy Director for Behavioral and Physical Health and Aging Services within the Michigan Department of Health and Human Services (MDHHS). |
| K | Declaration of Lindy Harrington, Assistant State Medicaid Director at the California Department of Health Care Services (DHCS) |
| L | Declaration of Rachel A. Heenan, Director of the Special Education Division at the California Department of Education (CDE) |
| M | Declaration of Rita Nguyen, Assistant Public Health Officer for the State of California at the California Department of Public Health (CDPH) |
| N | Declaration of Elizabeth Villamil-Cummings, New York State Registrar and the Director of the Bureau of Vital Records at the New York Department of Health (DOH) |
| O | Declaration of Gabrielle Armenia, Director of the Division of Eligibility and Marketplace Integration in the Office of Health Insurance Programs of the New York Department of Health (DOH) |
| P | Declaration of Jonathan Fanning, Director of Fiscal Management of the New York Department of Health (DOH) |
| Q | Declaration of Jennifer Avenia, Director of Immigration Practice for the Connecticut Department of Children and Families (DCF) |
| R | Declaration of Peter Hadler, Deputy Commissioner for the Connecticut Department of Social Services (DSS) |
| S | Declaration of Yvette Gauthier, State Registrar of Vital Records of the Connecticut Department of Public Health |

| T | Declaration of Tom Wong, Associate Professor at the University of California, San Diego (UCSD) |
| U | State Department's Foreign Affairs Manual |
| V | Declaration of Peri Weisberg, Principal Administrative Analyst in the Planning Unit of the City and County of San Francisco's Human Services Agency |
| W | Executive Order, "Protecting the Meaning and Value of American Citizenship," (Jan. 20, 2025) |
| X | Noah Webster, An American Dictionary of the English Language 635 (George & Charles Merriam 1860) (excerpt) |
| Y | 1 William Blackstone, *Commentaries on the Laws of England* 366 (6th ed., Co. of Booksellers, Dublin 1775) (excerpt) |
| Z | Cong. Globe, 39th Cong., 1st Sess. (excerpts) |

2

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*

      Plaintiffs,

v.

DONALD J. TRUMP, *et al.*

      Defendants.

Civil Action No.: <u>25-cv-10139</u>

## DECLARATION OF SARAH ADELMAN

I, Sarah Adelman, hereby declare:

1. I am the Commissioner of the New Jersey Department of Human Services ("DHS"). I have been employed as Commissioner since January 2021.

2. As Commissioner of DHS, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts on the State of New Jersey's health insurance programs of an executive order titled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born after February 19, 2025 to (i) a mother who is

1

unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

### NJ FamilyCare and Eligibility Rules

4.  Within DHS, the Division of Medical Assistance and Health Services ("DMAHS"), administers several programs that enable qualifying New Jersey residents to access free or low-cost healthcare coverage. These are referred to as "NJ FamilyCare" programs.

5.  NJ FamilyCare is publicly funded health insurance. It includes New Jersey's partially federally funded Medicaid program ("Federal-State Medicaid"), New Jersey's partially federally funded Children's Health Insurance Program ("CHIP"), and New Jersey's Cover All Kids Phase II initiative.  As of December 2024, 1,673,856 New Jersey residents are enrolled in Federal-State Medicaid, of which 639,212 were children.  An additional 161,577 children are enrolled in CHIP.

6.  NJ FamilyCare provides comprehensive healthcare coverage for a wide range of services, including primary care, hospitalization, laboratory tests, x-rays, prescriptions, mental health care, dental care, preventive screenings, and more.

7.  Health insurance provided through NJ FamilyCare, including programs that rely in part on federal funding and those funded entirely by the state, are generally administered through managed care organizations ("MCOs") that receive a monthly capitation payment from the State for each member enrolled in a particular MCO plan.

8.  Eligibility for NJ FamilyCare health insurance programs, including eligibility for Federal-State Medicaid and CHIP, depends in part on age, immigration status, and household income.

9.  In general, children under the age of 18 (i) meet the income eligibility requirement for Federal-State Medicaid in New Jersey if their household's modified adjusted gross income

PA36

("MAGI") is less than 147% of the federal poverty level ("FPL"), and (ii) meet the income eligibility requirement for CHIP in New Jersey if their household's MAGI is less than 355% of the FPL.

10. To be eligible for Federal-State Medicaid or CHIP, a child must also be a U.S. citizen or "lawfully residing," as that term is defined by federal law. "Lawfully residing" individuals are "lawfully present" and include qualified immigrants such as lawful permanent residents, asylees, refugees, and trafficking victims, as well as nonimmigrant visa holders and humanitarian status classes such as Temporary Protected Status and Special Immigrant Juvenile Status. Children who are not citizens or "lawfully residing" are commonly referred to as undocumented. This eligibility requirement is subject to certain narrowly-defined exceptions for some emergency services, which Federal-State Medicaid may cover for individuals who are neither citizens nor "lawfully residing" if they meet the Federal-State Medicaid income eligibility guidelines.

11. Pursuant to Cover All Kids Phase II, all New Jersey children under age 19 who meet the income eligibility requirements for Federal-State Medicaid or CHIP but are not U.S. citizens or "lawfully residing" are eligible for health insurance through NJ FamilyCare that is fully funded by the State.

12. New Jersey implemented Cover All Kids Phase II because access to healthcare, particularly to primary care, makes children and communities healthier, and it is a fiscally responsible investment in the future of New Jersey children.

13. The increased enrollment of children in NJ FamilyCare via Cover All Kids Phase II has had a positive impact on public health in the state. Children enrolled in NJ FamilyCare are more likely to receive preventative care services. This reduces the need for more intensive health

PA37

care treatments, including emergency care, as illnesses develop.  It also reduces the financial

burden on health care providers from providing care to uninsured individuals and ensures

that families are not left with medical bills that they are unable to pay.  In addition, sick

children with health insurance coverage are more likely to see a health care provider and

receive treatment, limiting the spread of infectious illnesses across the state.

14. Having insurance coverage also makes it less likely that children will have to visit an

emergency room to treat preventable illnesses because it is more likely that they will receive

medical care before a treatable medical issue becomes an emergency.  This reduces the

resource strain and uncompensated care burden on hospitals.

<u>Federal Funding</u>

15. For children covered by the Federal-State Medicaid program, the federal government

generally reimburses for 50 percent of New Jersey's health care expenditures.  For children

covered by CHIP, the federal government generally reimburses for 65 percent of New

Jersey's health care expenditures.

16. By contrast, with the exception of certain limited emergency medical services that may be

covered by Federal-State Medicaid, NJ FamilyCare coverage for undocumented children is

fully funded by New Jersey, without any federal funding assistance.

17.  Federal funding for NJ FamilyCare's Medicaid and CHIP programs is provided through an

advance quarterly grant from the federal Centers on Medicare and Medicaid Services

("CMS") to the State of New Jersey, with a post-quarter reconciliation.  This quarterly

process begins with the State submitting to CMS a CMS-37 report, which estimates the

reimbursable expenditures the State expects to make for the upcoming quarter, six weeks

before the quarter begins.  Those estimates are based on current enrollment figures.  For the

PA38

January to March 2025 quarter, the State submitted the report on or about October 15, 2024. The next CMS-37 report is expected to be submitted in mid-February.

18. CMS then issues quarterly federal grants the week before the start of the quarter. During the quarter, the State draws down from this grant award what is needed to make weekly batch payments to partially fund its expenditures for Medicaid and CHIP. Within 30 days after the end of a quarter, the State sends to CMS a CMS-64 report, which reports all reimbursable expenditures for the quarter. If the initial federal grant was less than final reimbursable expenditures, CMS will typically transmit an additional reconciling grant four to five months after the end of the relevant quarter.

### Healthcare Coverage for Newborns

19. All children born in the United States and residing in New Jersey whose family income is at or below 355% of the Federal Poverty Level are eligible for NJ FamilyCare.

20. Before the Executive Order, all children born in New Jersey were considered U.S. citizens. Thus, NJ FamilyCare coverage for newborns in New Jersey was partially funded by the State and partially funded by the federal government, either through Federal-State Medicaid or CHIP.

21. Most healthy newborns remain in the hospital for two or three days after delivery. During this time, they receive routine postnatal care, including a vitamin K injection, antibiotic eye ointment, screening tests (e.g., heel-prick blood test, hearing screening), and hepatitis B vaccination.

22. Additionally, the American Academy of Pediatrics recommends that newborns see a doctor or nurse for a "well-baby visit" six times before their first birthday, including within the first

PA39

3-5 days, the first month, the second month, the fourth month, the sixth month, and the ninth month after birth.

23. Within the first year of life, babies may also need to visit a doctor when they appear ill and may require testing or prescription medication.

24. Children ages 1-18 typically have a range of health care needs that require services from various health care providers.  For example, children in New Jersey must receive certain immunizations prior to starting school, unless they have an exemption for medical or religious reasons.

<u>Fiscal Impact of Revoking Birthright Citizenship</u>

25. NJ FamilyCare currently pays $248.35 per member, per month (totaling $2,980.20 per year) for the vast majority of children enrolled in NJ FamilyCare health insurance programs.  As noted above, the federal government generally covers 50 percent of these costs for children enrolled in Federal-State Medicaid and 65 percent for children enrolled in CHIP.

26. However, if a child were not eligible for Federal-State Medicaid or CHIP, New Jersey would not receive that federal assistance, and would cover the full cost of health insurance coverage for the newborn.

27.  The Medical Emergency Payment Program ("MEPP") provides limited emergency Medicaid coverage that is partially federally-funded to adults ages 19 or older who meet income eligibility guidelines regardless of citizenship or immigration status.  MEPP covers labor and delivery services for undocumented women giving birth in New Jersey, but does not cover post-delivery health care for their newborn children.  Instead, those newborns have, until now, been eligible for Federal-State Medicaid because they meet the income eligibility guidelines and are U.S. citizens.

28. In each of the last three calendar years, there have been between 7,000 and 8,000 births per year to pregnant women whose labor and delivery was covered by MEPP. DHS has been advised of estimates indicating that approximately 58 percent of these children likely had a second parent who was undocumented. Thus, a reasonable approximation of the number of children born to undocumented parents who would have been eligible for Federal-State Medicaid but will not be due to the Executive Order—and instead will receive health insurance through New Jersey's state-funded health insurance program—is 4,060 to 4,640 children per year.  This is an underestimate to some degree because it does not include children who have one parent who is not undocumented but who nonetheless does not meet the immigration status requirements of the Executive Order to confer citizenship on their child born in the United States.

29. New Jersey spends close to $3,000 per member per year on children enrolled in Federal-State Medicaid, and the federal government covers 50 percent of these costs.  If between 4,060 and 4,640 children are enrolled in fully state-funded health insurance rather than Federal-State Medicaid in a given year because of the Executive Order, this will cost the State between approximately $6 to $7 million per year.  This estimate does not include the loss of federal funding that New Jersey would experience from children who are eligible for CHIP but not Federal-State Medicaid being shifted to fully state-funded health insurance.

Eligibility Verification Process For Federally-Funded Medicaid and CHIP

30. When a child is born to parents who lack private health insurance, the healthcare facility at which the child is born typically submits information to DHS for a determination of the child's eligibility for public health insurance through NJ FamilyCare.  The application is processed by either a state vendor or the county social services agency in the individual's

7

PA41

county of residence.  Approximately half of all Medicaid enrollees are enrolled through the vendor and another half through the counties.

31. The vendor and counties utilize an eligibility verification system to determine whether the applicant is eligible for Federal-State Medicaid or CHIP, and if not, if they are eligible for fully state-funded health insurance.  The vendor uses its own eligibility verification system, while the counties use a system designed by DHS.  Both systems currently rely on the fact that a newborn was born in a New Jersey healthcare facility as proof of citizenship to qualify the newborn for Federal-State Medicaid or CHIP.

32. Because of the Executive Order, the state vendor and DHS will have to develop a new eligibility verification system to determine whether newborn children are eligible for Federal-State Medicaid or CHIP because they can no longer rely on the fact that a child was born in the United States to confirm citizenship status.  Although some newborn children, pursuant to a federal regulation, may be deemed eligible for Federal-State Medicaid until the age of one because their mother was covered by MEPP, this does not ensure coverage for all newborn children who are otherwise eligible for Federal-State Medicaid or CHIP.

33. DHS and the state vendor would incur significant costs to re-design their eligibility verifications systems to address changes in citizenship rules for newborn children.  The re-design would require significant planning to understand the new rules governing U.S. citizenship for newborn children born in the United States, to identify and determine the kinds of evidence that would suffice as proof of citizenship, and to modify the IT systems that are used to process applications and verify eligibility.  The state vendor would almost certainly seek to pass on to the State any costs that it incurred.

34. In addition, DHS would incur significant costs to train staff, partners, and healthcare providers on the new eligibility system and procedures, and to revise existing guidance documents and manuals regarding eligibility rules and procedures. DHS currently relies on 1,471 county caseworkers and 173 vendor employees to handle eligibility determinations for NJ FamilyCare.

35. It will likely take in the range of six months to develop and implement a new eligibility system and undertake the necessary training to ensure that it can be deployed effectively.

36. Children residing in New Jersey are eligible for NJ FamilyCare health insurance programs, including the fully state-funded program regardless of where they were born. Children residing in New Jersey who moved into the state from other states, including neighboring states like Pennsylvania or New York, are frequently enrolled in NJ FamilyCare health insurance programs. Presently, the eligibility verification systems used by DHS's vendor and county agencies have no reason to track the state of birth of U.S.-born children who apply for NJ FamilyCare. If the rules governing birthright citizenship varied by state of birth, these eligibility verification systems will have to start tracking state of birth so that they can accurately determine whether a child is a citizen and therefore eligible for Federal-State Medicaid or CHIP, or whether they are not a citizen and thus only eligible for fully state-funded health insurance.  This will further complicate the process of redesigning eligibility verification systems described above, requiring additional expenditure of DHS's time and resources.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of January, 2025, in Trenton, New Jersey.

_____
Sarah Adelman, Commissioner
New Jersey Department of Human Services

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

       Plaintiffs,

  v.

DONALD J. TRUMP, et al.

       Defendants.

Civil Action No.: 25-cv-10139

**DECLARATION OF KATHLEEN EHLING**

    I, Kathleen Ehling, hereby declare:

1. I am the Assistant Commissioner for the Division of Educational Services within the New Jersey Department of Education ("NJDOE"), a position I have held since 2021. As Assistant Commissioner, I oversee the Offices of Special Education, including the Special Education Medicaid Initiative ("SEMI") program, Supplemental Educational Programs, Fiscal and Data Services, Student Support Services, Performance Management and the Marie H. Katzenbach School for the Deaf. I am also responsible for overseeing implementation of the federal Every Student Succeeds Act, the federal Individuals with Disabilities Education Act ("IDEA"), the New Jersey Tiered Systems of Support, and the development and release of the annual School Performance Reports. Prior to holding this position, I served in various positions throughout my 20-year tenure with NJDOE including as the Director of the Office

1

PA46

of Fiscal and Data Services in which I oversaw the administration of over $4 billion in federal and state grant funds for NJDOE. Prior to this role, I served as the Manager of the Bureau of Governance and Fiscal Support, Office of Special Education Policy and Procedure within NJDOE.  In this capacity, I oversaw the implementation of administrative policy for the office, including development of regulations, model individualized education programs ("IEPs"), and the Parental Rights in Special Education booklet.  I also oversaw the dispute resolution system, the complaint investigation process, the approval and monitoring of approved private schools for students with disabilities and clinics and agencies, the SEMI program, and the IDEA Part B grant process.  Prior to assuming the role of Manager, I worked as a Special Assistant to the Director of the Office of Special Education Programs, a Complaint Investigator, and a Mediator with the Office of Special Education.

2. As Assistant Commissioner, I have personal knowledge of the matters set forth below, or I have knowledge of the matters below based on my review of information, information provided by other state agencies, including the New Jersey Department of the Treasury, and information gathered by my staff.

3. I am providing this declaration to explain certain impacts on the State of New Jersey and its local education agencies of an executive order entitled "Protecting the Meaning and Value of American Citizenship" issued on January 20, 2025 (the "Executive Order"). The Executive Order revokes birthright citizenship for children born after February 19, 2025, to (i) a mother who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

<u>New Jersey Department of Education</u>

4. NJDOE's mission is to support schools, educators, and districts to ensure all of New Jersey's 1.4 million public school students have equitable access to high quality education and achieve academic excellence.

5. Pursuant to *Plyler v. Doe*, 457 U.S. 202 (1982), local education agencies ("LEAs") within the State serve all school-age children, regardless of their immigration status. An LEA is a public authority legally constituted by the State as an administrative agency to provide control of and direction for kindergarten through grade 12 public educational institutions.

6. Within NJDOE, the Division of Finance and Business Services administers federal and state funds to LEAs to support crucial education initiatives and provide essential services to students.

<u>Special Education Medicaid Initiative</u>

7. School-based health services ("SBHS") refer broadly to medical services provided to all students in a school setting, such as on-site school nurses, behavioral health counselors, and preventative health screenings for visual and auditory acuity.

8. All New Jersey LEAs are required to provide certain SBHS free of charge to all students, regardless of their immigration or insurance status.

9. In State Fiscal Year 2024, $2,466,759,247 of State funds were provided to LEAs for special education services.  This is the total amount for special education categorical aid, extraordinary aid for special education costs, and the estimated portion of equalization aid that is calculated for special education costs.

10. Since 1988, Section 1903(c) of the Social Security Act has authorized the federal Medicaid program to reimburse LEAs for medically necessary SBHS provided to Medicaid-eligible students with disabilities ("special education SBHS") pursuant to the IDEA, 20 U.S.C. §

3

PA48

1400 et seq., provided the services were delineated in the student's individualized education program ("IEP") (or similar plan) and covered in the State plan for Medicaid. IDEA requires LEAs to develop an IEP for children found eligible for special education and related services. An IEP identifies certain special education and related services, and program modifications and supports, that the LEA will provide a child with a disability.

11. Currently, New Jersey's State plan for Medicaid provides coverage for certain special education SBHS, such as occupational or speech therapy, that are specified in a student's IEP.

12. The Medicaid reimbursement program for special education SBHS in New Jersey is called the Special Education Medicaid Initiative ("SEMI"), which is jointly operated by NJDOE and New Jersey's Departments of Human Services and Treasury.

13. New Jersey has contracted with a vendor for administrative support in managing SEMI and matching reimbursement claims to Medicaid-eligible students.

14. Approximately 408 LEAs in New Jersey were required under State law to participate in SEMI in State Fiscal year 2025 because they had more than 40 Medicaid-eligible classified students.  LEAs with 40 or fewer Medicaid-eligible classified students may request a waiver from the executive county superintendent not to participate in SEMI. Approximately 185 such LEAs did not seek a waiver and therefore participated in SEMI in State Fiscal year 2025.

15. Under SEMI, over the course of a school year, LEAs receive interim reimbursement payments through a fee-for-service process for costs associated with providing special education SBHS to Medicaid-eligible students.

16. The federal reimbursement funds are split between the State Treasury and LEAs. In State Fiscal Year 2024, the federal government paid 50% of the costs submitted for interim reimbursement for special education SBHS.  The State retained 65% of the federal reimbursement and passed on 35% of the federal reimbursement to the relevant LEA.

17. At the end of the fiscal year, New Jersey engages in a cost settlement process to verify that LEAs are accurately reimbursed for the costs of providing SBHS by comparing interim reimbursements with reported annual expenditures.

18. In State Fiscal Year 2024, New Jersey LEAs submitted interim fee-for-service reimbursement claims to the federal government for claims valued at $220,734,493, of which federal Medicaid reimbursed 50%, or $110,367,246.60. The State retained 65% of the federal reimbursement, a total of $71,755,196.95, and passed on the remaining 35%, a total of $38,612,049, to the LEAs. These sums reflect the pre-cost settlement interim dollar amount, as the cost settlement process has not been completed.

19. To be eligible for a partially federally-funded Medicaid program, a student must be a U.S. citizen, a "qualified non-citizen," or "lawfully present."

   a. Qualified non-citizens include lawful permanent residents, asylees, refugees, and trafficking victims, among others.

   b. Individuals who are lawfully present include those with humanitarian statuses (such Temporary Protected Status and Special Immigrant Juvenile Status) as well as asylum applicants, among others.

   c. Children who are neither "qualified non-citizens" nor "lawfully present" are commonly referred to as undocumented.

5

PA50

20. Thus, undocumented children are not eligible for partially federally-funded Medicaid. LEAs are still required to provide special education SBHS to undocumented children, but cannot receive federal reimbursement dollars for those services.

21. In 2024, New Jersey's SEMI vendor identified approximately 88,000 students with disabilities who were enrolled in partially federally-funded Medicaid in New Jersey.

22. Because of the Executive Order, students with disabilities who are born in the United States to two undocumented parents, or whose birthright citizenship will otherwise be revoked by the Executive Order, will lose eligibility for federally-funded Medicaid for which they otherwise would have qualified. LEAs will thus not receive any SEMI reimbursement funds for provision of SBHS to those students, increasing the State's net costs.

23. The Executive Order will also increase the population of undocumented children, some percentage of whom will very likely have disabilities that require SBHS and would be eligible for partially federally-funded Medicaid but for their immigration status. The costs of providing those services will be borne by the State and LEAs without any federal Medicaid reimbursement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of January, 2025, in Trenton, New Jersey.

Kathleen Ehling

_____

Kathleen Ehling, Assistant Commissioner
Division of Educational Services, New
Jersey Department of Education

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

       Plaintiffs,

v.

DONALD J. TRUMP, et al.

       Defendants.

Civil Action No.: 25-cv-10139

**<u>DECLARATION OF KAITLAN BASTON</u>**

I, Kaitlan Baston, MD, MSc, DFASAM, hereby declare the following:

1. I am the Commissioner of the New Jersey Department of Health ("DOH") and have been employed as the Commissioner since August of 2023. I am dual boarded in Family Medicine and Addiction Medicine, obtained a master's degree in Neuroscience from Kings College, London, and graduated from Jefferson Medical College in Philadelphia, Pennsylvania. Prior to becoming DOH's Commissioner, I built and led the Cooper Center for Healing, an integrated pain, addiction, and behavioral health center and was an Associate Professor of Medicine at Cooper Medical School of Rowan University. Prior to my position with Cooper, my work ranged from public health projects in Rwanda, to public maternity and trauma

1

hospitals in the Dominican Republic, to providing full spectrum family planning services and working in a bilingual community health center in Seattle, Washington.

2. The information in the statements set forth below were compiled through personal knowledge, through DOH personnel who have assisted in gathering this information from our agency, as well as information from experts outside of DOH provided to me.

New Jersey Department of Health

3. DOH's mission is to protect public health, promote healthy communities, and continue to improve the quality of health care in New Jersey. To support that goal, DOH performs many functions, including regulating healthcare facilities and overseeing the registration of vital events, such as births, through the Department's Office of Vital Statistics and Registry ("OVSR").

Registration and Birth Certificates of Newborns

4. Healthcare facilities coordinate with OVSR to collect information to register a child's birth.

5. When a child is born in a healthcare facility, a medical attendant to the birth is statutorily obligated to register the birth. They provide the newborn's parents with a Birth Certificate Worksheet ("the Worksheet"). The Worksheet does not inquire about the parents' immigration status.

6. After the newborn's parents complete and sign the Worksheet, the healthcare facility enters the information from the Worksheet into an electronic birth system (VERI) maintained by OVSR. The local registrar in the municipality where the child is born then reviews the birth record in VERI, and if accepted, the birth certificate is created and registered with OVSR.

7. A newborn's completed birth certificate does not indicate whether the parents have a Social Security Number ("SSN"). The only information provided on a birth certificate regarding the

2

PA54

child's parents is the mother's legal name, the father's full name (if provided), their places and dates of birth, residence, and mailing addresses. Currently, it is not possible to determine a foreign-born parent's immigration status from their child's birth certificate.

8.  In 2024 there were approximately 95,792 births registered in the State of New Jersey.

Application for Social Security Number of Newborns

9.  While registering a newborn for a birth certificate at a healthcare facility, parents may also indicate on the Worksheet whether they would like to request an SSN for their child through a Social Security Administration ("SSA") program called Enumeration at Birth ("EAB").

10. The EAB program is voluntary for families, but according to SSA, about 99 percent of SSNs for infants are assigned through this program. If parents indicate on the Worksheet that they want an SSN for their child, healthcare facilities transmit these requests electronically to OVSR, which then transmits the requests to SSA.

11. New Jersey receives federal funding from the SSA EAB process on a quarterly basis for each SSN that is issued through the EAB process.  The State receives $4.82 per SSN issued through the EAB program, or approximately $90,000 to $110,000 per quarter.  The State generally receives payment a month after the quarter ends and is thus expecting its next payment in April 2025. OVSR uses those funds to support the payment of administrative and operational costs.

Effects of the Executive Order on Registration and EAB Process

12. I have been advised that an executive order titled "Protecting the Meaning and Value of American Citizenship" was issued on January 20, 2025 (the "Executive Order") stating that children born to (i) a mother who is unauthorized or who is lawfully present but only on a temporary basis, and (ii) a father who is neither a U.S. citizen nor a lawful permanent

3

resident, shall not be recognized as citizens by the federal government, rendering them ineligible to receive an SSN. DOH has been advised that approximately 6,200 children per year are born in New Jersey with two undocumented parents. This is an underestimate to some degree because it does not include children who have one parent who is not undocumented but who nonetheless does not meet the immigration status requirements of the Executive Order to confer citizenship on their child born in the United States.

13. If SSA will not issue an SSN to those children, OVSR estimates approximately 6,200 fewer SSNs will be issued annually in New Jersey. If approximately 6,200 fewer SSNs are issued through the EAB process under the Executive Order, this will result in an annual loss of EAB funding to New Jersey of approximately $30,000.

14. If, as a result of the Executive Order, the newborn registration process has to be amended to provide for verification of the parents' citizenship and/or immigration status either to obtain an SSN for the newborn, issue a birth certificate to the newborn, or to indicate on the birth certificate whether the newborn child is eligible for birthright citizenship based on their parents' status, this will impose material administrative burdens on OVSR and healthcare facilities, including University Hospital, which is an acute care hospital that is an instrumentality of the State providing obstetric services.

15. OVSR and healthcare facilities would have to develop a system for ascertaining, documenting, and verifying the parents' immigration status, and they would have to train staff on how to implement and use this system. Assuming this burden would further lead to delays in registration and issuance of the newborn's birth certificate, which must be completed within five days of the birth under state law.

4

16. Because of the Executive Order, SSA will presumably require proof of parents' lawful status to issue an SSN. Healthcare facilities providing obstetric services, including University Hospital, will be forced to consult with, and assist, families with obtaining the paperwork necessary to prove their lawful status. It is likely that the electronic system and guidelines for submitting SSN applications through that system—which are currently detailed in a 59-page SSA manual— will have to be revised. This will likely require healthcare facilities to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish lawful immigration status. It will also require OVSR to expend resources to modify its systems for obtaining information from healthcare facilities and transmitting that information to SSA, and to train staff on these changes.

<u>Early Intervention Services for Children</u>

17. Under the federal Individuals with Disabilities Act ("IDEA"), states are required to provide Early Intervention Services ("EIS"), such as speech or occupational therapy, to children up to three years old with certain disabilities and developmental delays. In New Jersey, DOH administers and provides EIS for families.

18. Direct services for children enrolled in EIS are principally funded by the State, but the federal government covers 50 percent of the costs for children enrolled in the federal-state Medicaid program ("Federal-State Medicaid"). Children are eligible for Federal-State Medicaid if they are U.S. citizens or "qualified aliens" and their family income is below certain thresholds.

19. There are currently 37,075 children in New Jersey receiving EIS, of which approximately 46 percent, or 17,220 are enrolled in Federal-State Medicaid.

20. For EIS direct services furnished in State fiscal year 2024, New Jersey appropriated approximately $118 million, had approximately $180 million in EIS Medicaid claims, and the federal government reimbursed approximately $90 million of those claims.

21. Before the Executive Order, children born in New Jersey were U.S. citizens by birthright regardless of their parents' immigration status and would be eligible for Federal-State Medicaid provided they met certain income requirements. If those children were enrolled in Federal-State Medicaid and needed EIS in the first three years of life, DOH would provide those services and receive a 50 percent cost reimbursement from the federal government. If those children needed EIS, but were ineligible for Federal-State Medicaid, DOH would still be required to provide EIS, but would not receive any reimbursement from the federal government and instead would have to rely on State-appropriated funds.

22. DOH has been advised of estimates that in the last three calendar years, there have been between 7,000 and 8,000 births per year to undocumented pregnant women whose labor and delivery were covered by emergency Medicaid services. Undocumented patients may qualify for emergency Medicaid that covers certain emergency medical services if they meet all Federal-State Medicaid eligibility requirements except for immigration status.

23. DOH has further been informed that approximately 58 percent of children born to undocumented mothers covered by emergency Medicaid likely had a second parent who was undocumented. Thus, a reasonable approximation of the number of children born to undocumented parents who have been eligible for Federal-State Medicaid prior to the Executive Order is 4,060 to 4,640 children per year.

24. Of this number, it is highly likely some will require EIS. The State will lose the federal reimbursement funds it would have otherwise received and will then have to absorb the cost of those lost reimbursement funds.

I declare under penalty of perjury that I am authorized to sign this certification, that there is no single official or employee of the DOH who has personal knowledge of all such matters; that the facts stated above have been assembled by employees of DOH as well as provided by experts outside of DOH, and I am informed that the information set forth above are in accordance with the information available to me and records maintained by the DOH and are true and accurate.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this 21st day of January, 2025, in Trenton, New Jersey.

_____
Kaitlan Baston, MD, MSc, DFASAM
Commissioner
New Jersey Department of Health

7

PA59

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

      Plaintiffs,

  v.

DONALD J. TRUMP, et al.

      Defendants.

Civil Action No.: 25-cv-10139

## DECLARATION OF LAURA JAMET

I, Laura Jamet, hereby declare:

1. I am Assistant Commissioner of the New Jersey Department of Children and Families ("DCF"), a position I have held since 2023. As Assistant Commissioner, I oversee the Division of Child Protection and Permanency ("DCPP"), New Jersey's division responsible for child protective services and permanency, including foster care and public adoptions. Prior to holding this position, I served in an acting capacity as Assistant Commissioner since 2022, and I served as Deputy Director of Operations for DCPP since 2021, along with other clinical and administrative roles in the New York City Administration for Children's Services.

1

2. As Assistant Commissioner for DCF, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts on the State of New Jersey's child welfare programs of an executive order entitled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"). The Executive Order revokes birthright citizenship for children born in the United States after February 19, 2025, to (i) a mother who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

<u>Division of Child Protection and Permanency</u>

4. DCF is devoted to serving and supporting at-risk children and families. Within DCF, the DCPP is New Jersey's child protection and child welfare agency. DCPP is responsible for investigating allegations of child abuse and neglect and, if necessary, arranging for a child's protection.

5. DCPP contracts with community-based agencies throughout the State to provide services for children and families. Services include counseling, substance abuse treatment, in-home services, and residential placement.

6. If a child has been harmed or is at risk of harm, DCPP may ask the county family court to place the child in foster care. Foster homes are provided by caring individuals who have completed extensive licensing and care training.

7. DCPP provides foster care services to children regardless of their immigration status.

8. The average daily population of children in foster care in New Jersey in State Fiscal Year 2024 was 3,753. The total number of children in foster care in New Jersey in Calendar Year 2024 was 4,547.

9. Children often enter DCPP's care within the first year of their lives. In 2023, 268 children entered DCPP's care within three months of birth, 308 within six months of birth, and 364 within 12 months of birth.

### Federal Funding Tied to a Child's Citizenship

### Title IV-E Funding

10. Under Title IV-E of the federal Social Security Act, the federal government provides grants to State foster care agencies with approved Title IV-E plans, including DCF, to assist those agencies with the costs of foster care maintenance for eligible children, as well as for adoption, guardianship, prevention services, and other support services.

11. Federal funding under Title IV-E is available only for services provided to children who are United States citizens or "qualified aliens." As DCF understands the Title IV-E limitations, undocumented children are not "qualified aliens," *cf.* 8 U.S.C. § 1641, and thus DCF does not receive any federal reimbursement for foster care expenditures by DCF for undocumented children.

12. Federal funding under Title IV-E covers maintenance payments for eligible children and a portion of the State's administrative expenses. Maintenance payments include foster care assistance, adoption assistance, and guardianship assistance, and cover the cost of basic necessities, including food, clothing, shelter, daily supervision, and school supplies, for eligible children in DCF's care. Federal funding is provided on a quarterly basis after the

State submits claims for eligible expenditures associated with eligible children. New Jersey submits claims for reimbursement within eight weeks of the close of a quarter.

13. Partial reimbursement of administrative expenses is calculated by using the State's "penetration rate," which is the percentage of children in foster care who are eligible for Title IV-E funding. DCF calculates a penetration rate for each quarter. For federal Fiscal Years 2023 and 2024, the penetration rate was between 55 and 60 percent.

14. In Federal Fiscal Year 2024, DCF received $205.3 million in Title IV-E federal funding, including $138.9 million for administrative expenses and $66.4 million for maintenance payments for eligible children. This federal funding constitutes a substantial share of DCF's budget. For example, DCF spent approximately $170 million on maintenance payments during the last fiscal year. Federal funding covered approximately 40 percent of these maintenance expenditures.

15. DCF must, consistent with state law, continue to provide children born in the United States whose birthright citizenship is not recognized by the federal government with foster care services as needed. However, because these children are now ineligible for Title IV-E funding, DCF will not receive any reimbursement under Title IV-E for providing those services.

16. DCF does not keep records of the immigration status of the parents of children that DCF works with. Based on DCF's experience and understanding of general demographics in New Jersey, it is very likely that DCF serves U.S. citizen children whose birthright citizenship would not be recognized by the federal government pursuant to the Executive Order. DCF has been advised that there were around 95,792 registered births in New Jersey in 2024, and that an estimated 6,200 children are born each year in New Jersey to two undocumented

parents.  This is a conservative underestimate of the number of children affected by the Executive Order because it does not include children who have one parent who is not undocumented but who nonetheless does not meet the immigration status requirements of the Executive Order to confer citizenship on their child born in the United States.  Given that 364 children entered foster care within the first year of their lives in 2023, it is likely that some number of these children had two undocumented parents or a mother with temporary lawful status and a father who was neither a U.S. citizen nor lawful permanent resident.  DCF reasonably expects that some number of children born within the 12-month period after February 19, 2025 will enter DCF's care. As a result of the Executive Order, DCF will lose material amounts of federal funding that it would use for foster care maintenance payments for those children, as well as reimbursement for administrative expenses associated with their care.

Medicaid Funding

17. Under New Jersey law, all foster children, regardless of immigration status, are eligible for public health insurance through NJ FamilyCare.  Children in foster care who are U.S. citizens or have a qualifying immigration status are eligible for the federal-state Medicaid program that is partially funded by the federal government.  However, except for certain limited emergency care that is covered by the federal-state emergency Medicaid program, undocumented children in foster care are eligible only for health insurance that is fully funded by the State.  Because of the Executive Order, the State will lose federal health insurance for such children and incur greater health care costs.

Other Federal Benefits Programs

18. DCF provides targeted financial and resource assistance to families with children who are at risk of familial crisis, including for necessities such as rent, baby supplies, and groceries, to ensure that children receive adequate care. DCF's goal is to keep families together, so that children do not experience the disruption and trauma of being removed from their home. In fiscal year 2024, DCF spent $13.3 million on this assistance. Many families with at-risk children also receive assistance for their children through federal programs, including SNAP, TANF, and SSI, for which their children are eligible because of their citizenship status. DCF determines the need for providing targeted assistance only after considering whether federal assistance to these families is sufficient to ensure that the basic needs of their children are met. Children with two undocumented parents, or whose birthright citizenship will otherwise be revoked by the Executive Order, will not be recognized as eligible for such federal assistance. DCF will be forced to increase its expenditures to ensure that these at-risk children receive adequate care.

<u>Costs of Ascertaining Citizenship and Immigration Status</u>

19. In order to determine whether children in its care are eligible for Title IV-E funding, DCF needs to determine the citizenship or immigration status of the children it serves.

20. In addition, DCF is responsible for applying for certain federal assistance for which a child in its care may be eligible, including Medicaid and SSI benefits. These federal benefits are not available to children who are not citizens or have a qualifying immigration status. Thus, as part of the application process, DCF must submit proof that a child is a citizen or has a qualifying immigration status.

6

21. Presently, DCF relies on a birth certificate as evidence of U.S. citizenship. This is administratively simple, especially with respect to newborns that DCPP caseworkers may interact with shortly after birth.

22. The Executive Order complicates DCF's ascertainment of whether a child is eligible for Title IV-E funding and the process for applying for certain federal assistance for children in its care.

23. To ascertain eligibility for these programs, DCPP caseworkers must now develop a new system for determining the citizenship and immigration status of children in its care. That system will likely require DCPP to take steps to determine, verify, and document the immigration status of the parents of children who come into foster care. This may be especially difficult in certain circumstances where parents are unwilling to engage with DCF. It will cost considerable time and resources to implement such a system.

24. DCPP will have to expend considerable resources to develop and implement a system to determine, verify, and document the citizenship and immigration status of children whose citizenship could not be presumed on the basis of a birth certificate showing their birth in the United States. DCPP will also incur significant costs to train DCPP caseworkers to implement that system. While the precise costs are difficult to estimate without further guidance from the federal government on how states must determine citizenship status for Title IV-E eligibility, it may easily cost millions of dollars. Because quarterly submissions to the federal government for reimbursements are due within 30 days of the end of a quarter, DCF must develop and begin implementing such a system within a matter of months. As a result of the Executive Order, DCF must immediately begin planning the development of a

new system for determining, verifying, and documenting the citizenship and immigration status of children born in the United States.

25. DCF provides services for children residing in New Jersey regardless of where they were born. With respect to U.S.-born children, DCF commonly provides services for children residing in New Jersey who moved into the state from other states, including neighboring states like Pennsylvania or New York. Presently, DCF does not and has no reason to track the state of birth of U.S.-born children in its care. If rules governing birthright citizenship varied by state of birth, DCF would have to start tracking state of birth so that DCF could accurately determine the citizenship and immigration status of children in its care for the purpose of determining Title IV-E eligibility. Without uniformity around such eligibility, DCF must also design, implement, and train staff on an eligibility determination system that accounts for differential rules based on a child's state of birth. This introduces additional complexity into any eligibility determination process for children in DCF's care, and will require additional expenditure of DCF's time and resources.

* * *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 21st day of January, 2025, in Trenton, New Jersey.


Laura W. Jamet, MSW
Laura Jamet, Assistant Commissioner
New Jersey Department of Children and Families

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*,

                        *Plaintiffs*,

   v.

DONALD J. TRUMP, *et al.*,

                        *Defendants*.

No. 1:25-cv-10139

## **DECLARATION OF SHARON C. BOYLE**

I, Sharon C. Boyle, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

### I.    **Background**

1.    I am the General Counsel of the Massachusetts Executive Office of Health and Human Services (EOHHS), a position I have held since 2016. EOHHS is a cabinet-level secretariat in Massachusetts that directly manages the MassHealth program and oversees eleven state agencies charged with promoting the health, resilience, and independence of the Commonwealth's residents. EOHHS's public-health programs serve nearly one in three Massachusetts residents, touching every city and town in the Commonwealth.

2.    Between 2003 and 2016, before assuming my current role, I held several titles within the EOHHS general counsel's unit, including First Deputy General Counsel and Chief MassHealth Counsel. From 1995 to 2003, I worked as an assistant general counsel in the Division of Medical Assistance.

3.    As EOHHS General Counsel, I have personal knowledge of the rules, regulations, and processes governing EOHHS and its agencies. I have personal knowledge, or knowledge based

on review in my capacity as General Counsel of information and records gathered by EOHHS and agency staff, of the matters set forth below.

## II.     MassHealth Programs

### A.     Overview, Eligibility, and Funding

4.     EOHHS administers several publicly funded programs that enable qualifying Massachusetts residents to access free or low-cost healthcare coverage. These programs include the Medicaid plan, Children's Health Insurance Program (CHIP), and the 1115 Demonstration Project—collectively known in Massachusetts as "MassHealth." Jointly funded by state and federal dollars, MassHealth provides coverage for a wide range of health services to children, the elderly, families, and individuals with disabilities. MassHealth benefits may vary depending on, among other things, a person's citizenship and immigration status and household income.

5.     Depending on household income, children who are U.S. Citizens or who have qualifying immigration status are eligible for MassHealth's more comprehensive health benefits. For example, children whose household income is no more than 200% of the federal poverty level (for children under 1) or 150% of the federal poverty level (for children 1 through 18) are eligible for MassHealth Standard benefits. These MassHealth plans, which are funded in part by federal dollars, cover comprehensive medical and behavioral health care, primary and specialty physician services, inpatient and outpatient hospital services, long-term services and supports, comprehensive dental and vision care, lab tests, and pharmacy services.

6.     Under federal law, children who are undocumented or who lack a qualifying immigration status are not eligible for the comprehensive plans discussed in the preceding paragraph. Instead, the only Medicaid coverage available for children who are undocumented or who lack qualifying immigration status is emergency services—known in Massachusetts as "MassHealth Limited." The household income thresholds for MassHealth Limited are 200% of the

2

PA71

federal poverty level for children under 1 and 150% of the federal poverty level for children aged 1 through 18.

7.     To provide more comprehensive coverage for children who are ineligible for the comprehensive MassHealth plans discussed in paragraph 5, Massachusetts allows individuals under age 19 to enroll in the state's Children's Medical Security Plan (CMSP). A child whose household income is at or below 200% of the federal poverty level does not pay for CMSP coverage. CMSP is funded primarily by the Commonwealth of Massachusetts; the federal government does not provide matching funds for CMSP as it does for the comprehensive MassHealth programs.[1] Stated otherwise, Massachusetts children under age 19 who meet the income eligibility requirements for federally funded comprehensive Medicaid or CHIP programs, but who are not eligible for those programs because they are not U.S. citizens or qualified immigrants, are eligible for more comprehensive health coverage through CMSP at the state's expense.

8.     For most MassHealth programs, the "Federal Medical Assistance Percentage"— *i.e.*, the amount that the federal government reimburses the Commonwealth for its spending—is 50%. For spending on children in CHIP, the Federal Medical Assistance Percentage is 65%. By contrast, and as just discussed, CMSP coverage for undocumented children, who are not eligible for federal-state Medicaid or CHIP, is primarily funded by the Commonwealth.

B.     Fiscal Impact from Elimination of Birthright Citizenship

---

[1] The federal government provides limited funding for CMSP through the "Health Services Initiative," but that funding is subject to an annual cap which the program regularly exceeds, meaning that the state will shoulder the cost of any increased enrollment in the CMSP.

PA72

9.     Today, any child born in Massachusetts is automatically deemed a U.S. citizen. Thus, any child born in Massachusetts to Massachusetts residents who meets income-eligibility criteria is eligible, as a citizen, for comprehensive federally funded MassHealth programs.

10.    Massachusetts currently spends an average of approximately $4,800 per year per child enrolled in a comprehensive federally funded MassHealth program. As noted above, the federal government currently reimburses at least 50–65% of those costs.

11.    On January 20, 2025, the President issued an Executive Order entitled "Protecting the Meaning and Value of American Citizenship," which purports to revoke birthright citizenship for certain children born in the United States after February 19, 2025. If the Executive Order is given effect, children covered by the Executive Order would not be eligible for any federally funded MassHealth program beyond MassHealth Limited. Instead, those children, if they meet income and other eligibility criteria, would receive CMSP from birth. Accordingly, other than emergency services, Massachusetts would cover the increased cost of health coverage for those children without federal reimbursement. This will be a significant number of children. MassHealth covers approximately 40% of the births in Massachusetts. Babies whose mothers are on MassHealth are deemed eligible for MassHealth for their first year.

C.    **Administrative Burdens from Elimination of Birthright Citizenship**

12.    Today, MassHealth's process for determining a newborn's eligibility for health care coverage operates on the premise that birth in a Massachusetts healthcare facility is, without more, proof that the newborn is a citizen.

13.    If the Executive Order goes into effect, MassHealth would have to develop new eligibility processes because EOHHS could no longer rely on the fact that a child was born in the United States to confirm citizenship status.

4

PA73

14.     EOHHS would incur significant costs to train eligibility staff and customer service workers on the new procedures and to revise existing guidance documents and manuals regarding eligibility rules and procedures.

## III.    Enumeration at Birth Program

15.     Massachusetts is a participant in the Social Security Administration's "Enumeration at Birth" (EAB) program. EAB allows new parents to request a Social Security Number (SSN) during the birth registration process, eliminating the need for them to gather documents and submit a separate application to the Social Security Administration.

16.     EAB involves collaboration between the federal government and state agencies. When a state participates in the program, the state's vital-statistics agency—in Massachusetts, the Registry of Vital Records and Statistics (RVRS) in the Department of Health (DPH)— electronically sends birth registration information to the Social Security Administration. The Administration then assigns an SSN, issues a card, and automatically updates its records with proof of birth. The federal government provides funding to the state for each SSN assigned this way.

17.     According to the Social Security Administration, approximately 99% of SSNs for infants are assigned through this program. Parents born outside the United States can apply for and receive an SSN for their child without including their own SSNs on the application. Currently, because children born in the United States are U.S. citizens, they are eligible for SSNs regardless of their parents' immigration status.

18.     Massachusetts receives federal funding from the federal government in connection with the EAB program on a quarterly basis. The funding rate for the June 2024–June 2025 time period is $4.82 per SSN issued through Massachusetts's EAB participation. Massachusetts's current contract with the Social Security Administrations provides for up to 87,860 SSNs to be

issued through the program in Massachusetts in that time—resulting in up to $423,485.20 in federal payments to the Commonwealth.

19. If birthright citizenship were revoked pursuant to the Executive Order, children covered by the order would no longer be citizens and would therefore be ineligible for an SSN, and Massachusetts would lose the federal funding associated with issuance of those SSNs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of January, 2025.

_____

Sharon C. Boyle
*General Counsel, Massachusetts Executive Office of Health and Human Services*

7

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.          :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :
                                     :      Civil Action No.: 1:25-cv-10139
DONALD J. TRUMP, et al.              :
                                     :
          Defendants.                :
                                     :
                                     :
                                     :

---

## DECLARATION OF KELLY SESTI

I, KELLY SESTI, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the Director for the Bureau of Administration within the Children's Services Administration (CSA) of the Michigan Department of Health and Human Services (MDHHS).  In this role, I am responsible for oversight of policy, technology, human resources, budget, continuous quality improvement efforts and data management for CSA.  I also oversee the Title IV-E program for Michigan.

2.     Through my role, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

3.     I am providing this declaration to explain certain impacts on the State of Michigan's Title IV-E program of the executive order titled "Protecting the

1

PA78

Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother who is unlawfully present or permitted into the United States on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident..

<u>Michigan's Title IV-E program, eligibility requirements, and federal funding</u>

4.      Michigan currently serves a monthly average of 8,668 children through the Title IV-E foster care program, 15,740 children through the Title IV-E adoption assistance program, 527 children through the Title IV-E guardianship program, and 8,516 children with Title IV-E prevention services.  These numbers do not include the number of children who are already supported through state, county, and tribal funds.  All children who are eligible receive equitable access to these services regardless of their citizenship status.  Currently, MDHHS ensures that all children in need of services are supported through a combination of state, county, and tribal funds if they are not eligible for Title IV-E or other federal support.  If children in the Michigan foster care system are stripped of citizenship status pursuant to the Executive Order, MDHHS would, consistent with state law and policy, continue to provide these children with foster care services as needed.  However, because those children would be ineligible for Title IV-E funding, MDHHS would not receive any federal reimbursement under Title IV-E for providing these services.

5.      Michigan's Title IV-E program also supports many programs through administrative claims.  Staffing for foster care, adoption, guardianship, and

prevention cases are supported in part through Title IV-E funds. Child and parent legal representation and the Foster Care Review Board through the State Court Administrative Office are also supported through Title IV-E funds. Statewide training initiatives for current MDHHS, contracted private agencies, and tribal social services receive Title IV-E funding. The Title IV-E Child Welfare Fellowship program, contracted through the University of Michigan and subcontracted to several other Michigan public universities, is supported through Title IV-E funds. These programs rely on the Title IV-E penetration rate to determine the matching funds to meet the Title IV-E requirements. Partial reimbursement of administrative expenses is calculated by using the State's Title IV-E penetration rate, which is based in part on the percentage of children in foster care who are eligible for Title IV-E payments. MDHHS calculates the penetration rate for each quarter. For federal Fiscal Years 2023 and 2024, the penetration rate was between 31 and 32 percent.

6. Due to the expansive programming that MDHHS has implemented with Title IV-E support, a small drop in the Title IV-E penetration rate causes a significant increase in the amount that the State, counties, and tribes must contribute. For example, a one percent increase in the penetration rate in each quarter of fiscal year 2024 would have resulted in an estimated $2,950,941.59 more Title IV-E reimbursement to the state.

7. Children who are eligible for Title IV-E are categorically eligible for Medicaid per federal requirements. Children placed with MDHHS who are not

eligible for Medicaid because they are not a U.S. citizen or qualified alien, however, continue to incur medical and dental expenses. Those expenses are paid by state funds to ensure children have access to appropriate medical and dental care. Any increase in the number of children who are not Title IV-E or Medicaid eligible due to a change in citizenship determination will result in substantial increases in the medical and dental costs to the state, starting with birth expenses for a child who enters care as a newborn.

<u>Fiscal Impact of Revoking Birthright Citizenship</u>

8.     The federal government's policy of ending birthright citizenship for children born in the United States based on their parent(s)' non-citizen/immigration status will have a variety of widespread impacts on Michigan's foster care, adoption, guardianship, and prevention system programs, including a decrease in receipt of federal Title IV-E funding for children born in Michigan and increased operational and administrative costs for Michigan.

9.     For fiscal year 2024, Michigan claimed $30,824,969 in maintenance expenses for foster care expenses, $113,843,897 for adoption assistance maintenance expenses, $3,662,817 for guardianship maintenance expenses, and $5,831,968 for prevention services. For fiscal year 2024, Michigan claimed a total of $61,455,039 in administrative and training expenses for foster care, $21,808,189 in administrative expenses for adoption assistance, $159,385 in administrative expenses for guardianship, and $9,296,981 in administrative expenses for prevention administration and training.

### Administrative Burden

10.    In addition, MDHHS expects burdensome increases in administrative and training costs for Title IV-E program as a result of the Executive Order.

11.    MDHHS currently determines Title IV-E eligibility by meeting several factors, one of which is being determined to be a United States citizen or qualified alien.  Per federal guidance, the *Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV-E of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996,* published in the Federal Register on November 17, 1997 (62 Fed. Reg. 61344) by the Department of Justice, requirements were incorporated into MDHHS policies to ensure that the citizenship and qualified alien requirements are being met.  There are checks and balances built into MDHHS's policy, processes, and electronic case records system to ensure that this eligibility requirement is met.  Prior to the Executive Order there were no federal requirements for the child's parents' citizenship to be factored into the eligibility decision.  That information is not gathered by MDHHS, nor readily available.  Obtaining this information from the Michigan Vital Records Department would most likely require legislative changes if the parent does not voluntarily provide the documentation.  This delay in determining if this child is Title IV-E eligible due to their citizenship would cause the child's payments to be made from a combination of state and county funds—rather than Title VI-E funds.  This process will add additional research onto those working with the family and the child welfare funding specialists.  Those delays in making a determination will force the

5

PA82

state, county, and/or tribe to fully support those children in the interim time needed for this additional research.

12.     Estimates on the number of children who will be impacted is difficult to determine as the citizenship and immigration status of parents is not something that is currently tracked.  The shift will impact the processes for all children who enter care and were born after the implementation date of the Executive Order.  In fiscal year 2024, 824 children under one-year-old entered foster care.  It is estimated a similar number of newborns will enter foster care in 2025.  For children born after February 19, 2025, they will all require additional research into their parents' citizenship to determine if they meet the new citizenship details in the Executive Order.

13.     There is federal guidance regarding Social Security Numbers and their impact to both Title IV-E and Medicaid eligibility as follows:  Changes brought about by the Deficit Reduction Act of 1984 (DEFRA) (Public Law 98-369) resulted in an Office of Human Development Services (OHDS) Policy Announcement which stated that otherwise eligible children are not required to apply for or furnish a Social Security Number (SSN) in order to be eligible for the Title IV-E Foster Care Maintenance Payments Program or the Adoption Assistance Program.  However, Title XIX program regulations, 42 C.F.R. § 435.910, were amended to require, effective April 1, 1985, that each individual (including children) requesting Medicaid services furnish his/her SSN as a condition of eligibility for Medicaid.  Children who are eligible for Title XIX Medicaid on the basis of their eligibility

under Title IV-E must furnish an SSN as a condition of eligibility for Medicaid, even though an SSN is not required under title IV-E.

14. The changes to citizenship documentation will require policy updates and changes to the electronic case records system. Changes to the system come at a large expense and will involve several different departments within MDHHS. Training will be needed for all case managers within MDHHS, contracted private agencies, and tribal social services agencies. Training of the courts in collaboration with the State Court Administrative Office (SCAO) would be needed as well. The Child Welfare Funding Specialists will require additional training regarding how to now determine a child's citizenship and how to manually track the changes until updates can be made to the electronic case records system.

15. The cost of care for children who are not eligible for Title IV-E is paid for with a combination of state, county, and tribal funds. Each of Michigan's 83 counties and twelve federally recognized tribes will need to turn to their local communities for additional funding to support the expected increase in their contributions due to this Executive Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 21, 2025

_____

Kelly Sesti
Director, Bureau of Administration
Children's Services, MDHHS

7

PA84

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.                :
                                           :
            Plaintiffs,                     :
                                           :
    v.                                      :
                                           :       Civil Action No.: 25-cv-10139
DONALD J. TRUMP, et al.                     :
                                           :
            Defendants.                     :
                                           :
                                           :
                                           :

---

I, JEFFREY DUNCAN, pursuant to 28 U.S.C. § 1746, hereby declare that the

following is true and correct:

1.      I am the State Registrar and the Director of the Division of Vital

Records and Health Statistics (VRHS) within the Michigan Department of Health

and Human Services (MDHHS).  In this role, I am responsible for administration of

Michigan's state vital records and statistics functions, including the civil

registration of births, deaths, marriages, and divorces. I also administer contracts

under which VRHS has to provide services to the Social Security Administration

and the National Center for Health Statistics, a Center in the U.S. Centers for

Disease Control and Prevention (CDC).   In addition, I am the President-Elect of the

National Association for Public Health Statistics and Information Systems, the

organization of state and territorial vital statistics registrars.

1

PA86

2.     As Michigan's State Registrar, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3.     I am providing this declaration to explain certain impacts on the State of Michigan of the executive order titled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother who is unlawfully present or who is lawfully present in permitted into the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

4.     The VRHS is responsible for the civil registration of births, deaths, marriages, and divorces, as well as issuing certified copies of these events to the public.  VRHS contracts with the National Center for Health Statistics (NCHS) to contribute data toward national vital statistics, and with the Social Security Administration for Enumeration at Birth (EAB).

<u>Registration and Birth Certificates of Newborns</u>

5.     Healthcare facilities throughout Michigan coordinate with VRHS to collect and submit information to register each child's birth.

6.     When a child is born in a healthcare facility, a medical attendant to the birth is statutorily obligated to register the birth.  They provide the newborn's parents with a Birth Certificate Worksheet that asks for several pieces of

information, including the parents' place of birth and Social Security Numbers (SSNs). The Worksheet does not inquire about the parents' immigration status.

7.      After the newborn's parents complete and sign the Worksheet, hospital staff enter the information from the Worksheet into an electronic birth system (VERA) maintained by VRHS. Local registrars, typically county clerks in Michigan, log in to VERA to accept and register each birth certificate and file it with VRHS. Upon registration, VRHS subsequently extracts statistical information from birth certificates and transmits weekly to the NCHS. Daily, VRHS extracts data from newly registered birth records and submits to Social Security for EAB.

8.      A newborn's completed birth certificate does not indicate whether the parents have an SSN. The only information on the parents is the mother's legal name, the father's full name (if provided), their places and dates of birth, residence, and mailing addresses. Currently, it is not possible to determine a foreign-born parent's immigration status from their child's birth certificate.

9.      Healthcare facilities do not routinely ask patients, including new parents, for their immigration status. Generally, hospitals learn that information only when assessing a patient's eligibility for public benefits, which may depend on immigration status. If hospitals obtain immigration status information for patients, it is recorded in their health records and becomes protected health information that is shielded from disclosure under the Health Insurance Portability and Accountability Act (HIPAA).

10.    If the newborn registration process had to be amended to provide for verification of the parents' citizenship and/or immigration status, this would impose material administrative burdens on healthcare facilities throughout Michigan. During the newborn registration process, hospitals ask parents for their SSNs and places of birth, but do not directly inquire about immigration status. Currently, healthcare facilities do not verify the accuracy of the information provided. If healthcare facilities were required to confirm the accuracy of the parents' places of birth, SSNs, or immigration status, they would incur significant new administrative costs to implement a system to substantiate the information and hire and train staff. This burden would likely further lead to delays in registration and issuance of birth certificates for all children.

<u>Application for Social Security Number of Newborns</u>

11.    While registering a newborn for a birth certificate at a healthcare facility, parents may also request an SSN for their child through a Social Security Administration (SSA) program called Enumeration at Birth (EAB).

12.    The EAB process is voluntary for families, but according to SSA, about 99% of SSNs for infants are assigned through this program.

13.    The EAB application is included as part of the Birth Certificate Worksheet parents complete at the facility. For EAB purposes the Worksheet asks for the parents' SSNs. Parents born outside the United States can apply for and receive an SSN for their child without including their own SSNs on the application. Currently, because children born in the United States are U.S. citizens, they are

4

eligible for SSNs regardless of their parents' immigration status. Parents check a box on the Worksheet indicating their permission to share information with SSA to obtain a social security number for their newborn child.

14. EAB information collected on the Worksheet is keyed into VERA and submitted to the VRHS electronically at the same time the birth is filed. VRHS extracts and submits EAB information to SSA daily to support timely enumeration. VRHS only sends EAB records to SSA for enumeration of infants born within the past 12 months.

15. Michigan receives federal funding from the SSA EAB process on a quarterly basis for each SSN that is issued through the EAB process. The State receives $4.82 per SSN issued through the EAB process, or approximately $100,000 to $115,000 per quarter. VRHS uses those funds to support the payment of administrative and operational costs.

16. If birthright citizenship were revoked pursuant to the Executive Order for children born in the United States after February 19, 2025 to (i) a mother who is unlawfully present or who is lawfully present in permitted into the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident, such children would no longer be citizens and would therefore be ineligible for an SSN. Assuming that SSA would not issue an SSN to such children , VRHS estimates approximately 6,615 to 6,673 fewer SSNs would be issued. This estimate is based on the number of births for which the parents

identified a foreign place of birth and did not provide an SSN on the Birth Certificate Worksheet in 2023 (6,673 births) and in 2024 (6,615 births).

17.    If approximately 6,600 to 6,800 fewer SSNs were issued through the EAB process due to the revocation of birthright citizenship, this would result in an annual loss of EAB funding to Michigan of approximately $31,812 to $32,776.

18.    In addition to the loss in funding, healthcare facilities in Michigan would incur new administrative costs by expending resources to verify parents' immigration status before applying for a newborn's SSN through the EAB process as SSA will presumably require proof of parents' lawful status to issue an SSN. Healthcare facilities will be forced to consult with, and assist, families with obtaining the paperwork necessary to prove their lawful status.  It is likely that Michigan's VERA system and guidelines for submitting SSN applications through to SSA—which are currently detailed in a 59-page SSA manual—would have to be revised.  This would likely require healthcare facilities to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish lawful immigration status.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  January 21, 2025          *Jeffrey Duncan*

                                 Jeffrey Duncan
                                 State Registrar
                                 Director, State Vital Records Office
                                 MDHHS

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

        Plaintiffs,

   v.

DONALD J. TRUMP, et al.

        Defendants.

Civil Action No.: 25-cv-10139

I, MEGHAN GROEN, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Senior Deputy Director for behavioral and physical health and aging services within the Michigan Department of Health and Human Services (MDHHS). I became the Senior Deputy Director for behavioral and physical health and aging services in May 2023. I am responsible for executive level oversight and administration of Medicaid and the HMP (Healthy Michigan Plan) (together commonly referred to as Medicaid), as well as CHIP (Children's Health Insurance Program), policy and the related eligibility and determination process. In this capacity, I also serve as the Michigan Medicaid Director.

2.      I am providing this declaration to explain certain impacts on Michigan's health assistance programs of an Executive Order titled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born in the

1

PA93

United States after February 19, 2025 to (i) a mother who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

<u>Michigan's Medicaid and CHIP programs, eligibility requirements, and federal funding</u>

3.    Medicaid is a comprehensive health care coverage program for low-income Michiganders. To qualify, individuals must generally fall into one of the following categories:

- Elderly adults

- Blind or disabled adults

- Pregnant women Families/Caretakers of dependent children

- Very low income children (generally under 110% of the federal poverty level)

4.    HMP is Michigan's Medicaid Expansion program, which provides comprehensive health care coverage for individuals who:

- Are age 19-64 years

- Have income at or below 133% of the federal poverty level* ($16,000 for a single person or $33,000 for a family of four)

- Do not qualify for or are not enrolled in Medicare

- Do not qualify for or are not enrolled in other Medicaid programs

- Are not pregnant at the time of application, and

- Are residents of the State of Michigan.

2

PA94

5.     CHIP is a health coverage program funded jointly by the state and federal government to provide health care coverage to eligible children in families that make too much to be eligible for Medicaid, but too low to afford private coverage.  Michigan's primary CHIP program is known by the name of MIChild. Children enrolled in MIChild are considered Medicaid beneficiaries and are entitled to all Medicaid covered services. The MIChild program provides health care coverage for children who:

- Are age 0 through 18
- Have income above traditional Medicaid eligibility levels but at or below 212% of the Federal Poverty Level under the Modified Adjusted Gross Income (MAGI) methodology
- Do not have other comprehensive medical insurance (this includes insurance that covers inpatient and outpatient hospital services, laboratory, x-ray, pharmacy, and physician services)
- Do not qualify for other MAGI related Medicaid programs, and
- Are residents of the State of Michigan.

6.     Medicaid, HMP, and MIChild offer a full array of health benefits, including physical health, behavioral health, dental, vision, and long-term care coverage. Medicaid, HMP, and MIChild are federal-state partnership programs with both a federal and state share funding the overall program costs. Michigan is able to draw 65% federal match for Medicaid, 90% federal match for HMP, and 76% federal match for MIChild.

7.      Non-citizens are generally eligible for coverage of Emergency Services Only (ESO) Medicaid. ESO Medicaid provides a very limited benefit for aliens who are not otherwise eligible for full Medicaid because of immigration status. Aliens who are not otherwise eligible for full Medicaid because of immigration status may be eligible for Emergency Services Only (ESO) Medicaid. For the purpose of ESO coverage, federal Medicaid regulations define an emergency medical condition (including emergency labor and delivery) as a sudden onset of a physical or mental condition which causes acute symptoms, including severe pain, where the absence of immediate medical attention could reasonably be expected to:

- Place the person's health in serious jeopardy, or
- Cause serious impairment to bodily functions, or
- Cause serious dysfunction of any bodily organ or part.

ESO Medicaid coverage is limited to those services necessary to treat emergency conditions. The following services are not covered under this benefit today:

- preventative services
- follow-up services related to emergency treatment (e.g., removal of cast, follow-up laboratory studies, etc.)
- treatment of chronic conditions (e.g., chemotherapy, etc.)
- sterilizations performed in conjunction with delivery
- organ transplants pre-scheduled surgeries
- postpartum care
- non-emergency newborn care

8. In order to get Medicaid or HMP coverage, most non-citizens have a five-year waiting period before they can get full Medicaid or HMP coverage. Certain noncitizens, like refugees or asylees, are exempt from the five-year waiting period.

9. The Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) allows states to provide full coverage to pregnant women and children who are lawfully residing in the United States. Michigan Medicaid allows lawfully residing pregnant women to receive full coverage through the entirety of both their pregnancy and their 12-month postpartum period. After the end of their postpartum period, they will revert to ESO coverage if applicable. Lawfully residing children receive full coverage until they reach age 21 and then revert to ESO coverage if applicable. Individuals who are not considered lawfully present pursuant to section 1903(v)(4) and 2107(e)(l)(J) of the Social Security Act would not qualify for this option and instead receive limited coverage through ESO Medicaid only.

10. During state fiscal year 2024, 3.3 million Michiganders, including 1.22 million children, were provided with health care coverage through Michigan's Medicaid and CHIP programs. An average of 979,727 children under the age of 18 and 42,735 pregnant women were covered each month over the course of the fiscal year.

11. Under federal law, Medicaid and CHIP coverage is provided to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. Individuals may apply via MI Bridges, Michigan's online application platform, via phone, or in person by completing an

PA97

application. With the exception of individuals who apply for ESO Medicaid coverage only, citizenship is considered to be an eligibility factor for Medicaid and CHIP coverage and is verified by MDHHS. There are multiple ways that MDHHS verifies citizenship to determine eligibility.

12. Citizenship is generally verified through a data matching process leveraging Social Security Administration and/or MDHHS vital records data. In instances where citizenship cannot be verified through those automatic means, the applicant is contacted to provide supporting documentation, including, but not limited to, a passport, Certificate of Naturalization, or Certificate of Citizenship, military record of service. If verification of this manner cannot be provided, MDHHS will request third level evidence of U.S. citizenship.

13. Third level evidence is usually a non-government document established for a reason other than to establish U.S. citizenship and showing a U.S. place of birth. This includes an extract of a hospital record on hospital letterhead established at the time of birth that was created at least five years before the initial application date that indicates a U.S. place of birth; life, health or other insurance record showing a U.S. place of birth that was created at least five years before the initial application date; religious record recorded in the U.S. within three months of birth showing the birth occurred in the U.S. and showing either the date of the birth or the individual's age at the time the record was made; or an early school record showing a U.S. place of birth.

14.    If third level evidence cannot be supplied, MDHHS policy stipulates that fourth level evidence can be used only in the rarest of circumstances. When this is necessitated, a written affidavit completed by the applicant or recipient and at least two additional individuals of whom one is not related to the applicant/recipient and who have personal knowledge of the event(s) establishing the person's claim of citizenship can be considered. Individuals making the affidavit must be able to provide proof of their own citizenship and identity. The affidavit is signed under penalty of perjury by the person making the affidavit and must include information explaining why other documentary evidence establishing the applicant's claim of citizenship does not exist or cannot be obtained.

15.    A child born to a woman receiving Medicaid in Michigan is considered a U.S. citizen. No further documentation of the child's citizenship is required. Following the child's birth, he or she would be automatically enrolled in Medicaid for the first 12 months after birth. This coverage provides full Medicaid benefits and permits the hospital and other providers to bill Medicaid for the child's covered services such as newborn testing and screenings, vaccination, pediatrician visit, and the hospital stay. The Executive Order is likely to have serious impacts on public health and inflict harm on hospitals and other safety-net providers that will be left with the costs of now uncompensated, but required, health care services and supports. Hospitals across the country and in Michigan have suspended labor and delivery units and adding uncompensated costs as a result of this order may

PA99

exacerbate growing access concerns over access to labor and delivery services for pregnant women regardless of their insurer.

16.     I understand that the President has issued an Executive Order ending birthright citizenship. The federal government's policy of ending birthright citizenship for children born in the United States based on their parent(s)' non-citizen/immigration status will have a variety of widespread impacts on Michigan's medical benefits programs, including a decrease in receipt of proper medical care for children born in Michigan and increased operational and administrative costs for Michigan. In addition, the change of policy will have a direct impact on Michigan's administration of its Medicaid and CHIP programs and result in a loss of federal funding Michigan receives to reimburse medical expenses in Michigan. As a result, uncompensated care costs will increase for hospitals and safety net providers in Michigan.

<u>Fiscal Impact of Revoking Birthright Citizenship</u>

17.     The Executive Order will result in a direct loss of federal funding for both the undocumented mothers and their children that were eligible for the Maternity Outpatient Medical Services program (MOMS).

18.     MOMS is a health coverage program in Michigan. The MOMS program provides health coverage for pregnant or recently pregnant women who are eligible for ESO Medicaid. MOMS provides coverage for outpatient prenatal services and pregnancy-related postpartum services for two months after the pregnancy ends including but not limited to inpatient labor and delivery, radiology and ultrasound,

laboratory service, doula and home visiting, behavioral health and substance use disorder services. MOMS also covers family planning services for the mother during the postpartum period.

19.    In state fiscal year 2024, 5,500 women were covered through the MOMS program for at least a portion of their pregnancy and postpartum period and 1,907 babies were born to women covered by this program. If the pregnant women covered through MOMS became ineligible due to a loss of citizenship for their unborn child, that would result in a loss of $13.2 million in federal reimbursements to Michigan and, assuming the State covers MOMS program expenses for those individuals with State funds, a corresponding increase to State expenditures of the same amount. If the babies born to these women were no longer considered citizens and ineligible for Medicaid as a result of this status change, that would result in a loss of approximately $11.6 million in federal reimbursements to Michigan and a corresponding increase to State expenditures of the same amount.

20.    The Executive Order will also result in a direct loss of federal funding for children that are born in Michigan to undocumented parents and were eligible for CHIP.

Administrative Burden

21.    In addition, MDHHS expects increased administrative and training costs for these programs relative to resources for training and potentially systems/policy implementation as a result of the Executive Order. Additional administrative costs will be incurred by hospitals and other safety-net providers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  January 20, 2025

Meghan E. Groen
Senior Deputy Director
Behavioral and Physical Health and
Aging Services Administration
MDHHS

# EXHIBIT K

PA103

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

      Plaintiffs,

  v.

DONALD J. TRUMP, et al.

      Defendants.

Civil Action No.: 25-cv-10139

---

## DECLARATION OF LINDY HARRINGTON

I, Lindy Harrington, hereby declare:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California Department of Health Care Services (DHCS) as the Assistant State Medicaid Director. I have held the Assistant State Medicaid Director position since 2023. As Assistant State Medicaid Director my responsibilities include assisting the State Medicaid Director in overseeing all aspects of the Medicaid and Children's Health Insurance Programs (CHIP) as governed by state and federal rules. My experience includes over 17 years of various executive leadership roles within DHCS, including over 7 years as the Deputy Director, Health Care Financing where I was responsible for the development, promotion, and implementation of financing for California's Medicaid program (Medi-Cal) prior to my appointment as Assistant State Medicaid Director.

1

3.      The organizational purpose of DHCS is to provide equitable access to quality health care leading to a healthy California for all.   In that effort, DHCS oversees the provision of healthcare for citizen and noncitizen low-income families, children, women, seniors, and persons with disabilities within the Medi-Cal and CHIP programs.

4.      DHCS is the single state agency authorized to administer California's Medicaid program under Title XIX of the federal Social Security Act, referred to in California as "Medi-Cal" and California's Children's Health Insurance Program (CHIP) under Title XIX and XXI of the federal Social Security Act.

5.      I am providing this declaration to explain certain impacts on the State of California's health insurance programs of the Executive Order titled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

6.      As described below, this Executive Order will inflict significant harm upon DHCS' efforts to provide Californians with equitable access to quality health care.

## Medicaid and CHIP

7.      California's Medi-Cal and CHIP programs are federal/state partnerships that provide comprehensive healthcare to individuals and families who meet defined eligibility requirements.

8.      There are several ways to be eligible for Medi-Cal, but in general, children born in the United States and residing in California whose household modified adjusted gross income (MAGI) is at or below 266 percent of the Federal Poverty Level (FPL) are eligible for Medi-Cal.

2

9. DHCS also leverages Medi-Cal resources to extend meaningful coverage to a wide range of children. This is accomplished in part with federal funds available under Titles XIX and XXI (Children's Health Insurance Program or CHIP).

10. The vast majority of the State's Title XXI allotment is used to expand Medicaid coverage to children in working families whose parent(s) or guardians(s) exceed the income eligibility thresholds for traditional Title XIX based Medi-Cal. DHCS uses Title XXI funds to further extend coverage to children with income up to 322 percent of the FPL in San Francisco, Santa Clara, and San Mateo Counties.

11. In addition, DHCS has elected to use Medi-Cal resources to make pregnancy health services accessible to the largest number of individuals possible. Medi-Cal includes coverage for eligible pregnant individuals up to 213 percent of the FPL. Pregnancy-related services include prenatal care, all Medi-Cal services for conditions that might complicate pregnancy (such as high blood pressure and diabetes) and postpartum care. Labor and delivery are provided under emergency services. Additionally, these services directly affect maternal and child health outcomes.

12. As part of California's CHIP State Plan, pregnant individuals and individuals up to 12 months post-partum who have income between 213 percent of the FPL and up to 322 percent of the FPL may be eligible for the Medi-Cal Access Program (MCAP), which includes the From-Conception-to-the-End-of-Pregnancy (FCEP) Option, which offers comprehensive coverage for no-cost with no copayments or deductibles for its covered services. Eligible pregnant individuals that meet the State's residency requirements may qualify for the MCAP, regardless of immigration status.

13.     Newborns whose mothers are enrolled in Medi-Cal or MCAP and give birth in participating hospitals or clinics can be automatically enrolled into Medi-Cal or the Medi-Cal Access Infant Program (MCAIP) at the time of birth using a simplified application. Medi-Cal deemed eligible newborns and MCAIP infants will receive full-scope, no-cost Medi-Cal until their first birthday.

14.     Under federal law, individuals who are undocumented and do not have a lawful, qualifying immigration status, are not eligible for federal Medicaid, CHIP, or other benefits. The limited exception involves the federal program for undocumented or non-qualified individuals otherwise eligible for Medicaid, known as Emergency Medicaid. Thus, except for emergency, pregnancy-related services, and postpartum services, California fully funds health insurance for individuals who meet the income eligibility guidelines for federally-funded Medicaid or CHIP, but do not qualify for those programs because they are not United States citizens or "qualified aliens."

15.     Under the CHIP State Plan, DHCS elected the From-Conception-to-End-of-Pregnancy Option, which provides full-scope coverage of services for pregnant individuals, regardless of immigration status, up to 322 percent of the FPL. This option provides the DHCS authority to cover pregnancy-related and postpartum services for undocumented or non-qualified individuals.

16.     DHCS recognizes that meaningful access to affordable and quality healthcare requires statewide efforts to increase coverage for more Californians.

17.     Thus, to better address the State's coverage needs, in 2015, California expanded full-scope, State-funded Medi-Cal eligibility to all low-income children through age eighteen, regardless of immigration status, and subsequently, expanded coverage to additional age groups

4

until, beginning in 2024, California became the second state to expand comprehensive coverage to all income-eligible residents, regardless of immigration status.

### Federal Funding

18.     As of the State Fiscal Year 2024-25 enacted budget, DHCS has an annual budget of more than $160 billion, the vast majority of which relates to Medi-Cal and CHIP, which supports the health care of more than 14 million Californians.

19.     The amount contributed by the federal government, known as the Federal Medical Assistance Percentage (FMAP), is based on a formula that uses a state's per capita income. California receives a 50 percent FMAP for Medi-Cal, which generally means that for every dollar California spends on Medi-Cal services, the federal government matches it with a dollar. For CHIP, the FMAP is 65 percent.

20.     However, Medi-Cal coverage for undocumented children who are not eligible for federal Medicaid or CHIP because of their immigration status, is fully funded by California, without any federal funding assistance.

21.     The only exception to this is Emergency Medicaid which is available to all income-eligible individuals who have a medical emergency or need pregnancy-related or postpartum services.

22.     In order to receive Medicaid matching funds from the federal government for healthcare expenditures by California, DHCS needs to verify that the expenditures submitted for federal matching were for care provided to citizens or qualifying noncitizens, or for emergency, pregnancy-related, or postpartum services.

23.     As of 2024, DHCS administers Medicaid and CHIP funded coverage for more than five million children in California. DHCS estimates that coverage on a per-child basis costs

approximately $3,445 per year. For this coverage, California estimates it expended approximately $17 billion in total and received approximately $8 billion in reimbursement from the federal government under Medicaid and CHIP.

24.    Federal funding for California's Medi-Cal program is provided through an advance quarterly grant from the federal Centers on Medicare and Medicaid Services ("CMS") to California, with a post-quarter reconciliation. This quarterly process begins approximately six weeks before the quarter begins, with the State submitting to CMS a CMS-37 report, which estimates the reimbursable expenditures California expects to make for the upcoming quarter. For instance, for the January to March 2025 quarter, California submitted the CMS-37 report on approximately November 15, 2024.

25.    Federal funding for California's CHIP program is provided through an annual allotment. The allotment amount is calculated by CMS as defined in Section 2104(m)(10) of the Social Security Act. Funds from this allotment are released to California based on the quarterly budget submission to CMS. For the January through March 2025 quarter, the State submitted the reports on approximately November 15, 2024. Initial CHIP allotment funds for Federal Fiscal Year 2025 were released to California previously.

26.    CMS then issues a quarterly federal grant no later than the week before the start of the quarter.  The State draws from this grant award during the quarter to partially fund its expenditures for Medicaid and CHIP.

**Healthcare Coverage for Newborns**

27.    Presently, all children born in California are U.S. citizens.

28.    Thus, at present, Medi-Cal coverage for newborns in California is partially funded by the State and partially funded by the federal government, either through Medicaid or CHIP.

6

However, if a child were not eligible for federally-funded Medicaid or CHIP, California would not receive that federal assistance, and would cover the full cost of health insurance coverage for the newborn, with the exception of federal funding for emergency services.

29.     CHIP and Medi-Cal are especially important for children under 21 years of age with disabilities enrolled in California's Children's Services (CCS) program which provides diagnostic and treatment services, medical case management, and physical and occupational therapy health care services to children with CCS-eligible conditions (e.g., severe genetic diseases, chronic medical conditions, infectious diseases producing major sequelae, and traumatic injuries) from families unable to afford catastrophic health care costs. CCS currently serves approximately 182,000 children in California, approximately 90 percent of whom receive this service through CHIP and Medi-Cal benefits.

### Impact of Executive Order

30.     Medi-Cal is the pillar of the State's health care safety net, providing access and meaningful coverage to millions of low-income Californians. If implemented, the Executive Order will not only interfere with the administration of Medi-Cal and other health programs operated by DHCS, reducing California's health care coverage gains, but it will also reduce the amount of federal funding California receives to reimburse medical expenses for children in California.

31.     California's current Medicaid and health benefits programs are structured around the significant reimbursements from the federal government, and any loss of funding would have serious consequences for DHCS and those individuals it serves.

32.     The Executive Order revoking birthright citizenship for certain children born in the United States will result in some babies being born in California as non-citizens with no legal

7

status. That will result in the direct loss of federal reimbursements to the State for coverage provided to those children because eligibility for federally matched programs such as Medicaid and CHIP depends on the individual's eligibility under federal law, which necessarily depends on their citizenship or immigration status.

33.     In particular, federally matched coverage for many children that would have been provided under Medicaid or CHIP will very likely be lost, since those programs are not available to unauthorized individuals aside from Emergency Medicaid coverage. This will necessarily result in a shift to the State of funding responsibility for this group of children.

34.     Further under California's CHIP State Plan, California covers pregnant individuals regardless of immigration status, with incomes at or below 322 percent of the FPL for prenatal care so even though the mother may not have a legal immigration status, the child will be born a U.S. citizen and is therefore eligible under CHIP from conception through birth. After the child is born, the child (as a U.S. citizen) can remain covered under CHIP, while the mother is no longer covered under the federal CHIP program. If these children are no longer deemed citizens at birth, DHCS will lose federal funding for all non-emergency services for these children.

35.     This poses an immediate risk to DHCS's federal funding stream used to provide healthcare coverage to vulnerable California newborns and children.

36.     In 2022, DHCS estimates there were approximately 41,000 births to undocumented pregnant individuals whose labor and delivery was covered by emergency Medicaid. Assuming that a similar number of undocumented pregnant individuals give birth within one year of the Executive Order, and that many of those children would have been

eligible for federal Medicaid and CHIP but for their new non-citizen status, DHCS estimates that it will lose several millions in federal funding in the first year, compounding annually.

37. Further, to the extent that the Executive Order will sow confusion about immigrants and their children's ability to access essential health benefits, for which they remain eligible under state law, the Executive Order undermines the substantial progress that DHCS has made to increase access to healthcare, harming families and communities, weakening the public health, and creating public distrust in the State's social welfare institutions.

38. Because the Executive Order will cause families and caregivers of children, especially infants, to avoid the preventive care and treatment provided by these programs, it will have long-term consequences for the health outcomes of those children.

39. Currently, these programs all follow the American Academy of Pediatrics Bright Futures recommendations, a series of evidence-based preventive care and treatment recommendations shown to improve the health outcomes of children. Beyond health outcomes like avoiding childhood diseases, avoiding long-term risk of chronic diseases in adulthood and promoting age-appropriate development, these services are also critical for ensuring the success of children in other domains like engagement in school, literacy and appropriate social development. These programs are also where any issues, especially related to development, child welfare and congenital or infectious diseases are first identified and treated early. Lack of utilization of these programs will pose long-term risk to the health of all Californians, increased risk for future pandemics, and overall impact to California's health and economy.

40. In addition, if implemented the Executive Order likely will interfere with and complicate DHCS' administration of programs.

41.     DHCS will need to immediately begin planning for the potential loss of federal funding. This includes reassigning staff from other priorities, hiring contractor support, and expanding existing financial and programmatic support contracts to encompass the new scope of work this would entail.

42.     DHCS would also incur significant costs to train staff, partners, and healthcare providers on any updated eligibility system and procedures, and to revise existing guidance documents and manuals regarding eligibility rules and procedures. DHCS will have an enormous administrative burden in training workers across 58 counties on processing Medi-Cal eligibility based on new immigration rules, which is a significant overhaul to Medi-Cal's current enrollment policies.

43.     DHCS will need to revise all eligibility determination policies around Medi-Cal at application, annual renewal, and changes of circumstances relating to citizenship and immigration status verifications, which can take as many as several years to complete and operationalize due to complexity. This includes significant updates to the Medicaid application and its requisite online applications in two eligibility systems, including reconstructing how verifications of immigration status will work to output an accurate Medi-Cal determination. None of these changes will be immediate due to the complexity, breadth, and depth of these fundamental policies for verification of citizenship status.

44.     Because so many changes will need to be made to implement Medicaid and CHIP under this new citizenship rule, DHCS is unable to currently predict how many millions of dollars it will cost to implement these changes.  The changes that would need to be made both at the state and federal level could take years to update to the new citizenship rule.

45.     Further, children residing in California are eligible for Medi-Cal, including the fully state-funded program, regardless of whether they were born in California. Children residing in California who moved into the State from other states, are frequently enrolled in Medi-Cal. Presently, the eligibility verification systems used by DHCS's vendor and county agencies does not track the state of birth of U.S.-born children who apply for Medi-Cal. If the rules governing birthright citizenship varied by state of birth, these eligibility verification systems need to be modified to track state of birth and parentage in order to determine whether a child relocating from another State is a citizen and therefore eligible for Federal-State Medicaid or CHIP. This would add further complexity to the process of updating eligibility verification systems described above, requiring additional expenditure of DHCS's time and resources.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __20th__ day of January, 2025, in Sacramento, CA.

_____
Lindy Harrington
Assistant State Medicaid Director
California Department of Health Care Services

# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

      Plaintiffs,

v.

DONALD J. TRUMP, et al.

      Defendants.

:
:
:
:
:
:
:
:
:
:
:

Civil Action No.: <u>25-cv-10139</u>

---

## **DECLARATION OF RACHEL A. HEENAN**

I, Rachel A. Heenan, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California Department of Education (CDE) as the Director of the Special Education Division. I have been in this position for one year. I have more than 7 years of experience as District Special Education Director and Special Education Local Plan Area Director and more than 19 years of experience in Special Education administration.

3.      As the Director of Special Education, I oversee the implementation of federal and state special education laws including the Individuals with Disabilities Education Act. I also oversee a total budget of $6,300,000,000 in state and federal funds that are allocated to Local Educational Agencies (LEAs) to meet the needs of 850,000 students with disabilities.

1

4.      CDE's mission is to innovate and collaborate with educators, schools, parents, districts, and community partners to ensure that all of California's 5.8 million public school students—across more than 9,000 schools—have access to a world-class education. Our aim is to prepare students to live, work, and thrive in a multicultural, multilingual, and highly connected world.

5.      Pursuant to *Plyler v. Doe*, 457 U.S. 202 (1982), LEAs within the State serve all school-age children, regardless of their immigration status. An LEA—such as a school district—is a public authority legally constituted by the State as an administrative agency to provide control of and direction for kindergarten through grade 12 public educational institutions.

6.      The children of immigrant families are a vital part of our school communities, and they are a part of what makes our schools so vibrant and diverse.

7.      I understand that the President issued the Executive Order "Protecting the Meaning and Value of American Citizenship" on January 20, 2025 (the "Executive Order"). It is my understanding that the Executive Order revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

8.      As described below, it is my understanding that an Executive Order ending birthright citizenship would inflict significant harm upon CDE's efforts to provide a free and appropriate public education to all children by restricting the federal funding made available to LEAs and public schools in California to serve students with disabilities.

**Special Education**

9.     The Individuals with Disabilities Education Act (IDEA) provides that schools are responsible for providing a free appropriate public education (FAPE) to students with disabilities. 20 U.S.C. § 1412(e).

10.     Funding for special education is meant to cover the additional costs that are associated with educating students with disabilities due to their disability. In California, there are three main sources of special education funding: (1) the federal government, as part of the IDEA; (2) the State; and (3) school district and charter school LEAs. For the school year 2024-25, California received $1.5 billion in special education funding from the federal government, the State allocated $4.8 billion for special education, and LEAs, using unrestricted funds, covered the remaining approximately $8 billion in special education costs.

11.     Medicaid responsibility precedes that of the LEA for a Medicaid (called Medi-Cal in California) covered service in the student's Individualized Education Plan (IEP). 20 U.S.C. § 1412(a)(12)(A)(i); 42 U.S.C. § 1396b(c). Section 1396b(c) states: "Nothing in this subchapter shall be construed as prohibiting or restricting, or authorizing the Secretary to prohibit or restrict, payment under subsection (a) for medical assistance for covered services furnished to a child with a disability because such services are included in the child's individualized education program established pursuant to part B of the IDEA [20 U.S.C. 1411 et seq.] or furnished to an infant or toddler with a disability because such services are included in the child's individualized family service plan adopted pursuant to part C of such Act [20 U.S.C. 1431 et seq.]." The IDEA provisions regarding LEA responsibilities for a FAPE do not alter the Medicaid responsibility for Medicaid-covered services in the IEP. 20 U.S.C. § 1412(e).

3

12. CDE receives funding under three provisions of IDEA. Since 1988, Section 1903(c) of the Social Security Act has authorized the federal Medicaid program to reimburse LEAs for covered services provided to Medicaid-eligible students with disabilities, pursuant to the IDEA, 20 U.S.C. § 1400 et seq., provided the services were delineated in the student's IEP (or similar plan) and covered in the state plan for Medicaid.

13. IDEA requires LEAs to develop an IEP for children found eligible for special education and related services. An IEP identifies certain special education and related services, and program modifications and supports, that the LEA will provide a child with a disability. If the IEP identifies Medicaid-covered services necessary to provide supports for the child with a disability, the IDEA requires LEAs to provide those Medicaid-covered services pursuant to the IEP.

14. Thus, LEAs and public schools in California may provide certain Medicaid-covered services to special needs students under an IEP, such as (but not limited to): audiological services, occupational therapy, physical therapy, psychological and mental health services, behavioral intervention services, as well as speech and language therapy.

15. In school year 2023-24, one of the largest school districts in the state (serving approximately 10,000 students with disabilities) received $5,000,000 in Medi-Cal reimbursements. Smaller districts sampled received approximately $1.5-$1.8 million in reimbursement for these services. On average, LEAs with between 4,000-6,000 students with disabilities receive more than $1,000,000 per LEA. In the State, there are 30 LEAs that serve more than 4,000 students with disabilities, thus receiving approximately $30,000,000 in Medi-Cal reimbursement.

4

16.     It is my understanding that if birthright citizenship is terminated, students with disabilities with undocumented parents—who would otherwise be citizens and qualify for federally-funded Medicaid but for the Order—will not be eligible for federally-funded Medicaid.

17.     LEAs would thus not receive any federal Medicaid reimbursements for their provision of health services to those special needs students under their IEPs. In the absence of those federal reimbursements, LEAs would have to draw upon state funds to maintain those IEP-required services for the affected special needs students, reducing the State's overall funds and diverting those funds from other educational services.

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 21, 2025, at Clearwater, Florida.

_____ /s/ Rachel A. Heenan

# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

      Plaintiffs,

v.

DONALD J. TRUMP, et al.

      Defendants.

:
:
:
:
:
:
:
:
:
:
:

Civil Action No.: <u>25-cv-10139</u>

---

## **DECLARATION OF RITA NGUYEN, M.D.**

      I, Rita Nguyen, declare as follows:

      1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

      2.      I am currently employed by the California Department of Public Health (CDPH) as the Assistant Public Health Officer for the State of California, a role I have served in since February 2022. I was previously the Assistant Health Officer at the San Francisco Department of Public Health from 2017-2022 where I supported chronic disease and cancer prevention efforts for the City and County of San Francisco. Prior to that, I was Assistant Clinical Professor at UCSF with a focus on nutrition security, public health, and providing clinical care to hospitalized patients. I received my M.D. at Johns Hopkins University School of Medicine and B.A. from Stanford University. I completed Internal Medicine Residency Training at Brigham and Women's Hospital.

1

PA124

3.      I oversee CDPH's Population Health Pillar which entails providing policy, program, and administrative oversight of the Centers for Healthy Communities, Family Health, Environmental Health, and Health Statistics and Informatics. As the Assistant Public Health Officer, I also assist and support the Director and State Public Officer with pressing and/or emerging public health issues.

4.      CDPH aims to optimize the health and wellbeing of all people in California. CDPH works with local health departments, as well as public and private partners, to implement policies and programs that advance public health.

5.      I am familiar with the Executive Order "Protecting the Meaning and Value of American Citizenship" issued on January 20, 2025 (the "Executive Order"). It is my understanding that the Executive Order revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident.

6.      I anticipate that the Executive Order will harm California by: (1) directly impacting the federal funding that CDPH and California receive to facilitate Social Security Number applications for newborn babies; and (2) imposing new administrative burdens upon CDPH that require it to expend and divert resources.

## Registration and Birth Certificates of Newborns

7.      As part of its functions, CDPH maintains birth, death, fetal death/still birth, marriage, and divorce records for California. CDPH issues certified copies of California vital records and registers and amends vital records as authorized by law.

PA125

8.      Within CDPH, the Center for Health Statistics and Informatics (CHSI) is responsible for collecting and maintaining data regarding births in California.

9.      California has the largest proportion and highest number of births in the United States, representing about one out of every eight births in the nation.

10.     In 2022, 420,543 babies were born in California.

11.     Hospitals and other healthcare facilities in California coordinate with CHSI to collect information to register a child's birth.

12.     When a child is born in a healthcare facility, a medical attendant to the birth is statutorily obligated to register the birth. They provide the newborn's parents with a Birth Certificate form that asks for several pieces of information, including the parents' place of birth and Social Security Numbers (SSNs). The form does not inquire about the parents' immigration status.

13.     If the parents do not have an SSN, or do not wish to share it, they can leave that field blank. Their omission of that information does not affect the newborn's ability to obtain a birth certificate.

14.     After the newborn's parents complete and sign the form, hospital staff enter the information from the form into the Electronic Birth Registration System (EBRS) maintained by CHSI.  Hospital staff then submit the record to the Local Registration District (usually affiliated with the county health department) who then registers the record (i.e., local registration).  Once the record has been locally registered, it is then state registered by CHSI.

15.     A newborn's completed birth certificate only includes the parents' SSNs at the bottom of the confidential section if the parents provided an SSN. The mother's residence address is also provided in the confidential section. The mother's birth name, the father's birth

3

name (if provided), and their places and dates of birth are provided in the public section of the certificate.

16.     Currently, it is not possible to determine a parent's immigration status from their child's birth certificate.

### Application for Social Security Number of Newborns

17.     CHSI also helps facilitate parents' applications for an SSN for their newborn baby through a Social Security Administration program called Enumeration at Birth.

18.     Under the Enumeration at Birth Program, the healthcare facility provides parents with an application form to request an SSN for their child.

19.     The Enumeration at Birth application form asks for the parents' SSNs. However, parents can leave that information field blank in the application, for various reasons. In 2023-2024, 22 percent of all Enumeration at Birth applications in California did not include either parents' SSN.

20.     After a healthcare facility receives a completed SSN application from the parents, it submits the information from the application through EBRS, which then transmits that information and request to SSA after state registration.

21.     Although the Enumeration at Birth Program is voluntary, the vast majority of families apply for SSNs for their newborns through this Program. In California, approximately 98 percent of families participated in the Enumeration at Birth Program in 2024.

22.     CDPH receives federal funding from the Social Security Administration's Enumeration at Birth Program for each SSN that is issued through this process.

23.     CDPH receives $4.82 in federal funding per SSN issued to a newborn baby in California. For the upcoming year, CDPH estimates that it will receive up to $2,885,599 through federal funding for CDPH's administration of the Enumeration at Birth Program in California.

24.     Prior to the Executive Order, the Social Security Administration accepted nearly all Enumeration at Birth applications sent by CDPH, including those that did not contain either parent's SSN. CDPH receives a report from the Social Security Administration every day indicating how many SSN applications the Social Security Administration received from CDPH, the number of applications rejected, and the reason for rejection. In 2023 and 2024, CDPH received no rejections of SSN applications sent through the Enumeration at Birth Program due to a lack of parental SSN.

25.     In 2023, parents in California submitted 393,897 applications for SSNs for newborn babies through the Enumeration at Birth Program, resulting in $1,898,583.54 in federal funding.

26.     In 2024, parents in California submitted 390,966 applications for SSNs for newborn babies through the Enumeration at Birth Program, resulting in $1,884,456.12 in federal funding.

27.     If the Executive Order revokes the citizenship of newborn babies born to undocumented parents, or to newborn babies born to one undocumented parent where the other parent is unknown, those babies would no longer be eligible for an SSN.

28.     If the Social Security Administration declines to issue SSNs to babies born to two undocumented parents, CDPH estimates approximately 24,500 babies would be affected.

29.     This estimate is based on figures provided to me by the State's demographer approximating the number of births to California residents who are undocumented in 2022. This

5

is an underestimate to some degree because it does not include children who have one parent who is not undocumented but who nonetheless does not meet the immigration status requirements of the Executive Order.

30. If approximately 24,500 newborn babies were denied SSNs due to the revocation of birthright citizenship, this would result in an annual loss of Enumeration at Birth funding to California of approximately $118,090.

31. In addition to the loss in funding, CDPH would incur new administrative costs if required to expend resources to verify parents' immigration status before facilitating an application for a newborn's SSN through the Enumeration at Birth Process. If required to obtain proof of parents' lawful status before facilitating an SSN application for newborns, CDPH or state-run facilities will be forced to consult with, and assist, families with obtaining the paperwork necessary to prove lawful status.

32. CDPH would also need to update and revise its electronic system, along with its guidelines for submitting SSN applications through that system. This would likely require CDPH and state healthcare facilities to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish lawful immigration status.

## Conclusion

33. CDPH's mission is to protect and advance the public health of California's residents. But the Executive Order impairs this mission in two main ways.

34. First, by stripping away the citizenship of newborn babies, the Order threatens to deny CDPH and the State of California more than a hundred thousand dollars per year in federal funding through the Enumeration at Birth Program.

35.     Second, the Executive Order imposes administrative burdens and costs upon CDPH. CDPH would incur administrative costs if required to verify parents' immigration status before facilitating an application for a newborn's SSN through the Enumeration at Birth Process, including the expenditure of resources revising CDPH's electronic system, submission guidelines, and the necessary training, hiring, and technical expertise to accomplish these changes.

36.     In sum, the Executive Order directly reduces the federal funding that CDPH receives, imposes administrative burdens, and diverts resources from public health programs that protect the health of families and their children.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 20, 2025, at Walnut Creek, California.

_____
Rita Nguyen, M.D.

# EXHIBIT N

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.                    :
                                               :
              Plaintiffs,                      :
                                               :
       v.                                      :
                                               :    Civil Action No.:  25-cv-10139
DONALD J. TRUMP, et al.                        :
                                               :
              Defendants.                      :
                                               :
                                               :
                                               :

---

## Declaration of Elizabeth Villamil-Cummings

I, Elizabeth Villamil-Cummings, hereby declare:

1. I am the New York State Registrar and the Director of the Bureau of Vital Records at the New York Department of Health ("DOH"). I have held this position since June 2023. As the State Registrar, I oversee all of the Bureau's operations including the filing of vital records and the processing of applications and court order for copies of, and amendments to, such records, in New York State, outside of New York City. Before this position, I was the Director of Data Management and Analytics in the Bureau of Vital Records.

2. As the State Registrar, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of the Executive Order "Protecting the Meaning and Value of American Citizenship" (January 20, 2025)  (the "Executive Order"), which revokes birthright citizenship for certain newly-born children of immigrants in the United States, on the State of New York's vital records programs.

1

4. DOH's mission is to protect and promote health and well-being for all, building on a foundation of health equity. To support that goal, DOH performs many functions, including regulating healthcare facilities and overseeing the registration of vital events such as births.

<u>Registration and Birth Certificates of Newborns</u>

5. Healthcare facilities coordinate with New York State Bureau of Vital Records[1] to collect information to register a child's birth.

6. When a child is born in a healthcare facility, a medical attendant to the birth is statutorily obligated to register the birth with the institution's registrar. They provide the newborn's parents with a Birth Certificate Work Booklet that asks for several pieces of information, including the parents' place of birth and Social Security Numbers (SSNs).[2] The Work Booklet does not inquire about, or require proof of, the parents' immigration status. A copy of the Birth Certificate Work Booklet is attached hereto, as Exhibit A.

7. After the newborn's parents complete and sign the Work Booklet, hospital staff enter the information from the Work Booklet into an electronic birth registration system maintained by the Bureau of Vital Records.

8. When a record is complete, the hospital prints out a short-form birth certificate, which contains only that portion of the birth information contained on the legal record. Once the physician or hospital administrator has signed the certificate, the record is filed with the local registrar, who in turn sends the state's copy of the certificate to the state.

---

[1] Through a cooperative agreement, the DOH Bureau of Vital Records receives data on vital events recorded in New York City from the New York City Department of Health and Mental Hygiene's Bureau of Vital Statistics.

[2] Parents of children born in New York State are provided with a Work Booklet by the New York State Bureau of Vital Records, and parents of children born in New York City are provided with a Work Booklet by the New York City Department of Health and Mental Hygiene's Bureau of Vital Statistics.

2

9. A newborn's completed birth certificate does not indicate whether the parents have an SSN. The only information provided on a birth certificate regarding the child's parents is the birthing parent's legal name, the second parent's full name (if provided), their places and dates of birth, residence, and mailing addresses. Currently, it is not possible to determine a foreign-born parent's immigration status from their child's birth certificate.

10. Healthcare facilities do not routinely ask patients, including new parents, for their immigration status and do not collect proof of citizenship or immigration status.

<u>Application for Social Security Number of Newborns</u>

11. Through the birth certificate registration process at a healthcare facility, parents have the opportunity to apply for an SSN for their newborn through a Social Security Administration ("SSA") program called Enumeration at Birth ("EAB").

12. The EAB program is voluntary for families, but according to SSA, about 99 percent of SSNs for infants are assigned through this program.[3]

13. To obtain an SSN through the EAB program, newborn parents can indicate on the Work Booklet that they allow the furnishing of information from the Work Booklet to SSA to issue their child an SSN.

14. The EAB application asks for the parents' SSNs. Parents born outside the United States can apply for and receive an SSN for their child without including their own SSNs on the application. Because children born in the United States are entitled to U.S. citizenship, they are eligible for SSNs regardless of their parents' immigration status.

---

[3] SOCIAL SECURITY ADMINISTRATION – BUREAU OF VITAL STATISTICS, STATE PROCESSING GUIDELINES FOR ENUMERATION AT BIRTH (2024), https://perma.cc/UK22-ZQSS.

15. Healthcare facilities transmit these requests electronically to the Bureau of Vital Records, which then transmits the request to SSA.

16. New York receives federal funding from the SSA EAB process on a quarterly basis for each SSN that is issued through the EAB process.  The State receives $4.82 per SSN issued through the EAB process, or approximately $111,000 per quarter. The state generally receives payment a month after the quarter ends, and is thus expecting its next payment in April 2025.

Effects of the Executive Order on Registration and EAB Process

17. Following the Executive Order, children born in the United States to two undocumented parents, among others, will no longer be considered citizens and will therefore be deemed ineligible for an SSN. The State of New York will lose revenue from the SSA, because fewer children born in the U.S. will be eligible for SSNs. The State of New York also anticipates a chilling effect, wherein fewer parents will opt in to the EAB program, out of concerns about sharing their information with the federal government. This, too, will result in reduced revenue to the State of New York.

18. In addition to the loss in funding, the State of New York would need to update its information technology infrastructure and train health care staff in how to document the information necessary to determine whether a child born in New York is eligible for an SSN. In addition, the Bureau of Vital Records would need to differentiate the births between those born to U.S. citizens or lawful permanent residents, or those born in the U.S. This would result in two different birth certificates, enhanced information gathering on parents' citizenship and technology advancements to capture the new workflow, data modifications and verification processes.

4

19. The State of New York also anticipates that it is likely that the electronic system and guidelines for submitting SSN applications through that system—which are currently detailed in a 59-page SSA manual—would have to be revised.  This would likely require healthcare facilities to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish lawful immigration status.

20. If, as a result of the Executive Order, the newborn registration process has to be amended to provide for verification of the parents' citizenship and/or immigration status, this would impose material administrative burdens on the State to communicate with and train staff in healthcare facilities. There are 121 maternity hospitals across the State of New York, and it is a huge undertaking to communicate with these hospitals and birthing centers about changes to what the Department of Health requires for newborn registration.

21. During the newborn registration process, hospitals ask parents for their SSNs and places of birth, but do not directly inquire about immigration status. Currently, healthcare facilities do not verify the accuracy of the information provided. If healthcare facilities were required to confirm the accuracy of the parents' places of birth, SSNs, or immigration status, they would incur significant new administrative costs to implement a system to substantiate the information. This burden will lead to delays in registration and issuance of the newborn's birth certificate, which must be completed within five days under state law. The lack of that birth certificate, in turn, can prevent a parent from securing health insurance coverage for the infant, leading to otherwise preventable lapses in early pediatric care.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

5

Executed this _21_ day of January, 2025, in _Menands, NY_ .

_Elizabeth Villamil-Cummings_

Elizabeth Villamil-Cummings

New York State Registrar and Director of the

Bureau of Vital Records

New York Department of Health

6

# EXHIBIT A

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

## Birth Certificate and SPDS Work Booklet

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## New York State Birth Certificate and Statewide Perinatal Data System Work Booklet

A child's birth certificate is a very important document. It is the official record of the child's full name, date of birth and place of birth. Throughout the child's lifetime, it provides proof of identity and age. As a child grows from childhood to adulthood, information in the birth certificate will be needed for many important events such as: entrance to school, obtaining a work permit, driver's license or marriage license, entrance in the Armed Forces, employment, collection of Social Security and retirement benefits, and for a passport to travel in foreign lands.

Because the birth certificate is such an important document, great care must be taken to make certain that it is correct in every detail. By completing this work booklet carefully, you can help assure the accuracy of the child's birth certificate.

Please Note: The Certificate of Live Birth serves as medical documentation of a birth event.  Therefore, the sex of the infant (Male, Female, Unknown/ Undetermine – a synonym for intersex) is captured as a medical fact by attending personnel. The Department of Health has an administrative interest in retaining the medically designated sex at birth on the Certificate of Live Birth to ensure the proper tracking of the health and development of this child.  Therefore, the gender designation of 'X (Non-Binary)' will not be permitted on the original Certificate of Live Birth.

---

**New York State Birth Certificate:**

**PARENTS, for the birth certificate, you must complete the <u>unshaded</u> portions of this work booklet, see pages 3 - 5, 10 - 12 & 14 (the shaded portions will be completed by hospital staff).**

Information that is not labeled "QI", "IMM", 'HS',  or "NBS" in the work booklet will be used to prepare the official birth certificate. The completed birth certificate is filed with the Local Registrar of Vital Statistics of the municipality where the child was born within five (5) business days after the birth and with the New York State Department of Health. When the filing process is completed, the mother will receive a Certified Copy of the birth certificate. This is an official form that may be used as proof of age, parentage, and identity. Receiving it confirms that the child's birth certificate is officially registered in the State of New York. Additional copies of the birth certificate may be obtained from the Local Registrar or the New York State Department of Health, P.O. Box 2602, Albany, New York 12220-2602. For further information about obtaining copies, please call (518) 474-3077 or visit the New York State Department of Health web site at: *www.health.ny.gov/vital_records/*.

All information (including personal/identifying information) is shared with the County Health Departments or other Local Health Units where the child was born and where the mother resides, if different. County Health Departments and Local Health Units may use this data for Public Health Programs. The Social Security Administration receives a minimal set of data ONLY when the parents have indicated, in this work booklet, that they wish to participate in the Social Security Administration's Enumeration at Birth program.

While individual information is important, public health workers will use medical and demographic data in their efforts to identify, monitor, and reduce maternal and newborn risk factors. This information also provides physicians and medical scientists with the basis to develop new maternal and childcare programs for New York State residents.

---

**Statewide Perinatal Data System (SPDS) – Quality Improvement (QI), Immunization Registry (IMM), Hearing Screening (HS) and Newborn Screening Program (NBS) Information:**

The information labeled "QI" will be used by medical providers and scientists to perform data analyses aimed at improving services provided to pregnant women and their babies. "IMM" information will be used by New York State's Immunization Information System (NYSIIS). A birthing hospital's obligation to report immunizations for newborns can be met by recording the information in SPDS, including the manufacturer and lot number as required by law. "HS" information will be used to improve the Newborn Hearing Screening program. Information labeled "NBS" will result in significant improvements in the Newborn Screening Program such as better identification and earlier treatment of infants at risk for a variety of disorders.

PA140

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

**Birth Certificate and SPDS Work Booklet**

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

**ATTENTION HOSPITAL STAFF:**

This work booklet has been designed to obtain information relating to the pregnancy and birth during the 72-hour period immediately following the birth of a live born child in New York State. Hospital staff should complete the shaded portions of the work booklet.

New York State Public Health Law provides the basis for the collection of the birth certificate data. For pertinent information about the New York State Public Health Laws refer to sections 206(1)(e), 4102, 4130.5, 4132 and 4135. These laws are also described in the New York State Birth Certificate Guidelines. The Guidelines are available to SPDS users on the **Help** tab of the SPDS Core Module.

Please Note: If the parent or legal guardian wishes to change the gender identification of the child to "X (Non-Binary)", the Parent/Legal Guardian Notarized Affidavit of Gender Error for a Person 16 Years of Age or Under and Parent/Legal Guardian Application for Correction of Certificate of Birth for Gender Designation for a Minor forms must be completed.  If, at the age of 17 years or older, an individual would like to change their gender identification to "X (Non-Binary)", the Application for Correction of Certificate of Birth for Gender Designation for an Adult forms must be completed.  If requested, parents or legal guardians can be directed to the NYS Bureau of Vital records website for more information: Birth Certificates - New York State Department of Health (ny.gov)

**Birth Certificate and SPDS Work Booklet**

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Help for Parents Completing This Work Booklet

**Page 4:**   **Last Name on Mother's Birth Certificate**
This is commonly referred to as "maiden name." If the mother was adopted, it would be the last name on her birth certificate *after* the adoption.

**Page 4:**   **Infant's Pediatrician/Family Practitioner**
Enter the name of the doctor who will care for the infant after he/she is released from the hospital. This may or may not be the same as the doctor who cared for the infant while in the hospital.

**Page 11:**   **Last Name on Father's / Second Parent's Birth Certificate**
- **Father:** This is usually the same as his current last name. In the event that a man has changed his last name through marriage, the name on his birth certificate should be entered here. This may or may not be the same as his current last name depending on whether his name was changed by marriage only or changed through a court proceeding which resulted in an amendment to his birth certificate.

- **Mother (Second Parent):** This is commonly referred to as maiden name and is the name on her birth certificate.

- **In either case:** If the parent was adopted it would be the last name on his or her birth certificate *after* the adoption.

PA142

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

**Birth Certificate and SPDS Work Booklet**

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## New Birth Registration

### Parents — Mother

| Mother's First Name: | Mother's Middle Name: |
|---|---|
| Mother's Current Last Name : | Last Name on Mother's Birth Certificate: |

| Social Security Number: ___ – ___ – ___ | Mother's Date of Birth: *(MM/DD/YYYY)* ___ / ___ / ___ | |

| Infant's First Name: | Infant's Middle Name: |
|---|---|

| Infant's Last Name: | Infant's Name Suffix *(e.g. Jr., 2nd, III)*: |
|---|---|

### Infant

Sex: ☐ Male ☐ Female ☐ Undetermined    Plurality:    Birth Order:    Medical Record No.:

Date of Birth: *(MM/DD/YYYY)* ___ / ___ / ___    Time of Birth: *(HH:MM)* ___ : ___    ☐ am ☐ pm ☐ military (24-hour time)

### Parents — Infant

Was child born in this facility? ☐ Yes ☐ No    If child is **not** born in this facility, please answer the following questions:

In what type of place was the infant born?
☐ Freestanding Birth Center (regulated by DOH)
☐ Home (intended)
☐ Home (unintended)
☐ Home (unknown intent)
☐ Clinic / Doctor's Office (not regulated by DOH)
☐ Other

If New York State Birthing Center, enter its name:

In what county was the child born?

### Parents — Birthplace

#### Institution

Site of Birth, If **Other** Type of Place:    Street Address – if other than Hospital / Birthing Center:

**If place of infant's birth was other than Hospital or Birthing Center:**
City, town or village where birth occurred:    Zip / Postal Code:

Infant's Pediatrician/Family Practitioner:    NBS

### Attendant

**Attendant's Information:**

| License Number: | Name: | First | Middle | Last |
|---|---|---|---|---|

Title: *(Select one)*
☐ Medical Doctor ☐ Doctor of Osteopathy ☐ Licensed Midwife (CNM) ☐ Licensed Midwife (CM) ☐ Other

### Certifier

**Certifier's Information:**
☐ Check here if the Certifier is the same as the Attendant *(otherwise enter information below)*

| License Number: | Name: | First | Middle | Last |
|---|---|---|---|---|

Title: *(Select one)*
☐ Medical Doctor ☐ Doctor of Osteopathy ☐ Licensed Midwife (CNM) ☐ Licensed Midwife (CM) ☐ Other

### Parents — Payor

**Primary Payor for this Delivery:**

Select one:
☐ Medicaid / Family Health Plus    ☐ Private Insurance    ☐ Indian Health Service
☐ CHAMPUS / TRICARE    ☐ Other Government / Child Health Plus B    ☐ Other
☐ Self-pay

| If Medicaid is not the primary payor, is it a secondary payor for this delivery? ☐ Yes ☐ No | Is the mother enrolled in an HMO or other managed care plan? ☐ Yes ☐ No |
|---|---|

PA143

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

## Birth Certificate and SPDS Work Booklet

| Mother's Name: *First* | *Middle* | *Last* | Mother's Med. Rec. Number: |
| --- | --- | --- | --- |
| Father / Second Parent Name: *First* | *Middle* | *Last* | *Suffix* |
| Infant's Name: *First* | *Middle* | *Last* | *Suffix* | Date of Birth |

**To the hospital:**
1. Obtain the parent(s) signature(s).
2. File the original Release Form in the mother's hospital record.
   Note: It is not necessary to file the remainder of the Work Booklet.
3. Provide a copy to the parent(s).
4. Do **not** send copies to the New York State Department of Health or to any Social Security office, unless specifically requested by such agency.

**To the parent(s):**
1. Please read the following notice about the collection and use of Social Security Numbers on your child's birth certificate.
2. Please check "Yes" or "No" to indicate if you wish to participate in the Social Security Administration's Enumeration at Birth program.

**NOTICE REGARDING COLLECTION OF PARENTS' SOCIAL SECURITY NUMBERS: The collection of parents' Social Security Numbers on the New York State Certificate of Live Birth is mandatory. They are required by Public Health Law Section 4132(1) and may be used for child support enforcement, public health related purposes, when requested by State, federal and municipal governments for official purposes, when required by Public Health Law Section 4173 or 4174, and when otherwise required or authorized by law.**

### Social Security Release

The Social Security Administration offers the parents of newborns an opportunity to apply for a Social Security Number for their child through the birth certificate registration process. This is referred to by the Social Security Administration as Enumeration at Birth (EAB). If you participate in the EAB, the New York State Department of Health will forward to the Social Security Administration information from your child's birth certificate. Please note that the Social Security Administration will not process your EAB request unless the birth certificate includes your child's full name. If you participate in the EAB, disclosure of parents' Social Security Numbers is mandated by 42 U.S.C. 405(c)(2). The Social Security Number(s) will be used by the Internal Revenue Service (IRS) solely for the purpose of determining Earned Income Tax Credit compliance. If you wish to participate in the Social Security Administration EAB program check "Yes" below.

**May the Social Security Administration be furnished with information from this form to issue your child a social security number?**

Yes ☐

No ☐

**Mother's Signature** ▶ _____ Date _____

**Father's or Second Parent's Signature** ▶ _____ Date _____

Either parent's signature applies to the above release.
If neither box is checked for the release, a 'No' response will be assumed.

| Hospital Name: |
| --- |
| Signature of Hospital Representative: ▶ | Date: |

PA144

THIS PAGE LEFT BLANK
FOR 2-SIDED PRINTING

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

**Birth Certificate and SPDS Work Booklet**

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Infant

**Infant**

**If Multiple Births:**

Number of Live Births:                Number of Fetal Deaths:

**Birth Weight:**

_grams_               lbs.          oz.

If birth weight < 1250 grams (2 lbs. 12 oz.), reason(s) for delivery at a less than level III hospital:  _(Only if applicable)_

☐ None  ☐ Unknown at this time

**Select all that apply:**

☐ Rapid / Advanced Labor          ☐ Bleeding          ☐ Fetus at Risk          ☐ Severe pre-eclampsia
☐ Woman Refused Transfer          ☐ Other _(specify)_

Infant Transferred:                    NYS Hospital Infant Transferred To:                    State/Terr./Province:

☐ Within 24 hrs  ☐ After 24 hrs.  ☐ Not transferred

**Birth Information**

Apgar Scores

1 minute:          5 minutes:          10 minutes:

Is the Infant Alive?

☐ Yes  ☐ No
☐ Infant Transferred / Status Unknown

Clinical Estimate of Gestation: _(Weeks)_

Newborn Treatment Given:

☐ Conjunctivitis only
☐ Vitamin K only
☐ Both
☐ Neither

How is infant being fed at discharge? _(Select one)_

☐ Breast Milk Only      ☐ Formula Only      ☐ Both Breast Milk and Formula
☐ Other                 ☐ Do Not Know

**Newborn Screening**

**Newborn Blood-Spot Screening**

Screening Lab ID Number: _(9-digits)_

**Reason if Lab ID is not submitted:**

☐ No NBS Lab ID because infant died prior to test
☐ No NBS Lab ID because infant transferred prior to test
☐ Lab ID is unknown / illegible
☐ Refused NBS

___ ___ ___ ___ ___ ___ ___ ___ ___

**Hepatitis B**

**Hepatitis B Inoculation**

Immunization Administered:  ☐ Yes  ☐ No              Immunoglobulin Administered:  ☐ Yes  ☐ No

Date: _(MM/DD/YYYY)_      /      /                    Date: _(MM/DD/YYYY)_      /      /

Mfr: _____              Mfr: _____

Lot: _____              Lot: _____

**Hearing Screening**

**Newborn Hearing Screening**

☐ Screening Performed (one or both ears)
☐ Not Performed – Facility Related
☐ Not Performed – Medical Exclusion (both ears)
☐ Not Performed – Parent Refused

**Equipment Type**

☐ AABR    ☐ Unknown
☐ ABR
☐ TEOAE
☐ DPOAE

**Screening Results**

Left Ear:                Right Ear:
☐ Pass                  ☐ Pass
☐ Refer                 ☐ Refer
☐ Not Performed -       ☐ Not Performed -
   Medical Exclusion       Medical Exclusion

Date: _(MM/DD/YYYY)_      /      /      -  Enter date final hearing screening was conducted prior to discharge

**Abnormal Conditions of the Newborn:**

☐ None  ☐ Unknown at this time

**Select all that apply**

☐ Assisted ventilation required immediately following delivery          ☐ Assisted ventilation required for more than six hours
☐ NICU Admission                                                        ☐ Newborn given surfactant replacement therapy
☐ Antibiotics received by the newborn for suspected neonatal sepsis     ☐ Seizures or serious neurologic dysfunction
☐ Significant birth injury (skeletal fx, peripheral nerve injury, soft tissue/solid organ hemorrhage which requires intervention)

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

**Birth Certificate and SPDS Work Booklet**

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Congenital Anomalies

☐ None of the listed  ☐ Unknown at this time
**Select all that apply**

**Diagnosed Prenatally?**

**If Yes, please indicate all methods used:**

QI

| | | Yes No | | |
|---|---|---|---|---|
| **Congenital Anomalies** | Anencephaly | Yes No ☐ ☐ | ☐ Level II Ultrasound   ☐ MSAFP / Triple Screen | ☐ Amniocentesis ☐ Other   ☐ Unknown |
| | Meningomyelocele/Spina Bifida | Yes No ☐ ☐ | ☐ Level II Ultrasound   ☐ MSAFP / Triple Screen | ☐ Amniocentesis ☐ Other   ☐ Unknown |
| | Cyanotic Congenital Heart Disease | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| | Congenital Diaphragmatic Hernia | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| | Omphalocele | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| **Congenital Anomalies** | Gastroschisis | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| | Limb Reduction Defect | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| | Cleft lip with or without Cleft Palate | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| | Cleft Palate Alone | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |
| | Down Syndrome ☐ Karyotype confirmed ☐ Karyotype pending | Yes No ☐ ☐ | ☐ Level II Ultrasound   ☐ MSAFP / Triple Screen | ☐ CVS ☐ Amniocentesis ☐ Other   ☐ Unknown |
| | Other Chromosomal Disorder ☐ Karyotype confirmed ☐ Karyotype pending | Yes No ☐ ☐ | ☐ Level II Ultrasound   ☐ MSAFP / Triple Screen | ☐ CVS ☐ Amniocentesis ☐ Other   ☐ Unknown |
| | Hypospadias | Yes No ☐ ☐ | ☐ Level II Ultrasound | ☐ Other   ☐ Unknown |

## Labor & Delivery

| **Labor & Delivery** | Mother Transferred in Antepartum: ☐ Yes  ☐ No | NYS Facility Mother Transferred From: | State/Terr./Province: |
|---|---|---|---|
| | Mother's Weight at Delivery: _____ *lbs.* | | |

**Method of Delivery**

Fetal Presentation:  *(select one)*
☐ Cephalic   ☐ Breech   ☐ Other

Route & Method:  *(select one)*
☐ Spontaneous   ☐ Forceps – Mid   ☐ Forceps – Low / Outlet   ☐ Vacuum   ☐ Cesarean   ☐ Unknown

Cesarean Section History:
☐ Previous C-Section    Number _____

Attempted Procedures:
Was delivery with forceps attempted but unsuccessful?   ☐ Yes   ☐ No
Was delivery with vacuum extraction attempted but unsuccessful?   ☐ Yes   ☐ No

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

## Birth Certificate and SPDS Work Booklet

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Labor & Delivery

**Method of Delivery**

Trial Labor:

If Cesarean section, was trial labor attempted?  ☐ Yes  ☐ No

Indications for C-Section:

☐ Unknown

**Select all that apply**

☐ Failure to progress   ☐ Malpresentation   ☐ Previous C-Section

☐ Fetus at Risk / NFS   ☐ Maternal Condition – Not Pregnancy Related   ☐ Maternal Condition – Pregnancy Related

☐ Refused VBAC   ☐ Elective   ☐ Other

Indications for Vacuum:

☐ Unknown

**Select all that apply**

☐ Failure to progress   ☐ Fetus at Risk

☐ Other

Indications for Forceps:

☐ Unknown

**Select all that apply**

☐ Failure to progress   ☐ Fetus at Risk

☐ Other

**Labor**

**Onset of Labor**

☐ None   ☐ Unknown at this time

**Select all that apply**

☐ Prolonged Rupture of Membranes -- (12 or more hours)   ☐ Premature Rupture of Membranes -- (prior to labor)   ☐ Precipitous Labor  -- (less than 3 hours)

☐ Prolonged Labor (20 or more hours)

**Characteristics**

**Characteristics of Labor & Delivery**

☐ None   ☐ Unknown at this time

Select all that apply

☐ Induction of Labor – AROM   ☐ Induction of Labor – Medicinal   ☐ Augmentation of Labor

☐ Steroids   ☐ Antibiotics   ☐ Chorioamnionitis

☐ Meconium Staining   ☐ Fetal Intolerance   ☐ External Electronic Fetal Monitoring

☐ Internal Electronic Fetal Monitoring

**Maternal Morbidity**

**Maternal Morbidity**

☐ None   ☐ Unknown at this time

**Select all that apply**

☐ Maternal Transfusion   ☐ Perineal Laceration (3rd / 4th Degree)   ☐ Ruptured Uterus

☐ Unplanned Hysterectomy   ☐ Admit to ICU   ☐ Unplanned Operating Room Procedure Following Delivery

☐ Postpartum transfer to a higher level of care

**Anesthesia / Analgesia**

**Anesthesia / Analgesia**

☐ None   ☐ Unknown at this time

**Select all that apply**

☐ Epidural (Caudal)   ☐ Local   ☐ Spinal

☐ General Inhalation   ☐ Paracervical   ☐ General Intravenous

☐ Pudendal

**Was an analgesic administered?**

☐ Yes   ☐ No

**Procedures**

**Other Procedures Performed at Delivery**

☐ None   ☐ Unknown at this time

**Select all that apply**

☐ Episiotomy and Repair   ☐ Sterilization

PA148

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

# Birth Certificate and SPDS Work Booklet

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Mother

Medical Record Number:

**Parents**

### Mother's Demographics

Mother's Education: *(select one)*
- ☐ 8th grade or less
- ☐ 9th – 12th grade; no diploma
- ☐ High school graduate; or GED
- ☐ Some college credit, but no degree
- ☐ Associate's degree
- ☐ Bachelor's degree
- ☐ Master's degree
- ☐ Doctorate degree

| City of Birth: | State/Terr./Province of Birth: | Country of Birth, if not USA: |
|---|---|---|

Hispanic Origin:
**Select all that apply**
- ☐ No, not Spanish/Hispanic/Latina
- ☐ Yes, Cuban
- ☐ Yes, Mexican, Mexican American, Chicana
- ☐ Yes, Other Spanish/Hispanic/Latina
- ☐ Yes, Puerto Rican

Specify: _____

### Mother's Demographics

Race:
**Select all that apply**
- ☐ White/Caucasian
- ☐ Chinese
- ☐ Korean
- ☐ Guamanian or Chamorro
- ☐ American Indian or Alaska Native  **Tribe:** _____
- ☐ Other Asian  **Specify:** _____
- ☐ Other Pacific Islander  **Specify:** _____
- ☐ Other  **Specify:** _____
- ☐ Black or African American
- ☐ Filipino
- ☐ Vietnamese
- ☐ Samoan
- ☐ Asian Indian
- ☐ Japanese
- ☐ Native Hawaiian

### Mother's Residence

**Residence Address**
Street Address:

| State/Terr./Province: | County: | City, Town or Village: |
|---|---|---|

| Zip/Postal Code: | Mother's Country of Residence, if not USA: | U.S./Canadian Phone Number: ( ) – |
|---|---|---|

### Mother's Mailing

**Mailing Address – Most Recent**
- ☐ Check here if the mailing address is the same as the residence address *(otherwise enter information below)*

Mailing Address:

| City, Town or Village: | State/Terr./Province: | Country, if not USA: | Zip/Postal Code: |
|---|---|---|---|

### Employment

**Employment History**

| Employed while Pregnant: ☐ Yes ☐ No | Current / Most Recent Occupation: | Kind of Business / Industry: |
|---|---|---|

| Name of Company or Firm: | Address: |
|---|---|

| City: | State/Territory/Province: | Zip / Postal Code: |
|---|---|---|

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

# Birth Certificate and SPDS Work Booklet

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Father or Second Parent

| Will the mother and father be executing an Acknowledgement of Parentage? ☐ Yes ☐ No ☐ Not required | What type of certificate is required? ☐ Mother / Father ☐ Mother / Mother |
|---|---|

**Parent's First Name:** | **Parent's Middle Name:**

**Parent's Current Last Name:** | **Last Name on Parent's Birth Certificate:**

**Parent's Name Suffix** *(e.g. Jr., 2nd, III):* | **Social Security Number:** — —

### Demographics

**Parent's Date of Birth:** *(MM/DD/YYYY)*   /   /

**Education:** *(select one)*
☐ 8th grade or less
☐ 9th – 12th grade; no diploma
☐ High school graduate; or GED
☐ Some college credit, but no degree
☐ Associate's degree
☐ Bachelor's degree
☐ Master's degree
☐ Doctorate degree

**City of Birth:** | **State/Terr./Province of Birth:** | **Country of Birth, if not USA:**

**Hispanic Origin:**

**Select all that apply**
☐ No, not Spanish/Hispanic/Latino
☐ Yes, Cuban
☐ Yes, Mexican, Mexican American, Chicano
☐ Yes, Other Spanish/Hispanic/Latino
☐ Yes, Puerto Rican
**Specify:**

**Race:**

**Select all that apply**
☐ White/Caucasian
☐ Chinese
☐ Korean
☐ Guamanian or Chamorro
☐ American Indian or Alaska Native **Tribe:**
☐ Other Asian **Specify:**
☐ Other Pacific Islander **Specify:**
☐ Other **Specify:**
☐ Black or African American
☐ Filipino
☐ Vietnamese
☐ Samoan
☐ Asian Indian
☐ Japanese
☐ Native Hawaiian

### Residence Address

☐ Check here if the parent's residence address is the same as the mother's address *(otherwise enter information below)*

**Street Address:**

**City, Town or Village:** | **State / Territory / Province:**

**Parent's Country of Residence, if not USA:** | **Zip / Postal Code:**

### Employment History

**Current / Most Recent Occupation:** | **Kind of Business / Industry:**

**Name of Company or Firm:** | **Address:**

**City:** | **State / Territory / Province:** | **Zip / Postal Code:**

PA150

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

# Birth Certificate and SPDS Work Booklet

Mother's Name:

Mother's Med. Rec. Number:

## Prenatal History

**Parents** / **Prenatal History**

**Did mother receive prenatal care?**
☐ Yes ☐ No

**Primary Prenatal Care Provider Type:**
☐ MD / DO / C(N)M / HMO    ☐ No Information
☐ Clinic    ☐ No Provider
☐ Other

**Did mother participate in WIC?**
☐ Yes ☐ No

**Key Pregnancy Dates** *(MM/DD/YYYY)*

| Date of Last Menses: | Estimated Due Date: | Date of First Prenatal Visit: | Date of Last Prenatal Visit: |
|---|---|---|---|
| / / | / / | / / | / / |

**Prenatal Visits**

Total Number of Prenatal Visits:

### Pregnancy History

**Pregnancy History**

**Previous Live Births:**

| **Now Living** | **Now Dead** |
|---|---|
| None or Number | None or Number |
| ☐ | ☐ |

**Previous Spontaneous Terminations:**

| **Less than 20 Weeks** | **20 Weeks or More** |
|---|---|
| None or Number | None or Number |
| ☐ | ☐ |

**Previous Induced Terminations:**
None or Number
☐

**Total Prior Pregnancies:**
None or Number
☐

| First Live Birth: *(MM / YYYY)* | Last Live Birth: *(MM / YYYY)* | Last Other Pregnancy Outcome: *(MM / YYYY)* | Prepregnancy Weight: | Height: |
|---|---|---|---|---|
| / | / | / | lbs. | ft.   in. |

## Prenatal Care

**Risk Factors**

### Risk Factors in this Pregnancy

☐ None  ☐ Unknown at this time

**Select all that apply**

☐ Prepregnancy Diabetes    ☐ Gestational Diabetes    ☐ Prepregnancy Hypertension    ☐ Gestational hypertension
☐ Other Serious Chronic Illnesses    ☐ Previous Preterm Births    ☐ Abruptio Placenta    ☐ Eclampsia
☐ Other Poor Pregnancy Outcomes    ☐ Prelabor Referred for High Risk Care    ☐ Other Vaginal Bleeding    ☐ Previous Low Birthweight Infant

☐ Pregnancy resulted from infertility treatment (if yes, check all that apply)
　☐ Fertility-enhancing drugs, artificial or intrauterine insemination
　☐ Assisted reproductive technology (e.g. IVF, GIFT)  **Number of Embryos Implanted:**  (if applicable)

### Infections Present and/or Treated During Pregnancy

**Infections**

☐ None  ☐ Unknown at this time

**Select all that apply**

☐ Gonorrhea    ☐ Syphilis    ☐ Herpes Simplex Virus (HSV)    ☐ Chlamydia
☐ Hepatitis B    ☐ Hepatitis C    ☐ Tuberculosis    ☐ Rubella
☐ Bacterial Vaginosis

### Other Risk Factors

**Parents** / **Other Risk Factors**

**Smoking Before or During Pregnancy?**
☐ Yes ☐ No

**List Number of Packs OR Cigarettes Smoked Per DAY**

| 3 Months Prior to Pregnancy | | First Three Months of Pregnancy | | Second Three Months of Pregnancy | | Third Trimester of Pregnancy | |
|---|---|---|---|---|---|---|---|
| Packs | OR Cigarettes | Packs | OR Cigarettes | Packs | OR Cigarettes | Packs | OR Cigarettes |

PA151

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

**Birth Certificate and SPDS Work Booklet**

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

| | **Prenatal Care** |
|---|---|

**Other Risk Factors**

| Other Risk | Alcohol Consumed During This Pregnancy? ☐ Yes ☐ No | Number of Drinks per Week: | Illegal Drugs Used During This Pregnancy? ☐ Yes ☐ No | |
|---|---|---|---|---|

**Obstetric Procedures**

☐ None ☐ Unknown at this time

**Select all that apply**

☐ Cervical Cerclage ☐ Tocolysis ☐ External Cephalic Version — ☐ Successful ☐ Failed
☐ Fetal Genetic Testing

If woman was 35 or over, was fetal genetic testing offered?
☐ Yes ☐ No, Too Late ☐ No, Other Reason

| Serological Test for Syphilis? ☐ Yes ☐ No | Date of Test: *(MM/DD/YYYY)* / / | Reason, if No Test: ☐ Mother refused ☐ Religious reasons ☐ No prenatal care ☐ Other ☐ No time before delivery |
|---|---|---|

PA152

NEW YORK STATE DEPARTMENT OF HEALTH
Vital Records – Birth Registration Unit

# Birth Certificate and SPDS Work Booklet

| Mother's Name: | Mother's Med. Rec. Number: |
|---|---|

## Interview/Records                                    QI

### Survey of Mother (in hospital)

Did you receive prenatal care?  ☐ Yes  ☐ No  *(If 'Yes' please answer question 1. Otherwise skip to question 2.)*

1. During any of your prenatal care visits, did a doctor, nurse, or other health care worker talk with you about any of the things listed below?

|  | Yes | No |
|---|---|---|
| a. How smoking during pregnancy could affect your baby? | ☐ | ☐ |
| b. How drinking alcohol during your pregnancy could affect your baby? | ☐ | ☐ |
| c. How using illegal drugs could affect your baby? | ☐ | ☐ |
| d. How long to wait before having another baby? | ☐ | ☐ |
| e. Birth control methods to use after your pregnancy? | ☐ | ☐ |
| f. What to do if your labor starts early? | ☐ | ☐ |
| g. How to keep from getting HIV (the virus that causes AIDS)? | ☐ | ☐ |
| h. Physical abuse to women by their husbands or partners? | ☐ | ☐ |

2. How many times per week during your current pregnancy did you exercise for 30 minutes or more, above your usual activities?      Times per week:

3. Did you have any problems with your gums at any time during pregnancy, for example, swollen or bleeding gums?   ☐ Yes  ☐ No

4. During your pregnancy, would you say that you were:  *(select one)*
☐ Not depressed at all          ☐ A little depressed
☐ Moderately depressed          ☐ Very depressed
☐ Very depressed and had to get help

5. Thinking back to just before you were pregnant, how did you feel about becoming pregnant?
☐ You wanted to be pregnant sooner          ☐ You wanted to be pregnant later
☐ You wanted to be pregnant then          ☐ You didn't want to be pregnant then or at any time in the future

### Chart Review (Prenatal and Medical)

1a. Copy of prenatal record in chart?
☐ Yes, Full Record          ☐ Yes, Prenatal Summary Only
☐ No

1b. Was formal risk assessment in prenatal chart?
☐ Yes, with Social Assessment          ☐ Yes, without Social Assessment
☐ No

1c. Was MSAFP / triple screen test offered?
☐ Yes          ☐ No
☐ No, Too Late

1d. Was MSAFP / triple screen test done?
☐ Yes          ☐ No

2. How many times was the mother hospitalized during this pregnancy, not including hospitalization for delivery?

### Admission and Discharge Information

Mother
Admission Date for Delivery *(MM/DD/YYYY)*      Discharge Date *(MM/DD/YYYY)*
  /   /          /   /

Infant
Discharge Date *(MM/DD/YYYY)*
  /   /
☐ Discharged Home          ☐ Infant Died at Birth Hospital
☐ Infant Still in Hospital          ☐ Infant Discharged to Foster Care/Adoption
☐ Infant Transferred Out          ☐ Unknown

*Side labels:* Parents | Survey of Mother (in hospital) | Chart Review (Prenatal and Medical) | Admission & Discharge

# EXHIBIT O

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.

              Plaintiffs,

    v.

DONALD J. TRUMP, et al.

              Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.: __25-cv-10139__

## Declaration of Gabrielle Armenia

I, Gabrielle Armenia, hereby declare:

1. I am the Director of the Division of Eligibility and Marketplace Integration in the Office of Health Insurance Programs of the New York Department of Health ("DOH"), a position I have held since 2024. I have also been New York State's Children's Health Insurance Program (CHIP) Director since 2019. As Director of Eligibility and Marketplace Integration, I am responsible for eligibility policy for the Medicaid and Child Health Plus Program, among other things. Prior to holding this position, I was the Director of the Bureau of Child Health Plus policy from April 2008 through October 2013, the Director of the Bureau of Child Health Plus and Marketplace Integration from October 2013 through October 2022, and the Director of the Child Health Plus and Marketplace Consumer Assistance Group from October 2022 through March 2024.

2. As Director of the Division of Eligibility and Marketplace Integration and New York's CHIP Director, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

1

3.  I am providing this declaration to explain certain impacts of Executive Order titled "Protecting the Meaning and Value of American Citizenship" January 20, 2025) (the "Executive Order"), which revokes birthright citizenship for certain newly-born children of immigrants in the United States, on the State of New York's health insurance programs.

4.  DOH's mission is to protect and promote health and well-being for all, building on a foundation of health equity. To support that goal, DOH performs many functions, including regulating healthcare facilities and overseeing the registration of vital events such as births.

## New York Health Insurance and Eligibility Rules

5.  Within DOH, the Office of Health Insurance Programs administers several programs through the NY State of Health Marketplace that enable qualifying New York residents to access free or low-cost healthcare coverage.

6.  Publicly-funded health insurance programs in New York include: Medicaid[1], Child Health Plus[2] (New York's Children's Health Insurance Program, which includes federal- and state-

---

[1] The term "Medicaid," as used throughout, means the New York State- and federally-funded healthcare program for low-income New Yorkers whose income and/or resources are below certain levels. It also includes state-funded Medicaid for individuals who are ineligible for federally funded Medicaid due to their immigration status. Eligible populations include children, pregnant women, single individuals, families, and individuals certified blind or disabled. In addition, certain persons with medical bills may be eligible for Medicaid if paying such bills allows them to spend down their income and resources to meet required Medicaid income levels. Medicaid enrollees do not pay premiums and have little to no out-of-pocket costs for many services. The term "Medicaid" does not include the Essential Plan, Child Health Plus, or Qualified Health Plans.

[2] Eligibility for Child Health Plus begins where Medicaid eligibility ends (223 percent of the federal poverty level for children under 1 year old and 154 percent of the federal poverty level for children age 1 year and older; children are eligible for subsidized coverage with incomes up to 400 percent of the federal poverty level. There is no Child Health Plus premium for children in households with incomes below 223 percent of the federal poverty level, and a sliding scale premium for those in households with incomes above 222 up to 400 percent of the federal poverty level. Households with incomes above 400 percent of the federal poverty level have the option to purchase Child Health Plus at full premium. 96 percent of children enrolled in Child Health Plus are enrolled with no premium or sliding scale premiums, and approximately four percent are enrolled with full premiums.

2

funded CHIP and New York's state extension), the Essential Plan[3] ("EP") (New York's 1332 State Innovation Waiver), and Qualified Health Plans ("QHP")[4].

7. As of October 2024, a total of 2,461,497 children in New York were enrolled in federal- and state- funded Medicaid ("Federal-State Medicaid") and Child Health Insurance Program, of whom 571,386 were enrolled in Child Health Plus. Some of the children enrolled in Child Health Plus were enrolled in federal- and state-funded CHIP, and some were enrolled in New York's state extension.

8. In New York, Medicaid and Child Health Plus provide comprehensive healthcare coverage for a wide range of services, including primary care, hospitalization, laboratory tests, x-rays, prescriptions, mental health care, dental care, preventive screenings, and more.

9. Eligibility for New York's publicly funded health insurance programs, including eligibility for Medicaid and Child Health Plus depends on age, New York State residency, household size, immigration status, and household income. Specifically, a child must not be eligible for Medicaid or have other comprehensive insurance or enrollment in or access to state health

---

[3] The Essential Plan covers New Yorkers between the ages of 19-64 who are not eligible for Medicaid and have incomes up to 250 percent of the federal poverty level. The Essential Plan provides comprehensive benefits including free preventive care and dental and vision with no annual deductibles and low copayments. Essential Plan is currently authorized under Section 1332 of the Affordable Care Act as a State Innovation Waiver, which allows states to pursue innovative strategies for providing residents with access to high-quality, affordable health insurance. Section 369-ii of the NY Social Services Law authorizes State action under the Waiver. New York's Section 1332 State Innovation Waiver was approved effective April 1, 2024 to expand Essential Plan eligibility to consumers up to 250 percent of the Federal Poverty Level, and is effective through December 31, 2029. New York received approval of a Waiver Amendment to extend subsidies to certain Qualified Health Plan enrollees under the Waiver, with an effective date of January 1, 2025.

[4] Qualified Health Plans are health plans that have been certified by and are available through the Marketplace in accordance with the Affordable Care Act and federal regulations. 42 § U.S.C. 18021(a). Enrollment in a Qualified Health Plan with financial assistance is available based on income and the cost of available health plans ,for residents who do not have access to other affordable health insurance that meets minimum essential coverage.

3

benefits coverage (New York State Health Insurance Program or NYSHIP) to be eligible for Child Health Plus.

10. In general, children under the age of 18 (i) meet the income eligibility requirement for Medicaid in New York if their household's modified adjusted gross income ("MAGI") is less than 223% of the federal poverty level (FPL) for children under age 1 and 154% of the FPL for children between the ages of 1 and 18, and (ii) meet the income eligibility requirement for subsidized Child Health Plus coverage if their household's MAGI is less than 400% of the FPL. Children with household income over 400% of the FPL who are otherwise eligible may purchase coverage at the full cost.

11. For a child to be eligible for Federal-State Medicaid or CHIP, they must also be a U.S. citizen or "lawfully residing," as that term is defined by federal law.

12. Most New York children under age 19 who do not qualify for Federal-State Medicaid because they are not U.S. citizens or "lawfully residing" are eligible for Child Health Plus, and the cost of providing that coverage is fully funded by the state.

13. New York implemented Child Health Plus because access to healthcare, particularly to primary care, makes children and communities healthier, and it is a fiscally responsible investment in the future of New York children.

14. The increased enrollment of children in New York through Child Health Plus has had a positive impact on public health in the state. Children enrolled in health insurance are more likely to receive preventative care services, including vaccinations. This reduces the need for more intensive health care treatments, including emergency care, as illnesses develop. It also reduces the financial burden on health care providers from providing care to uninsured individuals and ensures that families are not left with medical bills that they are unable to

4

pay.  In addition, sick children with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

15. Having insurance coverage also makes it less likely that children will have to visit an emergency room to treat preventable illnesses because it is more likely that they will receive medical care before a treatable medical issue becomes an emergency.  This reduces the resource strain and uncompensated care burden on hospitals.

Healthcare Coverage for Newborns

16.  Many children born in the United States and residing in New York whose family income is at or below 400% of the Federal Poverty Level are eligible for New York public health insurance.

17. Presently, all children born in New York are U.S. citizens, regardless of the immigration status of their parent(s).

18. Thus, at present, public health insurance coverage for newborns born in New York State is funded jointly by the state and federal government, either through Medicaid or Child Health Plus.

19. Most healthy newborns remain in the hospital for two or three days after delivery. During this time, they receive routine postnatal care, including a vitamin K injection, antibiotic eye ointment, screening tests (e.g., heel-prick blood test, hearing screening), and hepatitis B vaccination.

20. Additionally, the American Academy of Pediatrics recommends that newborns see a doctor or nurse for a "well-baby visit" six times before their first birthday, including within the first

5

3-5 days, the first month, the second month, the fourth month, the sixth month, and the ninth month after birth.

21. Within the first year of life, babies may also need to visit a doctor when they appear ill and may require testing or prescription medication.

22. Children ages 1-18 typically have a range of health care needs that require services from various health care providers. For example, children in New York must show proof of certain immunizations within 14 days of starting school, unless they have an exemption for medical reasons.

<u>Fiscal Impact of Revoking Birthright Citizenship</u>

23. New York spends on average $299 per member per month on non-disabled children enrolled in Medicaid. New York currently pays approximately $272 per member, per month (totaling $3,264 per member per year) for children enrolled in its Child Health Plus program. As noted above, the federal government generally covers 50 percent of these costs for children enrolled in Federal-State Medicaid and 65 percent for children enrolled in Child Health Plus.

24. However, if a low-income child were not eligible for Federal-State Medicaid or CHIP, New York would not receive that federal assistance, and would cover the full cost of health insurance coverage for the newborn through Child Health Plus.

25. In 2023, approximately 100,000 or approximately 49% of births in New York State are enrolled in Federal-State Medicaid. Assuming that as a result of the Executive Order certain children born in New York will no longer be considered citizens, within one year of the revocation of birthright citizenship, a substantial portion of these children would be eligible for federally participating Federal-State Medicaid but for their new status as non-citizens.

6

26. DOH would need to immediately begin planning for this potential loss of federal funding and would need to determine how to offset this loss to pay for coverage if newborns were shifted to state only funding through Child Health Plus. This includes reassigning staff from other priorities, hiring contractor support, changing information technology infrastructure, and expanding existing financial and programmatic support contracts to encompass the new scope of work this would entail. These costs increase dramatically the longer it takes CMS and the federal government to issue Medicaid specific impact guidance on this new policy.

<u>Eligibility Verification Process for Children on Federal-State Medicaid and CHIP</u>

27. The State of New York fully funds public health insurance for children who meet the income eligibility guidelines for Federal-State Medicaid or CHIP, but do not qualify for those programs because they are not United States citizens or "qualified aliens."

28. When a child's birthing parent is enrolled in Federal-State Medicaid, the DOH automatically enrolls that child in Medicaid, as a "deemed newborn." This is authorized by 42 C.F.R. § 435.117, which requires States to provide Medicaid coverage from birth to a child's first birthday if the child's birthing parent was eligible for and received Federal-State Medicaid at the time of the child's birth. Newborns are not "deemed" in Child Health Plus and must proactively apply for coverage as it is not automatic.

29. New York State utilizes the hospital newborn reporting system to automatically deem and enroll an eligible child in Federal-State Medicaid. The eligibility system currently relies on the fact that a newborn was born in a New York health care facility provided through the hospital newborn reporting system as proof of citizenship, qualifying the newborn for Federal-State Medicaid.

30. Under the Executive Order, DOH will have to amend its existing processes to determine whether newborn children are eligible for Federal-State Medicaid because they can no longer rely on the fact that a child was born in the United States to confirm citizenship status. For example, the intake process including the booklet the parents complete in the hospital when the child is born would need to be revised to collect the immigration status of the birthing parent. Hospitals would only report children who appear eligible for Federal-State Medicaid through this system. Hospitals would need to be trained about what cases to report. Quality assurance reviews would need to occur to be sure the hospitals appropriately report the births that are Medicaid eligible. Since newborns are not deemed in Child Health Plus as they are for Medicaid, the parent/guardian would be required to apply for coverage on NY State of Health. For purposes of Child Health Plus, as long as a completed application is submitted within 60-days of the date of birth, coverage can be retroactive to the first date of the month of the child's date of birth. This may create a gap in coverage for the child if the application is not completed within this timeframe, thus creating the potential for families to forgo needed care and placing a strain of uncompensated care on the provider community.

31. The DOH would incur significant costs to revise the process hospitals follow for reporting births to address changes in citizenship rules for newborns. This would require significant planning to understand the new rules governing U.S. citizenship for newborn children, to identify and determine the kinds of evidence that would suffice as proof of citizenship, to modify the intake process/booklet the parent completes in the hospital, and to develop and implement guidance and training for Department and State agency staff as well as for hospital staff statewide.

8

32. DOH would incur significant costs to train staff, partners, and healthcare providers on the new newborn reporting rules and procedures. DOH would also need to revise existing guidance documents and manuals regarding eligibility rules and procedures which will involve significant effort. A quality assurance component would need to be added to ensure hospitals are reporting correctly.

33. It would likely take years to make the necessary updates to the process and perform the necessary training to ensure that it can be deployed effectively.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this twenty-first day of January, 2025, in Niskayuna, NY.

*Gabrielle Armenia*

Gabrielle Armenia
Director, Division of Eligibility and
Marketplace Integrity
Office of Health Insurance Programs
New York Department of Health

9

# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.,     :

       Plaintiffs,       :
                     :

 v.                  :
                     :     Civil Action No.:  25-cv-10139
DONALD J. TRUMP, et al.,      :

       Defendants.     :

                     :

                     :

                     :

# DECLARATION OF PETER HADLER

I, Peter Hadler, hereby declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by agency staff.

2. I am the Deputy Commissioner for the Connecticut Department of Social Services (DSS). I have been employed in this position since April 2023 and have been employed by DSS since January 2012. I am responsible for executive level program and policy oversight and administration of eligibility policy and enrollment determinations for the Medicaid program and the Children's Health Insurance Program (CHIP), among other healthcare programs. In my capacity as Deputy Commissioner, I also oversee the state's program and policy administration for the Supplemental Nutrition Assistance Program, the Temporary Assistance for Needy Families block grant, the Low Income Home Energy Assistance block grant and numerous other public assistance programs.

3. I am an attorney with a juris doctor degree from Boston University and am admitted to the bar in both Connecticut and New York.

## Connecticut HUSKY and Eligibility Rules

4. Medicaid is the federally matched medical assistance program under Title XIX of the Social Security Act. CHIP is the federally matched medical assistance program under Title XXI of the Social Security Act. The programs operate as a state and federal partnership with states funding a portion of the programs (usually starting at 50%). In Connecticut, Medicaid, CHIP and other medical assistance programs are collectively called "HUSKY Health" or simply "HUSKY." HUSKY provides comprehensive health care coverage to

1

PA166

State residents, including preventative care, inpatient and outpatient services, behavioral health services and many other health care services.

5. DSS is the designated single state agency responsible for administering Connecticut's Medicaid program and Children's Health Insurance Program (CHIP), federal programs regulated by the U.S. Department of Health and Human Services. Medicaid and CHIP are jointly funded by both state and federal dollars, though at different rates, as explained herein. DSS also administers some state funded health care programs, including the State HUSKY program (which provides coverage for children up to 15 years of age who do not qualify for Medicaid or CHIP due to immigration status).

6. "HUSKY" is an umbrella term or "brand name" for all Connecticut State medical assistance programs, including Medicaid, CHIP and state-funded coverage. DSS is Connecticut's Medicaid authority and functions as one of the largest providers of health coverage in Connecticut. It is a leader in ensuring Connecticut residents have access to high-quality, affordable health care, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut. DSS provides health care for over 1 million state residents annually through HUSKY.

7. The table below illustrates the State Fiscal Year (SFY) 2024 expenditure dollars in the thousands for DSS's programs. Funds are broken out by federal funded (FF) and state funded (SF) expenditures. The Medicaid line in the table includes funds associated with all eligibility groups authorized pursuant to Title XIX of the Social Security Act as well as CHIP funds that cover certain pregnant women and children. The CHIP line in the table includes children covered under Title XXI of the Social Security Act. State-only programs

2

PA167

in Connecticut include State HUSKY for Children and post-partum coverage for noncitizens, among others. States, including Connecticut, use federal funds to support services for noncitizens through Emergency Medicaid. Emergency Medicaid is authorized under Title XIX and expenditures are reflected within the Medicaid line in the below table.

| SFY 2024 Expenditures ($$ in Thousands) | | | |
|---|---|---|---|
| | **FF** | **SF** | **Total** |
| *Medicaid* | $4,883,249 | $3,357,225 | $8,240,475 |
| *CHIP* | $26,608 | $14,145 | $40,753 |
| *State-only (State HUSKY)* | $ - | $23,502 | $23,502 |
| *Total* | $4,883,249 | $3,394,873 | $8,304,730 |

8. Within DSS, roughly 1,000 State employees and hundreds of contracted staff are responsible for determining eligibility, providing customer service, and managing policy for the majority of state and federal medical assistance programs serving over 1 million Connecticut residents. In addition to providing direct access to the Medicaid and CHIP programs through HUSKY, DSS administers the Supplemental Nutrition Assistance Program, the Temporary Assistance for Needy Families block grant, and a number of other public assistance programs.

9. Medicaid eligibility is comprised of three income methodologies: Modified Adjusted Gross Income (MAGI) methodology, non-MAGI methodology, and categorical eligibility (for example, SSI recipients or Foster Care/Adoption support coverage). Programs with eligibility determined under MAGI rules include coverage for adults aged 19-64, pregnant women, families, and children. Programs with eligibility determined under non-MAGI rules include coverage for aged, blind, or disabled populations, including long-term services and supports programs. Categorical eligibility means that a person is granted

coverage based on their categorical relationship to the program. For example, a person receiving Supplemental Security Income (SSI) automatically receives Medicaid coverage.

10. Federal Medicaid rules direct states to look at income and residency rules first and then determine whether someone is a citizen or has a qualifying immigration status in order to determine eligibility. Individuals who are undocumented or do not have a lawful, qualifying immigration status are not eligible for Medicaid or most other federally funded DSS administered benefits. The limited exception involves the federal Medicaid program for undocumented or non-qualified non-citizens to receive emergency medical care coverage if they are otherwise eligible for Medicaid. This is also known as Emergency Medicaid. Emergency Medicaid covers emergency health care for a limited set of qualifying emergent medical conditions. Individuals must meet all the income and other requirements of Medicaid. In other words, they must be eligible "but for" their citizenship and immigration status. Individuals who are undocumented or non-qualified can receive Emergency Medicaid services, and the federal matching rate is 50%, meaning that federal funds cover 50% of the cost and state funds cover 50% of the cost.

11. Coverage programs for children are also provided under HUSKY. HUSKY covers all kids through age 15, regardless of immigration status, up to 323% of the Federal Poverty Level (FPL), and covers all citizen children and non-citizens with qualifying immigration statuses up to 323% FPL through age 18. Funding for the coverage depends on a child's eligibility for different programs that fall under the HUSKY Health branding, i.e. Medicaid, CHIP or State coverage.

12. Below 201% of the FPL, for children who are citizens or qualified immigrants, the funding for this coverage is through Medicaid.

13. Between 201% and 323% of the FPL, for children who are citizens or qualified immigrants, the funding for this coverage comes through CHIP, and some households pay a small premium or copays for coverage. CHIP is a federally matched health coverage program that expands coverage to children above the Medicaid income limit. Connecticut's CHIP offers comprehensive healthcare coverage to children through age 18, who reside in households with incomes between 201% and 323% of the FPL, whereas Medicaid covers eligible children at or below 201% of the FPL.

14. While provided in Connecticut under the name HUSKY, coverage provided under the CHIP program operates separately from Medicaid on the funding side. Historically, CHIP federal match has been 65%. It was increased as high as 88% for a period of time in recent years, but now is at 65%. This means that coverage provided to eligible children under the CHIP funding structure results in federal funds covering a higher portion of the expenses compared to Medicaid, where federal funding normally covers 50% of the expenses.

15. Children who would have been eligible for Connecticut's Medicaid or CHIP-funded coverage programs had they met immigration status requirements receive coverage through the 100% state-funded State HUSKY program. Connecticut law requires such coverage to be provided to all children who apply and are eligible.

<u>Healthcare Coverage for Pregnant Women and Newborns</u>

16. HUSKY also covers all pregnant women regardless of immigration status with income at or below 263% of the FPL. This is possible because their unborn children are deemed covered at conception, so even though the mother may not have a qualifying immigration status, the child will be born a U.S. citizen and is therefore eligible for services under CHIP from conception through birth. After the child is born, the child (as a U.S. citizen) can

5

remain covered under HUSKY, while the mother is no longer covered under any federal healthcare program, but in Connecticut is provided 12 months of state-funded postpartum coverage.

17. As of 2024, DSS administers Medicaid funded coverage for more than 380,000 children annually in Connecticut, and CHIP funded coverage for approximately 39,000 children in Connecticut. DSS estimates that coverage on a per-child basis costs approximately $3,850 per year on average. For this coverage, Connecticut expended approximately $1,450,000,000 and received $744,000,000 in reimbursement from the federal government under Medicaid and CHIP. With respect to State HUSKY, there were over 20,000 children covered and the State expended approximately $23,000,000 in 2024.

18. Under federal law, DSS must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. Applications for coverage are processed either through Access Health Connecticut (the state's health insurance marketplace), where eligibility is based on a MAGI determination, or through DSS directly for individuals qualifying under a non-MAGI basis. Citizenship eligibility status is one eligibility factor that DSS must verify for HUSKY coverage. There are multiple ways that DSS verifies citizenship or immigration status to determine eligibility.

19. Generally speaking, for MAGI-based coverage, DSS first uses an individuals' Social Security Number (SSN) along with the individual's name and date of birth to automatically check the SSN with the Social Security Administration (SSA) in order to confirm identity and citizenship or qualifying immigration status through what is called the "federal data services hub." For newborns who do not yet have an SSN, citizenship eligibility is verified

by birth records provided (usually by the hospital or other medical provider) at the time of birth because children born in the United States are citizens. For individuals who declare to be lawfully present and have an SSN, DSS uses the SSN, name, and date of birth to confirm an individual's status with the Department of Homeland Security. For individuals who have an SSN and declare to be a citizen, but for whom citizenship cannot be automatically verified, DSS will request verification from the individual of their citizenship. When an individual is applying for non-MAGI coverage through DSS, SSN and citizenship are automatically verified through an interface with the SSA.

20. In the relatively infrequent instances where citizenship is not or cannot be verified by those automatic means, an individual can be approved for coverage based on their attestation and given a reasonable opportunity to provide verification. On that issue, a declaration of citizenship or qualifying immigration status may be provided in writing, and under penalty of perjury by an adult member of the household, an authorized representative, or someone acting for the applicant. States must provide otherwise eligible individuals with a "reasonable opportunity period" to verify their qualifying immigration status. Individuals making a declaration of a qualifying citizenship or immigration status are furnished at least 90 days of Medicaid coverage while additional verification is collected. If an individual's status is found to be unsatisfactory before the 90 days, their eligibility is determined and their coverage closed.

<u>Impact of Purported Revocation of Birthright Citizenship</u>

21. I am aware of an executive order titled "Protecting the Meaning and Value of American Citizenship," issued on January 20, 2025 (the "Executive Order"), which revokes birthright citizenship for children born in the United States after February 19, 2025 to (i) a mother

who is unlawfully present or who is lawfully present in the United States but on a temporary basis, and (ii) a father who is neither a citizen nor a lawful permanent resident. This Executive Order will have a variety of widespread harmful impacts on Connecticut's HUSKY programs, including a decrease in receipt of proper medical care for children born in Connecticut and increased operational and administrative costs for the State.

22. In addition to impacts on those subject to such a policy—children who would have been citizens had they been born weeks earlier—it will have a direct impact on DSS's administration of its healthcare programs and the amount of federal funding Connecticut receives to reimburse medical expenses for children residing in Connecticut.

23. Connecticut has made tremendous strides in reducing the number of uninsured individuals. Many immigrants are direct beneficiaries of HUSKY coverage. Connecticut has continued to improve and broaden coverage options for children residing in the State and worked to streamline the application process and make that process as simple as possible for parents seeking coverage for themselves and their children. This is possible using both state and federal Medicaid and CHIP dollars as appropriate. Uninsured individuals suffer significant negative health impacts and the economic impacts of an increase in the uninsured rate could be severe. Individuals with health insurance that provides preventative care are less likely to need more intensive health care treatments, including emergency care. Health insurance reduces the financial burden on Connecticut health care providers who provide care to uninsured individuals, reduces uncompensated care, and ensures families are not left with medical bills that they are unable to pay. Sick children with health insurance coverage are more likely to see a health care provider and receive treatment, limiting the spread of infectious illnesses across the state.

PA173

24. Connecticut's current Medicaid, CHIP, and other health coverage programs are structured around the significant reimbursements from the federal government, and any loss of funding would have serious consequences for Connecticut and the individuals served by DSS. The federal government action of taking away birthright citizenship from children born in Connecticut would result in babies being born as non-citizens with no legal status. That will result in direct loss of federal reimbursements to the State for coverage provided to those children because eligibility for federally matched programs such as Medicaid and CHIP depend on the individual's eligibility under federal law, which necessarily depends on their citizenship or immigration status. In particular, federally matched coverage to many children that would have been provided under Medicaid or CHIP will very likely be lost without the clear line of eligibility tied to birth in the United States, because those programs are not available to individuals who have not been verified to be eligible. This will necessarily result in a shift to the State of funding responsibility for this group of children, which poses a direct threat to the ability of the State to provide meaningful healthcare to all in need without interruption. It will also likely result in a significant number of children going uninsured and receiving only emergency care when absolutely necessary, leading to worse health outcomes as they grow up and require more expensive care through emergency procedures due to a lack of access to affordable preventative care.

25. Additionally, there will be substantial uncertainty and administrative burdens for DSS in providing coverage to pregnant women and their unborn children. As noted above, Connecticut is able to provide coverage to all pregnant women, regardless of citizenship status, for prenatal care under the CHIP program because the unborn children are covered under CHIP. If the children are no longer to be citizens at birth, DSS will be left in limbo

9

to determine whether coverage to those vulnerable pregnant women will be able to be covered, and if so, under what program. This is likely to pose a significant barrier to DSS providing streamlined coverage to State residents in need of medical care for themselves and their future children.

26. The purported removal of birthright citizenship is also likely to cause coverage lapses or, at a minimum, result in direct shifts to the State with respect to the cost of funding healthcare coverage for children who would have otherwise been immediately eligible for Medicaid and/or CHIP at birth. These are not impacts that can be avoided. For example, with respect to emergency care, the State and its providers will be required to absorb costs that would normally be recoverable through federal reimbursements under Medicaid and CHIP. Hospitals must provide emergency medical care under federal law, including the Emergency Medical Treatment and Labor Act and the relevant Emergency Medicaid provisions. They cannot turn patients away as a general rule. Such emergency services, if provided to a child otherwise eligible for Medicaid but for their immigration status, will still be covered in part by the federal government at the 50% match rate for Medicaid. However, if a child is a citizen and covered under CHIP, such services would be covered and reimbursed at the 65% match rate. If that same child is deemed a non-citizen at birth (and thus is ineligible for CHIP), the State will be left to pay for that care. Indeed, Connecticut's state-funded State HUSKY program would provide coverage, as is required under state law. As a result, for each child that would be eligible for CHIP but for their new non-citizen status, the State will lose the 65% federal reimbursement for any care provided—solely because the child, now as a non-citizen, would not be eligible for CHIP.

10

27. This poses a risk to DSS's federal funding stream used to provide healthcare coverage to vulnerable Connecticut newborns and children. Based on DSS's most recent data for 2024, there were over 5,500 children born who were eligible for HUSKY and born to mothers who qualified for state-funded postpartum coverage because the mother could not qualify for Medicaid due to their immigration status. If the children covered under Medicaid and CHIP became ineligible due to a loss of citizenship and moved to the State-funded coverage, that would result in a loss of over $10,000,000 in federal reimbursements to Connecticut and a corresponding increase to State expenditures of the same amount.

28. In order to respond and update its practices in light of the federal government's new policy, DSS will also need to develop updated comprehensive training for staff, partners, and healthcare providers. For example, DSS will need to update its training and guidance around which children are citizens and therefore eligible for Medicaid and CHIP programs, and which must be funneled into state-only programs. DSS will also need to change its verification processes, acquire more information from parents, pursue absent parents, change its computer systems, and in so doing significantly increase both the number of staff required to conduct this eligibility work and delay the enrollment process for families. This is a significant burden for the State, children, parents, and healthcare providers. This will require additional eligibility units comprised of eligibility workers and supervisory staff. For every additional eligibility unit that would need to be brought on to support the additional work, it will cost the state approximately $1,700,000. Because of the burden of revamping a program of this size and complexity, adjusting to the federal government's new policy and ensuring coverage for all needy newborns in Connecticut would likely take one year at a minimum. It may also require additional legislative

11

solutions at the state level, including the allocation of additional state funds to operationalize this dramatically changed interpretation of citizenship.

<u>Impact on School-Based Health Services</u>

29. In addition, and upon information and belief, local education agencies (LEAs) within the State serve all school-age children, regardless of their immigration status. Within DSS, the Division of Health Services administers federal Medicaid funds to LEAs to support crucial education initiatives and provide essential services to students. Upon information and belief, school-based health services (SBHS) refer broadly to medical services provided to all students in a school setting, such as on-site school nurses, behavioral health counselors, and preventative health screenings for visual and auditory acuity. All Connecticut LEAs are required to provide certain SBHS free of charge to all students, regardless of their immigration or insurance status.

30. Upon information and belief, Section 1903(c) of the Social Security Act has authorized the federal Medicaid program to reimburse LEAs for medically necessary SBHS provided to Medicaid-eligible students with disabilities pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., provided the services were delineated in the student's individualized education program (IEP) (or similar plan) and covered in the State plan for Medicaid. IDEA requires LEAs to develop an IEP for children found eligible for special education and related services. An IEP identifies certain special education and related services, and program modifications and supports, that the LEA will provide a child with a disability.

31. Upon information and belief, in SFY 2023 there were over 25,000 unique Medicaid recipients identified as obtaining services claimed under Medicaid related to SBHS. For

PA177

SFY 2023, and upon information and belief, quarterly statistics submitted by the LEAs to DSS indicate a total of approximately 22,800 Medicaid-eligible special educated students with medical services in their IEP/504 plans.  Upon information and belief, in SFY 2022, total LEA gross costs were approximately $61 million, of which federal Medicaid reimbursed 50%, or approximately $30.5 million. The State retained 50% of the federal reimbursement, or approximately $15.25 million, with the remainder passed on to the LEAs.

32. If birthright citizenship was revoked, impacted students with disabilities—who would have otherwise qualified for federally-funded Medicaid—would lose that eligibility and thus there would be no federal matching support. LEAs would thus not receive any reimbursement funds for provision of SBHS to those students, increasing the State's net costs. A change to birthright citizenship would also increase the population of undocumented children, some percentage of whom would very likely have disabilities that require SBHS and would have been eligible for partially federally-funded Medicaid but for their immigration status. The costs of providing those services would be borne by the State of Connecticut and LEAs without any federal Medicaid reimbursement.

I declare under penalty of perjury under the laws of the State of Connecticut and the United States of America that the foregoing is true and correct.

Executed this 21st day of January 2025, in New Haven, Connecticut.

Peter Hadler

Digitally signed by Peter Hadler
DN: cn=Peter Hadler, o=DSS, ou=Deputy
Commissioner, email=peter.hadler@ct.gov, c=US
Date: 2025.01.21 07:32:04 -05'00'

Peter Hadler, Deputy Commissioner
Connecticut Department of Social Services

13

# EXHIBIT S

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.,                :
                                             :
            Plaintiffs,                       :
                                             :
    v.                                        :
                                             :
                                             :       Civil Action No.: 25-cv-10139
DONALD J. TRUMP, et al.,                     :
                                             :
            Defendants.                       :
                                             :
                                             :
                                             :

# DECLARATION OF YVETTE GAUTHIER

I, Yvette Gauthier, hereby declare:

1. I am State Registrar of Vital Records of the Connecticut Department of Public Health, a position I have held since 2022. As State Registrar of Vital Records, I am responsible for the supervision of the State-wide vital records data collection system. Prior to holding this position, I was the Health Program Supervisor of the Office of Vital Records.

2. As Registrar of Vital Records, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

## Connecticut Department of Public Health

3. Connecticut Department of Public Health's mission is to protect and improve the health and safety of the people of Connecticut by assuring the conditions in which people can be healthy; preventing disease, injury and disability, and promoting the equal enjoyment of the highest attainable standard of health, which is a human right and a priority of the State. To support that goal, Connecticut Department of Public Health performs many functions, including regulating healthcare facilities and overseeing the Office of Vital Records (OVR), which facilitates the registration of vital events such as births.

## Registration and Birth Certificates of Newborns

4. Healthcare facilities coordinate with OVR to collect information to register a child's birth.

5. When a child is born in a healthcare facility, a medical attendant to the birth is statutorily obligated to register the birth. They must provide the newborn's parents with a Birth Certificate Worksheet that asks for several pieces of information, including the parents' place

2

of birth and Social Security Numbers (SSNs). The Worksheet does not inquire about the parents' citizenship or immigration status.

6. If the parents do not have SSNs, or do not wish to share them, they can leave that field blank. Their omission of that information does not affect the newborn's ability to obtain a birth certificate.

7. After the newborn's parents complete and sign the Worksheet, hospital staff enter the information from the Worksheet into an electronic birth system (ConnVRS) maintained by OVR. Local Registrars in the town of Birth then create and register the birth certificate with the State. Neither OVR nor Local Registrars have a duty to verify the accuracy of the information submitted by the parent(s) on the Worksheet.

8. A newborn's completed birth certificate does not indicate whether the parents have an SSN. The only information on the parents is the mother's legal name and previous name, the father's full name (if provided), their places and dates of birth, mother's residence and mailing address(es). Currently, it is not possible to determine a foreign-born parent's citizenship or immigration status from their child's birth certificate.

9. If the newborn registration process had to be amended to require the Department to verify the parents' citizenship and/or immigration status, this would impose substantial administrative burdens on the Department. Assuming this burden would further lead to delays in registration and issuance of the newborn's birth certificate.

10. Connecticut currently receives funding from the National Center for Health Statistics (NCHS), which is a unit of the Centers for Disease Control and Prevention, for sharing its statistical birth data with NCHS. NCHS annually allocates funds to states based on the number and quality of birth records provided. If the births of children born to two foreign

3

born parents were not recorded, the State estimates that it would lose approximately 20% of its NCHS funding.

11. The State received $341,280 from NCHS for its 2023 birth records. A loss of 20% in funding would total $68,256.

<u>Application for Social Security Number of Newborns</u>

12. While registering a newborn for a birth certificate at a healthcare facility, parents may also complete an application for an SSN for the newborn through a Social Security Administration (SSA) program called Enumeration at Birth (EAB).

13. The EAB process is voluntary for families, but according to SSA, about 99% of SSNs for infants are assigned through this program.

14. Under the EAB process, the healthcare facility provides parents with an application form to request an SSN for their child.

15. The EAB application asks for the parents' SSNs. Parents born outside the United States can apply for and receive an SSN for their child without including their own SSNs on the application. Currently, because children born in the United States are U.S. citizens, they are eligible for SSNs regardless of their parents' citizenship or immigration status.

16. After a healthcare facility receives a completed SSN application, it submits electronically the information from the application and a request for an SSN to OVR, which then transmits that information and request to SSA. OVR only sends EAB records to SSA for enumeration of infants born within the past 12 months. OVR does not have a duty to verify the information submitted by the parent(s) on the EAB application.

17. Connecticut Department of Public Health receives federal funding from the SSA EAB process on a quarterly basis for each SSN that is issued through the EAB process. The

4

Department receives $4.82 per SSN issued through the EAB process, or approximately $45,000 per quarter. OVR uses those funds to support the payment of administrative and operational costs.

18. Assuming that SSA would not issue an SSN to a child born in the United States if the child's parents were undocumented, OVR estimates approximately 7,400 fewer SSNs annually would be issued. This estimate is based on the number of births for which the parents identified a foreign place of birth on the Birth Certificate Worksheet in 2023 (7,380 births) and in 2024 (7,704 births).

19. If approximately 7,400 fewer SSNs were issued through the EAB process due to the revocation of birthright citizenship, this would result in an annual loss of EAB funding to the Connecticut Department of Public Health of approximately $35,668.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  17th  day of January, 2025, in   Hartford, Connecticut   .

Yvette Gauthier

Digitally signed by Yvette Gauthier
Date: 2025.01.17 14:03:37 -05'00'

Yvette Gauthier, State Registrar of Vital Records

Connecticut Department of Public Health/Office of Vital Records

5

| 01/24/2025 | 71 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. |
| | | After review of the response to the Order to Show Cause filed by the Plaintiffs, Doc. No. 59, the Court discharges the Order and determines that the two cases at issue are related within the meaning of Local Rule 40.1(g) for the reasons expressed in the filing. Most significantly, the Court notes: (1) though the Complaint and Motion filed by the Plaintiffs in this case involve a broader range of factual issues, they do also involve the same factual issues raised by the <u>Doe</u> Complaint and Motion; (2) random reassignment of this case poses a risk of different determinations as to the same factual issues, as well as a possible risk that Defendants might become subject to conflicting court orders regarding their treatment of Ms. Doe and members of the organizations that are also plaintiffs in the <u>Doe</u> case; and (3) counsel representing all Defendants in both cases "do not oppose continuing to treat the cases as related," Doc. No. 59 at 1 n.1. In addition, the Court ADOPTS the jointly proposed briefing deadlines, Doc. No. 60 at 1, and schedules a hearing on the Plaintiffs' motion for preliminary injunction (Doc. No. 3) for February 7, 2025, at 10:00 AM, along with the previously scheduled hearing on the motion for preliminary injunctive relief in <u>Doe</u>.( Motion Hearing set for 2/7/2025 10:00 AM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin.)(SED) (Entered: 01/24/2025) |
| 01/24/2025 | 72 | NOTICE of Appearance by Marissa Malouff on behalf of State of California (Malouff, Marissa) (Entered: 01/24/2025) |
| 01/27/2025 | 73 | NOTICE of Appearance by John C. Keller on behalf of State of Minnesota (Keller, John) (Entered: 01/27/2025) |
| 01/27/2025 | 74 | NOTICE of Appearance by Shefali Saxena on behalf of State of New Jersey (Saxena, Shefali) (Additional attachment(s) added on 1/28/2025: # 1 Certficate of Service) (FGD). (Entered: 01/27/2025) |
| 01/27/2025 | 75 | NOTICE of Appearance by Elizabeth R. Walsh on behalf of State of New Jersey (Walsh, Elizabeth) (Additional attachment(s) added on 1/28/2025: # 1 Certficate of Service) (FGD). (Main Document 75 replaced on 1/28/2025, with corrected information per counsel's request.) (FGD) (Entered: 01/27/2025) |
| 01/27/2025 | 76 | NOTICE of Appearance by William M. Tong on behalf of State of Connecticut (Tong, William) (Entered: 01/27/2025) |
| 01/27/2025 | 77 | NOTICE of Appearance by Janelle Medeiros on behalf of State of Connecticut (Medeiros, Janelle) (Entered: 01/27/2025) |
| 01/27/2025 | 78 | NOTICE of Appearance by Yuri Fuchs on behalf of Donald J. Trump, U.S. Department of State, Marco Rubio, U.S. Department of Homeland Security, Benjamine Huffman, U.S. Department of Health and Human Services, Dorothy Fink, U.S. Social Security Administration, Michelle King, United States of America (Fuchs, Yuri) (Entered: 01/27/2025) |
| 01/27/2025 | 79 | MOTION for Leave to Appear Pro Hac Vice for admission of Heidi Parry Stern Filing fee: $ 125, receipt number AMADC-10808133 by State of Nevada. (Attachments: # 1 Heidi Parry Stern Certification)(Cedrone, Gerard) (Entered: 01/27/2025) |
| 01/27/2025 | 80 | NOTICE of Appearance by Kalikoonalani Diara Fernandes on behalf of State of Hawaii (Fernandes, Kalikoonalani) (Entered: 01/27/2025) |
| 01/28/2025 | 81 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 79 Motion for Leave to Appear Pro Hac Vice Added Heidi Parry Stern. |

PA185

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| O. DOE, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-10135-LTS |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-10139-LTS |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

Pursuant to the Court's January 24, 2025 Order (ECF No. 71, *New Jersey, et al v. Donald J. Trump, et al,*, No. 1:25-cv-10139-LTS), Defendants submit this consolidated memorandum in opposition to the motions for preliminary injunction filed in the two above-referenced cases.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 3

I.    The Executive Order ............................................................................. 3

II.   This Litigation ....................................................................................... 5

STANDARD OF REVIEW ................................................................................ 6

ARGUMENT ..................................................................................................... 7

I.    The State Plaintiffs Lack Standing. ...................................................... 7

II.   Plaintiffs Lack A Valid Cause of Action. ........................................... 11

     A.    Plaintiffs' APA Claims Fail. ..................................................... 11

     B.    Plaintiffs Lack a Cause of Action to Assert Their Constitutional and INA Claims. ...................................................................................... 13

III.  Plaintiffs Are Not Likely To Succeed On the Merits. ........................ 14

     A.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power ..................................................................... 15

     B.    Children Born of Unlawfully Present Aliens or Lawful But Temporary Visitors Fall Outside the Citizenship Clause. ......................... 19

     C.    Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause ........................................................... 27

     D.    Plaintiffs' Contrary Arguments Are Unpersuasive. ................. 30

IV.  Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of This Lawsuit. ....... 35

V.   The Public Interest Does Not Favor an Injunction. ........................... 38

VI.  Any Relief Should Be Limited. ........................................................... 38

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Abuhajeb v. Pompeo,*
    531 F. Supp. 3d 447 (D. Mass. 2021) ...................................................................... 13

*Afroyim v. Rusk,*
    387 U.S. 253 (1967) ...................................................................................................... 35

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ...................................................................................................... 14

*Alsaidi v. U.S. Dep't of State,*
    292 F. Supp. 3d 320 (D.D.C. 2018) ....................................................................... 13

*Arcam Pharm. Corp. v. Faria,*
    513 F.3d 1 (1st Cir. 2007) .......................................................................................... 33

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022).......................................................................... 8, 9, 39

*Arizona v. United States,*
    567 U.S. 387 (2012) ...................................................................................................... 38

*Benny v. O'Brien,*
    32 A. 696 (N.J. 1895) ........................................................................................... 25, 26

*Berenyi v. Dist. Dir., INS,*
    385 U.S. 630 (1967) ...................................................................................................... 30

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.,*
    996 F.3d 37 (1st Cir. 2021) ....................................................................................... 37

*Cambranis v. Blinken,*
    994 F.3d 457 (5th Cir. 2021)..................................................................................... 12

*Cap. Area Immigrants' Rts. Coal. v. Trump,*
    471 F. Supp. 3d 25 (D.D.C. 2020) ......................................................................... 37

*Carlisle v. United States,*
    83 U.S. (16 Wall.) 147 (1872)................................................................................... 20

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004) ..................................................................................... 37

*Cherokee Nation v. Georgia,*
    30 U.S. (5 Pet.) 1 (1831) ............................................................................................ 21

*Chin Bak Kan v. United States,*
   186 U.S. 193 (1902) ................................................................ 32

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .................................................................. 9

*DeVillier v. Texas,*
   601 U.S. 285 (2024) ................................................................ 13

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................ 35

*Doe #1 v. Trump,*
   957 F.3d 1050 (9th Cir. 2020) ............................................... 38

*E. Bay Sanctuary Covenant v. Biden,*
   102 F.4th 996 (9th Cir. 2024) ................................................. 8

*Elk Run Coal Co. v. U.S. Dep't of Labor,*
   804 F. Supp. 2d 8 (D.D.C. 2011) .......................................... 11

*Elk v. Wilkins,*
   112 U.S. 94 (1884) .......................................................... *passim*

*Elkins v. Moreno,*
   435 U.S. 647 (1978) ................................................................ 20

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) .................................................................. 9

*Franchise Tax Bd. of Cal. v. Hyatt,*
   587 U.S. 230 (2019) ................................................................ 22

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) .......................................................... 11, 39

*Garcia v. Vilsack,*
   563 F.3d 519 (D.C. Cir. 2009) ............................................... 12

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
   458 U.S. 375 (1982) ................................................................ 17

*Gill v. Whitford,*
   585 U.S. 48 (2018) .................................................................. 39

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ............................................... 10, 11, 16, 21

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ............................................................................ 27

*Inglis v. Trs. of Sailor's Snug Harbor*,
   28 U.S. (3 Pet.) 99 (1830) ............................................................ 22, 31

*INS v. Chadha*,
   462 U.S. 919 (1983) ............................................................................ 35

*INS v. Legalization Assistance Project*,
   510 U.S. 1301 (1993) .......................................................................... 38

*Kaiser v. Blue Cross of Cal.*,
   347 F.3d 1107 (9th Cir. 2003) ............................................................ 36

*Kawakita v. United States*,
   343 U.S. 717 (1952) ............................................................................ 29

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ............................................................................ 10

*Kwock Jan Fat v. White*,
   253 U.S. 454 (1920) ............................................................................ 32

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
   599 U.S. 382 (2023) ............................................................................ 21

*Lamar v. Micou*,
   112 U.S. 452 (1884) ............................................................................ 20

*Liu v. SEC*,
   591 U.S. 71 (2020) .............................................................................. 28

*Lone Wolf v. Hitchcock*,
   187 U.S. 553 (1903) ............................................................................ 16

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................ 38

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ............................................................ 16

*Martinez v. Bynum*,
   461 U.S. 321 (1983) ............................................................................ 20

*Maryland v. King*,
   567 U.S. 1301 (2012) .......................................................................... 38

iv

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ........................................................................... 10

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................... 6

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................... 17

*Metro. Stevedore Co. v. Rambo*,
  515 U.S. 291 (1995) ........................................................................... 3

*Miller v. Albright*,
  523 U.S. 420 (1998) ........................................................................... 30

*Minor v. Happersett*,
  88 U.S. 162 (1874) ........................................................................... 19

*Mississippi Band of Choctaw Indians v. Holyfield*,
  490 U.S. 30 (1989) ........................................................................... 20

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ........................................................................... 39

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ........................................................................... 10

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*,
  927 F.3d 1 (1st Cir. 2019) ........................................................................... 36

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 39

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892) ........................................................................... 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................... 38

*NYSRPA v. Bruen*,
  597 U.S. 1 (2022) ........................................................................... 34, 35

*Oceanic Navigation Co. v. Stranahan*,
  214 U.S. 320 (1909) ........................................................................... 28

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) ........................................................................... 35

*Ortega-Morales v. Lynch,*
    168 F. Supp. 3d 1228 (D. Ariz. 2016) .................................................................. 13

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ....................................................................................... 9

*Pizarro,*
    15 U.S. (2 Wheat.) 227 (1817) ...................................................................... 20

*Plyler v. Doe,*
    457 U.S. 202 (1982) ..................................................................................... 33

*Richards v. Sec'y of State,*
    752 F.2d 1413 (9th Cir. 1985) ....................................................................... 12

*Robertson v. Cease,*
    97 U.S. 646 (1878) ....................................................................................... 18

*Rogers v. Bellei,*
    401 U.S. 815 (1971) ..................................................................................... 29

*Savorgnan v. United States,*
    338 U.S. 491 (1950) ..................................................................................... 29

*Schooner Exchange v. McFaddon,*
    11 U.S. (7 Cranch) 116 (1812) ................................................................ 16, 17

*Sierra Club v. Larson,*
    769 F. Supp. 420 (D. Mass. 1991) ................................................................. 36

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ..................................................................................... 10

*The Slaughterhouse Cases,*
    83 U.S. 36 (1873) ......................................................................................... 24

*Town of Milton v. FAA,*
    87 F.4th 91 (1st Cir. 2023) ............................................................................ 10

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ....................................................................................... 7

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ..................................................................................... 27

*U.S. Army Corps of Eng'rs  v. Hawkes Co.,*
    578 U.S. 590 (2016) ..................................................................................... 12

vi

*United States v. Antelope,*
   430 U.S. 641 (1977) ................................................................ 34

*United States v. Holliday,*
   70 U.S. (3 Wall.) 407 (1866) ................................................. 16

*United States v. Kagama,*
   118 U.S. 375 (1886) ................................................................ 16

*United States v. Manzi,*
   276 U.S. 463 (1928) ................................................................ 30

*United States v. Rahimi,*
   602 U.S. 680 (2024) ........................................................... 34, 39

*United States v. Texas,*
   599 U.S. 670 (2023) ............................................................. 2, 7

*United States v. Wong Kim Ark,*
   169 U.S. 649 (1898) ...................................................... *passim*

*Vance v. Terrazas,*
   444 U.S. 252 (1980) ................................................................ 12

*Verlinden BV v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) ................................................................ 16

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................. 9, 10

*Wilkins v. United States,*
   598 U.S. 152 (2023) ................................................................ 15

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ...................................................................... 6

*Winton v. Amos,*
   255 U.S. 373 (1921) ................................................................ 15

## **Constitution**

U.S. Const. Art. I, § 8, Cl. 4 .................................................... 28

U.S. Const. amend. XIV, § 1 ........................................... *passim*

## **Statutes**

5 U.S.C. § 704 ............................................................................ 11

8 U.S.C. § 1185(d)(5)(C) ........................................................................... 14

8 U.S.C. § 1225(b)(3) ................................................................................. 14

8 U.S.C. § 1226(f) ...................................................................................... 14

8 U.S.C. § 1231(a)(2)(B) ........................................................................... 14

8 U.S.C. § 1252(b)(5) ........................................................................... 12, 37

8 U.S.C. § 1253(e) ...................................................................................... 14

8 U.S.C. § 1401(a) .......................................................................... 14, 15, 30

8 U.S.C. § 1503 ..................................................................................... 12, 37

28 U.S.C. § 2201 ........................................................................................ 12

Civil Rights Act of 1866,
    14 Stat. 27 ........................................................................................ 17, 23

Laken Riley Act,
    Pub. L. No. 119-1, 139 Stat. 3 (2025) ................................................ 13-14

Nationality Act of 1940,
    ch. 876, § 201(a), 54 Stat. 1137 ............................................................ 17

Naturalization Act of 1790,
    ch. 3, 1 Stat. 103 ................................................................................... 30

## **Rules**

Fed. R. Civ. P. 54(b)(2) .............................................................................. 40

Fed. R. Civ. P. 65(a)(2) .............................................................................. 40

## **Legislative Materials**

2 Cong. Rec. 3279 (1874) .......................................................................... 26

Cong. Globe, 39th Cong., 1st Sess. 572 (1866) ........................................ 18

Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) ...................................... 23

Cong. Globe, 39th Cong., 1st Sess. 1262 (1866) ...................................... 18

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866) ...................................... 24

Cong. Globe, 39th Cong., 1st Sess. 2769 (1866) ...................................... 24

Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) .................................................. 24

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) .................................................. 18

Cong. Globe, 39th Cong., 1st Sess. 2894 (1866) .................................................. 18

Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) ................................................... 34

Cong. Globe, 40th Cong., 2nd Sess. 967 (1868) ................................................... 34

Cong. Globe, 40th Cong., 2nd Sess. 1130-31 (1868) ............................................ 34

## Administrative & Executive Materials

Exec. Order No. 14159, *Protecting the American People Against Invasion* (Jan. 20, 2025) ... 3, 27

Exec. Order No. 14160, *Protecting the Meaning and Value of American Citizenship* (Jan. 20, 2025).................................................................................................... 1, 4, 5, 36

Exec. Order No. 14165, *Securing Our Borders* (Jan. 20, 2025) .................................... 3

Proclamation No. 10866, *Declaring a National Emergency at the Southern Border of the United States* (Jan. 20, 2025) ............................................................................................ 3

## Other Authorities

2 *A Digest of the International Law of the United States* (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*) .............................................................................. 25, 26, 27

2 James Kent, *Commentaries on American Law* (6th ed. 1848) .................................... 22

Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) .................................... 25

Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019) .................................... 4

Boyd Winchester, *Citizenship in its International Relation*, 31 Am. L. Rev. 504 (1897) ......................................................................... 25

Emmerich de Vattel, *The Law of Nations* (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.)........................................................................... 22, 29

Hannis Taylor, *A Treatise on International Public Law* (1901) .................................... 33

Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* (1901) ........................................ 33

Henry Campbell Black, *Handbook of American Constitutional Law* (1895)............................ 25

John Westlake, *International Law* (1904) ............................................................. 32-33

Joseph Story, *Commentaries on the Conflict of Laws* (1834) ....................................... 23

Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*,
    101 Va. L. Rev. 455 (2015) ......................................................................... 26

Letter from Sen. Lyman Trumbull to President Andrew Johnson, (*in* Andrew Johnson Papers,
    Reel 45, Manuscript Div., Library of Congress) ...................................................... 23

M.A. Lesser, *Citizenship and Franchise*,
    4 Colum. L. Times 145 (1891) ............................................................... 18, 25

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of
Citizenship*,
    119 Yale L. J. 1351 (2010) ................................................................... 23, 24

Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the
Citizenship Clause of the Fourteenth Amendment*,
    32 St. Louis U. L. Rev. 329 (2012) ................................................................. 29

Samuel F. Miller, *Lectures on the Constitution of the United States* at 279 (1891) .................... 25

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown,
Assistant Attorney General* (1910) ...................................................................... 32

*The Significance of Parental Domicile Under the Citizenship Clause*,
    101 Va. L. Rev. 455 (2015) ......................................................................... 26

William Edward Hall, *A Treatise on International Law* (4th ed. 1895) ............................... 21, 25

PA196

### INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. On January 20, 2025, President Donald J. Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States. *See* Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship (Citizenship EO or EO). That EO recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States or the children of aliens whose presence is lawful but temporary. Prior misimpressions of the Citizenship Clause have created a perverse incentive for illegal immigration that has negatively impacted this country's sovereignty, national security, and economic stability. But the generation that enacted the Fourteenth Amendment did not fate the United States to such a reality. Instead, text, history, and precedent support what common sense compels: the Constitution does not harbor a windfall clause granting American citizenship to, *inter alia*, the children of those who have circumvented (or outright defied) federal immigration laws.

The Plaintiffs—in one case, a group of states and other governmental entities, and in the other, an individual and two membership organizations—filed suit within hours of the EO's issuance. But their dramatic assertions about the supposed illegality of the EO cannot substitute for a showing that Plaintiffs are entitled to extraordinary emergency relief. And as to each factor of that analysis, Plaintiffs have failed to carry their burden.

To start, the states lack standing. While they largely concede that the EO does not operate directly upon them, they nonetheless complain that the EO will force them to spend more money on public benefits. But that is the exact sort of incidental expenditure the Supreme Court has held

insufficient. Indeed, just two years ago, the Supreme Court rejected Texas's argument for standing based on expenditures on public programs in response to a federal policy that increased the number of illegal aliens in the state. *See United States v. Texas*, 599 U.S. 670 (2023). Similarly, the states here cannot satisfy Article III by claiming that they will choose to spend more money on public programs in response to a federal policy that will result in more individuals in their states being classified as illegal aliens. Moreover, all Plaintiffs lack a cause of action—they cannot proceed under the Administrative Procedure Act (APA), nor can they bring these suits under the Citizenship Clause or the Immigration and Nationality Act (INA).

Plaintiffs are also unlikely to succeed on the merits. As was apparent from the time of its enactment, the Citizenship Clause's use of the phrase "subject to the jurisdiction" of the United States contemplates something more than being subject to this country's regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, that they have a "direct and immediate allegiance" to this country, unqualified by an allegiance to any other foreign power. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for diplomats or occupying enemies, it similarly does not hold for foreigners admitted temporarily or individuals here illegally. "[N]o one can become a citizen of a nation without its consent." *Id.* at 103. And if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children.

Although Plaintiffs contend that the Citizenship EO upends well-settled law, it is their maximalist reading which runs headlong into existing law. Not only is it inconsistent with the Supreme Court's holding in *Elk* that the children of Tribal Indians did not fall within the Citizenship Clause, even though they were subject to the regulatory power of the United States, *id*. at 101-02, but it would render the Civil Rights Act of 1866 (which defined citizenship to cover

2

those born in the United States, not "subject to any foreign power") unconstitutional just two years after it was passed. But the Citizenship Clause was an effort to *constitutionalize* the Civil Rights Act. Plaintiffs also rely heavily on the Supreme Court's decision in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). The Court, however, was careful to cabin its actual holding to the children of those with a "permanent domicile and residence in the United States," *id.* at 652-53, and "[b]reath spent repeating dicta does not infuse it with life." *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 300 (1995). The Court in *Wong Kim Ark* did not suggest that it was overturning *Elk* or jeopardizing the 1866 Civil Rights Act, and reading that decision to leave open the question presented here is consistent with contemporary accounts, prior practices of the political branches, and Supreme Court decisions in the years following *Wong Kim Ark*.

Finally, the balance of the equities does not favor injunctive relief. The Court should deny the pending preliminary injunction motions in both cases.

## BACKGROUND

### I.     The Executive Order

The Citizenship EO is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See, e.g.*, Exec. Order No. 14165, Securing Our Borders (Jan. 20, 2025); Proclamation No. 10866, Declaring a National Emergency at the Southern Border of the United States (Jan. 20, 2025); Exec. Order No. 14159, Protecting the American People Against Invasion (Jan. 20, 2025) (Invasion EO). As the President has recognized, individuals unlawfully in this country "present significant threats to national security and public safety," Invasion EO § 1, and the severity of these problems warrants a full panoply of immigration measures. Some of these threats are related to the United States' prior, erroneous policy of recognizing near-universal birthright citizenship. For instance,

3

"the nation's current policy of universally granting birthright citizenship to individuals who lack any meaningful ties to the United States provides substantial opportunities for abuse by motivated enemies."  Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019).

The Citizenship EO seeks to correct the Executive Branch's prior misreading of the Citizenship Clause.  It recognizes that the Constitution and the INA provide for citizenship for all persons who are born in the United States and subject to the jurisdiction thereof, and identifies two circumstances in which a person born in the United States is not automatically extended the privilege of United States citizenship:

> (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

 Citizenship EO § 1.

Section 2(a) of the EO directs the Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons born in the United States under the conditions described in section 1, and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons.  The EO specifies, however, that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," or February 19.  Citizenship EO § 2(b).  The Citizenship EO makes clear that its provisions do not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship."  *Id*. § 2(c).

As for enforcement, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take "all appropriate

measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and not to "act, or forbear from acting, in any manner inconsistent with this order." *Id*. § 3(a). It further directs the heads of all federal agencies to issue public guidance within 30 days (by February 19) "regarding this order's implementation with respect to their operations and activities." *Id*. § 3(b).

## II.   This Litigation

On January 20, 2025, the same day the EO issued, Lawyers for Civil Rights initiated a lawsuit on behalf of one individual (O. Doe, an expectant mother with Temporary Protected Status) and two membership organizations (the Brazilian Worker Center and La Colaborativa) (the private plaintiffs or *Doe* plaintiffs). *See* Compl. ¶¶ 13-15, *Doe, et al. v. Trump, et al.*, No. 1:25-cv-10135 ("*Doe*"), ECF No. 1. Both organizations allege that they have "numerous" members who "are undocumented or in the United States on temporary statuses and who are either pregnant or plan to grow their families in the future." *Id*. ¶¶ 14-15. The complaint asserts claims under the Citizenship Clause (Count I), the Equal Protection Clause (Count II), and the INA (Count III). It also asserts an APA claim challenging "arbitrary and capricious" agency actions (Count IV) and a claim pursuant to the Declaratory Judgment Act (Count V). The *Doe* plaintiffs moved for a preliminary injunction on January 23, *see* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., *Doe* ECF No. 11 ("*Doe* Mem."), which is expressly limited to "their claims under the Citizenship Clause, 8 U.S.C. § 1401, and the APA" (Counts I, III, and IV). *Id*. at 2 n.2.

On January 21, 2025, 18 states (plus the District of Columbia and the City and County of San Francisco) (the state plaintiffs or the states), also filed suit against the EO. *See* Compl., *New*

*Jersey, et al. v. Trump, et al.*, No. 1:25-cv-10139, ECF No. 1.[1]  Claiming harm to "their residents," *id*. ¶ 4, and the loss of federal reimbursement for services the states voluntarily choose to provide, *id*. ¶ 5, the states assert claims via the Citizenship Clause (Count 1), the separation of powers (Count 2), the INA (Count 3), and the APA, to the extent the EO "directs federal agencies . . . to take actions that are contrary to the constitution and federal statutes," *id*. (Count 4, ¶ 16).  The states moved for a preliminary injunction the same day.  *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., *New Jersey* ECF No. 5 ("*New Jersey* Mem.").  On January 24, the Court entered an order relating the *Doe* and *New Jersey* cases, setting a hearing for both cases on February 7, and authorizing Defendants to file this consolidated brief opposing both motions.  *New Jersey* ECF No. 71.

**STANDARD OF REVIEW**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that the injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

---

[1] The Citizenship EO has been challenged in several other lawsuits.  On January 23, a district judge in the Western District of Washington issued a temporary restraining order "fully enjoining the Defendants in that case "and all their respective officers, agents, servants, employees, and attorneys," from enforcing or implementing Section 2(a), Section 3(a), or Section 3(b) of the Citizenship EO.  *See* TRO, *Washington v. Trump*, No. 2:25-cv-00127-JCC (Jan. 23, 2025), ECF No. 43.  That TRO remains in effect "pending further orders from th[e] Court," *id*., and the court has scheduled a preliminary injunction hearing for February 6.  *See Washington*, ECF No. 44.

## ARGUMENT

### I.    The State Plaintiffs Lack Standing.

The state plaintiffs' preliminary injunction motion should be denied at the outset because the states have not established that they are likely to meet Article III standing requirements.  First, the direct harms that they allege to have suffered as states are insufficient to confer Article III standing.  And second, the state plaintiffs lack third-party standing to assert Citizenship Clause claims on behalf of their residents.

1.    To establish Article III standing, the states must show that they have suffered a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  The states attempt to satisfy that requirement primarily by asserting incidental "proprietary harms" and "fiscal injuries." *New Jersey* Mem. at 8.  Those harms—which boil down to the contention that states will have to "assume a greater fiscal responsibility for providing critical services and assistance" to residents who are classified as aliens under the EO, *id.* at 4—do not satisfy Article III.

As an initial matter, the Supreme Court rejected those types of incidental economic harms as a basis for standing in *United States v. Texas*.  There, Texas and Louisiana challenged federal actions that, in their view, increased the number of noncitizens in their states, which imposed various costs on the states (*e.g.*, costs from continuing to "supply social services . . . to noncitizens").  *See Texas*, 599 U.S. at 674.  Those costs were insufficient for standing:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated. In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

*Id.* at 680 n.3 (citations omitted).

7

That holding forecloses the state plaintiffs' standing here.  Just as in *Texas*, where it was insufficient for the challenger states to identify monetary costs stemming from the presence of aliens, these states cannot rely on social services expenditures to challenge the federal government's regulation of others.  The Citizenship EO simply regulates how the federal government will approach certain individuals' citizenship status.  The state (or municipality) where such individuals live has no legally cognizable interest in the recognition of citizenship by the federal government of a particular individual—let alone economic benefits or burdens that are wholly collateral to citizenship status.  Whatever potential downstream effects might arise for state programs in response cannot establish standing.  *See E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding that states lack "a significant protectable interest in minimizing their expenditures" from immigration-related policy changes because "such incidental effects are … attenuated and speculative.").

Accepting the states' theory of injury here—that states suffer Article III injury whenever a federal policy allegedly results in an increase in state expenditures or loss in state revenues—would eliminate any limits on state challenges to federal policies.  *See Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?").  Indeed, the states' claimed interest in future fees under their contract with the Social Security Administration (SSA), *New Jersey* Mem. at 6, highlights the breadth of their theory—asserting that a discrete contract with SSA grants them Article III license to challenge any federal action that conceivably lowers the birthrate within their states.

Moreover, the states' asserted injuries are also not traceable to the Citizenship EO.  Nothing

8

in the EO requires the states to provide "low-cost health insurance," "certain educational services," or "child welfare services," *New Jersey* Mem. at 4, to aliens.  Nor have the states identified any other source of federal law that compels them to provide the referenced services—indeed, as they recognize, federal law makes clear that if states choose to offer otherwise reimbursable services and benefits to individuals who are not citizens, the federal government will not provide reimbursement.  *See, e.g.*, *id*.  Because the states have *voluntarily* chosen to provide such benefits, the costs they incur to do so are the result of an independent choice made by the states' legislatures and not attributable to the Citizenship EO itself.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (holding that "respondents' self-inflicted injuries" were insufficient for Article III standing, because they "are not fairly traceable" to the challenged government action); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand.").

The state plaintiffs likewise cannot rely on "administrative and operational burdens" that they claim will result from the Citizenship EO, *New Jersey* Mem. at 7, which does not require states to change their systems or impose any penalty for failing to do so.  Thus, these claimed harms are not attributable to the federal policy itself.  And again, the notion that states can assert standing based on putative harms from changing their systems to adapt to new federal policies would create automatic standing to challenge every new federal policy.  That is not the law, for states or other organizations.  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95 (2024).

2.  "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement," "the plaintiff generally must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citation omitted).  A plaintiff "cannot rest his claim to

9

relief on the legal rights or interests of third parties." *Id.* Thus, constitutional claims generally may be brought only by "one at whom the constitutional protection is aimed." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted).

Relatedly, the Supreme Court has foreclosed states from suing the federal government in *parens patriae* actions to protect their citizens. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) ("[I]t is no part of [a state's] duty or power to enforce [its people's] rights in respect of their relations with the federal government."); *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) ("States do not have standing as *parens patriae* to bring an action against the Federal Government." (internal quotation marks & citation omitted)). The same principles apply to entities like San Francisco, which "derive their existence from the state and function as political subdivisions of the state." *Town of Milton v. FAA*, 87 F.4th 91, 96 (1st Cir. 2023) (citation omitted).

Applying those principles, the Supreme Court has held that states lack standing to bring claims under Section 1 of the Fourteenth Amendment against the federal government. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Court held that South Carolina lacked standing to challenge a federal statute under the Due Process Clause. *See id.* at 323-324. The "States of the Union" have no rights of their own under that clause; "[n]or does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government." *Id.* at 323-24. Similarly, in *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Court held that Texas lacked standing to challenge a federal statute under the Equal Protection Clause. Texas "ha[d] no equal protection rights of its own," and Texas could not "assert equal protection claims on behalf of its citizens because 'a State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* at 294-295 (brackets and citation omitted).

Those precedents control this case. Just as South Carolina and Texas could not sue the

federal government under the Fourteenth Amendment's Due Process and Equal Protection Clauses, the state plaintiffs here may not sue the federal government under the Citizenship Clause. Neither the states, nor the City and County of San Francisco, which is "organized and existing under and by virtue of the law of the State of California," *New Jersey* Compl. ¶ 66, "ha[ve] [any] [citizenship] rights of their own," and given established "limits on *parens patriae* standing," they also may not "assert [Citizenship Clause] claims on behalf of [their residents]." *Brackeen*, 599 U.S. at 294-95 & n.11.

## II.      Plaintiffs Lack A Valid Cause of Action.

The Court should also deny both motions for the threshold reason that neither group of Plaintiffs are likely to show that they have a valid cause of action.  Plaintiffs cannot proceed under the APA because they fail to identify any final agency action and because the INA provides an adequate remedy.  And Plaintiffs cannot assert the claims at issue in this lawsuit directly under the Citizenship Clause or the INA.

### A.      Plaintiffs' APA Claims Fail.

Both sets of Plaintiffs purport to assert APA challenges to agency action implementing the EO.  But the APA only authorizes judicial review over "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Neither requirement is met here.

*First*, Plaintiffs do not even attempt to "identify the final agency action being challenged." *Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 30 (D.D.C. 2011).  They do not identify *any* agency action that has been taken, much less final agency action that is reviewable under the APA.  The EO does not qualify as an agency action because the President is not an "agency" within the meaning of the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  Until such time as an agency named in the complaints takes action by determining rights

11

or obligations, or otherwise causes legal consequences, *see, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016), Plaintiffs' APA claims are not cognizable.

*Second*, the INA provides an adequate alternate remedy for review of citizenship determinations. *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) ("[T]he Supreme Court interpreted [5 U.S.C.] § 704 as precluding APA review where Congress has otherwise provided a 'special and adequate review procedure.'" (citation omitted)). Pursuant to the INA's comprehensive statutory framework for judicial review, disputes regarding the citizenship of an individual within the United States are resolved by the individual filing an action for declaratory relief once he is denied a right or privilege as a U.S. national. 8 U.S.C. § 1503(a). Thus, "[i]f any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States," then that person may institute an action under 8 U.S.C. § 1503(a), in conjunction with 28 U.S.C. § 2201, for a declaratory judgment that he is a U.S. national. *See id.* § 1503(a).[2] Under section 1503, district courts conduct *de novo* proceedings as to the person's nationality status. *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980); *Richards v. Sec'y of State*, 752 F.2d 1413, 1417 (9th Cir. 1985).

Because "Congress intended § 1503(a) to be the exclusive remedy for a person within the United States to seek a declaration of U.S. nationality following an agency or department's denial of a privilege or right of citizenship upon the ground that the person is not a U.S. national," *Cambranis v. Blinken*, 994 F.3d 457, 466 (5th Cir. 2021), courts have consistently concluded that

---

[2] If an individual is placed in removal proceedings, Section 1503 is unavailable and the individual can raise the issue of citizenship in those proceedings. 8 U.S.C. § 1252(b)(5) (if an alien appeals a removal order to a circuit court, that court, upon finding a genuine issue of material fact as to U.S. citizenship, transfers the proceeding to the district court for an evidentiary hearing).

section 1503(a) offers an adequate alternative remedy to—and thus precludes—APA review. *See, e.g.*, *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 326-27 (D.D.C. 2018); *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 455 (D. Mass. 2021); *Ortega-Morales v. Lynch*, 168 F. Supp. 3d 1228, 1233-34 (D. Ariz. 2016).

### B.   Plaintiffs Lack a Cause of Action to Assert Their Constitutional and INA Claims.

Both groups of Plaintiffs primarily assert claims under the Fourteenth Amendment's Citizenship Clause. As discussed above, the state plaintiffs lack standing to assert such claims. But even setting that aside, it is well established that the Constitution does not generally provide a cause of action to pursue affirmative relief. *See, e.g.*, *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("[C]onstitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose."). Neither group of Plaintiffs identifies any "independent cause of action"[3] that would enable them to enforce the Citizenship Clause. *Id*. at 291.

As for the INA claims, Congress provided a specific remedy for individuals within the United States to seek judicial resolution of disputes concerning their citizenship. *See supra* Sec. II.A. The exclusive remedy for an individual in the U.S. who claims to be a U.S. citizen denied a right or privilege of citizenship is to institute an action for declaratory relief under section 1503(a). The INA does not provide for states or organizations to sue under section 1503(a), either on their own account or on behalf of residents or members—a particularly telling omission, given that some provisions of the INA—as amended by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3

---

[3] As discussed above, Plaintiffs assert separate claims under the APA. But they do not allege that their constitutional or INA claims are pursuant to the APA cause of action, and in any event Plaintiffs have failed to assert a proper APA claim based on the defects described above.

(2025)—expressly authorize states to bring enforcement actions.  *See* 8 U.S.C. §§ 1185(d)(5)(C), 1225(b)(3), 1226(f), 1231(a)(2)(B), 1253(e).  And even with respect to an individual like Ms. Doe, the statute requires any dispute over a citizenship determination to be resolved in individual declaratory judgment proceedings once a right or privilege is actually denied.  It does not permit Ms. Doe to file a facial challenge seeking to permanently enjoin enforcement of an executive order nationwide before any right has been denied to her.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." (citation omitted)).

## III.    Plaintiffs Are Not Likely To Succeed On the Merits.

The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  And the INA grants U.S. citizenship to any "person born in the United States, and subject to the jurisdiction thereof."  8 U.S.C. § 1401(a).  Plaintiffs contend that the EO violates both the Citizenship Clause and the INA, but they are mistaken.[4]

To obtain U.S. citizenship under the Citizenship Clause, a person must be: (1) "born or naturalized in the United States" and (2) "subject to the jurisdiction thereof."  U.S. Const. amend XIV, § 1.  The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not subject to the jurisdiction of the United States: children of foreign sovereigns or their diplomats, children of alien

---

[4] The *Doe* plaintiffs recognize that their statutory claim rises and falls with their constitutional claim, *see Doe* Mem. at 10, and while the states contend that the Citizenship EO "independently violate[s]" the INA, *New Jersey* Mem. at 14, they do not meaningfully explain how the two are distinct—nor do they identify any legal authority suggesting any intentional delta between the two sources of law.  Rather, in using the exact text of the Citizenship Clause in the INA, Congress imported its exact scope.  Because the two provisions are coterminous, Defendants focus here on the constitutional provision.

enemies in hostile occupation, children born on foreign public ships, and certain children of members of Indian tribes.[5]  *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898).  The Citizenship EO recognizes an additional category of persons not subject to the jurisdiction of the United States: children born in the United States of foreign parents whose presence is either unlawful or lawful but temporary.

### A.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.

"Jurisdiction . . . is a word of many, too many, meanings."  *Wilkins v. United States*, 598 U.S. 152, 156 (2023) (citation omitted).  Plaintiffs equate "jurisdiction" with something akin to regulatory power, arguing that anyone "to whom United States law applies" is subject to the jurisdiction of the United States.  *Doe* Mem. at 7; *see also New Jersey* Mem. at 9-10.  But that interpretation is incorrect.  It conflicts with both Supreme Court precedent and ample evidence as to the provision's original public meaning.

1.    Most importantly, Plaintiffs' understanding of the term "jurisdiction" conflicts with Supreme Court precedents identifying the categories of persons who are not subject to the United States' jurisdiction within the meaning of the Citizenship Clause.  For example, the Supreme Court has held that children of members of Indian tribes, "owing immediate allegiance" to those tribes, do not acquire citizenship by birth in the United States.  *Elk*, 112 U.S. at 102; *see Wong Kim Ark*, 169 U.S. at 680-82.  Yet members of Indian tribes and their children are plainly subject to the United States' regulatory power.  "It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations."  *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see*

---

[5] Although the Citizenship Clause has always been understood to exclude certain children of members of Indian tribes from a constitutional right to citizenship by birth, Congress has by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe."  8 U.S.C. § 1401(b).

*Brackeen*, 599 U.S. at 272-73. For example, Congress may regulate Indian commercial activities, see *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866); Indian property, *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); and Indian adoptions, see *Brackeen*, 599 U.S. at 276-280. And the United States may punish Indians for crimes. *See United States v. Kagama*, 118 U.S. 375, 379-385 (1886). If, as Plaintiffs argue, "subject to the jurisdiction thereof" means subject to U.S. law, this longstanding exception for Indians would be inexplicable.

In fact, Plaintiffs' reading cannot even explain the exception to birthright citizenship for "children of foreign sovereigns or their ministers." *Wong Kim Ark*, 169 U.S. at 693. Although foreign leaders and diplomats have traditionally enjoyed immunity as a matter of common law, the Constitution allows Congress to abrogate that immunity or to make exceptions to it. *See Verlinden BV v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). And to the extent Plaintiffs argue that children of foreign leaders or diplomats are not subject to the United States' jurisdiction because the U.S. *chooses* to extend immunity to them, their theory would allow Congress to turn the Citizenship Clause on and off at will by extending or retracting immunity.

Against the surplusage canon, on Plaintiffs' reading, the phrase "subject to the jurisdiction thereof" adds nothing to the phrase "born . . . in the United States." Because the United States is sovereign over its territory, everyone who is born (and so present) in the United States would necessarily be subject, at least to some extent, to the United States' regulatory authority. *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). But "[i]t cannot be presumed that any clause in the [C]onstitution is intended to be without effect; and therefore such a construction is inadmissible." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

2.      Instead of equating "jurisdiction" with regulatory authority, the Supreme Court has held that a person is "subject to the jurisdiction" of the United States under the Citizenship Clause

16

if he is born "in the allegiance and under the protection of the country." *Wong Kim Ark*, 169 U.S. at 693. That allegiance to the United States, the Court has further held, must be "direct," "immediate," and "complete," unqualified by "allegiance to any alien power." *Elk*, 112 U.S. at 101-02. In other words, a person is subject to the jurisdiction of the United States within the meaning of the Clause only if he is *not* subject to the jurisdiction of a foreign power, and the "nation" has "consent[ed]" to him becoming part of its own "jurisdiction." *Elk*, 112 U.S. at 102-03; *see also Schooner Exchange*, 11 U.S. at 136 (explaining a nation's "jurisdiction … must be traced up to the consent of the nation itself").

That reading of the Citizenship Clause reflects its statutory background. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as "the initial blueprint" for the Amendment, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). The Act stated, as relevant here, that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act § 1, 14 Stat. 27 (1866) (emphasis added). There is no reason to read the phrase "subject to the jurisdiction thereof" in the Amendment as broader than the phrase "not subject to any foreign power" in the Act—in no small part, because doing so would render the Civil Rights Act unconstitutional. And as telling, the Act's citizenship language remained on the books until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138— suggesting that Congress regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction" requirement. The Act thus confirms that, to be subject to the jurisdiction of the United States under the Clause, a person must owe "no

17

allegiance to any alien power." *Elk*, 112 U.S. at 101.

Debates on the Act and the Amendment show that members of Congress shared that understanding.  During debates on the Act, Senator Lyman Trumbull explained that the purpose of the Act was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States."  Cong. Globe, 39th Cong., 1st Sess. 572 (1866).  And Representative John Broomall explained that the freed slaves were properly regarded as U.S. citizens by birth because they owed no allegiance to any foreign sovereign.  *See id*. at 1262.  Similarly, during debates on the Amendment, Senator Trumbull explained: "What do we mean by 'subject to the jurisdiction of the United States?'  Not owing allegiance to anybody else.  That is what it means. . . . It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'"  *Id.* at 2893.  Trumbull went on to equate "being subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894.  And Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power . . . shall be considered as citizens."  *Id.* at 2893.

The full text of the Citizenship Clause reinforces that reading of the Clause's jurisdictional element.  The Clause provides that persons born in the United States and subject to its jurisdiction "are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  The Clause uses the term "reside[nce]" synonymously with "domicile."  *See Robertson v. Cease*, 97 U.S. 646, 650 (1878) (explaining that state citizenship requires "a fixed permanent domicile in that State").  And then as now, domicile was understood to have two components— presence that is both permanent and lawful.  *See* M.A. Lesser, *Citizenship and Franchise*, 4 Colum. L. Times 145, 146 n.3 (1891) (explaining the term "'resident' … 'is applied exclusively to one

18

who lives in a place and has a fixed *and legal* settlement'" (citations omitted) (emphasis added)). The Clause thus confirms that citizenship flows from lawful domicile.

Finally, as a decisive cross-check, the government's reading, unlike Plaintiffs' interpretation, is the only one that fully explains the Supreme Court's precedents on citizenship by birth in the United States. It was "never doubted" that "children born of citizen parents" owe allegiance to the United States and are subject to its jurisdiction. *Minor v. Happersett*, 88 U.S. 162, 167 (1874). In *Wong Kim Ark*, the Court held that a child born in the United States "of parents of Chinese descent, who at the time of his birth [were] subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity" by China are likewise subject to the jurisdiction of the United States. 169 U.S. at 653. The Court explained that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance . . . of the United States." *Id.* at 693. By contrast, children of diplomats, children of certain alien enemies, and children born on foreign public ships are not subject to the jurisdiction of the United States because they all owe allegiance to foreign sovereigns under background principles of common law. *See id.* at 655. And the Court has held that certain children of members of Indian tribes are not subject to U.S. jurisdiction in the necessary sense because they "owe[] immediate allegiance to their several tribes." *Elk*, 112 U.S. at 99.

**B.** **Children Born of Unlawfully Present Aliens or Lawful But Temporary Visitors Fall Outside the Citizenship Clause.**

1.    To determine which sovereign may properly claim a person's allegiance, the Supreme Court has looked to the background principles of the common law and the law of nations, as understood in the United States at the time of the ratification of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S. at 653-55. Under those principles, a child born of foreign parents

19

other than lawful permanent residents is domiciled in, and owes a measure of allegiance to, his parents' home country. As a result, such a child is not subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

Under the common law, a person owes a form of "allegiance" to the country in which he is "domiciled." *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 155 (1872); see *Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country . . . owes allegiance to the country."). A child's domicile, and thus his allegiance, "follow[s] the independent domicile of [his] parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *see Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents.").

Temporary visitors and unlawfully present aliens, however, are not domiciled here but in foreign countries. As touched on above, "[i]n general, the domicile of an individual is his true, fixed and permanent home." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Temporary visitors to the United States, by definition, retain permanent homes in foreign countries. And illegal aliens, by definition, have no right even to be present in the United States, much less a right to make *lawful* residence here. Instead, as a matter of law, illegal aliens formally retain their foreign domiciles, because they have not yet been accepted to reside anywhere else. *See, e.g.*, *Elkins v. Moreno*, 435 U.S. 647, 665-66 (1978) (recognizing that federal immigration law restricts the ability of foreigners to establish domiciles in the United States). And if a temporary visitor or illegal alien domiciled in a foreign country has a child with another temporary visitor or illegal alien while in the United States, the child's domicile also lies in the foreign country, and the child owes allegiance to that country. That "allegiance to [an] alien power" precludes the child from being "completely subject" to the United States' jurisdiction, as the Fourteenth Amendment

20

requires. *Elk*, 112 U.S. at 101-02.

Indeed, the Citizenship EO follows directly from Supreme Court precedent recognizing that distinction, and the established exception to birthright citizenship for certain "children of members of the Indian tribes." *Wong Kim Ark*, 169 U.S. at 682. Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (citation omitted). The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Yet the Court has held that "an Indian, born a member of one of the Indian tribes," has no constitutional birthright to U.S. citizenship given his "immediate allegiance" to his tribe. *Elk*, 112 U.S. at 99, 101-02; *see Wong Kim Ark*, 169 U.S. at 680-682.

Illegal aliens and temporary visitors have far weaker connections to the United States than do members of Indian tribes. "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life." *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring). If the United States' link with Indian tribes does not suffice as a constitutional matter for birthright citizenship, its weaker link with illegal aliens and temporary visitors even more obviously does not do so. *See, e.g.*, William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

2.      The Fourteenth Amendment's historical background provides additional support for the conclusion that, while children born here of U.S. citizens and permanent residents are entitled to U.S. citizenship by birth, children born of parents whose presence is either unlawful or lawful but temporary are not. Under the common law, "[t]wo things usually concur to create

21

citizenship; [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth . . . within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (citation omitted); *see* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848) ("To create [citizenship] by birth, the party must be born, not only within the territory, but within the ligeance of the government"). The phrase "born . . . in the United States," U.S. Const. amend. XIV, § 1, codifies the traditional requirement of "birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. Amend. XIV, § 1, codifies the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

 Drawing from the same tradition, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)— explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those born in the country, of parents who are citizens." Emmerich de Vattel, *The Law of Nations* § 212, at 101 (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants" of that country, whom Vattel regarded as "a kind of citize[n]." *Id.* § 213, at 102 (emphasis omitted); *see also id.* § 215, at 102. According to Vattel, citizenship does not extend, however, to children of those foreigners who lack "the right of perpetual residence" in the country. *Id.* § 213, at 102. Such persons would instead owe allegiance to their parents' home countries, in accord with the principle that "children follow the condition of their fathers." *Id.* § 215, at 102.

Justice Story also understood that birthright citizenship required more than mere physical presence. He explained in a judicial opinion later quoted in *Wong Kim Ark* that "children of even aliens born in a country, *while the parents are resident there*," "are subjects by birth." *Inglis v.*

22

*Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (emphasis added) (quoted in *Wong*

*Kim Ark*, 169 U.S. at 660).  He also wrote in a treatise:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country.  A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

3.     Congressional debates over the Civil Rights Act and Fourteenth Amendment also confirm that children born in the United States to non-resident aliens lack a right to U.S. citizenship because they are not subject to U.S. jurisdiction.  For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen."  Cong. Globe, 39th Cong., 1st Sess. 1117 (1866).  But he recognized "except[ions]" to that general rule for "children born on our soil to *temporary sojourners* or representatives of foreign Governments."  *Id.* (emphasis added).

When Congress was considering the Civil Rights Act, Senator Trumbull, "who wrote [the Act's] citizenship language and managed the Act in the Senate, wrote a letter to President Andrew Johnson summarizing the bill."  Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010) (footnotes omitted).  The Act, as noted above, provided that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens."  Civil Rights Act § 1, 14 Stat. 27 (emphasis added).  Senator Trumbull summarized that provision: "The Bill declares 'all persons' *born of parents domiciled in the United States*, except untaxed Indians, to be citizens of the United States."  Shawhan, *supra*, at 1352-53 (emphasis added) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson, (*in* Andrew Johnson Papers, Reel 45, Manuscript

23

Div., Library of Congress)).  "Trumbull thus understood the Act's 'not subject to any foreign [p]ower' requirement as equivalent to 'child of parents domiciled in the United States.'"  *Id.* at 1353 (footnote omitted).

During a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the additional qualification of being "subject to the jurisdiction").  Cong. Globe, 39th Cong., 1st Sess. 2768 (1866).  One of his colleagues objected that "persons may be born in the United States and yet not be citizens," giving the example of "a person [who] is born here of parents from abroad temporarily in this country."  *Id.* at 2769.  Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case."  *Id.* at 2768-69.  That exchange concludes that "a person [who] is born here of parents from abroad temporarily in this country" is not subject to the jurisdiction of the United States, *id.* at 2769, and is accordingly not constitutionally entitled to citizenship by birth.  Likewise, Senator Howard stated that the Clause "of course" would not include the children of "foreigners" or "aliens."  *Id.* at 2890.

4.      Contemporary understanding following ratification accords with that reading of the Fourteenth Amendment.  Perhaps most telling, right on the heels of the Citizenship Clause, the Supreme Court described its scope as such: "The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, *and citizens or subjects of foreign States* born within the United States."  *The Slaughterhouse Cases*, 83 U.S. 36, 73 (1873) (emphasis added).  That is wholly consistent with the Citizenship EO.

Contemporary commentators expressed similar views:

24

- "Indians are held not within this clause, not being 'subject to the jurisdiction of the United States.' The same reasoning, it may be argued, would exclude children born in the United States to foreigners here on transient residence, such children not being by the law of nations 'subject to the jurisdiction of the United States.'" 2 *A Digest of International Law of the United States* § 183, at 393-394 (Francis Wharton ed., 2d ed. 1887) (*Wharton's Digest*) (citation omitted).

- "The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States." Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881).

- "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such a child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel F. Miller, *Lectures on the Constitution of the United States* at 279 (1891).

- "Indians are no more 'born within the United States *and* subject to the jurisdiction thereof,' within the meaning of the XIVth amendment, than the children of foreign subjects, born while the latter transiently sojourn here." M.A. Lesser, *Citizenship and Franchise*, 4 Colum. L. Times 145, 146 (1891).

- "[I]f a stranger or traveler passing through the country, or temporarily residing here, . . . has a child born here, who goes out of the country with his father, such child is not a citizen of the United States, because he was not subject to its jurisdiction. But the children, born within the United States, of permanently resident aliens, . . . are citizens." Henry Campbell Black, *Handbook of American Constitutional Law* 458-459 (1895) (footnote omitted).

- "In the United States it would seem that the children of foreigners in transient residence are not citizens." Hall, *supra*, 236-237.

- "[T]he requirement of personal subjection to the 'jurisdiction thereof' . . . excludes Indians, the children of foreign diplomatic representatives born within the limits of the United States, and *the children of persons passing through or temporarily residing in this country*." Boyd Winchester, *Citizenship in its International Relation*, 31 Am. L. Rev. 504, 504 (1897) (emphasis added).

The Supreme Court of New Jersey similarly linked birthright citizenship with parental domicile in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895). In a passage that was later quoted in *Wong Kim Ark*, the court interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right of citizenship." *Id.* at 698 (emphasis added)

25

(quoted in *Wong Kim Ark*, 169 U.S. at 692). And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

The political branches operated from the same understanding in the years following the Fourteenth Amendment's enactment. For instance, six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment . . . concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that, as a general matter, "a child born within the United States of parents who are not citizens, and who do not reside within the United States, . . . shall not be regarded as a citizen thereof." *Id.* Although the bill ultimately failed because of "opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015). The bill thus suggests that, soon after the ratification of the Fourteenth Amendment, members of Congress accepted that children born of non-resident alien parents are not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, at times took the position that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents. In 1885, Secretary of State Frederick T. Frelinghuysen issued an opinion denying a passport to an applicant who was "born of Saxon subjects, temporarily in the United States." 2 *Wharton's Digest* § 183, at 397. Secretary Frelinghuysen explained that the applicant's claim of birthright citizenship was "untenable" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship." *Id.* at 398.

Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, issued an opinion denying a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany." *Id.* at 399. Secretary Bayard explained that the applicant "was no doubt born in the United States, but he was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.' He was not, therefore, under the statute and the Constitution a citizen of the United States by birth." *Id.* at 400.

5.        Finally, *Wong Kim Ark* recognized an exception to birthright citizenship for "children born of alien enemies in hostile occupation," *Wong Kim Ark*, 169 U.S. at 682. Here, the President has determined that the United States has experienced "an unprecedented flood of illegal immigration" in which "[m]illions of illegal aliens"—many of whom "present significant threats to national security and public safety"—have entered the country in violation of federal law. Invasion EO § 1; *see also id.* (explaining that "[o]thers are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities"). Plaintiffs' maximalist reading of the Citizenship Clause would require extending birthright citizenship to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks.

## C.        Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause.

1.        "[A]ny policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citation omitted).

The government's reading of the Citizenship Clause respects that principle, while

27

Plaintiffs' reading violates it. The Citizenship Clause sets a constitutional floor, not a constitutional ceiling. Although Congress may not deny citizenship to those protected by the Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. Art. I, § 8, Cl. 4; *see Wong Kim Ark*, 169 U.S. at 688. The government's reading would thus leave Congress with the ability to extend citizenship to the children of illegal aliens or of temporary visitors, just as it has extended citizenship to the children of members of Indian tribes. Plaintiffs' reading, by contrast, would for all time deprive the political branches of the power to address serious problems caused by near-universal birthright citizenship.

As a "sovereign nation," the United States has the constitutional power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). "[O]ver no conceivable subject" is federal power "more complete" than it is over the admission of aliens. *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909). Interpreting the Constitution to require the extension of birthright citizenship to the children of illegal aliens directly undermines that power by holding out a powerful incentive for illegal entry. Contrary to the principle that no wrongdoer should "profit out of his own wrong," *Liu v. SEC*, 591 U.S. 71, 80 (2020) (citation omitted), it also allows foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

2.     The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). Although the United States tolerates dual citizenship

28

in some circumstances, it has "long recognized the general undesirability of dual allegiances." *Savorgnan v. United States*, 338 U.S. 491, 500 (1950). "One who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952).

History shows that competing claims of allegiance can even lead to "problems for the governments involved." *Bellei*, 401 U.S. at 832. For instance, the War of 1812 resulted in part from the Royal Navy's impressment of sailors whom the United Kingdom viewed as British subjects, but whom the United States viewed as American citizens. *See* Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. L. Rev. 329, 345 (2012). And during the years preceding the adoption of the Fourteenth Amendment, the United States faced diplomatic clashes with the United Kingdom and other European powers "with respect to the allegiance of persons with links to both countries." *Id.* at 348.

Plaintiffs' reading of the Citizenship Clause invites just such problems. For centuries, countries have extended citizenship to the foreign-born children of their citizens. Vattel wrote that children born abroad "follow the condition of their fathers," so long as "the father has not entirely quitted his [home] country." Vattel, *supra*, § 215, at 102. England has extended citizenship to certain foreign-born children of English subjects since at least the 14th century. *See Wong Kim Ark*, 169 U.S. at 668-71. In 1790, the First Congress extended citizenship to "children of citizens" born "out of the limits of the United States," with the proviso that "the right of citizenship shall not descend to persons whose fathers have never been resident in the United States."

29

Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104.  Today, federal law recognizes as a citizen any

"person born outside of the United States . . . of parents both of whom are citizens of the United

States and one of whom has had a residence in the United States."  8 U.S.C. § 1401(c).  Many

other countries have similar laws.  *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (Breyer, J.,

dissenting).

      3.      Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant

of it, generally at least, they should be resolved in favor of the United States and against the

claimant."  *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. Dist. Dir., INS*, 385

U.S. 630, 637 (1967).  For the reasons discussed above, the Citizenship Clause is best read not to

extend citizenship to children born in the U.S. of illegal aliens or of temporary visitors.  To the

extent any ambiguity remains in the Clause, however, the Court should resolve it against extending

citizenship.

      **D.**      **Plaintiffs' Contrary Arguments Are Unpersuasive.**

      1.      Plaintiffs rely heavily on *Wong Kim Ark*, *see Doe* Mem. at 9-10; *New Jersey* Mem.

at 10-11, but they misread that precedent.  *Wong Kim Ark* did not concern the status of children

born in the United States to parents who were illegal aliens or temporary visitors.  To the contrary,

the Court precisely identified the specific question presented:

> whether a child born in the United States, of parents of Chinese descent, who at the
> time of his birth, are subjects of the emperor of China, *but have a permanent
> domicile and residence in the United States*, and are there carrying on business, and
> are not employed in any diplomatic or official capacity under the emperor of China,
> becomes at the time of his birth a citizen of the United States.

*Wong Kim Ark*, 169 U.S. at 653 (emphasis added).

      In analyzing that question, the Court repeatedly relied on fact that the parents were

permanent residents.  For example, it quoted an opinion in which Justice Story recognized that

"the children, even of aliens, born in a country, *while the parents are resident there* under the protection of the government, . . . are subjects by birth." *Wong Kim Ark*, 169 U.S. at 660 (emphasis added) (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting)).  It quoted the New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the general rule, that *when the parents are domiciled here*, birth establishes the right to citizenship." *Id.* at 692 (emphasis added; citation omitted).  It explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693 (emphasis added).  And it noted that "Chinese persons . . . owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as all other aliens *residing* in the United States." *Id.* at 694 (emphasis added).

After reviewing the relevant history, the Court reached the following "conclusions": "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born of *resident* aliens." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added).  Although the Amendment is subject to certain "exceptions" (*e.g.*, for "children of foreign sovereigns or their ministers"), the Amendment extends citizenship to "children born within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*." *Id.* (emphasis added).  The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, . . . and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

No doubt some statements in *Wong Kim Ark* could be read to support Plaintiffs' position. But *Wong Kim Ark* never purported to overrule any part of *Elk*, and the Supreme Court has previously (and repeatedly) recognized *Wong Kim Ark*'s limited scope. In one case, the Court stated that

> [t]he ruling in [*Wong Kim Ark*] was to this effect: "A child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicile and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen."

*Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902) (emphasis added; citation omitted). In another, the Court cited *Wong Kim Ark* for the proposition that a person is a U.S. citizen by birth if "he was born to [foreign subjects] *when they were permanently domiciled in the United States*." *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920) (citation omitted).

About a decade after *Wong Kim Ark* was decided, the Department of Justice likewise explained that the decision "goes no further" than addressing children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship. It was not so held in the Wong Kim Ark case." *Id.* at 124. Commentators, too, continued to acknowledge the traditional rule denying citizenship to children of non-resident foreigners. *See*, *e.g.*, John Westlake, *International Law* 219-20 (1904) ("[W]hen the father has domiciled himself in the Union . . . his children afterwards born there . . . are citizens; but . . . when the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality.");

32

Hannis Taylor, *A Treatise on International Public Law* 220 (1901) ("[C]hildren born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'"); Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* 25 (1901) ("[M]ere birth within American territory does not always make the child an American citizen. . . . Such is the case with children of aliens born here while their parents are traveling or only temporarily resident, or of foreign ministers.").

In short, only "those portions of [an] opinion necessary to the result . . . are binding, whereas dicta is not," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), and the *Wong Kim Ark* Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." 169 U.S. at 679 (citation omitted). The only question that was presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicile and residence in the United States." *Id.* at 653; *see id.* at 705. The case should not be read as doing anything more than answering that question.

2.     Nor do Plaintiffs advance their argument by relying on *Plyler v. Doe*, 457 U.S. 202 (1982), a case they admit "involved the threshold question of which persons fall 'within [the United States's] jurisdiction' for purposes of the Fourteenth Amendment's Equal Protection Clause." *New Jersey* Mem. at 11 (quoting U.S. Const. amend. XIV, § 1). But the phrase "*within* its jurisdiction" in the Equal Protection Clause, which focuses on a person's geographic location, differs from the phrase "*subject to* the jurisdiction thereof" in the Citizenship Clause, which focuses on an individual's personal subjection or allegiance to the United States. As Supreme Court cases illustrate, a person may fall outside the scope of the Citizenship Clause even if the person or his parents falls within the scope of the Equal Protection Clause. For example, certain children of

33

members of Indian tribes lack a constitutional right to U.S. citizenship by birth, *see Elk*, 112 U.S. at 102, but Indians *are* entitled to the equal protection of the laws, *see United States v. Antelope*, 430 U.S. 641, 647-650 (1977). Children of foreign diplomats also are not entitled to birthright citizenship, *see Wong Kim Ark*, 169 U.S. at 682, but Plaintiffs do not offer any authority suggesting such individuals are not subject to the Equal Protection Clause.

Plaintiffs also invoke the "common law view known as 'jus soli,'" *i.e.*, that "citizenship is acquired by birth within the sovereign's territory." *Doe* Mem. at 7-8; *see also New Jersey* Mem. at 12. But the Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022) (citation omitted). And that admonition holds particular force here. *Cf. United States v. Rahimi*, 602 U.S. 680, 722 & n.3 (2024) (Kavanaugh, J., concurring). The English *jus soli* tradition was premised on an unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) (statement of Rep. Woodward) (calling the British tradition an "indefensible feudal doctrine of indefeasible allegiance"); *id.* at 967 (statement of Rep. Bailey) (calling it a "slavish" doctrine); *id.* at 1130-31 (statement of Rep. Woodbridge) (saying it conflicts with "every principle of justice and of sound public law" animating America and its independent identity).

Indeed, the Supreme Court has already held that the Citizenship Clause departs from English common law in important respects. For example, the Clause's exception for certain children of members of Indian tribes has no parallel in English law, *see Wong Kim Ark*, 169 U.S. at 693; and the Clause permits voluntary renunciation of citizenship, even though English common law did not, *see Afroyim v. Rusk*, 387 U.S. 253, 257-262 (1967). This Court should thus interpret

the Citizenship Clause in light of *American* common-law principles, and as shown above, those principles do not support birthright citizenship for children of illegal aliens or temporary visitors.

Plaintiffs also point to 20th century Executive Branch precedent that accords with their view. *See New Jersey* Mem. at 13. But the scope of the Citizenship Clause turns on what it meant in 1868, not on what the Executive Branch assumed it meant during parts of the 20th century. *See*, *e.g.*, *Bruen*, 597 U.S. at 66 n.28 (declining to consider "20th-century evidence" in interpreting the Constitution). Nor is it unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions. *See*, *e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 644-45 (2022) (holding that states may prosecute non-Indians for crimes against Indians in Indian country despite decades of contrary Supreme Court dicta); *District of Columbia v. Heller*, 554 U.S. 570, 624 n.24 (2008) (holding that the Second Amendment protects an individual right even though lower courts had long read it to protect a collective right); *INS v. Chadha*, 462 U.S. 919, 944-45 (1983) (holding the legislative veto unconstitutional even though Congress had enacted, and the President had signed, almost 300 legislative-veto provisions over the preceding 50 years).

## IV.    Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of This Lawsuit.

As discussed above, the state plaintiffs lack standing to challenge the Citizenship EO; by definition, they cannot show that it will cause them irreparable harm. In any event, the states fail to establish that their claimed pecuniary harms are irreparable. The states' asserted "operational chaos" and costs associated with developing new citizenship "eligibility verification systems," *New Jersey* Mem. at 16, for example, are not directly attributable to the EO and hardly "threaten the existence of [their] business." *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5 (1st Cir. 2019) (citation omitted). And even assuming *arguendo* that financial harms

could be irreparable if they were unable to be "recouped," *New Jersey* Mem. at 15, the state plaintiffs fail to show that their feared loss of federal funding and reimbursements are truly unrecoverable. For instance, they do not explain how they would be unable to adjudicate their claims in separate proceedings when they seek reimbursement or whether there are any available administrative processes to recover federal monies to which the states claim entitlement after the conclusion of this litigation. *Cf. Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115-16 (9th Cir. 2003) (finding that a party asserting a claim for Medicare reimbursement would not be irreparably harmed by exhausting claims through an administrative review process).

The private plaintiffs similarly fail to establish any injury "of such imminence that there is a 'clear and present need for relief to prevent irreparable harm.'" *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) (citation omitted). They claim that the EO would "render [covered] newborns . . . deportable at birth," *Doe* Mem. at 9, or "stateless," *id*. at 13. But the Citizenship EO does not, by its terms, mandate that outcome with certainty for any plaintiff in this case. As discussed above, Section 1 declares the Executive Branch's policy against recognizing birthright citizenship in certain situations, but the implementation and enforcement of the Citizenship EO are left to agencies under Section 3. *See* Citizenship EO § 3(a)-(b). That implementation and enforcement have yet to occur, and no agency has taken any action pursuant to the EO to determine the immigration status of Ms. Doe or the organizational plaintiffs' identified members, much less initiate any deportation actions.

Indeed, Ms. Doe and her husband have "pending asylum applications." Decl. of O. Doe ¶ 2, *Doe* ECF No. 11-1. Were such applications to be granted, they would receive "a path to citizenship, eligibility for certain government benefits, and the chance for family members to receive asylum as well." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 32

36

(D.D.C. 2020).  Moreover, if any removal action were initiated against the children of any of the private plaintiffs at issue in this case, the subject of the action could assert their claim to citizenship as defense in that proceeding.  *See* 8 U.S.C. § 1252(b)(5).  Because the precise effects of the EO are yet to materialize, Plaintiffs must speculate at what specific harms the Citizenship EO might ultimately cause.  *See, e.g.*, *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

This same rationale undercuts the *Doe* plaintiffs' remaining arguments that "children subject to the EO" would be deprived of the benefits of citizenship and "suffer compromised health and decreased housing access."  *See Doe* Mem. at 14 (capitalization normalized).  Setting aside that some of these claimed harms (*e.g.*, denial of rights to vote or hold public office) could not happen to anyone for many years, the *Doe* plaintiffs generally describe the population-wide effects of the EO.  They offer no concrete evidence that Ms. Doe's child or the children of any identified member of the organizational plaintiffs plans to travel internationally or will lose access to healthcare or housing as a result of the EO during the pendency of this litigation.  *See Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021) ("simply showing some possibility of irreparable injury" is insufficient) (citation omitted).  And in any event, if an individual were actually "denied" any "right or privilege" of citizenship, 8 U.S.C. § 1503 provides an adequate legal remedy to avoid any irreparable harm.  *See supra* Sec. II.A; *Charlesbank Equity Fund II*, 370 F.3d at 162 (a party cannot show irreparable harm if it has an "adequate" "legal remedy").

## V.    The Public Interest Does Not Favor an Injunction.

Plaintiffs' asserted harms are outweighed by the harm to the government and public interest

37

that would result from the extraordinary relief Plaintiffs request. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the balancing of harms and public interest requirement for emergency injunctive relief merge when "the Government is the opposing party"). As the Supreme Court has recognized, Executive officials must have "broad discretion" to manage the immigration system. *Arizona v. United States*, 567 U.S. 387, 395-96 (2012). It is the United States that has "broad, undoubted power over the subject of immigration and the status of aliens," *id*. at 394, and providing Plaintiffs with their requested relief would mark a severe intrusion into this core executive authority, *see INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (an injunction that limits presidential authority is "itself an irreparable injury" (citing *Maryland v. King*, 567 U.S. 1301 (2012)).

## VI. Any Relief Should Be Limited.

For the reasons above, the Court should deny Plaintiffs' motions in their entirety. But even if the Court determines that a preliminary injunction is appropriate, it should limit its scope in at least three ways. *First*, nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Although the state plaintiffs suggest that a nationwide injunction is necessary because, in their view, "the issue [of the scope of birthright citizenship] has already been settled for this Nation," *New Jersey* Mem. at 19, the propriety of a plaintiff's remedy "must be tailored to redress the plaintiff's particular injury"—not to how correct a plaintiff believes his position to be. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). And while the states contend that allowing the EO to take effect in other states and

38

not theirs would have spillover effect on state expenditures, *see New Jersey* Mem. at 19, that is the case with any nationwide policy and is not sufficient to justify nationwide relief.  To prevent ordering "the government to act or refrain from acting toward nonparties in the case," *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring), the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief.

*Second*, "courts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin*, 505 U.S. at 802–03 ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).  Accordingly, the Court lacks jurisdiction to enter Plaintiffs' requested relief against the President and should dismiss him as a defendant in both actions.

*Third*, the Court should reject Plaintiffs' facial challenges to the Citizenship EO so that its lawfulness can be determined in individual as-applied challenges, consistent with the process established by the INA.  To mount a successful facial challenge, a plaintiff must show that "no set of circumstances exists" under which the challenged provision "would be valid," *Rahimi*, 602 U.S. at 693 (citation omitted), and as explained in the merits section of the brief, Plaintiffs have failed to do so here.  *See supra* Sec. III.[6]

---

[6] Because Plaintiffs' claims are purely legal and fully addressed in the parties' briefing on the instant motions, Defendants request that the Court consolidate the February 7 preliminary injunction hearing with a trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). *See also* Fed. R. Civ. P. 54(b)(2) (allowing a court to "direct entry of a final judgment as to one or more, but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay").

39

# CONCLUSION

For the foregoing reasons, the Court should deny the preliminary injunction motion that

has been filed in each of the related cases.

Dated: January 31, 2025

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

LEAH B. FOLEY
United States Attorney

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar No. 89400)
YURI S. FUCHS
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone:  202-616-8098
Fax: 202-616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

PA236

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the NEF.

Dated: January 31, 2025

*/s/ R. Charlie Merritt*
R. Charlie Merritt

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL FOR THE PEOPLE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; and CITY & COUNTY OF SAN FRANCISCO, |  |
| *Plaintiffs*, | No. 1:25-cv-10139-LTS |
| v. | Leave to File Granted on January 24, 2025 [ECF No. 71] |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,[*] in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of Social Security, and UNITED STATES OF AMERICA, |  |
| *Defendants*. |  |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

[*] Automatically substituted for Benjamine Huffman pursuant to Fed. R. Civ. P. 25(d).

PA238

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.    PLAINTIFFS HAVE STANDING UNDER SETTLED LAW....................................1

II.   PLAINTIFFS HAVE VALID CAUSES OF ACTION UNDER SETTLED LAW ......................................................................................................................3

III.  PLAINTIFFS' CLAIMS PREVAIL ON ALL MERITS UNDER SETTLED LAW ......................................................................................................................4

IV.  PLAINTIFFS' REMEDY FOLLOWS FROM SETTLED LAW ...............................9

CONCLUSION..................................................................................................................10

**TABLE OF AUTHORITIES**

<b>Page(s)</b>

**Cases**

*Arizona v. United States*,
    567 U.S. 387 (2012)..............................................................................10

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)................................................................................3

*Bell v. Hood*,
    327 U.S. 678 (1946)................................................................................3

*Benny v. O'Brien*,
    32 A. 696 (N.J. 1895).............................................................................7

*Biden v. Nebraska*,
    600 U.S. ___, 143 S. Ct. 2355 (2023)............................................1, 2, 3

*ChildCareGroup v. Dep't of Health & Human Servs.*,
    DAB No. 3010 (2020)............................................................................9

*CREW v. Trump*,
    302 F. Supp. 3d 127 (D.C. Cir. 2018)..................................................10

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)................................................................................1

*DeVillier v. Texas*,
    601 U.S. 285 (2024)................................................................................4

*Elk v. Wilkins*,
    112 U.S. 94 (1884)..............................................................................5, 6

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)................................................................................3

*Gamble v. United States*,
    587 U.S. 678 (2019)................................................................................7

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)............................................................................2, 3

*Harmon v. Brucker*,
    355 U.S. 579 (1958)................................................................................3

PA240

*Hawai'i v. Trump*,
   859 F.3d 741 (9th Cir. 2017) ...............................................................10

*United States ex rel. Hintopoulos v. Shaughnessy*,
   353 U.S. 72 (1957)...............................................................................7

*INS v. Rios-Pineda*,
   471 U.S. 444 (1985)..............................................................................7

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ...............................................................10

*Lamar, Archer & Cofrin, LLP v. Appling*,
   584 U.S. 709 (2018)..............................................................................8

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)..............................................................................3

*Massachusetts v. HHS*,
   923 F.3d 209 (1st Cir. 2019).............................................................1, 3

*Missouri v. Biden*,
   738 F. Supp. 3d 1113 (E.D. Mo. 2024)...............................................10

*New York v. Yellen*,
   15 F.4th 569 (2d Cir. 2021) ...............................................................2, 3

*Nishikawa v. Dulles*,
   356 U.S. 129 (1958)..............................................................................9

*Plyler v. Doe*,
   457 U.S. 202 (1982)..............................................................................7

*Schooner Exch. v. McFaddon*,
   11 U.S. 116 (1812)................................................................................6

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966).........................................................................2, 3

*South Carolina v. Regan*,
   465 U.S. 367 (1984)..............................................................................3

*State v. Nelson*,
   576 F. Supp. 3d 1017 (M.D. Fla. 2021) ..............................................10

*Texas v. United States*,
   599 U.S. 670 (2023)..............................................................................2

PA241

*Ticor Title Ins. Co. v. FTC*,
   814 F.2d 731 (D.C. Cir. 1987) ................................................................4

*United States v. Place*,
   693 F.3d 219 (1st Cir. 2012) ...............................................................8

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ..........................................................4, 5, 6, 7, 8, 10

**Statutes**

Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137 ................................8

**Other Authorities**

Hrgs. Before Comm. on Imm. & Naturalization on H.R. 6127,
   76th Cong. 37 (1940) (Ex. B) .............................................................8

James C. Ho, *Defining "American:" Birthright Citizenship & the Original
   Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006).....................8

*Legislation Denying Citizenship at Birth to Certain Children Born in the U.S.*,
   19 Op.  340, 1995 WL 1767990 (1995)..............................................9, 10

Noah Webster, *An American Dictionary of the English Language*
   (George & Charles Merriam 1860) (Ex. A)...............................................5

## INTRODUCTION

Defendants' responses all suffer the same fatal defect: they conflict with binding precedent. Defendants' claim that Plaintiffs lack standing to challenge a policy that works direct, predictable, and imminent fiscal harm contradicts both Supreme Court and First Circuit decisions. Their view that courts may not enjoin federal officials' unconstitutional acts absent an additional statutory cause of action has been repeatedly rejected. Their claim that the President can exclude, by executive fiat, children born on U.S. soil from the Constitution's promise of citizenship is contrary to caselaw, history, and a federal statute. And their remedial arguments are inconsistent with settled law. This Court need only cite binding and well-reasoned Supreme Court precedents to resolve this dispute—and to invalidate this unprecedented attack on an inviolable constitutional principle.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING UNDER SETTLED LAW.

Controlling decisions have consistently held that States may challenge federal actions that increase state spending or deprive the States of federal funds. Recently, for example, the Supreme Court allowed Missouri to challenge a federal student-debt relief plan because its instrumentality would collect fewer fees for servicing federal loans under the plan. *Biden v. Nebraska*, 600 U.S. ___, 143 S. Ct. 2355, 2366 (2023); *accord, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (States could challenge proposed census question because it would cause them to "lose out on federal funds"). The First Circuit has likewise recognized Massachusetts' standing to challenge a federal regulation allowing health plans to opt out of contraceptive coverage because the Commonwealth would bear the cost of replacing some of that coverage. *Massachusetts v. HHS*, 923 F.3d 209, 222-27 (1st Cir. 2019). Plaintiffs here have established, with ample and undisputed evidence, that the Order will have a similarly direct and imminent effect on their budgets in light of their preexisting policies—an injury this Court can redress. *See* Doc. No. 5 at 14-15, 21-23.

1

Defendants' responses flout precedent. Defendants first claim that Plaintiffs lack standing because their injuries are "incidental" effects of the Order. They rely on *Texas v. United States*, 599 U.S. 670 (2023), but that case—as the Supreme Court held—was an "extraordinarily unusual lawsuit" in which two States asked "the Federal Judiciary to order the Executive Branch to … make more arrests." *Id.* at 674, 686. The Court ultimately found a lack of standing based on unique concerns about prosecutorial discretion that have no purchase here. *See id.* at 676-81. The *Texas* plaintiffs, moreover, had offered only a vague contention that "the[y] would incur additional costs because the Federal Government [was] not arresting more noncitizens." *Id.* at 676. Here, by contrast, the record shows direct and predictable links between the Order and Plaintiffs' impending financial loss. As *Nebraska* held, that satisfies Article III. *See* 143 S. Ct. at 2366.

Defendants' claim that Plaintiffs lack standing because their injuries are "self-inflicted" is likewise contrary to settled law. *See* Doc. No. 92 at 19-20 (arguing that Plaintiffs "voluntarily chose[] to provide" benefits to noncitizens). If Defendants' characterization were enough to defeat standing, the result in both *Nebraska* and *Massachusetts* would have been different: federal law did not force Missouri to service federal student loans, and Massachusetts had no federal obligation to cover contraceptive care. That both States nevertheless had standing—given the predictable harm to their treasuries based on their preexisting policies—shows that Defendants' sweeping conception of "self-inflicted" injury is inconsistent with settled law. *See, e.g.*, *New York v. Yellen*, 15 F.4th 569, 575-77 (2d Cir. 2021) (standing based on predictable fiscal harm to state taxes).

Finally, Defendants incorrectly argue that Plaintiffs improperly advance the rights of third parties under the Citizenship Clause. In fact, Plaintiffs press their *own* interests in avoiding fiscal harm from an unlawful executive order. Defendants' reference to *parens patriae* suits is thus a non sequitur. So is their reliance on *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), and *Haaland*

2

*v. Brackeen*, 599 U.S. 255 (2023): the States in those cases did not suffer concrete harm at all—much less the kind of quintessential fiscal harm here. *See, e.g.*, *Haaland*, 599 U.S. at 296 ("Texas is not injured by the [allegedly unequal] placement preferences [for Indian children].").[1]

## II.  PLAINTIFFS HAVE VALID CAUSES OF ACTION UNDER SETTLED LAW.

Plaintiffs properly seek declaratory and injunctive relief to avoid injury from an Order that is both *ultra vires* under the Constitution and INA (Counts I-III) and unlawful under the APA (Count IV). Defendants argue that "the Constitution does not generally provide a cause of action to pursue affirmative relief," Doc. No. 92 at 24, but the Supreme Court has repeatedly held that plaintiffs may pursue prospective equitable relief without a separate statutory cause of action to stop government officials from violating the Constitution or exceeding their lawful authority. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015) (describing "equitable relief that is traditionally available to enforce federal law"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) (recognizing, "as a general matter," a "private right of action directly under the Constitution"); *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) (similar); *Bell v. Hood*, 327 U.S. 678, 684 (1946) (similar).[2] Indeed, the case Defendants cite confirms the point: even as the Court

---

[1] That one of Plaintiffs' claims rests on the violation of an individual constitutional right does not change that conclusion. Indeed, *Massachusetts* arose in the same posture: the Commonwealth asserted (among other things) that the regulation violated the Equal Protection Clause, *see* 301 F. Supp. 3d 248, 250 (D. Mass. 2018), and the First Circuit held that it had standing to seek relief for its pocketbook injuries, 923 F.3d at 222. Moreover, Plaintiffs are not challenging the constitutionality of federal statutes, as in *Katzenbach* and *Haaland*, but an executive action that violates federal law. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (explaining "critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' … and allowing a State to assert its rights under federal law (which it has standing to do)").

[2] This logic also applies to the INA claim, which is a separation-of-powers claim positing that the Executive contravened the limits Congress placed on it. Notably, the plaintiff states in *Nebraska* brought exactly that kind of *ultra vires* claim. *See* J.A. 36-37, 143 S. Ct. 2355 (2023), www.bit.ly/40YajdR. Nor is there any basis to claim Plaintiffs have some alternative remedy here, *see* Doc. No. 92 at 23-25, because they cannot file challenges to adjudicate an individual's

PA245

declined to address whether the Takings Clause permits *damages* claims, it cited numerous cases allowing *injunctive relief* under the Clause. *DeVillier v. Texas*, 601 U.S. 285, 292 (2024).

Defendants also err in arguing that Plaintiffs' APA claims fail on the ground that any agency action is nonfinal. Even assuming Defendants' premise, the APA permits judicial review of nonfinal agency action in the event of an "outright violation of a clear statutory provision." *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 749 (D.C. Cir. 1987). Such a clear violation exists here. The President ordered defendant agencies to take blatantly unlawful action by February 19. The illegality of those actions does not depend on any forthcoming decisions. For example, whether the SSA may deny Social Security cards to children born on U.S. soil does not turn on the precise denial process that SSA implements. In those circumstances, an APA suit is appropriate.

## III. PLAINTIFFS' CLAIMS PREVAIL ON THE MERITS UNDER SETTLED LAW.

Defendants' interpretation of birthright citizenship is contrary to Supreme Court precedent, centuries of history, and a longstanding federal statute.

While Defendants seek to distinguish *Wong Kim Ark* on its facts, *see* Doc. No. 92 at 30-32, that case provided a considered and detailed analysis of the Fourteenth Amendment's text, common-law backdrop, and originalist sources in holding that U.S.-born children of foreigners have birthright citizenship subject only to certain precisely defined exceptions—none of which is based on the duration or lawfulness of their parents' presence in the country. *See* Doc. No. 5 at 16-17; *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898).[3] Indeed, while Defendants' core premise is that whether one is "subject to the jurisdiction" of the United States does not turn on

---

citizenship. *Cf. South Carolina v. Regan*, 465 U.S. 367, 373 (1984); *New York*, 15 F.4th at 577-79 (rejecting argument that Anti-Injunction Act bars suits by States, who cannot bring their own tax-refund suits and thus lack adequate alternative remedies).

[3] The exception for "alien enemies in hostile occupation," Doc. No. 92 at 38, is plainly inapplicable: neither undocumented nor temporary immigrants exert hostile territorial control.

PA246

whether a person must obey U.S. laws, Doc. No. 92 at 26, *Wong Kim Ark* is explicit: "[A]n alien is completely subject to the political jurisdiction of the country in which he resides" because "for so long a time as he continues within the dominions of a foreign government," he "owes obedience to the laws of that government." 169 U.S. at 693-94. Similarly, though Defendants contend that a person is "subject to the jurisdiction" if he is born "in the allegiance" of the United States, Doc. No. 92 at 27-28, the Court explained that "allegiance" in this context means "nothing more than the tie or duty of obedience" to the sovereign's laws. 169 U.S. at 659.[4] Because no one could dispute that noncitizens here with temporary status or without authorization have a "duty of obedience" to U.S. laws, they are subject to U.S. jurisdiction—and their children are citizens.

Defendants seek support from *Elk v. Wilkins*, 112 U.S. 94 (1884), but that case confirms Plaintiffs' position. *Elk* explained that the "evident meaning" of the phrase "subject to the jurisdiction" is "not merely subject *in some respect or degree* to the jurisdiction of the United States, but *completely* subject to their political jurisdiction." *Id.* at 102 (emphasis added); *Wong Kim Ark*, 169 U.S. at 680 (same). That distinction refutes Defendants' surplusage argument, Doc. No. 92 at 27 (asserting that Native Americans and foreign diplomats are "subject, at least to some extent" to the nation's legal authority). The children of Native Americans and diplomats are not "subject to the jurisdiction" within the meaning of the Citizenship Clause because they enjoy substantial—even if not unlimited—immunity. *Elk*, 112 U.S. at 99-100 (Native Americans generally exempt from taxation and federal laws); *Wong Kim Ark*, 169 U.S. at 678-79 (various "immunities" to which foreign ambassadors and ministers are "entitled by the law of nations"). By

---

[4] *See also id*. at 708 (Fuller, J., dissenting) (using "allegiance" and "obedience" interchangeably); Noah Webster, *An American Dictionary of the English Language* 35 (George & Charles Merriam 1860) (Ex. A) (defining "allegiance" as "[t]he tie or obligation of a subject to his prince or government; the duty of fidelity to a king, government, or state," and noting "[e]very native or citizen owes *allegiance* to the government under which he is born").

contrast, those here without legal authorization or with temporary status are not afforded such broad immunity from our laws—and so are "subject to the jurisdiction" of the United States. Moreover, *Elk* emphasized that the petitioner was born into an "alien nation" within the United States, effectively "within the domain of a foreign government," 112 U.S. at 99—a singular distinction applicable to tribal members that does not apply to the children excluded by the Order.

Defendants' efforts to equate jurisdiction with "domicile" also fail. *See* Doc. No. 92 at 30-31 (claiming "temporary visitors and unlawfully present aliens" lack "allegiance" to the United States absent "domicile"). As *Wong Kim Ark* noted, the English common-law and Founding-era understandings of jurisdiction on which its holding was based were entirely distinct from domicile. *See* 169 U.S. at 657 (noting at common law that "every person born within the dominions of the crown … whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject"); *id.* at 686 (discussing C.J. Marshall's explication of "jurisdiction" in *Schooner Exch. v. McFaddon*, 11 U.S. 116 (1812), when concluding that "private individuals of another nation" who visit a country "for purposes of business or pleasure" are not "exempt[] from the jurisdiction of the country in which they are found"); 11 U.S. at 144 (holding "merchant vessels enter[ing] for the purposes of trade" must "owe temporary and local allegiance" and be "amenable to the jurisdiction of the country," or else they would "subject the laws" of that country "to continual infraction"). As *Wong Kim Ark* put it, whether a person "within the dominions of a foreign government" is subject to that government's jurisdiction operates "[i]ndependently of" their "intention to continue such residence" or "domiciliation." 169 U.S. at 693-94.[5] While *Wong*

---

[5] Defendants' reliance on a hodgepodge of historical sources at odds with *Wong Kim Ark*'s clear rejection of their "domicile" theory, *see* Doc. No. 92 at 32-38, is simply an attempt to relitigate binding precedent. All of these sources predate *Wong Kim Ark*, most are considered in that opinion, and several are featured by the dissent. *Compare* Doc. No. 92 at 32-38 *with Wong Kim Ark*, 169

*Kim Ark* notes that domicile in a nation would be *sufficient* to require their allegiance and subject that person to the nation's jurisdiction, Doc. No. 92 at 30-31, Defendants make a logical error in claiming domicile is therefore *necessary*. Nor does *Wong Kim Ark* stand alone. *See INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (unanimously noting child of undocumented resident was a citizen); *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (noting U.S.-born child was "of course, an American citizen by birth," despite parents' "illegal presence").[6]

Defendants cannot overcome Supreme Court precedent, and the text and history underlying it, by citing the 1866 Civil Rights Act, which granted statutory citizenship to persons born in the United States "not subject to any foreign power." Doc. No. 92 at 28-29. Even leaving aside that "one version of a text is shoddy evidence of the public meaning of an altogether different text," *Gamble v. United States*, 587 U.S. 678, 684 (2019), Defendants do not explain why immigrants here with temporary status or without lawful status are subject to a foreign power. Their argument again appears predicated on a vague understanding of "allegiance," *see* Doc. No. 92 at 28-29, but there is no dispute that these groups owe allegiance to—*i.e.*, have a duty to obey the laws of—the United States while here, like lawful permanent residents. In any event, *Wong Kim Ark* carefully considered how the earlier statutory language differed from the Citizenship Clause, and determined that the difference reaffirmed the drafters' intent broadly to confer citizenship to those born on

---

U.S. at 661, 679 (citing Story, *Conflict of Laws* § 48); *id.* at 666 (citing Hall, *International Law* § 68 (4th ed.)); *id.* at 692-93 (citing *Benny v. O'Brien*, 32 A. 696 (N.J. 1895)); *id.* at 708 (dissent) (citing Vattel, *Law of Nations* § 212); *id.* at 718 (dissent) (quoting Story); *id.* at 718-19 (dissent) (citing Miller, *Lectures on Constitutional Law* at 279); *id.* at 719 (dissent) (discussing Hausding and Greisser passport denials). The *Wong Kim Ark* majority soundly rejected Defendants' view.

[6] *Plyler v. Doe* also makes clear that there is "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." 457 U.S. 202, 211 n.10 (1982). The fact that tribal members are entitled to equal protection when States exercise their limited jurisdiction against them, Doc. No. 92 at 44-45, even though they are not "completely subject" to U.S. jurisdiction under the Citizenship Clause, does not negate *Plyler*'s holding.

7

U.S. soil. *See* 169 U.S. at 688; *see also* James C. Ho, *Defining "American:" Birthright Citizenship & the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 373 (2006).

Even if this Court were convinced that it could contravene precedent in its construction of the Constitution, Plaintiffs would still prevail on their statutory claim. *See* Doc. No. 1 at 44 (Count III). Although Defendants claim there is no basis to treat the Constitution and statutes differently, laws take their meaning from how they would have been understood at the time of enactment. And as of 1940, *see* Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138, there was no doubt that "subject to the jurisdiction" codified birthright citizenship, regardless of the immigration status of the child's parents. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721-22 (2018) (presuming the enacting Congress is "aware of the longstanding judicial interpretation of [a] phrase" that it codifies "and intend[s] for it to retain its established meaning"); *United States v. Place*, 693 F.3d 219, 229 (1st Cir. 2012). Indeed, when a member of Congress inquired whether the bill could be amended to exclude persons living abroad "who happen to have been born here" to "alien parents" and departed the country "in early infancy" to be "brought up in the countries of their parents," all agreed that "it is not a matter we have any control over" because there was "no proposal … to change the Constitution." Hrgs. Before Comm. on Imm. & Naturalization on H.R. 6127, 76th Cong. 37, 38 (1940) (Ex. B). The INA thus codified Congress's understanding that the length of a parent's stay does not impact a child's birthright citizenship.

Defendants' resort to policy arguments cloaked as "interpretive principles," Doc. No. 92 at 38-41, fares no better. First, Defendants' plea to the President's authority over "status of aliens" begs the question: under the Citizenship Clause, the affected children are not "aliens" in the first place. Nor is the President empowered to re-define them as such because he believes punishing the children of "wrongdoers" will deter illegal entry—a belief neither the Order nor Defendants'

PA250

brief substantiates with facts. Second, while Congress may consider various policy concerns when exercising its authority over naturalization rules, *see* Doc. No. 92 at 39-41, no branch can nullify a *constitutional* right to citizenship. *See Nishikawa v. Dulles*, 356 U.S. 129, 138 (1958) (because the "Constitution has conferred" birthright citizenship, "neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert, may strip [it] away"). That was, indeed, the purpose of the Citizenship Clause: having learned the painful lessons of *Dred Scott*, the Framers of the Fourteenth Amendment understood "our country should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 1995 WL 1767990, *6 (1995). Defendants' effort to upend that core principle must be rejected.

## IV.  PLAINTIFFS' REMEDY FOLLOWS FROM SETTLED LAW.

This Court should grant a preliminary and/or permanent injunction to prevent Defendants from violating the Citizenship Clause and the INA, as they have been directed to do on February 19. Aside from their incorrect argument that Plaintiffs' impending injuries are not attributable to the Order, *but see* Doc. No. 5 at 14-15, 21-23, Defendants' only response to Plaintiffs' irreparable harm is to baselessly speculate that Plaintiffs might remedy their fiscal injuries via administrative processes. Doc. No. 92 at 47. But no such process could compensate Plaintiffs for (i) the burdens and costs incurred to re-design Plaintiffs' eligibility verification systems, (ii) extra payments for at-risk children due to their ineligibility for federal assistance, or (iii) the EAB funding they lose when families do not obtain an SSN at birth. Doc. No. 5 at 11-13.[7] Nor do Defendants offer a legitimate public interest that can outweigh these harms. Any interest in protecting the statutory

---

[7] And though an HHS appeals board considers specific cost disallowances in certain programs, it does not adjudicate constitutional claims regarding the eligibility of large swaths of the population. *See ChildCareGroup v. Dep't of Health & Human Servs.*, DAB No. 3010, at 11 (2020).

"discretion exercised by immigration officials," *Arizona v. United States*, 567 U.S. 387, 396 (2012), is not at issue here, where the Executive seeks to trample over constitutional and statutory dictates—on the precise issue the Fourteenth Amendment's framers removed from the political process entirely. *See OLC Op.* at *6. And on the other side of the ledger is the abrogation of a 127-year-old precedent and practice, the loss of citizenship for millions of American-born children, and the chaotic disruption of Plaintiffs' critical child health and welfare programs.[8]

Plaintiffs' injuries could only be remedied with a nationwide injunction because children and families can and do move from one jurisdiction to another—a key factual point Defendants do not deny. Doc. No. 5 at 25-26. Defendants brush this aside, without any explanation, as a "spillover effect." Doc. No. 92 at 49-50. But the harms to Plaintiffs from allowing the Order to take effect in other jurisdictions are the exact same harms of allowing it to take effect within their borders—the loss of federal funding for serving the affected children and the administrative cost and burdens of standing up new eligibility verification systems. Thus, if the Court concludes that injunctive relief is needed to remedy Plaintiffs' injuries, that injunction necessarily must be nationwide. Nor is that burdensome for Defendants, as the Federal Government has for over a century (and until just weeks ago) complied with this understanding nationwide—just as *Wong Kim Ark* commands.

## **CONCLUSION**

For the above reasons, the Court should grant Plaintiffs' motion for injunctive relief.

---

[8] Defendants are also wrong that Plaintiffs may not obtain declaratory relief against the President. *See CREW v. Trump*, 302 F. Supp. 3d 127, 139 n.6 (D.C. Cir. 2018) (rejecting government's claim). Courts routinely enjoin the enforcement of executive orders. *See, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022) (enjoining enforcement of EO mandating certain vaccinations); *State v. Nelson*, 576 F. Supp. 3d 1017, 1040 (M.D. Fla. 2021) (granting injunction "prohibiting enforcement of" EO). And when an injury cannot be "redressed fully" by enjoining other federal defendants, an injunction against the President can also be appropriate. *Hawai'i v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017); *Missouri v. Biden*, 738 F. Supp. 3d 1113, 1145 (E.D. Mo. 2024).

February 4, 2025

Respectfully submitted.

ANDREA JOY CAMPBELL
  ATTORNEY GENERAL OF MASSACHUSETTS

MATTHEW J. PLATKIN
  ATTORNEY GENERAL OF NEW JERSEY

Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Jared B. Cohen (BBO No. 689217)
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

Viviana M. Hanley (BBO No. 707266)
  *Deputy Attorney General*
Jeremy M. Feigenbaum*
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Shefali Saxena*
Elizabeth R. Walsh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
viviana.hanley@njoag.gov

*Counsel for the Commonwealth of
Massachusetts*

*Counsel for the State of New Jersey*

ROB BONTA
  ATTORNEY GENERAL OF CALIFORNIA

PHIL WEISER
  ATTORNEY GENERAL OF COLORADO

Denise Levey*
  *Deputy Attorney General*
Michael L. Newman
  *Senior Assistant Attorney General*
Marissa Malouff*
Irina Trasovan*
  *Supervising Deputy Attorneys General*
Lorraine López*
Delbert Tran*
Annabelle Wilmott*
  *Deputy Attorneys General*
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6269
denise.levey@doj.ca.gov

Shannon Stevenson*
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

*Counsel for the State of California*

PA253

WILLIAM M. TONG
  ATTORNEY GENERAL OF CONNECTICUT

William M. Tong*
  *Attorney General*
Janelle Rose Medeiros*
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
janelle.medeiros@ct.gov

*Counsel for the State of Connecticut*


BRIAN L. SCHWALB
  ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA

Nicole S. Hill*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney
  General for the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Counsel for the District of Columbia*


AARON M. FREY
  ATTORNEY GENERAL OF MAINE

Sean D. Magenis (BBO No. 658578)
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
sean.d.magenis@maine.gov

*Counsel for the State of Maine*


KATHLEEN JENNINGS
  ATTORNEY GENERAL OF DELAWARE

Ian R. Liston**
  *Director of Impact Litigation*
Vanessa L. Kassab**
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


ANNE E. LOPEZ
  ATTORNEY GENERAL OF HAWAIʻI

Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*


ANTHONY G. BROWN
  ATTORNEY GENERAL OF MARYLAND

Adam D. Kirschner*
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
akirschner@oag.state.md.us
(410) 576-6424

*Counsel for the State of Maryland*

PA254

DANA NESSEL
  ATTORNEY GENERAL OF MICHIGAN

Toni L. Harris*
Stephanie Service*
Neil Giovanatti*
  Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, Michigan 48909
(517) 335-7603
harrist19@michigan.gov

Counsel for Attorney General Dana Nessel
  on behalf of the People of Michigan


AARON D. FORD
  ATTORNEY GENERAL OF NEVADA

Heidi Parry Stern*
  Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
hstern@ag.nv.gov

Counsel for the State of Nevada


LETITIA JAMES
  ATTORNEY GENERAL OF NEW YORK

Zoe Levine*
  Special Counsel for Immigrant Justice
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
zoe.levine@ag.ny.gov
(212) 416-8329

Counsel for the State of New York


KEITH ELLISON
  ATTORNEY GENERAL OF MINNESOTA

John C. Keller*
  Chief Deputy Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

Counsel for the State of Minnesota


RAÚL TORREZ
  ATTORNEY GENERAL OF NEW MEXICO

James W. Grayson*
  Chief Deputy Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

Counsel for the State of New Mexico


JEFF JACKSON
  ATTORNEY GENERAL OF NORTH CAROLINA

Daniel P. Mosteller*
  Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

Counsel for the State of North Carolina

PA255

P<span>ETER</span> F. N<span>ERONHA</span>
  A<span>TTORNEY</span> G<span>ENERAL OF</span> R<span>HODE</span> I<span>SLAND</span>

Katherine Connolly Sadeck (BBO No. 681501)
  *Solicitor General*
Leonard Giarrano IV*
  *Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2480
ksadeck@riag.ri.gov

*Counsel for the State of Rhode Island*


C<span>HARITY</span> R. C<span>LARK</span>
  A<span>TTORNEY</span> G<span>ENERAL OF</span> V<span>ERMONT</span>

Julio A. Thompson**
  *Co-Director, Civil Rights Unit*
109 State Street
Montpelier, VT 06509
(802) 828-5519
julio.thompson@vermont.gov

*Counsel for the State of Vermont*


J<span>OSHUA</span> L. K<span>AUL</span>
  A<span>TTORNEY</span> G<span>ENERAL OF</span> W<span>ISCONSIN</span>

Gabe Johnson-Karp*
  *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
P.O. Box 7857
Madison, WI 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*


D<span>AVID</span> C<span>HIU</span>[†]
  C<span>ITY</span> A<span>TTORNEY</span>, C<span>ITY AND</span> C<span>OUNTY</span>
  <span>OF</span> S<span>AN</span> F<span>RANCISCO</span>

Yvonne R. Meré[†]
  *Chief Deputy City Attorney*
Sara J. Eisenberg[†]
  *Chief of Complex and Affirmative Litigation*
Mollie M. Lee[†]
  *Chief of Strategic Advocacy*
David S. Louk*
Molly J. Alarcon*
  *Deputy City Attorneys*
1390 Market Street, 6th Floor
San Francisco, CA 94102-5408
(415) 505-0844
david.louk@sfcityatty.org

*Counsel for the City and County of San Francisco*

\*   admitted *pro hac vice*
\*\* admitted *pro hac vice*; notice of appearance forthcoming
[†]   motion for admission *pro hac vice* pending



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

———————————————————————————

O. DOE, et al.,

     Plaintiffs,               Civil Action No.
                                          1:25-cv-10135-LTS

   v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al. ,

     Defendants.

and

STATE OF NEW JERSEY, et al.,

     Plaintiffs,               Civil Action No.
                                          1:25-cv-10139-LTS

   v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al.

     Defendants.

———————————————————————————

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

MOTION HEARING

Friday, February 7, 2025
9:58 a.m.

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

1                        **A P P E A R A N C E S**

2

   On behalf of the 10135 Plaintiffs Doe, Brazilian Worker
3  Center, and La Colaborativa:

4       LAWYERS FOR CIVIL RIGHTS
        BY:  OREN M. SELLSTROM, MIRIAN ALBERT,
5       AND JACOB LOVE
        61 Batterymarch Street
6       Boston, Massachusetts  02110
        (617) 988-0608
7       osellstrom@lawyerscom.org
        malbert@lawyersforcivilrights.org
8       jlove@lawyersforcivilrights.org

9

10 On behalf of the 10139 Plaintiffs State of New Jersey,
   Commonwealth of Massachusetts, and State of California:
11
        MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
12      BY:  GERARD J. CEDRONE AND JARED B. COHEN
        One Ashburton Place
13      20th Floor
        Boston, Massachusetts  02108
14      (617) 963-2282
        gerard.cedrone@mass.gov
15      jared.b.cohen@mass.gov

16

17      NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
        BY:  SHAKAR DURAISWAMY
18      33 Washington Street
        Newark, New Jersey  07102
19      (908) 507-2949
        shankar@duraiswamy@njoag.gov
20

21
        OFFICE OF THE ATTORNEY GENERAL
22      BY:  IRINA TRASOVAN
        300 S. Spring Street
23      Suite 1702
        Los Angeles, California  90013
24      (213) 269-6261
        irina.trasovan@doj.ca.gov
25

1                    **A P P E A R A N C E S, Cont.**

2

   On behalf of the Defendants:

3
         US DEPARTMENT OF JUSTICE
4        BY:  ERIC HAMILTON
         950 Pennsylvania Avenue, NW
5        Washington, D.C.,  20530
         (202) 514-3301
6        eric.hamilton@usdoj.gov

7

8        DEPARTMENT OF JUSTICE - CIVIL DIVISION
         BY:  BRAD P. ROSENBERG
9        1100 L Street, NW
         Washington, D.C., 20005
10       (202) 514-3374
         brad.rosenberg@usdoj.gov

11

12       UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
13       BY:  MICHAEL FITZGERALD
         John Joseph Moakley Courthouse
14       One Courthouse Way, Suite 9200
         Boston, Massachusetts  02210
15       (617) 748-3266
         michael.fitzgerald2@usdoj.gov

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            (In open court.)

 3            THE DEPUTY CLERK:  The United States District Court

 4    for the District of Massachusetts is now in session, the

 5    Honorable Leo T. Sorokin presiding.

 6            THE COURT:  Please be seated.

 7            THE COURTROOM CLERK:  Today is Friday, February 7,

 8    2025, and we are on the record in Civil Case Number

 9    25-cv-10135, O. Doe, et al., versus Donald J. Trump, et al.,

10    and 25-cv-10139, The State of New Jersey, et al., versus

11    Donald J. Trump, et al.

12            Will counsel please state your name for the record.

13            THE COURT:  Hold on one second.  Give me one moment

14    just to get set up, and I want to make a note of one thing.

15            Okay.  Go ahead.

16            MR. SELLSTROM:  Good morning, Your Honor.  Oren

17    Sellstrom from Lawyers for Civil Rights on behalf of

18    Plaintiffs O. Doe, La Colaborativa, and Brazilian Workers

19    Center.

20            THE COURT:  Good morning.

21            MR. CEDRONE:  Good morning, Your Honor.  Gerard

22    Cedrone from the Massachusetts Attorney General's Office, on

23    behalf of the Commonwealth.

24            I'll let my colleagues at counsel table introduce

25    themselves, but note that we have co-counsel from several
```

1    other jurisdictions in the courtroom today, as well.

2           THE COURT:  Okay.

3           MR. DURAISWAMY:  Good morning, Your Honor.  Shankar

4    Duraiswamy from the State of New Jersey here on behalf of the

5    plaintiffs in the 10139 action.

6           THE COURT:  Good morning.

7           MS. ALBERT:  Good morning, Your Honor, Mirian

8    Albert on behalf of the Doe plaintiffs, La Colaborative, and

9    Brazilian Workers Center.

10          THE COURT:  Good morning.

11          MR. LOVE:  Good morning, Your Honor.  Jacob Love

12    from Lawyers for Civil Rights on behalf of the Doe

13    plaintiffs.

14          THE COURT:  Good morning.

15          MS. TRASOVAN:  Good morning, Your Honor.  Irina

16    Trasovan on behalf of The State of California.

17          MR. COHEN:  Good morning, Your Honor.  Jared Cohen

18    on behalf of The Commonwealth of Massachusetts.

19          THE COURT:  Just say it again.  I didn't catch your

20    name.

21          MR. COHEN:  Jared Cohen on behalf of The

22    Commonwealth of Massachusetts.  Good morning.

23          THE COURT:  Good morning.

24          MR. HAMILTON:  Good morning, Your Honor.  Eric

25    Hamilton, deputy assistant attorney general in the Civil

1    Division of the US Department of Justice for defendants.

2            THE COURT:  Good morning.

3            MR. ROSENBERG:  Good morning, Your Honor.  Brad

4    Rosenberg, special counsel with the Federal Programs Branch

5    in the Department of Justice's Civil Division, on behalf of

6    the federal defendants.

7            THE COURT:  Good morning.  Okay.

8            All right.  So I have read all the papers that

9    you've all submitted and all the amicus briefs that I've

10   authorized that I've allowed to file.

11           Who's arguing on -- for the plaintiffs?

12           MR. SELLSTROM:  Your Honor, with the Court's

13   permission, we've spoken with the state's counsel, as well,

14   and we would propose to consolidate the arguments.  From the

15   plaintiffs' side in the two cases, I would go first on behalf

16   of the Doe plaintiffs.  The state's counsel can then pick up

17   from there on some of the shared arguments, as well as some

18   that are unique to the State.

19           THE COURT:  Okay.

20           MR. SELLSTROM:  We'd also like some rebuttal time

21   after the government's argument, as well.

22           THE COURT:  All right.  And just one person from

23   the states?

24           MR. CEDRONE:  So I think you'll be hearing from two

25   of us, with the Court's leave.  I'll be addressing the

1    standing and threshold questions, and Mr. Duraiswamy will

2    address the PI factors, so the merits in the case.

3            THE COURT:  I see.  So just the two of you?

4            MR. CEDRONE:  Correct.

5            THE COURT:  Okay.  All right.  And then one or both

6    of you on the defense side?

7            MR. HAMILTON:  Yes, Your Honor.

8            THE COURT:  Who's with you at the table, who you

9    didn't introduce?

10            MR. FITZGERALD:  Oh.  Good morning, Your Honor,

11    Michael Fitzgerald from the US Attorney's Office for the

12    defendants.

13            THE COURT:  Okay.  Good morning.  Sorry, I couldn't

14    see you right there behind them.  Washington looms large over

15    the US Attorney's Office, I guess.

16            Okay.  That's fine.  I'm not going to set time

17    limits.  I'll hear from you; then I'll hear from the

18    government.  I'll hear something more in response from you,

19    and then we might be done, or maybe depending whether you

20    want to say anything else.  But you don't -- just as sort of

21    a guide post, you don't need to say everything in your

22    briefs.  If you walked out right now, you will have waived

23    nothing.  Okay?  If you say, "I waive," everything that

24    follows is gone.  Right?  But if you don't use those words,

25    right, you have whatever is in your briefs.  So if you walked

1    out and you hadn't said part two of your brief, or what have

2    you, it's not gone.  I have it; I've read it.  I'm going to

3    think about it.  I'll consider it; I'll address it.  So in

4    that sense, you know, I don't -- just keep that in mind in

5    terms of the -- what you have to say.  Okay?

6              Go ahead.

7              MR. SELLSTROM:  Thank you, Your Honor, and we will

8    try and hit the highlights.

9              As the Supreme Court has said, it would be

10   difficult to exaggerate the value and importance of American

11   citizenship.  Citizenship carries with it a full array of

12   rights and privileges and makes one a full member of the

13   United States community.

14             Given that importance, the Supreme Court has also

15   said that stripping someone of citizenship amounts to, quote,

16   "A total destruction of the individual status in organized

17   society."

18             The declarations that we have submitted show

19   clearly how that harm would be visited upon children and

20   families if the executive order were to go into effect.  That

21   momentous act of denaturalization cannot be done by the

22   stroke of a pen, and that is because the concept of

23   birthright citizenship that anyone born on American soil is

24   an American citizen is so fundamental to the fabric of our

25   nation that it's expressly written into the Constitution.

1    That, of course, is through the 14th Amendment, passed as a

2    means to mend a broken nation and make clear in the

3    citizenship clause that the government never again can decide

4    who among disfavored classes is entitled to citizenship.

5    That is why the citizenship clause was enacted, and it makes

6    clear that all who are born here, subject only to very rare

7    exceptions, like the children of diplomats, are automatically

8    American citizens.  That basic concept has been definitively

9    endorsed and upheld by the Supreme Court, by the First

10   Circuit, and by courts around this country for generations.

11   It permeates federal agency and state agency practice and has

12   for 150 years and more.  It cannot be changed with the stroke

13   of a pen.

14        In many ways, the Court's inquiry this morning need

15   go no further than that.  The defendants may wish that the

16   Supreme Court revisit this issue.  But at this point in time,

17   First Circuit and Supreme Court jurisprudence is clear and

18   unequivocal, the citizenship clause does not turn on the

19   immigration status of one's parents, and, therefore, the

20   executive order is unconstitutional.

21        The seminal case, of course, is *Wong Kim Ark*,

22   decided by the Supreme Court at the turn of the century,

23   which outlines a long line of English history and common law

24   to arrive at its conclusion.

25        THE COURT:  Turning back, sorry, just to one thing

1    from earlier, the -- from the papers that you've submitted

2    with respect to the associations, I draw the conclusion or

3    it's established that the associations have members in

4    Massachusetts.

5              MR. SELLSTROM:  That's correct.

6              THE COURT:  But do they have members in --

7    elsewhere?

8              MR. SELLSTROM:  The members are primarily in

9    Massachusetts, Your Honor.

10             THE COURT:  And what about -- is it -- should I

11   view them as just having members in Massachusetts?  Or should

12   I view them as having members beyond Massachusetts?

13             MR. SELLSTROM:  I think viewing them as having

14   members in Massachusetts is what's supported by the

15   affidavits that we submitted.

16             THE COURT:  Okay.

17             MR. SELLSTROM:  And is fully sufficient for

18   granting the relief that we are asking for.

19             THE COURT:  All right.  Okay.

20             MR. SELLSTROM:  Which I'm happy to address, if it's

21   something that Your Honor would like to probe deeper.

22             THE COURT:  Well, one -- certainly you can address

23   that.  I intend to address all of the issues that are put to

24   me in this case, the way I would in any case.  And so one of

25   the issues, it's just, as you know, a series of steps, but

1    one of the issues, if I get there, is what, if any, form of

2    relief should be granted, and what's the scope of that

3    relief.  So if you want to talk -- you've talked about it in

4    your papers, but you can talk about it.

5            MR. SELLSTROM:  Yes, absolutely.  Let me get to it,

6    Your Honor.  As you said, the Doe plaintiffs are an

7    individual, an expectant mother whose unborn child would be

8    subject to the executive order, and two membership

9    organizations, each of whom have members, as the declarations

10    attest, who are essentially similarly situated to Ms. Doe.

11    That, as Your Honor alluded to, gives them membership,

12    associational standing, something that is quite clear from

13    Supreme Court First Circuit jurisprudence, the *Hunt vs.*

14    *Washington State Apple* case, and many others that say,

15    essentially, membership organizations can bring the action on

16    behalf of individual members.

17            THE COURT:  I wasn't really asking about standing.

18    I was asking about what other members there were, in terms of

19    thinking about scope of relief.

20            MR. SELLSTROM:  That gets, then, to the question of

21    relief, Your Honor.  And I raise that because -- and we went

22    into a little bit of detail about this in our -- at the end

23    of our reply brief, citing in particular the Supreme Court's

24    decision in the *Trump vs. IRAP* case, because it is so similar

25    to the issue before Your Honor today in terms of those

1    issues.  In that case, that was also brought, the Fourth

2    Circuit case that was later consolidated with the Ninth

3    Circuit case, was brought on behalf of individuals and

4    membership organizations who were affected by the travel ban.

5    And the Supreme Court there upheld a nationwide injunction.

6    It did so by refusing a stay request from the government, but

7    it made clear that it was endorsing the nationwide relief

8    that had been granted in that case, and it did so on a number

9    of different grounds.  One, probably the most important, is

10   because it involved issues of immigration, which the Court

11   said, and the lower courts in both the Fourth and Ninth

12   Circuit also said is, you know, needs to be uniform

13   throughout the country.  That's, you know, a part of the

14   Constitution and the naturalization clause saying it has to

15   be a uniform system of naturalization.  And everyone thinks

16   of it that way, that the immigration laws, in particular, the

17   same rules need to apply to everyone.  And so for that

18   reason, there's a necessity of granting nationwide relief on

19   a facial challenge like this, that is -- that is challenging,

20   again, the analogy is clear -- an executive order that is, on

21   its face, unconstitutional.

22          There are other grounds for that same relief.

23   Again, this is in our reply brief.  We are running out of

24   room a little bit, so it's in a footnote, but the

25   Administrative Procedure Act also makes clear that nationwide

1    relief is the appropriate relief under that act, that the

2    statute says that if an enactment or an agency action is

3    found unconstitutional, the remedy is to set it aside, and

4    that, by its nature, has nationwide impact.  And that's

5    something that has -- you know, there are a number of cases

6    that we've cited that, in the regulatory context, that's the

7    case, an individual challenges something like a regulation is

8    facially unconstitutional, the result under the APA is that

9    it is set aside and nationwide relief is granted.

10                So for all of those reasons, should Your Honor find

11   in our favor, that, we believe, is the appropriate relief.

12                THE COURT:  Okay.

13                MR. SELLSTROM:  I do want to also address the

14   merits of the issue, as well, to make sure that that is laid

15   out.  And again, my brother counsel will pick up on that.

16   But the main case, going back to *Wong Kim Ark*, is cited so

17   much, because it is so decisive and so authoritative.  As

18   Your Honor knows, it is a very lengthy opinion that really

19   traverses a lot of territory, from English common law to, you

20   know, the enactments after the Revolution.  But it's

21   important not only for background, but also because it shows

22   just how wrong defendants are in their interpretation today.

23                The idea of birthright citizenship goes back to the

24   English common law, the idea that anyone born within the

25   king's dominion is automatically subject to his protection

1    and is owed allegiance to him.  And the important thing about

2    those two concepts, protection and allegiance, is that they

3    are not, in any way, subjective.  They're automatic.  It's

4    not as if the king is deciding, you know, who should I bring

5    under my protection.  It automatically adheres, at birth, to

6    anyone who is born in the king's dominion.  And on the other

7    side, the allegiance that is talked about in those cases is

8    not something that is subjective, like we think of, you know,

9    today, the Pledge of Allegiance, where somebody stands up and

10   makes that allegiance.  It's really much more fundamental

11   than that.  It is talked about in terms of the duty that is

12   owed to the king, to be subject to the king, and that is what

13   makes it automatic, that that happens whenever, you know,

14   someone is born on the country's soil.  And that is the basic

15   framework of birthright citizenship that came over to the

16   United States in the colonies, and then through the

17   constitution after the revolution.  And that's what the Court

18   in *Wong Kim Ark* makes so clear, and then takes those

19   principles and applies them to the facts of that particular

20   case.

21          Wong Kim Ark was born here in the United States, in

22   San Francisco, to parents who were Chinese citizens.  And

23   he -- then the question before the Court was he a citizen,

24   when he left the country, and then was trying to reenter.

25   And that's where the Court went into the whole concept of

1    birthright citizenship and held that, yes, because he is born

2    on American soil, he is subject to the jurisdiction of the

3    United States, under the citizenship clause.

4        The Court then illustrated that by the exceptions.

5    There are very few exceptions to that, but the Court went

6    into detail about those exceptions to essentially prove the

7    rule, to show why that rule existed.  And so, for example,

8    the Court talked about children of foreign diplomates, you

9    know, what we know today as diplomatic immunity that has long

10   existed both in England and here, the idea that those

11   individuals are not subject to the country's laws, because

12   they have that diplomatic immunity.

13       The other example given is the children of invading

14   armies during hostile occupations, who are clearly not,

15   again, subject to the country's laws.

16       The other exception that the Court raised in *Wong*

17   *Kim Ark* was something that was unique to the United States,

18   not something that existed in England, which is the case of

19   what was then referred to as Indian tribes.  The idea -- and

20   this is drawing on the earlier case, the *Elk vs. Wilkins*

21   case, authored by the same justice, by the way, who came

22   along later in *Wong Kim Ark* to then explain that in more

23   detail, that because at the time, Indian tribes, Native

24   Americans were viewed as quote/unquote, "alien nations," that

25   was essentially the same as the children of foreign

1    diplomates; that the idea, there again, is it's the exception

2    that shows the basic rule that if you are born in the United

3    States, you are subject to the United States laws.  You are a

4    citizen.  That's what the 14th Amendment was about.  That's

5    exactly what the citizenship clause was enacted to ensure,

6    and that is what *Wong Kim Ark* held.

7            That's not the only case, certainly.  It's cited to

8    so much, because it's authoritative, but there's a long line

9    of Supreme Court First Circuit cases and other cases since

10   then that make that exact same point and cite back to *Wong*

11   *Kim Ark*.  So that is the basic framework that says that you

12   cannot -- a President cannot, with the stroke of a pen, add

13   additional qualifications to that.  It's written in the

14   Constitution, and the President cannot overturn that through

15   executive order.

16           THE COURT:  Okay.  Thank you.

17           MR. SELLSTROM:  I do want to make sure that my

18   colleagues from the State have time to argue.  I did want to

19   touch, just briefly, on the equities.  Your Honor, we think

20   that on the merits, there's a high likelihood of success, and

21   that the balance of equities tips sharply in plaintiffs'

22   favor.  The declarations that we set forth go into detail

23   about that, about babies being born stateless, subject to

24   immediate deportation, all of the other consequences that

25   flow from stripping someone of citizenship, whether it's

```
 1    health ramifications and others.  This is serious, serious
 2    business to strip someone of citizenship in that way.  And
 3    the Supreme Court comes back to not only that, but what the
 4    Supreme Court talks about as a dignitary harm, the idea that
 5    taking away someone's national identity is a grave and
 6    irreparable threat.  And that's what this executive order
 7    does, and that's why the balance of equities tips sharply in
 8    plaintiffs' favor.
 9              THE COURT:  Thank you.
10              Mr. Cedrone?
11              MR. CEDRONE:  Good morning, Your Honor, Gerard
12    Cedrone for the Commonwealth of Massachusetts and the
13    plaintiff States.  As I mentioned at the outset, I'll address
14    standing and the federal government's threshhold arguments,
15    and then Mr. Dauraiswamy will address any additional points
16    on the merits and the equities of the PI.
17              THE COURT:  Just to clarify one thing, you're not
18    asserting *Wong Kim Ark*?
19              MR. CEDRONE:  We are not asserting that as a basis
20    here.
21              THE COURT:  I thought so, but I just wanted to be
22    sure.
23              Go ahead.
24              MR. CEDRONE:  And there are obviously weighty
25    interests here, but I'll take a moment in my portion to
```

1    explain why we are obviously the right plaintiffs or why we

2    obviously are proper plaintiffs to vindicate those interests.

3    Mindful of Your Honor's request that we keep it short, I'll

4    try to keep it concise, because in our view, this is not a

5    closed case on standing, both on the facts before the court,

6    in the record, and on settled law in the First Circuit and

7    Supreme Court.  We are clearly proper plaintiffs.  I'm here

8    on behalf of 18 states, the District of Columbia, and the

9    City and County of San Francisco, who will all suffer

10   immediate, direct, and predictable injury if this executive

11   order goes into effect.

12         So let me maybe take a moment to address the facts

13   that are before the Court, and then a moment to explain why,

14   under settled precedent, we clearly have standing.  We've put

15   in front of Your Honor declarations explaining the harms that

16   the jurisdictions will suffer if this order goes into effect.

17   I'll focus on the financial harms, because economic harm is

18   in the heartland of an Article III injury, and we've put

19   forward declarations showing the types of federal funding

20   that the plaintiff jurisdictions receive today, that they

21   will no longer receive if this order goes into effect.

22         And I think it's helpful to think about it in that

23   but-for way, to consider what federal funding are we

24   receiving now, what federal funding will the plaintiffs'

25   jurisdictions not receive if this order goes into effect.

1    And Your Honor has declaration after declaration explaining
2    those injuries.
3            Just speaking for the Commonwealth, millions of
4    dollars in Medicaid funding, thousands of dollars from the
5    Social Security Administration for processing Social Security
6    applications will be lost if a whole class of children are
7    considered undocumented or without lawful status.  That's
8    just what the Commonwealth has put forward.  Our colleagues
9    in other states have addressed Title IV-E funding,
10   school-based health services, really vital programs that are
11   assisted by federal dollars to help some of our most
12   vulnerable citizens, where the states will receive less
13   funding if this order goes into effect.
14           I don't take the federal defendants to dispute that
15   that federal funding will be lost.  They simply dispute
16   whether this rises to the level of an Article III injury, and
17   whether we have standing.  For the reasons we said in our
18   papers, we clearly do.  The two points that I'll just
19   reiterate today are that, essentially, every objection to
20   standing that the federal defendants make is resolved by the
21   *Biden vs. Nebraska* case in the Supreme Court, and the
22   *Massachusetts vs. HHS* case in the First Circuit.  In the
23   first case, the Biden case was a state-led challenge to then
24   President Biden's plan to forgive student loans.  The
25   argument for standing there was that this quasi-governmental

1    entity of the state --

2         THE COURT:  You view yourselves as in similar shows

3    to the Missouri entity.

4         MR. CEDRONE:  That's exactly right.  I think we're

5    actually in a stronger position.  In that case there was a

6    question of whether that quasi-governmental entity, MOHELA,

7    was really an arm of the state, such that injuries to MOHELA

8    counted as injuries to Missouri.  Here we don't even have

9    that question.  The money that we're talking about comes

10   directly to the Treasury of the Commonwealth and the

11   plaintiff jurisdictions, and will be lost otherwise.

12        So I don't think there's a way to find no standing

13   in this case, without -- without directly conflicting with

14   that case and with the *Massachusetts vs. HHS* case in the

15   First Circuit.

16        And I will note that just yesterday a judge in the

17   Western District of Washington agreed on this exact standing

18   question on exactly those grounds.

19        I think the only other point that I would like to

20   emphasize --

21        THE COURT:  Am I right that there are certain state

22   laws that turn on citizenship?

23        MR. CEDRONE:  That's right, Your Honor.  There are

24   a number of state laws about participation in civic life that

25   turn on state citizenship.  There are --

1           THE COURT:  On US citizenship?

2           MR. CEDRONE:  That's right.  For jury service, for

3     example.  And also in these joint federal state programs that

4     we've talked about, things like Medicaid, there's obviously

5     federal law that implements Medicaid, and state law that

6     implements Medicaid that tracks federal law or has to comply

7     with federal law.  But that's correct.

8           So we think this is a straightforward case on

9     standing.  I'll just mention briefly, the government -- the

10    federal government's argument that we lack a proper cause of

11    action.  Our argument on that, I think, is addressed by the

12    papers.  I'll just mention two things that are new since we

13    submitted our reply brief.  One is that, again, a judge in

14    the Western District of Washington found that --

15          THE COURT:  I read his decision.

16          MR. CEDRONE:  Exactly.  And the only other thing

17    I'll mention is that the government -- the federal government

18    is talking a little bit out of both sides of its mouth on

19    this.  The government just filed a complaint yesterday in the

20    Northern District of Illinois, the case is 25-cv-1285, the

21    *United States vs. Illinois*, and it challenges so-called

22    sanctuary policies seeking to enjoin state and city officers

23    in Illinois and Chicago and Cook County from implementing

24    those policies.  As I read that complaint, it relies on the

25    exact same *ultra vires* cause of action that we bring in

1    Count 1 and 2 of our complaint.  So I would submit that even

2    the federal government, by its actions in other cases,

3    recognizes that this cause of action to enjoin

4    unconstitutional actions by executive office holders clearly

5    exists and is recognized.

6                Unless Your Honor has further questions, I'll --

7                THE COURT:  No.  Thank you.

8                MR. DURAISWAMY:  Good morning, Your Honor.  On

9    behalf of the 18 plaintiff states, the District of Columbia,

10   and the City of San Francisco, we ask for a nationwide

11   injunction to remedy the profoundly harmful effects of the

12   President's executive order, not only the effect on millions

13   of children who will now be born without any legal status,

14   but the immense disruption to the operation of plaintiffs,

15   child health and welfare programs, and the loss of millions

16   and millions of dollars in federal funding to support those

17   programs.

18                I want to touch on the merits, Your Honor, briefly.

19   But before I get to that, with respect to the Court's earlier

20   question about the scope of relief, I want to be clear that

21   in order to remedy the harms to the plaintiffs that

22   Mr. Cedrone identified, nationwide relief is absolutely

23   essential, for the simple reason that those harms will not be

24   remedied if children living in states outside of the

25   plaintiffs' jurisdiction are denied birthright citizenship,

1    because those families can move into plaintiffs'

2    jurisdictions, and, in fact, there may be families who live,

3    for example, in Massachusetts, who, for whatever reason, give

4    birth in New Hampshire.  So for that fundamental reason that

5    people are mobile, the harms cannot be remedied without full,

6    nationwide relief.

7           Let me start with the merits.  And I don't intend

8    to repeat everything that Mr. Sellstrom said, but with the

9    Court's indulgence, I do think it's critical to reiterate the

10   historical context for this executive order.

11          150 years ago, in the wake of the civil war, the

12   framers of the 14th Amendment enshrined the right to

13   birthright citizenship in the Constitution as a reaction to

14   the *Dred Scott* decision, which itself was an aberration from

15   the well-recognized common law rule that a person born on

16   American soil was an American citizen.  Moreover, the reason

17   the framers chose to enshrine birthright citizenship as a

18   constitutional right was to ensure that it would never again

19   be subject to the vicissitudes of fleeting political

20   considerations.  In the years since, as Mr. Sellstrom has

21   explained, the Supreme Court has made explicit that

22   birthright citizenship is subject only to certain very narrow

23   and precisely defined exceptions, exceptions that were

24   articulated in *Wong Kim Ark*.  And it has also been explicit

25   that these exceptions do not include the children of

1    undocumented immigrants or those who are here are a temporary

2    basis.

3        And for the more than 100 years, the executive

4    branch has acted in accordance with this bedrock

5    constitutional principle, recognizing citizenship for all

6    children born here without regard to the lawfulness or

7    duration of their parents' presence in the United States.  In

8    the face of this century-plus of unbroken precedent and

9    practice, the President issued an executive order summarily

10   declaring that these children are not, in fact, entitled to

11   birthright citizenship, and directing every federal agency to

12   execute his order by stripping them of that right.

13       The order is flatly unconstitutional and *ultra*

14   *vires*.  Not only does it directly conflict with the

15   longstanding understanding of the scope of the citizenship

16   clause, it conflicts with a congressionally enacted statute

17   that codified that understanding into law.  And although

18   defendants attempt to justify the executive order by

19   resorting to purported policy concerns, those must be

20   addressed through lawful means, not by disregarding the

21   Constitution and statutory limits.  And indeed, the very

22   purpose of the citizenship clause was, as the office of legal

23   counsel said, 30 years ago, to remove the right of

24   citizenship by birth from transitory political pressures.

25       Mr. Sellstrom discussed *Wong Kim Ark* in depth, so I

1    won't repeat that, but I do want to focus on defendants'

2    argument that *Wong Kim Ark* is not controlling because it

3    involved the child of permanent residents, not undocumented

4    immigrants or individuals here on a temporary basis.  And

5    they premised this argument on the distinction between

6    whether parents are domiciled here long-term or they're not.

7          This argument is flawed for multiple reasons,

8    Your Honor, but first start with Supreme Court case law.

9    *Plyler v. Doe* held that undocumented immigrants fell within

10    the jurisdiction of the United States for the purposes of the

11    14th Amendment because they were subject to the full range of

12    obligations imposed by the State's civil and criminal laws.

13    The Court further explained that there was no distinction in

14    that regard between those who resided here lawfully and those

15    who resided here unlawfully.  And in several cases, the Court

16    has specifically recognized the citizenship of children born

17    to undocumented immigrants, as well as those here

18    temporarily.

19          In 1957, in *Hintopoulos vs. Shaughnessy*, the Court

20    considered a case involving two crew members of a foreign

21    ship who had been granted temporary permission into the

22    United States and who overstayed.  They gave birth to a

23    child, and the Court explained that, quote, "Of course, the

24    child is an American citizen by birth."

25          In *INS v. Rios-Pineda*, which also involved a

1    petition for suspension of deportation proceedings, the

2    Supreme Court stated plainly that the undocumented immigrant

3    in that case had given birth to a child who, quote, "Born in

4    the United States, was a citizen of this country."

5         In *Hamdi v. Rumsfeld,* the Supreme Court considered

6    the legality of the government's detention of a person born

7    in the United States on the ground that he was an enemy

8    combatant.  An amicus brief argued that the individual in

9    question was not actually a citizen because his parents were

10   on temporary visas in the country when he was born.  The

11   Court did not adopt that view, and they proceeded to analyze

12   his due process rights as a, quote/unquote, "citizen

13   detainee."

14        The First Circuit has also recognized this.  In

15   2011, in *Mariko v. Holder* -- Your Honor, I identified this

16   case after the close of briefing, so I'll give the cite.

17   It's 632 F.3d 1.  The Court considered the case of a child

18   born in the United States to parents who had entered

19   unlawfully and had removal proceedings initiated against them

20   and noted that the child simply, quote, "is a United States

21   citizen."

22        So defendants' domicile theory is squarely at odds

23   with binding Supreme Court case law.

24        Second, it's at odds with the plain language of

25   *Wong Kim Ark*.  And I won't repeat all of these quotations,

1    because we discussed them at length in our reply brief.  But

2    the Court there made clear that whether one is subject to the

3    jurisdiction is independent of their intention to continue

4    such residence or domiciliation; that one is subject to the

5    jurisdiction even if they are, quote/unquote, "merely

6    temporarily sojourning"; that one is subject to the

7    jurisdiction even if they are here, quote/unquote, "for

8    business or pleasure."

9         And for that proposition, they point to Chief

10    Justice Marshall's explication of jurisdiction in the seminal

11    case *The Schooner Exchange,* where he explained that even a

12    merchant vessel that is here for purposes of trade is subject

13    to the jurisdiction of the United States, because if they

14    were not, it would subject the nation's laws to continual

15    infraction.

16         No one, Your Honor, least of all the federal

17    defendants, would suggest that individuals who are here

18    undocumented or are here on a temporary bases are free to

19    disregard the full range of civil and criminal laws of the

20    United States simply because of their status.

21         Although there are parts of *Wong Kim Ark* that refer

22    to the fact that the parents of Wong Kim Ark were here as

23    permanent residents, that discussion is applying the holding

24    of the case to the facts before the Court.  In no way did it

25    qualify the court holding and the precisely defined

1     exceptions that Mr. Sellstrom identified.

2         Finally, Your Honor, if you unpack the reasoning of

3     defendants' domicile argument, it falls apart pretty quickly.

4     It hinges on references in both *Wong Kim Ark* and

5     *Elk v. Wilkins* to owing allegiance, and they never explain

6     what that means.  They never explain what they think it means

7     to owe allegiance or why one has to be domiciled here to owe

8     allegiance.  By contrast, *Wong Kim Ark* makes very clear what

9     they mean -- what allegiance means and what it means simply

10    is a duty to obey the law.

11        Finally, Your Honor, if domicile were a proxy for

12    allegiance as defendants posit, that would not explain why

13    Native Americans were found not to be subject to the

14    jurisdiction.  They are, after all, domiciled long term

15    within the territorial boundaries of the United States.

16        One more point on defendants' arguments,

17    Your Honor, with respect to this issue.  The notion of

18    consent.  They attempt to rely on *Elk's* comment that no one

19    can become a citizen of the nation without its consent.  That

20    statement is taken out of context clearly.  Because *Elk*

21    involved a situation where someone who -- a Native American

22    who had been born within the jurisdiction of a tribal nation,

23    subsequently attempted, through his own volition, to subject

24    himself to the jurisdiction of the United States.  And the

25    Court treated that, essentially, as a naturalization

1    question.  And their point was that you cannot naturalize

2    yourself, only the nation can consent to your naturalization.

3         At bottom, Your Honor, defendants are not really

4    litigating the scope of Supreme Court precedents.  They're

5    seeking to relitigate those precedents directly.  That's

6    clear from the recitation of historical sources that were

7    largely cited in the dissent in *Wong Kim Ark* that were known

8    to and considered by the majority, and that were rejected in

9    the majority's holding.  It's clear from the defendants'

10   attempt to rely on the language of the 1866 Civil Rights Act,

11   which *Wong Kim Ark* expressly discussed and explained the

12   language of which was no different than the meaning of

13   subject to jurisdiction as they articulated it in that

14   opinion.  And it's clear from the policy argument that

15   defendants advance that dual citizenship is problematic, that

16   the government must have tools to address unlawful entry, and

17   the like.

18        To be clear, Your Honor, the executive branch does

19   have some discretion when it comes to the enforcement of

20   immigration laws with respect to the entry, admission, and

21   removal of noncitizens.  But this is not a case about the

22   entry, admission, or removal of noncitizens.  This is a case

23   about children who are born in the United States.  And the

24   executive branch has no more power to take away their

25   constitutional rights to birthright citizenship because they

1  believe it will disincentivize unlawful entry than they have

2  the power to take away their First Amendment rights, their

3  due process rights, or their equal protection rights because

4  they believe it may disincentivize illegal reentry.

5       Finally, Your Honor, even if the Court believed

6  that *Wong Kim Ark* was wrongly decided and even if it had the

7  power to overturn that precedent, plaintiffs would still

8  prevail on their *ultra vires* claims based on the Immigration

9  and Nationality Act, because Congress, at the time of

10  enacting that statute, codified the then existing

11  understanding of what it meant to be subject to the

12  jurisdiction, which was articulated in *Wong Kim Ark*.

13       Let me move quickly, Your Honor, to the equities.

14  Mr. Cedrone has already explained the harms to the states.

15  There's no serious argument that they are not irreparable.  I

16  think it's undisputed that many of the harms could not be

17  addressed, many of the fiscal harms could not be remedied

18  through any administrative channel.  And even as to the ones

19  that involve reimbursement programs, like Medicaid,

20  defendants ask the question as to whether they could be

21  recovered through administrative processes, but the fact that

22  they don't answer that question is very telling.  They don't

23  actually identify any administrative process they have where

24  plaintiffs could recover those funds.

25       On the public interest, I think it's quite

1    straightforward, Your Honor.  I think this is really

2    derivative of the merits.  Once the Court answers the merits,

3    the government has no public interest in violating a

4    constitutional principle in order to address policy concerns.

5          So finally, as I mentioned, Your Honor, we are

6    seeking nationwide relief for the reasons I mentioned before.

7    And I would say that the government raises, in their

8    opposition brief, in a footnote or request that the PI

9    proceedings be consolidated on the merits and that the Court

10    proceed to a final judgment, plaintiffs' position is --

11    Your Honor, is that if the Court is inclined to grant relief,

12    then the record is complete in terms of supporting that

13    relief, and we fully support granting a full and final

14    permanent injunction.

15          THE COURT:  So are you saying that you support me

16    consolidating -- that this is the trial on the merits?  You

17    support that?

18          MR. DURAISWAMY:  We do.  Obviously to the extent

19    the Court believes that there's some defect in the record

20    that would not support --

21          THE COURT:  If I think that everything -- if I

22    think I don't need -- there isn't any -- are you asking for

23    the possibility of more?  Are you saying that if I don't

24    think there's anything else needed, I should just proceed to

25    enter final judgment?

```
 1              MR. DURAISWAMY:  I think what we're saying,
 2     Your Honor, is if you're prepared to enter relief, then
 3     certainly we think that that relief can proceed by way of a
 4     permanent injunction.
 5              THE COURT:  I see.  So if you persuade me that a
 6     preliminary injunction is appropriate, then what you're
 7     saying is I should enter a permanent final injunction.
 8              MR. DURAISWAMY:  That's exactly right, Your Honor,
 9     because to reach that conclusion, I think that would -- the
10     record would be sufficient to support a permanent injunction,
11     as well.  And I would also point out that nothing that we've
12     submitted in the factual record has been disputed by the
13     defendants in any way.  So we really are here on legal
14     arguments.
15              THE COURT:  Okay.  Thank you.
16              Is it Mr. Hamilton or Mr. Rosenberg?
17              MR. HAMILTON:  Good morning, Your Honor.  Eric
18     Hamilton again for the defendants.
19              This Court should deny the plaintiffs' motion for a
20     preliminary injunction.  Our brief identifies a number of
21     threshold problems with plaintiffs' claims.  I want to start
22     by highlighting just one.  That is the lack of standing of
23     the New Jersey plaintiffs.  The New Jersey case is a group of
24     18 states, the District of Columbia, and the City and County
25     of San Francisco.  They lack standing under the
```

1    *United States vs. Texas* case of the Supreme Court.  In that

2    case, two states, Texas and Louisiana, challenge a federal

3    immigration policy, and they premised their challenge on

4    incidental economic harms.

5            Now, plaintiffs respond that

6    *United States vs. Texas* dealt with what the Court called an

7    unusual lawsuit seeking the enforcement of federal law, and

8    that's true.  But it is also true that there's language in

9    *Texas* that is specific to issues of state standing.  We

10   highlight Footnote 3 of that opinion, which calls out the

11   problem of states resting theory on incidental economic

12   harms, which we view as an identical problem to that here.

13           If plaintiffs --

14           THE COURT:  Is direct injury, financial injury

15   enough, or not?

16           MR. HAMILTON:  A direct injury would be different.

17   And that distinguishes *Biden vs. Nebraska*, as well as the

18   Department of Commerce case.  In *Biden vs. Nebraska* that's

19   actually --

20           THE COURT:  But why isn't the injury they advance

21   direct?

22           MR. HAMILTON:  Well, it's an incidental one,

23   because it sort of depends on a chain of --

24           THE COURT:  Well, you -- the President determines

25   or directs that person -- Doe's child -- nowhere in your

1    brief challenged Doe's standing, right?

2            MR. HAMILTON:  That's right.  That's right.

3            THE COURT:  So actually, the lack of standing is

4    not a basis to deny the injunction.

5            MR. HAMILTON:  Well, you're talking about the --

6            THE COURT:  I can't -- it would be wrong for me to

7    deny both motions for injunction for lack of standing.  Do

8    you agree with that?

9            MR. HAMILTON:  Well, I'm not sure, Your Honor,

10   because we have two separate cases right now --

11           THE COURT:  I asked for both.  So you made a

12   challenge to standing of the state plaintiffs' case, right?

13           MR. HAMILTON:  Exactly.  The argument I'm making

14   right now has nothing to do with the --

15           THE COURT:  So it's not a basis to deny both

16   motions for injunction.

17           MR. HAMILTON:  Right.  Right.

18           THE COURT:  In fact, it would be wrong for me to

19   deny injunctive relief only on standing grounds, if I applied

20   that to both cases.

21           MR. HAMILTON:  For the Doe case, yes.  For the New

22   Jersey case --

23           THE COURT:  Right.

24           MR. HAMILTON:  Yes.  No -- yes, though.

25           THE COURT:  So you agree with me that I would

1    commit legal error if I denied both motions for injunctive

2    relief and the only reason I cited was the lack of standing.

3           MR. HAMILTON:  That's right.  That's right.

4           THE COURT:  So the reason the Doe plaintiff, if I

5    understand it correctly, has standing, given the -- her

6    pregnancy and the birth of her child anticipated to occur

7    after the effective date of the executive order, is that that

8    would cause her direct injury.

9           MR. HAMILTON:  Exactly.  Exactly.

10           THE COURT:  All right.  So my question is, since

11    the executive order would -- what follows from the executive

12    order is that Doe's child is not a citizen under the

13    executive order, right?

14           MR. HAMILTON:  Yes.

15           THE COURT:  And so -- and that causes her direct

16    injury sufficient for Article III, right?

17           MR. HAMILTON:  Yes.

18           THE COURT:  So why -- and since what the states

19    point to is various monies they get based on people being

20    citizens, right?

21           MR. HAMILTON:  Yes.

22           THE COURT:  And so the money they would get for

23    Doe's child being a citizen, they're not going to get if the

24    executive order is in place, right?

25           MR. HAMILTON:  Yes.  But there's more steps

1    involved to get there.  And again, it's a problem that

2    *United States vs. Texas* addressed.  States are unique kinds

3    of plaintiffs, and if these incidental economic harms were

4    sufficient to confer standing --

5         THE COURT:  I guess that's my question.  What does

6    it mean to you, or what do you think it meant to the Supreme

7    Court to be incidental?

8         MR. HAMILTON:  Well, I think it means where

9    there's -- there's kind of a leap you have to take, and it's

10   not a direct regulation.  I think, again, the *Nebraska*

11   against *Biden* case is actually unhelpful for plaintiffs,

12   because there there was multiple states that were challenging

13   the policy.  And the Court didn't hold that all the states

14   had standing --

15        THE COURT:  Didn't Justice Roberts say that the

16   standing of one state was sufficient for him to proceed in

17   his opinion to address the merits?

18        MR. HAMILTON:  It is, but the standing that was

19   sufficient there was specific to a very unique state program,

20   where the state --

21        THE COURT:  Well, but wasn't the standing there

22   that the Supreme Court said that the elimination of the

23   program -- the elimination -- the forgiveness, rather, of the

24   loans would mean that the entity, as a downstream effect,

25   would no longer receive fees for managing those loans, right?

 1              MR. HAMILTON:  Yes, but it was unusual that

 2     Missouri --

 3              THE COURT:  But it wasn't that the federal

 4     regulation said anything directly to that entity.  It was

 5     just a consequence of the -- forgiving the loans, right?

 6              MR. HAMILTON:  Yes.  But it had a direct effect on

 7     federal loan servicers, which is the business that the State

 8     of Missouri decided to get into.

 9              THE COURT:  So but why is that a direct -- you

10     concede that's a direct effect in that case.

11              MR. HAMILTON:  Yes.

12              THE COURT:  And so if that's a direct effect, why

13     isn't it a direct effect to say that we will -- the number of

14     people we're going to pay you for processing Social Security

15     numbers, for example, is going to be less, because there's

16     going to be, under this order, less birthright citizens.

17              MR. HAMILTON:  Because the persons directly

18     affected are people like O. Doe, people whose citizenship

19     hinges on the executive order.

20              THE COURT:  Well, no, but they get money for

21     submitting the applications, just the way the servicer got

22     money for servicing the loans.  What's the difference?

23              MR. HAMILTON:  Well, there's still that extra step

24     between the individuals within the states and then the

25     incidental effects that the states --

```
1                 THE COURT:  What's the extra step?

2                 MR. HAMILTON:  Well, the extra step is that the

3      states are claiming that they're going to receive certain

4      funds or not --

5                 THE COURT:  Well, you haven't disputed that.

6                 MR. HAMILTON:  We haven't disputed that.

7                 THE COURT:  So that's a fact.  That's a fact that

8      you conceded, essentially.

9                 MR. HAMILTON:  Yes.  But there's still --

10                THE COURT:  Yes, you conceded it.

11                MR. HAMILTON:  Yes.  Yes.

12                THE COURT:  Right.  So that is a fact that they

13     will lose that money.

14                MR. HAMILTON:  We're not challenging that on the

15     present record.  But Your Honor --

16                THE COURT:  Or seeking to expand the record.

17                MR. HAMILTON:  Correct.  Correct.

18                THE COURT:  So if they are losing that, why isn't

19     that direct?  I'm just misunderstanding -- I'm just not

20     understanding what is this extra step?  I mean, because what

21     seems like the analogy is you would agree with me that in the

22     Nebraska case, the loans that were forgiven were not the --

23     were the loans owed by borrowers, right?

24                MR. HAMILTON:  Right.

25                THE COURT:  And not loans owed by that Missouri
```

1    entity.

2          MR. HAMILTON:  Yes.  I think, though, that the

3    boundaries and standing are frequently fuzzy, but we have

4    *Biden vs. Nebraska* and *United States vs. Texas*.  Those are

5    two very recent state standing cases in the US Supreme Court.

6    In the end, we think this case is more analogous to the

7    *United States vs. Texas* case.

8          But even aside from state standing, the Court

9    should also deny the motion for preliminary injunction,

10   because none of the plaintiffs have shown --

11         THE COURT:  Can I ask one other question before --

12   you're moving on to something else, right?

13         MR. HAMILTON:  I am.

14         THE COURT:  Just before you go on to that, one

15   other question about standing.

16         You would agree with me, or do you agree with me,

17   is maybe a better way to ask the question, do you agree with

18   me that a person who acquires birthright -- in birthright

19   United States citizenship, under the Section 1 of the 14th

20   Amendment, by virtue of that clause, automatically acquires

21   citizenship in the state in which they reside?

22         MR. HAMILTON:  I do, yes.

23         THE COURT:  Which means that a person who has

24   birthright -- who is born, say, in Massachusetts,

25   Massachusetts -- that person, if they are a person who

1    gets -- you concede there are people who get birthright

2    citizenship, even after the EO, right?

3            MR. HAMILTON:  Yes, of course.

4            THE COURT:  Right.  Of course.  Okay.  So somebody

5    is born, let's just say Massachusetts, and they're born in

6    Massachusetts, and they're a person who acquires birthright

7    citizenship.  Okay?  They -- Massachusetts has to give them,

8    recognize them as citizens of Massachusetts.  As a citizen of

9    Massachusetts, right?

10            MR. HAMILTON:  It does.

11            THE COURT:  And so why doesn't that fact that -- so

12    in that sense, that clause operates directly on the states.

13    Right?

14            MR. HAMILTON:  It does.  And candidly, I think

15    Your Honor has articulated a theory of standing that is

16    stronger than anything the plaintiffs have suggested.  They

17    did not make that argument.  Arguments in favor of standing

18    are forfeited.  But even then, I would still question the

19    state standing, because the 14th Amendment would just set a

20    floor for state citizenship.  It isn't necessarily the case

21    that the --

22            THE COURT:  But it severs the unitary connection.

23    The 14th Amendment established this unification between

24    citizenship of the United States and a state.

25            MR. HAMILTON:  It did.

| 1 | THE COURT:  And your interpretation severs that, to |

1       THE COURT:  And your interpretation severs that, to

2  some degree, because it, first of all, narrows it, right?

3       MR. HAMILTON:  Yes.

4       THE COURT:  It puts it in a narrower interpretation

5  than theirs.

6       MR. HAMILTON:  It would affect who becomes a

7  citizen of the State, but, again, this is a forfeited

8  argument by the state and plaintiffs.

9       Turning, though, to the likelihood of success on

10  the merits --

11       THE COURT:  Well, I just -- okay.  I understand.

12  Go ahead.

13       MR. HAMILTON:  Plaintiffs -- none of the plaintiffs

14  show a likelihood of success on the merits, which, of course,

15  is also a requirement for a preliminary injunction.  That's

16  because all of the plaintiffs arguments rest on a misreading

17  of the 14th Amendment of the Constitution.  The 14th

18  Amendment was enacted to repudiate the US Supreme Court's

19  shameful decision in *Dred Scott vs. Sanford*, and ensure it

20  would never again be the law of this country that an

21  African-American might be denied American citizenship based

22  on his or her race.  But the framers of that amendment did

23  not intend to, and did not, in fact, create a loophole to be

24  exploited by temporary visitors to the country and illegal

25  aliens.  The 14th Amendment says that all persons --

```
 1              THE COURT:  So just to stop you there.  So your
 2    position is that the definition of who is and who is not a
 3    birthright citizen, articulated in the EO is what the 14th
 4    Amendment always meant?
 5              MR. HAMILTON:  Yes.
 6              THE COURT:  And so to the extent it's been
 7    construed, understood, or applied differently, those are, as
 8    you put it, misimpressions or misreadings?
 9              MR. HAMILTON:  Yes.
10              THE COURT:  And am I correct that prior to -- well,
11    even up to today, people who the EO says don't -- are not
12    birthright citizens have been recognized by the United States
13    government as birthright citizens?
14              MR. HAMILTON:  Yes.  This would be a change in
15    policy.
16              THE COURT:  And so those people, under this Trump
17    administration, have been recognized as birthright citizens,
18    right?
19              MR. HAMILTON:  Yes, the policy was not slated to
20    take effect until the future.
21              THE COURT:  Right.  So even before -- putting aside
22    the injunctions issued by the other judges, the -- this
23    administration has been recognizing people who fall into
24    the -- who otherwise, executive order applied to, they have
25    been recognized as US citizens, right?
```

```
 1              MR. HAMILTON:  Correct.  Nothing has changed in
 2   executive practice.
 3              THE COURT:  I'm not asking about change.  I'm
 4   asking about --
 5              MR. HAMILTON:  Yeah.
 6              THE COURT:  The federal government has been
 7   recognizing them as citizens, right?
 8              MR. HAMILTON:  Yes.
 9              THE COURT:  And that was true under the Biden
10   administration, right?
11              MR. HAMILTON:  Yes.
12              THE COURT:  And that was true under the first Trump
13   administration, right?
14              MR. HAMILTON:  Yes.
15              THE COURT:  And that was true at least back to
16   World War II, if not earlier.
17              MR. HAMILTON:  Yes.
18              THE COURT:  And so my question then is -- and your
19   interpretation is that -- or your view is that all of
20   those -- those are wrong.  Correct?
21              MR. HAMILTON:  Yes.
22              THE COURT:  So that, in fact, in law, really, the
23   people who were born -- who were born in the United States --
24   forgetting about the injunctions, but prior to February 19th,
25   okay, who are children of -- who would fall within the two
```

1    categories of executive orders, they are not -- the proper

2    reading of the clause one of the 14th Amendment, they are not

3    birthright citizens.

4              MR. HAMILTON:  That's right.

5              THE COURT:  So if that's true, then how do they

6    have citizenship?

7              MR. HAMILTON:  Well, this --

8              THE COURT:  And how do you lawfully -- like you

9    have just told me, essentially, that people that the federal

10   government is now recognizing as US citizens, even putting

11   before -- putting aside the injunctions, before the

12   injunctions were into place, whatever it was the other day,

13   that they were not -- they were -- you were recognizing

14   people as citizens who are not birthright citizens under the

15   United States Constitution, right?

16             MR. HAMILTON:  Right.  So the executive order is

17   forward looking only, and that is consistent with how the US

18   Supreme Court has handled the misapplication of

19   constitutional law in the immigration context previously.

20   The *Sessions vs. Morales-Santana* case corrected a -- a -- it

21   corrected a constitutional rule of law, and at the end of

22   that opinion, the Court announces that it is applying its

23   rule prospectively only, and so the path that this executive

24   order takes is consistent with that.

25             And I'd also note --

1          THE COURT:  So you're suggesting that when you

2   identify -- when -- the President's not the Supreme Court,

3   right?  They're different.

4          MR. HAMILTON:  Of course.

5          THE COURT:  Right.  So you're suggesting that that

6   principle, then, that you're articulating on behalf of the

7   executive branch, is that the executive branch identifies an

8   error in the application of constitutional law, that's what

9   we're talking about, that's the executive branch's position,

10  right?

11         MR. HAMILTON:  Yes.

12         THE COURT:  And that then the executive branch can

13  choose or must apply it prospectively?

14         MR. HAMILTON:  Yeah, I don't know that we've taken

15  a position on that, but in this case, it was the President's

16  judgment that a forward-looking policy was --

17         THE COURT:  I'm asking what the law is.

18         MR. HAMILTON:  We haven't taken a position on that.

19         THE COURT:  So -- as you stand here now, you don't

20  know whether or not the executive branch has the authority to

21  make it not prospective or -- I'm sorry.  That's a bad

22  question.

23         Is it -- you don't know whether that you must make

24  it, under the law, prospective?

25         MR. HAMILTON:  Yeah, it's not something that we've

```
 1    taken a position on, but the executive order's path is

 2    consistent with the line that the US Supreme Court drew in

 3    that Sessions case in recent turns.

 4            THE COURT:  So you're not taking a position, either

 5    way, as to whether or not it would be either required to say

 6    to people who prior -- who are born prior to February 19th

 7    that they don't have citizenship.  You're not taking a

 8    position whether or not it's required for you to do that,

 9    assuming you prevail on your view.

10            MR. HAMILTON:  Well, that is certainly not the

11    policy of the executive order.

12            THE COURT:  I understand.  Right.  The executive

13    order doesn't say that.  But my question is whether the

14    law -- you're not taking a position on whether the law, if

15    you're correct on the meaning of the Constitution, would

16    require to apply it to people before February 19th.

17            MR. HAMILTON:  Oh, no.  That is not something that

18    we're arguing.  We do not think of that as a requirement

19    under the Sessions case.

20            THE COURT:  You don't think the law requires you to

21    do that.

22            MR. HAMILTON:  Exactly.

23            THE COURT:  Okay.

24            MR. HAMILTON:  Apologies if I misunderstood

25    Your Honor's questions.
```

1          THE COURT:  No problem.

2          So -- and whether you have discretion to do that is

3    something that you're not taking a position on now.

4          MR. HAMILTON:  That's right.

5          THE COURT:  Okay.  So your view is -- I don't want

6    to put words in your mouth, I just want to make sure I

7    understand.  You're not required -- your view is the law does

8    not require, when you're correcting a constitutional

9    interpretation, to apply it to all people who would be

10   subject to it.  You can apply it instead prospectively.

11         MR. HAMILTON:  That's right.

12         THE COURT:  So the law doesn't require that and

13   you're not taking a -- that is, you're not saying you do have

14   discretion to apply it retroactively -- or not retroactively.

15   You're saying you do -- you're not -- you're taking no

16   position as to whether or not you -- the executive branch has

17   the discretion to say to someone born before February 19th,

18   you're not a United States citizen, because you're not under

19   the proper interpretation of the clause.

20         MR. HAMILTON:  Correct, but it definitely is not a

21   requirement to do that.  The executive orders forward-looking

22   policy is consistent with law.

23         And I'd also note, because Your Honor referenced

24   that recent executive practice has been something different.

25   That recent Supreme Court decisions have -- have not been

1    afraid to chart a different course, despite recent practice.

2    For example, in the *Chadha* case, the legislative veto was on

3    the books --

4          THE COURT:  So your position is that -- well,

5    that's for the Supreme Court, right?  It's not for me to

6    chart a different course under constitutional law than the

7    Supreme Court has chartered, right?

8          MR. HAMILTON:  Supreme Court precedent is, of

9    course, binding, but we think that the language that

10    plaintiffs are leaning into is *dicta*.

11          THE COURT:  Right.  So your position is that the --

12    I can deny the injunction because this case is not controlled

13    by the Supreme Court precedent?

14          MR. HAMILTON:  Exactly.

15          THE COURT:  Okay.  I got it.  Go ahead.

16          MR. HAMILTON:  So I'll return to the 14th Amendment

17    citizenship clause, and specifically that subject to the

18    jurisdiction thereof clause, because that is what is at

19    issue --

20          THE COURT:  By the way, one of your arguments for

21    the subject, too, is that -- that it's premised on mutual

22    consent between the person and the polity, right?

23          MR. HAMILTON:  Yes.

24          THE COURT:  Okay.  That's that the polity, that's

25    that the government, right, consents to the person's

1   citizenship, right?

2           MR. HAMILTON:  Right.

3           THE COURT:  And that the person consents to being a

4   citizen, right?

5           MR. HAMILTON:  Yes.

6           THE COURT:  And you agree that the 14th Amendment,

7   that when it became -- the moment it became part of the

8   Constitution, the moment it was enacted and became law, that

9   the children born to enslaved people in the United States, at

10  that moment, they became citizens.  The US born, natural

11  born, born in the United States children of enslaved peoples,

12  they became citizens at that moment.

13          MR. HAMILTON:  Yes.

14          THE COURT:  But their parents, you agree, came to

15  the United States or many of them, in chains.

16          MR. HAMILTON:  (Nods head.)

17          THE COURT:  Yes?

18          MR. HAMILTON:  Yes.

19          THE COURT:  And they did not consent to come to the

20  United States, those people who came in chains.

21          MR. HAMILTON:  No.

22          THE COURT:  Any hesitation?

23          MR. HAMILTON:  Well --

24          THE COURT:  As to whether they consented to come to

25  the United States?

```
 1              MR. HAMILTON:  No, they certainly did not.

 2              THE COURT:  And they didn't consent to become part

 3     of this polity, correct?

 4              MR. HAMILTON:  No.

 5              THE COURT:  So -- okay.  Well, that's just what I

 6     wanted to understand the theory.  Go ahead.

 7              MR. HAMILTON:  Yeah, I mean, obviously --

 8              THE COURT:  But they did -- but their children

 9     became citizens of the United States, if they were born in

10     the United States.

11              MR. HAMILTON:  Yes.  Yes.

12              THE COURT:  And that was one of the points of the

13     14th Amendment.

14              MR. HAMILTON:  Absolutely.  Absolutely.

15     Repudiating Dred Scott vs. Stanford was the central purpose

16     of the citizenship clause.

17              THE COURT:  But those people didn't consent.

18              MR. HAMILTON:  That's -- that's right, but it

19     was -- I mean, slavery --

20              THE COURT:  That is right, isn't it?

21              MR. HAMILTON:  Yes.  Yes.  Elk vs. Wilkins and Wong

22     Kim Ark.

23              THE COURT:  So consent wasn't a part of the meaning

24     of the 14th Amendment.

25              MR. HAMILTON:  Well, I don't think it's the sole
```

1  meaning of the subject to the jurisdiction thereof.  I'd

2  start with --

3  THE COURT:  But you've advanced that as an argument

4  that if you didn't -- if they didn't have those consents, you

5  were outside the scope of the 14th Amendment, but you just

6  agreed with me that there's a whole swath of people they had

7  in mind, who, in law, became citizens and that was their

8  intent.  That was the purpose of those words, and they didn't

9  consent.

10  MR. HAMILTON:  Right.  I think consent is

11  frequently relevant, but, perhaps, not with every

12  application.

13  Being born into the allegiance of the country is

14  the concept that *Elk vs. Wilkins* and *Wong Kim Ark* both

15  identify as -- as --

16  THE COURT:  Were those children, when they were

17  born in the United States, and they were enslaved, were they

18  born into allegiance to the United States?

19  MR. HAMILTON:  I'm sorry, I missed the first part.

20  THE COURT:  Were the children who were born in the

21  United States, who became citizens under the 14th Amendment,

22  when they were born, the relevant time is birth, right?

23  MR. HAMILTON:  Yes.

24  THE COURT:  When they were born, were they born

25  into allegiance to the United States?

1          MR. HAMILTON:  I think it would have to be

2     understood that way to reconcile that with *Wong Kim Ark* and

3     *Elk vs. Wilkins*.

4          I'd also want to highlight the Civil Rights Act of

5     1866, which is important because it was drafted by the

6     Congress at, basically, the same time that the 14th Amendment

7     was drafted by Congress, both were passed in the first half

8     of 1866.  And that act uses slightly different language.  It

9     says that all persons born in the US and not subject to any

10    foreign power, excluding Indians not taxed, are hereby

11    declared to be citizens.  And it was just a few months later

12    that the 14th Amendment was passed by the Congress and sent

13    out for ratification.

14          I know Your Honor has read our briefs.  I do want

15    to highlight one piece of legislative history in our briefs,

16    it's from Senator Lyman Trumbull who was one of the principle

17    authors of the 14th Amendment.  He said during the

18    congressional debates, what do we mean by subject to the

19    jurisdiction of the United States not owing allegiance to

20    anybody else.  That is what it means.  And that understanding

21    of subject to the jurisdiction thereof is --

22          THE COURT:  Owing no allegiance to anyone else.

23    That's your position, right?

24          MR. HAMILTON:  Right.

25          THE COURT:  Complete, with no allegiance to anyone

1    else, to another country.

2            MR. HAMILTON:  And that's what *Elk vs. Wilkins*

3    says.  It talks about direct and immediate allegiance and

4    that's language that reappears --

5            THE COURT:  So how can the -- you agree with me

6    that lawful permanent residents are obviously not citizens of

7    the United States, right?

8            MR. HAMILTON:  That's right.

9            THE COURT:  And they are, in most, if not all

10   cases, citizens of another country, right?

11           MR. HAMILTON:  Yes.

12           THE COURT:  And they owe allegiance, in some form,

13   to those other countries.

14           MR. HAMILTON:  Yes.  Yes.

15           THE COURT:  And yet their children -- you agree

16   that their children, if born in the United States, are

17   birthright citizens?

18           MR. HAMILTON:  Yes.  Because the common law

19   recognizes that --

20           THE COURT:  But they owe allegiance to other

21   people, their parents owe allegiance to another country.

22           MR. HAMILTON:  Right.

23           THE COURT:  But even if you owe allegiance to

24   another country, your child can be a birthright citizen.

25           MR. HAMILTON:  That's right.  The allegiance.

1          THE COURT:  So why is it complete.

2          MR. HAMILTON:  The allegiance inquiry doesn't turn

3     on whether there exists another allegiance based on some

4     foreign body of law, it turns on whether there's an

5     allegiance to the United States or not, under controlling

6     American law.  And the common law recognized that individuals

7     owe an allegiance to the country where their domicile is.

8     And so lawful permanent residents do have a domicile in the

9     United States, and so they have that allegiance to the United

10    States, as well.

11          I also want to say a few words about plaintiffs'

12    theory of the clause, because it makes subject to the --

13          THE COURT:  So if lawful permanent residents were

14    here and they -- the -- one of them was -- the mother was

15    pregnant, and then they went overseas, like, what is the

16    child's domicile -- you're saying it's the domicile of the

17    parents?

18          MR. HAMILTON:  Yes.  Well, if the parents went

19    overseas, then the child would not be born in the United

20    States.

21          THE COURT:  (Nods head.)

22          MR. HAMILTON:  But I do want to address plaintiffs'

23    theory.  The Doe plaintiffs say that subject to the

24    jurisdiction thereof means anyone --

25          THE COURT:  I'm sorry, wait.  So Canadians who

 1    cross the border to give birth in an American hospital,

 2    they're not birthright US citizens?

 3           MR. HAMILTON:  Well, it would depend on whether

 4    they were a citizen or lawful permanent resident.

 5           THE COURT:  No, they're Canadian citizens, like in

 6    some places, Canadians, the border is close.  They live --

 7    many Canadians live close to the border.  If they happen to

 8    either be in the United States for the day, for shopping, or

 9    whatever, and went into labor, and went to a US hospital, or

10    maybe the closest medical facility is a US medical facility,

11    but for whatever reason -- a Canadian citizen who -- not

12    lawful permanent resident, just Canadian citizens, came over

13    to the hospital, gave birth there, then they wouldn't be

14    birthright citizens.

15           MR. HAMILTON:  That's right.  Temporary visitors to

16    the United States do not have a domicile in the United

17    States.  They do not owe an allegiance to the United States.

18           THE COURT:  So the allegiance comes from the

19    domicile of the parents.

20           MR. HAMILTON:  It does.  It does, as well as the

21    citizenship.

22           THE COURT:  Okay.  Go ahead.

23           MR. HAMILTON:  Again, the Doe plaintiffs say that

24    this clause applies to anyone to whom United States law

25    applies.  The states say that it means being subject to US

1    authority.  That would render subject to the jurisdiction

2    thereof redundant, because anyone who is in the United States

3    that would be true for.

4         Plaintiffs' theory also does not explain the

5    categories of individuals that *Elk* and *Wong Kim Ark* say are

6    not subject to the jurisdiction thereof.  *Elk* holds that

7    Indians are not subject to the jurisdiction thereof, but the

8    US can regulate Indian commercial activities, property, and

9    adoptions, can also punish Indians for crimes.  Foreign

10    diplomats are also subject to US law.  It's true that they do

11    have a limited immunity, but foreign diplomats can still be

12    sued in civil courts and that immunity is subject to

13    abrogation.  Surely it isn't the case that the citizenship

14    clause turns on Congress's expansion and contraction of

15    diplomatic immunity.

16         I also want to address the Plyler against --

17         THE COURT:  So that's not really the immunity that

18    they're talking about, right?

19         MR. HAMILTON:  I understood them to --

20         THE COURT:  I mean, police officers have qualified

21    immunity, right?

22         MR. HAMILTON:  Yes.

23         THE COURT:  Nobody is suggesting that because a

24    police officer has qualified immunity that if he has a

25    child -- the plaintiffs aren't suggesting that if he has a

1    child, that that's the kind of immunity that they're talking

2    about with respect to subject to the jurisdiction, assuming

3    the police officer is a citizen and has a child born in the

4    United States.  That's not the kind of immunity they're

5    talking about.  They're talking about --

6              MR. HAMILTON:  I agree.  They're talking about

7    diplomatic immunity, but that is still something that

8    Congress has the authority to alter.

9              THE COURT:  Yes.  But they were talking about its

10   understanding of what they were -- what they meant by those

11   words then, not whether there was any possibility of that

12   shifting.  I mean, in fairness, like their argument, you're

13   transforming their argument into a regulatory argument that

14   anybody to whom US law has any sort of application to.

15   That's not what their interpretation of what the subject to

16   means.

17             MR. HAMILTON:  I respectfully disagree.  I'll just

18   read from page 10 of the State's briefs.  They say that

19   subject to the jurisdiction thereof means, quote, "subject to

20   US authority."  And I think that's very difficult to square

21   at least with the *Elk vs. Wilkins* case, holding with respect

22   to Indians.

23             THE COURT:  If you interpret authority to mean the

24   application of any civil law to the person.

25             MR. HAMILTON:  Well, but also criminal.  There are

1    statutes.

2              THE COURT:  Well, civil or criminal.

3              MR. HAMILTON:  Yes.  Also, I'll say a few words on

4    scope of relief issues, since Your Honor asked my friends on

5    the other side about that.

6              THE COURT:  Yes, of course.

7              Before you get to that, I have one other, just,

8    question.

9              So this -- under the EO, citizenship turns -- you

10   agree with me that, before the EO, whether right or wrong,

11   misimpression, misreading or not, the way citizenship,

12   birthright citizen was applied was you just looked at where

13   the person was born, correct?  At least for within the United

14   States -- the 50 states.

15             MR. HAMILTON:  Well, no, because you do have

16   *Elk vs. Wilkins* and then the categories of individuals in

17   *Wong Kim Ark* that are recognized as not being subject to the

18   jurisdiction thereof.

19             THE COURT:  So there's a few people -- so in that

20   sense, you're saying even before the EO, or -- and the way

21   it's been done, a birth certificate alone -- determining the

22   fact that you were born here did not necessarily completely

23   resolve the question of whether you were a birthright

24   citizen.

25             MR. HAMILTON:  Yes.  And let me add one point to

1  the answer.  There is a statute, 8 USC 1401, that expands

2  citizenship --

3          THE COURT:  Sure.

4          MR. HAMILTON:  -- beyond the citizenship clause.

5  That is the reason that Indians have birthright citizens in

6  the United States.

7          THE COURT:  So but my -- under the EO, there is

8  a -- you are expanding the number of people who fall into the

9  category, who, merely looking at their birth certificate

10  doesn't establish their citizenship.

11          MR. HAMILTON:  That's right.  The EO mandates the

12  change of --

13          THE COURT:  So you would have to have -- in order

14  to have -- to determine whether someone is a citizen going

15  forward, not just on February 25th, but as this goes --

16  because the intent is to have this be -- this is the

17  proper -- the intent of the executive branch is that this is

18  how it should be forever, because that is how it was

19  established in 1868, right?

20          MR. HAMILTON:  Exactly.  The executive order wants

21  to align executive practice with what the law requires.

22          THE COURT:  Well, what the clause says.

23          MR. HAMILTON:  Yes, which is what the law and 8 USC

24  1401 requires.  Both are relevant authorities in determining

25  citizenship.

```
 1              THE COURT:  So to then determine who's a citizen,
 2    you have to look into who the parents are going forward,
 3    right?
 4              MR. HAMILTON:  Yes.
 5              THE COURT:  In almost every case, more so -- more
 6    and more as time goes forward?
 7              MR. HAMILTON:  Yes.  Yes.
 8              THE COURT:  And so -- well, one, doesn't that make
 9    citizenship more like bloodline citizenship as a general
10    proposition?
11              MR. HAMILTON:  I don't think so.  The rule that
12    we're proposing is both citizenship and domicile and --
13              THE COURT:  And to sort of, just as a practical
14    matter, to effectuate that, aren't you going to need a list
15    of people?
16              MR. HAMILTON:  I -- so the executive order directs
17    federal agencies to work through implementation issues during
18    the 30-day period.  That has not happened because of the
19    temporary restraining order.
20              THE COURT:  Well, presumably they started that
21    before.  Those orders only went into effect 48 hours ago.
22              MR. HAMILTON:  Oh, Your Honor, a federal judge in
23    Seattle entered --
24              THE COURT:  Oh, the TRO.  Right.  I forget about
25    that.  I'm sorry.  Yes, I forgot.
```

1      MR. HAMILTON:  So I'm not able to answer questions

2  about implementation.  That's something that the executive

3  order excepted.

4      THE COURT:  So you have no idea, for example,

5  whether or not this would require the federal government or

6  whether the -- what comes out of this is the federal

7  government would require every person -- keep a list of every

8  person, whether they were citizen or not, so that it could be

9  determined when the State Department was issuing passports or

10  whether there was any other question that they would need to

11  reference that list.  You have no idea whether or not that

12  that's what's contemplated?

13      MR. HAMILTON:  Correct.  It's Section 3 of the EO

14  that directs agencies to work on guidance and work through

15  the implementation issues.  That work was not allowed to go

16  forward under the TRO issued in Seattle just days after the

17  EO was signed.

18      THE COURT:  It doesn't prevent -- the TRO or the

19  PIs don't prevent thinking about that issue, right?

20      MR. HAMILTON:  I don't know that we've taken a

21  position on that, but it did -- it did enjoin Section 3, as

22  well as other portions of the executive order --

23      (Counsel confers.)

24      MR. HAMILTON:  And we've interpreted it as a

25  pencils down executive order -- or sorry.  A pencils down

```
 1    temporary restraining order.

 2              THE COURT:  I see.  Okay.  Go ahead.

 3              MR. HAMILTON:  On the scope of relief, so the state

 4    standing issue that I began with is important because the --

 5              THE COURT:  So just turning back to that, it may be

 6    or it may be not, but it may be that it would require

 7    everybody to register, or maybe not.  You just don't know and

 8    haven't addressed it.

 9              MR. HAMILTON:  I can't --

10              THE COURT:  You can't answer.

11              MR. HAMILTON:  I can't answer any implementation

12    questions.

13              THE COURT:  Okay.  Go ahead.

14              MR. HAMILTON:  To the extent the Court is inclined

15    to enter injunctive relief, there should not be a nationwide

16    injunction.  The plaintiff states lack standing, and the

17    associational plaintiffs have acknowledged that their members

18    are limited to Massachusetts.  And so there's no

19    justification for a nationwide injunction, which also is

20    inconsistent with Article III authority, which is limited to

21    resolving cases and controversies not to setting nationwide

22    rules of policy applicable to parties not before the Court.

23              THE COURT:  When just circling -- I'm sorry.  Do

24    you have something else?

25              MR. HAMILTON:  No, Your Honor.
```

```
 1            THE COURT:  Okay.  One last question about
 2   forfeiting.  Does that principle come into play in the PI
 3   when there hasn't been an answer, there hasn't been a motion
 4   to dismiss?
 5            MR. HAMILTON:  I think so.  I don't know how we
 6   could --
 7            THE COURT:  When did -- so at what point do people
 8   forfeit standing arguments?
 9            MR. HAMILTON:  Well, standing arguments are --
10            THE COURT:  There's a different question -- I'm
11   sorry to interrupt.  Let me just divide it.  I understand it
12   to say hey, they didn't address it, Judge, I didn't get a
13   chance to respond to it.  That's not a forfeit argument.
14   That's just an argument that it's not fair, either you
15   shouldn't consider it, or I should get a chance to respond,
16   but a forfeit argument is it's gone from the case.  That's
17   what you mean by forfeit.
18            MR. HAMILTON:  Right.  Right.
19            THE COURT:  And so my question is then do you
20   forfeit it if you don't articulate it in the complaint, or
21   like if they had -- when -- when are you locating it under
22   the federal rules that they forfeited it.
23            MR. HAMILTON:  For purposes of deciding this
24   motion, it is forfeited because it doesn't appear anywhere in
25   the papers, but I suppose Your Honor would have to anticipate
```

```
 1    that the states would have a different standing theory in the
 2    future that they haven't taken yet.  But again, even if that
 3    happened, we don't think that theory of standing is
 4    sufficient, because the citizenship clause is just setting a
 5    floor for citizenship.  We don't see anything in there that
 6    would prevent states.
 7              THE COURT:  Well, doesn't it affect, for example,
 8    if you lower the floor, that's essentially what you're doing.
 9    You're saying you're lowering the floor back to what it
10    should be.  But you certainly -- however you characterize it,
11    you're lowering it, but it's a narrower floor, or a lower
12    floor than what they've articulated or what was previously
13    was misimpressed or --
14              MR. HAMILTON:  Yes.  Yes.
15              THE COURT:  So that effects states in terms of the
16    number of citizens in the state, right?
17              MR. HAMILTON:  In a sense.  But at bottom.
18              THE COURT:  Well, not in a sense.  I mean, the
19    Doe's child born here, without the executive order, would
20    have been treated as a birthright citizen, right?
21              MR. HAMILTON:  Yes.
22              THE COURT:  And so with the executive order, if
23    it's enforced, she would not be treated as a citizen, Doe's
24    child.
25              MR. HAMILTON:  That's right.  That's right.
```

```
 1              THE COURT:  And so that -- actually, not in a
 2   sense, that actually reduces by one the number of US citizens
 3   in Massachusetts, right?
 4              MR. HAMILTON:  Yes.  But, again, we're talking
 5   about a theory of standing that plaintiffs have not argued.
 6              THE COURT:  Right, but then you were explaining to
 7   me why it didn't work as a theory.  That's what I'm wondering
 8   about.
 9              MR. HAMILTON:  Right.  Right.  And it also doesn't
10   work because the states would be able to still extend
11   citizenship to --
12              THE COURT:  But not United States citizenship --
13              MR. HAMILTON:  That's right.
14              THE COURT:  -- which would matter for various
15   things -- for example, apportionment -- aren't
16   representative's apportionment based on the population,
17   right?
18              MR. HAMILTON:  Yes.
19              THE COURT:  Or just population.  But aren't there
20   provisions in the Constitution, I think, that relate to the
21   number of citizens?
22              MR. HAMILTON:  There are provisions in the
23   constitution that relate to the number of citizens.  I'm not
24   prepared to spell them out all here.
25              THE COURT:  Right.  Okay.  Thank you.
```

1          MR. HAMILTON:  Thank you, Your Honor.

2          THE COURT:  Anything you want to say in response?

3          MR. SELLSTROM:  Thank you, Your Honor, and I'll be

4     brief, just a couple of points to respond to.  I think, in

5     particular, the colloquy between the Court and defense

6     counsel about the retroactive nature of the executive order

7     really highlights what the defendants are asking to do and

8     wanting to do, which is to take the place of what the Supreme

9     Court does.  The whole idea that there is an effective date

10    to the executive order and the particular categories that are

11    called out really shows that this is something that is not

12    executing laws and Constitution that exists now by asking to

13    change that.  The similar -- very similar in the arguments

14    that defense counsel was making about the *Wong Kim Ark* case

15    and domicile and subject to the jurisdiction of, all of those

16    arguments are specifically addressed by the *Wong Kim Ark* case

17    that domicile is not the controlling factor there, and that

18    the consent is not what is at issue here.  These are issues

19    that are addressed to the Supreme Court and are not

20    controlling law that exists today.  And that's from *Wong Kim*

21    *Ark*, along to the *Hintopoulos* case that we cited in note 11,

22    and all of the other cases that have since -- come since

23    then.

24          Finally, I just wanted to go to the point where the

25    state had said that they would consent to converting the

1    preliminary injunction hearing into a permanent injunction.

2    The Doe plaintiffs also agree with that, that on the record

3    that Your Honor has, should the Court be inclined to issue a

4    preliminary injunction, we believe a permanent injunction

5    would also be appropriate.

6              THE COURT:  Okay.

7              Anything else you want to add?

8              MR. CEDRONE:  Two brief points on standing,

9    Your Honor.  First on the question of whether we've forfeited

10   standing on the basis of the sovereign harms to the

11   plaintiffs, we don't think we have, for the reason that your

12   question highlighted.  This is a preliminary posture, there

13   hasn't been an answer, there hasn't been a motion to dismiss.

14   We put forward in our PI papers what we think was the

15   clearest and most straightforward path to finding standing in

16   this case, with the limited space we had to do so.  I don't

17   think we forfeited other arguments.

18             Your Honor has heard fulsome argument on it here

19   today, and to the extent you were -- had questions about the

20   basis for standing that we included in the papers, but

21   thought that there was another more straightforward path, we

22   could also put in supplemental briefing on that issue.

23             I don't -- that brings me to my second point, which

24   is I don't think the Court needs to go down that path,

25   because the grounds for standing in the briefing make this a

 1    very straightforward case.  The federal defendants rely on

 2    *United States vs. Texas* to try to make this seem like a muddy

 3    or fuzzy, in their words, issue.  This is not that case.

 4    That case, the opinion of the Supreme Court was infused with

 5    the fact that the plaintiff states in that case had a really

 6    *sui generis* request.  They were asking federal courts to

 7    issue a mandatory injunction to the federal government to

 8    arrest more people.  And the Court's opinion made clear that

 9    that was such an unprecedented request that it bore on the

10    state's standing.  Even assuming there's some kind of fuzzy

11    line between what's direct and what's indirect, this case is

12    clearly on the direct side of the line.

13            Your Honor can take everything that Mr. Hamilton

14    said about why the government views this case as not direct

15    and apply it to the situation in *Biden vs. Nebraska*, and

16    apply it to the situation in *Massachusetts vs. HHS*.  You're

17    familiar with the facts in *Biden vs. Nebraska*.  There were

18    student loans.  The President had a policy to forgive them.

19    That policy was obviously immediately directed at the student

20    loan holders, but it had a direct financial impact on MOHELA,

21    that state entity.

22            We're in the same position here.  We have a

23    contract with the federal government, for example, to process

24    Social Security numbers, and the federal government doesn't

25    dispute the factual premise that that contract, other

1     arrangements with the federal government, will result in a

2     direct financial harm -- or result in a financial harm to the

3     plaintiffs, and that is clearly direct within the meaning of

4     both *Biden vs. Nebraska*, and *Mass. vs. HHS* in the First

5     Circuit.

6              THE COURT:  Thank you.

7              MR. CEDRONE:  Thank you.

8              MR. DURAISWAMY:  Just one point, Your Honor, on

9     this issue of allegiance and owing allegiance to a foreign

10    power.  So again, I think it's unclear what the government

11    thinks allegiance means.  They don't -- what it means to owe

12    allegiance, they don't really say that.  To the extent that

13    it just means having a tie of some sort to another foreign

14    power, then that would apply equally to people who are lawful

15    permanent residents, and it would convert the citizenship

16    clause into something that absolute -- that prohibits dual

17    citizenship or dual nationality, which we know it does not.

18             What allegiance means, as *Wong Kim Ark* has

19    explained, is a duty to obey, and so owing allegiance to a

20    foreign power is problematic from the standpoint of the

21    citizenship clause only when, while you are in the United

22    States, you have a principle duty to a foreign power that is

23    effectively operating with the express or implied consent of

24    the United States, as Chief Justice Marshall explained in the

25    *Schooner Exchange*, where that foreign power is effectively

1    operating within the territorial boundaries of the United

2    States.

3            So that is the case with respect to tribal nations,

4    which were considered in the 19th Century to be alien powers

5    within the United States.  That is the case when there is a

6    hostile entity that is occupying part of the territory of the

7    United States, and that is the case when you have foreign

8    representatives of a foreign government, who are allowed into

9    the country, and are acknowledged to be essentially operating

10   within the United States as emissaries of their foreign

11   government.  It is not the case with respect to lawful

12   permanent residents, as -- which defendants do not dispute,

13   and there is no reason, if it's not the case with respect to

14   lawful permanent residents that it should be the case with

15   respect to those who are here long term, short term,

16   whatever, but who are not here under the domain and under the

17   auspices, or as representatives of a foreign power.

18           THE COURT:  Thank you.

19           You didn't have anything else, right?

20           MR. HAMILTON:  I'll just make one comment on

21   Rule 65, consolidation of trial on the merits with the PI.

22   We agree with that, with the Doe plaintiffs' concession that

23   their members are only in Massachusetts.

24           Thank you, Your Honor.

25           THE COURT:  That is your position, right?  They're

1  only in Massachusetts?  The members of the associations, for

2  purposes of preliminary and permanent relief.

3  　　　　　MR. SELLSTROM:  That's right.

4  　　　　　THE COURT:  Just one last question, Mr. Hamilton.

5  　　　　　One of the things, just so I understand correctly,

6  that you're urging that I do is conclude that -- on the

7  merits, putting aside standing and cause of action, but on

8  the merits, deny the injunction, because the -- I have the --

9  you think I have the authority to do that within the case law

10  from the Supreme Court?

11  　　　　　MR. HAMILTON:  Exactly.

12  　　　　　THE COURT:  And you've read -- I'm not going to get

13  the name of the case right, there's a lot of cases that I've

14  read in the last two weeks, it's a 1985 decision by unanimous

15  Supreme Court, so nine to zero, Justice White, I think, wrote

16  the opinion for the Court *INS v.* -- I think it was *Rios*.  Are

17  you familiar with that case?

18  　　　　　MR. HAMILTON:  I am not, Your Honor.

19  　　　　　THE COURT:  Let me explain it to you and then

20  just -- I want to understand the position that you're urging

21  on me.

22  　　　　　In that case, according to the Supreme Court, the

23  only opinion that they issued, the father and mother paid a

24  professional smuggler to illegally bring them into the United

25  States, and they came into the United States without

1    inspection.  So they would be undocumented, or illegal

2    aliens, or whatever term you want to use, right?  You agree?

3            MR. HAMILTON:  That sounds right.

4            THE COURT:  It seems right.  I'm just telling you

5    what they said as I read it, as I understand it.

6            And they then had a child in the United States,

7    according, again, to the opinion from the Supreme Court.  And

8    they, in immigration proceedings, asserted that to deport

9    them, the parents, was to *de facto* deport their child.  And

10   they lost that claim in the immigration proceedings and they

11   went to the Supreme Court.  And I think the question in the

12   Supreme Court turned on whether they were entitled to have --

13   it was a question of just the scope of the attorney general's

14   discretion to reopen that proceeding, given that was what

15   they were urging, and so that's the context of the case.

16           And you're in all of these cases, right?  Or are

17   you just in the case before me?

18           MR. HAMILTON:  You're asking about my role in the

19   different cases?

20           THE COURT:  Yeah.

21           MR. HAMILTON:  I --

22           THE COURT:  It doesn't matter.  You don't have to

23   tell me, but I would assume that all of you are talking to

24   each other, but you don't have to tell me that, either.

25           So in any event, the Supreme Court called that

1    child a United States citizen, born in the United States and,

2    therefore, was a citizen.  And so I guess my question is, I

3    know one answer you'll give me is the express holding of that

4    case was not -- the question -- I'm sorry, the question

5    presented to the Supreme Court was not was that child a

6    United States citizen, so, therefore, there's not a four

7    corners.  So that's one answer I'm sure you would give me,

8    right?

9            MR. HAMILTON:  Yes.  Yes.

10           THE COURT:  And so my related, follow-up question

11   is you're telling me that in the face of that context of that

12   case, where citizenship -- the underlying claim turned on the

13   citizenship of the child, that -- and the unanimous Supreme

14   Court saying those things, nonetheless, as a district judge,

15   I have the authority to say they're wrong, effectively.

16           MR. HAMILTON:  We read comments like that to be

17   *dicta*.  And *dicta* is something that even *Wong Kim Ark* talks

18   about.  *Wong Kim Ark* cites the *Cohens* case and warns against

19   overreading *dicta*.

20           THE COURT:  So your position is, (a), that

21   statement, assuming I've accurately described it to you, is

22   wrong --

23           MR. HAMILTON:  Yes.

24           THE COURT:  -- that the person was a United States

25   citizen.  The nine justices when they said that, they were

 1   wrong.

 2            MR. HAMILTON:  From my understanding of --

 3            THE COURT:  From the way I've described it,

 4   assuming if I've described it fairly.

 5            MR. HAMILTON:  Yes.

 6            THE COURT:  Then they would be wrong.

 7            MR. HAMILTON:  Yes.  And I --

 8            THE COURT:  And then I have -- because it's *dicta*,

 9   in your view, as I've described it, then I have the authority

10   to disregard that?

11            MR. HAMILTON:  Yes.  But if I could add, our brief

12   does cite some post-*Wong Kim Ark* cases of the Supreme Court

13   decided in 1902 and 1920.  This is page 32 of our brief, that

14   include the domicile condition we've identified in stating

15   *Wong Kim Ark's* rule.  So I think there are conflicting --

16            THE COURT:  But the power of the 1985 decision

17   would be more -- since it's more recent since the 1902

18   decision, might have more -- neither -- not necessarily

19   binding.  I don't think it's a binding holding about that

20   question.  I'm only asking you, just a narrow question, and I

21   think your answer is yes, that I -- I think the answer is, A,

22   those nine justices were wrong when they said that, assuming

23   my recitation of the facts is correct.  They were wrong, and

24   B, I'm not bound by that.

25            MR. HAMILTON:  Yes.

```
 1              THE COURT:  And therefore, I would be -- it would
 2    be appropriate for me to not follow that statement.
 3              MR. HAMILTON:  That's right.
 4              THE COURT:  Okay.
 5              MR. HAMILTON:  Thank you, Your Honor.
 6              THE COURT:  Thank you.
 7              MR. SELLSTROM:  Your Honor, could I raise one more
 8    point on the issue of the membership?
 9              THE COURT:  So just to be clear, so I'm only
10    bound -- in the view of the Department of Justice, I am only
11    bound to the four corners of holdings of the United States
12    Supreme Court?
13              MR. HAMILTON:  Well, I think the rules are also
14    applicable, but I don't think plaintiffs --
15              THE COURT:  No, no.  I'm just asking, am I bound --
16    I think what you're saying to me is I'm only bound by the
17    holdings?
18              MR. HAMILTON:  Yes.
19              THE COURT:  And not anything more.
20              MR. HAMILTON:  Yes.  Yes.
21              THE COURT:  And then I'm -- not -- so just the
22    holdings, that's all that binds me, in any case.
23              MR. HAMILTON:  And *dicta* can be disregarded.
24              MR. SELLSTROM:  The final point that I wanted to
25    make, Your Honor, on that was just to make sure the record is
```

1    clear, that the membership is primarily Massachusetts

2    residents.  I don't want to represent to the Court all of the

3    membership, but it is certainly primarily --

4              THE COURT:  I think the question -- what

5    Mr. Hamilton meant by that, and you'll correct me,

6    Mr. Hamilton, if I'm not reciting it accurately.  I think

7    what he meant by that is for purposes of this case in

8    deciding all of the issues in play, by the motion, I should

9    decide it as if the members were only from Massachusetts, not

10   that that -- and that assumption would not be binding in any

11   other case involving the association, simply that we would be

12   deciding that that's what this case was deciding.

13              That's -- is that what you were saying,

14   Mr. Hamilton?

15              MR. HAMILTON:  Yes, Your Honor.

16              THE COURT:  That's how I understand.

17              MR. SELLSTROM:  That is correct in terms of

18   primarily membership that is residents of Massachusetts,

19   correct.

20              THE COURT:  So if I proceed to final determination,

21   I should -- I would be assuming and accepting, just for

22   purposes of this case, that the only association members are

23   in Massachusetts.

24              MR. SELLSTROM:  That's correct, Your Honor.

25              THE COURT:  Okay.  And that just to be clear, so,

1    like, that wouldn't bind -- you could come forward in the

2    next case, filed in four minutes or in four years, or

3    whenever, and take the position that members of the

4    association, some, many, lots of them, are elsewhere, and you

5    wouldn't be bound by this assumption or this determination

6    that I made, even if it's necessary to the judgment, right?

7              MR. SELLSTROM:  Yes, Your Honor.

8              THE COURT:  You agree with that, Mr. Hamilton?

9              MR. HAMILTON:  Yes, Your Honor.

10             THE COURT:  Okay.  All right.  So I'll take it

11   under advisement.  I intend to issue a written decision

12   promptly, but I don't think you should expect it today, and I

13   want to think about all the issues.  They're important and

14   serious, and I thank you very much.  You have a good day.

15             (Court in recess at 11:29 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                           Dated this 7th day of February, 2025.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20   _____

21   Rachel M. Lopez, CRR
     Official Court Reporter

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE et al.,           ) | |
|                   ) | |

O. DOE et al.,                                     )
)
        Plaintiffs,                              )
)
v.                                                )          Civil No. 25-10135-LTS
)
DONALD J. TRUMP et al.,                           )
)
        Defendants.                              )
_____)
)
STATE OF NEW JERSEY et al.,                       )
)
        Plaintiffs,                              )
)
v.                                                )          Civil No. 25-10139-LTS
)
DONALD J. TRUMP et al.,                           )
)
        Defendants.                              )
_____)

MEMORANDUM OF DECISION ON MOTIONS FOR PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

In this pair of lawsuits, two groups of plaintiffs advance similar challenges to the legality

of one executive order among many issued by President Donald Trump on January 20, 2025.

The executive order is titled "Protecting the Meaning and Value of American Citizenship" ("the

EO").  Exec. Order No. 14,160 (Jan. 20, 2025).[1]  The EO identifies two "categories of

---

[1] Multiple copies of the EO have been made part of the record before the Court.  When
referencing submissions filed in Doe et al. v. Trump et al., No. 25-cv-10135, the Court will cite
to "Doe, Doc. No. __ at __."  For submissions filed in New Jersey et al. v. Trump et al., No. 25-
cv-10139, the Court will cite to "New Jersey, Doc. No. __ at __."  All such citations use the
document and page numbering appearing in the ECF header, except where pinpoint citations

individuals born in the United States" to whom the EO says "the privilege of United States

citizenship does not automatically extend," then directs federal departments and agencies to

cease issuing or accepting "documents recognizing United States citizenship" for such

individuals born after February 19, 2025.  Doe, Doc. No. 1-1 §§ 1-3.

      Both groups of plaintiffs assert that the EO violates the Citizenship Clause of the

Fourteenth Amendment to the United State Constitution, along with other constitutional

provisions and federal statutes.  Each group seeks a preliminary injunction preventing the EO

from taking effect.  Doe, Doc. No. 10; New Jersey, Doc. No. 3.  The motions are fully briefed

and were the subject of a motion hearing.[2]

      In opposing the requests for injunctions, the defendants assert an array of arguments,

which the Court addresses briefly here and in detail below.  For starters, each plaintiff has

standing to sue, because the uncontested facts establish each would suffer direct injury from the

EO's implementation.  The plaintiffs are also likely to succeed on the merits of their claims.  In a

lengthy 1898 decision, the Supreme Court examined the Citizenship Clause, adopting the

interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO.  The

rule and reasoning from that decision were reiterated and applied in later decisions, adopted by

---

reference enumerated sections or paragraphs within the document.  The EO appears at Doe, Doc.
No. 1-1, and New Jersey, Doc. No. 1-1.

[2] The Court has accepted amicus curiae briefs from the following groups: a collection of local
governments and officials representing seventy-two jurisdictions in twenty-four states; eighteen
members of Congress serving on the House Judiciary Committee; the Immigration Reform Law
Institute; the State of Iowa along with seventeen other states; the State of Tennessee; and former
U.S. Attorney General Edwin Meese III.  Doe, Doc. Nos. 32, 38, 40; New Jersey, Doc. Nos. 88,
118, 120, 122, 127, 129.  The Court has considered these submissions only insofar as they
concern legal issues and positions advanced by the parties.  See United States v. Sturm, Ruger &
Co., 84 F.3d 1, 6 (1st Cir. 1996) (explaining "an amicus cannot introduce a new argument into a
case").  While several of these briefs were helpful, the submission by the State of Tennessee was
especially well written.

Congress as a matter of federal statutory law in 1940, and followed consistently by the Executive Branch for the past 100 years, at least. A single district judge would be bound to apply that settled interpretation, even if a party were to present persuasive arguments that the long-established understanding is erroneous.

The defendants, however, have offered no such arguments here. Their three main contentions are flawed. First, allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents, nor must it be exclusive, as the defendants contend. Applying the defendants' view of allegiance would mean children of dual citizens and lawful permanent residents would not be birthright citizens—a result even the defendants do not support. Next, the defendants argue birthright citizenship requires the mutual consent of the person and the Nation. This theory disregards the original purpose of the Fourteenth Amendment: to recognize as birthright citizens the children of enslaved persons who did not enter the country consensually, but were brought to our shores in chains. There is no basis to think the drafters imposed a requirement excluding the very people the Amendment aimed to make citizens. Simply put, the Amendment is the Nation's consent to accept and protect as citizens those born here, subject to the few narrow exceptions recognized at the time of enactment, none of which are at issue here. Finally, the Amendment requires states to recognize birthright citizens as citizens of their state of residence. The text includes no domicile requirement at all.

Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake. In so doing, these interpretations stray from the text of the Citizenship Clause. The Fourteenth Amendment says nothing of the birthright citizen's parents, and efforts

3

to import such considerations at the time of enactment and when the Supreme Court construed the text were rejected. This Court is likewise bound to reject such theories now.

The plaintiffs have also satisfied the other preliminary-injunction factors. Each plaintiff faces irreparable harm, the defendants face none, and the public interest favors enjoining the EO. Accordingly, the plaintiffs in each case are entitled to an injunction preventing implementation of the EO. The individual and two associations who are plaintiffs in the earlier-filed action will be fully protected by an injunction limited to the individual and the members of the associations. The later-filed case, brought by eighteen states and two cities, requires a broader, nationwide injunction. Applying traditional equity principles, such relief is necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions.

For these reasons, the plaintiffs' motions are ALLOWED. This ruling, explained further below and memorialized in separate Orders issued concurrently with this Memorandum, is based on straightforward application of settled Supreme Court precedent reiterated and reaffirmed in various ways for more than a century by all three branches of the federal government.

I.    BACKGROUND

Within hours of taking office, the President signed the EO, which he describes as "an integral part of [his] broader effort to repair the United States' immigration system and to address the ongoing crises at the southern border." Doe, Doc. No. 22 at 14. The EO, however, does not directly concern immigration; rather, it seeks to define the scope of birthright citizenship in the United States. In the section stating its purpose, the EO acknowledges that the Citizenship Clause and a section of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1401, confer citizenship on any person born in the United States and "subject to the jurisdiction thereof." Doe, Doc. No. 1-1 § 1. The EO goes on to identify two "categories of individuals born

4

PA338

in the United States" but "not subject to the jurisdiction thereof," to whom birthright citizenship "does not automatically extend." Id.  A child falls within one of the identified categories if, at the time of their birth, their father was neither a citizen nor a lawful permanent resident ("LPR") of the United States, and their mother was 1) "unlawfully present in the United States," or 2) lawfully but temporarily present in the United States "(such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)." Id.

The second section announces that it is "the policy of the United States that no department or agency" of the federal "government shall issue [or accept] documents recognizing United States citizenship" of children within the identified categories.  Id. § 2.  The stated policy "shall apply only to persons who are born" after February 19, 2025.  Id.  The EO expressly does not restrict the ability of U.S.-born children of LPRs to receive or use documents recognizing "their United States citizenship."  Id.  Next, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with" the EO, and that no one within any identified department "act[s], or forbear[s] from acting, in any manner inconsistent with" the EO.  Id. § 3(a).  The EO further requires "[t]he heads of all executive departments and agencies" to "issue public guidance" by February 19, 2025, regarding implementation of the EO.  Id. § 3(b).

In a complaint filed the day the EO issued, an individual plaintiff and two nonprofit associations challenged its legality and sought equitable relief preventing its implementation. See generally Doe, Doc. No. 1.  The individual plaintiff, proceeding under the pseudonym "O. Doe," is "an expectant mother" who is lawfully present in the United States "through Temporary

PA339

Protected Status" ("TPS").  Id. ¶ 13.  Doe's husband, the father of the child due to be born next

month, is neither a citizen nor LPR of this country.  Id.  The baby will be Doe's second child; her

first, now seven years old, also was born in the United States.  Doe, Doc. No. 11-1 ¶ 3.

       Doe's co-plaintiffs are La Colaborativa and the Brazilian Worker Center, two

membership organizations located in eastern Massachusetts who provide immigration-related

assistance, among other services.  Doe, Doc. No. 1 ¶¶ 14-15.  Both organizations have members

who are unlawfully present in the United States, some of whom "are either pregnant or plan to

grow their families in the future."  Id.; see Doe, Doc. No. 11-2 ¶ 4; Doe, Doc. No. 11-3 ¶¶ 8-10.

Though the present record does not conclusively establish where the organizations' members

live, counsel at the motion hearing suggested the Court could view the members as located

"primarily" (though perhaps not exclusively) in Massachusetts.  Mot. Hr'g Tr. at 10, 76.[3]  Doe

and the organizations' members have submitted unrebutted declarations describing the harms

they allege the EO will cause the children it targets, who will be treated as noncitizens lacking

any recognized, lawful immigration status.  See generally Doe, Doc. Nos. 11-1 to -3.

       The day after Doe and her co-plaintiffs filed suit, New Jersey and a group of seventeen

other states, along with the District of Columbia and San Francisco (collectively, "the State

plaintiffs"), instituted a separate action also challenging the EO under provisions of the

Constitution and other federal statutes.[4]  New Jersey, Doc. No. 1.  Along with their complaint,

---

[3] The transcript of the February 7, 2025, hearing on the motions appears on both dockets.  Doe, Doc. No. 44; New Jersey, Doc. No. 142.

[4] Besides New Jersey, the plaintiffs in this action are Massachusetts, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan (through its Attorney General), Minnesota, Nevada, New Mexico, New York, North Carolina, Rhode Island, Vermont, and Wisconsin.  Venue is proper in the District of Massachusetts because the defendants are all officers or agencies of the United States, and at least one plaintiff in each case resides in Massachusetts.  See 28 U.S.C. § 1391(e)(1)(C).

the State plaintiffs filed a motion for a preliminary injunction supported by a memorandum and more than two dozen exhibits.  New Jersey, Doc. Nos. 3, 5, 5-1 to -27.  The exhibits include declarations by various representatives of state agencies describing financial and administrative burdens they anticipate will result from the EO.  See, e.g., New Jersey, Doc. Nos. 5-2, 5-8, 5-14, 5-18 (describing impacts of EO on federal funding related to state health insurance programs, education, foster care, and hospital-based process for acquiring Social Security numbers at birth).

Both complaints name as defendants the President, the State Department, the Secretary of State, the Social Security Administration, and the Acting Commissioner of Social Security.  The State plaintiffs also sued the United States, the Department of Homeland Security, the Secretary of Homeland Security, the Department of Health and Human Services, and the Acting Secretary of Health and Human Services.

On January 23, 2025, the Doe plaintiffs filed their own motion for a preliminary injunction, supporting memorandum, declarations, and other exhibits.  Doe, Doc. Nos. 10, 11, 11-1 to -10.  After hearing from the parties, the Court deemed the cases related to one another and set a consolidated briefing schedule.  New Jersey, Doc. No. 71; Doe, Doc. No. 12.  The defendants opposed both motions, challenging the State plaintiffs' standing to sue, arguing no plaintiff has advanced a valid cause of action, and urging that the plaintiffs have not satisfied the test governing preliminary-injunctive relief.  See generally Doe, Doc. No. 22.  Both sets of plaintiffs replied.  Doe, Doc. No. 33; New Jersey, Doc. No. 123.  The Court heard argument from all parties on February 7, 2025.

II.  DISCUSSION

Before addressing the factors governing requests for injunctive relief, the Court disposes of two preliminary challenges that the defendants suggest foreclose consideration of the merits of the plaintiffs' motions.  As the Court will explain, the defendants' opening pair of procedural

7

PA341

challenges, like their substantive arguments opposing the motions, wither in the face of settled and binding Supreme Court precedent.

    A.   <u>Threshold Issues</u>

        1.  *Standing*

The defendants first argue that the State plaintiffs lack standing to bring the claims alleged in their complaint.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 18-22.  They are wrong.

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies'" in which a plaintiff can "demonstrate [a] personal stake." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021).  To establish standing under Article III, a "plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).  This test is satisfied if state- or local-government plaintiffs show that an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which they otherwise would be entitled.  <u>See</u> <u>Dep't of Com. v. New York</u>, 588 U.S. 752, 767 (2019).  Such a showing establishes injury that is "sufficiently concrete and imminent" and "fairly traceable" to the challenged action, thereby satisfying Article III.  <u>Id.</u>

The State plaintiffs easily meet this standard.[5]  Uncontested declarations from officials representing several State plaintiffs articulate various forms of federal funding that will be

---

[5] The defendants direct their standing challenge against the State plaintiffs as a group.  They have not contested the showing made by any individual State plaintiff or subset of State plaintiffs.  Even if the defendants had done so, the result would be the same.  The record before the Court includes sworn declarations establishing standing on the part of at least several State plaintiffs.  No more is required at this juncture.  <u>See</u> <u>Nebraska</u>, 143 S. Ct. at 2365 ("If at least one plaintiff has standing, the suit may proceed."); <u>United States v. Texas</u>, 599 U.S. 670, 709 n.1 (2023) (Alito, J., dissenting) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.").

diminished as a direct result of the EO.  States receive federal funding to cover portions of services like health insurance, special education, and foster care in amounts that depend on how many "eligible" children receive such services.  Citizenship is one component of eligibility for purposes of these programs.  Pursuant to the EO, fewer children will be recognized as citizens at birth.  That means the number of persons receiving services who are "eligible" under the identified federal programs will fall—and, as a direct result, the reimbursements and grants the State plaintiffs receive for these services will decrease.  The reduction to such funding is a concrete and imminent injury directly and fairly traceable to the EO, redressable by the injunctive relief the State plaintiffs seek.

This is all the Constitution requires.  Two decisions of the Supreme Court, both authored by Chief Justice Roberts, make the point.  In 2023, the Chief Justice, joined by five other Justices, explained that Missouri had standing to challenge executive action discharging federal student loans, where a quasi-state agency stood to lose fees it would have collected for servicing the forgiven loans.  Nebraska, 143 S. Ct. at 2366.  A few years earlier, the Chief Justice conveyed the Supreme Court's unanimous conclusion that "at least some" states had standing to challenge executive action revising the United States census.  New York, 588 U.S. at 767-68.[6] The proposed changes at issue raised the likelihood that persons without lawful immigration status would be undercounted, and states faced reductions in federal funds allocated according to population.  Id.  The State plaintiffs here challenge the EO based on precisely the same sort of direct financial impacts.  They have identified federal grants and reimbursements to which they

---

[6] Though some Justices parted ways as to other issues in the case, all agreed as to standing.

are entitled that will diminish under the EO.  As in <u>Nebraska</u> and <u>New York</u>, therefore, the State

plaintiffs have Article III standing.[7]

The defendants have neither disputed the State plaintiffs' showing of harm nor

materially distinguished the Chief Justice's analysis.  Their standing challenge hinges on an

attempt to analogize this case to <u>United States v. Texas</u>.  There, the Supreme Court held state

plaintiffs lacked standing to compel the federal government to pursue more "arrests and

prosecutions" for violations of immigration laws.  599 U.S. at 678-79.  The analogy is inapt.[8]

<u>Texas</u> involved "novel" theories of standing and a "highly unusual" claim that the Executive

Branch was not sufficiently vigorous in exercising its prosecutorial discretion.  <u>Id.</u> at 681, 684.

This case, however, concerns the bounds of citizenship guaranteed by the Constitution—not an

---

[7] The Court does not consider a *parens patriae* theory of standing, because the State plaintiffs are not pursuing it.  The State plaintiffs also probably have standing based on their sovereign interests.  The Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside.  U.S. Const. amend. XIV, § 1.  States have general sovereign interests in which persons are their citizens.  They very likely also have sovereign interests in which persons are U.S. citizens, as state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship.  <u>E.g.</u>, N.J. Stat. Ann. § 2B:20-1(c); Mass. Gen. Laws ch. 234A, § 4.  The defendants essentially conceded at the motion hearing that the State plaintiffs would have standing under these theories, but suggested the theories were "forfeited," at least "[f]or purposes of deciding [the pending] motion[s]," because they were not advanced in the State plaintiffs' submissions thus far.  Mot. Hr'g Tr. at 40, 63.  The defendants cited no authority for their forfeiture theory.  The plaintiffs generally endorsed the sovereign-interest theories during the hearing.  Given the strength of the plaintiffs' showing of direct financial harms, the Court need not resolve whether the State plaintiffs' sovereign interests supply an alternative basis for satisfying Article III.

[8] In fact, the defendants' discussion of <u>Texas</u> in their papers verges on misleading.  The language upon which they most heavily rely appears in a footnote quoted in their opposition memorandum and referenced during the motion hearing.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 18-19 (quoting <u>Texas</u>, 599 U.S. at 680 n.3).  Contrary to the defendants' characterization, that footnote is not a "holding," and it does not "foreclose[]" the State plaintiffs' standing in this case.  <u>Id.</u>  Rather, it acknowledges that "States sometimes have standing to sue . . . an executive agency or officer," and though it warns that "standing can become more attenuated" when based on "indirect effects" of federal action, it stops short of saying such effects could never satisfy Article III.  <u>Id.</u>  This case, in any event, concerns direct effects.

area typically reserved for executive discretion. The theory of standing advanced by the State plaintiffs—direct financial harm—is ordinary.[9] <u>Texas</u> simply does not aid the defendants here.

The defendants have not challenged the standing of Doe or her co-plaintiffs to sue—nor could they. Doe has plainly established injury, to herself and her unborn child, that is concrete, imminent, traceable to the EO, and redressable by the relief she seeks in this lawsuit. The same is true of the association plaintiffs, which provide services impacted by the EO and have described one or more members facing the same type of injury as Doe. <u>See</u> <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498 (2009) (requiring, for associational standing, "specific allegations establishing that at least one identified member had suffered or would suffer harm"); <u>see also</u> <u>United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.</u>, 517 U.S. 544, 551-53 (1996) (describing test for associational standing).

Accordingly, the defendants' standing challenge fails. All plaintiffs before the Court have satisfied Article III.

### 2. *Cause of Action*

Next, the defendants assert the Court must deny the pending motions because no plaintiff has a valid cause of action under the Citizenship Clause or the identified federal statutes. This is meritless.

As Justice Scalia observed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial

---

[9] The harms the State plaintiffs have identified are not "indirect"—indeed, when specifically asked, the defendants failed to identify any "extra step" separating the loss of funding identified by the State plaintiffs from the EO's direct effects. Mot. Hr'g Tr. at 37-39. Nor do they arise, as defendants argue, exclusively from services "the states have *voluntarily* chosen to provide." <u>New Jersey</u>, Doc. No. 92 at 20; <u>see</u> <u>Plyler v. Doe</u>, 457 U.S. 202, 230 (1982) (holding states are required by federal law to provide public education services to all children, regardless of immigration status).

review of illegal executive action, tracing back to England." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief" to prevent "violations of federal law" planned or committed by "state officers" or "by federal officials." Id. at 326-27. The plaintiffs here ask the Court to do just that.[10]

Limitations that apply where plaintiffs seek damages, rather than equitable relief, have no bearing on the claims pending here. See New Jersey, Doc. No. 92 at 24 (citing DeVillier v. Texas, 601 U.S. 285, 291 (2024)). Nor can the defendants short-circuit this lawsuit by pointing to a narrow provision of the INA providing an avenue for a "national of the United States" to challenge discrete denials of rights or privileges. See id. (invoking 8 U.S.C. § 1503(a)). That statute does not facially create an exclusive remedy for such claims, nor does it offer an adequate alternative to the claims advanced in these actions—including, but not only, because it is not a mechanism through which the State plaintiffs can obtain relief. Cf. Rusk v. Cort, 369 U.S. 367, 375 (1962) (considering related provisions of same statute and concluding they were not exclusive means of asserting rights associated with citizenship).

The defendants' threshold challenges fail under clear Supreme Court precedent. The plaintiffs assert valid causes of action and have standing to pursue them. The Court, therefore, turns to the substance of the pending motions.

---

[10] In fact, the Department of Justice is doing precisely what it says the plaintiffs cannot do. The day before this Court's motion hearing, the United States sued Illinois and various state and local officials, seeking equitable relief via claims brought directly under the Supremacy Clause. See Compl., United States v. Illinois, No. 25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1; cf. New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (discussing equitable doctrine of "judicial estoppel," which in some circumstances prevents parties that have taken one legal position from reversing course "simply because [their] interests have changed" (cleaned up)). During the motion hearing, the State plaintiffs raised this issue, and the defendants offered no response.

B. <u>Preliminary Injunction Analysis</u>[11]

The familiar standard governs the plaintiffs' requests for interlocutory relief.  To secure

the "extraordinary remedy" provided by preliminary injunctions, each group of plaintiffs "must

establish" that: 1) they are "likely to succeed on the merits," 2) they are "likely to suffer

irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their]

favor," and 4) "an injunction is in the public interest."  <u>Winter v. Nat. Def. Res. Council, Inc.</u>,

555 U.S. 7, 20 (2008).

"The first two factors of the traditional standard are the most critical."  <u>Nken v. Holder</u>,

556 U.S. 418, 434 (2009).  Courts consider them in tandem.  <u>See</u> <u>Vaqueria Tres Monjitas, Inc. v.</u>

<u>Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (noting "irreparable harm is not a rigid" factor, but

rather "a sliding scale, working in conjunction with" the first factor); <u>EEOC v. Astra U.S.A.,</u>

<u>Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996) ("[W]hen the likelihood of success on the merits is great, a

movant can show somewhat less in the way of irreparable harm and still garner preliminary

injunctive relief.").  The third and fourth factors of the injunction test "merge when the

Government is the opposing party."  <u>Nken</u>, 556 U.S. at 435.

---

[11] The defendants proposed, in a footnote, that the Court proceed now to enter or deny a final, permanent injunction.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 50 n.6.  The plaintiffs expressed no objection to this proposal during the motion hearing, agreeing that the Court could now enter a final injunction if it concluded an injunction was warranted.  After consideration, the Court resolves now only the plaintiffs' original requests for preliminary relief.  The defendants are correct that the plaintiffs' causes of action "are purely legal," <u>id.</u>, but they are wrong to imply that facts are immaterial here.  The test for injunctive relief requires the plaintiffs to prove, and the Court to evaluate, questions of harm that bear on the scope of any permanent relief ultimately awarded.  Though the defendants have leveled no challenges to the plaintiffs' factual submissions, the Court has an independent duty to ensure that any relief provided is appropriately tailored to address the harms established by the parties before it.  <u>Cf.</u> <u>DraftKings Inc. v. Hermalyn</u>, 118 F.4th 416, 423 (1st Cir. 2024) (noting trial judge is "uniquely placed to design" injunctive relief that corresponds to "specific harm" proven based on facts found by judge).  To that end, further factual development may be required before the Court crafts a final judgment.

Measured against these standards, the plaintiffs' submissions support entry of the injunctions they seek, with only minor adjustments explained below.

          1.   *Likelihood of Success*

"The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor: "likelihood of success on the merits." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). This factor weighs strongly in the plaintiffs' favor. The plain language of the Citizenship Clause—as interpreted by the Supreme Court more than a century ago and routinely applied by all branches of government since then— compels a finding that the plaintiffs' challenges to the EO are nearly certain to prevail.

The Citizenship Clause speaks in plain and simple terms. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The words chosen by the drafters and ratified by the states, understood "in their normal and ordinary" way, United States v. Sprague, 282 U.S. 716, 731 (1931), bestow birthright citizenship broadly to persons born in the United States. The text is directed at the person born (or naturalized). It does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents. So, at the outset, the EO and its focus on the immigration status of a child's parents find no support in the text.

One phrase in the Citizenship Clause is at the heart of the parties' disagreement. The constitutionality of the EO, and the success of the plaintiffs' claims, turns on the meaning of "subject to the jurisdiction thereof." To understand that phrase, however, this Court need look no further than United States v. Wong Kim Ark, 169 U.S. 649 (1898).[12] In that case, the

---

[12] In a line of cases not directly relevant here, courts have considered whether a person born in an unincorporated territory of the United States—such as American Samoa or, for a time, the

Supreme Court meticulously reviewed the contours of citizenship under English and early

American common law, under the 1866 Civil Rights Act and the Fourteenth Amendment, and as

reflected in legal scholarship and court decisions in the decades leading up to the turn of the

twentieth century.  See generally id. at 653-704.  From these sources, the Supreme Court

concluded that "subject to the jurisdiction thereof" was meant "to exclude, by the fewest and

fittest words," the following categories of persons: "children of members of the Indian tribes,"

"children born of alien enemies in hostile occupation, and children of diplomatic representatives

of a foreign state."[13]  Id. at 682.  As to all other persons, "the fundamental rule of citizenship by

birth within the dominion of the United States, notwithstanding alienage of parents," applied.  Id.

at 689.[14]

Applying this longstanding and "fundamental rule of citizenship," the Supreme Court

held that the petitioner—born in the United States to Chinese-citizen parents, who were living

and working in the United States at the time of the child's birth, but who were prevented by law

from naturalizing and eventually returned to China—was a citizen "by virtue of the

---

Philippines—was born "in the United States" for purposes of the Citizenship Clause.  E.g.,
Tuaua v. United States, 788 F.3d 300, 302 (D.C. Cir. 2015).  That language is not the focus of
the present dispute, nor was it the Supreme Court's focus in Wong Kim Ark.

[13] Neither the EO nor the defendants' brief has suggested that all (or any) persons within the
EO's categories are "children born of alien enemies in hostile occupation," specified which
portions of the country are presently so occupied, or identified which foreign powers or
organizations are the "enemies" presently controlling those areas.  See New Jersey, Doc. No. 92
at 38 (quoting another Executive Order and summarily stating that plaintiffs' view might grant
citizenship to children of "unlawful enemy combatants who enter this country in an effort to
create sleeper cells or other hostile networks").  Accordingly, the Court need not consider this
exception to birthright citizenship.

[14] This rule has been reiterated by the Supreme Court.  See, e.g., Perkins v. Elg, 307 U.S. 325,
329 (1939) (citing Wong Kim Ark majority's "comprehensive review" supporting "decision . . .
that a child born here of alien parentage becomes a citizen of the United States"); Weedin v.
Chin Bow, 274 U.S. 657, 660, 670 (1927) (stating "learned and useful opinion" of Wong Kim
Ark majority "held that . . . one born in the United States, although . . . of a parentage denied
naturalization under the law, was nevertheless . . . a citizen" under Fourteenth Amendment).

[C]onstitution itself." Wong Kim Ark, 169 U.S. at 652-53, 703-05. This holding followed

"irresistibly" from the extensive analysis the majority articulated. Id. at 693. Throughout that

analysis, the availability of birthright citizenship "irrespective of parentage" was repeatedly

emphasized. E.g., id. at 690. The duration of the parents' residency in the United States was not

assessed, nor did laws preventing the parents from seeking naturalization influence the Court's

determination of the petitioner's status. The question was resolved, for purposes of the

Citizenship Clause, by the location of the petitioner's birth, and the inapplicability of the narrow

exceptions to birthright citizenship that had been identified by the Court. Understood this way—

indeed, the way all branches of government have understood the decision for 125 years—Wong

Kim Ark leaves no room for the defendants' proposed reading of the Citizenship Clause. Of

course, the defendants can seek to revisit this long-settled rule of law, but that is a matter for the

Supreme Court, not a district judge.

The defendants accept that this Court is bound by the prior holdings of the Supreme

Court. See New Jersey, Doc. No. 92 at 44; Mot. Hr'g Tr. at 48. Nevertheless, they urge the

Court to essentially ignore all but a handful of sentences from Wong Kim Ark, arguing the bulk

of the majority's lengthy opinion is dicta. See New Jersey, Doc. No. 92 at 44 (urging Wong Kim

Ark resolved only whether Citizenship Clause extended to "children of parents with 'a

permanent domicile and residence in the United States,'" and that "[t]he case should not be read

as doing anything more than answering that question" (quoting 169 U.S. at 653)). At the motion

hearing, the defendants doubled down on this point, brazenly claiming that "dicta can be

disregarded." Mot. Hr'g Tr. at 75. That position reflects a serious misunderstanding at best—

and a conscious flouting at worst—of the judicial process and the rule of law.

Lower federal courts are not merely obligated to apply the holdings of Supreme Court decisions; they also "are bound by the Supreme Court's 'considered dicta.'" United Nurses & Allied Prof'ls v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)). "Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). If such a statement "bears the earmarks of deliberative thought purposefully expressed," concerns an issue that was "thoroughly debated in the recent past," and "has not been diluted by any subsequent pronouncement" of the Supreme Court, a lower federal court must adhere to it. Id.

To the extent the thorough analysis in Wong Kim Ark of the Fourteenth Amendment's common-law foundations, the purpose and intent of its drafters, and its application during the first thirty years after its ratification can be called "dicta" at all, it is undoubtedly the "considered" and "authoritative" sort that this Court is bound to apply. The sheer detail and length of the discussion by the Court's majority make this plain. Add to that the fact that the opposite view—the one the defendants advance to justify the EO—was rejected by the majority in Wong Kim Ark (in the portions of the decision now labeled "dicta" by the defendants) and endorsed only by the dissent. See 169 U.S. at 705-32. The plaintiffs are not relying on a stray "remark" that lacks "care and exactness," standing "wholly aside from the question in judgment" and "unsupported by any argument, or by any reference to authorities," that might not "control the judgment" of a lower court. 169 U.S. at 678. They are "leaning into" the central reasoning of the Supreme Court in support of its holding. Mot. Hr'g Tr. at 48. The defendants' argument to the contrary invites the Court to commit legal error.

17

Whether "holding" or "considered dicta," the straightforward rule and limited exceptions identified in Wong Kim Ark and summarized above have been applied repeatedly and without hesitation, including by the Supreme Court and the First Circuit.  For example:

- In Morrison v. California, despite statutes that then rendered Japanese persons "ineligible" for citizenship via naturalization, the Supreme Court stated without qualification: "A person of the Japanese race is a citizen of the United State if he was born within the United States."  291 U.S. 82, 85 (1934).

- In Dos Reis ex rel. Camara v. Nicolls, the First Circuit described a person "born in Massachusetts" as having become "an American citizen, not by gift of Congress, but by force of the constitution," despite his parents' status as foreign nationals "never naturalized in the United States," and despite his own "dual nationality" that led to his "service as a draftee in the Portuguese army."  161 F.2d 860, 861-62 (1st Cir. 1947).

- In Kawakita v. United States, a person "born in this country in 1921 of Japanese parents who were citizens of Japan" was "a citizen of the United States by birth"—a status the person did not lose despite later committing treason by acts of cruelty undertaken while working at a Japanese camp for American prisoners during World War II.  343 U.S. 717, 720 (1952).  See also Nishikawa v. Dulles, 356 U.S. 129, 131 (1958) (finding Japanese military service during World War II was basis for expatriation of U.S.-born citizen of Japanese-citizen parents only if service was voluntary); Hirabayashi v. United States, 320 U.S. 81, 96-97 (1943) (noting, in context of World War II, that tens of thousands of "persons of Japanese descent" living on Pacific coast "are citizens because born in the United States," even though "under many circumstances" they also were citizens of Japan "by Japanese law").

- In United States ex rel. Hintopoulous v. Shaughnessy, all members of the Supreme Court considered a child born to foreigners, both of whom had entered the U.S. with temporary permission but remained after their authorization expired, to be "of course[] an American citizen by birth," despite the parents' "illegal presence." 353 U.S. 72, 73 (1957); see id. at 79 (reflecting dissent's agreement that the child was a citizen).

- In INS v. Errico, two different children "acquired United States citizenship at birth" despite their parents having gained admission to this country by misrepresenting material facts about themselves and thereby evading statutory restrictions on lawful immigration. 385 U.S. 214, 215-16 (1966).

- In INS v. Rios-Pineda, a unanimous Supreme Court viewed a child "born in the United States" as "a citizen of this country," even though the father had entered the country "illegally" on his own and "returned to Mexico . . . under threat of deportation"; both parents had then "paid a professional smuggler . . . to transport them" across the border; and the father, when apprehended again, had failed to depart voluntarily "as promised." 471 U.S. 444, 446 (1985).

18

- In <u>Hamdi v. Rumsfeld</u>, at least six Justices treated the petitioner as a citizen of the United States based on his birth in Louisiana, without even discussing his parents' status (they were present lawfully but temporarily), despite the petitioner's active participation in a foreign terrorist organization. 542 U.S. 507, 510 (2004).[15]

- In <u>Mariko v. Holder</u>, a panel of the First Circuit considered a child "born in the United States" to be "a United State citizen" despite the parents' concession that both of them "were here illegally" and therefore removable. 632 F.3d 1, 3, 8 n.4 (1st Cir. 2011).

- In <u>Hasan v. Holder</u>, a different panel of the First Circuit similarly viewed as "a U.S. citizen" a child born in California to foreign-national parents who had overstayed their nonimmigrant visas. 673 F.3d 26, 28 & n.1 (1st Cir. 2012).

This line of decisions—which is not limited to the cases described above—further undermines the defendants' proposed interpretation.[16]

If that were not enough to find that the plaintiffs are likely to succeed on the merits (and it is), the fact that Congress incorporated the language of the Citizenship Clause into provisions of the INA passed more than forty years after <u>Wong Kim Ark</u> cements the meaning of the disputed phrase and provides the plaintiffs an independent avenue to prevailing here. In the INA, Congress conferred birthright citizenship via statute on several categories of individuals, the first of which is described using language mirroring the Citizenship Clause. 8 U.S.C.

---

[15] Justice Scalia, joined by Justice Stevens, referred to Hamdi as a "presumed American citizen." 542 U.S. at 554 (Scalia, J., dissenting); <u>see</u> <u>Hamdi v. Rumsfeld</u>, 243 F. Supp. 2d 527, 534 (E.D. Va. 2002) (noting Hamdi had "identified himself as a Saudi citizen who had been born in the United States" when detained and interrogated by the American military). No justice took up the invitation of one amicus in the case to revisit the meaning of the Citizenship Clause, correct the "erroneous interpretation" adopted in <u>Wong Kim Ark</u>, and conclude Hamdi was not a citizen because his parents, though living in Louisiana lawfully at the time of his birth, had only temporary work visas authorizing their presence in this country. <u>See</u> Br. Amicus Curiae The Claremont Inst. Ctr. Const. Jurisprudence at 2-3, 5, <u>Hamdi v. Rumsfeld</u>, No. 03-6696, 2004 WL 871165 (U.S. Mar. 29, 2004).

[16] So does the fact that the Supreme Court has cited <u>Wong Kim Ark</u> as an example of how to properly assess the original meaning of language in the Constitution or a federal statute. <u>See</u> <u>Standard Oil Co. v. United States</u>, 221 U.S. 1, 59 & n.6 (1911); <u>cf.</u> <u>BNSF Ry. Co. v. Loos</u>, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (citing <u>Wong Kim Ark</u> majority opinion as authority reflecting "everyone agrees" that "record of *enacted* changes Congress made" to relevant text "over time" is "textual evidence" that "can sometimes shed light on meaning").

§ 1401(a) (confirming citizenship of "a person born in the United States, and subject to the jurisdiction thereof"). As the plaintiffs point out, this provision was enacted in 1940 and "re-codified" in 1952. See Doe, Doc. No. 33 at 2; see also Doe, Doc. No. 11 at 15 (raising statutory claim and advancing brief but distinct argument about likelihood of success thereunder). Because it uses the same language chosen by the Fourteenth Amendment's drafters—words that had been studied in Wong Kim Ark decades earlier—the statute must be understood to have incorporated the Supreme Court's interpretation of those words. See Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020) (explaining statute "normally" is interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment").[17]

Here, the fundamental rule conveyed by the Citizenship Clause was clear by the time § 1401 was enacted, and the legislators who chose to include the same phrase the Supreme Court already had examined presumably intended the same words would be accorded the same meaning in both contexts. See Taggart v. Lorenzen, 587 U.S. 554, 560 (2019) (recognizing "longstanding interpretive principle" that if statutory term "is obviously transplanted from another legal source, it brings the old soil with it" (cleaned up)). Thus, the statute supports a related but distinct claim upon which the plaintiffs are likely to succeed.[18]

---

[17] Justice Gorsuch went on to explain why this is so: "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, . . . we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." Bostock, 590 U.S. at 654-55.

[18] The defendants advance no separate challenge to the plaintiffs' statutory claim, choosing to "focus . . . on the constitutional provision" which is "coterminous" with the statute. New Jersey, Doc. No. 92 at 25 n.4. By opting not to address the statute, or the manner in which its enactment necessarily strengthens the plaintiffs' interpretation of the relevant language, the defendants have waived any discrete argument related to the statutory claim for purposes of the pending motions. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived").

Beyond sidestepping Wong Kim Ark, the defendants urge the Court to read three specific requirements into the phrase "subject to the jurisdiction thereof." The defendants contend these requirements are necessary to ensure adherence to the phrase's original meaning. None of these requirements, however, find support in the text itself or the cases construing and applying it. And, more importantly, each of them, if applied as argued, would prevent the Citizenship Clause from reaching groups of persons to whom even the defendants concede it must apply.

First, the defendants suggest the "jurisdiction" phrase is satisfied only by persons who owe the United States "allegiance" that is "direct," "immediate," "complete," and "unqualified by allegiance to any alien power." New Jersey, Doc. No. 92 at 27-28 (cleaned up). Certainly, allegiance matters. Various sources link the "jurisdiction" phrase and concepts of allegiance, including Wong Kim Ark. See, e.g., 169 U.S. at 654 (noting English common law provided citizenship to those "born within the king's allegiance, and subject to his protection"). The defendants veer off course, however, by suggesting allegiance must be exclusive, and that it derives from the status of a child's parents. If that were so, then the children of dual citizens or LPRs could not receive birthright citizenship via the Fourteenth Amendment. A dual citizen necessarily bears some allegiance to both the United States and the second nation of which they are a citizen. LPRs, unless and until naturalized, remain foreign nationals who are citizens of other countries bearing some allegiance to their places of origin. This principle would also rule out the petitioner in Wong Kim Ark, whose parents resided for years in the United States but remained "subjects of the emperor of China" (and, indeed, returned to China when their U.S.-born son was a teenager). 169 U.S. at 652-53. The defendants, however, agree that children of dual citizens and LPRs are entitled to birthright citizenship, and that the petitioner in Wong Kim Ark was as well.

21

These anomalies are avoided by focusing on the allegiance of the child, not the parents. As noted earlier, the Citizenship Clause itself speaks only of the child. A child born in the United States necessarily acquires at birth the sort of allegiance that justified birthright citizenship at the common law. That is, they are born "locally within the dominions of" the United States and immediately "derive protection from" the United States. Id. at 659. A child born here is both entitled to the government's protection and bound to adhere to its laws. This is true regardless of the characteristics of the child's parents, subject only to the narrow exceptions identified in Wong Kim Ark. Allegiance, in this context, means nothing more than that. See id. at 662 ("Birth and allegiance go together."). As James Madison explained:

> It is an established maxim that birth is a criterion of allegiance. Birth however derives its force sometimes from place and sometimes from parentage, but in general place is the most certain criterion; it is what applies in the United States; it will be therefore unnecessary to investigate any other.

Founders Online, Citizenship, Nat'l Archives (May 22, 1789), https://founders.archives.gov /documents/Madison/01-12-02-0115 [https://perma.cc/ZC4B-NS9R]. So, "allegiance" does not mean what the defendants think it means, and their first proposed rule founders.[19]

Next, the defendants seek to graft concepts of social-contract theory onto the "jurisdiction" clause of the Fourteenth Amendment by arguing birthright citizenship requires "mutual consent between person and polity." New Jersey, Doc. No. 92 at 45. The defendants again center their argument on the parents at the expense of the child whose birthright is at stake—perhaps, in part, because infants are incapable of consent in the legal sense. In the

---

[19] To the extent the defendants believe temporary, lawful visitors to this country are people who "do not owe an allegiance to the United States," Mot. Hr'g Tr. at 55, the Supreme Court disagrees, see Wong Kim Ark, 169 U.S. at 685 (quoting Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 144 (1812), and its description of the "temporary and local allegiance" private visitors from other countries owe the United States while passing through or doing business here).

defendants' view, mutual consent is lacking where a person (the parent) has entered the United States without permission to do so, or without permission to remain here permanently. The absence of "mutual consent" in those circumstances means, according to the defendants, that the children of such parents fall beyond the "jurisdiction" of the United States for Fourteenth Amendment purposes.

This argument fares even worse than the first. The Fourteenth Amendment enshrined in the Constitution language ensuring "the fundamental principle of citizenship by birth" in the United States applied regardless of race—including, and especially, to formerly enslaved persons. 169 U.S. at 675; see Afroyim v. Rusk, 387 U.S. 253, 262-63 (1967). The defendants do not (and could not) deny this. Enslaved persons, of course, did not "consent" to come to the United States or to remain here. They were brought here violently, in chains, without their consent. These conditions persisted after their arrival. Against this backdrop, it verges on frivolous to suggest that Congress drafted, debated, and passed a constitutional amendment, thereafter enacted by the states, that imposed a consent requirement necessarily excluding the one group of people the legislators and enactors most specifically intended to protect.

Finally, the defendants seek to transform the use of the term "reside" at the end of the Citizenship Clause into a basis for finding that the "jurisdiction" phrase eliminates any person without a lawful "domicile" in the United States. The defendants contend that persons here with temporary visas retain "domiciles" in their native countries, and persons here without lawful status cannot establish a true "domicile." And so, the argument goes, they cannot "reside" in any state, and they remain outside the "jurisdiction" of the United States for Fourteenth Amendment purposes. This, once again, shifts the focus away from the child and the location of birth to the parents and the status and duration of their presence in this country.

23

The word "reside" appears in the Citizenship Clause only in the phrase specifying that a person entitled to birthright citizenship becomes a citizen not only of the United States, but also of the state where they live.  For example, a state within the former Confederacy (or any other state) could not constitutionally deny state citizenship to the child of a formerly enslaved person who lived and gave birth there.  The word "reside" does not inject a "domicile" requirement limiting the reach of the Citizenship Clause as a whole and justifying examination of the immigration status of a child's parents.  See New Jersey, Doc. No. 123 at 11-12 (articulating the flaws in this theory).  In any event, it is not so clear that "illegal entry into the country would . . . , under traditional criteria, bar a person from obtaining domicile within a State." Plyler, 457 U.S. at 227 n.22.

In sum, the defendants invite the Court to adopt a set of rules that work (except when they don't).  None of the principles the defendants advance are sturdy enough to overcome the settled interpretation and longstanding application of the Citizenship Clause described above. Each principle, applied uniformly, would lead to unintended results at odds with the text, meaning, and intent of the Fourteenth Amendment—and, in some instances, with the parameters set out in the EO itself.

For all these reasons, the Court finds the plaintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims.  This conclusion would allow the plaintiffs to "show somewhat less in the way of irreparable harm." Astra U.S.A., 94 F.3d at 743.  That relaxed burden, however, is not essential, as the second factor also favors the plaintiffs strongly.

### 2. *Irreparable Harm*

The plaintiffs have supported their assertions of irreparable harm with numerous declarations detailing the imminent and damaging impacts they anticipate will flow from the EO.

PA358

See Doe, Doc. Nos. 11-1 to -10; New Jersey, Doc. Nos. 5-2 to -21, -23.[20]  Upon review, the Court accepts and credits those declarations, which the defendants have not disputed or rebutted in any way.  The declarations establish that the State plaintiffs do not stand to lose discrete amounts of one-time funds; they face unpredictable, continuing losses coupled with serious administrative upheaval.  They have established irreparable harm.

As for the Doe plaintiffs, what is at stake is a bedrock constitutional guarantee and all of its attendant privileges.  The loss of birthright citizenship—even if temporary, and later restored at the conclusion of litigation—has cascading effects that would cut across a young child's life (and the life of that child's family), very likely leaving permanent scars.  The record before the Court establishes that children born without a recognized or lawful status face barriers to accessing critical healthcare, among other services, along with the threat of removal to countries they have never lived in and possible family separation.[21]  That is irreparable harm.[22]

---

[20] Not every State plaintiff has submitted its own declarations, but the complaint alleges that all face the same categories of harm.  E.g., New Jersey, Doc. No. 1 ¶ 122.  The record supports that allegation, for example, by reflecting that each official attesting to health-insurance-related impacts describes the same federal programs used the same way and forecasts the loss of the same types of federal reimbursements.  See, e.g., Doc. Nos. 5-2, -6, -11, -12, -16, -19.  At this stage, that is enough to find that all State plaintiffs would suffer irreparable harm absent injunctive relief.  The defendants do not contend otherwise.

[21] Doe, for example, has a pending asylum petition and an older child who is a U.S. citizen by birthright—assuming the defendants do not later reconsider the effective date contained in the EO and opt to apply their reading of the Citizenship Clause retroactively, a possibility they did not definitively rule out during the motion hearing.  Mot. Hr'g Tr. at 45-47.  Her family would be placed at a distressing crossroads if her new baby were to face removal from the country.

[22] The defendants' only responses are to suggest that the plaintiffs wait and see how the EO will be implemented, and hope that Doe's asylum application is granted.  Or, in the worst case, "if any removal action were initiated against the children of any of the private plaintiffs at issue in this case, the [child] subject of the action could assert their claim to citizenship as defense in that proceeding."  New Jersey, Doc. No. 92 at 48.  That answer is not persuasive.  Cf. Texas v. EEOC, 933 F.3d 433, 448 & n.29 (5th Cir. 2019) (stating "it would strain credulity to find that an agency action targeting" conduct the agency has deemed "presumptively unlawful" would not trigger implementation "immediately enough to constitute" nonspeculative injury).

PA359

The plaintiffs in both cases have shown they are likely to suffer substantial and irreparable harm in the absence of a preliminary injunction. Thus, the two most important factors strongly favor the plaintiffs.

### 3. Balance of Harms and Public Interest

The final merged factors also support the plaintiffs' requests for relief. On the plaintiffs' side of the scales, there is a grave risk of significant and irreparable harm arising from the EO. Children not yet born will be stripped of birthright citizenship constitutionally guaranteed to them, as confirmed by settled law and practice spanning more than a dozen decades. They will be deprived of a "title" that is, as "Justice Brandeis observed, . . . superior to the title of President." Tuaua, 788 F.3d at 301. And that harm will arise from an EO that is unconstitutional on its face—an assessment that has now been echoed by multiple federal courts in different jurisdictions. E.g., Prelim. Inj. Order at 6, N.H. Indonesian Cmty. Support v. Trump, No. 25-cv-38 (D.N.H. Feb. 11, 2025), ECF No. 79.

It is difficult to imagine a government or public interest that could outweigh the harms established by the plaintiffs here. Perhaps that is why the defendants have identified none. Instead, they point only to the Executive Branch's discretion in matters of immigration. New Jersey, Doc. No. 92 at 49. But this case is not about how "to manage the immigration system." Id. It is about the Constitution's guarantee of citizenship by virtue of birth. When this right was enshrined in the Fourteenth Amendment, it was moved firmly beyond the bounds of the "core executive authority" the defendants invoke. Id.; see Afroyim, 387 U.S. at 263 (noting framers of Fourteenth Amendment "wanted to put citizenship beyond the power of any governmental unit to destroy"). The defendants' only argument, therefore, adds nothing to their side of the scales.

Though the government has waived any other arguments on these final factors by not developing them in their opposition memorandum, see Zannino, 895 F.2d at 17, the Court makes

26

PA360

two more observations.  First, the government has no legitimate interest in pursuing unconstitutional agency action; "it is always in the public interest to prevent the violation of a party's constitutional rights."  Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned up); accord League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).  Second, an injunction will do no more than maintain a status quo that has been in place for well over a century.  The defendants have not even attempted to demonstrate how they or the public will be harmed by continuing, for the duration of this action, to adhere to the interpretation of birthright citizenship that has been consistently applied by the Executive Branch throughout that time period—including under this President during his first term in office.

The scales tip decisively toward the plaintiffs.  Because all factors favor entry of injunctive relief, the Court ends by explaining the appropriate parameters of such relief.

    C.    Scope of Injunction

Both sets of plaintiffs ask the Court to universally enjoin the defendants from implementing the EO.  That is, they seek an order that prevents the defendants from applying the EO not only to them—to Doe, to members of the plaintiff associations, and to the State plaintiffs—but at all, to anyone, anywhere.  Orders like those the plaintiffs seek here have become "increasingly common" over the last twenty years.  Dep't of Homeland Sec. v. New York, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring in grant of stay); see generally Developments in the Law—District Court Reform: Nationwide Injunctions, 137 Harv. L. Rev. 1701, 1703-15 (2024) (quantifying rise in such injunctions and examining consequences).  That trend raises meaningful concerns about the appropriate scope of a single district judge's equitable powers.  See Trump v. Hawaii, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring) (examining reasons to be "skeptical that district courts have the authority to enter universal injunctions").

27

Alluding to such concerns, the defendants urge the Court to enter relief that is limited in scope. New Jersey, Doc. No. 92 at 49-50. Though the defendants have not proposed specific terms, two of the limitations they urge merit consideration.[23] First, the defendants argue "the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief." Id. at 50. As explained above, the Court has concluded all plaintiffs are so entitled. But that conclusion does not alone justify relief that is universal in scope. The Court still must confront the general principle that injunctive relief should be tailored to the parties before it. Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs"). Here, the Court finds this principle leads to different results for the two sets of plaintiffs.

For Doe and the members of the two plaintiff organizations, the record before the Court does not demonstrate that universal relief is necessary to "provide complete relief to," and protect the rights of, those parties. An injunction that prevents the defendants and their agents from implementing and applying the EO against Doe or any member of either plaintiff organization suffices to protect them from harm during the pendency of this lawsuit. The record does not establish how awarding similar relief to other persons or organizations that are not parties to this lawsuit is necessary to provide complete relief to the Doe plaintiffs.

---

[23] The third, which urges the Court to reject any facial challenge to the EO and require "individual as-applied challenges," can be rejected out of hand. The plaintiffs have advanced substantial facial challenges that the Court has deemed likely to succeed. The defendants do not explain how their third proposal, which is supported only by a citation to general language from a criminal case in which injunctive relief was not at issue, has anything to do with the scope of injunctive relief. See New Jersey, Doc. No. 92 at 50.

Different considerations arise as to the State plaintiffs. They have identified harms that do not hinge on the citizenship status of one child, or even of all children born within their borders. The harms they have established stem from the EO's impact on the citizenship status—and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction. For example, Massachusetts will suffer the identified harms not only if children born and living there are unlawfully denied citizenship, but also if a pregnant woman living in the northeastern part of the Commonwealth gives birth across the border in a nearby New Hampshire hospital, or if a family moves to Massachusetts from Pennsylvania (or any other state that has not joined this lawsuit) after welcoming a new baby. These examples illustrate why injunctive relief limited to the State plaintiffs is inadequate. In both, children born in states that are not parties to this lawsuit (such as New Hampshire and Pennsylvania) would theoretically lack birthright citizenship even after returning or moving to—and seeking various services in—a state that is among the plaintiffs here.

That result not only fails in providing complete relief to the State plaintiffs, but also risks creating a new set of constitutional problems. See Saenz v. Roe, 526 U.S. 489, 500-04 (1999) (identifying as component of "right to travel" protected by Fourteenth Amendment "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State"). For the State plaintiffs, then, universal or nationwide relief is necessary to prevent them from suffering irreparable harm. Cf. Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579-83 (2017) (narrowing in part but upholding in part injunction that protected nonparties similarly situated to the plaintiffs).

Only one issue remains.  The defendants assert the Court may not enjoin the President.[24]
New Jersey, Doc. No. 92 at 50.  The Doe plaintiffs offer no response to this point, see generally
Doe, Doc. No. 33, but the State plaintiffs disagree in a footnote citing instances where executive
orders have been enjoined, see New Jersey, Doc. No. 123 at 15 n.8.  Assuming without deciding
that this Court is empowered to issue an injunction directly constraining the President's actions
in any set of circumstances, nothing in the record suggests such relief is necessary here.  The
President has signed the EO.  No further action by him is described by the EO or predicted by the
plaintiffs.  Other officers and agencies within the Executive Branch are responsible for
implementing the EO, and it is their conduct that the plaintiffs really seek to restrain.  Thus, for
purposes of the preliminary injunction, the relief will be awarded against all other defendants
besides the President, and against any other officers or agents acting on behalf of the President,
but not against the President himself.[25]

### III.    CONCLUSION

"What the Constitution has conferred neither the Congress, nor the Executive, nor the
Judiciary, nor all three in concert, may strip away."  Nishikawa, 356 U.S. at 138 (Black, J.,
concurring).  Here, the Constitution confers birthright citizenship broadly, including to persons
within the categories described in the EO.  Under the plain language of the Citizenship Clause
and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court
precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to the
EO are likely to prevail, the plaintiffs face serious and irreparable harm in the absence of relief,

---

[24] They also suggest the Court should dismiss the President as a defendant, New Jersey, Doc. No.
92 at 50, but a request like that is properly advanced in a motion (not an opposition brief), after
conferral and in compliance with the Local Rule governing motion practice in this Court.  See
generally L.R. 7.1.
[25] Should circumstances arise that merit reconsideration of this aspect of the injunction, the
plaintiffs may bring them to the Court's attention via an appropriate motion.

the defendants face no cognizable harm from a preliminary injunction, and the public interest is served by preventing the implementation of a facially unconstitutional policy.

Accordingly, the plaintiffs' motions (<u>Doe</u>, Doc. No. 10, and <u>New Jersey</u>, Doc. No. 3) are ALLOWED as described herein. Separate orders will issue in each case memorializing the preliminary injunctions entered by the Court.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW JERSEY et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>DONALD J. TRUMP et al., )<br><br>Defendants. ) | Civil No. 25-10139-LTS |

PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

For the reasons set forth in the Memorandum of Decision issued today, Doc. No. 144, the

plaintiffs' motion for preliminary injunction (Doc. No. 3) is ALLOWED. As explained in the

Memorandum, the plaintiffs have advanced valid causes of action seeking equitable relief, and

they have standing to pursue such claims. They also have demonstrated that each factor

governing their request for preliminary injunctive relief weighs strongly in their favor. The

plaintiffs are likely to succeed on the merits of their claims under the Citizenship Clause and 8

U.S.C. § 1401, they are likely to suffer irreparable harm in the absence of relief, the balance of

harms tips overwhelmingly in their favor, and the public interest favors an injunction.

Additionally, the record establishes that universal relief is required in order to provide complete

relief to the eighteen states and two cities that have brought this case.

Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), this Court ORDERS as

follows:

PA366

1. The United States Department of State, the Secretary of State, the United States Department of Homeland Security, the Secretary of Homeland Security, the United States Department of Health and Human Services, the Acting Secretary of Health and Human Services, the United States Social Security Administration, the Acting Commissioner of Social Security, and all officers, agents, employees, attorneys, and any other persons acting in concert with or behalf of any named defendant in this action (including agents, employees, and other representatives of President Donald J. Trump), are ENJOINED from implementing and enforcing Executive Order No. 14,160, "Protecting the Meaning and Value of American Citizenship."

2. No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case, where the plaintiffs seek to vindicate an important constitutional and federal statutory right, and the injunction will not expose the defendants to financial loss. See da Silva Medeiros v. Martin, 458 F. Supp. 3d 122, 130 (D.R.I. May 1, 2020) (citing Crowley v. Loc. No. 82, 679 F.2d 978, 1000-01 (1st Cir. 1982)).

3. This preliminary injunction shall take effect immediately upon the docketing of this Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the United States Court of Appeals for the First Circuit, or the United States Supreme Court order otherwise.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

2

PA367

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW JERSEY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-10139-LTS |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL</u>

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62, Defendants respectfully move for a stay pending appeal of the Court's February 13, 2025 Order, ECF No. 145, which preliminarily enjoins Defendants on a nationwide basis from implementing and enforcing Executive Order No. 14160, Protecting the Meaning and Value of American Citizenship (Jan. 20, 2025) ("EO"). Defendants have appealed the Court's injunction and expect to ultimately prevail on their merits arguments. But those arguments are not at issue here: irrespective of the Court's views on the merits, it should stay the injunction because it provides relief to parties—both in this litigation and across the country—who have not demonstrated their entitlement to the extraordinary remedy of a preliminary injunction.

On appeal, Defendants are likely to succeed on their argument that the states lack standing. Fundamentally, the states lack any rights under the Citizenship Clause and cannot assert such claims on behalf of their third-party residents. And they cannot otherwise claim standing based on their own purported financial injuries because the downstream effects of federal immigration policies on voluntary state expenditures do not inflict an Article III injury. Even setting that aside, the Court's extension of relief to non-party individuals across the nation violates the well-established principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). At minimum, the Court should stay the injunction insofar as it applies beyond the plaintiff states.

The equities similarly weigh in favor of staying an injunction that intrudes into internal executive branch affairs, preventing Defendants from taking even preparatory steps to implement the EO in the event that it is eventually permitted to take effect, and extends to states and non-parties who have not demonstrated a likelihood of irreparable harm or entitlement to injunctive

relief.

Defendants respectfully request a ruling by the close of business on February 26, 2025. After that time, if relief has not been granted, Defendants intend to seek relief from the U.S. Court of Appeals for the First Circuit.

## ARGUMENT

Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 43 (1st Cir. 2021). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.    Defendants Are Likely to Prevail On The Merits Of Their Argument That The Preliminary Injunction Was Improperly Issued.

"At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see also, e.g., Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (to establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision").

1.    As Defendants have explained, the state plaintiffs have failed to carry this burden here. *See* Doc. No. 92 at 18-22. The Court disagreed, but it did not acknowledge or rebut Defendants' argument that the states lack third-party standing to assert Citizenship Clause claims on behalf of their residents, much less the residents of other states. *See id.* at 20-22.

A plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties."

2

*Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Even assuming the states had made an adequate showing of direct economic injury to support Article III standing (which they have not), this argument would provide an independent basis to deny their Citizenship Clause claim.  In *Kowalski v. Tesmer*, for example, the Supreme Court assumed that the criminal defense attorney plaintiffs had established Article III standing through allegations that the challenged state law "reduced the number of cases in which they could be appointed and paid as assigned appellate counsel."  543 U.S. 125, 129 n.2 (2004) (citation omitted).  But the Court held that notwithstanding that pocketbook injury, the attorneys could not sue to assert their putative clients' constitutional right to have the government pay for their services.  *Id*. at 134.  Here, for the same reason that states lack standing to assert claims that individuals' Due Process and Equal Protection rights are harmed, *see South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966); *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023), they lack standing to assert that other individuals' rights under the Citizenship Clause are impaired.

While the Court did not address Defendants' third-party standing arguments, it found that the plaintiff states had standing because they were able to "articulate various forms of federal funding that will be diminished as a direct result of the EO."  Doc. No. 144 at 8-9.  But the challenged EO does not directly regulate the states, set standards for determining federal funding, or otherwise require that states provide any services or incur any expenditures.  It merely regulates how the federal government will approach certain individuals' immigration status.  Whatever impacts that federal policy might have on state programs are necessarily the kind of "indirect effects on state revenues or state spending" that the Supreme Court recently warned should not confer standing in "cases brought by States against an executive agency or officer."  *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

This Court found the standing analysis in *Texas* "inapt," Doc. No. 144 at 10, but its rejection of state standing based on the downstream effects of a federal policy on state budgets is based on "bedrock Article III constraints," *Texas*, 599 U.S. at 680 n.3, that courts have consistently applied to deny similar attempts at state standing as are at issue here. *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927); *Washington v. FDA*, 108 F.4th 1163, 1175-76 (9th Cir. 2024); *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). To find standing here would imply that every state has Article III standing to litigate the citizenship status of every person residing within its borders, but that is not the law and the Court should decline to adopt such a "boundless conception of Article III's injury requirement." *Washington*, 108 F.4th at 1176.[1]

2.    Defendants are also likely to prevail on their argument that nationwide relief is improper. *See* Doc. No. 92 at 49-50. A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill*, 585 U.S. at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Indeed, nationwide injunctions "take a toll on the federal court system," and "prevent[] legal questions from percolating through the federal courts." *Trump v. Hawaii*, 585

---

[1] Without fully resolving the issue, the Court suggested in a footnote that the states "also probably have standing based on their sovereign interests" that were not asserted in their preliminary injunction briefing. *See* Doc. No. 144 at 10 n.7. But the Court cited no authority for the proposition that states have a sovereign interest in "which persons are U.S. citizens," *id.*, and indeed federal citizenship status is an issue over which the federal government has plenary control. *See, e.g.*, *Foley v. Connelie*, 435 U.S. 291, 312 n.5 (1978) ("For it is the Federal Government that exercises plenary control over naturalization and immigration."); *cf. Arizona*, 40 F.4th at 386-87 ("The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States.").

4

U.S. 667, 713 (2018) (Thomas, J., concurring).  These general principles foreclose relief to anyone in this case, and that is especially true for individuals outside of the plaintiff states who are not only non-parties but do not even live in the states that are parties to this case.

The Court acknowledged that "universal relief" is not generally necessary to "provide complete relief to" parties affected by the EO.  Doc No. 144 at 28.  But it nonetheless fashioned nationwide relief in this case because of the possibility that "children born in states that are not parties to this lawsuit" would move to a plaintiff state, "seek[] various services," and necessitate state funding.  *Id*. at 29.  But the mere prospect of such remote future impacts on state revenue streams is insufficient to justify the breadth of the Court's order here, which prevents implementation or enforcement *anywhere* in the United States.  Particularly in this preliminary injunction posture, the remote concern that babies will be born after the effective date of the EO but also move into the plaintiff states while this case is pending is too speculative to justify such sweeping relief.  It is not necessary to provide complete relief to the plaintiff states, whose claimed injuries would be substantially remedied by an order that provided relief only within their borders (assuming that they were proper parties, which again they are not).  *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  This is particularly so when the injunction covers states who asked this Court not to issue an injunction.  *See* Doc. No. 122 (amicus brief filed by 18 states); Doc. No. 127 (Tennessee amicus brief); *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring) ("Nationwide injunctions … sometimes give States victories they do not want.").

The Court also suggested that an injunction limited to the plaintiff states would "risk[] creating a new set of constitutional problems."  Doc. No. 144 at 29.  But the authority on which the Court relied—recognizing a Fourteenth Amendment "right to travel" allowing a United States citizen traveling to a new state to enjoy therein the "same privileges and immunities enjoyed by

PA373

other citizens of the same State," *Saenz v. Roe*, 526 U.S. 489, 502 (1999)—provides no basis for nationwide relief to non-parties here. That line of cases prevents states from discriminating against U.S. citizens from other states; it does not have anything to say about the United States' recognition of citizenship under the Citizenship Clause. *See, e.g.*, *id*.; at 502-04; *Hope v. Comm'r of Ind. Dep't of Corrs.*, 9 F.4th 513, 525 (7th Cir. 2021) (noting that the Supreme Court's right to travel decisions each involved a state "rule that explicitly discriminated between old and new residents"). It would not violate anyone's right to travel for the Court, for the limited period of time until this case can be resolved and in accordance with traditional equitable principles, to limit any preliminary injunctive relief to the parties before it.

3. The Court's injunction is also overbroad to the extent it enjoins not only enforcement of the EO, but also internal steps relating to its implementation. As noted below, that causes harm to the government, and it is inconsistent with the well-established principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). At minimum, the Court should limit its injunction to permit the government to implement the EO in ways that cause no harm to the plaintiff states, including by taking internal, preparatory steps regarding the EO's application and formulating relevant policies and guidance.

## II. The Balance Of Equities, Including The Irreparable Harm Defendants Will Suffer, Favors a Stay.

The balance of the equities likewise favors staying injunctive relief to parties who have not demonstrated their entitlement to it. Providing relief to states that lack standing and individuals in all 50 states who have not demonstrated their entitlement to such relief conflicts with the principles articulated above and allows "one district court [to] make a binding judgment for the entire country." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). That is especially inappropriate

6

in the context of this litigation, where multiple states have argued that the EO should not be universally enjoined. *See* Doc Nos. 122, 127 (state amicus briefs).

In addition, an injunction that interferes with the President's ability to carry out his broad authority over immigration matters is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of L.A. County Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). Indeed, any injunction that prevents the President from exercising his core authorities is "itself an irreparable injury." *Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

As noted above, the injunction causes further harm to the Defendants because its breadth—applying to all implementation and enforcement—prevents the executive branch as a whole from even beginning the process of formulating relevant policies and guidance for implementing the EO. If Defendants are successful on their appeal and the EO is eventually allowed to take effect, but the injunction is not stayed in its overbroad applications while that appeal is pending, the Defendants will be unable to make preparations necessary to implement the EO, thus further delaying its implementation.[2] Such a delay in effectuating a policy enacted by a politically

---

[2] The EO is also subject to two other preliminary injunctions preventing implementation and enforcement of the EO on a nationwide basis. *See Washington v. Trump*, No. 2:25-cv-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025); *CASA, Inc. v. Trump*, No. 8:25-cv-201-DLB, 2025 WL 408636 (D. Md. Feb. 5, 2025). Defendants have appealed both preliminary injunctions and, in both cases, filed motions to stay their overbroad applications in both district court and with the relevant courts of appeal. *See Washington v. Trump*, No. 25-807, ECF No. 21.1 (9th Cir. Feb. 12, 2025); *Casa, Inc. v. Trump*, No. 25-1153, ECF No. 9 (4th Cir. Feb. 19, 2025). Two narrower injunctions have also been entered against the EO. *See N. H. Indonesian Comm. Supp. v. Trump* ("*NHICS*"), No. 1:25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025); *Doe v. Trump*, No. 25-CV-10135-LTS, ECF No. 47 (D. Mass. Feb. 13, 2025). Defendants have sought clarification regarding the NHICS injunction's scope, *see NHICS*, ECF No. 81, and filed a notice of appeal in the *Doe* case, *see Doe*, ECF No. 48.

PA375

accountable branch of the government imposes its own "form of irreparable injury." *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (citation omitted).  This is especially harmful in this context where, as Defendants have explained, the challenged EO is part of a larger immigration policy designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Doc. No. 92 at 14.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' opposition to Plaintiffs' motions for preliminary injunction, Doc. No. 92, Defendants respectfully request that this Court stay its preliminary injunction.  Defendants respectfully request a ruling on this motion by no later than the close of business on February 26, 2025, after which time, if relief has not been granted, Defendants intend to seek relief from the First Circuit.

Dated: February 19, 2025                      Respectfully submitted

                                              BRETT A. SHUMATE
                                              Acting Assistant Attorney General
                                              Civil Division

                                              LEAH B. FOLEY
                                              United States Attorney

                                              ALEXANDER K. HAAS
                                              Branch Director

                                              BRAD P. ROSENBERG
                                              Special Counsel

                                              */s/ R. Charlie Merritt*
                                              R. CHARLIE MERRITT (VA Bar No. 89400)
                                              YURI S. FUCHS
                                              U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street, NW
                                              Washington, DC 20005

Phone:  202-616-8098
Fax: 202-616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

PA377

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: February 19, 2025

*/s/ R. Charlie Merritt*
R. Charlie Merritt
Trial Attorney