# United States Court of Appeals
## For the First Circuit

No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF
MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL, on
behalf of the People of Michigan; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH
CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF
WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the
United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his
official capacity as Secretary of State; U.S. DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity
as Secretary of Health and Human Services; U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND DUDEK, in his official capacity as Acting
Commissioner of Social Security; UNITED STATES OF AMERICA,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Barron, Chief Judge,
Rikelman and Aframe, Circuit Judges.

Yaakov M. Roth, Acting Assistant Attorney General, Eric D. McArthur, Deputy Assistant Attorney General, Mark R. Freeman, Sharon Swingle, Brad Hinshelwood, and Derek Weiss, Attorneys, Appellate Staff, U.S. Department of Justice, on brief for appellants.

Jonathan Skrmetti, Attorney General & Reporter, J. Matthew Rice, Solicitor General, and Whitney D. Hermandorfer, Director of Strategic Litigation, on brief for State of Tennessee, amicus curiae.

R. Trent McCotter, Boyden Gray PLLC, Daniel Z. Epstein, America First Legal Foundation, George W. Vien, Pietro A. Conte, and Donnelly, Conroy & Gelhaar, LLP on brief for Members of Congress, amici curiae.

William J. Olson, Jeremiah L. Morgan, William J. Olson, P.C., Jeffrey C. Tuomala, Rick Boyer, and Integrity Law Firm on brief for America's Future, Gun Owners of America Inc., Gun Owners Foundation, Citizens United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund, amici curiae.

Judd E. Stone II, Christopher D. Hilton, Ari Cuenin, Cody C. Coll, Stone Hilton PLLC, Daniel Z. Epstein, and America First Legal Foundation on brief for Former National Security Official Joshua Steinman, amicus curiae.

Matthew J. Platkin, Attorney General of New Jersey, Viviana M. Hanley, Deputy Attorney General, Jeremy M. Feigenbaum, Solicitor General, Shankar Duraiswamy, Deputy Solicitor General, Andrea Joy Campbell, Attorney General of Massachusetts, Gerard J. Cedrone, Deputy State Solicitor, Jared B. Cohen, Assistant Attorney General, Rob Bonta, Attorney General of California, Denise Levey, Deputy Attorney General, Michael L. Newman, Senior Assistant Attorney General, Marissa Malouff, Irina Trasovan, Supervising Deputy Attorneys General, Lorraine López, Delbert Tran, Annabelle Wilmott, Deputy Attorneys General, Christopher D. Hu, Deputy Solicitor General, Phil Weiser, Attorney General of Colorado, Shannon Stevenson, Solicitor General, William M. Tong, Attorney General of Connecticut, Janelle Rose Medeiros, Assistant Attorney General, Brian L. Schwalb, Attorney General for the District of Columbia, Caroline S. Van Zile, Solicitor General, Jeremey R. Girton, Assistant Attorney General, Kathleen Jennings, Attorney General of Delaware, Vanessa L. Kassab, Deputy Attorney General, Anne E. Lopez, Attorney General of Hawai'i, Kaliko'onālani D. Fernandes, Solicitor General, Aaron M. Frey, Attorney General of Maine, Thomas A. Knowlton, Assistant Attorney General, Dana Nessel, Attorney General of Michigan, Toni L. Harris, Neil Giovanatti, Stephanie M. Service, Assistant Attorneys General, Anthony G. Brown, Attorney General of Maryland, Adam D. Kirschner, Senior Assistant Attorney General, Keith Ellison,

Attorney General of Minnesota, <u>John C. Keller</u>, Chief Deputy Attorney General, <u>Aaron D. Ford</u>, Attorney General of Nevada, <u>Heidi Parry Stern</u>, Solicitor General, <u>Letitia James</u>, Attorney General of New York, <u>Matthew William Grieco</u>, Senior Assistant Solicitor General, <u>Ester Murdukhayeva</u>, Deputy Solicitor General, <u>Raúl Torrez</u>, Attorney General of New Mexico, <u>James W. Grayson</u>, Chief Deputy Attorney General, <u>Jeff Jackson</u>, Attorney General of North Carolina, <u>Daniel P. Mosteller</u>, Associate Deputy Attorney General, <u>Peter F. Neronha</u>, Attorney General of Rhode Island, <u>Katherine Connolly Sadeck</u>, Solicitor General, <u>Joshua L. Kaul</u>, Attorney General of Wisconsin, <u>Gabe Johnson-Karp</u>, Assistant Attorney General, <u>Charity R. Clark</u>, Attorney General of Vermont, Julio A. Thompson, Co-Director, Civil Rights Unit, <u>David Chiu</u>, City Attorney of San Francisco, and <u>David S. Louk</u>, Deputy City Attorney, on brief for appellees.

———————————

March 11, 2025

———————————

BARRON, **Chief Judge**.    Defendants-Appellants ("the Government") move for a stay pending appeal of a February 13, 2025 order by the United States District Court for the District of Massachusetts.[1]  The District Court's order granted a "universal" preliminary injunction to eighteen states ("Plaintiff-States"), including Massachusetts,[2] in their suit challenging the enforcement of Executive Order No. 14,160.

Titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order"), Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025), the Executive Order limits, in two circumstances, the persons whom federal officials may recognize as having United States citizenship based on having been born in the United States.  The first circumstance is "when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at

---

[1] The following movants have moved for leave to file an amicus (or amici) curiae brief in support of the Government's motion for a stay pending appeal: the State of Tennessee; 18 Members of Congress who serve on the Committee on the Judiciary of the U.S. House of Representatives; America's Future, Gun Owners of America, Gun Owners Foundation, Citizens United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund; and Former National Security Official Joshua Steinman.  We grant those motions, and the proposed briefs are accepted as filed.  We have considered the amicus briefs only insofar as they concern legal issues and positions raised by the parties.  See Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020).

[2] The District of Columbia and the City of San Francisco also are plaintiffs.

the time of said person's birth."  Id.  The second circumstance is "when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."  Id.

The complaint alleges that the Executive Order violates the Citizenship Clause of the Fourteenth Amendment to the United States Constitution, which provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  The complaint also alleges that the Executive Order violates 8 U.S.C. § 1401, which provides that "a person born in the United States, and subject to the jurisdiction thereof" "shall be . . . [a] citizen[] of the United States at birth."  The complaint names as the defendants the President, the Secretary of State, the Secretary of Homeland Security, the Secretary of Health and Human Services, the Commissioner of the Social Security Administration, the corresponding agencies, and the United States of America.

The Plaintiff-States moved for a preliminary injunction on January 21, 2025.  The District Court's order granting the motion enjoined all the officials named as defendants, but not the President, as well as all others "acting in concert with or on

behalf of any named defendant in this action" from "implementing and enforcing" the Executive Order.[3]

We do not address the Government's appeal of the preliminary injunction itself. We address only the Government's stay motion, which asks us to decide whether the District Court's order granting a preliminary injunction should be stayed while this court takes up an interlocutory appeal of that injunction. Based on the arguments that the Government presents in support of the stay motion, we deny it.[4]

## I.

A preliminary injunction is an "extraordinary remedy." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To

---

[3] The District Court reasoned that "directly constraining the President's actions" was not necessary to provide relief to the Plaintiff-States, as "[o]ther officers and agencies within the Executive Branch are responsible for implementing the [Executive Order], and it is their conduct that the plaintiffs really seek to restrain."

[4] The District Court also issued a preliminary injunction in the companion case of Doe et al. v. Trump et al., No. 25-cv-10135, which involved only private plaintiffs and organizations. That injunction did not provide relief to "other persons or organizations that are not parties to [that] lawsuit." The Government has appealed that injunction but has not moved for a stay pending appeal of that injunction. We note too that the Ninth Circuit recently denied the Government's motion for a partial stay pending appeal of an order granting a nationwide preliminary injunction to four states in their challenge to the Executive Order. See Washington v. Trump, No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025). The Fourth Circuit did the same in a case brought by private parties. See Casa, Inc. v. Trump, No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025).

obtain this relief, a plaintiff "must establish" that: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." Id. at 20.  In addition, a plaintiff seeking a preliminary injunction "must make a 'clear showing' that [it] is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Winter, 555 U.S. at 22).  A grant of a preliminary injunction is reviewed for abuse of discretion. Ashcroft v. ACLU, 542 U.S. 656, 664 (2004) (citation omitted).

       The District Court determined that the Plaintiff-States met their burden of showing that they were likely to succeed in establishing their standing to challenge the Executive Order.  It also determined that the Plaintiff-States showed that they were likely to succeed in establishing that the Executive Order violated the Citizenship Clause of the Fourteenth Amendment and 8 U.S.C. § 1401.  The District Court next determined that the Plaintiff-States showed that they would suffer irreparable harm in the absence of their requested injunction based on the Plaintiff-States' declarations "detailing the imminent and damaging impacts they anticipate will flow from the [Executive Order]."  Finally, the District Court determined that the "[b]alance of [h]arms" and the "[p]ublic [i]nterest" supported the

injunction's issuance because "the [G]overnment has no legitimate interest in pursuing unconstitutional agency action" and "an injunction [would] do no more than maintain a status quo that has been in place for well over a century."[5]  With respect to the "universal" aspect of the preliminary injunction, the District Court explained that such relief was "necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions."

The Government filed a notice of appeal of the District Court's preliminary injunction order on February 19, 2025.  On the same day, it filed a motion in the District Court to stay the preliminary injunction pending appeal.  See Fed. R. App. P. 8(a)(1)(A) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").

The District Court denied the stay motion on February 26, 2025, explaining that "[t]he standard applicable to the defendants' [stay] request requires consideration of essentially the same four equitable factors that governed the plaintiffs' original motion."  The District Court reasoned that

---

[5] The District Court noted that the parties both agree that 8 U.S.C. § 1401 and the Citizenship Clause of the Fourteenth Amendment are "coterminous."  The Government does not seek to distinguish between them in its stay motion to us.

"[i]f the defendants could not succeed in that context, then they certainly cannot prevail now" because "[o]n the [stay] motion, the burden shifts to the defendants to establish entitlement to the extraordinary relief they seek."  The Government filed this motion for a stay pending appeal on February 27, 2025.  This court set an expedited briefing schedule.

## II.

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right."  Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotation marks omitted).  Thus, the party seeking a stay -- here, the Government -- bears the burden of proving that the circumstances justify one.  Id. at 433-34.  To meet that burden, the Government must: (1) make a "strong showing that [it] is likely to succeed on the merits" in its appeal; (2) show that it "will be irreparably injured absent a stay"; (3) show that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) show that the stay would be in "the public interest."  Id. at 434.  "The first two factors . . . are the most critical."  Id.

In evaluating these factors, we are mindful that "[t]he ability to grant interim relief is . . . a means of ensuring that appellate courts can responsibly fulfill their role in the judicial process."  Id. at 427.  But we are also aware of the "tight

timeline" for resolving applications for interim relief, which is "not always optimal for orderly judicial decisionmaking." Labrador v. Poe, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., concurring in the grant of stay). That makes it especially important for us to keep in mind that as the "neutral arbiter of matters the parties present," we "rely on the parties to frame the issues for decision," Greenlaw v. United States, 554 U.S. 237, 243 (2008), given our reluctance to definitively opine on issues for which we have been deprived of "the benefit of vigorous adversarial testing," Abernathy v. Wandes, 713 F.3d 538, 552 (1st Cir. 2013) (citing Hill v. Kemp, 478 F.3d 1236, 1251 (10th Cir. 2007)).

The Government expressly declines to make any developed argument that it is likely to succeed on appeal in showing that the Executive Order is either constitutional or compliant with 8 U.S.C. § 1401. Nor does the Government contest that, for more than a century, persons in the two categories that the Executive Order seeks to prevent from being recognized as United States citizens have been so recognized. Instead, the Government contends that it can make the requisite showing for a stay of the preliminary injunction even without developing an argument to us that the Executive Order is lawful and even though the enforcement of the Executive Order would dramatically break with the Executive Branch's longstanding legal position and thereby disrupt longstanding governmental practices. See, e.g., Legis. Denying

- 10 -

Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340, 340-47 (1995).  The Government's chief contention in so arguing is that, as to the first <u>Nken</u> factor, it has made a "strong showing" that the Plaintiff-States likely lack standing both under Article III of the U.S. Constitution, <u>see</u> U.S. Const. art. III, § 2, cl. 1 (providing that the "judicial Power shall extend" to all "Cases" and "Controversies"), and under third-party standing principles.  As we will explain, we conclude that, at least given its arguments in its stay motion, the Government has not made a "strong showing" to undermine the Plaintiff-States' standing in either respect.  We further conclude that it has not met its burden as to the other <u>Nken</u> factors.

### A.

In seeking the preliminary injunction, the Plaintiff-States contended, and the District Court agreed, that they were likely to establish that they had Article III standing based on a number of distinct kinds of injuries traceable to the enforcement of the Executive Order.  The Plaintiff-States' contentions in this regard included that they likely could show that the enforcement of the Executive Order would "directly" cause the Plaintiff-States the "loss of federal . . . funds" that they otherwise would receive for administering federal programs that provide healthcare, education for special needs youth, child welfare, and the Social Security Administration's Enumeration at

Birth program ("EAB").[6]  The Plaintiff-States relied on both Department of Commerce v. New York, 588 U.S. 752 (2019), and Biden v. Nebraska, 143 S. Ct. 2355 (2023), as support for this contention.

The asserted pocketbook injuries in Department of Commerce and Biden did take the form of a loss of federal funds to which the plaintiff-states in those cases would have been entitled absent the challenged federal governmental action.  See Dep't of Com., 588 U.S. at 766-67; Biden, 143 S. Ct. at 2366.  However, the Government's stay motion to us, like its opposition to the motion for the preliminary injunction, makes no reference to either precedent.  Its stay motion thus does not address how those precedents bear on the Plaintiff-States' Article III standing insofar as their injury-in-fact is premised on the loss of the federal funding itself.

The Government, in its reply to the Plaintiff-States' opposition to the stay motion, finally addresses Biden -- but still not Department of Commerce.  In Biden, one of the plaintiff-states there claimed a fiscal injury based on the loss of loan servicing

---

[6] The EAB program provides a mechanism -- facilitated by states, including Plaintiff-States -- for newborns to apply for Social Security Numbers ("SSNs").  Even though eligible noncitizens (in addition to U.S. citizens) may apply for SSNs, the EAB program is only open to U.S. citizens by birth.  See Soc. Sec. Admin., Pub No. 05-10023, Social Security Numbers for Children (2024), ssa.gov/pubs/EN-05-10023.pdf.  States that administer the EAB program receive a service fee for each SSN issued.

fees that a corporation that it controlled would have received absent the Executive Branch's forgiveness of certain federal student loans.  143 S. Ct. at 2365-66.  The Government contends that Biden only held that this asserted financial injury was "concrete" and incurred by the state and so did not address whether the injury was "too attenuated" to establish standing.  But Biden held not just that the loss of loan servicing "fees that [the state-controlled corporation] otherwise would have earned" was a concrete injury, but also that it "[was] an injury in fact directly traceable to the [challenged government action]."  143 S. Ct. at 2366 (emphasis added).

The Government relies principally in its stay motion on the analysis in a footnote in United States v. Texas, 599 U.S. 670, 680 n.3 (2023), concerning the attenuated nature of the injury there, to contend that the Plaintiff-States likely cannot show a pocketbook injury for purposes of Article III standing.  The plaintiff-states in Texas -- unlike the plaintiffs in Department of Commerce and Biden who successfully established their standing -- did not allege that the challenged federal government action would result in their being denied federal funds to which they otherwise would be entitled.  Id. at 674.  In asserting a pocketbook injury, the plaintiff-states in Texas instead pointed to the additional state funds that they alleged that they would expend in response to the federal government's assertedly unlawful

under-regulation of third parties, which the plaintiff-states contended would cause more undocumented noncitizens to be within their states than otherwise would be the case. Id. at 674-75. Thus, given how different Texas is not only from this case but also from Biden and Department of Commerce, the portion of the standing analysis in Texas on which the Government relies provides no basis for us to conclude that it has made the required "strong showing" to undermine the Plaintiff-States' Article III standing.[7]

The Government does also invoke in its stay motion an out-of-circuit precedent, Washington v. FDA, 108 F.4th 1163 (9th Cir. 2024), for the general proposition that an "indirect" fiscal injury does not constitute an Article III injury. One of the state plaintiffs in Washington claimed economic injury in the form of increased costs to the state's Medicaid system, and the court there determined that the claimed injury "depend[ed] on an attenuated chain of healthcare decisions by independent actors." Id. at 1174; see also id. at 1170-71 (explaining Idaho's contention that the FDA's elimination of an in-person dispensing requirement for a particular medication would lead to increased use of that

---

[7] Texas also emphasized that the challenged under-regulation in that case involved the "Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute," and that "a party 'lacks a judicially cognizable interest in the prosecution . . . of another.'" 599 U.S. at 677 (alteration in original) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973)). No such concern is presented here.

medication, which in turn would lead "more women [to] experience complications that require follow-up care, some of which [will be] borne by Idaho through Medicaid expenditures" (second alteration in original) (internal quotation marks omitted)).  In other words, as in Texas, the asserted injury took the form of the additional state funds that the plaintiff-state claimed that it would spend as a result of the federal government's lack of regulation of a third party -- namely, the U.S. Food and Drug Administration's elimination of an in-person dispensing requirement for a medication.  See id. at 1174.  This precedent thus no more assists the Government's position with respect to the loss-of-federal-funds-based injury at issue here than Texas does.

The Government separately contends in its stay motion, without reference to either Department of Commerce or Biden, that if the Plaintiff-States' alleged injury from the loss of fees from the Social Security Administration's EAB program sufficed for Article III standing, then states would "equally have standing to challenge any federal action that conceivably lowers the birthrate within their borders."  (Emphasis added).  But, although "qualifying for less federal funding" is "primarily [a] future injur[y]," it can still be an Article III injury when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  Dep't of Com., 588 U.S. at 767 (emphasis added) (quoting Susan B. Anthony List v. Driehaus, 573

U.S. 149, 158 (2014)).  Yet, the Government does not explain why the loss of the EAB servicing fees differs from the loss of the loan servicing fees in <u>Biden</u>, which loss was held to be an Article III injury.  143 S. Ct. at 2365-66.

The Government more broadly contends in its stay motion that because the Plaintiff-States have "<u>voluntarily</u> chosen to provide certain benefits without regard to the recipient's citizenship," "the costs they incur to do so are self-inflicted costs" that "are not traceable to the Executive Order" and thus "do not confer standing to sue in federal court."  In doing so, the Government appears to contend that the Plaintiff-States have no claimed injuries that are immune from this "self-inflicted costs" objection.  But, insofar as this contention is a reprise of the argument based on <u>Texas</u> and <u>Washington</u>, it fails for the same reasons as that argument fails.  And, in any event, the Government has not explained why -- and so has not made a "strong showing" that -- it is likely to succeed in establishing that the Plaintiff-States' claimed fiscal injury is the result of their "voluntary" choice to spend their own funds insofar as that injury is the loss of <u>federal</u> funds to which they otherwise would be entitled for administering the federal programs at issue.  After all, <u>Biden</u> did not deem the plaintiff-state's loss of the fees for servicing federal student loans to be the result of such a choice by the plaintiff and thus not a basis for its Article III standing.

See 143 S. Ct. at 2365-66.  Nor did Department of Commerce so deem

the loss of federal funds there.  588 U.S. at 766-67.

We thus conclude that the Government has failed to make

a "strong showing" that the Plaintiff-States likely lack Article

III standing.[8]

**B.**

The Government separately contends in its stay motion to

us that it can make a "strong showing" that the Plaintiff-States

likely cannot satisfy third-party standing requirements even if

they have Article III standing.  The Government first relies on

---

[8] In addressing the Plaintiff-States' claim that they likely
had Article III standing, the District Court reasoned that the
Plaintiff-States "very likely . . . have sovereign interests in
which persons are U.S. citizens, as state laws commonly define
civic obligations such as jury service using eligibility criteria
that include U.S. citizenship."  The Plaintiff-States also allege
an Article III injury based on the administrative costs associated
with updating their citizenship verification systems.  We need not
resolve whether either the Plaintiff-States' sovereign interests
or administrative burdens provide alternative bases for their
Article III standing, because we conclude that the Government has
not made the requisite "strong showing" to undermine the
Plaintiff-States' claimed injury from the loss of federal funds.
We will have time enough to address the questions concerning those
asserted injuries, if necessary, in connection with the appeal of
the preliminary injunction itself.  The Government does contend
that if such administrative burdens sufficed for Article III
standing, then states would have standing to challenge "any change
in the federal government's policies . . . [that] would affect
eligibility for federal programs."  The Government does not
contend, however, that the same concern applies insofar as the
Plaintiff-States predicate their Article III standing on the
claimed loss of federal funds -- nor is it evident why, in the
face of Biden and Department of Commerce, that concern would be
well-taken.

Warth v. Seldin, 422 U.S. 490 (1975), and Kowalski v. Tesmer, 543 U.S. 125 (2004), for the proposition that a plaintiff "must assert his own legal rights and interests," 422 U.S. at 499, and that a constitutional claim should be brought by the person "at whom the constitutional protection is aimed," 543 U.S. at 129 (quoting Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955 n.5 (1984)).  It thus contends that the Plaintiff-States may not rely on either the Citizenship Clause of the Fourteenth Amendment or 8 U.S.C. § 1401 to challenge the Executive Order, as individuals rather than states hold the right of birthright citizenship that those provisions guarantee.

In the proceedings in the District Court, however, the Government did not mention, cite to, or otherwise address the portion of Kowalski that recognized that "[i]n several cases, [the Supreme Court] has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights."  543 U.S. at 130 (quoting Warth, 422 U.S. at 510).  And the Government did not do so even though the Supreme Court has explained after Kowalski that it has "generally permitted plaintiffs to assert third-party rights in cases" where the above-mentioned condition in Kowalski is met.  June Med. Servs. L.L.C. v. Russo, 591 U.S. 299, 318 (2020) (citing Kowalski, 543 U.S. at 130).  Nor does the Government's stay motion address this

possible ground for the Plaintiff-States' securing so-called third-party standing.  Instead, the motion merely once again asserts that "[t]he [Plaintiff-States] need to allege fiscal injuries because the Executive Order violates their own rights, not just fiscal injuries resulting from an order which, they allege, unlawfully violates someone else's rights."

For the first time in its reply to the Plaintiff-States' opposition to the stay motion, the Government addresses this aspect of Kowalski.  It does so by asserting that what it terms this "exception" to the general rule applies only to "parties facing sanctions, criminal convictions, or civil penalties," and cites Craig v. Boren, 429 U.S. 190, 193 (1976), for this proposition. Even if we were to excuse the belated nature of the contention, see Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief."); June Medical, 591 U.S. at 316-18 (arguments challenging third-party standing may be waived), Craig does not so hold, and the Government does not point to any case that does.  In fact, Craig observed that the litigant faced the possibility of "incurring a direct economic injury through the constriction of . . . [the] market," and that "such injuries establish the threshold requirements of" Article III standing.  429 U.S. at 194.  Furthermore, the

Government ignores the fact that June Medical, 591 U.S. at 318-19, in recognizing this ground for asserting third-party rights, cited to Barrows v. Jackson, 346 U.S. 249 (1953), in which the Supreme Court allowed a litigant facing a "direct, pocketbook injury" in the form of a civil suit seeking damages for the litigant's alleged breach of a racially restrictive covenant to assert a third party's equal protection rights as a defense against that suit, id. at 251-52, 256.  Thus, the Government still fails to explain why limitations on third-party standing bar the Plaintiff-States from relying on the Citizenship Clause and 8 U.S.C. § 1401 to challenge the Executive Order based on the logic that "enforcement of the challenged restriction against [them] would result indirectly in the violation of [the] rights [of those individuals excluded from citizenship by the Executive Order]."  June Med. Servs., 591 U.S. at 318 (quoting Kowalski, 543 U.S. at 130).

Indeed, under the Executive Order, to achieve the "[p]urpose" of ensuring that "the privilege of United States citizenship does not automatically extend to persons born in the United States" in certain circumstances described above, "no department or agency of the United States government shall . . . accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" for such persons.  90 Fed. Reg. 8449.  Thus, in directly operating as to the Plaintiff-States, and not the

individuals excluded from citizenship, the Executive Order causes the Plaintiff-States to lose federal funds but nonetheless has the indirect effect of preventing the individuals from obtaining federally funded services based on their U.S. citizenship. As a result, the Government in seeking the stay from us, as in its filings in the District Court, simply does not engage with whether the enforcement of the challenged governmental action against the Plaintiff-States would result "indirectly" in the violation of the individuals' rights under the Citizenship Clause and 8 U.S.C § 1401. June Med. Servs., 591 U.S. at 318 (quoting Kowalski, 543 U.S. at 130).

The Government also cites to South Carolina v. Katzenbach, 383 U.S. 301 (1966), Haaland v. Brackeen, 599 U.S. 255 (2023), and Murthy, 603 U.S. 43, for the proposition that states may not "assert[] derivative injuries from the alleged violations of other individuals' rights." But Katzenbach held only that states could not bring parens patriae actions against the federal government, see 383 U.S. at 323-24, which is not a theory of standing on which the Plaintiff-States rely. And while it is true that Brackeen, 599 U.S. at 295 n.11, and Murthy, 603 U.S. at 76, denied the plaintiff-states' assertions of third-party standing in those cases as "thinly veiled attempt[s] to circumvent the limits on parens patriae standing," the Court did so because the plaintiff-states there did not successfully allege a concrete

Article III injury -- which, for reasons explained above, the Government has failed to make a "strong showing" is likely the case here. Furthermore, in those cases, there was no sense in which enforcement of the challenged governmental action against the plaintiff-states "indirectly" resulted in the violation of the constitutional rights held by individuals. June Med. Servs., 591 U.S. at 318 (citing Kowalski, 543 U.S. at 130).

Thus, we do not see how the Government has made, through its arguments to us, a "strong showing" that it is likely to prevail in its contention that the Plaintiff-States do not have standing to assert the federal constitutional and statutory rights to United States citizenship of the individuals who would not be recognized as having such citizenship under the Executive Order.[9]

## c.

The Government's failure to make a "strong showing" to undermine the Plaintiff-States' standing -- and thus as to the first Nken factor -- adversely impacts the arguments that it makes about what it describes as the "remaining" Nken factors. As to the second and fourth Nken factors -- whether the Government "will

---

[9] We note that the Government does not make any independent argument that the Plaintiff-States either fall outside the "zone of interest" of, or fail to invoke a valid cause of action with respect to, the rights asserted under 8 U.S.C. § 1401 and the Citizenship Clause of the Fourteenth Amendment. Cf. INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers).

be irreparably injured absent a stay" and whether the stay would be in "the public interest" -- the Government contends that they "merge" when the Government is the party seeking a stay of a preliminary injunction against it.  Nken, 556 U.S. at 435.  The Government contends that is so because any injunction that "prevents the President from carrying out his broad authority over and responsibility for immigration matters" results in irreparable harm to it and thus the public interest.  But the precedent to which the Government cites in support of its argument for satisfying its burden as to these two factors found such an injunction to be "an improper intrusion by a federal court into the workings of a coordinate branch of the Government" only because the Government had shown that the plaintiffs likely "had no standing to seek the order entered by the District Court."  INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor, 510 U.S. 1301, 1305-06 (1993) (O' Connor, J., in chambers).  As we have just explained, the Government has not made a "strong showing" that the Plaintiff-States are likely to fail in establishing their standing.  In addition, as we noted at the outset, the Government has not made any developed argument in support of its stay motion that it is likely to succeed in showing that the Executive Order is lawful.

The Government relatedly argues that the injunction is "especially harmful" because "the challenged Executive Order is an

integral part of President Trump's broader effort to repair the
United States' immigration system and to address the ongoing crisis
at the southern border."  Because the Government has not made a
"strong showing" that it is likely to succeed in showing either
that the lower court had no power to enter an injunction or that
the enjoined conduct was lawful, we do not see how this contention
can suffice to show that the Government has met its burden as to
the irreparable harm and public interest factors any more than the
contention just considered could do so.

    We note, too, to the extent that we must consider
"irreparable injury to the parties or to the public resulting from
the premature enforcement of a determination which may later be
found to have been wrong" in assessing the public interest,
Scripps-Howard Radio v. FCC, 316 U.S. 4, 9 (1942) (emphasis added),
we must consider how the interests of the broader public are
affected by "premature enforcement" of the determination in the
Executive Order regarding who is entitled to be recognized as a
U.S. citizen.  The risks that this determination may later be
deemed wrong are high, given that the Government does not argue to
us that the Executive Order likely complies with either federal
constitutional or federal statutory law.  And, understandably, the
Government does not dispute that the public has a substantial
interest in ensuring that those entitled to be recognized as U.S.
citizens under the criteria on which officials at all levels of

government have long relied are not unlawfully deprived of that recognition.  So, as to the first two Nken factors -- which are the most critical ones -- and the fourth Nken factor, the Government has not met its burden.

With respect to the third Nken factor -- whether the "issuance of the stay will substantially injure the other parties interested in the proceeding" -- the Government also bears the burden as the party seeking the stay.  See Nken, 556 U.S. at 433-34.  To meet it, the Government contends that the Plaintiff-States "have failed to show that any such injuries occurring between now and final judgment would be irreparable." That is so, the Government contends, because the Plaintiff-States have failed to demonstrate that any loss of federal funds "could not be recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs" and "requiring exhaustion of claims through an administrative process that could result in payment of contested claims [does not] constitute irreparable harm."

In its motion for a stay to the District Court, however, the Government did not make this contention, which, we note, also does not address the significant additional burdens that the District Court identified in finding that the Plaintiff-States would suffer irreparable harm in the absence of preliminary injunctive relief to redress their Article III injury.  Cf.

_Acevedo-García_ v. _Vera-Monroig_, 296 F.3d 13, 17-18 (1st Cir. 2002)
(declining to consider arguments raised for first time in this
court in support of stay pending appeal of preliminary injunction).
This waiver aside, we note that the Plaintiff-States asserted
during the preliminary injunction proceedings below that, even
after final judgment in this litigation, they would not be able to
recoup the lost EAB servicing fees if families do not obtain an
SSN at birth through the EAB program, _cf._ _Biden_, 143 S. Ct. at
2366, and the Government does not contend otherwise.  Furthermore,
with respect to other federal funds that the Plaintiff-States
assert enforcement of the Executive Order would cause them to lose,
the Government does not, in attempting to meet its burden as to
the third _Nken_ factor, explain how the Plaintiff-States could
recoup those funds after final judgment.  Nor does the Government
address the Plaintiff-States' assertion that any administrative
proceedings applicable to the recoupment of these funds would be
unable to adjudicate constitutional challenges to the eligibility
criteria for those funds.

        While the Government separately contends with respect to
the third _Nken_ factor that the alleged harms to the
Plaintiff-States will occur "years in the future," it does so for
the first time in its reply to the Plaintiff-States' opposition to
the motion for the stay.  _See_ _Sparkle Hill_, 788 F.3d at 29.
Moreover, the Government does not grapple with declarations

submitted by the Plaintiff-States in the preliminary injunction proceedings that show that the loss of federal funds for healthcare insurance and the loss of fees from the EAB program would occur immediately upon the birth of any newborns who would not be recognized as U.S. citizens if the Executive Order were enforced. Thus, the Government has not shown that it has met its burden with respect to the third Nken factor, insofar as it seeks to meet that burden by challenging the District Court's determination that the Plaintiff-States had established that they would suffer irreparable harm in the absence of their requested relief. We therefore conclude that the Government has failed to meet its burden as to the third Nken factor, just as it has failed to meet its burden with respect to the other Nken factors.

### III.

The Government separately contends that, under the Nken factors, it is at least entitled to a stay pending appeal of the preliminary injunction as to its nationwide application. In opposing the Plaintiff-States' request for a nationwide preliminary injunction, however, the Government made only the broad argument -- not now asserted -- that the District Court lacked the authority to enjoin the Government's conduct toward any nonparties because district courts necessarily lack the power to enjoin nonparties. Then, in seeking a stay as to the nationwide aspect of the injunction in front of the District Court, the

Government did not repeat that categorical contention. It instead argued that a court abuses its discretion when it issues an injunction that is not necessary to provide "complete relief to the plaintiff[s]," and that it is likely to succeed in showing that this injunction was not so necessary because the Plaintiff-States' claimed injuries could be "substantially remedied by an order that provided relief only within their borders." Now, in its application to our court for a stay pending appeal, the Government contends that the preliminary injunction is overbroad because "complete relief" could have been provided by a preliminary injunction that "required the federal defendants to treat the children covered by the Executive Order as eligible for the services the [Plaintiff-States] administer."

The Plaintiff-States argue that the Government did not apprise the District Court of the alternative injunction that it now identifies in its stay motion to us, and, in doing so, they point out that the Government offers no details on "how such an injunction would be designed or enforced." They thus argue that the Government cannot assert the availability of such an injunction now as a reason for granting, in part, the stay motion.

The Government responds that it has consistently lodged the same challenge to the nationwide scope of the injunction throughout the course of this litigation. We cannot agree.

The argument that the Government now presses in its stay motion is obviously not the far more sweeping one advanced in challenging the granting of a nationwide preliminary injunction in the preliminary injunction proceedings themselves.  In requesting a stay in front of the District Court, moreover, the Government contested the District Court's finding that a nationwide preliminary injunction was necessary to provide complete relief to the Plaintiff-States only on the ground that "the remote concern that babies will be born after the effective date of the [Executive Order] but also move into the plaintiff states while this case is pending is too speculative to justify such sweeping relief."  In context, then, its contention at that time that the Plaintiff-States' claimed injuries would be substantially remedied by an order that provided relief "only within their borders" was a contention that the Executive Order not be enforced against the Plaintiff-States as to children born inside their borders but still be enforced against them as to children born outside.  That is different from the contention that it now makes in opposing the nationwide aspect of the injunction, which focuses on which state administers the service -- rather than where the children are born.  Thus, we decline to address the contention.  See Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 680 (1st Cir. 1998) (explaining that "[a]s a general rule, a disappointed litigant cannot surface an objection to a preliminary injunction for the first time in an

appellate venue" because doing so deprives the district court of
the opportunity to "consider [the objection] and correct the
injunction if necessary, without the need for appeal" (internal
quotation marks omitted) (quoting United States v. Zenon, 711 F.2d
476, 478 (1st Cir. 1983))); Acevedo-García, 296 F.3d at 18
(declining to consider arguments raised for first time in this
court in support of stay pending appeal of preliminary injunction).

We do note, however, that, waiver aside, the Government
cites no authority for the proposition that the first Nken factor
weighs in favor of a stay of a preliminary injunction as to its
nationwide scope even when the party seeking such a stay makes no
"strong showing" that it is likely to succeed in demonstrating
either that the challenged conduct is lawful or that the plaintiff
lacks standing to bring the challenge.  Cf. Biden, 143 S. Ct. at
2376 (denying "as moot" the Government's application to vacate, or
at a minimum narrow, the lower court's nationwide injunction
pending appeal, in light of its conclusion that the
plaintiff-states there had standing to challenge the Government
action, see id. at 2365-68, and that the challenged action was
unlawful, see id. at 2365-75).  And yet, the Government, as we
have explained, has not made a strong showing as to either the
Executive Order's lawfulness or the Plaintiff-States' lack of
standing.  Accordingly, the Government has failed to make a "strong
showing" that the first Nken factor favors the grant of a stay

pending appeal of the preliminary injunction as to its nationwide application.

The only other Nken factor that the Government addresses in seeking a stay as to the injunction's scope is whether such a stay would be in the public interest. In that regard, it asserts that the public-interest factor weighs against a nationwide preliminary injunction because "nineteen other States filed amicus briefs opposing a preliminary injunction here." According to the Government, the District Court's order "imposes an injunction on those non-party States to which they object."

There is no preliminary injunction, however, against any non-party States, only a preliminary injunction that bars the Government from enforcing the Executive Order against those states (and every other state). Nor does the Government cite any authority for the proposition that a nationwide preliminary injunction is against the public interest whenever nineteen states oppose the entry of the injunction against federal officials -- and so even as to the specific circumstance that we confront here, which involves a proposed change to the long-established means by which the United States has determined who its citizens are. Nken, 556 U.S. at 433 (explaining that because a stay is "an exercise of judicial discretion," "the propriety of its issue is dependent upon the circumstances of the particular case" (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672-73 (1926))). Thus,

the Government has not met its burden under the <u>Nken</u> factors for a stay as to the nationwide scope of the preliminary injunction.

## IV.

There is one hanging thread.  In challenging the scope of the District Court's preliminary injunction, the Government separately argues that it is overbroad to the extent that it "prevents . . . the Executive Branch as a whole from beginning the process of formulating relevant policies and guidance for implementing the President's Order" because the Plaintiff-States cannot claim any injury from such "internal operations."  But, as the District Court noted, the Government does not identify any such steps that it wishes to take but is enjoined from taking by the District Court's order.  Nor do we read the plain terms of the District Court's order to enjoin "internal operations" that are "preparatory operations that cannot impose any harm" on the Plaintiff-States.

## V.

For the reasons given above, the motion for a stay pending appeal is <u>denied</u>.  A briefing order shall issue forthwith.