**Nos. 25-1169, 25-1170**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants.*

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security; UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF FOR APPELLANTS

**COUNSEL LISTED ON INSIDE COVER**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................. 1

STATEMENT OF JURISDICTION ...................................................................... 3

STATEMENT OF ISSUES ................................................................................... 3

STATEMENT OF THE CASE .............................................................................. 3

      A.     Constitutional and Statutory Background ................................................. 3

      B.     Factual Background.................................................................................... 4

      C.     Prior Proceedings ..................................................................................... 6

SUMMARY OF ARGUMENT ............................................................................. 9

STANDARD OF REVIEW.................................................................................. 12

ARGUMENT ...................................................................................................... 12

I.      Plaintiffs Are Not Likely to Succeed on the Merits............................................ 12

      A.     The Executive Order Is Consistent with the Original Meaning of the Citizenship Clause............................................................................ 14

            1.     Persons Are "Subject to the Jurisdiction" of the United States if They Owe Primary Allegiance to the United States. ...... 14

            2.     Persons Temporarily or Unlawfully Present Do Not Owe the Requisite Allegiance to the United States................................ 24

      B.     The District Court's Contrary Holding Is Mistaken. .............................. 37

      C.     Plaintiffs' Statutory Claim Fails for the Same Reasons........................... 43

II.     The States Lack Standing. ................................................................................... 44

      A.     The States Cannot Sue to Assert Claimed Individual Rights to Citizenship............................................................................................... 44

B.     The States Lack Article III Standing or Irreparable Harm from Their Alleged Injuries. ...................................................................49

III.    The Injunctions Are Both Substantially Overbroad. ............................ 53

A.     The *New Jersey* Injunction Is Broader Than Necessary to Provide Complete Relief to Plaintiffs. ..........................................................53

B.     The *Doe* Injunction Impermissibly Grants Relief to Members Who Lack Article III Standing. ......................................................55

C.     The Remaining Equitable Factors Do Not Support the Preliminary Injunction. ..................................................................57

CONCLUSION .................................................................................... 59

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Afroyim v. Rusk*,
  387 U.S. 253 (1967) ................................................................ 43

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ................................................................ 45

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ................................................ 50

*Barrows v. Jackson*,
  346 U.S. 249 (1953) ................................................................ 46

*Berenyi v. District Dir., INS*,
  385 U.S. 630 (1967) ................................................................ 36

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ................................................................ 52

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................ 53

*Carlson v. Reed*,
  249 F.3d 876 (9th Cir. 2001) ..........................................31-32

*CASA, Inc. v. Trump*,
  No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025) ........................................ 9

*Cherokee Nation v. Georgia*,
  30 U.S. (5 Pet.) 1 (1831) ........................................................ 26

*Chin Bak Kan v. United States*,
  186 U.S. 193 (1902) ................................................................ 40

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019) ................................................................ 44

*Craig v. Boren,*
    429 U.S. 190 (1976) ................................................................ 46

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................ 55

*Department of Commerce v. New York,*
    588 U.S. 752 (2019) ................................................................ 52

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022) ................................................................ 46

*Dred Scott v. Sandford,*
    60 U.S. (19 How.) 393 (1857) ............................................... 1, 3

*Elk v. Wilkins,*
    112 U.S. 94 (1884) ............................. 1, 10, 11, 15, 16, 18, 25, 26

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ................................................................ 49

*Florida v. Mellon,*
    273 U.S. 12 (1927) ................................................................. 50

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893) ............................... 19, 25, 26, 31, 39, 40

*Franchise Tax Bd. of Cal. v. Hyatt,*
    587 U.S. 230 (2019) ................................................................ 22

*General Bldg. Contractors Ass'n v. Pennsylvania,*
    458 U.S. 375 (1982) ................................................................ 20

*Gill v. Whitford,*
    585 U.S. 48 (2018) ................................................................. 53

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ................................................................ 46

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ............................................... 17, 26, 45

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) ........................................................... 35

*Hunt v. Washington State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ........................................................... 55

*Inglis v. Trustees of the Sailor's Snug Harbour in N.Y.C.,*
   28 U.S. (3 Pet.) 99 (1830) ................................................. 38

*INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor,*
   510 U.S. 1301 (1993) ......................................................... 58

*International Union v. Brock,*
   477 U.S. 274 (1986) ...................................................... 56, 57

*June Med. Servs. LLC v. Russo,*
   591 U.S. 299 (2020) ........................................................... 45

*Kaplan v. Tod,*
   267 U.S. 228 (1925) ........................................................... 32

*Kawakita v. United States,*
   343 U.S. 717 (1952) ........................................................... 34

*Kemp v. United States,*
   596 U.S. 528 (2022) ........................................................... 43

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ........................................ 45, 46, 47, 48

*Kwock Jan Fat v. White,*
   253 U.S. 454 (1920) ........................................................... 40

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
   599 U.S. 382 (2023) ........................................................... 26

*Lamar v. Micou,*
   112 U.S. 452 (1884) ...................................................... 20, 31

*Lau Ow Bew v. United States,*
144 U.S. 47 (1892) ............................................................. 10, 18, 25, 39, 40

*Lem Moon Sing v. United States,*
158 U.S. 538 (1895) ........................................................................ 39

*Lone Wolf v. Hitchcock,*
187 U.S. 553 (1903) ........................................................................ 17

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ........................................................................ 53

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) .......................................................... 14

*Martinez v. Bynum,*
461 U.S. 321 (1983) ........................................................................ 25

*Massachusetts v. Mellon,*
262 U.S. 447 (1923) ........................................................................ 45

*Mata Chorwadi, Inc. v. City of Boynton Beach,*
66 F.4th 1259 (11th Cir. 2023) ........................................................ 47

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................................ 20

*Mississippi Band of Choctaw Indians v. Holyfield,*
490 U.S. 30 (1989) .......................................................................... 20

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) .................................................................... 12, 33

*Murray v. Schooner Charming Betsy,*
6 U.S. (2 Cranch) 64 (1804) ............................................................ 18

*Murthy v. Missouri,*
603 U.S. 43 (2024) ...................................................................12, 45, 46

*New Jersey v. Trump,*
131 F.4th 27 (1st Cir. 2025) ........................................................ 8-9, 9, 46

*N.H. Indonesian Cmty. Support v. Trump,*
  No. 25-cv-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ............................ 9

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................... 57

*NYSRPA v. Bruen,*
  597 U.S. 1 (2022) ............................................................................. 42

*Park v. Barr,*
  946 F.3d 1096 (9th Cir. 2020) ............................................................. 32

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ........................................................................... 52

*Plyler v. Doe,*
  457 U.S. 202 (1982) ........................................................................... 31

*Quirin, Ex parte,*
  317 U.S. 1 (1942) ...........................................................................17-18

*Rogers v. Bellei,*
  401 U.S. 815 (1971) ........................................................................33, 34

*Rojas-Tapia v. United States,*
  130 F.4th 241 (1st Cir. 2025) .............................................................. 41

*Sacerdote v. Cammack Larhette Advisors, LLC,*
  939 F.3d 498 (2d Cir. 2019) ................................................................ 57

*Savorgnan v. United States,*
  338 U.S. 491 (1950) ........................................................................... 34

*Schooner Exch. v. McFaddon,*
  11 U.S. (7 Cranch) 116 (1812) ........................................................14, 17

*Shelley v. Kraemer,*
  334 U.S. 1 (1948) ............................................................................. 47

*Slaughter-House Cases*,
    83 U.S. (16 Wall.) 36 (1873) ................................................................. 15

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ........................................................................... 45

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................. 14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................... 56

*The Pizarro*,
    15 U.S. (2 Wheat.) 227 (1817) ........................................................... 18

*The Venus*,
    12 U.S. (8 Cranch) 253 (1814) ........................................................... 18

*Tilghman v. Proctor*,
    125 U.S. 136 (1888) ........................................................................... 32

*Toll v. Moreno*,
    458 U.S. 1 (1982) ......................................................................... 26, 31

*Town of Chester v. Laroe Estates, Inc.*,
    581 U.S. 433 (2017) ........................................................................... 55

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..................................................................... 49, 55

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ........................................................................... 35

*United States v. Holliday*,
    70 U.S. (3 Wall.) 407 (1866) ............................................................. 17

*United States v. Kagama*,
    118 U.S. 375 (1886) ........................................................................... 17

*United States v. Manzi*,
    276 U.S. 463 (1928) ........................................................................... 36

*United States v. Mrs. Gue Lim*,
    176 U.S. 459 (1900) ........................................................................ 40

*United States v. Rogers*,
    45 U.S. (4 How.) 567 (1846) ........................................................ 16

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................ 49-50, 50

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ........................................................................ 25

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ...................................... 1, 2, 8, 10, 13, 15-16, 17, 19, 22,
                                                            25, 33, 37, 38, 39, 41, 42

*Verlinden B.V. v. Central Bank of Nigeria*,
    461 U.S. 480 (1983) ........................................................................ 17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................ 44, 45, 56

*Washington v. Trump*,
    No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025) ............................ 9

*Water Keeper All. v. U.S. Dep't of Def.*,
    271 F.3d 21 (1st Cir. 2001) ........................................................ 12

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................ 12

*Winton v. Amos*,
    255 U.S. 373 (1921) ........................................................................ 16

*Benny v. O'Brien*,
    58 N.J.L. 36, 32 A. 696 (N.J. 1895) ........................................................ 28

*Hodgson v. De Beauchesne* [1858]
    14 Eng. Rep. 920 (Privy Council) ........................................................ 25

ix

**U.S. Constitution:**

Art. I, § 8, cl. 4 ............................................................................................. 35

Amend. XIV, § 1 ................................................................... 1, 4, 12, 14, 22

**Statutes:**

Civil Rights Act of 1866, ch. 31, § 1,
14 Stat. 27, 27 ........................................................................................ 4, 20

Civil Rights Act of 1870, ch. 114, § 18,
16 Stat. 140, 144 ......................................................................................... 21

Immigration and Nationality Act, ch. 477, § 301,
66 Stat. 163, 235-36 (1952) ...................................................................... 4

Nationality Act of 1940, ch. 876, § 201(a),
54 Stat. 1137, 1138 ................................................................................ 4, 21

Naturalization Act of 1790, ch. 3, 1 Stat. 103 ................................... 33

8 U.S.C. § 1101(a)(15)(B) .......................................................................... 26

8 U.S.C. § 1101(a)(15)(F)(i) ...................................................................... 26

8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b) ..................................................... 26

8 U.S.C. § 1101(a)(15)(H)(iii) ................................................................. 26

8 U.S.C. § 1101(a)(15)(J) ........................................................................... 26

8 U.S.C. § 1101(a)(15)(M)(i) .................................................................... 26

8 U.S.C. § 1101(a)(15)(M)(iii) ................................................................. 26

8 U.S.C. § 1101(a)(15)(O)(ii)(IV) ........................................................... 26

8 U.S.C. § 1101(a)(15)(P) .......................................................................... 26

8 U.S.C. § 1101(a)(15)(Q) ............................................................ 26

8 U.S.C. § 1401(a) ................................................... 3, 4, 6, 12, 43

8 U.S.C. § 1401(b) ...................................................................... 16

8 U.S.C. § 1401(c) ....................................................................... 33

8 U.S.C. § 1612 ........................................................................... 50

28 U.S.C. § 1292(a)(1) .................................................................. 3

28 U.S.C. § 1331 ........................................................................... 3

42 U.S.C. § 1316(e) ..................................................................... 51

1999 Mich. Legis. Serv. 200 (West) (codified at Mich. Comp. Laws
    Ann. § 770.3a (West 2004)) ................................................ 48

**Regulatory Materials:**

Exec. Order No. 14,159,
    90 Fed. Reg. 8443 (Jan. 29, 2025) ................................... 4, 36, 58

Exec. Order No. 14,160,
    90 Fed. Reg. 8449 (Jan. 29, 2025) .............................................. 4

Exec. Order No. 14,165,
    90 Fed. Reg. 8467 (Jan. 30, 2025) ........................................ 4, 58

Proclamation No. 10,886,
    90 Fed. Reg. 8327 (Jan. 29, 2025); ...................................... 4, 58

**Legislative Materials:**

Cong. Globe, 39th Cong., 1st Sess. (1866):
    p. 572 .......................................................................... 21
    p. 1117 ......................................................................... 27
    p. 1262 ......................................................................... 22

pp. 2768-69 ...........................................................................................27, 28
p. 2769 ...................................................................................................... 28
p. 2893 ...................................................................................................... 22
p. 2894 ...................................................................................................... 22

Cong. Globe, 40th Cong., 2nd Sess. (1868):
p. 868 ........................................................................................................ 43
p. 967 ........................................................................................................ 43
pp. 1130-31 ............................................................................................... 43

2 Cong. Rec. 3279 (1874) ............................................................................. 29

Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs,
*Report on Birth Tourism in the United States* (2015),
https://perma.cc/C8SA-ZG8X ..............................................................35, 36

*Report of H. Comm. on Foreign Affairs Concerning the Rights of American
Citizens in Foreign States,*
*in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94 (1868); .......................... 43

**Other Authorities:**

2 *A Digest of the International Law of the United States* (Francis Wharton ed.,
2d. ed. 1887) .......................................................................................30, 43

Administrative Order No. 1989-3, *in Michigan Supreme Court
Administrative Orders* 68, https://perma.cc/Z8AW-ZS49 .......................47-48

Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and
Expulsion of Aliens in the United States* (1912) ............................................40, 44

Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by
the Fourteenth Amendment to the Constitution of the United States* (1901) ........................... 29

Frederick A. Cleveland, *American Citizenship as Distinguished from
Alien Status* (1927) ...................................................................................... 19

Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* (1869) .............19, 34

A. V. Dicey, *A Digest of the Law of England* (1896) ............................................ 25

Dig. 50.1.31 (Marcellus, Digest 1) (4 *The Digest of Justinian* 906a
(Alan Watson trans., 1985)) .............................................................. 32

85 Fed. Reg. 4219 (Jan. 24, 2020) ...................................................... 36

1 William Edward Hall, *A Treatise on International Law* (4th ed. 1895)......................26-27

M.W. Jacobs, *A Treatise on the Law of Domicile* (1887) .................................. 31, 43

Sidney Kansas, *Immigration and Nationality Act Annotated* (4th ed. 1953) ...................... 44

2 James Kent, *Commentaries on American Law* (6th ed. 1848)........................................... 22

Kurt T. Lash, *Prima Facie Citizenship* (Apr. 17, 2025),
https://perma.cc/ARN2-5CSJ ............................................................ 27

Letter from Sen. Lyman Trumbull to President Andrew Johnson (in
Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.) .................. 21

Letter from William Marcy to Austrian Charge d'Affaires
at Washington (reprinted in 44 *British and Foreign State Papers* 997 (1865)) ............... 19

Justin Lollman, Note, *The Significance of Parental Domicile Under the
Citizenship Clause*,
101 Va. L. Rev. 455 (2015) ............................................................. 29

Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its
Meaning in the Citizenship Clause of the Fourteenth Amendment*,
32 St. Louis U. Pub. L. Rev. 329 (2013) ....................................................... 34

Samuel Freeman Miller, *Lectures on the Constitution of the United States* (1891) ................ 28

Alexander Porter Morse, *A Treatise on Citizenship* (1881)................................................. 28

4 Robert Phillimore, *Commentaries upon International Law* (2d ed. 1874)......................... 40

Robert Phillimore, *The Law of Domicil* (1847) ...................................................... 32

*Regulations Governing the Admission of Chinese* (Feb. 26, 1907),
 *in* Bureau of Immigration & Naturalization, Dep't of Commerce & Labor,
 Doc. No. 54, *Treaty, Laws, and Regulations Governing the Admission of
 Chinese* 34 (June 1908) .................................................................................. 41

Mark Shawhan, Comment, *The Significance of Domicile in Lyman
 Trumbull's Conception of Citizenship*,
 119 Yale L.J. 1351 (2010) ............................................................................. 21

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of
 William Wallace Brown, Assistant Attorney-General* (1910) .......................... 30, 41

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* (1834) .......... 23, 25

Hannis Taylor, *A Treatise on International Public Law* (1901) ............................. 28

1 Travers Twiss, *The Law of Nations Considered as Independent
 Political Communities* (1861) ...................................................................... 19, 40

Emmerich de Vattel, *The Law of Nations* (1797 ed.) .................................... 23, 32

John Westlake, *International Law* (1904) ........................................................ 29

J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence* (Edward Hopper ed.,
 2d ed. 1860) ................................................................................................. 31

Ilan Wurman, *Jurisdiction and Citizenship* (Apr. 18, 2025),
 https://perma.cc/5DFJ-Z9BN ...................................................................... 40

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

These appeals involve two preliminary injunctions of the President's Executive Order addressing the meaning of the Citizenship Clause of the Fourteenth Amendment, one of which is a nationwide injunction.  The government respectfully requests the Court hear oral argument given the importance of the issues involved in these appeals.

# INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment rightly repudiated the Supreme Court's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as excluding people of African descent from United States citizenship based on their race. Simply put, the Citizenship Clause was concerned with rectifying a grave injustice to the recently freed slaves, not extending citizenship to birth tourists and other transient visitors or those who enter the country in violation of our laws.

While extending citizenship to all races, the Clause refrained from conferring citizenship on "[a]ll persons born … in the United States," instead limiting the privilege of citizenship to those who were also born "subject to the jurisdiction thereof." U.S. Const. amend. XIV, § 1. To be "subject to the jurisdiction," the Clause requires the person be "not merely subject in some respect or degree … but completely subject to" the "political jurisdiction" of the United States. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). A country has political jurisdiction over those persons who owe it "direct and immediate allegiance," *id.*, and to whom the country owes the "reciprocal obligatio[n]" of "protection," *United States v. Wong Kim Ark*, 169 U.S. 649, 679 (1898) (quotation marks omitted). Citizens, of course, have this reciprocal relationship of allegiance and protection. So too, the Supreme Court has recognized that aliens "domiciled here" are "within the allegiance and the protection … of the

United States" such that their children are subject to its jurisdiction for purposes of the Citizenship Clause. *Id.* at 693.

But these principles—and the text, history, and precedent from which they derive—demonstrate that children born to aliens in the United States temporarily or illegally do not come within the Clause. Such children lack the reciprocal relationship of allegiance and protection that would bring them within the political jurisdiction of the United States. To conclude otherwise, the district court refrained from attributing any coherent meaning to the phrase "subject to the jurisdiction thereof," instead concluding that all people born in the United States were subject to its jurisdiction unless their parents came within one of the exceptions listed in *Wong Kim Ark*. Add. 19-22. But *Wong Kim Ark*'s list of exceptions does not foreclose other exceptions that were neither presented to nor considered by the Court. The question here—which the district court avoided—is whether the reason that children born to parents within the exceptions listed in *Wong Kim Ark* are not subject to the United States's jurisdiction also applies to children born to aliens here temporarily or illegally. And the district court's mistaken understanding leaves Congress and the Executive Branch powerless to address concerns about individuals manipulating or flouting the nation's immigration laws to obtain the privileges of citizenship for their children. The Executive Order's interpretation of the Citizenship Clause is correct, and the preliminary injunctions should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  JA13; JA191.  It entered preliminary injunctions on February 13, 2025.  Add. 37-40.  The United States filed notices of appeal on February 19, 2025.  JA155; JA522.  This court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.      Whether the district court erred in holding that plaintiffs are likely to succeed on their claims that the Citizenship Clause and 8 U.S.C. § 1401(a) confer birthright citizenship on the children of aliens who are temporarily or unlawfully present in the United States.

2.      Whether the district court erred in issuing a nationwide injunction in *New Jersey v. Trump* premised on alleged injuries to eighteen States and two cities.

3.      Whether the district court erred in issuing an overbroad injunction in *Doe v. Trump* covering uninjured members of the plaintiff organizations.

## STATEMENT OF THE CASE

### A. Constitutional and Statutory Background

Until 1866, federal law did not expressly provide for citizenship by birth in the United States.  In *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), the Supreme Court misinterpreted the Constitution as excluding people of African descent from citizenship.  In response, Congress enacted the Civil Rights Act of 1866 and, months later, proposed the Citizenship Clause of the Fourteenth Amendment.

3

The Act provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27. The Clause, as ratified in 1868, provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.

The 1866 Act's statutory definition of citizenship by birth remained in place until 1940, when Congress replaced it with a statute copying the text of the Citizenship Clause. That statute provided that any "person born in the United States, and subject to the jurisdiction thereof," is a citizen. *See* Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138. That provision was reenacted in the Immigration and Nationality Act, ch. 477, § 301, 66 Stat. 163, 235-36 (1952), and remains the governing statute, *see* 8 U.S.C. § 1401(a).

## B. Factual Background

On January 20, 2025, President Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States. *See* Exec. Order No. 14,160, § 1, 90 Fed. Reg. 8449 (Jan. 29, 2025); Add. 1-2. The order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See, e.g.*, Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025); Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

The Executive Order recognizes that the Constitution and corresponding statutory provision extend citizenship at birth to most people born in the United States but do not extend the privilege of U.S. citizenship where neither parent has a sufficient relationship with the United States, specifically when the father was not a citizen or lawful permanent resident and the mother was either: (1) unlawfully present or (2) lawfully but temporarily present (such as visiting through the Visa Waiver Program or on a student, work, or tourist visa).  Add. 1, § 1.

The Executive Order directs the federal Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons in these two categories and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons.  Add. 1-2, § 2(a).  The order specifies, however, that those directives "apply only to persons who are born within the United States after" February 19, 2025.  Add. 2, § 2(b).

The Executive Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and not to "act, or forbear from acting, in any manner inconsistent with this order."  Add. 2, § 3(a).  It further directs the heads of all federal agencies to issue public guidance "regarding this order's implementation with respect to their operations and activities."  *Id.* § 3(b).

C.    **Prior Proceedings**

**1.**  The day the Executive Order issued, a pseudonymous individual, O. Doe, and two organizations, La Colaborativa and the Brazilian Worker Center, (collectively, the *Doe* Plaintiffs), filed suit challenging the Order.  JA10.  The next day, eighteen States and two cities (collectively, the States) filed a similar suit.  JA189.

The *Doe* Plaintiffs argue the Order "is unlawful on its face" because it violates the Citizenship Clause and 8 U.S.C. § 1401(a).  JA21-JA22.  They also argue the actions the administration will take to implement the Executive Order will violate the Administrative Procedure Act.  JA29.  The States raise the same claims.  JA230-JA232.  The *Doe* Plaintiffs also bring a Due Process claim, JA27-JA28, and the States also bring a Separation of Powers claim, JA231-JA232.

The *Doe* organizations' declarations each identify one or two individual members with standing.  JA36-JA37; JA42.  The States claim they "will be irreparably injured by the Order separate and apart from" those whose citizenship rights are allegedly violated, "principally by forcing [the States] to assume a greater fiscal burden for providing essential services and assistance to tens of thousands of residents."  JA211.  Because the Executive Order will, they claim, "strip[] individuals of their citizenship," those individuals will become "ineligible to receive" "benefits" the States administer—such as Medicaid, Children's Health Insurance Program (CHIP), early intervention programs for speech and occupational therapy, and welfare—that are "partially federally funded."  JA211; *see* JA211-JA223.  The loss of eligibility will also

6

cause some of the States to correspondingly spend more on state programs that provide similar services.  JA211-JA223.  In addition, the States contend that they will lose fees under a contract with the Social Security Administration for each new application they process in the Enumeration at Birth program.  JA223-225.  Finally, the States contend that they will incur "administrative and operational burdens" adapting to the Order.  JA225.

**2.**  The district court issued a single opinion addressing both cases, Add. 6, and granted separate preliminary injunctions.  Add. 37, 39.  The court held that not just the individual and associational plaintiffs but also the States had Article III standing. The States have Article III standing, the court said, whenever "an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which [the States] otherwise would be entitled."  Add. 13.  The court further reasoned that the States "probably have standing based on their sovereign interests … in which persons are their citizens" but concluded that it "need not resolve" the question because the States' "showing of direct financial harms" satisfied Article III.  Add. 15 n.7 (citation omitted).

On the merits, the district court concluded that plaintiffs' "facial challenges" were "likely to succeed."  Add. 33 n. 23.  It held that the Executive Order "and its focus on the immigration status of a child's parents find no support in the text" of the Citizenship Clause, which "does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents."

7

Add. 19.  It then said that the phrase "subject to the jurisdiction thereof" excludes from citizenship only those children whose parents are "members of the Indian tribes," "alien enemies in hostile occupation," and "diplomatic representatives of a foreign state."  Add. 20 (quoting *Wong Kim Ark*, 169 U.S. at 682).  The court held that the Supreme Court's listing of these three exceptions in *Wong Kim Ark* was a holding (or at least binding dicta) that no other exceptions existed.  The district court also pointed to later cases treating individuals born here as citizens, without inquiring into parental domicile.  Add. 23-24.

The court concluded that the remaining equitable factors favored an injunction. The balance of harms and the public interest merged, and because the court viewed the Executive Order as a constitutional violation, it held that the equities favored enjoining it.  Add. 31-32.

While plaintiffs in both cases sought nationwide relief, Add. 32-34, the court held that an injunction in the *Doe* case providing relief to the individual plaintiff and all members of the associations would provide complete relief to those plaintiffs. Add. 33.  In the *New Jersey* case, however, the court believed that the possibility that children may be born in non-plaintiff States but move to a plaintiff State required extending the injunction nationwide.  Add. 34.

**3.**  The government appealed both injunctions and sought a stay pending appeal of the *New Jersey* injunction.  The district court denied the motion.  JA525.  A panel of this Court denied the motion in a published opinion.  *New Jersey v. Trump*, 131

F.4th 27 (1st Cir. 2025).  The panel concluded that "the Government ha[d] failed to make a 'strong showing' that the Plaintiff-States likely lack Article III standing."  *Id.* at 38.  The panel also held that the government had "fail[ed] to explain" sufficiently "why limitations on third-party standing" likely applied here, when those limitations do not prevent litigants from challenging the "enforcement of the challenged restriction *against*" the litigant.  *Id.* at 39 (quotation marks omitted).  Finally, the panel "decline[d] to address the" scope-of-relief arguments, as the panel thought the government's district court stay motion had raised different arguments in support of that objection than were raised in the court of appeals.  *Id.* at 43.

The government has since sought a stay from the Supreme Court, which will hear oral argument on the application for a stay on May 15.[1]

## SUMMARY OF ARGUMENT

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  As was apparent from the time of its enactment, the Clause's use of the phrase "subject

---

[1] Three other courts have enjoined enforcement of the Executive Order.  *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025); *CASA, Inc. v. Trump*, No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025); *N.H. Indonesian Cmty. Support v. Trump*, No. 25-cv-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025).  The government has likewise sought stays or partial stays from the Supreme Court of two of those injunctions.  The government has appealed the third injunction to this Court.  *N.H. Indonesian Cmty. Support v. Trump*, No. 25-1348 (1st Cir.).

9

to the jurisdiction" of the United States contemplates something more than being subject to regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, they must have a "direct and immediate allegiance" to this country. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for certain tribal Indians, diplomats, or occupying enemies, it similarly does not hold for foreigners here temporarily or illegally. "[N]o one can become a citizen of a nation without its consent …." *Id.* at 103. And if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children.

The district court construed *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), to hold that the phrase "subject to the jurisdiction thereof" adopted the traditional English common-law exceptions from citizenship at birth for children of diplomats and occupying enemies while adding one—and only one—new exception for tribal Indians. Such a reading conflicts with the interpretation of the Citizenship Clause that prevailed in Supreme Court decisions, Executive Branch practice, and the legal community's understanding in the decades following the decision in *Wong Kim Ark*. It also ignores how the Court carefully cabined its holding to the children of those with a "permanent domicil[e] and residence in the United States," *id.* at 652-53, a limitation that made sense in light of the Court's contemporaneous cases explaining the close relationship between domicile and the rights and duties of citizenship. *See, e.g.*, *Lau Ow Bew v. United States*, 144 U.S. 47, 61 (1892).

10

The understandings of "subject to the jurisdiction" adopted by the district court and plaintiffs leave "jurisdiction" without a coherent meaning. The district court offered no definition at all, while plaintiffs' argument that "subject to the jurisdiction" encompasses anyone within the United States's regulatory jurisdiction reads that language out of the Citizenship Clause, since everyone born or present on U.S. soil is subject to U.S. regulatory jurisdiction. That interpretation cannot explain the exclusion of children born to tribal Indians, *see Elk*, 112 U.S. at 102, or the other exclusions the Supreme Court has recognized. It also would have made the Civil Rights Act of 1866—which served as the blueprint for the Citizenship Clause and defined citizenship by birth as including persons "not subject to any foreign power"—inconsistent with the Clause, even though it was enacted just months before the same Congress proposed the Fourteenth Amendment, was reenacted just two years after ratification, and was the statutory counterpart to the Citizenship Clause for over 70 years.

In any event, the injunctions are inappropriate and overbroad. The States are not proper parties to litigate the citizenship rights of individuals, lack Article III standing, and made no showing of irreparable injury. Membership-wide relief to organizations' members who lack Article III standing based on one or two members whose standing was established misconceives associational standing and exceeds a court's Article III power.

11

## STANDARD OF REVIEW

A grant of a preliminary injunction is reviewed for "abuse of discretion," with questions of law reviewed "de novo and findings of fact for clear error." *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where standing is at issue, "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

For a facial challenge to succeed, plaintiffs must "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid, or … sho[w] that the [Executive Order] lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation marks omitted).

## ARGUMENT

### I.    Plaintiffs Are Not Likely to Succeed on the Merits.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.  Section 1401(a) of Title 8 similarly grants citizenship to any "person born in the United States, and subject to the jurisdiction thereof."  Text, history, and precedent show that in overturning the Supreme Court's

odious *Dred Scott* decision and ensuring citizenship for freed slaves and their children, Congress employed the phrase "subject to the jurisdiction" of the United States to denote *political* jurisdiction (a concept rooted in allegiance and protection), not—as plaintiffs argue—*regulatory* jurisdiction (to which all persons in the United States are subject).

The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not "subject to the jurisdiction" of the United States: children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, children born on foreign public ships, and children of certain members of Indian tribes. *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898). Individuals in these categories all lack the requisite allegiance to the United States because of their primary allegiance to another sovereign. The Executive Order identifies two additional categories of persons that similarly lack the requisite allegiance: children born to aliens present temporarily and children born to aliens illegally in the United States. Because this is a facial challenge, plaintiffs bear the especially heavy burden of demonstrating that the Executive Order would be unlawful in *all* its applications. Plaintiffs cannot demonstrate any unlawful application, much less meet that imposing standard.

### A. The Executive Order Is Consistent with the Original Meaning of the Citizenship Clause.

#### 1. Persons Are "Subject to the Jurisdiction" of the United States if They Owe Primary Allegiance to the United States.

The text and structure of the Fourteenth Amendment, as well as its drafting history and background principles of law, demonstrate that "subject to the jurisdiction" refers to persons who owe primary allegiance to the United States. The text imposes two requirements for citizenship by birth: a person must be "born … in the United States" and must separately be "subject to the jurisdiction thereof." U.S. Const. amend. XIV, § 1. The Clause's separate requirements make clear that some persons born "in the United States" are not "subject to" its "jurisdiction." This "jurisdiction," therefore, cannot simply be the power to regulate. The Supreme Court has explained that the regulatory "jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). As explained in detail below, that regulatory power extends to all persons born on U.S. soil, even to classes of persons—such as members of Indian tribes—that have always been understood to fall outside the Citizenship Clause. If "jurisdiction" means regulatory power, then the Clause's independent textual requirement would be redundant. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the [C]onstitution is intended to be without effect …."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)

14

("Jurisdiction, it has been observed, is a word of many, too many, meanings." (quotation marks omitted)).

The Supreme Court's cases identifying categories of persons not "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause thus have not turned on the general power to regulate those persons. Instead, the Court has emphasized whether those persons owe allegiance to a different sovereign and thus are not regarded as owing the requisite allegiance to—or being entitled to protection from other sovereigns by—the United States.

That was the interpretation the Supreme Court adopted in its first encounter with the Citizenship Clause. In the *Slaughter-House Cases*, the Court explained that "[t]he phrase, 'subject to its jurisdiction,'" operated to "exclude" from the Citizenship Clause "children of ministers, consuls, and citizens or subjects of foreign States born within the United States." 83 U.S. (16 Wall.) 36, 73 (1873).

Subsequently, in *Elk v. Wilkins*, 112 U.S. 94 (1884), the Supreme Court addressed whether children of members of Indian tribes acquire citizenship at birth under the Citizenship Clause. The Court explained that the "evident meaning" of "subject to the jurisdiction" "is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* at 102. This political jurisdiction is a "reciprocal" relationship: the United States receives allegiance from the individual and provides that individual protection from other sovereigns. *Wong*

15

*Kim Ark*, 169 U.S. at 679 (quotation marks omitted).  Indian tribes did not meet this definition, the Court held, because the tribes were "alien nations" and "distinct political communities," and "[t]he members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States."  *Elk*, 112 U.S. at 99.[2]

Notably, the Supreme Court in *Elk* reached this conclusion even as it acknowledged that Indian tribes within U.S. territory are subject to the regulatory power of the United States.  *Elk* noted that Indian tribes were "within the territorial limits of the United States" and that Congress could deal with such tribes "either through treaties made by the president and senate, or through acts of congress."  112 U.S. at 99.  More than two decades before the Citizenship Clause was adopted, the Supreme Court had thought:

> it too firmly and clearly established to admit of dispute, that the Indian tribes residing within the territorial limits of the United States are subject to [the United States'] authority, and where the country occupied by them is not within the limits of one of the States, Congress may by law punish any offen[s]e committed there, no matter whether the offender be a white man or an Indian.

*United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846).  And in the years before and after *Elk*, the Court "thoroughly established that Congress has plenary authority over the Indians and all their tribal relations," *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see*

---

[2] Congress has since by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe."  8 U.S.C. § 1401(b).

16

*Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023), as Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866), Indian property; *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903), and Indian adoptions, *see Brackeen*, 599 U.S. at 276-80; while punishing Indians for crimes, *see United States v. Kagama*, 118 U.S. 375, 379-85 (1886).

The same is true of other categories of persons the Supreme Court has identified as outside the scope of the Citizenship Clause. In particular, the Supreme Court has observed that "children of diplomatic representatives of a foreign state," "children born of alien enemies in hostile occupation," and children born "on foreign public ships" in our ports are not "subject to the jurisdiction" of the United States. *Wong Kim Ark*, 169 U.S. at 682, 693. Here, too, the issue is not a lack of regulatory jurisdiction. The immunity diplomatic officials enjoy from state and federal law, for example, was historically a product of "the consent of the nation itself," *Schooner Exch.*, 11 U.S. (7 Cranch) at 136, not some inherent inability to exercise regulatory jurisdiction over such individuals. *See id.* at 146 (explaining that the immunity granted to foreign public ships could be "destroy[ed]" if the sovereign wished to "claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals"); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) ("[F]oreign sovereign immunity is a matter of grace and comity …."). Invading forces illustrate the same point: though the United States may exercise jurisdiction to punish "enemy invaders" for violations of the laws of war, *Ex parte Quirin*, 317 U.S. 1, 47

17

(1942), their children are not citizens by birth.  Instead, the central point is that such individuals—and their children—owe primary allegiance to a foreign sovereign.  That makes them not "completely subject" to the "political jurisdiction" of the United States because they do not owe "direct and immediate allegiance." *Elk*, 112 U.S. at 102.

The children of citizens born in the United States, by contrast, plainly owe "direct and immediate allegiance" to the United States and are undoubtedly subject to its political jurisdiction.  And the Supreme Court has made clear that under some circumstances aliens may establish sufficient ties of allegiance so as to come within the Citizenship Clause's scope.  In particular, a person "owes allegiance" to the country in which he is "domiciled." *The Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.).  Such an individual "places him[self] out of the protection" of his former country, *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 120 (1804), and "becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of an inferior order … but is, nevertheless, united and subject to the society." *The Venus*, 12 U.S. (8 Cranch) 253, 278 (1814).

Thus, "foreigners who have become domiciled in a country other than their own acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 61-62 (1892).  As the Supreme Court explained, "aliens residing in a country, with the intention of making it a permanent place of abode, acquire, in one sense, a

domicil there, and, while they are permitted by the nation to retain such a residence and domicil, are subject to its laws, and may invoke its protection against other nations." *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893); *accord id.* at 734 (Brewer, J., dissenting). For example, in 1853, the United States intervened to protect an unnaturalized U.S. domiciliary who had been seized by Austrian government officials while travelling in Turkey. *See* Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* 118-22 (1869). As Secretary of State William Marcy protested, "[t]he establishment of his domicil" in America "invested him with the national character of this country, and with that character he acquired the right to claim protection from the United States." Letter from William Marcy to Austrian Charge d'Affaires at Washington (reprinted in 44 *British and Foreign State Papers* 997 (1865)).

"Domicil [was] thus under the Law of Nations the foundation of jurisdiction over persons …." 1 Travers Twiss, *The Law of Nations Considered as Independent Political Communities* § 164, at 239 (1861); *cf.* Frederick A. Cleveland, *American Citizenship as Distinguished from Alien Status* 34 (1927) ("In dealing with domicil we are dealing with the question of jurisdiction—the right of the government to exercise control over the social population, and the rights of individuals to claim protection or to enjoy the benefits which are attached to residence.").

The Supreme Court has thus explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance … of the United States" and subject to its political jurisdiction. *Wong Kim Ark*, 169 U.S. at 693 (emphasis

added). Their children are therefore born "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause: the Supreme Court has repeatedly explained that a child's domicile "follow[s] the independent domicil of his parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *accord Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Other interpretive principles confirm that the Citizenship Clause's reference to "jurisdiction" refers to political jurisdiction and obligations of allegiance. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as the "initial blueprint" for the Amendment, *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). And the principal aim of both the Act and the Amendment was to repudiate *Dred Scott* and secure citizenship for the newly freed slaves—not to grant citizenship to illegal aliens (a group that did not yet exist, given the absence of federal laws restricting immigration). In fact, both the Act and the Amendment were written to ensure that the grant of citizenship to the newly freed slaves would not inadvertently extend citizenship to persons whose primary allegiance was not to the United States. The Act stated that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. at 27 (emphasis added). Congress "reenacted" the Civil Rights Act of 1866

20

shortly after ratification of the Fourteenth Amendment, Civil Rights Act of 1870, ch. 114, § 18, 16 Stat. 140, 144, and its citizenship language remained unchanged until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. at 1138. As this illustrates, Congress in the immediate wake of the Fourteenth Amendment regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction thereof" requirement.

Debates and correspondence about the Act and the Amendment show that members of Congress shared that understanding. Senator Lyman Trumbull, the Act's principal sponsor in the Senate, explained that its purpose was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). He summarized the Act to President Johnson as making citizens of "'all persons' born of parents domiciled in the United States, except untaxed Indians."[3] Representative John Broomall explained that the freed slaves—the primary focus of the Act and Amendment—were properly regarded as U.S. citizens by birth because they owed no allegiance to any foreign sovereign: "[U]ntil the opponents of this measure can point to the foreign Power to which he is subject, the African potentate to whom after five generations of absence he still owes allegiance, I will assume him to be, what the bill calls him, a citizen of the country in

---

[3] Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1352-53 (2010) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.)).

which he was born." *Id.* at 1262. Similarly, during debates on the Amendment, Trumbull explained: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. … It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'" *Id.* at 2893. Trumbull went on to equate being "subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894. Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power … shall be considered as citizens." *Id.* at 2893.

Common-law and other sources reflected the same understanding. Under the common law, "[t]wo things usually concur to create citizenship: [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth … within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (quotation marks omitted); *see also* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848). The phrase "born … in the United States," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of "birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

Similarly, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)—explained that

citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those born in the country, of parents who are citizens." Emmerich de Vattel, *The Law of Nations* § 212, at 101 (1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants," whom Vattel regarded as "a kind of citize[n]." *Id.* § 213, at 102; *see id.* § 215, at 102. Citizenship does not extend, however, to children of foreigners who lack "the right of perpetual residence" in the country. *Id.* § 213, at 102. Such persons would instead owe allegiance to their parents' home countries, in accord with the principle that "children follow the condition of their fathers." *Id.* § 215, at 102. Vattel then identified several additional exceptions to citizenship by birth in a country—children born "in the armies of the state," "in the house of its minister at a foreign court," or "in [its] vessels"—that track exceptions already recognized by the Supreme Court. *Id.* §§ 216-217, at 102-03.

American jurists acknowledged a similar distinction. As Justice Story explained, citizenship at birth required more than temporary physical presence:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834).

### 2.  Persons Temporarily or Unlawfully Present Do Not Owe the Requisite Allegiance to the United States.

As discussed, the text and structure of the Citizenship Clause, its history, and Supreme Court precedent all make clear that a person is "subject to the jurisdiction" of the United States only if they owe primary allegiance to the United States and not some other power.  To determine whether a person is within the political jurisdiction of the United States, the Supreme Court has looked to the relationship between the person and the country, and the degree of allegiance and protection exchanged, under the background principles of the common law and the law of nations at the time of ratification of the Fourteenth Amendment.  Under those principles, both classes of persons covered by the Executive Order are not subject to the complete political jurisdiction of the United States.  A child born of parents here temporarily is domiciled in, and owes primary allegiance to, his parents' home country.  A child born to parents here unlawfully, who lack primary allegiance to the United States, similarly owes primary allegiance to his parents' home country.  Neither child is subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

**a.**  Persons lawfully but temporarily present in the United States retain their primary allegiance to their home countries.  While they must respect U.S. law and are protected by U.S. law while temporarily present here, they have not established the requisite allegiance to the United States or received the necessary protection to come within the complete political jurisdiction of the United States.  Although English and

international law sources sometimes referred to all aliens as owing a "'temporary' allegiance," *Wong Kim Ark*, 169 U.S. at 657 (quoting A. V. Dicey, *A Digest of the Law of England* (1896)), those sources also understood that "[a] settled domicile in a country, imports an allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council). "[T]he law of nations" "recognized" "[t]hat those who have become domiciled in a country are entitled to a more distinct and larger measure of protection than those who are simply passing through, or temporarily in, it." *Fong Yue Ting*, 149 U.S. at 734 (Brewer, J., dissenting) (collecting sources). Because aliens present temporarily have not established domicile, they have not accepted those "rights and … duties" similar to "citizens," *Lau Ow Bew*, 144 U.S. at 61-62, which would form the necessary "direct and immediate allegiance" to make them "completely subject to [the] political jurisdiction" of the United States, *Elk*, 112 U.S. at 102. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (explaining how constitutional rights often attach to people who "develo[p] sufficient connection with this country to be considered part of that community.").

Domicile is, "[i]n general," an individual's "true, fixed and permanent home," *Martinez v. Bynum*, 461 U.S. 321, 331 (1983) (quotation marks omitted), and formed when "[t]wo things … concur": "residence" in a place and the "intention of making it the home of the party." Story, *supra*, § 44. Temporarily present aliens plainly do not establish domicile; indeed, under the immigration laws, many classes of aliens—

25

including tourists, students, and temporary workers—are admitted only on the express requirement that they have "a residence in a foreign country" they have "no intention of abandoning." 8 U.S.C. § 1101(a)(15)(B), (F)(i), (H)(ii)(a)-(b), (H)(iii), (J), (M)(i), (M)(iii), (O)(ii)(IV), (P), (Q); *see Toll v. Moreno*, 458 U.S. 1, 14 (1982) (describing how "Congress has precluded" aliens covered by provisions of this type "from establishing domicile in the United States"). And such individuals are not entitled to diplomatic protection from the United States when they travel abroad. *Fong Yue Ting*, 149 U.S. at 724 (explaining that domiciliaries "may invoke" diplomatic protection).

The United States' political connection to children of aliens present temporarily is far weaker than its relationship with children of "members of the Indian tribes," who fall outside the "jurisdiction" necessary under the Citizenship Clause. *Elk*, 112 U.S. at 99, 101-02. Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (quotation marks omitted). The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Despite the "enduring place" the Constitution "reserves for the Tribes … in the structure of American life," *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring), that link does not suffice as a constitutional matter for citizenship at birth, and the weaker link of aliens present temporarily even more obviously does not establish political jurisdiction or sufficient allegiance. *See, e.g.*, 1 William Edward Hall,

*A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

Here, too, the Fourteenth Amendment's historical background supports the conclusion that children born of parents temporarily present in the United States are not "subject to the jurisdiction" of the United States under the Citizenship Clause. Congressional debates over the Civil Rights Act and Fourteenth Amendment specifically addressed temporarily present foreigners. For instance, Representative Bingham, the main drafter of the Fourteenth Amendment, said in public speeches that citizens were "all free persons born and domiciled within the United States." Kurt T. Lash, *Prima Facie Citizenship* 18 (Apr. 17, 2025) (quotation marks omitted), https://perma.cc/ARN2-5CSJ. Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen." Cong. Globe, 39th Cong., 1st Sess. at 1117. But he recognized "except[ions]" for "children born on our soil to temporary sojourners or representatives of foreign Governments." *Id.* And during a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the qualification of being "subject to" its "jurisdiction"). *Id.* at 2768-69. One of his colleagues objected that "person[s] may be born in the United States and yet not be

27

… citizen[s]," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. Wade's broader version of the Citizenship Clause did not carry the day.

Similarly, the legal community's understanding following ratification accords with that understanding of the Fourteenth Amendment. In a passage later quoted in *Wong Kim Ark*, the Supreme Court of New Jersey interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right to citizenship." *Benny v. O'Brien*, 58 N.J.L. 36, 32 A. 696, 698 (N.J. 1895) (emphasis added). And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

Commentators likewise regularly recognized that the children of temporarily present aliens were not citizens. *See, e.g.*, Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States …."); Samuel Freeman Miller, *Lectures on the Constitution of the United States* 279 (1891) (similar); Hannis Taylor, *A Treatise on International Public Law* 220 (1901) ("[C]hildren born in the United States

28

to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'"); Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* 25 (1901) (recognizing an exception to American citizenship at birth for "children of aliens born here while their parents are traveling or only temporarily resident"); John Westlake, *International Law* 220 (1904) ("[W]hen the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality …..").

The political branches operated from the same understanding following the Fourteenth Amendment's enactment. Six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment … concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that "a child born within the United States of parents who are not citizens, and who do not reside within the United States, … shall not be regarded as a citizen thereof." *Id.* Although the bill ultimately failed because of "opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015). It thus appears that members of Congress accepted that children born of non-resident alien parents were not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, has taken the position at times that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents. In 1885, Secretary of State Frederick T. Frelinghuysen denied a passport to an applicant who was "born of Saxon subjects, temporarily in the United States" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship." 2 *A Digest of the International Law of the United States* § 183, at 397-98 (Francis Wharton ed., 2d. ed. 1887) (Wharton's Digest). Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, denied a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany," explaining that the applicant "was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'" *Id.* at 399-400. And in 1910, a Department of Justice report explained that "it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 124 (1910).

**b.** The same principles apply to aliens illegally present in the United States—like aliens whose presence is temporary, they lack both the requisite allegiance to the United States and the legal capacity to establish domicile here. Illegal aliens have

30

never renounced their allegiance to a foreign power and are by definition within the United States in defiance of U.S. law.  That defiance is inconsistent with establishing the requisite "allegiance" to the United States necessary to be completely subject to its political jurisdiction.  *See* J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence* 40 (Edward Hopper ed., 2d ed. 1860) (defining "allegiance" as "natural, lawful, and faithful obedience").  And, like temporary visitors, such illegally present aliens are not entitled to the reciprocal benefit of "protection against other nations" when they travel abroad.  *Fong Yue Ting*, 149 U.S. at 724.

Illegal aliens are also incapable of establishing allegiance through domicile in the United States.  Domicile, recall, requires residence and an intent to remain indefinitely.  Even if some illegal aliens may meet those requirements factually for purposes of state law, *see Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982), domicile, "being a creation of the law, contains within it certain legal fictions."  M.W. Jacobs, *A Treatise on the Law of Domicile* § 71, at 119 (1887).  Two such rules have already been discussed.  One is that a child's domicile follows its parents.  *E.g.*, *Lamar*, 112 U.S. at 470.  Second, and equally relevant, is that Congress may "preclud[e]" classes of aliens "from establishing domicile in the United States."  *Toll*, 458 U.S. at 14.  Provisions of the immigration laws that bar individuals from relinquishing their former domicile leave them without "the legal capacity to establish domicile in the United States," by precluding, as a legal matter, the intent necessary to establish domicile, regardless of the subjective desires or intentions of the alien.  *Carlson v. Reed*, 249 F.3d 876, 881 (9th

31

Cir. 2001); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding statute prohibiting entry legally precluded immigrant from "dwel[ling] within the United States" even while physically present).

Individuals whose very presence in the United States is unlawful have even less claim to allegiance established by domicile. They have no lawful basis to establish a residence in the United States, much less to assert an intent to remain indefinitely in defiance of immigration laws. "It would be inconsistent to conclude that Congress sought to preclude [those] who *comply* with federal immigration law" from establishing domicile while "permitting [those] who *violate*" it to do so. *Park v. Barr*, 946 F.3d 1096, 1099 (9th Cir. 2020) (per curiam).

Their unlawful presence cannot be a basis on which to claim allegiance to the United States. That, too, has a pedigree in the law of domicile. *See* Robert Phillimore, *The Law of Domicil* 63 (1847) (explaining that persons could not form a domicile in a place from which they were exiled); Dig. 50.1.31 (Marcellus, Digest 1) (4 *The Digest of Justinian* 906a (Alan Watson trans., 1985)) (stating that a person could not establish domicile somewhere "forbidden to him"); *cf.* Vattel, *supra*, § 213, at 102 (explaining that "inhabitants" are those "permitted to settle and stay in the country"). And it accords with the general equitable principle that no wrongdoer should "profit by his own wrong," *Tilghman v. Proctor*, 125 U.S. 136, 145 (1888), by allowing foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

In any event, even if some illegal aliens were capable of establishing allegiance through domicile in defiance of federal law, that would not support the facial claim here.  Many illegal aliens do not intend to remain here indefinitely and thus have not formed the intent necessary to establish domicile even as a factual matter.  Plaintiffs cannot "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid."  *NetChoice, LLC*, 603 U.S. at 723 (quotation marks omitted).  Indeed, it is not even clear what category the individuals identified in the *Doe* case fall into, as the complaint and declarations do not include allegations about their intent to remain here indefinitely, their continued connections to their home countries, and whether they would return if conditions in those countries changed.  *See* JA33; JA36-JA37; JA42.

**c.**  If any doubt remained about the proper application of the Citizenship Clause to children of aliens temporarily or unlawfully in the United States, related principles of interpretation would compel resolving that doubt in favor of the Executive Order's construction.

Countries have for centuries extended citizenship to the foreign-born children of their citizens, *see, e.g.*, *Wong Kim Ark*, 169 U.S. at 668-71 (discussing English history); Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104; *cf.* 8 U.S.C. § 1401(c).  The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality."  *Rogers v. Bellei*, 401 U.S. 815, 831 (1971).  The individual "who has a dual

nationality will be subject to claims" of allegiance "from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952); *cf. Savorgnan v. United States*, 338 U.S. 491, 500 (1950) ("The United States has long recognized the general undesirability of dual allegiances.").

Recognizing citizenship for the children of temporarily and illegally present aliens—thereby imposing a duty of protection on the United States—could also conflict with the other nation's claims of allegiance, creating "problems for the governments involved." *Bellei*, 401 U.S. at 832. For instance, the War of 1812 resulted in part from the Royal Navy's impressment of sailors whom the United Kingdom viewed as British subjects, but whom the United States viewed as U.S. citizens. Cockburn, *supra*, at 70-79. In the 1860s, Congress and the Executive Branch were taking steps to reduce the frequency of dual allegiance, enacting the Expatriation Act of 1868, ch. 249, 15 Stat. 223, and entering into the Bancroft treaties to coordinate the rights of an immigrant's former and adopted country, *see* Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329, 376-79 (2013). The Citizenship Clause was ratified at a time when the focus was on avoiding dual nationality.

In addition, "any policy toward aliens is vitally and intricately interwoven with … the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (quotation marks omitted). Although Congress may not deny citizenship to those protected by the Citizenship Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. art. I, § 8, cl. 4. Congress would retain the power to extend citizenship to the children of aliens present illegally or temporarily, just as it has extended citizenship to the children of members of Indian tribes. Reading the Citizenship Clause to compel that result, however, would deprive the political branches of the power to address serious problems caused by near-universal citizenship at birth.

Nor are these idle concerns. Technological advances have allowed foreigners to come to the United States and give birth on a scale without precedent in earlier centuries. A "birth tourism" industry has developed to help expectant mothers travel to the United States to secure U.S. citizenship for their children. *See* Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs, *Report on Birth Tourism in the United States* 1 (2015), https://perma.cc/C8SA-ZG8X. "[B]irth tourism companies" have even collected hefty fees to facilitate such travel. *Id.* at 25. One such company charged between $22,000 and $38,000 for a full package including assistance in

35

securing a visa, airfare, and housing and healthcare in the United States. *Id.* at 26; *see id.* at 25-31. That practice "demeans the naturalization process by monetizing the privilege of U.S. citizenship." *Id.* at 39. It also defies U.S. law, under which "obtaining United States citizenship for a child … is an impermissible basis" for a tourist visa. 85 Fed. Reg. 4219, 4223 (Jan. 24, 2020). The Constitution does not grant citizenship in such circumstances.

Similarly, some illegal aliens enter the United States to engage in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and these and other aliens "present significant threats to national security and public safety." Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443. On the district court's view, Congress and the Executive Branch are powerless to prevent the children of such individuals from becoming citizens. But again, the Constitution does not grant citizenship in such circumstances.

Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. District Dir., INS*, 385 U.S. 630, 637 (1967). While the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of aliens present temporarily or illegally, any ambiguity should be resolved against extending citizenship. Congress may extend citizenship in such circumstances if it wishes to do so.

**B. The District Court's Contrary Holding Is Mistaken.**

The district court held that "subject to the jurisdiction thereof" encompasses every person born in this country except the classes of persons listed in *Wong Kim Ark*. Add. 20. That holding does not bear scrutiny.

At the outset, the district court failed to meaningfully engage with the constitutional text. Its textual analysis was limited to asserting that the Clause "does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents." Add. 19. Yet in the next breath, the district court defined the classes of persons excepted from the Clause by their parents' status, holding that all children born in the U.S. are "subject to the jurisdiction thereof" unless *their parents* were "members of the Indian tribes," "alien enemies in hostile occupation," or "diplomatic representatives of a foreign state." Add. 20 (quoting *Wong Kim Ark*, 169 U.S. at 682).

More generally, the district court made no effort to ascribe a coherent meaning to the phrase "subject to the jurisdiction thereof" that would include these classes but exclude the classes covered by the Executive Order. Instead, the court treated *Wong Kim Ark* as resolving whether the children of aliens present temporarily or illegally are citizens under the Citizenship Clause. In *Wong Kim Ark*, however, the Supreme Court precisely identified the narrow question presented:

> whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but *have a permanent domicil and residence in the United States*, and are there

37

carrying on business, and are not employed in any diplomatic or official
capacity under the Emperor of China, becomes at the time of his birth a
citizen of the United States.

169 U.S. at 653 (emphasis added).

In analyzing that question, the Supreme Court repeatedly relied on the parents'
domicile and permanent residence. For example, it quoted an opinion in which
Justice Story recognized that "the children, even of aliens, born in a country, *while the
parents are resident there* under the protection of the government, … are subjects by
birth." *Id.* at 660 (emphasis added) (quoting *Inglis v. Trustees of the Sailor's Snug Harbour
in N.Y.C.*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J., dissenting)). It quoted the New
Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the
general rule, that *when the parents are domiciled here* birth establishes the right to
citizenship." *Id.* at 692 (emphasis added) (quotation marks omitted). It explained that
"[e]very citizen or subject of another country, *while domiciled here*, is within the
allegiance and the protection, and consequently subject to the jurisdiction, of the
United States." *Id.* at 693 (emphasis added). And it noted that "persons … owe
allegiance to the United States, *so long as they are permitted by the United States to reside here*,
and are 'subject to the jurisdiction thereof,' in the same sense as *all other aliens residing in*
the United States." *Id.* at 694 (emphases added).

After reviewing the relevant history, the Court concluded that the Amendment
extends citizenship to "children born, within the territory of the United States, of all

other persons, of whatever race or color, *domiciled within the United States.*" *Id.*
(emphasis added). The Court then summed up its holding:

> [A] child born in the United States, of parents of Chinese descent, who,
> at the time of his birth, are subjects of the Emperor of China, but *have a*
> *permanent domicil and residence in the United States,* … and are not employed
> in any diplomatic or official capacity under the Emperor of China,
> becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

Given the Court's repeated emphasis on domicile, there is no basis for the
district court's assertion that the "duration of the parents' residency in the United
States was not assessed," Add. 21, particularly given that the Court specifically noted
that Wong's parents continued to reside in the United States from their son's birth in
1873 for 17 more years, until 1890. *Wong Kim Ark*, 169 U.S. at 652.

The Court's emphasis on domicile was not accidental. The Supreme Court in
the years before and after *Wong Kim Ark* repeatedly addressed the rights of Chinese
immigrants, which frequently turned on whether they were domiciled in the United
States. Before *Wong Kim Ark*, the Court had held in *Lau Ow Bew* that "Chinese
merchants domiciled in the United States" were exempt from the requirement to
obtain a certificate of entry, 144 U.S. at 61, while in *Fong Yue Ting* it had noted that a
domiciled Chinese resident could "invoke [America's] protection against other
nations," 149 U.S. at 724. In *Lem Moon Sing v. United States*, the Court held that the
domiciliary status of a Chinese resident did not entitle him to judicial review of his
exclusion. 158 U.S. 538, 546 (1895). After *Wong Kim Ark*, the Court continued to

39

treat domiciled Chinese residents differently, *see, e.g.*, *United States v. Mrs. Gue Lim*, 176 U.S. 459, 468 (1900), and described and applied *Wong Kim Ark* as addressing domiciled permanent residents, *see Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902); *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920).  The domiciliary status of Chinese residents was significant because of the relationship between domicile, allegiance, and protection in international law, *see, e.g.*, *Lau Ow Bew*, 144 U.S. at 61-62; *Fong Yue Ting*, 149 U.S. at 724; *accord id.* at 734 (Brewer, J., dissenting), a relationship which was understood in jurisdictional terms, with treatises describing "[d]omicil" as "the foundation of jurisdiction over persons" "under the Law of Nations,"  1 Twiss, *supra*, § 164, at 239, and a "ti[e] which bind[s], or … [a] caus[e] which subject[s], the individual to the jurisdiction of a particular territory," 4 Robert Phillimore, *Commentaries upon International Law* 32 (2d ed. 1874); *see* Ilan Wurman, *Jurisdiction and Citizenship* 81 (Apr. 18, 2025) ("[T]he United States did not exercise a complete legislative jurisdiction over nondomiciled foreigners."), https://perma.cc/5DFJ-Z9BN.  Domicile's relationship to allegiance and jurisdiction and its implications for the Citizenship Clause was well understood at the time.  *Cf.* Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 423 (1912) ("It is of interest to note the frequency [in *Wong Kim Ark*] with which the terms 'residence' and 'domicile' are used in connection with 'allegiance' and 'subject to the jurisdiction.'").

40

Executive Branch practice recognized the limitations of *Wong Kim Ark*'s holding.  The official regulations governing the administration of the Chinese Exclusion Acts exempted any person who had "been born in the United States, of parents who at the time of his birth have a permanent domicile and residence in the United States."  *Regulations Governing the Admission of Chinese* r. 2 (Feb. 26, 1907), *in* Bureau of Immigration & Naturalization, Dep't of Commerce & Labor, Doc. No. 54, *Treaty, Laws, and Regulations Governing the Admission of Chinese* 34, 34 (June 1908).  The Department of Justice, likewise, explained in 1910 that *Wong Kim Ark* "goes no further" than addressing children of foreigners "domiciled in the United States," and did not address the status of children of "parents who are accidentally or temporarily in the United States."  Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *supra*, at 121, 124; *see also supra* p. 28-29 (collecting post-*Wong Kim Ark* commentary).

In short, the only question presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicil and residence in the United States."  169 U.S. at 653; *see id.* at 705.  The Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."  *Id.* at 679 (quotation marks omitted); *see Rojas-Tapia v. United States*, 130 F.4th 241, 256 (1st Cir. 2025) ("[T]he language of an opinion … must be read with a careful eye to context in light of the discrete case or controversy to which the opinion was addressed." (quotation marks omitted)).

More generally, *Wong Kim Ark*'s historical discussion of English common law *jus soli* principles—which undergird many of the district court's broad statements—is not particularly instructive here. Children born to domiciled foreigners were treated identically under English common law and the Citizenship Clause because they were regarded as owing sufficient allegiance to the sovereign. But that does not mean that the Citizenship Clause matched the English common law in every detail. The Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022). That admonition holds particular force here. The Supreme Court had already held—and *Wong Kim Ark* acknowledged—that the Citizenship Clause departs in important respects from English common law. The Clause's exception for children of members of Indian tribes was "unknown to the [English] common law," *Wong Kim Ark*, 169 U.S. at 682.

The district court offered no definition of "subject to the jurisdiction," instead simply saying that Indians were the sole departure from the English common law. Add. 20. But the reasons undergirding that exception—like all others the Supreme Court has recognized—underscore that being subject to the political jurisdiction of the United States is the determining factor, and aliens here temporarily or unlawfully are similarly outside the operation of the Citizenship Clause.

Moreover, the English *jus soli* tradition was premised on unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded

42

on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, *Report of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94, 95 (1868) (explaining that "the American Constitution is itself proof that Blackstone's [English] theory of allegiance was not accepted by the American governments"); Cong. Globe, 40th Cong., 2nd Sess. 868, 967, 1130-31 (1868) (statements objecting to English doctrine). The Citizenship Clause thus permits voluntary renunciation of citizenship, even though English common law did not. *See Afroyim v. Rusk*, 387 U.S. 253, 257-62 (1967). And more generally, "[n]o country ha[d] carried" the idea that establishing "domicil[e]" "stamp[ed]" an immigrant with his new home's "national character" "further than that of the United States." Wharton's Digest § 198, at 482 (quotation marks omitted); *see* Jacobs, *supra*, § 26, at 36 n.12 ("There has … from the first been a stronger disposition in the American cases to put national character upon the general principles of domicil than is apparent in the English cases.").

### C. Plaintiffs' Statutory Claim Fails for the Same Reasons.

Plaintiffs also bring claims under 8 U.S.C. § 1401(a), which provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen. Absent a "well-settled" meaning to the contrary, *Kemp v. United States*, 596 U.S. 528, 539 (2022) (quotation marks omitted), texts adopting identical wording generally

convey the same meaning. *Cf. Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019).

As discussed above, the Citizenship Clause does not cover the children of aliens temporarily or unlawfully present in the United States. Treatises and other sources long after the *Wong Kim Ark* decision continued to recognize that citizenship at birth required more than mere presence. *See, e.g.*, Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (explaining that the INA's statutory provision excluded "transients or visitors"); Bouvé, *supra*, at 423. Plaintiffs' statutory claim thus fails for the same reasons as their constitutional claim.

## II.    The States Lack Standing.

The *New Jersey* injunction should also be reversed for the independent reason that the plaintiffs lack standing. The States cannot assert individual-rights claims of their residents, even if they have some articulable financial harm. And they have also failed to demonstrate an Article III injury, much less an irreparable one.

### A. The States Cannot Sue to Assert Claimed Individual Rights to Citizenship.

**1.** The States claim that their future residents may be denied the rights or privileges of citizenship by the federal government and that this will indirectly cost the States money. Because a plaintiff generally "must assert his own legal rights and interests," *Warth v. Seldin*, 422 U.S. 490, 499 (1975), a constitutional claim should ordinarily be brought by the person "at whom the constitutional protection is aimed,"

that is, "the party with the right." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation marks omitted). Crucially, this principle precludes litigating others' claims even when the putative plaintiff "has alleged injury sufficient to meet" Article III requirements. *Warth*, 422 U.S. at 499; *see Kowalski*, 543 U.S. at 127, 129 n.2.

These principles apply with full force to the States. "[I]t is no part of [a State's] duty or power to enforce [its people's] rights in respect of their relations with the Federal Government," *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and thus a "State does not have standing as *parens patriae* to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982). The Supreme Court likewise has refused to countenance States' "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing," *Brackeen*, 599 U.S. at 295 n.11, by asserting derivative injuries from the alleged violations of individuals' rights. In *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), South Carolina lacked standing to claim that a federal statute violated its citizens' due-process rights because a State has no due process rights of its own and also could not invoke its citizens' rights "against the Federal Government." *Id.* at 323-24. Similarly, in *Brackeen*, 599 U.S. 255, Texas lacked standing to claim that a federal statute violated its citizens' equal-protection rights because Texas "ha[d] no equal protection rights of its own" and could not "assert third-party standing" to bring such a suit. *Id.* at 294-95, 295 n.11. And in *Murthy v. Missouri*, 603 U.S. 43 (2024), Missouri lacked standing to claim that the federal government had violated the Free Speech Clause by censoring the

45

speech of its citizens whose views Missouri was allegedly prevented from hearing. *Id.* at 76.

**2.** These precedents control here. Although the government prominently raised this issue, *e.g.*, NJ Dkt. 92 at 9-11; NJ Dkt. 158 at 2-3, the district court did not grapple with it. This Court, deciding the stay motion, concluded that the federal government had not carried its heightened burden because it had "fail[ed] to explain" why the States would not fall within the exception that a party may "'litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *New Jersey v. Trump*, 131 F.4th 27, 38-39 (1st Cir. 2025) (quoting *Kowalski*, 543 U.S. at 130).

That exception does not apply here. Litigants have only been found to fall within the exception when the challenged restriction "regulates their conduct," and the litigant is threatened with "'governmental sanctions' for noncompliance."[4] *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 319 (2020); *see, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 480 (1965) (criminal defendant faced criminal liability for selling contraceptives); *Craig v. Boren*, 429 U.S. 190, 193 (1976) (litigant threatened with loss of liquor license for noncompliance with statute); *Barrows v. Jackson*, 346 U.S. 249, 251-53 (1953) (allowing homeowner subject to racial restrictive covenant—enforcement of

---

[4] The Supreme Court has raised doubts about the continuing vitality of its cases allowing broad third-party standing. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287 & n.61 (2022). But the States here violate the rule against third-party standing even under the most permissive precedents.

which would "constitute state action"— to raise rights of third parties to purchase in defending against damages claim for breach of covenant (citing *Shelley v. Kraemer*, 334 U.S. 1 (1948))).

Nothing remotely comparable is present here. The Executive Order neither imposes duties on the States nor threatens them with any sanctions; there is no way a State can "violate" or "breach" the Executive Order. The Executive Order merely instructs federal officials to not "accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship." Add. 1, § 2(a). It neither prohibits States from issuing such documents nor imposes sanctions for such issuance. The Order thus does not regulate the States' conduct in any way. And because the States are not required to "comply" with the Executive Order, there is no causal link between any duty imposed on the States "and the violation of the third parties' constitutional rights" the States are attempting to assert. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1266 (11th Cir. 2023). In the absence of a "legal duty" imposed on the States that could lead to a violation of third-party rights when the States comply, there is no basis for ignoring ordinary third-party standing principles. *Id.*

*Kowalski* again illustrates the point. There, criminal defense attorneys sought to invoke indigent defendants' constitutional right to appointed appellate counsel. 543 U.S. at 127. To obtain appointments, the counsel registered directly with state courts, Administrative Order No. 1989-3, §§ 4-6, *in Michigan Supreme Court Administrative Orders*

47

68, 69-71, https://perma.cc/Z8AW-ZS49, and the challenged statute limited when state courts could appoint counsel from among those who had registered. 1999 Mich. Legis. Serv. 200 (West) (codified at Mich. Comp. Laws Ann. § 770.3a (West 2004)). The statute, in other words, dictated how the state courts directly interacted with the attorneys. The Supreme Court held that notwithstanding the attorneys' pocketbook injury from reduced fees and notwithstanding that the state courts interacted directly with the attorneys, there was no enforcement of the statute against the attorneys and they could not sue to assert their putative clients' constitutional right to counsel. *Kowalski*, 543 U.S. at 134.

Given that precedent, it is unsurprising that the States themselves did not contend in district court that this exception to third-party standing principles applied, *see* NJ Dkt. 123 at 2-3; NJ Dkt. 160 at 10-11, presenting it for the first time only in opposing a stay pending appeal in this Court. In district court, the States repeatedly opposed any suggestion that they were raising the rights of third parties, and there is no basis for the States' belated effort to reconceptualize their claim as one of avoiding (nonexistent) sanctions from noncompliance with the Executive Order by asserting the rights of third parties.[5]

---

[5] The district court, in a footnote, suggested that the States "probably" have a sovereign injury because the "Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside," and because "state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship." Add. 15 n.7. That

*Continued on next page.*

**B. The States Lack Article III Standing or Irreparable Harm from Their Alleged Injuries.**

Even apart from these principles, the district court erred in concluding that the States have Article III standing and irreparable injury on the basis of "diminished" "federal funding." Add. 13-14; *see* Add. 30.

To establish Article III standing, the States must show a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The States' showing of causation "must not be too speculative or too attenuated," an inquiry that includes examining whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

The States' claim the Executive Order will indirectly reduce the federal funding they receive does not satisfy Article III. The Supreme Court recently rejected nearly identical claims in *United States v. Texas*, where States challenged federal actions that, in their view, increased the number of noncitizens in their States, thereby imposing costs

---

suggestion suffers from multiple flaws. First, States have no sovereign interest in whether individuals are *federal* citizens. Second, any interest States may have in whether individuals are *state* citizens is not relevant to their claim, which focuses entirely on the fiscal consequences of whether the federal government recognizes individuals as *federal* citizens. Finally, the Executive Order directs federal officials to interpret the Citizenship Clause a particular way and does not purport to compel state officials to interpret it the same way.

to "supply social services such as healthcare and education to noncitizens." 599 U.S.

670, 674 (2023). The Supreme Court held those costs insufficient to confer standing:

> [I]n our system of dual federal and state sovereignty, federal policies
> frequently generate indirect effects on state revenues or state spending.
> And when a State asserts, for example, that a federal law has produced
> only those kinds of indirect effects, the State's claim for standing can
> become more attenuated. In short, none of the various theories of
> standing asserted by the States in this case overcomes the fundamental
> Article III problem with this lawsuit.

*Id.* at 680 n.3 (citations omitted).

That holding was only the most recent in a series of cases rejecting state

standing based on downstream effects of federal policy. The Supreme Court long ago

rejected claims that States had standing to challenge federal policy on the basis that it

"induc[ed] potential taxpayers to withdraw property" and thereby diminished the

State's tax base, explaining that such harms are "purely speculative, and, at most, only

remote and indirect." *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927).

The States' standing theory illustrates that no "limits on state standing" would

remain if "any federal regulation of individuals through a policy statement that

imposes peripheral costs on a State creates a cognizable Article III injury for the

State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). While illegal aliens

generally are not eligible for federal benefits, certain "qualified aliens," such as lawful

permanent residents, asylees, or refugees, may qualify for federal benefits in certain

circumstances (including Medicaid and CHIP). *See, e.g.*, 8 U.S.C. § 1612. On the

States' theory, every State would have standing to challenge a change in the federal

50

government's policies for conferring "qualified alien" status. Indeed, the district court made this point explicit, concluding that a State has standing any time a federal policy reduces the number of "eligible" recipients for federal aid and thus reduces federal reimbursements to the States. Add. 14.

The same points illustrate that even if the States' claim of lost reimbursements were sufficient for standing, they have failed to show that any such injuries occurring between now and final judgment would be irreparable. Plaintiffs have not shown—and the district court did not find—that any missed federal reimbursements under the Social Security Enumeration at Birth, Medicaid, or CHIP programs could not be recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs.

For example, Medicaid and CHIP provide avenues for States to pursue administrative and judicial review of disputes. *See, e.g.*, 42 U.S.C. § 1316(e). The States have not alleged they would be unable to utilize these processes to recover any lost monies. Similarly, neither the States nor the district court explained why contract payments to the States for relaying Social Security applications could not be received at the conclusion of this suit if the Social Security Administration ultimately issues social security numbers based on those applications. Thus, even assuming these purported injuries could establish Article III standing, the States have not clearly established irreparable injury.

The district court relied extensively on *Department of Commerce v. New York*, 588 U.S. 752 (2019), and *Biden v. Nebraska*, 600 U.S. 477 (2023). *Department of Commerce* involved allegations about the loss of federal funding from an undercount on the decennial census—specifically, federal funds "distributed on the basis of state population." 588 U.S. at 767. That direct link between the challenged federal funding and the action at issue is distinct from the attenuated relationship here. Medicaid and CHIP are jointly funded by state governments and the federal government; when someone is ineligible for those programs, neither the State nor the federal government pays for benefits for the individual under those programs. Put another way, when an individual becomes ineligible for the programs, the States are relieved of their obligation to pay 100% of the costs, even if they also lose the 50-75% typically "reimburs[ed]" by the federal government. JA212. The States are thus left to contend that they will devote other funds to provide state benefits to individuals ineligible for the federal programs. JA212. But those self-inflicted costs of choosing to provide certain benefits without regard to the recipient's citizenship cannot confer Article III standing, *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam), and the States' claim of injury from the federal government's decision about who will or will not be eligible for federal benefits is too attenuated to confer standing. And *Nebraska* is even further afield: there, the federal government cancelled contracts serviced by an arm of a state, again a far more direct injury than the inevitable effects of deciding who will or will not be eligible to receive federal assistance.

52

### III. The Injunctions Are Both Substantially Overbroad.

#### A. The *New Jersey* Injunction Is Broader Than Necessary to Provide Complete Relief to Plaintiffs.

Even if the States had standing to obtain injunctive relief, both Article III and traditional equitable principles require that relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted); *see Gill v. Whitford*, 585 U.S. 48, 66 (2018) (explaining that under Article III "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury'" (alteration adopted)). Similarly, traditional principles of equity require that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The *New Jersey* injunction is overbroad. The States' alleged injury, as the district court described it, stems from fewer individuals being "eligible" for the States' federally funded "health," "special education, and foster care" programs. Add. 13-14. A tailored injunction, therefore, should have focused on the eligibility for such programs. For example, requiring the federal government to determine eligibility for these States' programs without regard to the Executive Order would fully remedy the States' alleged injuries while being significantly less burdensome on the federal government.

53

Rather than tailoring the injunction to plaintiffs' programs, the district court focused on how the Executive Order applied to nonparty children. Even on those terms, the injunction is overbroad. The district court correctly identified that the relevant nonparty children causing the States' alleged injuries were only those "within" the plaintiff States. Add. 34. It therefore should have enjoined the federal government from applying the Executive Order to any nonparty children while they were "within" the plaintiff States—regardless of where they were born—which would have provided plaintiffs complete relief. Instead, the district court implicitly assumed that the effect of the injunction on a nonparty needed to be determined at the moment of the nonparty's birth. If a nonparty child born in Tennessee later moves to New Jersey, the need for the nonparty child to be eligible for services in New Jersey, the court reasoned, required the injunction to cover the nonparty from the moment of his birth in Tennessee. But whether the injunction applies to the nonparty *before* the nonparty moves to New Jersey has no effect on New Jersey. An injunction requiring the federal government to treat nonparty individuals as citizens while in the plaintiff States (without requiring the government to treat those nonparties as citizens elsewhere) would provide plaintiffs complete relief and be less burdensome on the defendants. If those nonparties had been plaintiffs, a court could, of course, provide complete relief from the moment of their birth, regardless of where they were. But when the individuals are not parties and the injunction affects them only incidentally as a way of providing the plaintiffs relief, the injunction's application to nonparty

54

children while they are outside of the plaintiff States exceeds Article III and equitable limits.

## B. The *Doe* Injunction Impermissibly Grants Relief to Members Who Lack Article III Standing.

The associations in *Doe* have no claims of their own; they instead bring suit to "assert the claims of [their] members." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Both Article III and traditional principles of equity required that the district court limit its relief to those identified claims for which the members' standing had been established.

"[S]tanding is not dispensed in gross …." *TransUnion LLC*, 594 U.S. at 431. A plaintiff must "demonstrate standing for each claim he seeks to press" because Article III requires courts to determine whether "the particular plaintiff is entitled to an adjudication of the *particular claims* asserted." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

These foundational Article III limits apply regardless of the representational or procedural device employed. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC*, 594 U.S. at 431 (quotation marks omitted). "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

"[R]epresentational standing … does not eliminate or attenuate" this "constitutional requirement."  *Warth*, 422 U.S. at 511.

Thus, organizations must identify a member or members with standing whose claims they press. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  Courts can remedy only those claims for which the association has established Article III standing.  *See International Union v. Brock*, 477 U.S. 274, 281 (1986) (holding labor union had standing to represent "those of its members injured by the [challenged] policy").

The organizations each satisfied that burden for one or two identified members' claims by providing a declaration explaining that member's standing.  *See* JA36-JA37; JA42.  Rather than granting relief for these specific claims, however, the district court granted relief to an unknown number of members of these organizations, the majority of whom likely lack Article III standing.  There is no prospect that all or even most members are pregnant or plan to become pregnant. The organization cannot obtain an injunction covering their mostly uninjured members for whom they have made no claim of standing.

Granting relief to a vast number of unidentified members is also fundamentally inequitable.  It is impossible to tell whether these members are also members of other organizations suing over the Executive Order.  *See* Complaint at 4, *N.H. Indonesian Cmty. Support v. Trump*, No. 1:25-cv-38 (D.N.H. Jan. 20, 2025) (three organizations claiming more than 355,000 members); Complaint at 8, 11, *CASA, Inc. v. Trump*, No. 8:25-cv-201 (D. Md. Jan. 21, 2025) (two organizations claiming more than 855,000

members).  Overlapping members may have their claims simultaneously litigated in two courts, despite the fundamental rule against duplicative litigation.  *See, e.g.*, *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019).

Similarly, the government does not know to whom a judgment would run, rendering it unclear to whom *res judicata* would apply.  *Cf. Brock*, 477 U.S. at 290 (explaining that preclusion "might not" apply to "subsequent claims by the association's members").

The associations cannot assert anonymous memberships of undisclosed size; claim one or two members have standing; but still demand relief for all members.  Article III principles and basic rules of equity require any relief be limited to those identified members whose standing is established and who undoubtedly could be bound by the judgment.

## C. The Remaining Equitable Factors Do Not Support the Preliminary Injunction.

Finally, the preliminary injunction inflicts irreparable injuries on the government and the public, whose interests "merge" in this context.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed above, plaintiffs are unlikely to succeed on the merits, and the injunction should be reversed on that basis.  But the equities and public interest also favor denying preliminary injunctive relief.  An injunction that prevents the President from carrying out his broad authority and constitutional responsibility is "an improper

intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). The challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. That immigration policy is designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467; Proclamation No. 10,886, 90 Fed. Reg. 8327. Addressing the Executive Branch's prior misinterpretation of the Citizenship Clause is one component of that broader effort, removing incentives to unlawful immigration and closing exploitable loopholes. Nor can the 18 plaintiff States plausibly claim to represent the public interest for a nationwide injunction when 19 other States filed amicus briefs opposing a preliminary injunction below. *See* Add. 7 n.2.

## CONCLUSION

For the foregoing reasons, the preliminary injunctions should be reversed, or at a minimum narrowed.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*

DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

APRIL 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of this Court's April 4, 2025, order because it contains 14,993 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

**ADDENDUM**

# TABLE OF CONTENTS

**Executive Order:**

Protecting the Meaning and Value of American Citizenship, Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025)......................................................Add. 1


**Constitutional and Statutory Provisions:**

Fourteenth Amendment, Section 1 ............................................................Add. 3

8 U.S.C. § 1401................................................................................Add. 4


**Local Rule 28.0 District Court Materials:**

Memorandum of Decision on Motions for Preliminary Injunction.................................
(Feb. 13, 2025) (*Doe* Dkt. 46) (also docketed as *New Jersey* Dkt. 144) .........Add. 6

Preliminary Injunction (Feb. 13, 2025) (*Doe* Dkt. 47)..............................................Add. 37

Preliminary Injunction (Feb. 13, 2025) (*New Jersey* Dkt. 145) ................................Add. 39

**Protecting the Meaning and Value of American Citizenship**

**Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025)**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The privilege of United States citizenship is a priceless and profound gift. The Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race.

But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States. The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof." Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text.

Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

**Sec. 2.** *Policy.* (a) It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons: (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was

lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b) Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c) Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

**Sec. 3.** *Enforcement.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b) The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

**Sec. 4.** *Definitions.* As used in this order:

(a) "Mother" means the immediate female biological progenitor.

(b) "Father" means the immediate male biological progenitor.

**Sec. 5.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Fourteenth Amendment, Section 1**

Section 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**8 U.S.C. § 1401**

**§ 1401. Nationals and citizens of United States at birth**

The following shall be nationals and citizens of the United States at birth:

(a) a person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(d) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(e) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years: Provided, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence

Add. 4

requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date; and

(h) a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 25-10135-LTS |
| ) | |
| DONALD J. TRUMP et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| STATE OF NEW JERSEY et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 25-10139-LTS |
| ) | |
| DONALD J. TRUMP et al., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OF DECISION ON MOTIONS FOR PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

In this pair of lawsuits, two groups of plaintiffs advance similar challenges to the legality

of one executive order among many issued by President Donald Trump on January 20, 2025.

The executive order is titled "Protecting the Meaning and Value of American Citizenship" ("the

EO"). Exec. Order No. 14,160 (Jan. 20, 2025).[1] The EO identifies two "categories of

---

[1] Multiple copies of the EO have been made part of the record before the Court. When
referencing submissions filed in Doe et al. v. Trump et al., No. 25-cv-10135, the Court will cite
to "Doe, Doc. No. __ at __." For submissions filed in New Jersey et al. v. Trump et al., No. 25-
cv-10139, the Court will cite to "New Jersey, Doc. No. __ at __." All such citations use the
document and page numbering appearing in the ECF header, except where pinpoint citations

individuals born in the United States" to whom the EO says "the privilege of United States citizenship does not automatically extend," then directs federal departments and agencies to cease issuing or accepting "documents recognizing United States citizenship" for such individuals born after February 19, 2025. Doe, Doc. No. 1-1 §§ 1-3.

Both groups of plaintiffs assert that the EO violates the Citizenship Clause of the Fourteenth Amendment to the United State Constitution, along with other constitutional provisions and federal statutes. Each group seeks a preliminary injunction preventing the EO from taking effect. Doe, Doc. No. 10; New Jersey, Doc. No. 3. The motions are fully briefed and were the subject of a motion hearing.[2]

In opposing the requests for injunctions, the defendants assert an array of arguments, which the Court addresses briefly here and in detail below. For starters, each plaintiff has standing to sue, because the uncontested facts establish each would suffer direct injury from the EO's implementation. The plaintiffs are also likely to succeed on the merits of their claims. In a lengthy 1898 decision, the Supreme Court examined the Citizenship Clause, adopting the interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO. The rule and reasoning from that decision were reiterated and applied in later decisions, adopted by

---

reference enumerated sections or paragraphs within the document. The EO appears at Doe, Doc. No. 1-1, and New Jersey, Doc. No. 1-1.

[2] The Court has accepted amicus curiae briefs from the following groups: a collection of local governments and officials representing seventy-two jurisdictions in twenty-four states; eighteen members of Congress serving on the House Judiciary Committee; the Immigration Reform Law Institute; the State of Iowa along with seventeen other states; the State of Tennessee; and former U.S. Attorney General Edwin Meese III. Doe, Doc. Nos. 32, 38, 40; New Jersey, Doc. Nos. 88, 118, 120, 122, 127, 129. The Court has considered these submissions only insofar as they concern legal issues and positions advanced by the parties. See United States v. Sturm, Ruger & Co., 84 F.3d 1, 6 (1st Cir. 1996) (explaining "an amicus cannot introduce a new argument into a case"). While several of these briefs were helpful, the submission by the State of Tennessee was especially well written.

Congress as a matter of federal statutory law in 1940, and followed consistently by the Executive Branch for the past 100 years, at least. A single district judge would be bound to apply that settled interpretation, even if a party were to present persuasive arguments that the long-established understanding is erroneous.

The defendants, however, have offered no such arguments here. Their three main contentions are flawed. First, allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents, nor must it be exclusive, as the defendants contend. Applying the defendants' view of allegiance would mean children of dual citizens and lawful permanent residents would not be birthright citizens—a result even the defendants do not support. Next, the defendants argue birthright citizenship requires the mutual consent of the person and the Nation. This theory disregards the original purpose of the Fourteenth Amendment: to recognize as birthright citizens the children of enslaved persons who did not enter the country consensually, but were brought to our shores in chains. There is no basis to think the drafters imposed a requirement excluding the very people the Amendment aimed to make citizens. Simply put, the Amendment is the Nation's consent to accept and protect as citizens those born here, subject to the few narrow exceptions recognized at the time of enactment, none of which are at issue here. Finally, the Amendment requires states to recognize birthright citizens as citizens of their state of residence. The text includes no domicile requirement at all.

Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake. In so doing, these interpretations stray from the text of the Citizenship Clause. The Fourteenth Amendment says nothing of the birthright citizen's parents, and efforts

3

to import such considerations at the time of enactment and when the Supreme Court construed the text were rejected. This Court is likewise bound to reject such theories now.

The plaintiffs have also satisfied the other preliminary-injunction factors. Each plaintiff faces irreparable harm, the defendants face none, and the public interest favors enjoining the EO. Accordingly, the plaintiffs in each case are entitled to an injunction preventing implementation of the EO. The individual and two associations who are plaintiffs in the earlier-filed action will be fully protected by an injunction limited to the individual and the members of the associations. The later-filed case, brought by eighteen states and two cities, requires a broader, nationwide injunction. Applying traditional equity principles, such relief is necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions.

For these reasons, the plaintiffs' motions are ALLOWED. This ruling, explained further below and memorialized in separate Orders issued concurrently with this Memorandum, is based on straightforward application of settled Supreme Court precedent reiterated and reaffirmed in various ways for more than a century by all three branches of the federal government.

I.    BACKGROUND

Within hours of taking office, the President signed the EO, which he describes as "an integral part of [his] broader effort to repair the United States' immigration system and to address the ongoing crises at the southern border." Doe, Doc. No. 22 at 14. The EO, however, does not directly concern immigration; rather, it seeks to define the scope of birthright citizenship in the United States. In the section stating its purpose, the EO acknowledges that the Citizenship Clause and a section of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1401, confer citizenship on any person born in the United States and "subject to the jurisdiction thereof." Doe, Doc. No. 1-1 § 1. The EO goes on to identify two "categories of individuals born

4

in the United States" but "not subject to the jurisdiction thereof," to whom birthright citizenship "does not automatically extend." Id. A child falls within one of the identified categories if, at the time of their birth, their father was neither a citizen nor a lawful permanent resident ("LPR") of the United States, and their mother was 1) "unlawfully present in the United States," or 2) lawfully but temporarily present in the United States "(such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)." Id.

The second section announces that it is "the policy of the United States that no department or agency" of the federal "government shall issue [or accept] documents recognizing United States citizenship" of children within the identified categories. Id. § 2. The stated policy "shall apply only to persons who are born" after February 19, 2025. Id. The EO expressly does not restrict the ability of U.S.-born children of LPRs to receive or use documents recognizing "their United States citizenship." Id. Next, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with" the EO, and that no one within any identified department "act[s], or forbear[s] from acting, in any manner inconsistent with" the EO. Id. § 3(a). The EO further requires "[t]he heads of all executive departments and agencies" to "issue public guidance" by February 19, 2025, regarding implementation of the EO. Id. § 3(b).

In a complaint filed the day the EO issued, an individual plaintiff and two nonprofit associations challenged its legality and sought equitable relief preventing its implementation. See generally Doe, Doc. No. 1. The individual plaintiff, proceeding under the pseudonym "O. Doe," is "an expectant mother" who is lawfully present in the United States "through Temporary

Protected Status" ("TPS").  Id. ¶ 13.  Doe's husband, the father of the child due to be born next

month, is neither a citizen nor LPR of this country.  Id.  The baby will be Doe's second child; her

first, now seven years old, also was born in the United States.  Doe, Doc. No. 11-1 ¶ 3.

Doe's co-plaintiffs are La Colaborativa and the Brazilian Worker Center, two

membership organizations located in eastern Massachusetts who provide immigration-related

assistance, among other services.  Doe, Doc. No. 1 ¶¶ 14-15.  Both organizations have members

who are unlawfully present in the United States, some of whom "are either pregnant or plan to

grow their families in the future."  Id.; see Doe, Doc. No. 11-2 ¶ 4; Doe, Doc. No. 11-3 ¶¶ 8-10.

Though the present record does not conclusively establish where the organizations' members

live, counsel at the motion hearing suggested the Court could view the members as located

"primarily" (though perhaps not exclusively) in Massachusetts.  Mot. Hr'g Tr. at 10, 76.[3]  Doe

and the organizations' members have submitted unrebutted declarations describing the harms

they allege the EO will cause the children it targets, who will be treated as noncitizens lacking

any recognized, lawful immigration status.  See generally Doe, Doc. Nos. 11-1 to -3.

The day after Doe and her co-plaintiffs filed suit, New Jersey and a group of seventeen

other states, along with the District of Columbia and San Francisco (collectively, "the State

plaintiffs"), instituted a separate action also challenging the EO under provisions of the

Constitution and other federal statutes.[4]  New Jersey, Doc. No. 1.  Along with their complaint,

---

[3] The transcript of the February 7, 2025, hearing on the motions appears on both dockets.  Doe,
Doc. No. 44; New Jersey, Doc. No. 142.
[4] Besides New Jersey, the plaintiffs in this action are Massachusetts, California, Colorado,
Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan (through its Attorney General),
Minnesota, Nevada, New Mexico, New York, North Carolina, Rhode Island, Vermont, and
Wisconsin.  Venue is proper in the District of Massachusetts because the defendants are all
officers or agencies of the United States, and at least one plaintiff in each case resides in
Massachusetts.  See 28 U.S.C. § 1391(e)(1)(C).

the State plaintiffs filed a motion for a preliminary injunction supported by a memorandum and more than two dozen exhibits.  New Jersey, Doc. Nos. 3, 5, 5-1 to -27.  The exhibits include declarations by various representatives of state agencies describing financial and administrative burdens they anticipate will result from the EO.  See, e.g., New Jersey, Doc. Nos. 5-2, 5-8, 5-14, 5-18 (describing impacts of EO on federal funding related to state health insurance programs, education, foster care, and hospital-based process for acquiring Social Security numbers at birth).

Both complaints name as defendants the President, the State Department, the Secretary of State, the Social Security Administration, and the Acting Commissioner of Social Security.  The State plaintiffs also sued the United States, the Department of Homeland Security, the Secretary of Homeland Security, the Department of Health and Human Services, and the Acting Secretary of Health and Human Services.

On January 23, 2025, the Doe plaintiffs filed their own motion for a preliminary injunction, supporting memorandum, declarations, and other exhibits.  Doe, Doc. Nos. 10, 11, 11-1 to -10.  After hearing from the parties, the Court deemed the cases related to one another and set a consolidated briefing schedule.  New Jersey, Doc. No. 71; Doe, Doc. No. 12.  The defendants opposed both motions, challenging the State plaintiffs' standing to sue, arguing no plaintiff has advanced a valid cause of action, and urging that the plaintiffs have not satisfied the test governing preliminary-injunctive relief.  See generally Doe, Doc. No. 22.  Both sets of plaintiffs replied.  Doe, Doc. No. 33; New Jersey, Doc. No. 123.  The Court heard argument from all parties on February 7, 2025.

## II.   DISCUSSION

Before addressing the factors governing requests for injunctive relief, the Court disposes of two preliminary challenges that the defendants suggest foreclose consideration of the merits of the plaintiffs' motions.  As the Court will explain, the defendants' opening pair of procedural

7

challenges, like their substantive arguments opposing the motions, wither in the face of settled and binding Supreme Court precedent.

    A.   <u>Threshold Issues</u>

        1.  *Standing*

The defendants first argue that the State plaintiffs lack standing to bring the claims alleged in their complaint.  <u>See New Jersey</u>, Doc. No. 92 at 18-22.  They are wrong.

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies'" in which a plaintiff can "demonstrate [a] personal stake." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021).  To establish standing under Article III, a "plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).  This test is satisfied if state- or local-government plaintiffs show that an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which they otherwise would be entitled.  <u>See Dep't of Com. v. New York</u>, 588 U.S. 752, 767 (2019).  Such a showing establishes injury that is "sufficiently concrete and imminent" and "fairly traceable" to the challenged action, thereby satisfying Article III.  <u>Id.</u>

The State plaintiffs easily meet this standard.[5]  Uncontested declarations from officials representing several State plaintiffs articulate various forms of federal funding that will be

---

[5] The defendants direct their standing challenge against the State plaintiffs as a group.  They have not contested the showing made by any individual State plaintiff or subset of State plaintiffs.  Even if the defendants had done so, the result would be the same.  The record before the Court includes sworn declarations establishing standing on the part of at least several State plaintiffs.  No more is required at this juncture.  <u>See Nebraska</u>, 143 S. Ct. at 2365 ("If at least one plaintiff has standing, the suit may proceed."); <u>United States v. Texas</u>, 599 U.S. 670, 709 n.1 (2023) (Alito, J., dissenting) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.").

diminished as a direct result of the EO.  States receive federal funding to cover portions of services like health insurance, special education, and foster care in amounts that depend on how many "eligible" children receive such services.  Citizenship is one component of eligibility for purposes of these programs.  Pursuant to the EO, fewer children will be recognized as citizens at birth.  That means the number of persons receiving services who are "eligible" under the identified federal programs will fall—and, as a direct result, the reimbursements and grants the State plaintiffs receive for these services will decrease.  The reduction to such funding is a concrete and imminent injury directly and fairly traceable to the EO, redressable by the injunctive relief the State plaintiffs seek.

This is all the Constitution requires.  Two decisions of the Supreme Court, both authored by Chief Justice Roberts, make the point.  In 2023, the Chief Justice, joined by five other Justices, explained that Missouri had standing to challenge executive action discharging federal student loans, where a quasi-state agency stood to lose fees it would have collected for servicing the forgiven loans.  Nebraska, 143 S. Ct. at 2366.  A few years earlier, the Chief Justice conveyed the Supreme Court's unanimous conclusion that "at least some" states had standing to challenge executive action revising the United States census.  New York, 588 U.S. at 767-68.[6] The proposed changes at issue raised the likelihood that persons without lawful immigration status would be undercounted, and states faced reductions in federal funds allocated according to population.  Id.  The State plaintiffs here challenge the EO based on precisely the same sort of direct financial impacts.  They have identified federal grants and reimbursements to which they

---

[6] Though some Justices parted ways as to other issues in the case, all agreed as to standing.

are entitled that will diminish under the EO.  As in <u>Nebraska</u> and <u>New York</u>, therefore, the State plaintiffs have Article III standing.[7]

The defendants have neither disputed the State plaintiffs' showing of harm nor materially distinguished the Chief Justice's analysis.  Their standing challenge hinges on an attempt to analogize this case to <u>United States v. Texas</u>.  There, the Supreme Court held state plaintiffs lacked standing to compel the federal government to pursue more "arrests and prosecutions" for violations of immigration laws.  599 U.S. at 678-79.  The analogy is inapt.[8] <u>Texas</u> involved "novel" theories of standing and a "highly unusual" claim that the Executive Branch was not sufficiently vigorous in exercising its prosecutorial discretion.  <u>Id.</u> at 681, 684. This case, however, concerns the bounds of citizenship guaranteed by the Constitution—not an

---

[7] The Court does not consider a *parens patriae* theory of standing, because the State plaintiffs are not pursuing it.  The State plaintiffs also probably have standing based on their sovereign interests.  The Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside.  U.S. Const. amend. XIV, § 1. States have general sovereign interests in which persons are their citizens.  They very likely also have sovereign interests in which persons are U.S. citizens, as state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship.  <u>E.g.</u>, N.J. Stat. Ann. § 2B:20-1(c); Mass. Gen. Laws ch. 234A, § 4.  The defendants essentially conceded at the motion hearing that the State plaintiffs would have standing under these theories, but suggested the theories were "forfeited," at least "[f]or purposes of deciding [the pending] motion[s]," because they were not advanced in the State plaintiffs' submissions thus far.  Mot. Hr'g Tr. at 40, 63.  The defendants cited no authority for their forfeiture theory.  The plaintiffs generally endorsed the sovereign-interest theories during the hearing.  Given the strength of the plaintiffs' showing of direct financial harms, the Court need not resolve whether the State plaintiffs' sovereign interests supply an alternative basis for satisfying Article III.

[8] In fact, the defendants' discussion of <u>Texas</u> in their papers verges on misleading.  The language upon which they most heavily rely appears in a footnote quoted in their opposition memorandum and referenced during the motion hearing.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 18-19 (quoting <u>Texas</u>, 599 U.S. at 680 n.3).  Contrary to the defendants' characterization, that footnote is not a "holding," and it does not "foreclose[]" the State plaintiffs' standing in this case.  <u>Id.</u>  Rather, it acknowledges that "States sometimes have standing to sue . . . an executive agency or officer," and though it warns that "standing can become more attenuated" when based on "indirect effects" of federal action, it stops short of saying such effects could never satisfy Article III.  <u>Id.</u> This case, in any event, concerns direct effects.

area typically reserved for executive discretion.  The theory of standing advanced by the State

plaintiffs—direct financial harm—is ordinary.[9]  <u>Texas</u> simply does not aid the defendants here.

The defendants have not challenged the standing of Doe or her co-plaintiffs to sue—nor

could they.  Doe has plainly established injury, to herself and her unborn child, that is concrete,

imminent, traceable to the EO, and redressable by the relief she seeks in this lawsuit.  The same

is true of the association plaintiffs, which provide services impacted by the EO and have

described one or more members facing the same type of injury as Doe.  <u>See</u> <u>Summers v. Earth

Island Inst.</u>, 555 U.S. 488, 498 (2009) (requiring, for associational standing, "specific allegations

establishing that at least one identified member had suffered or would suffer harm"); <u>see also</u>

<u>United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.</u>, 517 U.S. 544, 551-53 (1996)

(describing test for associational standing).

Accordingly, the defendants' standing challenge fails.  All plaintiffs before the Court

have satisfied Article III.

### 2.  *Cause of Action*

Next, the defendants assert the Court must deny the pending motions because no plaintiff

has a valid cause of action under the Citizenship Clause or the identified federal statutes.  This is

meritless.

As Justice Scalia observed, "[t]he ability to sue to enjoin unconstitutional actions by state

and federal officers is the creation of courts of equity, and reflects a long history of judicial

---

[9] The harms the State plaintiffs have identified are not "indirect"—indeed, when specifically
asked, the defendants failed to identify any "extra step" separating the loss of funding identified
by the State plaintiffs from the EO's direct effects.  Mot. Hr'g Tr. at 37-39.  Nor do they arise, as
defendants argue, exclusively from services "the states have *voluntarily* chosen to provide."
<u>New Jersey</u>, Doc. No. 92 at 20; <u>see</u> <u>Plyler v. Doe</u>, 457 U.S. 202, 230 (1982) (holding states are
required by federal law to provide public education services to all children, regardless of
immigration status).

review of illegal executive action, tracing back to England." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief" to prevent "violations of federal law" planned or committed by "state officers" or "by federal officials." Id. at 326-27. The plaintiffs here ask the Court to do just that.[10]

Limitations that apply where plaintiffs seek damages, rather than equitable relief, have no bearing on the claims pending here. See New Jersey, Doc. No. 92 at 24 (citing DeVillier v. Texas, 601 U.S. 285, 291 (2024)). Nor can the defendants short-circuit this lawsuit by pointing to a narrow provision of the INA providing an avenue for a "national of the United States" to challenge discrete denials of rights or privileges. See id. (invoking 8 U.S.C. § 1503(a)). That statute does not facially create an exclusive remedy for such claims, nor does it offer an adequate alternative to the claims advanced in these actions—including, but not only, because it is not a mechanism through which the State plaintiffs can obtain relief. Cf. Rusk v. Cort, 369 U.S. 367, 375 (1962) (considering related provisions of same statute and concluding they were not exclusive means of asserting rights associated with citizenship).

The defendants' threshold challenges fail under clear Supreme Court precedent. The plaintiffs assert valid causes of action and have standing to pursue them. The Court, therefore, turns to the substance of the pending motions.

---

[10] In fact, the Department of Justice is doing precisely what it says the plaintiffs cannot do. The day before this Court's motion hearing, the United States sued Illinois and various state and local officials, seeking equitable relief via claims brought directly under the Supremacy Clause. See Compl., United States v. Illinois, No. 25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1; cf. New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (discussing equitable doctrine of "judicial estoppel," which in some circumstances prevents parties that have taken one legal position from reversing course "simply because [their] interests have changed" (cleaned up)). During the motion hearing, the State plaintiffs raised this issue, and the defendants offered no response.

B.    <u>Preliminary Injunction Analysis</u>[11]

The familiar standard governs the plaintiffs' requests for interlocutory relief. To secure the "extraordinary remedy" provided by preliminary injunctions, each group of plaintiffs "must establish" that: 1) they are "likely to succeed on the merits," 2) they are "likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their] favor," and 4) "an injunction is in the public interest." <u>Winter v. Nat. Def. Res. Council, Inc.</u>, 555 U.S. 7, 20 (2008).

"The first two factors of the traditional standard are the most critical." <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009). Courts consider them in tandem. <u>See</u> <u>Vaqueria Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (noting "irreparable harm is not a rigid" factor, but rather "a sliding scale, working in conjunction with" the first factor); <u>EEOC v. Astra U.S.A., Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996) ("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief."). The third and fourth factors of the injunction test "merge when the Government is the opposing party." <u>Nken</u>, 556 U.S. at 435.

---

[11] The defendants proposed, in a footnote, that the Court proceed now to enter or deny a final, permanent injunction. <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 50 n.6. The plaintiffs expressed no objection to this proposal during the motion hearing, agreeing that the Court could now enter a final injunction if it concluded an injunction was warranted. After consideration, the Court resolves now only the plaintiffs' original requests for preliminary relief. The defendants are correct that the plaintiffs' causes of action "are purely legal," <u>id.</u>, but they are wrong to imply that facts are immaterial here. The test for injunctive relief requires the plaintiffs to prove, and the Court to evaluate, questions of harm that bear on the scope of any permanent relief ultimately awarded. Though the defendants have leveled no challenges to the plaintiffs' factual submissions, the Court has an independent duty to ensure that any relief provided is appropriately tailored to address the harms established by the parties before it. <u>Cf.</u> <u>DraftKings Inc. v. Hermalyn</u>, 118 F.4th 416, 423 (1st Cir. 2024) (noting trial judge is "uniquely placed to design" injunctive relief that corresponds to "specific harm" proven based on facts found by judge). To that end, further factual development may be required before the Court crafts a final judgment.

Measured against these standards, the plaintiffs' submissions support entry of the injunctions they seek, with only minor adjustments explained below.

>    1.   *Likelihood of Success*

"The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor: "likelihood of success on the merits." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). This factor weighs strongly in the plaintiffs' favor. The plain language of the Citizenship Clause—as interpreted by the Supreme Court more than a century ago and routinely applied by all branches of government since then—compels a finding that the plaintiffs' challenges to the EO are nearly certain to prevail.

The Citizenship Clause speaks in plain and simple terms. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The words chosen by the drafters and ratified by the states, understood "in their normal and ordinary" way, United States v. Sprague, 282 U.S. 716, 731 (1931), bestow birthright citizenship broadly to persons born in the United States. The text is directed at the person born (or naturalized). It does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents. So, at the outset, the EO and its focus on the immigration status of a child's parents find no support in the text.

One phrase in the Citizenship Clause is at the heart of the parties' disagreement. The constitutionality of the EO, and the success of the plaintiffs' claims, turns on the meaning of "subject to the jurisdiction thereof." To understand that phrase, however, this Court need look no further than United States v. Wong Kim Ark, 169 U.S. 649 (1898).[12] In that case, the

---

[12] In a line of cases not directly relevant here, courts have considered whether a person born in an unincorporated territory of the United States—such as American Samoa or, for a time, the

Supreme Court meticulously reviewed the contours of citizenship under English and early

American common law, under the 1866 Civil Rights Act and the Fourteenth Amendment, and as

reflected in legal scholarship and court decisions in the decades leading up to the turn of the

twentieth century. See generally id. at 653-704. From these sources, the Supreme Court

concluded that "subject to the jurisdiction thereof" was meant "to exclude, by the fewest and

fittest words," the following categories of persons: "children of members of the Indian tribes,"

"children born of alien enemies in hostile occupation, and children of diplomatic representatives

of a foreign state."[13] Id. at 682. As to all other persons, "the fundamental rule of citizenship by

birth within the dominion of the United States, notwithstanding alienage of parents," applied. Id.

at 689.[14]

Applying this longstanding and "fundamental rule of citizenship," the Supreme Court

held that the petitioner—born in the United States to Chinese-citizen parents, who were living

and working in the United States at the time of the child's birth, but who were prevented by law

from naturalizing and eventually returned to China—was a citizen "by virtue of the

---

Philippines—was born "in the United States" for purposes of the Citizenship Clause. E.g., Tuaua v. United States, 788 F.3d 300, 302 (D.C. Cir. 2015). That language is not the focus of the present dispute, nor was it the Supreme Court's focus in Wong Kim Ark.

[13] Neither the EO nor the defendants' brief has suggested that all (or any) persons within the EO's categories are "children born of alien enemies in hostile occupation," specified which portions of the country are presently so occupied, or identified which foreign powers or organizations are the "enemies" presently controlling those areas. See New Jersey, Doc. No. 92 at 38 (quoting another Executive Order and summarily stating that plaintiffs' view might grant citizenship to children of "unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks"). Accordingly, the Court need not consider this exception to birthright citizenship.

[14] This rule has been reiterated by the Supreme Court. See, e.g., Perkins v. Elg, 307 U.S. 325, 329 (1939) (citing Wong Kim Ark majority's "comprehensive review" supporting "decision . . . that a child born here of alien parentage becomes a citizen of the United States"); Weedin v. Chin Bow, 274 U.S. 657, 660, 670 (1927) (stating "learned and useful opinion" of Wong Kim Ark majority "held that . . . one born in the United States, although . . . of a parentage denied naturalization under the law, was nevertheless . . . a citizen" under Fourteenth Amendment).

[C]onstitution itself." Wong Kim Ark, 169 U.S. at 652-53, 703-05.  This holding followed

"irresistibly" from the extensive analysis the majority articulated.  Id. at 693.  Throughout that

analysis, the availability of birthright citizenship "irrespective of parentage" was repeatedly

emphasized.  E.g., id. at 690.  The duration of the parents' residency in the United States was not

assessed, nor did laws preventing the parents from seeking naturalization influence the Court's

determination of the petitioner's status.  The question was resolved, for purposes of the

Citizenship Clause, by the location of the petitioner's birth, and the inapplicability of the narrow

exceptions to birthright citizenship that had been identified by the Court.  Understood this way—

indeed, the way all branches of government have understood the decision for 125 years—Wong

Kim Ark leaves no room for the defendants' proposed reading of the Citizenship Clause.  Of

course, the defendants can seek to revisit this long-settled rule of law, but that is a matter for the

Supreme Court, not a district judge.

        The defendants accept that this Court is bound by the prior holdings of the Supreme

Court.  See New Jersey, Doc. No. 92 at 44; Mot. Hr'g Tr. at 48.  Nevertheless, they urge the

Court to essentially ignore all but a handful of sentences from Wong Kim Ark, arguing the bulk

of the majority's lengthy opinion is dicta.  See New Jersey, Doc. No. 92 at 44 (urging Wong Kim

Ark resolved only whether Citizenship Clause extended to "children of parents with 'a

permanent domicile and residence in the United States,'" and that "[t]he case should not be read

as doing anything more than answering that question" (quoting 169 U.S. at 653)).  At the motion

hearing, the defendants doubled down on this point, brazenly claiming that "dicta can be

disregarded."  Mot. Hr'g Tr. at 75.  That position reflects a serious misunderstanding at best—

and a conscious flouting at worst—of the judicial process and the rule of law.

Lower federal courts are not merely obligated to apply the holdings of Supreme Court decisions; they also "are bound by the Supreme Court's 'considered dicta.'" United Nurses & Allied Prof'ls v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)). "Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). If such a statement "bears the earmarks of deliberative thought purposefully expressed," concerns an issue that was "thoroughly debated in the recent past," and "has not been diluted by any subsequent pronouncement" of the Supreme Court, a lower federal court must adhere to it. Id.

To the extent the thorough analysis in Wong Kim Ark of the Fourteenth Amendment's common-law foundations, the purpose and intent of its drafters, and its application during the first thirty years after its ratification can be called "dicta" at all, it is undoubtedly the "considered" and "authoritative" sort that this Court is bound to apply. The sheer detail and length of the discussion by the Court's majority make this plain. Add to that the fact that the opposite view—the one the defendants advance to justify the EO—was rejected by the majority in Wong Kim Ark (in the portions of the decision now labeled "dicta" by the defendants) and endorsed only by the dissent. See 169 U.S. at 705-32. The plaintiffs are not relying on a stray "remark" that lacks "care and exactness," standing "wholly aside from the question in judgment" and "unsupported by any argument, or by any reference to authorities," that might not "control the judgment" of a lower court. 169 U.S. at 678. They are "leaning into" the central reasoning of the Supreme Court in support of its holding. Mot. Hr'g Tr. at 48. The defendants' argument to the contrary invites the Court to commit legal error.

Whether "holding" or "considered dicta," the straightforward rule and limited exceptions identified in Wong Kim Ark and summarized above have been applied repeatedly and without hesitation, including by the Supreme Court and the First Circuit.  For example:

- In Morrison v. California, despite statutes that then rendered Japanese persons "ineligible" for citizenship via naturalization, the Supreme Court stated without qualification: "A person of the Japanese race is a citizen of the United State if he was born within the United States."  291 U.S. 82, 85 (1934).

- In Dos Reis ex rel. Camara v. Nicolls, the First Circuit described a person "born in Massachusetts" as having become "an American citizen, not by gift of Congress, but by force of the constitution," despite his parents' status as foreign nationals "never naturalized in the United States," and despite his own "dual nationality" that led to his "service as a draftee in the Portuguese army."  161 F.2d 860, 861-62 (1st Cir. 1947).

- In Kawakita v. United States, a person "born in this country in 1921 of Japanese parents who were citizens of Japan" was "a citizen of the United States by birth"—a status the person did not lose despite later committing treason by acts of cruelty undertaken while working at a Japanese camp for American prisoners during World War II.  343 U.S. 717, 720 (1952).  See also Nishikawa v. Dulles, 356 U.S. 129, 131 (1958) (finding Japanese military service during World War II was basis for expatriation of U.S.-born citizen of Japanese-citizen parents only if service was voluntary); Hirabayashi v. United States, 320 U.S. 81, 96-97 (1943) (noting, in context of World War II, that tens of thousands of "persons of Japanese descent" living on Pacific coast "are citizens because born in the United States," even though "under many circumstances" they also were citizens of Japan "by Japanese law").

- In United States ex rel. Hintopoulous v. Shaughnessy, all members of the Supreme Court considered a child born to foreigners, both of whom had entered the U.S. with temporary permission but remained after their authorization expired, to be "of course[] an American citizen by birth," despite the parents' "illegal presence."  353 U.S. 72, 73 (1957); see id. at 79 (reflecting dissent's agreement that the child was a citizen).

- In INS v. Errico, two different children "acquired United States citizenship at birth" despite their parents having gained admission to this country by misrepresenting material facts about themselves and thereby evading statutory restrictions on lawful immigration.  385 U.S. 214, 215-16 (1966).

- In INS v. Rios-Pineda, a unanimous Supreme Court viewed a child "born in the United States" as "a citizen of this country," even though the father had entered the country "illegally" on his own and "returned to Mexico . . . under threat of deportation"; both parents had then "paid a professional smuggler . . . to transport them" across the border; and the father, when apprehended again, had failed to depart voluntarily "as promised."  471 U.S. 444, 446 (1985).

- In <u>Hamdi v. Rumsfeld</u>, at least six Justices treated the petitioner as a citizen of the United States based on his birth in Louisiana, without even discussing his parents' status (they were present lawfully but temporarily), despite the petitioner's active participation in a foreign terrorist organization. 542 U.S. 507, 510 (2004).[15]

- In <u>Mariko v. Holder</u>, a panel of the First Circuit considered a child "born in the United States" to be "a United State citizen" despite the parents' concession that both of them "were here illegally" and therefore removable. 632 F.3d 1, 3, 8 n.4 (1st Cir. 2011).

- In <u>Hasan v. Holder</u>, a different panel of the First Circuit similarly viewed as "a U.S. citizen" a child born in California to foreign-national parents who had overstayed their nonimmigrant visas. 673 F.3d 26, 28 & n.1 (1st Cir. 2012).

This line of decisions—which is not limited to the cases described above—further undermines the defendants' proposed interpretation.[16]

If that were not enough to find that the plaintiffs are likely to succeed on the merits (and it is), the fact that Congress incorporated the language of the Citizenship Clause into provisions of the INA passed more than forty years after <u>Wong Kim Ark</u> cements the meaning of the disputed phrase and provides the plaintiffs an independent avenue to prevailing here. In the INA, Congress conferred birthright citizenship via statute on several categories of individuals, the first of which is described using language mirroring the Citizenship Clause. 8 U.S.C.

---

[15] Justice Scalia, joined by Justice Stevens, referred to Hamdi as a "presumed American citizen." 542 U.S. at 554 (Scalia, J., dissenting); <u>see</u> <u>Hamdi v. Rumsfeld</u>, 243 F. Supp. 2d 527, 534 (E.D. Va. 2002) (noting Hamdi had "identified himself as a Saudi citizen who had been born in the United States" when detained and interrogated by the American military). No justice took up the invitation of one amicus in the case to revisit the meaning of the Citizenship Clause, correct the "erroneous interpretation" adopted in <u>Wong Kim Ark</u>, and conclude Hamdi was not a citizen because his parents, though living in Louisiana lawfully at the time of his birth, had only temporary work visas authorizing their presence in this country. <u>See</u> Br. Amicus Curiae The Claremont Inst. Ctr. Const. Jurisprudence at 2-3, 5, <u>Hamdi v. Rumsfeld</u>, No. 03-6696, 2004 WL 871165 (U.S. Mar. 29, 2004).

[16] So does the fact that the Supreme Court has cited <u>Wong Kim Ark</u> as an example of how to properly assess the original meaning of language in the Constitution or a federal statute. <u>See</u> <u>Standard Oil Co. v. United States</u>, 221 U.S. 1, 59 & n.6 (1911); <u>cf.</u> <u>BNSF Ry. Co. v. Loos</u>, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (citing <u>Wong Kim Ark</u> majority opinion as authority reflecting "everyone agrees" that "record of *enacted* changes Congress made" to relevant text "over time" is "textual evidence" that "can sometimes shed light on meaning").

§ 1401(a) (confirming citizenship of "a person born in the United States, and subject to the jurisdiction thereof").  As the plaintiffs point out, this provision was enacted in 1940 and "re-codified" in 1952.  See Doe, Doc. No. 33 at 2; see also Doe, Doc. No. 11 at 15 (raising statutory claim and advancing brief but distinct argument about likelihood of success thereunder).  Because it uses the same language chosen by the Fourteenth Amendment's drafters—words that had been studied in Wong Kim Ark decades earlier—the statute must be understood to have incorporated the Supreme Court's interpretation of those words.  See Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020) (explaining statute "normally" is interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment").[17]

Here, the fundamental rule conveyed by the Citizenship Clause was clear by the time § 1401 was enacted, and the legislators who chose to include the same phrase the Supreme Court already had examined presumably intended the same words would be accorded the same meaning in both contexts.  See Taggart v. Lorenzen, 587 U.S. 554, 560 (2019) (recognizing "longstanding interpretive principle" that if statutory term "is obviously transplanted from another legal source, it brings the old soil with it" (cleaned up)).  Thus, the statute supports a related but distinct claim upon which the plaintiffs are likely to succeed.[18]

---

[17] Justice Gorsuch went on to explain why this is so: "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, . . . we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations."  Bostock, 590 U.S. at 654-55.

[18] The defendants advance no separate challenge to the plaintiffs' statutory claim, choosing to "focus . . . on the constitutional provision" which is "coterminous" with the statute.  New Jersey, Doc. No. 92 at 25 n.4.  By opting not to address the statute, or the manner in which its enactment necessarily strengthens the plaintiffs' interpretation of the relevant language, the defendants have waived any discrete argument related to the statutory claim for purposes of the pending motions.  Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived").

Beyond sidestepping Wong Kim Ark, the defendants urge the Court to read three specific requirements into the phrase "subject to the jurisdiction thereof." The defendants contend these requirements are necessary to ensure adherence to the phrase's original meaning. None of these requirements, however, find support in the text itself or the cases construing and applying it. And, more importantly, each of them, if applied as argued, would prevent the Citizenship Clause from reaching groups of persons to whom even the defendants concede it must apply.

First, the defendants suggest the "jurisdiction" phrase is satisfied only by persons who owe the United States "allegiance" that is "direct," "immediate," "complete," and "unqualified by allegiance to any alien power." New Jersey, Doc. No. 92 at 27-28 (cleaned up). Certainly, allegiance matters. Various sources link the "jurisdiction" phrase and concepts of allegiance, including Wong Kim Ark. See, e.g., 169 U.S. at 654 (noting English common law provided citizenship to those "born within the king's allegiance, and subject to his protection"). The defendants veer off course, however, by suggesting allegiance must be exclusive, and that it derives from the status of a child's parents. If that were so, then the children of dual citizens or LPRs could not receive birthright citizenship via the Fourteenth Amendment. A dual citizen necessarily bears some allegiance to both the United States and the second nation of which they are a citizen. LPRs, unless and until naturalized, remain foreign nationals who are citizens of other countries bearing some allegiance to their places of origin. This principle would also rule out the petitioner in Wong Kim Ark, whose parents resided for years in the United States but remained "subjects of the emperor of China" (and, indeed, returned to China when their U.S.-born son was a teenager). 169 U.S. at 652-53. The defendants, however, agree that children of dual citizens and LPRs are entitled to birthright citizenship, and that the petitioner in Wong Kim Ark was as well.

These anomalies are avoided by focusing on the allegiance of the child, not the parents. As noted earlier, the Citizenship Clause itself speaks only of the child. A child born in the United States necessarily acquires at birth the sort of allegiance that justified birthright citizenship at the common law. That is, they are born "locally within the dominions of" the United States and immediately "derive protection from" the United States. Id. at 659. A child born here is both entitled to the government's protection and bound to adhere to its laws. This is true regardless of the characteristics of the child's parents, subject only to the narrow exceptions identified in Wong Kim Ark. Allegiance, in this context, means nothing more than that. See id. at 662 ("Birth and allegiance go together."). As James Madison explained:

> It is an established maxim that birth is a criterion of allegiance. Birth however derives its force sometimes from place and sometimes from parentage, but in general place is the most certain criterion; it is what applies in the United States; it will be therefore unnecessary to investigate any other.

Founders Online, Citizenship, Nat'l Archives (May 22, 1789), https://founders.archives.gov /documents/Madison/01-12-02-0115 [https://perma.cc/ZC4B-NS9R]. So, "allegiance" does not mean what the defendants think it means, and their first proposed rule founders.[19]

Next, the defendants seek to graft concepts of social-contract theory onto the "jurisdiction" clause of the Fourteenth Amendment by arguing birthright citizenship requires "mutual consent between person and polity." New Jersey, Doc. No. 92 at 45. The defendants again center their argument on the parents at the expense of the child whose birthright is at stake—perhaps, in part, because infants are incapable of consent in the legal sense. In the

---

[19] To the extent the defendants believe temporary, lawful visitors to this country are people who "do not owe an allegiance to the United States," Mot. Hr'g Tr. at 55, the Supreme Court disagrees, see Wong Kim Ark, 169 U.S. at 685 (quoting Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 144 (1812), and its description of the "temporary and local allegiance" private visitors from other countries owe the United States while passing through or doing business here).

defendants' view, mutual consent is lacking where a person (the parent) has entered the United States without permission to do so, or without permission to remain here permanently. The absence of "mutual consent" in those circumstances means, according to the defendants, that the children of such parents fall beyond the "jurisdiction" of the United States for Fourteenth Amendment purposes.

This argument fares even worse than the first. The Fourteenth Amendment enshrined in the Constitution language ensuring "the fundamental principle of citizenship by birth" in the United States applied regardless of race—including, and especially, to formerly enslaved persons. 169 U.S. at 675; see Afroyim v. Rusk, 387 U.S. 253, 262-63 (1967). The defendants do not (and could not) deny this. Enslaved persons, of course, did not "consent" to come to the United States or to remain here. They were brought here violently, in chains, without their consent. These conditions persisted after their arrival. Against this backdrop, it verges on frivolous to suggest that Congress drafted, debated, and passed a constitutional amendment, thereafter enacted by the states, that imposed a consent requirement necessarily excluding the one group of people the legislators and enactors most specifically intended to protect.

Finally, the defendants seek to transform the use of the term "reside" at the end of the Citizenship Clause into a basis for finding that the "jurisdiction" phrase eliminates any person without a lawful "domicile" in the United States. The defendants contend that persons here with temporary visas retain "domiciles" in their native countries, and persons here without lawful status cannot establish a true "domicile." And so, the argument goes, they cannot "reside" in any state, and they remain outside the "jurisdiction" of the United States for Fourteenth Amendment purposes. This, once again, shifts the focus away from the child and the location of birth to the parents and the status and duration of their presence in this country.

The word "reside" appears in the Citizenship Clause only in the phrase specifying that a person entitled to birthright citizenship becomes a citizen not only of the United States, but also of the state where they live.  For example, a state within the former Confederacy (or any other state) could not constitutionally deny state citizenship to the child of a formerly enslaved person who lived and gave birth there.  The word "reside" does not inject a "domicile" requirement limiting the reach of the Citizenship Clause as a whole and justifying examination of the immigration status of a child's parents.  See New Jersey, Doc. No. 123 at 11-12 (articulating the flaws in this theory).  In any event, it is not so clear that "illegal entry into the country would . . . , under traditional criteria, bar a person from obtaining domicile within a State." Plyler, 457 U.S. at 227 n.22.

In sum, the defendants invite the Court to adopt a set of rules that work (except when they don't).  None of the principles the defendants advance are sturdy enough to overcome the settled interpretation and longstanding application of the Citizenship Clause described above. Each principle, applied uniformly, would lead to unintended results at odds with the text, meaning, and intent of the Fourteenth Amendment—and, in some instances, with the parameters set out in the EO itself.

For all these reasons, the Court finds the plaintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims.  This conclusion would allow the plaintiffs to "show somewhat less in the way of irreparable harm." Astra U.S.A., 94 F.3d at 743.  That relaxed burden, however, is not essential, as the second factor also favors the plaintiffs strongly.

### 2. *Irreparable Harm*

The plaintiffs have supported their assertions of irreparable harm with numerous declarations detailing the imminent and damaging impacts they anticipate will flow from the EO.

See Doe, Doc. Nos. 11-1 to -10; New Jersey, Doc. Nos. 5-2 to -21, -23.[20]  Upon review, the

Court accepts and credits those declarations, which the defendants have not disputed or rebutted

in any way.  The declarations establish that the State plaintiffs do not stand to lose discrete

amounts of one-time funds; they face unpredictable, continuing losses coupled with serious

administrative upheaval.  They have established irreparable harm.

As for the Doe plaintiffs, what is at stake is a bedrock constitutional guarantee and all of

its attendant privileges.  The loss of birthright citizenship—even if temporary, and later restored

at the conclusion of litigation—has cascading effects that would cut across a young child's life

(and the life of that child's family), very likely leaving permanent scars.  The record before the

Court establishes that children born without a recognized or lawful status face barriers to

accessing critical healthcare, among other services, along with the threat of removal to countries

they have never lived in and possible family separation.[21]  That is irreparable harm.[22]

---

[20] Not every State plaintiff has submitted its own declarations, but the complaint alleges that all face the same categories of harm.  E.g., New Jersey, Doc. No. 1 ¶ 122.  The record supports that allegation, for example, by reflecting that each official attesting to health-insurance-related impacts describes the same federal programs used the same way and forecasts the loss of the same types of federal reimbursements.  See, e.g., Doc. Nos. 5-2, -6, -11, -12, -16, -19.  At this stage, that is enough to find that all State plaintiffs would suffer irreparable harm absent injunctive relief.  The defendants do not contend otherwise.

[21] Doe, for example, has a pending asylum petition and an older child who is a U.S. citizen by birthright—assuming the defendants do not later reconsider the effective date contained in the EO and opt to apply their reading of the Citizenship Clause retroactively, a possibility they did not definitively rule out during the motion hearing.  Mot. Hr'g Tr. at 45-47.  Her family would be placed at a distressing crossroads if her new baby were to face removal from the country.

[22] The defendants' only responses are to suggest that the plaintiffs wait and see how the EO will be implemented, and hope that Doe's asylum application is granted.  Or, in the worst case, "if any removal action were initiated against the children of any of the private plaintiffs at issue in this case, the [child] subject of the action could assert their claim to citizenship as defense in that proceeding."  New Jersey, Doc. No. 92 at 48.  That answer is not persuasive.  Cf. Texas v. EEOC, 933 F.3d 433, 448 & n.29 (5th Cir. 2019) (stating "it would strain credulity to find that an agency action targeting" conduct the agency has deemed "presumptively unlawful" would not trigger implementation "immediately enough to constitute" nonspeculative injury).

The plaintiffs in both cases have shown they are likely to suffer substantial and
irreparable harm in the absence of a preliminary injunction.  Thus, the two most important
factors strongly favor the plaintiffs.

### 3.   *Balance of Harms and Public Interest*

The final merged factors also support the plaintiffs' requests for relief.  On the plaintiffs'
side of the scales, there is a grave risk of significant and irreparable harm arising from the EO.
Children not yet born will be stripped of birthright citizenship constitutionally guaranteed to
them, as confirmed by settled law and practice spanning more than a dozen decades.  They will
be deprived of a "title" that is, as "Justice Brandeis observed, . . . superior to the title of
President."  Tuaua, 788 F.3d at 301.  And that harm will arise from an EO that is unconstitutional
on its face—an assessment that has now been echoed by multiple federal courts in different
jurisdictions.  E.g., Prelim. Inj. Order at 6, N.H. Indonesian Cmty. Support v. Trump, No. 25-cv-
38 (D.N.H. Feb. 11, 2025), ECF No. 79.

It is difficult to imagine a government or public interest that could outweigh the harms
established by the plaintiffs here.  Perhaps that is why the defendants have identified none.
Instead, they point only to the Executive Branch's discretion in matters of immigration.  New
Jersey, Doc. No. 92 at 49.  But this case is not about how "to manage the immigration system."
Id.  It is about the Constitution's guarantee of citizenship by virtue of birth.  When this right was
enshrined in the Fourteenth Amendment, it was moved firmly beyond the bounds of the "core
executive authority" the defendants invoke.  Id.; see Afroyim, 387 U.S. at 263 (noting framers of
Fourteenth Amendment "wanted to put citizenship beyond the power of any governmental unit
to destroy").  The defendants' only argument, therefore, adds nothing to their side of the scales.

Though the government has waived any other arguments on these final factors by not
developing them in their opposition memorandum, see Zannino, 895 F.2d at 17, the Court makes

two more observations.  First, the government has no legitimate interest in pursuing

unconstitutional agency action; "it is always in the public interest to prevent the violation of a

party's constitutional rights."  Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned

up); accord League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).  Second, an

injunction will do no more than maintain a status quo that has been in place for well over a

century.  The defendants have not even attempted to demonstrate how they or the public will be

harmed by continuing, for the duration of this action, to adhere to the interpretation of birthright

citizenship that has been consistently applied by the Executive Branch throughout that time

period—including under this President during his first term in office.

The scales tip decisively toward the plaintiffs.  Because all factors favor entry of

injunctive relief, the Court ends by explaining the appropriate parameters of such relief.

C.   Scope of Injunction

Both sets of plaintiffs ask the Court to universally enjoin the defendants from

implementing the EO.  That is, they seek an order that prevents the defendants from applying the

EO not only to them—to Doe, to members of the plaintiff associations, and to the State

plaintiffs—but at all, to anyone, anywhere.  Orders like those the plaintiffs seek here have

become "increasingly common" over the last twenty years.  Dep't of Homeland Sec. v. New

York, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring in grant of stay); see generally

Developments in the Law—District Court Reform: Nationwide Injunctions, 137 Harv. L. Rev.

1701, 1703-15 (2024) (quantifying rise in such injunctions and examining consequences).  That

trend raises meaningful concerns about the appropriate scope of a single district judge's

equitable powers.  See Trump v. Hawaii, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring)

(examining reasons to be "skeptical that district courts have the authority to enter universal

injunctions").

Alluding to such concerns, the defendants urge the Court to enter relief that is limited in scope. New Jersey, Doc. No. 92 at 49-50. Though the defendants have not proposed specific terms, two of the limitations they urge merit consideration.[23] First, the defendants argue "the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief." Id. at 50. As explained above, the Court has concluded all plaintiffs are so entitled. But that conclusion does not alone justify relief that is universal in scope. The Court still must confront the general principle that injunctive relief should be tailored to the parties before it. Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs"). Here, the Court finds this principle leads to different results for the two sets of plaintiffs.

For Doe and the members of the two plaintiff organizations, the record before the Court does not demonstrate that universal relief is necessary to "provide complete relief to," and protect the rights of, those parties. An injunction that prevents the defendants and their agents from implementing and applying the EO against Doe or any member of either plaintiff organization suffices to protect them from harm during the pendency of this lawsuit. The record does not establish how awarding similar relief to other persons or organizations that are not parties to this lawsuit is necessary to provide complete relief to the Doe plaintiffs.

---

[23] The third, which urges the Court to reject any facial challenge to the EO and require "individual as-applied challenges," can be rejected out of hand. The plaintiffs have advanced substantial facial challenges that the Court has deemed likely to succeed. The defendants do not explain how their third proposal, which is supported only by a citation to general language from a criminal case in which injunctive relief was not at issue, has anything to do with the scope of injunctive relief. See New Jersey, Doc. No. 92 at 50.

Different considerations arise as to the State plaintiffs. They have identified harms that do not hinge on the citizenship status of one child, or even of all children born within their borders. The harms they have established stem from the EO's impact on the citizenship status—and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction. For example, Massachusetts will suffer the identified harms not only if children born and living there are unlawfully denied citizenship, but also if a pregnant woman living in the northeastern part of the Commonwealth gives birth across the border in a nearby New Hampshire hospital, or if a family moves to Massachusetts from Pennsylvania (or any other state that has not joined this lawsuit) after welcoming a new baby. These examples illustrate why injunctive relief limited to the State plaintiffs is inadequate. In both, children born in states that are not parties to this lawsuit (such as New Hampshire and Pennsylvania) would theoretically lack birthright citizenship even after returning or moving to—and seeking various services in—a state that is among the plaintiffs here.

That result not only fails in providing complete relief to the State plaintiffs, but also risks creating a new set of constitutional problems. See Saenz v. Roe, 526 U.S. 489, 500-04 (1999) (identifying as component of "right to travel" protected by Fourteenth Amendment "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State"). For the State plaintiffs, then, universal or nationwide relief is necessary to prevent them from suffering irreparable harm. Cf. Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579-83 (2017) (narrowing in part but upholding in part injunction that protected nonparties similarly situated to the plaintiffs).

Only one issue remains.  The defendants assert the Court may not enjoin the President.[24] New Jersey, Doc. No. 92 at 50.  The Doe plaintiffs offer no response to this point, see generally Doe, Doc. No. 33, but the State plaintiffs disagree in a footnote citing instances where executive orders have been enjoined, see New Jersey, Doc. No. 123 at 15 n.8.  Assuming without deciding that this Court is empowered to issue an injunction directly constraining the President's actions in any set of circumstances, nothing in the record suggests such relief is necessary here.  The President has signed the EO.  No further action by him is described by the EO or predicted by the plaintiffs.  Other officers and agencies within the Executive Branch are responsible for implementing the EO, and it is their conduct that the plaintiffs really seek to restrain.  Thus, for purposes of the preliminary injunction, the relief will be awarded against all other defendants besides the President, and against any other officers or agents acting on behalf of the President, but not against the President himself.[25]

III.    CONCLUSION

"What the Constitution has conferred neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert, may strip away."  Nishikawa, 356 U.S. at 138 (Black, J., concurring).  Here, the Constitution confers birthright citizenship broadly, including to persons within the categories described in the EO.  Under the plain language of the Citizenship Clause and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to the EO are likely to prevail, the plaintiffs face serious and irreparable harm in the absence of relief,

---

[24] They also suggest the Court should dismiss the President as a defendant, New Jersey, Doc. No. 92 at 50, but a request like that is properly advanced in a motion (not an opposition brief), after conferral and in compliance with the Local Rule governing motion practice in this Court.  See generally L.R. 7.1.

[25] Should circumstances arise that merit reconsideration of this aspect of the injunction, the plaintiffs may bring them to the Court's attention via an appropriate motion.

the defendants face no cognizable harm from a preliminary injunction, and the public interest is served by preventing the implementation of a facially unconstitutional policy.

      Accordingly, the plaintiffs' motions (<u>Doe</u>, Doc. No. 10, and <u>New Jersey</u>, Doc. No. 3) are ALLOWED as described herein.  Separate orders will issue in each case memorializing the preliminary injunctions entered by the Court.

                       SO ORDERED.

                       /s/ Leo T. Sorokin           
                      United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| O. DOE et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 25-10135-LTS |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |

PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

For the reasons set forth in the Memorandum of Decision issued today, Doc. No. 46, the

plaintiffs' motion for preliminary injunction (Doc. No. 3) is ALLOWED. As explained in the

Memorandum, the plaintiffs have advanced valid causes of action seeking equitable relief, and

they have standing to pursue such claims. They also have demonstrated that each factor

governing their request for preliminary injunctive relief weighs strongly in their favor. The

plaintiffs are likely to succeed on the merits of their claims under the Citizenship Clause and 8

U.S.C. § 1401, they are likely to suffer irreparable harm in the absence of relief, the balance of

harms tips overwhelmingly in their favor, and the public interest favors an injunction.

Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), this Court ORDERS as

follows:

1. The United States Department of State, the Secretary of State, the United States Social

   Security Administration, the Acting Commissioner of Social Security, and all officers,

   agents, employees, attorneys, and any other persons acting in concert with or behalf of

any named defendant in this action (including agents, employees, and other representatives of President Donald J. Trump), are ENJOINED from implementing and enforcing Executive Order No. 14,160, "Protecting the Meaning and Value of American Citizenship," against plaintiff O. Doe, or against any member of La Colaborativa or the Brazilian Worker Center.

2. No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case, where the plaintiffs are an individual and two local non-profit organizations, they seek to vindicate an important constitutional and federal statutory right, and the injunction will not expose the defendants to financial loss. See da Silva Medeiros v. Martin, 458 F. Supp. 3d 122, 130 (D.R.I. May 1, 2020) (citing Crowley v. Loc. No. 82, 679 F.2d 978, 1000-01 (1st Cir. 1982)).

3. This preliminary injunction shall take effect immediately upon the docketing of this Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the United States Court of Appeals for the First Circuit, or the United States Supreme Court order otherwise.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 25-10139-LTS |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>PRELIMINARY INJUNCTION</u>

February 13, 2025

SOROKIN, J.

For the reasons set forth in the Memorandum of Decision issued today, Doc. No. 144, the plaintiffs' motion for preliminary injunction (Doc. No. 3) is ALLOWED. As explained in the Memorandum, the plaintiffs have advanced valid causes of action seeking equitable relief, and they have standing to pursue such claims. They also have demonstrated that each factor governing their request for preliminary injunctive relief weighs strongly in their favor. The plaintiffs are likely to succeed on the merits of their claims under the Citizenship Clause and 8 U.S.C. § 1401, they are likely to suffer irreparable harm in the absence of relief, the balance of harms tips overwhelmingly in their favor, and the public interest favors an injunction. Additionally, the record establishes that universal relief is required in order to provide complete relief to the eighteen states and two cities that have brought this case.

Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), this Court ORDERS as follows:

1. The United States Department of State, the Secretary of State, the United States
   Department of Homeland Security, the Secretary of Homeland Security, the United States
   Department of Health and Human Services, the Acting Secretary of Health and Human
   Services, the United States Social Security Administration, the Acting Commissioner of
   Social Security, and all officers, agents, employees, attorneys, and any other persons
   acting in concert with or behalf of any named defendant in this action (including agents,
   employees, and other representatives of President Donald J. Trump), are ENJOINED
   from implementing and enforcing Executive Order No. 14,160, "Protecting the Meaning
   and Value of American Citizenship."

2. No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the
   circumstances of this case, where the plaintiffs seek to vindicate an important
   constitutional and federal statutory right, and the injunction will not expose the
   defendants to financial loss.  See da Silva Medeiros v. Martin, 458 F. Supp. 3d 122, 130
   (D.R.I. May 1, 2020) (citing Crowley v. Loc. No. 82, 679 F.2d 978, 1000-01 (1st Cir.
   1982)).

3. This preliminary injunction shall take effect immediately upon the docketing of this
   Order and shall remain in effect until the entry of judgment in this matter, unless this
   Court, the United States Court of Appeals for the First Circuit, or the United States
   Supreme Court order otherwise.

                                  SO ORDERED.


                                   /s/ Leo T. Sorokin
                                  United States District Judge