Nos. 25-1169, 25-1170

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
———————————————

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants.*
———————————————

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security; UNITED STATES,

*Defendants-Appellants.*
———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
———————————————

## BRIEF OF *AMICI CURIAE* NON-PROFIT ORGANIZATIONS SERVING IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE AND SEXUAL ASSAULT IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE
———————————————

*(Counsel listed on inside cover)*

John Cort, law student intern
Kira Hinchey, law student intern
Shaquan McDowell, law student intern
Carolyn Zaccaro, law graduate
Reena Parikh (CA1 Bar # 1191849), Counsel of Record
Boston College Legal Services LAB
Civil Rights Clinic
885 Centre Street
Newton, MA 02459
617-552-0283
reena.parikh@bc.edu

Sarai Suarez Campos, law graduate
Juan Camilo Mendez (CA1 Bar #1216617), Counsel of Record
HarborCOV
P.O. Box 505754
Chelsea, MA 02150
(617) 884-9799
juan@harborcov.org

*Counsel for Amici Curiae*

## <u>FRAP RULE 29 STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), undersigned counsel for *Amici Curiae* states that no counsel for the parties authored this brief in whole or in part, and no party, party's counsel, or person or entity other than *Amici Curiae* or its counsel contributed money that was intended to fund the preparing or submitting of this brief.

/s/ Reena Parikh
Reena Parikh
*Counsel for Amici Curiae*

Date: May 28, 2025

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), *amici* submit the following corporate disclosure statements:

*Amici curiae*, listed in Appendix A, are private, non-profit organizations. *Amici* do not have parent companies, and no publicly held company holds more than 10% of the stock in any *amici* or has a direct financial interest in the outcome of the litigation.

# **TABLE OF CONTENTS**

FRAP RULE 29 STATEMENT ............................................................... i

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ............................................................... iv

INTEREST OF *AMICI CURIAE* ...................................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 2

ARGUMENT ............................................................................... 5

I.    A PRELIMINARY INJUNCTION OF EXECUTIVE ORDER NO. 14160 IS IN THE PUBLIC INTEREST AS IT IS NECESSARY TO PROTECT THE LIVES OF IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE OR SEXUAL ASSAULT ............................................. 5

   A.    Under the EO, Newly-Issued U.S. Birth Certificates Will No Longer Be Prima Facie Proof of Citizenship ......................................... 6

   B.    DV and SA Against Immigrant Women Is Prevalent in the United States, Where Abusive Partners and Assailants Often Use a Woman's Immigration Status as a Means of Power and Control ..................................... 7

   C.    The EO Places Immigrant Mothers Who Are DV/SA Survivors at Serious Risk of Harm by Requiring Them to Engage with Their Abusive U.S. Citizen or Lawful Permanent Resident Partner or Assailant to Establish Their Child's U.S. Citizenship Status. ......................................... 10

II.   A PRELIMINARY INJUNCTION OF THE EO IS VITAL TO ENSURING THAT IMMIGRANT SURVIVORS OF DV/SA CAN SAFELY USE THE LEGAL SYSTEM TO SEEK JUSTICE .................................... 12

   A.    Congress Has Repeatedly Deemed That It Serves the Public Interest to Protect Immigrant Survivors of DV/SA and Encourage Accountability from

Their Abusive Partners or Assailants as Reflected in Legislation Such as the Violence Against Women Act and the Trafficking Victims Protection Act .................................................................................................................. 12

B.   The EO Will Deter Immigrant Mothers from Holding Their Abusive Partners or Assailants Accountable, Furthering Societal Harm ..................... 15

CONCLUSION ............................................................................................ 18

APPENDIX A ............................................................................................1a

## TABLE OF AUTHORITIES

**Cases**

*Nken v. Holder,*
  556 U.S. 418(2009) ............................................................................. 5

*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) ............................................................................ 2

*Winter v. Nat. Def. Res. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................ 5

**Statutes**

42 U.S.C. § 608(a) ...................................................................................... 12

8 U.S.C. § 1255(m) ................................................................................... 14

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No.
  106-386, 114 Stat. 1464, 1533 (codified as amended in scattered sections of
  U.S.C. ............................................................................................... 13, 14

Violence Against Women Act of 1994, Pub. L. No. 103-322, 108 Stat. 1902 (codified
  as amended at scattered sections of 18 U.S.C. and 42 U.S.C.)................................. 12

**Regulations**

  8 C.F.R. § 214.14(b) ............................................................................. 14

  8 C.F.R. § 214.14(c)(7)........................................................................... 14

**Other Authorities**

  Abigail M. Morrison et al., *Intimate Partner Violence and Immigration in the United States:
  A Systematic Review*, 25 TRAUMA, VIOLENCE, & ABUSE
  846, 846 (2024)................................................................................2, 7, 8, 9

  *About Adverse Childhood Experiences*, CDC (Oct. 8, 2024),
  https://www.cdc.gov/aces/about/index.html ...................................................... 16

*About Intimate Partner Violence*, CDC, https://www.cdc.gov/intimate-partner-violence/about/index.html (last updated May 16, 2024) .......................................... 7

*About Sexual Assault,* NATIONAL SEXUAL VIOLENCE RESOURCE CENTER, https://www.nsvrc.org/about-sexual-assault (viewed on May 19, 2025) ............ 17

*Abused Spouses, Children and Parents*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents (last reviewed Jan. 24, 2025) ...................................................................................... 13

Admin. for Child. & Fams., *Chapter Sixteen Domestic Violence and Child Support, in* ESSENTIALS FOR ATTORNEYS IN CHILD SUPPORT ENFORCEMENT 1, 6–7 (2021) ............................................................................................................................ 12

Aisha Alsinai et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, FRONTIERS SOCIO., 2023, at 1, 2 ....................................... 3, 8, 9, 11

K.C Basile et al., NATIONAL CENTER FOR INJURY PREVENTION AND CONTROL, CENTERS FOR DISEASE CONTROL AND PREVENTION, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence* ................................. 3

Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence Among Immigrants: Evidence for VAWA Self-Petitions* 3 (Utah State Univ. Ctr. for Growth & Opportunity Working Paper No. 2020.019), https://www.thecgo.org/wp-content/uploads/2020/11/Immigration-Domestic-Violence-4.0.pdf .................................................................................................................. 7

*Citizenship Evidence*, U.S. DEP'T OF ST. — BUREAU OF CONSULAR AFFS., https://travel.state.gov/content/travel/en/passports/how-apply/citizenship-evidence.html (last updated Sept. 14, 2024) .............................................................. 6

Michele R. Decker et al., *Sexual Violence Against Adolescent Girls: Influences of Immigration and Acculturation*, 13 VIOLENCE AGAINST WOMEN 498, 507 (2007) ........................................................................................................................ 8

Erica Smith, BUREAU OF J. STAT., *Female Murder Victims and Victim-Offender Relationship*, 2021 (2022), https://bjs.ojp.gov/female-murder-victims-and-victim-offender-relationship-2021 ................................................................................................ 11

Erica M. Webster, *The Impact of Adverse Childhood Experiences on Health and Development in Young Children*, 9 GLOBAL PEDIATRIC HEALTH 1, 8 (2022) ............................... 17

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025) .................................... 2, 6

*History of VAWA*, LEGAL MOMENTUM, https://www.legalmomentum.org/history-vawa ................................................................................................................... 12

Jeni Klugman et al., CTR. ON GENDER EQUITY & HEALTH & NEWCOMB INST. TULANE UNIV., *The Costs of Intimate Partner Violence in California* (July 2024), 9 ............................................................................... 17

Joanne Hulley et al., *Intimate Partner Violence and Barriers to Help-Seeking Among Black, Asian, Minority Ethnic and Immigrant Women: A Qualitative Metasynthesis of Global Research*, 24 TRAUMA, VIOLENCE, & ABUSE 1001, 1004 (2023) ............................... 2

Josh T. Smith, *When Immigrants Are and Aren't Afraid of Reporting Crime*, CTR. FOR GROWTH & OPPORTUNITY AT UTAH ST. UNIV. (Nov. 8, 2021), https://www.thecgo.org/benchmark/when-immigrants-are-and-arent-afraid-of-reporting-crime/ ...................................................................................... 16

*Learn More About Domestic Violence*, N.Y. ST., https://opdv.ny.gov/learn-more-about-domestic-violence ........................................................................... 9, 11

Leslye E. Orloff et al., *Legislative History of VAWA (94, 00, 05), T and U-Visas, Battered Spouse Waiver, and VAWA Confidentiality*, 2 (2023), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/VAWA_Leg-History_Final.pdf ................................................................................. 13, 14

Leslye Orloff, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT, AMERICAN UNIVERSITY ADVOCACY PROJECT, AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW*, Empowering Survivors: Legal Rights of Immigrant Victims of Sexual Assault,* 1-2*,* (2013), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/pdf/FAM-Man-Full-EmpoweringSurvivors07.13.pdf.... 3

Marshall B. Knapp, *Social Values and Older Persons: The Role of the Law*, 7 MARQUETTE'S ELDER ADVISOR 69, 72 (2012) ........................................................ 15

MARTIN R. HUECKER ET AL., DOMESTIC VIOLENCE (2023) ........................................ 7

Olivia Harrison, Note, *The Long-Term Effects of Domestic Violence on Children*, 41 CHILD. LEGAL RTS. J. 63, 63 (2021)...........................................................................17

Susanne Lohmann et al., *The Trauma and Mental Health Impacts of Coercive Control: A Systematic Review and Meta-Analysis*, 25 TRAUMA, VIOLENCE & ABUSE 630 (2024) ..........................................................................................................................16

*The Ripple Effect of Domestic Violence: How it Touches an Entire Community*, SAFE ALLIANCE (2023), https://www.safealliance.org/blog/ripple-effect-domestic-violence-how-touches-entire-community/.................................................................17

Tien-Li Loke, Note, *Trapped in Domestic Violence: The Impact of United States Immigration Laws on Battered Immigrant Women*, 6 B.U. PUB. INT. L.J. 589, 591 (1997).............10

U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-487, IMMIGRATION ENFORCEMENT: ACTIONS NEEDED TO BETTER TRACK CASES INVOLVING U.S. CITIZENSHIP INVESTIGATIONS 2 (2021)............................................................................................6

*Understanding the Impact of Domestic Violence*, MASS GENERAL BRIGHAM MCLEAN, https://www.mcleanhospital.org/essential/domestic-violence ...........................16

### INTEREST OF *AMICI CURIAE*

*Amici* are local, state, and national non-profit organizations who serve and advocate on behalf of immigrant survivors of domestic violence ("DV") or sexual assault ("SA") in various ways. Some *amici* represent and advocate for immigrant women, including DV and SA survivors, who are seeking immigration relief. Others provide critical assistance and resources to survivors of domestic abuse, sexual assault, and other gender-based violence in the United States. Through their work, *amici* have direct knowledge of the many ways in which abusive partners and assailants control and threaten women using their immigration status. As such, *amici* are deeply concerned that Executive Order 14160 ("the EO"), which would eliminate birthright citizenship, poses a grave danger to immigrant mothers who are DV or SA survivors, by forcing them to re-engage with their abusive U.S. Citizen ("USC") or Lawful Permanent Resident ("LPR") partner or assailant to obtain documentation to establish that their U.S-born child has U.S. citizenship. *Amici* believe that the District Court's Preliminary Injunction ("PI") of the EO serves the public interest, because it protects immigrant mother survivors of DV/SA from further violence, which benefits them, their children and society. As such, *amici* support Plaintiffs-Appellees' position that the District Court's PI should be affirmed. A complete list of *amici* is attached as Appendix A.

All parties have, through counsel, consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

## SUMMARY OF THE ARGUMENT

Under Executive Order 14160, U.S. citizenship will no longer be granted automatically for all children born on U.S. soil, upending the century-old understanding of rights conferred by the Fourteenth Amendment. *See* Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025); *see United States v. Wong Kim Ark*, 169 U.S. 649, 687–88 (1898).

The District Court's Preliminary Injunction of the EO must be upheld, because Plaintiffs meet the required standard. In particular, the District Court correctly determined that a PI maintaining the status-quo of birthright citizenship during litigation would serve the public interest. Indeed, permitting the EO to go into effect would severely undermine the safety and autonomy of DV/SA survivors who are not USCs, LPRs, or otherwise lawfully present in the U.S. on a permanent basis (hereinafter referred to as "immigrant").

DV is an epidemic in the United States, affecting around 10 million individuals yearly. Ensnared in this epidemic are immigrant women, who are uniquely vulnerable in relationships with abusive partners. Immigrant women often face immense barriers to leaving abusive relationships or seeking help because they experience social isolation, language differences, lack of social capital, and fear of deportation.[1] These

---

[1] Abigail M. Morrison et al., *Intimate Partner Violence and Immigration in the United States: A Systematic Review*, 25 TRAUMA, VIOLENCE, & ABUSE 846, 846 (2024); Joanne Hulley et al., *Intimate Partner Violence and Barriers to Help-Seeking Among Black, Asian, Minority Ethnic and Immigrant Women: A Qualitative Metasynthesis of Global Research*, 24 TRAUMA, VIOLENCE, & ABUSE 1001, 1004 (2023).

compounding factors are frequently exploited by abusive partners: between thirty to sixty percent of immigrant women in the United States are estimated to have experienced DV, and they are almost twice as likely as USC women to lose their lives as a result.[2] SA is similarly pervasive in the United States, with 1 in 4 women reporting being the victim of an attempted or completed rape during their lifetime.[3] Immigrant SA survivors experience not only the trauma of assault but community, legal, and economic barriers arising from their non-citizen status.[4]

The EO further pushes immigrant women who are DV/SA survivors into harm's way. The EO causes a U.S. birth certificate to no longer serve as prima facie evidence of citizenship. Instead, under the EO's directive, a U.S.-born child of an immigrant woman, who is not lawfully present in the U.S. on a permanent basis, will only be a citizen if the child's biological father is a USC or LPR. As such, new mothers will be forced to re-engage with their abusive partners or assailants (and father of their children), and plead with them to obtain documentation of their lawful permanent

---

[2] Aisha Alsinai et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, FRONTIERS SOCIO., 2023, at 1, 2.

[3] K.C. Basile et al., NATIONAL CENTER FOR INJURY PREVENTION AND CONTROL, CENTERS FOR DISEASE CONTROL AND PREVENTION, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence.*

[4] Leslye Orloff, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT, AMERICAN UNIVERSITY ADVOCACY PROJECT, AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW, *Empowering Survivors: Legal Rights of Immigrant Victims of Sexual Assault,* 1-2, (2013), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/pdf/FAM-Man-Full-EmpoweringSurvivors07.13.pdf.

status or citizenship to prove to relevant government agencies (i.e. social security office and healthcare, education, and immigration agencies) that their children are U.S. citizens. This forced dependence on an abusive partner or assailant jeopardizes an immigrant woman's ability to disengage from abuse and experience safety. An abusive partner or assailant can withhold documentation needed to verify their child's citizenship to exercise extreme control over the immigrant mother, ultimately keeping immigrant women stuck in the cycle of abuse or subject to further violence.

Additionally, the EO will prevent immigrant survivors of DV/SA from safely cooperating with law enforcement or participating in the legal system to hold their abusers or assailants accountable, which Congress has deemed essential to the public's interest. Congress has explicitly and repeatedly contemplated the vulnerable position of immigrants who experience DV/SA in the United States and the importance of seeking justice against abusive partners and assailants. Indeed, a bipartisan Congress passed landmark legislation such as the Violence Against Women Act ("VAWA") and the Trafficking Victims Protection Act ("TVPA"), which encourage DV/SA survivors to use the legal system to hold their abusive partners and assailants accountable and provide them alternative pathways to lawful immigration status that do not rely on their abusers petitioning for them.

Because the EO requires that an immigrant mother get the father's cooperation to verify their child's U.S. citizenship, the EO provides abusive partners with a weapon of abuse. Further, it deters an immigrant mother from seeking justice

4

against her abusive partner or assailant, out of fear he will then not cooperate to prove their child's citizenship. Refraining from reporting abusive behavior or filing for a protection order could also put the child in danger of physical harm and/or lead to detrimental mental and social impacts on the child. This, in turn, could result in public harm in the short and long term. This includes creating more adverse childhood experiences (ACEs) for adolescents, which impacts children's development and long-term health, as well as burdening social structures and institutions. Given the immense individual and social harm that would occur as a result of the EO, the First Circuit should find that the District Court's PI serves the public interest and affirm.

## ARGUMENT

### I.    A PRELIMINARY INJUNCTION OF EXECUTIVE ORDER NO. 14160 IS IN THE PUBLIC INTEREST AS IT IS NECESSARY TO PROTECT THE LIVES OF IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE OR SEXUAL ASSAULT.

A PI may be granted if the plaintiff establishes that 1) they are "likely to succeed on the merits," 2) they are "likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their] favor," and 4) "an injunction is in the public interest." *Winter v. Nat. Def. Res. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors of the injunction test "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In this case, the public interest would be served by upholding the District's Court's injunction of the EO. The EO would make immigrant mothers who have a child in the United States with an

abusive USC or LPR partner or assailant dependent on the abuser to establish their child's citizenship status, continuing or reigniting the cycle of abuse—harming not only the immigrant mother, but the child and the community as well.

### A. Under the EO, Newly-Issued U.S. Birth Certificates Will No Longer Be Prima Facie Proof of Citizenship.

USCs have historically been able to use their U.S. birth certificates as proof of citizenship because of birthright citizenship.[5] The EO destroys that long-standing convention. Under the EO, U.S. birth certificates no longer serve as prima facie proof of citizenship because there's an additional check: the parents' immigration status. This change will require an evolution of the current citizenship documentation process for all children born in the United States.

Under the EO, a child whose mother is a USC, LPR or is otherwise lawfully present in the U.S. on a permanent basis, only needs the mother's cooperation and documentation of immigration status to establish the child's U.S. citizenship. Children needing to claim citizenship through their USC or LPR "immediate male biological progenitor," however, would now need their father's cooperation to submit documentation and possibly DNA-tests to prove paternity and citizenship. Exec. Order

---

[5] *Citizenship Evidence*, U.S. Dep't of St. — Bureau of Consular Affs., https://travel.state.gov/content/travel/en/passports/how-apply/citizenship-evidence.html (last updated Sept. 14, 2024); *see* U.S. Gov't Accountability Off., GAO-21-487, Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations 2 (2021), https://www.gao.gov/assets/gao-21-487.pdf.

No. 14160 § 4(b), 90 Fed. Reg. 8449 (Jan. 29, 2025). This requirement grants the father of a U.S.-born child whose mother is an immigrant the power over whether that child will receive the benefits and protections of U.S. citizenship, and to withhold their cooperation as a means of punishment or intimidation.

**B. DV/SA Against Immigrant Women Is Prevalent in the United States, Where Abusive Partners and Assailants Often Use a Woman's Immigration Status as a Means of Power and Control.**

DV and SA are endemic in the United States. Although DV can include a broad range of behaviors, intimate partner violence —"abuse or aggression that occurs in a romantic relationship" including harms of "physical violence, sexual violence, stalking, and psychological aggression" —is commonly synonymous with DV.[6] This violence knows few boundaries, with nearly ten million people in the United States experiencing DV each year and approximately twenty people experiencing physical battery by a romantic partner every minute.[7] Immigrant women are at an increased risk of being in abusive relationships.[8] Between thirty to sixty percent of immigrant women in the United States are estimated to have experienced domestic abuse by a romantic

---

[6] *About Intimate Partner Violence*, CDC, https://www.cdc.gov/intimate-partner-violence/about/index.html (last updated May 16, 2024).

[7] MARTIN R. HUECKER ET AL., DOMESTIC VIOLENCE (2023); Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence Among Immigrants: Evidence for VAWA Self-Petitions* 3 (Utah State Univ. Ctr. for Growth & Opportunity Working Paper No. 2020.019), https://www.thecgo.org/wp-content/uploads/2020/11/Immigration-Domestic-Violence-4.0.pdf.

[8] Morrison et al., *supra* note 1, at 846.

partner, and they are almost twice as likely as USC women to lose their lives at the hands of that abusive partner.[9] Studies also indicate immigrant women may be particularly vulnerable to sexual assault, and being an immigrant confers increased vulnerability to recurring sexual assault.[10] The *amici*'s experience with immigrant clients reflects this reality:

- Maria,[11] married to a USC, left her husband to escape his abuse. Soon after, her husband began stalking her, and finally caught up to her on her commute to work. When she stepped out of her car, he stabbed and very nearly killed her.

- Claudia reported that when she tried to end her relationship with her abusive husband, he grabbed their child's tricycle and hit her in the head with it. Chasing her through their home, he then picked up a heavy suitcase and threw it at her.

Risk factors prevalent in immigrant communities increase immigrant women's likelihood of experiencing abuse and being unable to escape. These factors include poverty, education inaccessibility, being part of a racial or cultural minority, critical stress levels, language barriers, lack of social support outside the home, and residing in communities with high levels of other violence and crime.[12] Abusive partners exploit

---

[9] Alsinai et al., *supra* note 2, at 2.

[10] Michele R. Decker et al., *Sexual Violence Against Adolescent Girls: Influences of Immigration and Acculturation*, 13 VIOLENCE AGAINST WOMEN 498, 507 (2007).

[11] For the privacy and safety of the *amici's* clients, pseudonyms are being used for each example shared in this brief.

[12] *Id.* at 2; Morrison et al. *supra* note 1, at 846.

these factors—such as by ensuring the survivor's financial dependence or preventing them from learning English—to trap women in abusive relationships.

- Fatima's partner, a USC, forbade her from taking formal English classes, prohibited her from forming relationships with anyone who might teach her English, and refused to allow her to apply for a job at Dunkin' Donuts for the same reason, as a means of controlling and isolating her.

- Adele, whose husband was also a USC, was not allowed by her abusive partner to open her own bank account, as a means of financially preventing her from escaping the relationship.

It is common for USC or LPR abusive partners—who do not fear deportation themselves—to take advantage of their partner's insecurity in their immigration status as a means of coercion.[13] The psychological violence often manifests as prohibiting contact with family members, threatening to turn their partner over to immigration authorities and taking custody of their children, and hiding or destroying their partner's passports, visas, or other immigration documents.[14]

- Samira tried to leave her abusive partner, and he retaliated by contacting Immigrant and Customs Enforcement and claiming that she only married him to gain permanent lawful residency.

---

[13] Morrison et al., *supra* note 1, at 847.
[14] Alsinai et al., *supra* note 2, at 2; *Learn More About Domestic Violence*, N.Y. St., https://opdv.ny.gov/learn-more-about-domestic-violence.

- Soon after Daniela married her husband, he demanded she cut off contact with her family, threatening to not file her immigration paperwork if she did not comply.

- Nancy's USC spouse got her a green card, but hid it from her and told her that she just had a temporary visa so that she would fear leaving him.

Even when an immigrant woman has some kind of lawful immigrant status, their isolation from a support network by their abusive partner and an overall fear of the authorities makes immigrant survivors less likely to seek help or accountability.[15]

### C. The EO Places Immigrant Mothers Who Are DV/SA Survivors at Serious Risk of Harm by Requiring Them to Engage with Their Abusive U.S. Citizen or Lawful Permanent Resident Partner or Assailant to Establish Their Child's U.S. Citizenship Status.

Because birth certificates will no longer serve as prima facie proof of U.S. citizenship, immigrant mothers who are undocumented or only have temporary immigration status will be reliant on the USC or LPR fathers' cooperation and documentation to affirm their child's citizenship. Women weighing the consequences of leaving a relationship may be compelled to stay, out of fear that their partner or assailant will refuse to provide the necessary documentation. In exchange for cooperation, survivors may refrain from reporting their abuse or assault, seeking a restraining order, or may make concessions in custody battles when they would have

---

[15] Tien-Li Loke, Note, *Trapped in Domestic Violence: The Impact of United States Immigration Laws on Battered Immigrant Women*, 6 B.U. PUB. INT. L.J. 589, 591 (1997).

otherwise raised DV/SA concerns.[16] As such, the EO harms these women by tipping the scales in favor of capitulating to their abusive partners' or assailants' demands, and it harms whole communities by creating impunity and enabling repeat offenses. If a survivor chooses a legal route (if even available) to compel cooperation without capitulation, the abusive partner may become angry, increasing the chance of continued violence, or death.[17]

- After initiating legal proceedings, Leslie's ex-spouse threatened to hurt her family in her home country, stating that he knew where they lived and could arrange for someone to hurt them.

- Ingrid's ex-spouse threatened to kill her U.S.-born child, because she filed a lawsuit against him.

This risk extends to immigrant women who have separated themselves and their US-born child from their abusive partner. If they leave the relationship before receiving the father's documentation, they will be required to re-engage with their abusive partners to obtain it or return to the abusive relationship itself.[18] In fact, Congress acknowledged this risk through its creation of a good cause exception in the

---

[16] *See* Alsinai et al., *supra* note 2, at 6; *Learn More About Domestic Violence*, N.Y. ST., https://opdv.ny.gov/learn-more-about-domestic-violence.

[17] Erica Smith, BUREAU OF J. STAT., *Female Murder Victims and Victim-Offender Relationship*, 2021 (2022) at 1, https://bjs.ojp.gov/female-murder-victims-and-victim-offender-relationship-2021.

[18] *Id.*

Temporary Assistance for Needy Families Act that exempts mothers with abusive partners from having to establish their child's paternity before being eligible for government assistance.[19] 42 U.S.C. § 608(a) (2018).

## II. A PRELIMINARY INJUNCTION OF THE EO IS VITAL TO ENSURING IMMIGRANT SURVIVORS OF DV/SA CAN SAFELY USE THE LEGAL SYSTEM TO SEEK JUSTICE.

### A. Congress Has Repeatedly Deemed That It Serves the Public Interest to Protect Immigrant Survivors of DV/SA and Encourage Accountability from Their Abusive Partners or Assailants as Reflected in Legislation Such as the Violence Against Women Act and The Trafficking Victims Protection Act.

For decades, Congress has consistently codified support for immigrant survivors of DV or SA. In 1994, Congress passed VAWA to protect the physical safety of DV survivors and to promote accountability from abusive partners. *See* Violence Against Women Act of 1994, Pub. L. No. 103-322, 108 Stat. 1902 (codified as amended at scattered sections of 18 U.S.C. and 42 U.S.C.). A watershed bill with bipartisan support, VAWA introduced sweeping provisions to address and reduce DV by expanding resources for survivors, strengthening legal protections, and improving the mechanisms of accountability in cases of abuse.[20]

---

[19] Section 654(29) allows the applicant or recipient to not cooperate with establishing paternity of the child if they can demonstrate their abusive partner is likely to retaliate by harming the mother or child. *Id.* § 654(29); Admin. for Child. & Fams., *Chapter Sixteen Domestic Violence and Child Support, in* ESSENTIALS FOR ATTORNEYS IN CHILD SUPPORT ENFORCEMENT 1, 6–7 (2021).

[20] *History of VAWA*, LEGAL MOMENTUM, https://www.legalmomentum.org/history-vawa.

A key component of this legislation focused on immigrant women. Through VAWA, Congress sought to eliminate barriers and create a channel for immigrant women in abusive relationships to secure safety, justice, and permanent status.[21] Legislators recognized that "domestic battery problems can become terribly exacerbated in marriages where one spouse is not a citizen, and the non-citizen's legal status depends on his or her marriage to the abuser."[22] The legislative record highlights a concern for the apprehension and paralysis many immigrant women in DV households face—"fear[ing] both continued abuse if they stay with their batterers and deportation if they attempt to leave."[23] Recognizing this unique vulnerability, VAWA permits immigrant women who have suffered battery or extreme cruelty at the hands of a USC or LPR to independently "self-petition" for LPR status, without the involvement of the abusive partner.[24]

Congress continued to underscore the importance of protecting immigrant women from intimate partner violence or sexual assault with the passage of the TVPA in 2000. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-

---

[21] Leslye E. Orloff et al., *Legislative History of VAWA (94, 00, 05), T and U-Visas, Battered Spouse Waiver, and VAWA Confidentiality*, 2 (2023), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/VAWA_Leg-History_Final.pdf

[22] *Id.* at 5.

[23] *Id.*

[24] *Abused Spouses, Children and Parents*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents (last reviewed Jan. 24, 2025).

386, § 2(a)(1), 114 Stat. 1464, 1533 (codified as amended in scattered sections of U.S.C.). Importantly, the TVPA established the U visa: an immigration status that confers employment authorization and a pathway to lawful permanent residence to victims of certain crimes, including domestic violence, rape, and sexual assault. 8 C.F.R. § 214.14(b), (c)(7) (2025); 8 U.S.C. § 1255(m) (2018). In enacting the U nonimmigrant status, Congress aimed to provide immigrant women experiencing certain criminal acts of violence protection against deportation, despite the threats of their assailants, and the freedom to cooperate with law enforcement without fear that their assailant would retaliate by taking actions to have them deported or by withdrawing—or threatening to withdraw—access to an immigration benefit under their control.[25]

Congress further reinforced its efforts to protect immigrant women facing severe violence or sexual exploitation by establishing the T visa. Focused primarily on providing protections for victims of human trafficking, the T visa stands as another example of Congress's commitment to protecting immigrant women in exploitative situations and providing them with a pathway towards stability. § 107, 114 Stat. at 1477.

This legislative history should not be forgotten, understated, nor undermined, for it offers a window into widely accepted truths. In many ways, the "law reflects and embodies prevailing social attitudes by codifying or enshrining them with a formal,

---

[25] ORLOFF ET AL., *supra* note 21, at 33.

14

official, and enforceable status."[26] By enacting legislation like VAWA and TVPA, Congress not only offers concrete avenues for relief but also signals that immigrant women are not invisible or expendable; rather, they must be protected for the public interest. These statutes acknowledge the unique and often intersectional forms of harm immigrant women face—ranging from DV to sexual exploitation to systemic barriers in accessing justice and resources. In doing so, these laws do more than regulate behavior—they reflect and shape cultural norms, combat stigma, and reaffirm a national commitment to justice, equity, and safety for all, regardless of status. These laws thus serve both a practical and symbolic function, underscoring the federal government's recognition that reducing harm to immigrant women is essential to the health, integrity, and moral direction of the nation.

### B. The EO Will Deter Immigrant Mothers from Holding Their Abusive Partners or Assailants Accountable, Furthering Societal Harm.

Allowing the EO to take effect would subvert the long-standing policy objectives of the aforementioned legislation by erecting new legal and psychological barriers to critical legal relief for DV survivors and shielding abusive partners from accountability. When DV survivors cannot seek safety, the harms of DV do not remain isolated. Rather, they reverberate outward, triggering a cascade of negative outcomes that threaten the health and stability of entire communities.

---

[26] Marshall B. Knapp, *Social Values and Older Persons: The Role of the Law*, 7 MARQUETTE'S ELDER ADVISOR 69, 72 (2012) (emphasis removed).

As discussed, under this EO, immigrant mothers are rendered wholly dependent on their partners' willingness to help affirm their child's citizenship. This coercive reliance discourages immigrant survivors of DV or SA from seeking legal protections or cooperating with authorities to hold partners or former partners accountable for instances of DV or SA.[27] Reporting rates of violent crimes are already disproportionately low within immigrant communities; the EO threatens to further suppress those rates by intensifying fear, reinforcing dependency, and deepening power imbalances in abusive relationships.[28]

More specifically, this EO compromises public health by allowing violence to go unchecked. Survivors trapped in abusive relationships face elevated risks of chronic physical illness, mental health and substance use disorders, reproductive harm, and even suicide.[29] But these long term health consequences also affect the children, because witnessing violence in the home constitutes an adverse childhood experience (ACE).[30] ACE is often "associated with poor health and developmental outcomes," and

---

[27] Susanne Lohmann et al., *The Trauma and Mental Health Impacts of Coercive Control: A Systematic Review and Meta-Analysis*, 25 TRAUMA, VIOLENCE & ABUSE 630 (2024).

[28] Josh T. Smith, *When Immigrants Are and Aren't Afraid of Reporting Crime*, CTR. FOR GROWTH & OPPORTUNITY AT UTAH ST. UNIV. (Nov. 8, 2021), https://www.thecgo.org/benchmark/when-immigrants-are-and-arent-afraid-of-reporting-crime/.

[29] *Understanding the Impact of Domestic Violence*, MASS GENERAL BRIGHAM MCLEAN, https://www.mcleanhospital.org/essential/domestic-violence.

[30] *About Adverse Childhood Experiences*, CDC (Oct. 8, 2024), https://www.cdc.gov/aces/about/index.html.

witnessing DV, a specific type of ACE, can lead to "greater risk of juvenile pregnancy, criminal behavior, suicidal tendencies, and bedwetting."[31] Additionally, children who witness DV are significantly more likely to experience IPV themselves later on in adulthood—either as victims or by engaging in abusive behavior themselves—thus perpetuating an intergenerational cycle of harm.[32]

Indeed, the ripple effects of DV/SA extend far beyond the household. Higher rates of DV/SA strain the very systems tasked with protecting community well-being— overburdening state and local hospitals, schools, shelters, and mental health providers with the long-term fallout of DV/SA.[33] Co-workers, neighbors, and service providers are also impacted by the destabilizing presence of unchecked abuse, with damaging effects ranging from lost productivity to escalating mental health crises.[34] Public health, at its core, depends on the ability of communities to respond to and recover from collective harm. By isolating survivors and weakening accountability mechanisms, this

---

[31] Erica M. Webster, *The Impact of Adverse Childhood Experiences on Health and Development in Young Children*, 9 GLOBAL PEDIATRIC HEALTH 1, 8 (2022); Olivia Harrison, Note, *The Long-Term Effects of Domestic Violence on Children*, 41 CHILD. LEGAL RTS. J. 63, 63 (2021).
[32] *Id.*
[33] Jeni Klugman et al., CTR. ON GENDER EQUITY & HEALTH & NEWCOMB INST. TULANE UNIV., *The Costs of Intimate Partner Violence in California* (July 2024), 9; *see also About Sexual Assault,* NATIONAL SEXUAL VIOLENCE RESOURCE CENTER, https://www.nsvrc.org/about-sexual-assault.
[34] *The Ripple Effect of Domestic Violence: How it Touches an Entire Community*, SAFE ALLIANCE (2023), https://www.safealliance.org/blog/ripple-effect-domestic-violence-how-touches-entire-community/.

EO directly impairs that capacity, ignoring the widespread and compounding damage that DV/SA inflicts on individuals, families, and communities alike.

In sum, this EO is not merely a legal misstep—it is a public health and safety hazard. It frustrates sustained efforts to reduce DV/SA, protect survivors, and promote collective well-being. There is a compelling public interest in promoting the health and safety of immigrant DV/SA survivors and ensuring accountability for abusive partners. EO 14160 undermines these objectives and harms the health of our communities.

## CONCLUSION

The *amici* urge this Court to affirm the District Court's Preliminary Injunction order, because an injunction preventing the EO from taking effect is squarely in the public interest.

Date: May 28, 2025                    Respectfully Submitted,

/s/ Reena Parikh                      /s/ Juan Camilo Mendez
Reena Parikh (CA1 Bar # 1191849)      Juan Camilo Mendez (CA1 Bar # 1216617)
Boston College Legal Services LAB     HarborCOV
Civil Rights Clinic                   P.O. Box 505754
885 Centre Street                     Chelsea, MA 02150
Newton Centre, MA 02459               617-884-9799
617-552-0283                          juan@harborcov.org
reena.parikh-ggroup@bc.edu

*Counsels for Amici Curiae*

## APPENDIX A

**HarborCOV** has been addressing the needs of survivors of domestic and sexual violence in Massachusetts since 1998. They provide direct legal representation to immigrant survivors of domestic violence, helping them obtain abuse prevention orders and immigration benefits. They also provide essential support services to domestic violence survivors, including case management, housing support, public education and assistance through a 24-hour hotline.

The **Tahirih Justice Center** ("Tahirih") is a national, nonprofit organization that serves women, girls, and all immigrant survivors of domestic violence, sexual assault, and other forms of gender-based violence. Tahirih's whole-person approach to services provides each survivor with free legal support and social services to secure the rights they are entitled to under U.S. law and build stable lives. Tahirih translates expertise gained from serving our clients into training, education, and policy advocacy to ensure that systems, laws, and policies protect immigrant survivors from violence and exploitation.  By amplifying the experiences of survivors, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity.

**ASISTA** Immigration Assistance is a national network of attorneys and advocates working at the intersection of immigration and gender-based violence.  The organization worked with Congress to create and expand routes to secure immigration status for survivors of domestic violence, sexual assault, and other crimes, which were

incorporated in the 1994 Violence Against Women Act (VAWA), as amended, and associated regulations and interim agency rulemaking. Today, ASISTA educates attorneys and advocates representing immigrant survivors and engages in policy advocacy and litigation. ASISTA also trains and provides technical support to local law enforcement officials and civil and criminal court judges. ASISTA has previously filed amicus briefs in cases before the U.S. Supreme Court, federal courts of appeals, the Board of Immigration Appeals, and the Administrative Appeals Office ("AAO").

The **Boston Area Rape Crisis Center (BARCC)**, founded in 1973, is the oldest and largest rape crisis center in New England. BARCC is dedicated to supporting underserved survivors, including immigrants, people with disabilities, communities of color, LGBTQ+ individuals, and those with limited English proficiency. To demonstrate this work, BARCC provides legal representation in certain humanitarian immigration remedies, as well as wraparound services. With bilingual legal staff and a wraparound service model that includes counseling and case management, BARCC addresses critical service gaps and barriers, helping survivors navigate complex legal systems and rebuild their lives in safety.

**Jane Doe Inc**., ("JDI") the Massachusetts Coalition Against Sexual Assault and Domestic Violence, is a statewide organization of 60 member programs that provide direct services to victims and survivors of sexual and domestic violence. Guided by the voices of survivors, JDI brings together organizations and people

committed to ending domestic violence and sexual assault, creating social change by addressing the root causes of this violence, and promoting justice, safety, and healing for survivors. JDI advocates for responsive public policy, promotes collaboration, raises public awareness, and supports its member organizations to provide comprehensive prevention and intervention services. JDI's 60 programs include numerous providers who support immigrant survivors of domestic violence, sexual assault, and human trafficking to find safety and stability in the US. Restrictions on access to services and support for immigrant survivors creates a chilling effect on all survivors and makes our communities less safe and well.

The **National Women's Law Center ("NWLC")** fights for gender justice — in the courts, in public policy, and in our society — working across the issues that are central to the lives of women and girls. NWLC uses the law in all its forms to change culture and drive solutions to the gender inequity that shapes our society and to break down the barriers that harm all of us — especially women of color, LGBTQI+ people, and low-income women and families. The Center has a longstanding and demonstrated commitment to advocating for women and girls to be free from sexual harassment and violence and has appeared either as counsel or as an amicus in a wide variety of cases advocating for protections on these issues. NWLC is particularly focused on supporting communities facing significant barriers to justice, including immigrant women and their families.

**Alianza Nacional de Campesinas, Inc.**'s mission is to unify the struggle and promote leadership of campesinas in a national movement to create major visibility and advocate for changes that defends their human rights. As an organization by and for campesinas organizing their communities for labor standards that center worker health and safety, for immigrant and migrant justice, and for an end to gender-based violence, we work at the intersection of gender, migrant, labor, and climate justice. We work for sustainable and healthy communities where campesinas and their families can live well and thrive.

The **Boston College Legal Services LAB Immigration Clinic** is a clinical program of Boston College Law School. The Immigration Clinic represents low-income noncitizens in removal proceedings before the Immigration Court in Boston, in their applications for legal status before the local U.S. Citizenship and Immigration Services offices, in their appeals before the Board of Immigration Appeals and First Circuit Court of Appeals, and in their petitions for habeas corpus before local U.S. district courts. Some of the Immigration Clinic's clients have been survivors of domestic violence. As such, the Immigration Clinic has an interest in ensuring that noncitizen survivors of domestic violence do not have legal barriers to proving the citizenship of their children that require the survivors to engage with their abusive partners.

The **Boston University School of Law's Immigrants' Rights and Human Trafficking Program** is dedicated to advancing the legal rights and protections of vulnerable populations, including immigrants and survivors of human trafficking. In the only program of its kind nationally, law students represent non-citizens facing deportation and survivors of human trafficking, persecution, and torture. Law students participate in a seminar led by experienced faculty that challenges them to consider the intersections between immigrants' rights and human trafficking. In addition to providing pro bono legal representation, law students work on systemic projects aimed at improving legal responses and providing new, creative models to address emerging challenges in the immigrants' rights and human trafficking fields. Through interdisciplinary research, advocacy, and practical training, the Program aims to strengthen legal frameworks, improve protections for immigrants and survivors of crime, and promote justice and dignity for marginalized populations.

The **Brazilian Women's Group** (BWG)'s mission is to promote the empowerment of Brazilian women and the Brazilian community in the Boston area. We advance our mission with member voices through inclusion, developing leadership skills, understanding domestic violence issues and sexual assault, and offering support to victims, promoting cultural awareness for social change, and facilitating political engagement.

The **Center for Gender & Refugee Studies** ("CGRS") advocates for asylum seekers fleeing gender-based violence. CGRS protects the fundamental human rights of refugee women, children, LGBTQ+ individuals, and others who flee persecution and torture in their home countries. As a critical part of our mission, CGRS serves as a resource to decision makers to promote laws and public policies that recognize the legitimate protection claims of those fleeing persecution and torture. Our goal is to ensure that the U.S. framework of law and policy respects the rights of refugees and aligns with international law.

**Central West Justice Center** is a legal nonprofit organization providing free legal services to low-income residents of the five most western and central counties of Massachusetts. CWJC has a long history of specializing in advocacy to survivors of domestic violence and sexual assault including through the organization's work helping clients access emergency shelter and other benefits as well as humanitarian immigration relief such as U and T visas and protection under the Violence Against Women Act. CWJC staff also regularly provide trainings to community partners serving survivor clients.

**De Novo** is a Client-driven integrated legal and mental health services to overcome the impacts of poverty, inequity, and trauma. De Novo helps protect the rights of immigrants and asylum seekers through passionate legal representation, education, and advocacy. We provide high-quality, free legal assistance to low-income

immigrants and asylum seekers living in Massachusetts in cases involving Asylum, VAWA, U-visa, Special Immigrant Juveniles, and Forensic Evaluations through our counseling. Our holistic model of care means clients not only receive effective legal assistance, but they are also better able to navigate the enormous struggles they face.

**Dignidad/The Right to Immigration Institute** seeks to impact immigration law and advocacy through universal representation by preparing impacted individuals-- while they are impacted-- to represent themselves and others as accredited representatives practicing in immigration proceedings, hearings, trials and appeals.

The **Dominican Development Center, Inc.** (DDC) works to support all immigrant communities impacted by anti-racist policies. We promote quality of life and combat discrimination and unfair policies against the most vulnerable communities in MA.

**Healing Abuse Working for Change (HAWC)**'s mission is to create social change by taking action against personal and societal patterns of violence and oppression. HAWC provides services to survivors of domestic abuse residing in 23 cities and towns on Massachusetts' North Shore in order that they may make informed, independent decisions about their futures.

The **Immigration Center for Women and Children** ("ICWC") has been representing immigrant children who are abused, abandoned, or neglected and immigrant survivors of domestic and sexual violence since 2004. ICWC provides free

and affordable legal representation to immigrants from their offices in California and Nevada. ICWC has also provided education and information to unrepresented women and children with upcoming immigration court proceedings, through group orientations, group workshops, and individual assessments.

At the core of the **Immigration & Human Rights Clinic (IHRC) at the University of the District of Columbia David A. Clarke School of Law**, is the belief that all individuals regardless of their circumstances or nationalities deserve a stable and safe home. Recognizing the large impact that an individual's legal status in the United States can have on their access to stability and safety, the IHRC represent individuals in a wide array of immigration and humanitarian matters, including in issues at the intersection of criminal and immigration law, detention advocacy work, LGBTQ+ issues, gender and domestic violence issues, human trafficking, consumer rights, policy advocacy, work before a regional human rights tribunal, and others.

The **Immigrant Law Center of Minnesota (ILCM)**, a legal services non-profit since 1996, enhances opportunities for immigrants and refugees through legal representation for low-income individuals, and through education and advocacy with diverse communities. ILCM's New Beginnings project supports immigrant survivors of domestic violence and other violent crimes and unaccompanied children who have been abused to obtain their legal status, thereby gaining the personal and economic self sufficiency needed to escape the cycle of violence.

**Life Span** empowers survivors of domestic and sexual violence to demand safety as a human right through client-centered services, and leads social change through accountability, community engagement, and systemic advocacy. Life Span provides comprehensive services to victims and their children including: counseling; criminal court advocacy; legal representation in order of protection and family law and immigration cases; civil legal remedies for sexual assault; outreach, education and training for service providers; and a full array of services for survivors of human trafficking where domestic violence and sexual assault are factors. Life Span's Immigration Program provides essential legal services to immigrant victims of domestic violence and sexual assault throughout Cook County. Our primary goals are to offer comprehensive immigration legal representation and advocate for systemic change and public education to better support immigrant survivors.

**Mabel Center for Immigrant Justice**'s mission is to provide pro bono legal representation primarily to asylum seeking women and children who have faced disproportionate challenges on their path to safety, such as family separation, family detention, and/or who were subjected to an unfair and expedited asylum process. Our clients are seeking asylum based on extreme gender violence in their home countries. Asylum is a means to safety, stability, and self-sufficiency for families fleeing violence, discrimination, persecution –especially gender violence. Our focus is on serving

asylum seekers who are at risk of imminent deportation and are in removal proceedings. The most important outcome is client access to security and justice.

The **Massachusetts Immigrant Collaborative** supports vulnerable immigrants throughout the Commonwealth, including immigrant survivors of domestic violence and sexual assault. Our 15 community partners provide emergency assistance, which can take the form of food, eviction relief, help with medical expenses, transportation, and more. When a person is experiencing violence, these supports can be life saving. Community partners are also able to refer their constituents to free legal consultations with the possibility of representation. Our legal partners have all provided legal aid to immigrant survivors, which translates into a legalization path for the survivor and their children, stability, and safety.

**Massachusetts Law Reform Institute** "MLRI", is a non-profit statewide poverty law and policy center that provides advocacy and leadership in advancing laws, policies and practices that secure economic, racial and social justice for low-income people and communities. MLRI provides technical assistance to the statewide immigration providers coalition, many of which serve immigrant victims of domestic violence and crimes. MLRI is funded by the Office for Victims of Crime, Office of Justice Programs, U.S. Department of Justice, to provide programmatic coordination and serve as co-manager of the Massachusetts Civil Legal Aid for Victims of Crime (CLAVC) initiative. MLRI also provides a lead advocate role for the Family Law Task

Force, a coalition of legal services lawyers, lawyers in community domestic violence service programs, law school family law clinics and pro bono programs.

**MetroWest Legal Services** ("MWLS") of Framingham, Massachusetts has been providing free civil legal services to protect and advance the rights of people living in poverty, people aged sixty years and older, people with disabilities, and otherwise disenfranchised individuals living in the thirty-six Massachusetts communities served by MWLS since 1976. Serving this area of Massachusetts, MWLS is a leading legal services provider for survivors of domestic violence, sexual abuse, human trafficking and other similar crimes. MWLS provides legal advice and direct representation to immigrant survivors in restraining order, contested divorce and child custody, preservation of housing benefits, and immigration benefits cases. MWLS is committed to delivering high quality and trauma-informed legal services to help immigrant survivors access the protections and legal relief to which they are entitled.

**Mid-South Immigration Advocates, Inc.** is the first nonprofit law firm in the Mid-South region with a core mission of expanding access to free and affordable legal immigration representation to low-income families. Through the Survivors' Project, MIA provides holistic immigration and civil legal services to Memphis-area victims of domestic violence, sexual assault, and similar crimes to ensure survivors can seek justice and heal from trauma while building safe and stable futures in our community.

The **Migrant and Immigrant Community Action Project** (MICA Project) is a community organization committed to working with low-income immigrants to overcome barriers to justice. A large percentage of our clients have experienced domestic violence or sexual assault and are pursuing permanent immigration status for the purpose of healing, safety, and family unity.

The **Northeastern University School of Law Domestic Violence Clinic** represents immigrant survivors of domestic violence in restraining order cases (209A) as well as survivors of sexual assault in Harassment Order Cases (258E). The clinic students represent adult and children survivors in their domestic violence based immigration relief. The clinic also assists community-based domestic violence organizations in longer-term projects related to policy, programming and outreach.

**Project Response**'s mission is to empower and support immigrant survivors of domestic violence and sexual assault through culturally responsive, trauma-informed advocacy and services. We are committed to dismantling systemic barriers that immigrants face in accessing safety, justice, and healing. By offering legal assistance, emotional support, community education, and pathways to self-sufficiency, we strive to create a world where every survivor—regardless of immigration status—can live free from violence and with dignity, equity, and hope.

**Public Counsel**, based in Los Angeles, California, is a nonprofit public interest law firm dedicated to advancing civil rights and racial and economic justice, as well as

amplifying the power of their clients through comprehensive legal advocacy. Founded in 1970 on and strengthened by a pro bono legal service model, Public Counsel's staff and volunteers seek justice through direct legal services, promote healthy and resilient communities through education and outreach, and support community-led efforts to transform unjust systems in and beyond Los Angeles. Public Counsel's Immigrants' Rights Project (IRP) provides pro bono placement and direct representation to individuals seeking humanitarian relief. IRP has five decades of experience representing immigrants, including unaccompanied minors, families, and survivors of domestic violence, and currently represents hundreds of individuals seeking humanitarian relief. IRP's Survivors' Team is dedicated to advocating for protection for victims of crime and trafficking and serves hundreds of immigrant survivors and engages in policy advocacy and litigation. Public Counsel has a strong interest in protecting the rights enshrined in the Constitution and ensuring those rights extend to survivors of domestic violence and their children.

**Rian Immigrant Center** in Boston has, since 1989 empowered immigrant and refugee families on the pathway to stability and safety. Rian provides comprehensive immigration legal services, as well as educational, resource, and support services, to immigrants and refugees from over 125 different countries. As an integral part of our practice, Rian attorneys advise and represent domestic violence, sexual assault, and

trafficking survivors in their immigration legal cases, in partnership with local shelters and hospitals.

**Sanctuary for Families** ("Sanctuary") is New York State's largest dedicated service provider and advocate for survivors of domestic violence, human trafficking, and related forms of gender violence. Each year. Sanctuary provides legal, clinical, shelter, and economic empowerment services to approximately 15,000 survivors. Sanctuary's Immigration Intervention Project provides free legal assistance and direct representation to thousands of immigrant survivors every year in a broad range of humanitarian immigration matters, including asylum, special rule cancellation of removal, SIJS, Violence Against Women Act self-petitions, and petitions for U and T nonimmigrant status. In addition. Sanctuary provides training on domestic violence and trafficking to community advocates, pro bono attorneys, law students, service providers, and the judiciary, and plays a leading role in advocating for legislative and public policy changes that further the rights and protections afforded to survivors and their children.

**Santa Fe Dreamers Project (SFDP)** boldly imagines a future where love, dignity, justice, and equity are the foundations of a transformed immigration system. We work toward this vision every day by using four central strategies: direct legal representation; community education; collaboration; and policy advocacy. We have offices located in Santa Fe and in Albuquerque, and we also have particular expertise

working in rural parts of our state where we maintain well-established relationships with service providers in rural communities. Santa Fe Dreamers Project serves immigrant survivors of violence all over the state of New Mexico and advocates for policies that center and uplift the voices of our immigrant community.

The **Sunita Jain Anti-Trafficking Initiative** (SJI) is a practitioner-led, survivor-informed, evidence-based, and community-informed think tank based at Loyola Law School. Founded in 2021, SJI advances advocacy and policy to prevent human trafficking and support survivors through a comprehensive, survivor-centered approach. SJI works to develop trauma-informed, justice-based solutions that protect the environment, uphold immigrant rights, reduce poverty, and confront racial injustice. Central to our work is amplifying the voices of lived-experience experts and closing systemic gaps through research, education, and direct engagement with survivors. As practitioners, SJI staff have worked directly with immigrant survivors of sex and labor trafficking whose trafficker was the father of their child—a calculated form of coercion designed to exert absolute control over the victim. This deeply manipulative dynamic weaponizes parental ties, leaving survivors trapped in fear, dependence, and legal uncertainty, making escape nearly impossible. The intersection of family, immigration status, and economic vulnerability compounds the trauma, forcing victims into prolonged cycles of exploitation with little recourse for justice.

The **Survivor Justice Center** (formerly Los Angeles Center for Law and Justice), founded in 1973, secures justice for survivors of intimate partner violence, sexual assault and human trafficking and empowers them to create their own futures. The Center provides extensive free legal services, including representation in family and immigration court, in addition to wraparound supportive services to meet other essential needs such as housing, food security, mental health, and access to healthcare and safety.

The **Human Trafficking Legal Center** is a non-profit organization that advocates for justice for survivors of human trafficking. The Center uses U.S. law to increase survivors' access to justice and to hold those who seek to benefit from forced labor and sex trafficking accountable in the federal courts. Since its inception in 2012, the Center has trained more than 5,000 attorneys at top law firms across the United States to handle civil trafficking cases. The Center connects survivors with pro bono representation in civil, criminal, and immigration cases, providing expert technical assistance to the pro bono legal teams. The Center maintains a database of all civil human trafficking cases filed in the federal courts under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595. Using this data and lessons learned from pro bono cases, the Center conducts national advocacy to protect trafficking victims' rights.

The **Women's Law Center of Maryland** provides direct legal services to foreign born survivors of intimate partner violence (IPV). We help these survivors, and their families get legal status in our country separate from their abuser. Our goal for our clients is for them to have physical safety, economic security and bodily autonomy.

The **Urban Justice Center Domestic Violence Project** (DVP) is a passionate group of attorneys and advocates coming together to provide holistic civil legal and clinical services to victims of domestic violence. We serve all survivors, regardless of their gender, sexual orientation, race, ethnicity, religion, disability, socioeconomic status, immigration status, or age. In keeping with its mission to defend the rights of New York City's most vulnerable, DVP applies a human rights framework to understanding domestic violence. Our attorneys provide free legal representation and advocacy to victims of domestic violence. Within in our holistic and collaborative framework, in addition to receiving legal assistance, survivors also receive case management, crisis counseling and financial empowerment services if desired.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5), 32(a)(7)(B) and 32(a)(5)-(6), I certify that this Amicus Brief complies with the Type-Volume limit of Fed. R. App. P because it contains 4257 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this Amicus Brief complies with typeface and typestyle requirements because it has been prepared in a proportionally spaced typeface, using Microsoft Word in 14-point Garamond type.

/s/ Reena Parikh
Reena Parikh

Date: May 28, 2025

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the First Circuit by using the appellate

CM/ECF system on May 28, 2025. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

/s/ Reena Parikh
Reena Parikh

Date: May 28, 2025