# United States Court of Appeals

*for the*

# First Circuit

———————◆———————

Case Nos. 25-1169 & 25-1170

Case No. 25-1169

O. DOE; BRAZILIAN WORKER CENTER, LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants.*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

## AMICUS BRIEF OF PROFESSOR ADAM ROTHMAN IN SUPPORT OF PLAINTIFFS-APPELLEES

VINCENT LEVY
HANNAH BARTLETT
425 Lexington Avenue, 14th Floor
New York, New York 10017
(646) 837-5151

*Counsel for Amicus Curiae Professor
Adam Rothman*

CP COUNSEL PRESS    (800) 4-APPEAL • (381862)

Case No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS;
STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA
NESSEL, Attorney General for the People of the State of Michigan; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF
NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF WISCONSIN;
CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of
the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their
official capacity as Secretary of State, US DEPARTMENT OF HOMELAND
SECURTY; KRISTI NOEM, in their official capacity as Secretary of Homeland
Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and
Human Services; US SOCIAL SECURTY ADMINISTRATION; MICHELLE
KING, in their official capacity as Acting Commissioner of
Social Security; UNITED STATES,

*Defendants-Appellants.*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...........................................................................1

SUMMARY OF THE ARGUMENT .........................................................................1

ARGUMENT ...........................................................................................................4

    I.     The Citizenship Clause is Intentionally Broad.....................................4

         A.    Citizenship from the American Revolution to Reconstruction . 4

         B.    The Civil Rights Act Was the First Iteration of Broad Citizenship Rights .................................................................. 19

         C.    The Citizenship Clause Intentionally Protected Birthright Citizenship for All................................................................... 20

    II.    The Executive Order Conflicts With the Text and History of the Fourteenth Amendment..........................................................................23

         A.    The Parents' "Primary Allegiance" Is Irrelevant.................... 24

         B.    The Common-Law Exceptions Align With the Territorial View of Jurisdiction ................................................................. 28

CONCLUSION ......................................................................................................32

ii

# TABLE OF AUTHORITIES

**Cases**

*Dred Scott v. Sanford*,
   60 U.S. 393 (1857) ........................................................... 14, 15

*Elk v. Wilkins*,
   112 U.S. 94 (1884) ................................................................. 23

*Inglis v. Trustees of Sailor's Snug Harbor*,
   28 U.S. 99 (1830) .................................................................... 8

*Lynch v. Clarke*,
   1 Sandford Ch. 583 (N.Y. 1844) ...................................... 10, 26

*McIlvaine v. Coxe's Lessee*,
   8 U.S. (4 Cranch) 209 (1808) ................................................. 8

*State v. Manuel*,
   20 N.C. 144, 151 (N.C. 1838) ......................................... 11, 13

*The Schooner Exchange v. McFadden*,
   11 U.S. (7 Cranch) 116 (1812) ............................... 9, 10, 25, 31

*United States v. Won Kim Ark*,
   169 U.S. 649 (1898) ............................................................. 22

*Worcester v. Georgia*,
   31 U.S. 515 (1832) ............................................................... 16

**Statutes**

Civil Rights Act of 1866, 14 Stat. 27 (1866)................................ 23, 27, 28

**Other Authorities**

1 William Blackstone, *Commentaries on the Laws of England*
   (Oxford, Clarendon Press 1765) ...................................... 7, 26

Amanda Frost, *Paradoxical Citizenship*,
65 Wm. & Mary L. Rev. 1177 (2024) .......................................... passim

Carol Nackenoff & Julie Novkov, *American by Birth:* Wong Kim Ark
*and the Battle for Citizenship*
(1st ed., 2021) ..................................................................... 5

Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) ................................ 22, 27

Earl Maltz, *The Civil War and the Transformation of American
Citizenship*
(Paul Quigley, ed. 2018) ....................................................... 17

Eric Foner, *The Second Founding: How the Civil War and
Reconstruction Remade the Constitution*
(2019) ............................................................................. 15

James Kettner, *The Development of American Citizenship 1608-1870*
(1978) ............................................................................ passim

Michael D. Ramsey, *Originalism and Birthright Citizenship*,
109 Geo. L.J. 405 (2021) ....................................................... passim

Sandra L. Rierson, *From* Dred Scott *to Anchor Babies: White Supremacy
and the Contemporary Assault on Birthright Citizenship*,
38 Geo. Imm. L.J. 1 (2023) ............................................. 12, 14, 15, 23

## Constitutional Provisions

U.S. Const. amend. XIV ......................................................... 22

U.S. Const. art. I ................................................................. 4

U.S. Const. art. II ............................................................... 5

## INTEREST OF AMICUS CURIAE[1]

*Amicus* is a Georgetown history professor with expertise in U.S. history from the Revolution through the Civil War. *Amicus* has an interest in ensuring that the Fourteenth Amendment is interpreted in a manner consistent with its history.

## SUMMARY OF THE ARGUMENT

For over 100 years, the Fourteenth Amendment's Citizenship Clause granted birthright citizenship to all persons born in the United States, regardless of their parents' circumstances. But in January 2025, the President issued an executive order that sought to abolish this right for certain immigrants. Because the executive order relies on a definition of birthright citizenship that conflicts with the Fourteenth Amendment's text and history, it is unconstitutional.

In the early years of the Republic, it was well understood that the United States adopted the English common-law definition of birthright citizenship, referred to as *jus soli* citizenship. To determine *jus soli* citizenship, the *only* relevant inquiry was whether the child was born

---

[1] No counsel of any party to this proceeding authored any part of this brief. No party or party's counsel, or person other than amicus and its counsel, contributed money to the preparation or submission of this brief.

within America's territorial jurisdiction.  The parents' circumstances were irrelevant.

Under *jus soli* principles, there were a few limited exceptions to birthright citizenship, and the early Republic adhered to these limits.  In addition, the United States did not extend birthright citizenship to Native Americans and, for many years, black persons.  Native Americans were excluded because they were considered part of a separate, quasi-sovereign entity, but there was no such justification for excluding black persons, particularly free black persons.

The exclusion of black persons incited intense debate in the decades before the Civil War.  Some states considered free black persons citizens at birth, even before the Civil War; however, other states disagreed, claiming that because black persons lacked legal rights, they were not citizens.  This dispute percolated for many years before the Supreme Court finally weighed in.  However, the Court's holding in *Dred Scott*— that most black persons could *never* be citizens—did not resolve the issue.  Instead, it sparked a backlash that ultimately led to the Civil War.

After the Civil War, there was widespread agreement that the only way to safeguard the country was to amend the Constitution.  It was

against this backdrop that the 39th Congress drafted the Fourteenth Amendment's Citizenship Clause.  Although the drafters considered a version of the clause that granted birthright citizenship to black persons only, this option was rejected.  Instead, Congress adopted a broad Citizenship Clause that—aside from the remaining exceptions— extended to all persons, regardless of race or any other characteristic: "*All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside*."  This broad definition of the Citizenship Clause went largely unquestioned for over 100 years.

Rejecting centuries of history, the executive order attempts to narrow the Citizenship Clause to exclude undocumented and visa-holding immigrants.  The order—as justified by the Government's briefing—rests on the premise that the phrase "subject to the jurisdiction thereof" refers to America's *political* jurisdiction, which covers only persons who are domiciled in America and can receive protection from America while abroad.  But the Fourteenth Amendment's text and history, as well as the common-law exceptions, conflicts with the Government's claim.  The executive order is, therefore, unconstitutional.

3

## ARGUMENT

### I.     The Citizenship Clause is Intentionally Broad

The Citizenship Clause of the Fourteenth Amendment can only be understood by looking to the history that spurred its enactment. From 18th-century England through American Reconstruction and beyond, there has been a consistent understanding of birthright citizenship that was challenged only briefly by efforts to exclude black persons from citizenship. Those efforts, among other things, led to *Dred Scott v. Sandford* and ultimately the Civil War that necessitated reconstructing the Constitution.

Rather than address only the exclusion of black persons from citizenship, the 39th Congress drafted a broad Citizenship Clause intended to apply to all persons born in the U.S., aside from a few limited exceptions. A review of the relevant history shows that the Government's efforts to restrict the reach of birthright citizenship violate the Fourteenth Amendment's broad mandate.

### A.     Citizenship from the American Revolution to Reconstruction

The Constitution does not define "citizen" despite using the term in numerous clauses. *See generally* U.S. Const. art. I, § 2, cl. 2; *id.* art. I, §

4

3, cl. 3; *id.* art. II, § 1, cl. 5. This is because there was a well-accepted understanding of citizenship extending back to English common law. And, by the 1820s, Americans largely agreed that, except for black persons, Native Americans, and those who fell within common-law exemptions, birthright citizenship extended to all persons born in the United States, regardless of their parent's circumstances. James Kettner, *The Development of American Citizenship 1608-1870*, at 287 (1978).

Although the exemption for black persons was challenged as America grappled with racial divisions at the time of the Civil War, the central definition of birthright citizenship remained and was adopted by the drafters of the Fourteenth Amendment.

***The origins of birthright citizenship.*** Traditionally, there were two theories of birthright citizenship: "*jus sanguinis*, or descent by blood, and *jus soli*, the citizenship gained by birthplace." Carol Nackenoff & Julie Novkov, *American by Birth:* Wong Kim Ark *and the Battle for Citizenship* 1 (1st ed., 2021). Under the first theory, "children of aliens born in a foreign country would not be citizens or subjects of that country (unless naturalized)"; instead, the citizenship of the parent—typically the

5

father—was passed on to the child. Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 412–13 (2021). For *jus soli* citizenship—which was adopted by "English law and practice" in the mid-1700s—"birth in England made a person an English subject regardless of the parents' circumstances." *Id.* at 413.

*Jus soli* citizenship in England is best captured by *Calvin's Case*. After Queen Elizabeth's death, James, who was then King of Scotland, also became King of England. Nackenoff & Novkov, *supra* p.5, at 6. A few years into James's dual reign, an English court considered whether Robert Calvin, who was born in Scotland after the death of Queen Elizabeth, was legally allowed to inherit land in England, a right granted only to the English. *Id.* Calvin claimed that James's reign over both nations during Calvin's birth meant that he possessed English rights. *Id.*

The court agreed, finding that individuals born in Scotland after James became King of England were entitled to English rights, including that of land inheritance. *Id.* at 7. "[R]enowned English jurist Sir Edward Coke" explained, "[e]very one born within the dominions of the King of England, whether here or in his colonies or dependencies, being under the protection of—therefore, according to our common law, owes

6

allegiance to—the King and is subject to all the duties and entitled to enjoy all the rights and liberties of an Englishman." *Id.* at 7. Thus, because Calvin was born during James's dual reign, he was a citizen of both countries.

Following *Calvin's Case*, in England, there was little confusion about the scope of birthright citizenship. According to Blackstone, "[n]atural-born subjects are such as are born within the dominions of the crown of England, that is, within the ligeance, or as it is generally called, the allegiance of the king." 1 William Blackstone, *Commentaries on the Laws of England* 354–55 (Oxford, Clarendon Press 1765). Allegiance, as used in this context, required only birth in a particular country. *Id.* at 357 ("Natural allegiance is such as is due from all men born within the king's dominions immediately upon their birth. For, immediately upon their birth, they are under the king's protection.").

This well-accepted definition travelled across the Atlantic Ocean to the colonies and informed early American ideas of citizenship.

***Citizenship in Revolution-era America.*** In early America, a consensus emerged that the United States had adopted *jus soli* citizenship, with a few exemptions. Specifically, "[p]ersons born in the

United States were citizens under common law (and sometimes state statutes), with exceptions for those born to slaves, tribal Native Americans, diplomats, and foreign military personnel." Ramsey, *supra* p.6, at 416; *see also* Nackenoff & Novkov, *supra* p.5, at 7 (explaining that early U.S. courts applied the English common-law rule of *jus soli*, under which a person's status was "vested at birth" and "based upon place of birth").

Although there was a short period after the Revolution during which individuals could "choose" their citizenship by staying or leaving, that "right" "applied only to the extraordinary circumstances of the Revolution." Nackenoff & Novkov, *supra* p.5, at 9; *see also McIlvaine v. Coxe's Lessee*, 8 U.S. (4 Cranch) 209, 211–215 (1808) (finding a NJ resident owed allegiance to the U.S. because he failed to depart once NJ had established itself as a sovereign at the time of the Revolution); *Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. 99, 120–25 (1830) (holding that a person born in what later became the U.S. but who left the country before the Declaration of Independence and never returned was not a citizen).

8

In the early years of the Republic, the well-accepted view in the United States was that America had adopted the English definition of birthright citizenship. *See* Nackenoff & Novkov, *supra* p.5, at 9. For instance, during the first session of the first Congress in 1789, James Madison explained: "It is an established maxim that birth is a criterion of allegiance. Birth, however, derives its force sometimes from place, and sometimes from parentage; but, in general, place is the most certain criterion; it is what applies in the United States." Ramsey, *supra* p.6, at 414 (citation omitted).

And, as in England, American birthright citizenship was based on the nation's sovereign authority over its territory. In 1812, the Supreme Court explained that a nation's jurisdiction "within its own territory" was "necessarily exclusive and absolute" such that all within it are subject to "the full and complete power of a nation." *The Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116, 136 (1812). This idea was "relax[ed] in practice, in cases under certain peculiar circumstances," which included the few limited common-law exceptions. But, the Court explained, the United States plainly had territorial jurisdiction over noncitizens travelling or living temporarily in the country. *Id.* at 136,

144. This was because "it would be obviously inconvenient and dangerous" for noncitizens to "not owe temporary and local allegiance" while present. *Id.* at 144.

This view remained for decades. *See e.g.*, *Lynch v. Clarke*, 1 Sandford Ch. 583, 663 (N.Y. 1844) (considering the status of a child born in the U.S. to temporarily present noncitizen parents and determining: "by the law of the United States, every person born within the dominions and allegiance of the United States, whatever the situation of the parents, is a natural-born citizen"). During this time, "policymakers and courts seemed to presume that the states and the nation would follow the familiar principle from [English] common law that individuals born under a sovereign's authority owed that entity their allegiance and received some form of citizenship in return." Nackenoff & Novkov, *supra* p.5, at 12.

***Disputes over excluding black persons from citizenship.*** Despite the general consensus on the central definition of citizenship, racial tensions came into sharp focus in advance of the Civil War, as the country grappled with whether black persons—particularly free black persons—should be excluded from citizenship.

10

During this period, there was not much debate over the citizenship status of enslaved persons. It was understood that "the colonial system of chattel slavery" reduced enslaved persons "to the general status of commodities—of things, of property." Kettner, *supra* p.5, at 301. Based on this, courts regularly held that enslaved persons could not be citizens. *But see id.* (noting that courts expressed an "uneasy" view towards slavery and, in some cases, "extended some privileges and legal benefits" to enslaved persons, particularly in the context of criminal cases).

The North and South, however, increasingly clashed over whether free black persons—both those who had been emancipated and those who had never been enslaved—could be citizens. Ramsey, *supra* p.6, at 416; *see* Kettner, *supra* p.5, at 317–18. Because free black persons and their children should have been considered citizens by birth under the traditional *jus soli* principles of citizenship, "there seemed to be no theoretically consistent way to deny them the rights and privileges of citizens." Kettner, *supra* p.5, at 311; *see also State v. Manuel*, 20 N.C. 144, 151 (N.C. 1838) (applying *jus soli* principles from English common law to conclude: "Slaves manumitted here become free-men—and therefore if born within North Carolina are citizens of North Carolina—

11

and all free persons born within the State are born citizens of the State."). But the South nonetheless tried and, for many years, succeeded in denying black persons citizenship.

The issue most clearly entered the national discussion around 1820, during the debates over Missouri's admission as a state. Under the Missouri compromise, Missouri would become a state that allowed slavery while Maine would be admitted as a non-slavery state, and the remaining northern territory in the Louisiana Purchase would prohibit slavery. *See* Kettner, *supra* p.5, at 312; Sandra L. Rierson, *From* Dred Scott *to Anchor Babies: White Supremacy and the Contemporary Assault on Birthright Citizenship*, 38 Geo. Imm. L.J. 1, 6 (2023). But, when Missouri proposed its constitution, another issue arose: Missouri's proposed constitution barred free black persons from entering the state. Kettner, *supra* p.5, at 312.

Many objected, arguing that this provision violated citizens' rights under the privileges and immunities clause in Article IV, Section 2 of the U.S. Constitution and asserting that Missouri was "mak[ing] an arbitrary distinction between citizens [and noncitizens] on the basis of color alone." *Id.* at 313. Missouri and other Southern states defended

12

the provision on the ground that they did not view black persons—whether free or enslaved—as citizens. *Id.* at 313 (Southerners arguing that "not every person who is born in a State, and born free could become a member of the political community" (citation omitted)). By the South's telling, no one could be a citizen until they "possessed all at least of the civil rights, if not political, of every other person in the community." *Id.* (citation omitted). Put differently, citizenship did not confer rights; citizenship was instead defined by the rights a person had.

Ultimately, this dispute was not resolved with Missouri's admission as a state: Missouri was admitted on the condition that its constitution would never be construed to exclude "any citizen of either of the States in this Union . . . from the enjoyment of any of the privileges and immunities" they were entitled under the U.S. Constitution. *Id.* at 314 (citation omitted).

Leaving this debate open only led to deeper divisions among state courts adjudicating the citizenship status of free black persons. *Id.* at 316–22. Many states applied *jus soli* citizenship principles to free black persons and held that they were citizens. *Id.* at 318; *see also Manuel*, 20 N.C. at 151. Other states, however, were "reversing the assumption that

13

citizenship conferred a legal claim to rights to contend that a lack of rights proved that" free black persons were not citizens. Kettner *supra* p.5, at 321.

These divisions percolated in state courts for many years until the Supreme Court finally addressed the issue in *Dred Scott v. Sanford*, 60 U.S. 393, 404 (1857). Dred Scott first filed suit in Missouri state court, requesting that the court find that he was a free man because, although born into slavery, Scott temporarily lived in a free state. *See* Nackenoff & Novkov, *supra* p.5, at 17; *see also* Rierson, *supra* p.13, at 7–8. The Missouri Supreme Court ultimately ruled against Scott, so he sued in federal court, asserting diversity jurisdiction based on his status as a birthright citizen. Nackenoff & Novkov, *supra* p.5, at 17. When the case reached the Supreme Court, the Court framed the question presented expansively to consider the citizenship status of black persons whose parents were enslaved as well as those whose parents were free. *Id.*

Justice Taney, writing the lead opinion, wrote that black persons—due to their "subordinate and inferior class"—were "not intended to be included . . . under the word 'citizens' in the Constitution," and therefore could "claim none of the rights and privileges which that instrument

14

provides for and secures to citizens of the United States." *Dred Scott*, 60 U.S. at 404–05. In effect, the Court "retroactively imposed a *jus sanguinis* model of citizenship . . . on all Black people in" America. Rierson, *supra* p.13, at 15. Under this rationale, most black persons could *never* be citizens, even if they were free, because they were either formerly enslaved or descended from enslaved persons. *See* Nackenoff & Novkov, *supra* p.5, at 4–5, 15.

This opinion provoked intense reactions, eventually leading to the South's secession and ultimately the Civil War.

**_Citizenship debates during Reconstruction._** After the Civil War, *Dred Scott* remained good law and "slavery was reinstated 'in all but name' through the Black Codes restricting every aspect of freedmen's lives." Amanda Frost, *Paradoxical Citizenship*, 65 Wm. & Mary L. Rev. 1177, 1182 (2024). Accordingly, the focus during Reconstruction was the "bitter split over . . . policy" due in large part to the "evidence accumulated of violent outrages against the freed people and the unwillingness of the governments [President] Johnson had established in the South to deal justly with" free black persons. Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* 55 (2019).

Although abolition of slavery and the rights of black persons were at the forefront of the Reconstruction era, other disputes were also prevalent, namely the citizenship status of Native Americans and the children of Chinese immigrants.

In the lead-up to the Civil War, the justification for excluding Native Americans from birthright citizenship was their membership in a tribe, which was considered a separate sovereign despite its presence within U.S. territory.  Kettner, *supra* p.5, at 293–94.  In other words, Native Americans were not granted birthright citizenship because— "though within the jurisdiction and 'protection' of the government and dependent on it to a large degree"—they were members of tribes that were "considered quasi-sovereign nations, enforcing their own laws and customs and requiring immediate allegiance of their own members."  *Id.*; *see also Worcester v. Georgia*, 31 U.S. 515, 555 (1832) (explaining that the relationship between the Cherokees and the federal government "was that of a nation claiming and receiving the protection of one more powerful: not that of individuals abandoning their national character").

Although it may have been internally inconsistent—acknowledging "dependency and wardship" on the one hand and denoting a "separate

allegiance and nationality" on the other—this reasoning was nonetheless well-accepted.  Kettner, *supra* p.5, at 299–300 ("Because the tribes were 'domestic' and 'dependent,' white laws could be extended over them" however "such extension did not constitute the kind of protection that elicited allegiance and sustained citizenship" because the tribes were considered "nations").

After the Civil War, Congress remained focused on ensuring Native Americans were not granted citizenship; however, new challenges arose. Earl Maltz, *The Civil War and the Transformation of American Citizenship* 65–69 (Paul Quigley, ed. 2018). Many Native Americans had participated in the Civil War and the Union victory was a literal defeat for those tribes that led to further defeat for others.  *Id.* at 65.  For instance, the Five Civilized Tribes had a "well established" practice of slavery, and many members fought against the Union in the Civil War. *Id.*  After the war, the Five Civilized Tribes—as well as other tribes, regardless of whether they supported the Confederacy—were forced to accept treaties that required them to renounce slavery.  *Id.*  These treaties often contained provisions that directly led to the tribes' demise. *Id.*  Due to the disbandment of many tribes, the Reconstruction-era

17

Congress was faced with the challenge of crafting a Citizenship Clause that would "definitively establish" citizenship for free black persons while not conferring citizenship to Native Americans. *Id.* at 67.

Additionally, there were growing disputes about Chinese immigrants living in the western United States. *Id.* at 70. Immigration had been steadily increasing and by 1870 there were more than 60,000 persons of Chinese descent living in America. *Id.* At that time, many white Americans believed that Chinese immigrants who came to America "lacked any desire to create a true permanent connection"; indeed, by 1866, "virtually every black person" was considered native to the United States while "almost all of the people of Chinese descent" were considered temporary visitors that would return to China. *Id.* at 71–72. The possibility that the continued presence of adult Chinese immigrants might mean that they have children in America "was not lost on those who opposed the efforts . . . to formally enshrine the principle of birthright citizenship." *Id.* at 72.

It was against this complicated backdrop that the debates over the Civil Rights Act of 1866 and the Fourteenth Amendment's Citizenship Clause took place.

**B.    The Civil Rights Act Was the First Iteration of Broad Citizenship Rights**

While debates over early versions of the Fourteenth Amendment were ongoing, Senator Lyman Trumbull introduced an early version of a bill that eventually became the Civil Rights Act of 1866, 14 Stat. 27 (1866) ("Civil Rights Act").  Foner, *supra* p.17, at 63.  That initial version would have granted citizenship only to black persons, but as debates intensified, the Act was revised to "grant citizenship to all children born in the United States, whatever the race of their parents."  Frost, *supra* p.17, at 1184.  To do so, the revised version stated that "all persons born in the United States and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States."  Civil Rights Act, § 1.  The Act explicitly extended to persons "of every race and color."  *Id.*

Senators were taken aback by this change, questioning whether the Act would "have the effect of naturalizing the children of Chinese and Gypsies born in this country," to which Senator Trumbull replied, "Undoubtedly."  Frost, *supra* p.17, at 1184; *see also* Maltz *supra* p.19, at 72 (noting that Senator Edgar Cowan's concern that "if [the Chinese immigrants] are to be made citizens and to enjoy political power . . . the

19

day may not be very far distant when California, instead of belonging to the Indo-European race . . . may belong to the" Chinese).

Even so, Congress voted overwhelmingly in favor of the bill. Understanding its expansive scope, President Andrew Johnson quickly vetoed it, "condemn[ing] the law for granting birthright citizenship to the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as" black. Frost *supra* p.17, at 1184 (citation omitted).

Undeterred, Congress overrode the President's veto on April 9, 1866. *Id.* at 1185. Senator Trumbull celebrated the passage of the bill, claiming it ensured "equal rights of every human being in the land, no matter from what quarter of the globe he or his ancestors may have come." *Id.* (citation omitted).

## C.    The Citizenship Clause Intentionally Protected Birthright Citizenship for All

In tandem with the debate over the Civil Rights Act, Republicans pushed forward with their efforts to enact the Fourteenth Amendment. Numerous amendment drafts were debated; however, it was not until shortly after the Civil Rights Act was passed that Senator Jacob Howard proposed that the amendment include a clause declaring birthright

citizenship. *Id.* Republicans—despite their congressional majority—were concerned that Southern Democrats would attempt to repeal the Civil Rights Act if they regained control of Congress or that the Act would be invalidated as unconstitutional. Foner, *supra* p.17, at 64–68. Thus, although many believed that birthright citizenship was "the law of the land already," Republicans wanted to put the issue "beyond the legislative power, beyond the reach of [those] who would pull the whole system by the roots and destroy it." *Id.* at 69–70.

As with the Civil Rights Act, Senator Cowan objected, contending that the "people of California" would be "overrun by a flood of [Chinese] immigration." Frost, *supra* p.17, at 1185 (citation omitted). In Senator Cowan's view, the Constitution and American citizenship should be limited to his "own people" and not "a society of other men entirely different in all those respects from [him]self." *Id.* at 1185–86.

In response, Senator Conness, an unlikely proponent of the Amendment,[2] expressed his hope that it would bring about a broad and diverse citizenship: "once [the Citizenship Clause] became law, 'the

_____

[2] Senator Conness was a representative of California, "a state whose White population had become deeply hostile to the Chinese immigrants they had welcomed as workers only a few decades before." *Id.* at 1186.

21

children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights.'" *Id.* at 1186 (quoting Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) (remarks of Sen. Conness)).  More than that, Senator Conness understood that the Clause would apply "to the children begotten of Chinese parents in California." *Id.*; *see also United States v. Wong Kim Ark*, 169 U.S. 649, 698–99 (1898) (quoting Senator Conness' broad understanding of the Citizenship Clause).

This broad Citizenship Clause was ultimately included in the final version of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.  The only difference between the Citizenship Clause of the Fourteenth Amendment and that of the Civil Rights Act is that the Act's negative language—"not subject to a foreign power," Civil Rights Act, § 1—is reversed to the affirmative in the Amendment—"subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1.  Drafters agreed that the substantive meaning was the same.  *See* Foner, *supra* p.17, at 70.

Specifically, the phrase "subject to the jurisdiction thereof" incorporated the well-accepted exceptions from citizenship for Native Americans, diplomats, foreign military personnel, and those born on

foreign ships.  *See* Rierson, *supra* p.13, at 27–29, 54–55.  As Senator Jacob Howard explained, the language is "declaratory of what I regard as the law of the land already."  Ramsey, *supra* p.6, at 441 n.173 (quoting Cong. Globe, 39th Cong., 1st Sess. 2890 (1866)).

The Citizenship Clause of the Fourteenth Amendment represents the repudiation of *Dred Scott*, and a restoration of the rule of birthright citizenship long grounded in English common law and reflected in early American consensus on citizenship.  *See* Frost, *supra* p.17, at 1184–86; Rierson, *supra* p.13, at 20, 40.  Although the 39th Congress considered language that addressed only the citizenship of black persons, they instead opted for a much broader statement of birthright citizenship. Frost, *supra* p.17, at 1185; Maltz, *supra* p.19, at 72–73.  In doing so, the Amendment extended citizenship to "*all persons*"— whether "white or black" and "whether formerly slaves or not"—who were "born or naturalized in the United States." *Elk v. Wilkins*, 112 U.S. 94, 101 (1884).

## II.    The Executive Order Conflicts With the Text and History of the Fourteenth Amendment

Despite the Amendment's text and history illustrating that the Citizenship Clause is intentionally broad, *see supra* p.4–26, the Government attempts to narrow its reach with a slight-of-hand, shifting

the focus to the parent's allegiance to the United States and claiming that the exceptions to citizenship fit its theory.  But when the Government's argument is evaluated in the proper historical context, its flaws are apparent.

### A.    The Parents' "Primary Allegiance" Is Irrelevant

The Government contends that the phrase "subject to the jurisdiction thereof" refers to "*political* jurisdiction (a concept rooted in allegiance and protection)."  Appellants' Br. at 12–13.  This allegiance and protection, according to the Government, can only be shown if a person establishes domicile in America and can invoke America's protections while abroad.  *Id.* at 18–20.  Based on this, the Government concludes that children of noncitizen and visa-holding parents do not acquire birthright citizenship because their parents lack the requisite relationship with the United States.  *See, e.g., id.* at 1–2.

But the Government's interpretation of "subject to the jurisdiction thereof," particularly its reliance on the parents' "primary allegiance," cannot be squared with the Clause's historical context.  Rather, under *jus soli* principles, birthright citizenship is determined only by the nation's sovereignty over the child.  In other words, "birth in [a country] made a

24

person [that country's] subject *regardless of the parents' circumstances*." Ramsey, *supra* p.6, at 413 (emphasis added).

This aligns with how the United States traditionally understood its jurisdiction. Specifically, America's territorial jurisdiction extended to all persons present within its power of "governing or legislating," which excepted Native Americans, those with diplomatic immunities, foreign military forces, and those born on foreign ships and, for many years, black persons. Ramsey, *supra* p.6, at 440. As such, America's territorial jurisdiction extended to noncitizens without domicile because such persons owed a "temporary allegiance" while present in the U.S.'s sovereign territory. *Id.*; *see also Schooner's Exchange*, 11 U.S. at 144 (explaining that "[w]hen private individuals of one nation" travel to another for "business or caprice . . . it would be obviously inconvenient and dangerous to society . . . if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country").

Endorsing this concept of territorial jurisdiction, U.S. courts routinely rejected any suggestion that the parents' allegiance or domicile were relevant to determining a child's citizenship. *See, e.g., Lynch*, 1

Sandford Ch. at 663 ("Upon principle . . . I can entertain no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, *whatever the situation of the parents*, is a natural-born citizen" (emphasis added)).

And, although many sources refer to "allegiance," the term does not require—as the Government now argues—the *parent's* intent to remain in the United States. *See* Appellants' Br. at 13, 20–23. Instead, the *child's* "allegiance" to the sovereign, again, depended only on whether the sovereign had governing control over the child; if it did, the child's allegiance and the sovereign's "reciprocal" obligation to protect the child was essentially assumed. *See, e.g.*, 1 Blackstone, *supra* P.7, at 357 ("Natural allegiance is such as is due from all men born within the king's dominions immediately upon their birth. For, immediately upon their birth, they are under the king's protection."). This is because those born within a nation's sovereign territory "were presumably educated from infancy in the values and habits necessary for self-government, and there was no need to worry about their qualifications for" citizenship. Kettner, *supra* p.5, at 287.

26

It was this well-accepted definition of "subject to the jurisdiction thereof" that the drafters of the Citizenship Clause adopted. While considering the Civil Rights Act and the Fourteenth Amendment's Citizenship Clause, Senator Trumbull made clear that those subject to U.S. jurisdiction included all persons within U.S. sovereign territory "who are subject to our laws," Cong. Globe, 39th Cong., 1st Sess. 2893 (1866), and other Senators noted their similar understanding, *id.* at 2895 (Sen. Howard noting that "jurisdiction ought to be construed so as to imply a full and complete jurisdiction on the part of the United States").

Indeed, this is precisely why several Senators expressed concern about granting broad birthright citizenship that extended to the children of Chinese immigrants living in the Western United States. Frost, *supra* p.17, at 1185–86. Contrary to how black persons were viewed at the time—as permanent U.S. residents—most considered Chinese immigrants living in America to be temporary visitors. Maltz, *supra* p.19, at 71–72. So, when Senator Trumbull unequivocally stated that children of Chinese immigrants born in the United States would "undoubtedly" be citizens by birthright, he contemplated only that the child would be born within U.S. sovereign territory. *See* Frost, *supra*

27

p.17, at 1184; *see also id.* at 1185–86.  The parents' situation, including their domicile, was not mentioned.

Viewed in the proper historical context, the Government's position is indefensible.  At bottom, the Government invites the Court to reject centuries of near consensus as well as the congressional debates that led to the Citizenship Clause's broad framing.  *See supra* p.4–26.  The Court should decline to do so.

## B.    The Common-Law Exceptions Align With the Territorial View of Jurisdiction

Perhaps sensing that historical support for its position is weak, the Government argues that the exceptions make its rule.  According to the Government, the common-law exceptions from citizenship—particularly for Native Americans—indicate that visa-holding and undocumented immigrants should also be considered outside the United States's jurisdiction.  Appellants' Br. at 15–18.

That is wrong.  As *Schooner Exchange* made clear as early as 1812, persons exempted from birthright citizenship, even when coming within the sovereign's territory, were not considered "within the jurisdiction of the sovereign" because they were immune in some way from local laws.  Ramsey, *supra* p.5, at 440.  To the Court, this was in stark contrast to

28

every other temporary visitor to the United States, who owed a "temporary and local allegiance" and were subject to U.S. jurisdiction while present in its territory. *Id.* at 445–46.

A closer review of each exception only confirms this. Native American children are typically born within the territorial jurisdiction of their tribe.[3] Kettner, *supra* p.5, at 293–94. Because the United States treated Native American tribes as a quasi-sovereign, a child born within that sovereign's territory was treated as born outside of U.S. jurisdiction. *Id.* at 293–94, 299–300. Although the United States subjected Native American tribes to many federal laws due to their physical presence, the United States, through statutes, common law, and treaties with Native American tribes, made clear that these tribes were nonetheless their own sovereign nations. *Id.*; *see also Worcester*, 31 U.S. at 555 (explaining that the relationship between the Cherokees and the federal government "was that of a nation claiming and receiving the protection of one more

---

[3] There were Native Americans based in the western United States who were not born into formal tribes. Although they may have been considered subject to U.S. jurisdiction, "the United States was unable to exercise that jurisdiction other than by force of arms." *Id.* at 444. These Native Americans were therefore considered analogous to another exception to jurisdiction: armies effectuating a hostile occupation. *Id.*

powerful: not that of individuals abandoning their national character"). As such, they were not subject to U.S. jurisdiction.

So too with foreign ambassadors. Ambassadors retain "diplomatic and other legal immunities" while present in the United States, which places them beyond U.S. legal control. Ramsey, *supra* p.6, at 440. Although ambassadors were physically present in the United States, courts viewed ambassadors' immunity as a "political fiction" placing them outside of the United States' territorial jurisdiction. *See Won Kim Ark*, 169 U.S. at 685 (explaining the theory that "we consider [the diplomat] as in the place of the sovereign he represents, or" we ascribe to the "political fiction" that the immunity means the diplomat is "extraterritorial, and therefore, in point of law, not within the jurisdiction"). In other words, this exemption is based on the notion that ambassadors are *not* treated like ordinary temporary visitors in terms of their submission to U.S. sovereign authority. Ramsey, *supra* p.6, at 459.

The same is true of children born within a territory subject to foreign military occupation and those born on a foreign ship. Although present in the United States, "hostile armies were not subject to U.S. jurisdiction when within U.S. territory as a result of their practical

condition as beyond U.S. civil authority." *Id.* at 444. And those born on ships on the high seas remained "subject to the jurisdiction of the state to which [the ships] belong." *Id.* at 437–38.

Seeking to distort these common-law exceptions, the Government argues that the United States *could* exercise control over each of these groups, and, thus, the exceptions' unifying feature is not the United States' lack of sovereign authority. Appellants' Br. at 18–19. But the Government admits that the United States could only exercise this control by using force. *See id.* (noting that "immunity granted to foreign public ships could be 'destroy[ed]'" if the sovereign "employ[ed] force"); *id.* (contending that the U.S. can "punish 'enemy invaders' for violations of the laws of war"). That makes it incompatible with the concept of territorial jurisdiction—which contemplates that no force would be needed. *See Schooner's Exchange*, 11 U.S. at 136 (explaining that a nation's jurisdiction "within its own territory" was "necessarily exclusive and absolute" such that all within it are subject to "the full and complete power of [that] nation"). This is precisely why these exceptions exist.

Unlike Native Americans, foreign diplomats, foreign military members, and those born on foreign ships, noncitizens and visa-holding

31

immigrants left the territorial jurisdiction of their countries to come to America and subjected themselves completely to the jurisdiction thereof. The Government's attempt to liken these immigrants to the common-law exceptions should be rejected.

## CONCLUSION

Nothing in the Fourteenth Amendment's history or in the common-law exceptions to citizenship supports the Government's definition of birthright citizenship.

Respectfully submitted,

*/s/ Vincent Levy*
Vincent Levy
(646) 837-5120
Hannah Bartlett
(646) 837-8424
425 Lexington Avenue
New York, New York 10017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it is 6,215 words. The brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: May 28, 2025                    /s/  *Vincent Levy*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2025, I electronically filed the foregoing document with the Clerk for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: May 28, 2025            /s/    *Vincent Levy*