Nos. 25-1169, 25-1170

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, in their official capacity as Commissioner of Social Security,

*Defendants-Appellants.*

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; US SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, in their official capacity as Commissioner of Social Security; UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

## REPLY BRIEF FOR APPELLANTS

COUNSEL LISTED ON INSIDE COVER

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................1

ARGUMENT ...........................................................................................3

I.      Plaintiffs Are Not Likely to Succeed on the Merits. ................................3

      A.      Political Jurisdiction Is Not Merely Regulatory Jurisdiction. ......................4

      B.      The Jurisdictional Clause Requires Political Jurisdiction, Which Is Formed by Establishing Domicile.....................................................8

      C.      The Citizenship Clause Adapted the Common Law to American Views, Departing from the English Rule. ..................................12

      D.      Plaintiffs' Statutory Claim Fails Because the Statute Has the Same Meaning as the Citizenship Clause.............................................18

II.     The Injunction Is Substantially Overbroad. ........................................ 20

      A.      The States Are Not Proper Parties and Thus Are Not Entitled to Injunctive Relief. ...............................................................21

      B.      At a Minimum, the Injunction Should Be Narrowed. ..............................26

CONCLUSION ...................................................................................... 29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Benny v. O'Brien,*
    32 A. 696 (N.J. 1895) ................................................................ 10, 17

*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.,*
    4 F.4th 63 (1st Cir. 2021) ...................................................... 28-29

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
    587 U.S. 262 (2019) ................................................................... 19

*Coddington v. Coddington,*
    20 N.J. Eq. 263 (Ch. 1869) ....................................................... 6, 7

*Dos Reis ex rel. Camara v. Nicolls,*
    161 F.2d 860 (1st Cir. 1947) .................................................. 18-19

*Elk v. Wilkins,*
    112 U.S. 94 (1884) ................................................................ 1, 4, 5

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893) ..................................................................... 9

*Georgia v. McCollum,*
    505 U.S. 42 (1992) ............................................................. 21-22, 22

*Gill v. Whitford,*
    585 U.S. 48 (2018) ...................................................................... 27

*Girouard v. United States,*
    328 U.S. 61 (1946) ...................................................................... 19

*Goodell v. Jackson ex dem. Smith,*
    20 Johns. 693 (N.Y. 1823) ..................................................... 13, 16

*Hasan v. Holder,*
    673 F.3d 26 (1st Cir. 2012) ........................................................ 12

*Hodgson v. De Beauchesne* [1858],
    14 Eng. Rep. 920 ......................................................................... 8

*Jackson ex dem. Smith v. Goodell,*
    20 Johns. 188 (N.Y. Sup. Ct. 1822) ............................................ 13

*Kaplan v. Tod,*
   267 U.S. 228 (1925) ................................................................... 19-20

*Kemp v. United States,*
   596 U.S. 528 (2022) ...................................................................... 19

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ......................................................... 21, 23, 24

*Kozera v. Spirito,*
   723 F.2d 1003 (1st Cir. 1983) ....................................................... 22

*Lau Ow Bew v. United States,*
   144 U.S. 47 (1892) ........................................................................... 9

*Lopez, Ex parte,*
   6 F. Supp. 342 (S.D. Tex. 1934) .................................................... 19

*Ludlam v. Ludlam,*
   31 Barb. 486, 503 (N.Y. Gen. Term. 1860),
   *aff'd,* 26 N.Y. 356 (1863) .............................................................. 16

*Lynch v. Clarke,*
   1 Sand. Ch. 583 (N.Y. Ch. 1844) ............................................. 15, 16

*Mariko v. Holder,*
   632 F.3d 1 (1st Cir. 2011) .............................................................. 12

*Massachusetts v. HHS,*
   923 F.3d 209 (1st Cir. 2019) .......................................................... 22

*Nishimura Ekiu v. United States,*
   142 U.S. 651 (1892) ....................................................................... 20

*Perkins v. Elg,*
   99 F.2d 408 (D.C. Cir. 1938) ......................................................... 18

*Philip Morris, Inc. v. Harshbarger,*
   159 F.3d 670 (1st Cir. 1998) .......................................................... 27

*Schooner Exch. v. McFaddon,*
   11 U.S. (7 Cranch) 116 (1812) ......................................................... 4

*Smith v. Goodell,*
   20 Johns. 188 (N.Y. Sup. Ct. 1822) ............................................... 13

*Texas v. United States,*
  126 F.4th 392 (5th Cir. 2025) ........................................................ 27

*United States v. Ju Toy,*
  198 U.S. 253 (1905) ........................................................ 20

*United States v. Rahimi,*
  602 U.S. 680 (2024) ........................................................ 12

*United States v. Rogers,*
  45 U.S. (4 How.) 567 (1846) ........................................................ 5

*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) ........................................................ 1, 9, 10, 17

*United States v. Zenon,*
  711 F.2d 476 (1st Cir. 1983) ........................................................ 27, 28

*United States ex rel. Mackey v. Coxe,*
  59 U.S. (18 How.) 100 (1855) ........................................................ 5

*Washington v. Trump,*
  765 F. Supp. 3d 1142 (W.D. Wash. 2025) ........................................................ 22-23

**Statutes:**

Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223, 223 ........................................................ 17

Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566 ........................................................ 5

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 ........................................................ 15

8 U.S.C. § 1401 ........................................................ 18

8 U.S.C. § 1401(a) ........................................................ 20

8 U.S.C. § 1401(b)-(h) ........................................................ 1

42 U.S.C. § 1396b(b)(4) ........................................................ 26

42 U.S.C. § 1396c ........................................................ 23

**Legislative Materials:**

Cong. Globe, 35th Cong. 1st Sess. 210 (1858) ........................................................ 14

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) ........................................................ 5, 15

*Rep. of H. Comm. on Foreign Affairs Concerning the Rights of
American Citizens in Foreign States*, *in*
Cong. Globe, 40th Cong., 2nd Sess. app. (1868) ..................................................... 16-17

**Other Authorities:**

Gregory Ablavsky, *"With the Indian Tribes": Race, Citizenship, and
Original Constitutional Meanings*, 70 Stan. L. Rev. 1025 (2018) ........................................ 13

Philemon Bliss, *Citizenship* (1858) .................................................................. 14

1 William Burge, *Commentaries on Colonial and Foreign Laws* (1838) ..................................... 6

*Citizenship by Birth*, 41 Harv. L. Rev. 643, 644-45, 644 n.9 (1928) ................................... 19

Frederick A. Cleveland, *American Citizenship as Distinguished
from Alien Status* (1927) .......................................................................... 6, 7

Comm'rs of the Code, *The Political Code of the State of New York*
§ 5(1) (1860) ..................................................................................... 14

David Dudley Field, *Outlines of an International Code* (2d ed. 1876) ................................... 16

*Richard W. Flournoy, Dual Nationality and Election*,
30 Yale L.J. 545 (1921) ......................................................................... 11, 18

H.W. Halleck, *International Law* 385 (1861) ............................................................ 7

M.W. Jacobs, *A Treatise on the Law of Domicil* § 47 (1887) .......................................... 7, 10

Kurt T. Lash, *Prima Facie Citizenship* (Apr. 17, 2025),
https://perma.cc/ARN2-5CSJ ..................................................................... 4-5, 5, 14

2 John Bassett Moore, *A Digest of International Law* § 183, at 59-61 (1906) ............................. 7

Alexander Porter Morse, *The Citizen in Relation to the State* (1884) ................................... 8, 16

2 James Kent, *Commentaries on American Law* (10th ed. 1860) ........................................... 10

Letter from Sen. Lyman Trumbull to President Andrew Johnson
(in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.) ............ 14

4 Robert Phillimore, *Commentaries Upon International Law* 32 (2d ed. 1874) ............................ 7

*Relations of Indians to Citizenship*, 7 Op. Att'y Gen. 746 (1856) ...................................... 13

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351 (2010) ........................................................ 14

Joseph Story, *Commentaries on the Conflict of Laws* § 51 (6th ed. 1865) ................ 6, 7, 8, 13

*The Nationality Act of 1940*, 54 Harv. L. Rev. 860 n.8 (1941) ..................................... 20

1 Travers Twiss, *The Law of Nations Considered as Independent Political Communities* § 164 (1st ed. 1861) ................................................................. 7

Henry St. George Tucker, *Commentaries on the Laws of Virginia* (3d ed. 1846) ............................................................................................. 13

Francis Wharton, *A Treatise on the Conflict of Laws* § 708 (1872) ....................... 7

Henry Wheaton, *Elements of International Law* § 84 (Richard Henry Dana, Jr. ed., 1866) ................................................................. 6, 7

16AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3973.3 (5th ed.), Westlaw (database updated May 2025) ......................... 28

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.5 (3d ed.), Westlaw (database updated May 2025) ........................... 28

Ilan Wurman, *Jurisdiction and Citizenship* 80-84 (rev. Apr. 21, 2025), https://perma.cc/5DFJ-Z9BN ........................................................................ 7, 15, 16

## INTRODUCTION

To receive birthright citizenship under the Citizenship Clause, an individual must be not only born in the United States, but also "subject to the jurisdiction thereof." This language rightly ensured citizenship for the freed slaves—the primary purpose of the Clause—as well as the children of others subject to the United States' complete political jurisdiction. But this constitutional floor lets Congress decide whether to confer citizenship on all other children, including those of tribal Indians and aliens here temporarily or illegally. While Congress has conferred citizenship on many categories of people who fall outside the Citizenship Clause, *see* 8 U.S.C. § 1401(b)-(h), children of aliens here temporarily or illegally are not among them.

The Supreme Court has held that the jurisdictional clause requires being "completely subject to the political jurisdiction of the country." *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). A country has complete political jurisdiction over individuals who owe it sufficient allegiance, such as children of citizens and aliens lawfully "domiciled here," *id.*, but not over those who owe only the lesser allegiance of merely obeying the law, such as children of tribal Indians, *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). This distinction reflects principles that were well recognized at the time the Fourteenth Amendment was ratified: domicile was understood to confer a more substantial allegiance than mere presence, a type of allegiance akin to citizenship that subjected an individual to the complete jurisdiction of the country of domicile with corresponding rights and duties. Children of aliens here temporarily or illegally,

whose only allegiance is the duty to obey the laws while here, lack sufficient allegiance to come within the United States' complete political jurisdiction. This historically grounded explanation reconciles the Supreme Court's cases and explains the substantial focus on domicile in the debates leading up to the Citizenship Clause and the Executive Branch practice and legal scholarship in the years thereafter.

Plaintiffs offer no interpretation of the Citizenship Clause that explains that history or reconciles *Elk* and *Wong Kim Ark*. Below, they argued that the jurisdictional clause refers only to regulatory jurisdiction (the ability to impose laws regulating individuals). *See, e.g.*, NJ Dkt. 5 at 9-10; Doe Dkt. 11 at 7. Faced with the problem that this theory cannot explain *Elk* because Congress clearly had *authority* to regulate tribal Indians—a point neither set of plaintiffs disputes—they now argue that what matters is whether the United States, in fact, *fully exercised that authority* or instead let another sovereign exercise some power over the individuals despite their presence in the United States. This recharacterized argument, however, only underscores why nondomiciled aliens fall outside the Citizenship Clause: under well-established nineteenth-century legal principles, personal laws—including civil-rights laws—did not generally apply to nondomiciled aliens, whose personal status and civil rights remained subject to the sovereign power of their home country.

Text and historical context thus confirm that the Executive Order's interpretation of the Citizenship Clause is correct. The preliminary injunction should be reversed.

2

# ARGUMENT

## I.     Plaintiffs Are Not Likely to Succeed on the Merits.

The Civil Rights Act of 1866 and the Citizenship Clause of the Fourteenth Amendment repudiated *Dred Scott* and confirmed that freed slaves and their children were citizens of the United States.  Plaintiffs' efforts to paint this case as a modern-day analogue to that odious decision are mistaken.  No one disputes that *Dred Scott* is deservedly overruled—or that fixing the citizenship status of freed slaves and their children was the central purpose of the Citizenship Clause.  Nor does the Executive Order create any classifications based on race—what matters is not one's race, but whether one has the requisite relationship of allegiance and protection, such as through lawful permanent residence in this country.

Nothing about the historical context of the Clause suggests that it extended to the children of foreigners who are present here temporarily or unlawfully.  On the contrary, the history of the Clause's adoption shows that the Framers did not intend to grant birthright citizenship to the children of "temporary sojourners."  And it is entirely devoid of concern for illegal aliens, a group that did not yet exist given the absence of federal immigration restrictions.  Instead, Congress chose language that would encompass freed slaves but still limited citizenship to individuals who are completely subject to the political jurisdiction of the United States—a category that excludes children of both transient visitors and illegal aliens.

3

## A. Political Jurisdiction Is Not Merely Regulatory Jurisdiction.

All agree that the jurisdictional clause excludes the U.S.-born children of (1) foreign ambassadors, (2) persons on foreign public ships, (3) invading armies, and (4) members of Indian tribes.  These exceptions share a single common feature: the child's parents do not fall within the "political jurisdiction" of the United States because they lack sufficient allegiance to the United States and owe primary allegiance to another sovereign.  *Elk*, 112 U.S. at 102.  That understanding of the Clause squares with its text and history, and the Supreme Court's precedents.

**1.**  Plaintiffs contend that "jurisdiction" encompasses all persons who are "fully subject to U.S. law" and "have a duty to obey the country's laws." Doe Br. 16, 17; *accord* States Br. 43-45.  That view cannot explain the long-recognized exceptions to the Citizenship Clause.  The United States plainly has the *power* to exercise authority over the categories of persons long understood to be excluded from the Citizenship Clause.  *See Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 146 (1812) (explaining that the immunity granted to foreign public ships could be "destroy[ed]" if the sovereign wished to "claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals"); Gov't Br. 16-17.

Indian tribes are an especially powerful example.  As plaintiffs' own amici acknowledge, "the debate" about the phrase *subject to the jurisdiction thereof* "predominantly focused on whether [it] included Native Americans."  Constitutional Law Scholars Amicus Br. 13; *accord* Kurt T. Lash, *Prima Facie Citizenship* 49-53 (Apr.

4

17, 2025), https://perma.cc/ARN2-5CSJ.  Any interpretation of the phrase "subject to the jurisdiction thereof" needs a coherent account of why tribal Indians are subject to the jurisdiction of the United States less completely than individuals who are granted citizenship under the Clause.  It was well settled by the time of the Citizenship Clause's ratification that the United States could exercise regulatory power over Indian tribes.  *See, e.g.*, *United States ex rel. Mackey v. Coxe*, 59 U.S. (18 How.) 100, 104 (1855) ("Cherokee country … is within our jurisdiction and subject to our laws."); *United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846); *see* Lash, *supra*, at 23-24.  The Congressional debates preceding the Clause reflected that understanding: multiple Senators recognized that Indian tribes were subject to congressional regulation.  *See* Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (Senator—and former Attorney General—Johnson stating that "the courts would have no doubt" about Congress's "authority to legislate" with respect to Indian tribes); *id.* at 2892 (Senator Doolittle stating that there were many Indians who were subject to U.S. regulatory jurisdiction "who ought not to be included as citizens").

Thus, the United States could "deal" with Indian tribes "through acts of Congress in the ordinary forms of legislation."  *Elk*, 112 U.S. at 99.  And indeed, shortly after ratification, Congress enacted a statute declaring that it would no longer recognize Indian tribes as "independent nation[s], tribe[s], or power[s] with whom the United States may contract by treaty."  Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566; *Elk*, 112 U.S. at 107.

5

"Jurisdiction" in the Citizenship Clause thus cannot mean the bare power to impose or enforce federal law, and the Clause does not cover all individuals who have a duty to obey the laws. It requires something more.

**2.** Confronted with Congress' power to regulate tribal Indians, both sets of plaintiffs reformulate their proposed test. They suggest that the Clause covers only those subject to the "full and absolute lawmaking power …, not some portion of it," and therefore excludes those with "longstanding and recognized exemptions from U.S. law," Doe Br. 20 (quotation marks omitted), or who were "exempt in any way from the nation's laws," States Br. 47. But that reformulation refutes plaintiffs' position. Under ratification-era legal principles, nondomiciled aliens were not subject to the full range of U.S. law.

Domicile was "one of the fundamental considerations in controversies over citizenship" because it was "so closely related to matters of civil jurisdiction." Frederick A. Cleveland, *American Citizenship as Distinguished from Alien Status* 35 (1927). As a matter of comity, the nation where an individual was domiciled had jurisdiction to determine the "numerous civil rights of the person." 1 William Burge, *Commentaries on Colonial and Foreign Laws* 32 (1838); *accord, e.g.*, *Coddington v. Coddington*, 20 N.J. Eq. 263, 264 (Ch. 1869) (explaining that it was "well settled" that the government of a person's domicile "regulated" "the positive and relative status of [the] person"); *see* Joseph Story, *Commentaries on the Conflict of Laws* § 51, at 53 (6th ed. 1865); Henry Wheaton, *Elements of International Law* § 84, at 141 (Richard Henry Dana, Jr. ed., 1866).

It was this relationship between domicile and jurisdiction over personal or civil rights that caused treatise writers to describe domicile as "the foundation of jurisdiction over persons" "under the Law of Nations," 1 Travers Twiss, *The Law of Nations Considered as Independent Political Communities* § 164, at 239 (1st ed. 1861), and a "caus[e] which subject[s] the individual to the jurisdiction of a particular territory," 4 Robert Phillimore, *Commentaries Upon International Law* 32 (2d ed. 1874); *see* Cleveland, *supra, at* 34 ("In dealing with domicil we are dealing with the question of jurisdiction—the right of the government to exercise control over the social population, and the rights of individuals to claim protection or to enjoy the benefits which are attached to residence."); Francis Wharton, *A Treatise on the Conflict of Laws* § 708 (1872) ("Domicil, of course, implies a voluntary submission to the local law, and invests the courts of the domicil with jurisdiction over the party thus domiciled.").

The United States thus yielded to the government of an alien's domicile to determine whether the alien was a minor, Story, *supra*, § 66, at 71; the rights of married women, *id.* § 66a, at 72; the rules of inheritance for personal property, Wheaton, *supra*, § 83, at 140; the forum to administer divorces, *Coddington*, 20 N.J. Eq. at 264, and insolvency proceedings, M.W. Jacobs, *A Treatise on the Law of Domicil* § 47, at 80 n.3 (1887); and to subject an individual to conscription, H.W. Halleck, *International Law* 385 (1861), or tax worldwide income, 2 John Bassett Moore, *A Digest of International Law* § 183, at 59-61 (1906). *See also* Ilan Wurman, *Jurisdiction and Citizenship* 80-84 (rev. Apr. 21, 2025), https://perma.cc/5DFJ-Z9BN; *id.* at 81 & n.413. Consequently, alien

visitors were only "subject to the jurisdiction of the State when in foreign territory in a much-qualified sense." Alexander Porter Morse, *The Citizen in Relation to the State* 10-11 (1884).

Neither set of plaintiffs argues that tribal Indians lacked a duty to obey the laws, yet they agree that the Citizenship Clause does not confer citizenship on tribal Indian children. Their attempts to explain that result based on tribal Indians being subjected to less than the full exercise of U.S. jurisdiction fails to grapple with the limited exercise of jurisdiction over nondomiciled aliens, particularly in the area of civil rights that the Fourteenth Amendment addressed.

## B. The Jurisdictional Clause Requires Political Jurisdiction, Which Is Formed by Establishing Domicile.

**1.** The United States exercised less jurisdiction over nondomiciled aliens precisely because of those aliens' primary allegiance to a different sovereign. The nineteenth-century legal community understood the important relationships between domicile and the concepts of allegiance, jurisdiction, and citizenship. Aliens who had established domicile developed a degree of "allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council); *see* Story, *supra*, § 49a, at 48 (discussing *Hodgson* as a "very extensiv[e] and learne[d] discuss[ion]" by "counsel of great eminence" and a "judge of very great learning"). Domiciled aliens "acquire rights and must discharge duties in many respects the same as possessed by and

8

imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 62 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698, 734 (1893) (Brewer, J., dissenting) (similar). And unlike temporarily present aliens—whose obligation to, and protection by, the United States ends on their departure—domiciled aliens could call on the United States for diplomatic protection abroad. *Fong Yue Ting*, 149 U.S. at 724.

*Wong Kim Ark* reflects the significance of this concept. The Supreme Court repeatedly emphasized that Wong's parents, though "subjects of the Emperor of China," had "a permanent domicil and residence in the United States." 169 U.S. 649, 653 (1898); *accord id.* at 652, 693, 696, 705. Indeed, the Court's paragraph announcing its "conclusions" from its analysis of the common law and other antecedents, *id.* at 693-94, underscores the importance of domicile: "Every citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States," and thus that the Citizenship Clause "includes the children born within the territory of the United States of all other persons … *domiciled within the United States.*" *Id.* at 693 (emphases added). And echoing the language of *Elk*, the Court concluded by noting that those domiciled here are "*completely* subject to the political jurisdiction" of the United States by comparing them to those temporarily present: "seeing that" even a temporary visitor to "the dominions of a foreign government" has a duty of "obedience to the laws of that government" during his presence "independently" of any "domiciliation," the Court explained that it "can hardly be denied that an alien is *completely* subject to

9

the political jurisdiction of the country in which he resides." *Id.* at 693-94 (emphases

added) (quotation marks omitted); *see* Jacobs, *supra*, § 75, at 123 & n.2 (collecting cases

equating residence and domicile); 2 James Kent, *Commentaries on American Law* 576

n.(c) (10th ed. 1860) (similar).

Plaintiffs dismiss these statements as not "factor[ing] in the Court's analysis,"

States Br. 56, or "reject[ing] the idea that domiciliation matters," Doe Br. 29. But it is

difficult to understand why the Court would have repeatedly included domicile in

announcing its holding if that status was irrelevant. And it is all the more improbable

given the dispute before the Court, as the parties briefed the case with

contemporaneous principles of domicile in mind. The government, addressing the

holding in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895), that citizenship did not extend to

those "*temporarily traveling here,*" argued that all Chinese aliens were here temporarily,

Brief for the United States at 26 (No. 132) (U.S. Jan. 13, 1897), and that Wong's

parents were in fact "temporary sojourners," Reply Brief for the United States at 7

(No. 132) (U.S. Mar. 3, 1897). Wong's lawyers submitted separate briefs expressly

addressing domicile. One brief repeatedly invoked domicile to explain why Wong's

father was "subject to the jurisdiction" of the United States, contending that Wong's

father "could have been … drafted into the armies of the United States" as an

"obligation[] ordinarily incident to [a] foreign domicile" and (citing *Fong Yue Ting*) that

Wong's father could "invoke" the United States' "protection against the country of

his origin." Brief of the Appellee at 22-23, 26-27 (No. 132) (Feb. 27, 1897) (quotation

omitted). The other brief responded to the government's position by arguing that temporary presence was sufficient for citizenship and devoted an entire section to the assertion that an individual's "citizenship" did not "depend … upon the 'domicile' of their parents." Brief for the Appellee 87-89 (No. 132) (Mar. 3, 1897).

Against this background, the Supreme Court's repeated emphasis on domicile in crafting both the question presented and its holding is properly understood as reflecting the limits of the Court's holding, not a mere description of the facts or rejection of the relevance of domicile and allegiance. And these points illustrate why in the years after *Wong Kim Ark*, Executive Branch practice and scholarly commentators recognized that children of nondomiciled aliens were *not* citizens at birth. Gov't Br. 28-29, 41. Indeed, the State Department official whose testimony to Congress both sets of plaintiffs rely upon acknowledged the consensus of treatise-writers that "in order that a person born in the United States of alien parents may have American citizenship, his parents must have been domiciled in this country at the time of his birth," and admits that *Wong Kim Ark* "did not directly decide the precise point" because the "parents were domiciled in the United States." Richard W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, 552 (1921).

**2**. The States (at 48-49) and *Doe* plaintiffs (at 26) both further underscore their misunderstanding of the relevant principles in arguing that the Executive Order's understanding of the Citizenship Clause is incompatible with cases accepting dual citizenship. As we have explained, *see* Gov't Br. 18-19, a person becomes subject to

11

the complete political jurisdiction of the country where they are domiciled, even if they remain citizens of another nation (as Wong's parents were).

Plaintiffs' arguments that other Supreme Court cases or this Court's cases have held that domicile is not relevant to the Citizenship Clause are equally mistaken.  The cases they identify involved legal questions about the children's parents, where the discussion of the children's citizenship is dicta.  *See, e.g.*, *Hasan v. Holder*, 673 F.3d 26, 28 n.1 (1st Cir. 2012); *Mariko v. Holder*, 632 F.3d 1, 8 n.4 (1st Cir. 2011); *see also* Doe Br. 23-24 (collecting similar dicta in Supreme Court cases).

### C. The Citizenship Clause Adapted the Common Law to American Views, Departing from the English Rule.

Plaintiffs attempt to draw support from English common law and early American sources, but these cannot overcome the Citizenship Clause itself.  The Constitution "did not purport to take English law or history wholesale and silently download it into" American law.  *United States v. Rahimi*, 602 U.S. 680, 722 n.3 (2024) (Kavanaugh, J., concurring).  While the English common law regarded children even of transients as citizens at birth, there is no dispute that the Citizenship Clause departed from English common law in some respects.  As early as the 1820s, American courts rejected the suggestion that members of Indian tribes were born citizens, even though they satisfied the English common-law rule.  When the New York Supreme Court of Judicature applied the English common-law rule to conclude that tribal Indians were "born in allegiance to the government of this state, for [New

12

York's] jurisdiction extends to every part of the state; they receive protection from [New York], and are subject to [New York's] laws," *Jackson ex dem. Smith v. Goodell*, 20 Johns. 188, 192-93 (N.Y. Sup. Ct. 1822), Chancellor Kent reversed its decision because Indians had "never been regarded as citizens or members of [New York's] body politic," *Goodell v. Jackson ex dem. Smith*, 20 Johns. 693, 710 (N.Y. 1823); *see* Gregory Ablavsky, *"With the Indian Tribes": Race, Citizenship, and Original Constitutional Meanings*, 70 Stan. L. Rev. 1025, 1056 (2018) (stating that "Indians were described as subjects" of the King "by both British officials and Native peoples themselves"); *Relations of Indians to Citizenship*, 7 Op. Att'y Gen. 746, 749 (1856) (concluding that Indians were not citizens even though they are "in our allegiance" in a more limited sense of the term).

Moreover, as noted, Justice Story explained that citizenship at birth required more than temporary physical presence. Story, *supra*, § 48, at 46. The *Doe* plaintiffs suggest (at 35 n.19) that Story's statement is undermined because he followed it with an acknowledgment that this rule was not "universally established," Story, *supra*, § 48, at 46. But given that the treatise covered both American and English law, *see id.* at xi-xiii, Story's qualification is merely evidence of how American views had begun to differ from the strict English rule. Story's view of citizenship was also shared by other American authorities. *See, e.g.*, Henry St. George Tucker, *Commentaries on the Laws of Virginia* 56-57 (3d ed. 1846) (describing the conclusion as "sufficiently obvious").

Importantly, by Reconstruction, the Republicans championing the Civil Rights Act of 1866 and the Citizenship Clause had adopted this American position. In 1858, Representative Philemon Bliss gave a floor speech criticizing the *Dred Scott* decision— later reprinted as a pamphlet—where he explained "[t]he few exceptions" to citizenship at birth as "children of foreign ministers or temporary sojourners." Cong. Globe, 35th Cong. 1st Sess. 210 (1858); Philemon Bliss, *Citizenship* 3 (1858). Prominent Civil War Republican lawyer David Dudley Field led a New York commission to codify laws that in 1860 proposed a citizenship provision that excluded "the children of transient aliens and of alien public ministers and consuls." Comm'rs of the Code, *The Political Code of the State of New York* § 5(1) (1860). Representative Bingham and Senator Trumbull—sponsors of the Fourteenth Amendment—both emphasized the importance of domicile to citizenship at birth. *See* Gov't Br. 19-20; Lash, *supra*, at 18 (noting speech by Representative Bingham declaring that "all free persons born and *domiciled* within the United States" are citizens (emphasis added) (quotation marks omitted)); Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1352-53 (2010) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.)).

Indeed, the Civil Rights Act of 1866—the predecessor to the Citizenship Clause—was drafted with this difference between American and English law in mind. Senator Trumbull explained that in drafting the Act he faced a "difficulty"; namely, he

14

initially considered using the phrase "all persons born in the United States and owing allegiance thereto" but rejected that approach because "upon investigation it was found that a sort of allegiance was due to the country from persons temporarily resident in it." Cong. Globe, 39th Cong., 1st Sess. at 572 (quotation marks omitted). The Act's eventual language—persons were citizens if they were "not subject to any foreign power," Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27—addressed this concern. The Citizenship Clause's use of affirmative language—being subject to the jurisdiction of the United States—was not intended to alter this result. *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. at 2890 (Senator Howard proposing language he described as "declaratory of …. the law of the land already"); *id.* at 2894 (Senator Trumbull saying "[t]he object to be arrived at" by the language in the Act and the Clause was "the same").[1]

Against this background, plaintiffs rely heavily on *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844), but overstate its importance. Julia Lynch was born during the

---

[1] The change from "born in the United States and not subject to any foreign power, excluding Indians not taxed" to "born … in the United States and subject to the jurisdiction thereof" appears to have been motivated by concerns that "Indians not taxed" might be interpreted literally (as a property test) rather than as a constitutional term of art (referring to Indians who were excluded from the apportionment base). *See* Wurman, *supra*, at 62, 70-71 (quotation marks omitted). To avoid that potential confusion, the express Indian exclusion was dropped, and without the exclusion, the "not subject to any foreign power" language from the Civil Rights Act would not have clearly excluded tribal Indians, since Indian tribes were not technically foreign powers but rather domestic dependent nations. A different formulation was therefore needed to ensure that birthright citizenship would not be extended to tribal Indians.

15

four years her parents spent in the U.S.; a low-ranking judge in New York's chancery court, *see Preface*, 1 Sand. Ch. iii, iii-iv (1845), concluded she was a citizen at birth under the English common-law rule. 1 Sand. Ch. at 587, 640-46, 655. But there is little indication that *Lynch* reflected a universal view, much less one incorporated wholesale into the Citizenship Clause. As David Dudley Field observed, *Lynch* "seems not to be entirely approved" and "probably would at the most be considered as authority only in regard to the right of succession to real property within that State." David Dudley Field, *Outlines of an International Code* 132 n.1 (2d ed. 1876). When New York judges were later faced with the inverse of *Lynch*—a child born to Americans temporarily abroad—they divided on whether the child was also a citizen of the foreign country. Wurman, *supra*, at 28-29 (discussing *Ludlam v. Ludlam*, 31 Barb. 486, 503 (N.Y. Gen. Term. 1860), *aff'd*, 26 N.Y. 356 (1863)). Nor was *Lynch* the test that New York applied to all of its inhabitants, notably tribal Indians. *See Goodell*, 20 Johns. 693. Given that the debates about the jurisdictional clause focused on Indians, *Lynch* unsurprisingly played almost no role in those debates. Lash, *supra*, at 20-21.

Moreover, when the Citizenship Clause was being ratified, Congress was criticizing the mode of reasoning employed in *Lynch*—that "everything that was law in England before, was law in America after the Revolution"—as having "no just foundation," and in particular objecting to American courts' acceptance of the English common law's "obsolete claim of inalienable allegiance." *Rep. of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe,

16

40th Cong., 2nd Sess. app. at 94, 99 (1868). Just weeks after the Fourteenth Amendment was ratified, Congress passed the Expatriation Act of 1868, forcefully repudiating the English doctrine of inalienable allegiance to one's birth country as incompatible with "the enjoyment of the rights of life, liberty, and the pursuit of happiness." Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223, 223.

Courts in the decades after ratification also understood the Citizenship Clause to depart from the English common-law rule. *Elk* and *Wong Kim Ark* acknowledged that the Clause departed from the English rule in how it treated Indians. As already discussed, the New Jersey Supreme Court in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895)—which *Wong Kim Ark* quoted favorably, 169 U.S. at 692-93—similarly recognized that America departed in how it treated nondomiciled aliens. The court reasoned that the Civil Rights Act and Citizenship Clause make clear that some aliens' children are not citizens because they are "subject to [a] foreign power." *Benny*, 32 A. at 697. The "[p]ersons intended to be excepted," the court explained, are "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of the sovereign power to which they belong…." *Id.* By contrast, for people who settled here and raised their children here—*i.e.*, became "domiciled here"—"it is clear that it will never be conceded by our government that such persons are subject to any foreign power" because they are instead "subject to the jurisdiction of the United States." *Id.* at 697-98.

17

### D. Plaintiffs' Statutory Claim Fails Because the Statute Has the Same Meaning as the Citizenship Clause.

Plaintiffs argue that even if the Executive Order reflects the original meaning of the Citizenship Clause, this Court should affirm because the 1940 enactment and 1952 recodification of the precursor to 8 U.S.C. § 1401 adopted the understanding of citizenship after *Wong Kim Ark*.

Contrary to the States' assertion (at 58), the government's position is consistent with the historical understanding of *Wong Kim Ark*, as the weight of legal authority in the decades after *Wong Kim Ark* recognized the decision was limited to children born to aliens domiciled here and did not extend to the children of temporary visitors. In contrast to the numerous authorities advancing that reading between 1898 and 1952, *see* Gov't Br. 28-29, 41, the States fail to cite any authority from this period adopting their reading except for a short exchange between a State Department official, Richard Flournoy, and a single congressman. *See* States Br. 60. Flournoy, of course, had previously written about how the consensus of treatise-writers disagreed with his view, *see* Flournoy, *supra*, at 552, and the States fail to show that his once-minority view had become a well-settled consensus to the contrary.

While the *Doe* plaintiffs cite a few additional sources between 1898 and 1952, they do not identify a single judicial decision involving a child of parents here illegally or temporarily. *See, e.g.*, *Perkins v. Elg*, 99 F.2d 408, 409 (D.C. Cir. 1938) (child's father naturalized before her birth); *Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860, 861 (1st

Cir. 1947) (no suggestion parents were unlawfully or temporarily present); *Ex parte Lopez*, 6 F. Supp. 342, 344 (S.D. Tex. 1934) (same). While a 1928 *Harvard Law Review* note speculated that plaintiffs' rule would be applied to children of parents here "temporarily" and argued that it "should" apply to children of parents here "illegally," it fails to identify a single judicial decision after the adoption of the Citizenship Clause for either proposition. *See* Note, *Citizenship by Birth*, 41 Harv. L. Rev. 643, 644-45, 644 n.9 (1928). Moreover, the footnote providing authority for aliens temporarily here includes a "[*c*]*ontra*" string citation of opposing authorities. *Id.* at 644 n.9.

Plaintiffs show, at most, that the issue remained a contested one and that the Roosevelt administration had adopted their position by 1940—not that there was a "well-settled" meaning of the Citizenship Clause, *Kemp v. United States*, 596 U.S. 528, 539 (2022), necessary to overcome the rules that similarly worded legal instruments should be read to have the same meaning, *see Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019), and that statutory recodifications do not silently adopt a revised meaning, *see, e.g., Girouard v. United States*, 328 U.S. 61, 70 (1946) (declining to interpret the reenactment in the Nationality Act of 1940 of unchanged provisions to adopt the Supreme Court's previous interpretation of those provisions).

Finally, even if plaintiffs were able to show a well-settled meaning of "subject to the jurisdiction thereof," their facial claim would fail because many individuals covered by the Executive Order would not be "in the United States" as that term was understood in 1940 and 1952. The Supreme Court's decisions in *Kaplan v. Tod*, 267

U.S. 228, 230 (1925); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905); and *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892), had created a well-understood legal rule that parents who had not been legally admitted "were not within the United States" but were legally treated as "still [being] at the frontier" and thus would not fall within the statutes. Note, *The Nationality Act of 1940*, 54 Harv. L. Rev. 860, 861 n.8 (1941). Therefore, even if the midcentury understanding of 8 U.S.C. § 1401(a)'s requirement to be born "subject to the jurisdiction" of the United States could help plaintiffs, the midcentury understanding of the second requirement of being "born in the United States" would defeat their facial challenge.[2]

## II.     The Injunction Is Substantially Overbroad.

Even if plaintiffs had shown likelihood of success, the nationwide injunction—premised entirely on the claims of the State plaintiffs—is inappropriate. The States cannot assert claims based on the alleged violation of individuals' Citizenship Clause rights and, in any event, lack Article III standing. And even if the States were proper parties, a nationwide injunction is not necessary to provide them complete relief.

---

[2] The *Doe* plaintiffs' forfeiture argument (at 39) is meritless. Just as "[t]he *Doe* plaintiffs" briefing below "recognize[d] that their statutory claim rises and falls with their constitutional claim," the government argued below that "in using the exact text of the Citizenship Clause in the INA, Congress imported its exact scope," and that the meaning of the Clause and the statute were "coterminous." NJ Dkt. 92 at 14 n.4. The *Doe* plaintiffs' sole statutory argument in the district court was that the Executive Order "violates the parallel statutory protections of 8 U.S.C. § 1401" "*[b]ecause [it] violates the Citizenship Clause*." Doe Dkt. 11 at 10 (emphasis added).

Thus, any injunction should be narrowed to the individuals for which Article III standing was established.

### A. The States Are Not Proper Parties and Thus Are Not Entitled to Injunctive Relief.

**1.** The States fail to overcome the general rule that a party "must assert his own legal rights" and not the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation marks omitted). Yet the States seek to enjoin an Executive Order they allege will "strip individuals of *their right* to citizenship," JA231 (emphasis added), and "will deny … children nationwide *their birthright* to citizenship," JA210 (emphasis added). *See also* JA191; JA206.

The States thus seek to litigate the rights of third parties—current and future residents—because of downstream effects the alleged violation of those rights might have on the States. *See* JA208. That is precisely the scenario in which litigating the claims of others is forbidden. In *Kowalski*, for example, the Supreme Court assumed that criminal defense attorneys had established Article III standing through allegations that a state law "reduced the number of cases in which they could be appointed and paid as assigned appellate counsel" for future "hypothetical indigents," but nevertheless held that the attorneys could not assert those individuals' constitutional right to counsel. 543 U.S. at 127, 129 n.2, 134.

The States' contrary arguments are meritless. They first suggest (at 32) that the rule does not apply to States, but one of the cases they cite—*Georgia v. McCollum*, 505

21

U.S. 42 (1992)—expressly applies ordinary third-party standing principles to state litigants, allowing the suit only because Georgia satisfied the "limited exception" for third-party standing (later discussed in *Kowalski*) when the litigant has a "close relation to the third party" and "there exists some hindrance to the third party's ability to protect its own interests." *Id.* at 55. If the States were correct, the Court need not have considered whether there was a close relationship or hindrance. And none of the other cases they cite supports the extraordinary proposition that third-party standing rules apply differently to States.[3]

The States alternatively argue (at 37-38, 38 n.6) that they fit within the exception discussed in *Georgia*. The States' claim, however, fails both prongs. Running a state Medicaid program that pays doctors to provide care to patients does not make the States sufficiently "close" to the individuals who possess the rights. And there is clearly no hindrance here. An expectant mother's claim is part of this appeal. In another lawsuit, pregnant mothers have filed suits on behalf of their children and sought class certification for similarly affected individuals. *See Washington*

---

[3] In *Massachusetts v. HHS*, 923 F.3d 209 (1st Cir. 2019), this Court addressed only the "narrow" "issue" of "Article III standing," 923 F.3d at 213, not third-party standing limitations. Nor does *Kozera v. Spirito*, 723 F.2d 1003 (1st Cir. 1983) suggest that different third-party standing rules apply to States. That case merely held that when a defendant brings a third-party complaint to implead another defendant, "the unity of the [original] plaintiffs' and third-party plaintiffs' claims" justifies third-party standing. *See id.* at 1006 n.2.

*v. Trump*, 765 F. Supp. 3d 1142, 1153 n.9 (W.D. Wash. 2025). There is no substantial

barrier hindering other similar suits.

The Supreme Court has "been quite forgiving with these" two "criteria …

when enforcement of the challenged restriction *against the litigant* would result

indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (citation

and quotation marks omitted). The States argue (at 36-39) their claim falls within this

class. Apparently acknowledging that the Executive Order's directive that federal

officials disregard state-issued documents is not "enforced against" them, *see* Gov't Br.

46-48, the States (at 37-38) abandon this Court's reasoning from the stay motion

decision and argue instead that 42 U.S.C. § 1396c threatens the States with the

sanction of terminating Medicaid. This novel theory, presented for the first time here,

fails for multiple reasons. First, 42 U.S.C. § 1396c is not the "challenged restriction"

in this suit. And the challenged Executive Order is not backed by sanctions under 42

U.S.C. § 1396c, even if future regulations promulgated because of the Executive

Order might be. Whatever standing the States may have to challenge future

regulations does not transform the Executive Order into a restriction enforced against

the States.

The States next argue (at 39-40) that because the doctrine is prudential, any

sufficiently motivated litigant can assert a third party's rights. But that conflicts with

*Kowalski* itself, where no one questioned the zeal with which the attorneys there

sought to represent the interests of putative future clients, and would render the third-

23

party standing doctrine largely irrelevant. The Supreme Court thus "ha[s] limited th[e] exception" to the bar on asserting third-party rights "by *requiring* that a party seeking third-party standing" meet the close relationship/hindrance test. *Kowalski*, 543 U.S. at 130 (emphasis added). A party who does not meet that test may not bring a claim based on the violation of a third party's rights no matter how zealous its advocacy.

Finally, the States put forward a variety of supposed legal rights that belong to the States themselves, Br. 19-20, 30-31, and claim that "individuals and governments could have distinct interests they can each vindicate," States Br. 36. The States, however, have not sought relief for any potential distinct interest in state citizenship; they have sought relief from the Executive Order's effects on individuals' federal citizenship. And like the States' purported "pocketbook" injuries, the States' supposed sovereign injuries depend entirely on a determination about the individual rights of state residents. Even if those purported injuries were viable under Article III, such claims would still be barred by third-party standing principles. *Kowalski*, 543 U.S. at 134.

More generally, the district court did not rely on these harms in assessing standing or fashioning injunctive relief, and for good reason. The Executive Order does not purport to dictate how the States determine citizenship for purposes of "jury systems" and other "core sovereign functions," States Br. 30-31, and the States have no cognizable interest in how *federal* officials react when they receive state-issued identity documents. Indeed, the States' theory appears to be that they would be free

to assert *any* individual's citizenship or naturalization-related claims, as such policies would necessarily affect state citizenship as well. The States cite no authority supporting that sweeping premise. At a minimum, such harms cannot establish irreparable harm justifying a preliminary injunction, as children subject to the Order would not be eligible to vote or serve on juries for many years.

**2.** The injuries the district court relied on are also insufficient to establish Article III standing. The States premise standing on purported losses of federal funding from programs administered by the States but jointly funded by States and the federal government. States Br. 14-17. The programs at issue—such as Medicaid, the Children's Health Insurance Program (CHIP), and the Enumeration at Birth Program—involve federal reimbursement for services provided by the States under the program. *See, e.g.*, States Br. 14 (explaining that the federal government "reimburses … 50 to 75 percent of the cost" of Medicaid and CHIP). As our opening brief explained (at 52), reduced eligibility for those programs relieves the States of the obligation to pay the expenses for which only a portion would be reimbursed, a net saving to States. The States respond (at 29) that they need not enact new legislation to avoid an injury, but that misses the point that the net effect of the federal action is not an injury when, for example, the reduced obligation on the States to provide care under Medicaid is larger than the reduction in federal reimbursement.

**B. At a Minimum, the Injunction Should Be Narrowed.**

**1.** The States pay lip service to the principle that injunctive relief should be no broader than necessary to provide complete relief to the plaintiffs, but they fail to justify the district court's nationwide injunction under that principle. The States argue that the injunction must be nationwide because a child born in Maine or Florida might move to New Jersey (or another plaintiff State), or a resident of a plaintiff State might give birth in another State. States Br. 64-65. As we explained, Gov't Br. 54, treating the child as a citizen eligible for the States' programs while the child is in a plaintiff State would provide complete relief for the plaintiff States' purported injuries. Tellingly, the States never refute that such an injunction would fully remedy their claimed lost funding under federal programs.

The States' response (at 67-70) is that it would be legally and practically unworkable for an individual's eligibility for programs such as Medicaid and CHIP to vary by state. But under existing Medicaid and CHIP rules, eligibility already frequently differs by state. *See, e.g.*, 42 U.S.C. § 1396b(b)(4) (allowing States to elect to provide Medicaid and CHIP to certain "lawfully present" aliens). They also argue that changes in how States determine eligibility may burden the States, but an appropriately crafted injunction could require the federal government to provide the plaintiff States a reasonable method for verifying eligibility. These manageable administrative burdens are not a basis on which to require nationwide relief, particularly where 19 other States opposed the plaintiff States' position. NJ Dkts. 90,

97, 115. And state-by-state relief has been workable in other immigration-related contexts. *See Texas v. United States*, 126 F.4th 392, 420-21 (5th Cir. 2025) (enjoining the enforcement of the Deferred Action for Childhood Arrivals Program but limiting relief to Texas).

The States also argue (at 65-67) that even though the government raised a scope-of-injunction argument below, *see* NJ Dkt. 92 at 38-39, the government failed to request this specific injunction. But this Court has squarely rejected the idea that the defendants-appellants need to "'write' the injunction themselves." *United States v. Zenon*, 711 F.2d 476, 478 (1st Cir. 1983). "[T]hat is a job for the court." *Id.* Because the proper "remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and because a defendant does not know in advance what injuries the court will find, it cannot be expected to propose a specific injunction tailored to those not-yet-determined injuries. In a case—like here—with multiple plaintiffs and multiple theories of injury, that would require defendants to propose a laundry list of appropriate injunctions for every possible combination of injuries.

Accordingly, the rare cases when this Court has found scope-of-injunction arguments forfeited is when a party made no scope-of-injunction argument at all in the district court, *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680 (1st Cir. 1998),[4] or

---

[4] *See* Brief for Paintiffs-Appellees at 48, *U.S. Tobacco Co. v. Harshbarger*, 1998 WL 34288496, at *48 (1st Cir. May 14, 1998) ("Defendants failed to request or even raise the option of a more narrow preliminary injunction with the District Court.").

when a district court had earlier entered a preliminary injunction and later—after providing parties an opportunity to object to that scope—made that injunction permanent, *Zenon*, 711 F.2d at 478.

Contrary to the States' assertion (at 66), this Court's stay motion ruling is not law of the case on forfeiture. *See* 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.5 (3d ed.), Westlaw (database updated May 2025) ("[L]aw of the case is not established by … denial of a stay … pending appeal."). "[T]he merits panel has access to better-developed briefing and a fuller record, positioning it to rethink potentially hastier determinations by the motions panel." 16AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3973.3 (5th ed.), Westlaw (database updated May 2025).

**2.** The injunction also impermissibly grants relief to individuals who lack Article III standing. The *Doe* organizations do not dispute that many of their members lack Article III standing; nor could they, as the vast majority likely are not pregnant and have no plans to become pregnant. They instead argue (at 46-48) that even though an Article III court would lack power to provide a remedy to those members if they brought their claims directly, the court can nonetheless grant relief as long as the individuals are represented by an organization. Because this argument goes to the district court's jurisdiction to enter this injunction, it cannot be forfeited and is not implicitly resolved by previous opinions that did not discuss the jurisdictional issue. *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63,

70-71 (1st Cir. 2021).  The organizations cite no authority that explains why an Article III court can issue a broader injunction to members if they sue through an organization than Article III would permit if those same members sued directly.

## CONCLUSION

The preliminary injunction should be reversed, or at a minimum narrowed.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE

   *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
DEREK WEISS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7256*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-7823*
   *bradley.a.hinshelwood@usdoj.gov*

JUNE 2025

29

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's June 5, 2025, order because it contains 7,498 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood