Nos. 25-1169, 25-1170

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

No. 25-1169

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in their official capacity as President of the United States;
US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as
Secretary of State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE
KING, in their official capacity as Acting Commissioner of Social Security,

Defendants - Appellants.

_____

No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS;
STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTI-
CUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HA-
WAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attor-
ney General for the People of the State of Michigan; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK;
STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF
SAN FRANCISCO,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in their official capacity as President of the United States;
USDEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as
Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI

NOEM, in their official capacity as Secretary of Homeland Security; US DE-
PARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KEN-
NEDY, JR., in their official capacity as Secretary of Health and Human Services;
US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their offi-
cial capacity as Acting Commissioner of Social Security; UNITED STATES,

Defendants - Appellants.

_____

*On Appeal from the United States District Court*
*for the District of Massachusetts*

_____

**BRIEF OF SCHOLARS OF CONSTITUTIONAL LAW AND
IMMIGRATION AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
Anna K. Jessurun
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICI CURIAE* ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ........................................................................................ 5

   I.     The Fourteenth Amendment's Text Guarantees Birthright
        Citizenship to Children Born to Noncitizens, No Matter Their
        Immigration Status ................................................................ 5

   II.    Longstanding Precedent Confirms that the Fourteenth Amendment
        Establishes Birthright Citizenship for Children of Noncitizens,
        Irrespective of Their Parents' Immigration Status ............................ 15

   III.   The Order Is Unconstitutional ............................................... 19

CONCLUSION ................................................................................... 28

ii

# TABLE OF AUTHORITIES

<u>CASES</u>

*Calvin's Case*,
(1608) 77 Eng. Rep. 377; 7 Co. Rep. 1 a ............................................. 7

*Dred Scott v. Sandford*,
60 U.S. 393 (1857) ................................................................... 9

*Elk v. Wilkins*,
112 U.S. 94 (1894) .......................................................... 14, 19-21

*Gardner v. Ward*,
2 Mass. 244 (1805) ................................................................ 8

*INS v. Rios-Pineda*,
471 U.S. 444 (1985) .............................................................. 19

*In re Look Tin Sing*,
21 F. 905 (C.C.D. Cal. 1884) ..................................................... 15

*Lynch v. Clarke*,
1 Sand. Ch. 583 (N.Y. Ch. 1844) ................................................. 8

*The Pizarro*,
15 U.S. 227 (1817) .............................................................. 24

*Plyler v. Doe*,
457 U.S. 202 (1982) ............................................................. 19

*The Schooner Exch. v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812) ................................................. 6, 24

*Slaughter-House Cases*,
83 U.S. 36 (1872) .............................................................. 18

*United States v. Wong Kim Ark*,
169 U.S. 649 (1898) ............................................. 1-4, 10, 12, 16-22, 24, 25

*Wong Wing v. United States*,
163 U.S. 228 (1896) ............................................................ 18

*Worcester v. Georgia*,
31 U.S. 515 (1832) ............................................................. 13

## TABLE OF AUTHORITIES – cont'd

Page(s)

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) .............................................................. 18


CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATE-
RIALS

Civil Rights Act of 1866, Pub. L. No. 39-26, 14 Stat. 27 ........................... 10

Cong. Globe, 39th Cong., 1st Sess. (1866) ................... 3, 4, 9, 11-15, 19, 20, 22, 26

90 Fed. Reg. 8449 (Jan. 20, 2025) ............................................... 2

Indian General Allotment (Dawes) Act of 1887, ch. 119, § 6, 24 Stat.
388 ................................................................................. 14

N.J. Act of Jan. 28, 1797, ch. 611, § 3 ....................................... 10

S. Rep. No. 41-268 (1870) ......................................................... 14

U.S. Const. amend. XIV, § 1, cl. 1 ............................................. 1, 5


OTHER AUTHORITIES

Gregory Ablavsky & Bethany Berger,
*Subject to the Jurisdiction Thereof: The Indian Law Context*,
100 N.Y.U. L. Rev. Online (forthcoming 2025) ..................................... 20

Bethany R. Berger, *Birthright Citizenship on Trial*, 37 Cardozo L.
Rev. 1185 (2016) ........................................................ 13, 14, 21

1 William Blackstone, *Commentaries* ......................................... 7

1 John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of
the United States of America, and of the Several States of the American
Union* (11th ed. 1864) ........................................................ 23, 24

2 Alexander M. Burrill, *A Law Dictionary and Glossary* (2d ed. 1871) .... 24

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215 (2021) ........................................................ 9, 10

Amanda Frost, *"By Accident of Birth": The Battle Over Birthright Citizenship After* United States v. Wong Kim Ark, 32 Yale J.L. & Humans. 38 (2021) .................................................................................................. 7

Hidetaka Hirota, *Expelling the Poor* (2017) ................................................ 10

James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367 (2006) ......... 2, 5, 6

Legislation Denying Citizenship at Birth to Certain Children Born in the United States, 19 Op. O.L.C. 340 (1995).................................................. 8

Hiroshi Motomura, *Americans in Waiting* (2006) ...................................... 5, 9

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993).................................................... 10

Gerald Neuman, Wong Wing v. United States*: The Bill of Rights Protects Illegal Aliens*, *in Immigration Stories* (Martin & Schuck eds., 2005) ...... 18

Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case *(1608)*, 9 Yale J.L. & Humans. 73 (1997) ............................................. 7, 8

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405 (2020) ............................................................... 2, 5, 6, 8, 11

William Rawle, *A View of the Constitution of the United States of America* (Portage Publications, Inc. 2d ed. 2011) (1829) ..................................... 8

Lucy Salyer, Wong Kim Ark*: The Contest Over Birthright Citizenship*, *in Immigration Stories* (Martin & Schuck eds., 2005).............................. 21

Statement from Hamilton Fish, U.S. Sec'y of State, to George Perkins Marsh, Am. Minister to Italy (May 19, 1871), *in* 2 *A Digest of the International Law of the United States Taken From Documents Issued by Presidents and Secretaries of States* (Francis Wharton ed., Gov't Printing Office 1887).................................................................................................... 18

Joseph Story, *Commentaries on the Conflict of Laws* (2d ed. 1841).......... 8

Noah Webster, *An American Dictionary of the English Language* (Chauncy A. Goodrich & Noah Porter eds., Springfield G. & C. Merriam 1865) ........................................................................ 5

**INTEREST OF *AMICI CURIAE*[1]**

*Amici* are law professors whose research focuses on constitutional law and immigration. *Amici* have an interest in ensuring that the Fourteenth Amendment is interpreted in a manner consistent with its text and history, and accordingly have an interest in this case.

A full listing of *amici* appears in the Appendix.

**INTRODUCTION AND
SUMMARY OF ARGUMENT**

In clear and sweeping language, the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. This Amendment means what it says: everyone who is born in the United States and subject to its authority is entitled to the privileges of citizenship at birth. The Supreme Court affirmed this foundational tenet of American citizenship in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), when it held that the Fourteenth Amendment, "in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons." *Id.* at 693. From 1868 to today, any child born in the United States

---

[1] *Amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici* or its counsel made a monetary contribution to the brief's preparation or submission. All parties have consented to this brief.

1

to noncitizen parents, no matter their immigration status, "becomes at once a citizen of the United States." *Id.* at 702.

On January 20, 2025, President Donald J. Trump attempted to contravene this constitutional guarantee though an executive order that purports to limit birthright citizenship to children who have at least one parent who is a citizen or is lawfully admitted for permanent residence. 90 Fed. Reg. 8449, § 1 (Jan. 20, 2025) ("Order"). According to the Order, the children of noncitizens without lawful status, as well as the children of noncitizens whose status is "lawful but temporary," are not "subject to the jurisdiction" of the United States and are not birthright citizens. *Id*. The Order prohibits the federal government from issuing citizenship documentation to any such children born after February 19, 2025. *Id.* § 2.

This is flagrantly unconstitutional, as the Fourteenth Amendment's text, its drafting history, and decades of Supreme Court precedent all make clear. At the time of the Amendment's drafting and ratification, "subject to the jurisdiction" simply meant "subject to the authority of the U.S. government." James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367, 368 (2006); Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 437-38 (2020). The jurisdictional requirement therefore exempted a narrow category of persons who, despite being born on U.S. soil, were not required to fully obey U.S. law. These included the

2

children of foreign diplomats and hostile occupying forces, as well as the members of Indian tribes, who were viewed as members of distinct political communities, *see infra* at 13-14. All other noncitizens were subject to the jurisdiction of the United States while they were in the country. *See Wong Kim Ark*, 169 U.S. at 693.

The Fourteenth Amendment's history confirms what its text makes clear. The Amendment's Framers drafted the Citizenship Clause against a long history, stretching back to English common law, in which persons born in the country, "whether children of citizens or of foreigners," *id.* at 675, were citizens by birth. Of course, there was a grievous exception to this principle. The Supreme Court held in *Dred Scott v. Sandford* that Black people, free or enslaved, were not citizens under the Constitution, fomenting the sectional conflict that led to the Civil War. After the war, Congress repudiated the *Dred Scott* decision, first with the Civil Rights Act of 1866 and then with the Fourteenth Amendment.

But in drafting the Fourteenth Amendment, the Framers did more than simply renounce *Dred Scott*. They used deliberately broad language to enshrine in the Constitution what was "already" "the law of the land": common-law birthright citizenship. Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). And while Members of the 39th Congress debated whether the Amendment *should* guarantee citizenship to the children of noncitizen parents, they all assumed that it did exactly that,

3

*see id.* at 2890-91.  As just noted, the only exceptions were the children of diplomats or hostile occupying forces, as those categories were understood at common law, and Native Americans born to tribal members, whom the Framers understood to be members of distinct political communities.

Courts soon confirmed the Clause's sweeping scope.  Most significantly, in *Wong Kim Ark*, the Supreme Court held that the Citizenship Clause "affirms the ancient and fundamental rule of *citizenship by birth* within the territory, in the allegiance and under the protection of the country, *including all children here born of resident aliens*."  169 U.S. at 693 (emphasis added).  The Court rejected the view that "subject to the jurisdiction" excludes anyone other than diplomats, hostile occupying forces, and Native Americans, a unique category "unknown to the common law."  *See id.* at 682.[2]

Thus, all children born in the United States and subject to its authority are entitled to citizenship at birth, regardless of their parents' immigration status.  Whatever one's views on the merits of birthright citizenship as a matter of policy, that constitutional guarantee cannot be changed by Executive Order, or even by legislation, but instead can be changed only by constitutional amendment.  This Court should affirm.

---

[2] *Wong Kim Ark* also recognized that people "born on foreign public ships" in U.S. waters are not birthright citizens.  *See* 169 U.S. at 693.

# ARGUMENT

## I.  The Fourteenth Amendment's Text Guarantees Birthright Citizenship to Children Born to Noncitizens, No Matter Their Immigration Status.

Under the Fourteenth Amendment's Citizenship Clause, "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."  U.S. Const. amend. XIV, § 1, cl. 1.  As the Clause's text makes clear, and its history confirms, all children born in the United States are—with narrow exceptions—birthright citizens.

**A.**  The Citizenship Clause embodies the *jus soli* rule of citizenship under which citizenship is acquired by right of the soil rather than by bloodline.  *See* Hiroshi Motomura, *Americans in Waiting* 72 (2006).  By extending citizenship to persons "subject to the jurisdiction" of the United States, the Clause sweeps broadly to include anyone who is "subject to the authority of the U.S. government."  Ho, *supra*, at 368.  According to contemporary dictionaries, "jurisdiction as applied to nations meant the '[p]ower of governing or legislating,' 'the power or right of exercising authority,' the 'limit within which power may be exercised,' or 'extent of power or authority.'"  Ramsey, *supra*, at 437 (alteration in original) (quoting Noah Webster, *An American Dictionary of the English Language* 732 (Chauncy A. Goodrich & Noah Porter eds., Springfield G. & C. Merriam 1865)); *id*. at 440 ("[I]t does not appear that there were competing definitions of 'subject to the jurisdiction' in the pre-Amendment period."); *see also* Ho, *supra*, at 368 n.8

("Black's Law Dictionary defines 'jurisdiction' as '[a] government's general power to exercise authority.'" (alteration in original)).

This understanding of "jurisdiction" accords with international law at the time of the Fourteenth Amendment's drafting and ratification. *See* Ramsey, *supra*, at 437-38 (according to Henry Wheaton, "[t]he leading U.S. international law writer of the pre-Civil War period," "'subject to the jurisdiction' of the United States meant under U.S. sovereign authority"). Under prevailing international law, "a nation's sovereign authority was closely linked to territory," meaning that persons within the United States were generally subject to its jurisdiction. *Id.* at 438. And while there were a few exceptions to that rule, foreign travelers within the United States were not among them. *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812) ("*The Exchange*"). Instead, only "foreign rulers themselves and their property, foreign diplomats, and foreign military forces" were exempt from the United States' jurisdiction. Ramsey, *supra*, at 439 (citing *The Exchange*, 11 U.S. at 137-40); *id.* (noting that those individuals were "immune from local laws and local adjudication"). Children born to noncitizen parents who do not fall under these exceptions are citizens at birth.

**B.**    In addition to the Citizenship Clause's clear text, the Fourteenth Amendment's history—from its common-law origins through its ratification—

6

makes clear that the Amendment broadly establishes birthright citizenship for virtually all children born in the United States.  As this history demonstrates, the Amendment's Framers were aware that the Clause would apply to the children of noncitizens who were in the country unlawfully or who did not intend to stay in the country permanently.

1.    Birthright citizenship has its origins in British common law, in which people born within the King's realm were natural-born subjects.  *See Calvin's Case* (1608) 77 Eng. Rep. 377, 409; 7 Co. Rep. 1 a, 27 a; Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case *(1608)*, 9 Yale J.L. & Humans. 73, 74 (1997) ("*Calvin's Case* is the earliest, most influential theoretical articulation" of "the common-law rule that a person's status was vested at birth, and based upon place of birth.").  As William Blackstone later explained, "[n]atural-born subjects are such as are born within the dominions of the crown of England; that is, within the ligeance, or, as it is generally called, the allegiance of the king."  1 William Blackstone, *Commentaries* \*366.  Natural born subjects thus included "[t]he children of aliens, born here in England."  *Id.* at \*373.

This common law principle traveled overseas to the United States, and "was the source of the rule of territorial birthright citizenship" prior to the ratification of the Fourteenth Amendment.  Price, *supra*, at 138; Amanda Frost, *"By Accident of Birth": The Battle Over Birthright Citizenship After* United States v. Wong Kim

Ark, 32 Yale J.L. & Humans. 38, 48 (2021); *see* Joseph Story, *Commentaries on the Conflict of Laws* § 48 (2d ed. 1841) ("Persons, who are born in a country, are generally deemed to be citizens and subjects of that country.").

Early American courts followed the common law, often relying on *Calvin's Case*. *See, e.g.*, *Lynch v. Clarke*, 1 Sand. Ch. 583, 583-84 (N.Y. Ch. 1844) ("children born here," including children born to "alien parents, during their temporary sojourn," "are citizens, without any regard to the political condition or allegiance of their parents"); *Gardner v. Ward*, 2 Mass. 244, 245 (1805) ("a man, born within the jurisdiction of the common law, is a citizen of the country wherein he is born"); *see also* Price, *supra*, at 139 nn.353-54 (collecting cases); Legislation Denying Citizenship at Birth to Certain Children Born in the United States, 19 Op. O.L.C. 340, 342 n.8 (1995) [hereinafter 1995 OLC Op.] (collecting cases and executive branch explanations of birthright citizenship).  Contemporary commentators agreed.  *See, e.g.*, Ramsey, *supra*, at 414 ("Therefore every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution." (quoting William Rawle, *A View of the Constitution of the United States of America* 86 (Portage Publications, Inc. 2d ed. 2011) (1829))); *id.* at 414 & nn.35-36 (citing the works of Zephaniah Swift in 1795 and James Kent in 1827).

**2.** In the United States' early years, a glaring exception to this common-law rule was the citizenship status of Black people. While some states recognized free Black people as citizens, others, particularly slave states, did not. *See* Motomura, *supra*, at 72. Then, in 1857, in the infamous *Dred Scott* decision, the Supreme Court held that persons of African descent, including free Black people, were not citizens under the U.S. Constitution. 60 U.S. 393, 404 (1857).

During Reconstruction, the Thirty-Ninth Congress swiftly renounced *Dred Scott*, extending birthright citizenship to all persons, irrespective of race or ancestry, other than members of the aforementioned groups. Lawmakers likely understood that the conception of citizenship they were establishing as the law of the land encompassed children whose parents were not lawfully in the country. At the time, many enslaved people were present in the United States in violation of laws that prohibited the migration and importation of Black people into the United States, making them analogous to today's "illegal aliens." Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2250 (2021). "[I]t is not plausible that slave trade enforcement—and the presence in the nation of Africans who were not legally allowed to be in the country—could have gone unnoticed … by Congress when the Fourteenth Amendment was being drafted and enacted into law." *Id.* at 2246-47; *cf.* Cong. Globe, 39th Cong., 1st Sess. 939 (1866)

9

(noting that the 39th Congress appropriated funds to care for Africans who had been "landed upon our coast by slavers").

Moreover, various states forbade the entry of free Black persons, and Congress authorized these prohibitions and aided their enforcement through an 1803 statute. Chin & Finkelman, *supra*, at 2230-32. States also passed laws to ban the immigration of foreign "paupers" and convicts. *See, e.g.*, N.J. Act of Jan. 28, 1797, ch. 611, § 3 (prohibiting knowingly bringing a foreign convict into the state); Hidetaka Hirota, *Expelling the Poor* 2-3, 70-71, 77-82 (2017); Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1841-77 (1993). By enshrining birthright citizenship into the Constitution for all persons born here, including for "persons of African descent born in the United States," *Wong Kim Ark*, 169 U.S. at 703, Congress presumably had in mind a population that included children whose parents were unlawfully present in the country, Chin & Finkelman*, supra*, at 2250.

Congress first repudiated *Dred Scott* through the Civil Rights Act of 1866, Pub. L. No. 39-26, 14 Stat. 27, which provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared citizens of the United States," *id.* § 1, 14 Stat. at 27. The Act's supporters understood this provision to be "merely declaratory of what the law now is," namely, the form of birthright citizenship that existed at common law.

10

Cong. Globe, 39th Cong., 1st Sess. 1115 (1866) (Sen. Wilson); *see id.* at 600 (Sen. Trumbull) ("birth entitles a person to citizenship, that every free-born person in this land is, by virtue of being born here, a citizen of the United States"); *id.* at 570 (Sen. Morrill) ("birth by its inherent energy and force gives citizenship"). They embraced the common law principle that birth created allegiance. *See id.* at 1152 (Rep. Thayer) ("It is a rule of universal law … that they who are born upon the soil are the citizens of the State. They owe allegiance to the State, and are entitled to the protection of the State."); *id.* at 1262 (Rep. Broomall) ("What is a citizen but a human being who by reason of being born within the jurisdiction of a Government owes allegiance to that government?").

Congress recognized that this language would confer citizenship on children with noncitizen parents of various backgrounds. Senator Cowan, for example, objected to the provision by asking whether "it will not have the effect of naturalizing the children of the Chinese and Gypsies born in this country." *Id.* at 498. Senator Trumbull stated that it would, "[u]ndoubtedly." *Id.* As Trumbull explained in the face of Cowan's xenophobic remarks, "the child of an Asiatic is just as much a citizen as the child of a European." *Id.* In other words, congressmen did not disagree about whether the Act included the children of noncitizens; they instead debated whether the Act *should* do so. *See* Ramsey, *supra*, at 453.

11

President Johnson shared this view of the Civil Rights Act—which was why he vetoed it.  In his veto message, Johnson noted that by referencing "all persons born in the United States, and not subject to any foreign power," the bill "comprehends the Chinese of the Pacific States" and "the people called Gypsies, as well as the entire race designated as blacks, people of color, negroes, mulattoes, and persons of African blood."  Cong. Globe, 39th Cong., 1st Sess. 1679 (1866).  He rejected the bill because "[e]very individual of those races, born in the United States, is by the bill made a citizen of the United States."  *Id.*  Congress overrode his veto.  *See id.* at 1809 (Senate); *id.* at 1861 (House).

**3.**    Soon after the passage of the 1866 Civil Rights Act, Congress drafted the Fourteenth Amendment, "evidently thinking it unwise … to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by any subsequent congress."  *Wong Kim Ark*, 169 U.S. at 675; *see also* Cong. Globe, 39th Cong., 1st Sess. 2896 (1866) ("We desired to put this question of citizenship and the rights of citizens and freedmen under the civil rights bill beyond the legislative power of such gentlemen ... who would pull the whole system up by the roots and destroy it …." (Sen. Howard)).

On May 30, 1866, Senator Howard proposed adding language that would ultimately be ratified as the Citizenship Clause.  He explained that his proposal would declare "that every person born within the limits of the United States, and

subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). Senator Howard further described his amendment as "simply declaratory of what I regard as the law of the land already." *Id.* As such, Congress understood that the "subject to the jurisdiction" requirement excluded from birthright citizenship those who were excluded at common law. *See id.* The Clause's inclusion of children born to noncitizen parents (other than diplomats), including those here temporarily, was never questioned.

Instead, the debate predominantly focused on whether the phrase included Native Americans, with some proposing a specific provision excluding "Indians not taxed." *See* Bethany R. Berger, *Birthright Citizenship on Trial*, 37 Cardozo L. Rev. 1185, 1197-99 (2016). Prior to the Fourteenth Amendment, those born into a tribe were not considered U.S. citizens. *Id.* at 1201. The Fourteenth Amendment's Framers thus recognized tribes' status as "distinct, independent political communities," *Worcester v. Georgia*, 31 U.S. 515, 559 (1832), by maintaining the status quo and ensuring that "Indians in tribal relations [did] not involuntarily become citizens," Berger, *supra*, at 1198. As Senator Trumbull put it, "Indians" are "by no means" "subject to the complete jurisdiction of the United States," because of their unique relationship to the government. Cong. Globe, 39th Cong., 1st Sess. 2893

13

(1866); S. Rep. No. 41-268, at 9-10 (1870) ("Congress has never regarded the Indian tribes as subject to the municipal jurisdiction of the United States.… Their right of self government, and to administer justice among themselves, … has never been questioned; and … the Government has carefully abstained from attempting to regulate their domestic affairs.").[3]

Aside from the agreed upon exceptions, both opponents and supporters of the Amendment shared the view that its language granted citizenship to virtually all persons born in the United States, no matter their parents' immigration status. In fact, like the opponents of the Civil Rights Act, lawmakers opposing the Citizenship Clause objected to the provision precisely because they understood it to enshrine in the Constitution a guarantee of birthright citizenship for virtually all children born on U.S. soil, including those whose parents might not remain in the country forever.  For example, Senator Cowan objected to giving citizenship "broadly" to "everybody who shall be born in the United States," arguing "we ought to exclude others besides Indians not taxed."  Cong. Globe, 39th Cong., 1st

---

[3] Consistent with this history, the Supreme Court held in *Elk v. Wilkins* that the Citizenship Clause did not grant birthright citizenship to Native Americans, underscoring that tribes are "alien nations, distinct political communities" that are not "subject to the jurisdiction" of the United States.  112 U.S. 94, 99, 102 (1894). Shortly after *Elk*, Congress provided that any Indian who accepted an allotment or separated from a tribe and "adopted the habits of civilized life" would become a citizen.  Berger, *supra*, at 1236 (quoting Indian General Allotment (Dawes) Act of 1887, ch. 119, § 6, 24 Stat. 388, 390).  In 1924, Congress granted citizenship to all Native Americans born in the United States.  *See* Appellants Br. 16 n.2.

14

Sess. 2891 (1866). He expressed concern that the proposal would expand the number of individuals of Chinese descent in California and "Gypsies" in his home state of Pennsylvania—who were, in his view, "trespassers" who owed the government "no allegiance"—by granting birthright citizenship to their children. *Id.*

Supporters of Howard's proposal did not respond by taking issue with Cowan's understanding, but instead by arguing that the proposal was sound policy. Senator Conness declared that the Clause would apply to "children of all parentage whatever" born in the United States. *Id.* He was "in favor" of making "the children begotten of Chinese parents … citizens." *Id.* For Conness, it did not matter that Chinese migrants were not necessarily living in the United States permanently, *see id.* (emphasizing that Chinese migrants "all return to their own country at some time or another"), because the Clause ensured citizenship for all "human beings born in the United States," *id.* at 2892.

## II. Longstanding Precedent Confirms that the Fourteenth Amendment Establishes Birthright Citizenship for Children of Noncitizens, Irrespective of Their Parents' Immigration Status.

Soon after the Amendment's ratification, courts, including the Supreme Court, recognized that it guaranteed birthright citizenship to the children of noncitizens. For example, in 1884, Justice Field rejected an attempt to deny citizenship to a man born in California to noncitizen parents of Chinese descent. *In re Look*

15

*Tin Sing*, 21 F. 905, 908 (C.C.D. Cal. 1884) (Field, J.).  After explaining the Citizenship Clause's limited exceptions, *id.* at 906-07, the court concluded that the petitioner was "not within any of the classes of persons excepted from citizenship," *id.* at 908.  The court summarized: "It is enough that he was born here, whatever was the status of his parents."  *Id.* at 910.

The Supreme Court confirmed this understanding in *United States v. Wong Kim Ark*, which held that the Fourteenth Amendment "reaffirmed in the most explicit and comprehensive terms" the "fundamental principle of citizenship by birth within the dominion," which included children born to noncitizen parents.  169 U.S. at 675; *see id.* at 676 ("[The Fourteenth Amendment] is declaratory in form, and enabling and extending in effect.").  In that case, the Court held that Wong Kim Ark was a citizen of the United States because he was born in the United States, even though his parents were "subjects of the emperor of China."  *See id.* at 705.  The Court exhaustively surveyed the common law origins of birthright citizenship, the history of the Citizenship Clause, and contemporary interpretations of the Clause's scope, and concluded "the effect of birth [is] declared by the [C]onstitution to constitute a sufficient and complete right to citizenship."  *Id.* at 703.

The Court held that noncitizens like Wong Kim Ark were "subject to the jurisdiction" of the United States under the plain meaning of the phrase.  As the Court explained, the Clause only "exclud[ed] ... two classes of cases[:] children

16

born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state," in addition to "children of members of the Indian tribes," who, owing to their "peculiar relation to the National Government," were "unknown to the common law," as recognized in *Elk*. *Id.* at 682; *see id.* at 687 (presuming that the 39th Congress understood "subject to the jurisdiction thereof" in the "same sense in which the like words had been used by Chief Justice Marshall in the [well-known] case of *The Exchange*").

All other foreigners living in the country were "within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693. The Court underscored that this "allegiance to the United States is direct and immediate, and, although but local and temporary, continuing only so long as he remains within our territory." *Id.* Even if a foreign citizen is here for a short period of time, that person is "within the allegiance" of the United States when they are living in the country. *Id.* Thus, the Court held that, aside from the narrow exceptions, the Fourteenth Amendment "includ[es] all children here born of resident aliens." *Id.*

This view was, as the Court noted, also consistent with contemporaneous interpretations of the Clause, including the position of President Grant's Secretary of State in 1871. *See id.* at 690 ("subject to the jurisdiction thereof was probably intended to exclude the children of foreign ministers, and of other persons who may

17

be within our territory with rights of extraterritoriality" (quoting Statement from Hamilton Fish, U.S. Sec'y of State, to George Perkins Marsh, Am. Minister to Italy (May 19, 1871), *in* 2 *A Digest of the International Law of the United States Taken From Documents Issued by Presidents and Secretaries of States* 394, 394 (Francis Wharton ed., Gov't Printing Office 1887))).[4]

Beyond the Citizenship Clause, the Court also emphasized that the Fourteenth Amendment encompassed all persons within the territorial jurisdiction of the United States. *Id.* at 694-96 (discussing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). Indeed, the Court cited its recent decision holding that the Fifth and Sixth Amendments protected migrants found to be unlawfully present. *See Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *id.* at 242-43 (Field, J., concurring) (noting the government had argued that unlawful entrants were not entitled to constitutional protection); Gerald Neuman, Wong Wing v. United States*: The Bill of Rights Protects Illegal Aliens*, *in Immigration Stories* 31, 31 (Martin & Schuck eds., 2005).

---

[4] While the Court recognized that it had previously written in *Slaughter-House Cases* that "children of ... citizens or subjects of foreign states" were not "subject to the jurisdiction" of the United States, the Court correctly dismissed this statement as dicta, "wholly aside from the question in judgment," and "unsupported by any argument, or by any reference to authorities." *Wong Kim Ark*, 169 U.S. at 678 (quoting *Slaughter-House Cases*, 83 U.S. 36, 73 (1872)).

In the decades since *Wong Kim Ark*, the Supreme Court has repeatedly affirmed and relied upon its holding.  *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (child born in the United States to parents who had entered the country illegally "was a citizen of this country"); *Plyler v. Doe*, 457 U.S. 202, 211-12 & n.10 (1982); *see also* 1995 OLC Op., *supra*, at 346 n.15 (collecting cases).

## III.    The Order Is Unconstitutional.

By depriving some children born in the United States to noncitizen parents of the constitutional guarantee of birthright citizenship, Order § 1, the Order violates the Fourteenth Amendment.  *See Wong Kim Ark*, 169 U.S. at 702.  Appellants' arguments to the contrary are meritless.

**A.**    First, Appellants argue that "subject to the jurisdiction" means "political jurisdiction," Appellants Br. 13, and that political jurisdiction only includes "persons who owe primary allegiance" to the United States," *id.* at 14.  To support their contention, Appellants rely heavily on *Elk v. Wilkins*'s conclusion that Tribal citizens' "direct and immediate allegiance" to their Tribes precludes them from being "subject to the jurisdiction" of the United States, *id.* at 15-16 (quoting *Elk*, 112 U.S. at 102), along with Senator Trumbull's statement that the Citizenship Clause does not apply to Native Americans because "subject to the jurisdiction" means "[n]ot owing allegiance to anybody else," *id.* at 22 (quoting Cong. Globe, 39th Cong., 1st Sess. 2893 (1866)).

19

Appellants misconstrue Senator Trumbull's statement and misread *Elk*. Both statements reflected the unique status of Tribal citizens and Tribal Nations as "distinct political communities" within the United States. *Elk*, 112 U.S. at 99-100.

Notably, during debates about the Citizenship Clause, Senator Howard had observed that the U.S. government had always treated the Indian tribes as "foreign Powers, so far as the treaty-making power is concerned, and so far especially as the commercial power is concerned," adding that "the very Constitution itself" includes a "full and complete recognition" of the tribes' unique sovereign status in the Indian Commerce Clause. Cong. Globe, 39th Cong., 1st Sess. 2895 (1866). Senator Trumbull agreed that the Indian tribes are "not subject to our jurisdiction" due to their distinct status as recognized governments existing within the territorial borders of the United States, as illustrated in part by treaties between the U.S. government and the tribes. *Id.* at 2893; s*ee also* Gregory Ablavsky & Bethany Berger, *Subject to the Jurisdiction Thereof: The Indian Law Context*, 100 N.Y.U. L. Rev. Online (forthcoming 2025) (manuscript at 18-20) (describing Trumbull's belief that "Native nations within Indian country were, … not within the territorial jurisdiction of either the state or the federal government" and "enjoyed jurisdictional immunity even within U.S. borders").

In view of this specific history, the *Elk* Court, like the Amendment's Framers, concluded that Tribal citizens were not "subject to the jurisdiction" of the

United States within the meaning of the Citizenship Clause. *Elk*, 112 U.S. at 102; *Wong Kim Ark*, 169 U.S. at 682 ("*Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents ... not in the diplomatic service of a foreign country."). The *Elk* Court also emphasized that the Constitution's text presumed that the children of Tribal citizens were exempt from birthright citizenship, *Elk*, 112 U.S. at 98-102 (emphasizing references to "Indians not taxed"), and noted that the "action of the political departments" both before and after the passage of the Fourteenth Amendment reflected that presumption, *id*. at 100, 103.

Further, *Wong Kim Ark* rejected Appellants' view that foreign citizens have allegiance to another country and thus cannot be "subject to the jurisdiction" of the United States. Appellants' position echoes the government's briefs in that case, *see* Berger, *supra*, at 1248; Lucy Salyer, Wong Kim Ark*: The Contest Over Birthright Citizenship*, *in Immigration Stories*, *supra*, at 51, 58-59, 65-71 (explaining that the briefs formed part of a campaign to undermine the antiracial and nationalizing project of the Fourteenth Amendment), and was embraced by the *Wong Kim Ark* dissent, *see* 169 U.S. at 725 (Fuller, C.J., dissenting) ("To be 'completely subject' to the political jurisdiction of the United States is to be in no respect or degree subject to the political jurisdiction of any other government."). But the Court's majority was clear: "Every citizen or subject of another country, while domiciled

21

here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693.

**B.**     To further support their contention that the Citizenship Clause requires "primary allegiance" to the United States, Appellants assert that the Civil Rights Act of 1866 excluded the children of noncitizens because it restricted birthright citizenship to those "not subject to any foreign power."  According to Appellants, the Fourteenth Amendment should be interpreted consistently with this understanding of the Civil Rights Act.  Appellants Br. 20-21.  This argument is wrong twice over.

First, Congress understood the Civil Rights Act, like the Fourteenth Amendment, to encompass children born to immigrants.  *See* Cong. Globe, 39th Cong., 1st Sess. 498 (1866) (the Act "[u]ndoubtedly" gives citizenship to "the children of Chinese and Gypsies born in this country"); *see also Wong Kim Ark*, 169 U.S. at 688 ("it can hardly be doubted that the words of that act, 'not subject to any foreign power,' were not intended to exclude any children born in this country from the citizenship which would theretofore have been their birthright").  Second, even if Appellants' reading of the Act were correct (and it is not), the Fourteenth Amendment superseded any previous statutory provision of birthright citizenship.  As the Supreme Court has explained, "any possible doubt" as to the application of birthright citizenship to the children of noncitizens was "removed when the negative

22

words of the [Civil Rights Act], 'not subject to any foreign power,' gave way, in the [Fourteenth Amendment], to the affirmative words, 'subject to the jurisdiction of the United States.'" *Wong Kim Ark*, 169 U.S. at 688.

**C.**    Third, Appellants claim that children born in the United States can "establish[] the requisite allegiance" only if their parents are domiciled in the United States. Appellants Br. 24-25. According to Appellants, persons in the United States without documentation or on nonimmigrant visas retain the domicile of the countries from which they came as a matter of law. *See id.* at 25-26, 31. Therefore, Appellants argue, neither they nor their children can establish domicile in the United States, and their children are not birthright citizens. *Id.* at 24. This argument fails on several fronts.

As an initial matter, Defendants' argument that the Clause requires either "primary allegiance" or "domicile" is entirely atextual. Neither term appears anywhere in the Fourteenth Amendment. Moreover, even if allegiance were required, Appellants' claim that individuals who are not domiciled in the United States do not have "primary" allegiance to the country and are not subject to its jurisdiction, *see id.*, is completely invented. Allegiance has never depended upon domicile, and it certainly did not at the time of the Fourteenth Amendment's drafting and ratification.

As Appellants explain, judges and lawmakers often referred to "allegiance" when describing the Citizenship Clause, *see id.* at 15-22, but these remarks referred to the "natural allegiance" that stemmed from birth within a jurisdiction. *See supra* at 7-8; 1 John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* 93 (11th ed. 1864) ("[n]atural allegiance is … due from all men born within the United States"). And having ties to another country did not defeat allegiance—foreigners owed "[l]ocal allegiance" to the United States stemming from their presence there, no matter how temporary or unauthorized that presence was. 1 Bouvier, *supra*, at 93; 2 Alexander M. Burrill, *A Law Dictionary and Glossary* 164 (2d ed. 1871) ("in the United States, during the residence of aliens amongst us, they owe a local allegiance and are equally bound with natives to obey all general laws"); *The Pizarro*, 15 U.S. 227, 246 (1817) (Story, J.) ("allegiance" can be "temporary," and merchant living in Spanish territory "owes allegiance to the country, while he resides in it," even though he had not "by birth or naturalization, contracted a permanent allegiance"). This makes sense: as Chief Justice Marshall explained, "it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction," if foreign citizens traveling through the United States "did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." *Wong Kim Ark*, 169 U.S. at 685-86 (quoting

24

*The Exchange*, 11 U.S. at 144).  In 1868, like today, being subject to the United States' laws did not depend on whether a person was in the country permanently or temporarily, lawfully or unlawfully.

Indeed, *Wong Kim Ark* embraced this understanding of allegiance.  *See* 169 U.S. at 693 (as long as a foreign citizen is in the United States, his allegiance to the United States is "direct and immediate" even if "temporary").  Appellants sidestep this passage and focus on the Court's use of the term "domicile" to argue that *Wong Kim Ark* is consistent with their theory of "primary allegiance."  Appellants Br. 38-39.  But Appellants mistake a stipulation for a condition.  The Court characterized Wong Kim Ark's parents as "domiciled" in the United States because the parties so stipulated and that stipulation formed part of the question presented. *Wong Kim Ark*, 169 U.S. at 652.  But the ground on which the Court based its decision—that the Citizenship Clause reached all individuals born in the United States and subject to its laws—did not turn on domicile.

Finally, Appellants' theory that those unlawfully present in this country are precluded by law from establishing domicile and "primary" allegiance to the United States is irreconcilable with one of the chief purposes of the Citizenship Clause: endowing citizenship to persons of African descent born in the United States.  As explained above, many Africans were in the country unlawfully after having been illegally trafficked to the United States.  *See supra* at 9.  And they had

25

certainly not traded allegiance in exchange for protection from the government, *see* Appellants Br. 31, given that they faced government-sponsored oppression.  If Appellants were correct, those children would not be birthright citizens.  Such a result would be completely at odds with Congress's plan to forcefully repudiate *Dred Scott*.

**D.**    Failing to make their case on the Clause's text, Appellants argue that history supports their contention that the Clause does not apply to persons temporarily in the United States.  *But see supra* Section I.B.3.  Appellants describe Senator Wade's proposed version of the Fourteenth Amendment that, as they tell it, "would have referred to 'persons born in the United States' (without the additional qualification of being 'subject to' its 'jurisdiction')," and assert that Senators debating this proposal agreed that persons temporarily in the United States would not be subject to the country's jurisdiction.  Appellants Br. 27-28.  According to Appellants, Senator Wade's proposal of a "broader version of the Citizenship Clause did not carry the day."  *Id.* at 28.  But Appellants mischaracterize the debates surrounding Senator Wade's proposal.

Senator Wade was proposing a revision to what would eventually become the Privileges or Immunities Clause (not the Citizenship Clause), and was suggesting that the word "citizen" be replaced with "persons born in the United States or naturalized by the laws thereof."  Cong. Globe, 39th Cong., 1st Sess. 2768 (1866).

26

Wade intended this amendment to quell any "doubt thrown over" the subject of citizenship by courts—certainly a reference to *Dred Scott. Id.* When Senator Fessenden inquired about "a person [who] is born here of parents from abroad temporarily in this country," *id.* at 2769, Senator Wade could only think of one example that fit into that category: "the children of foreign ministers who ... [b]y a fiction of law ... are not ... residing here," *id.* Despite Appellants' contentions, this exchange confirms how narrowly members of Congress understood the exception to birthright citizenship.

*  *  *

In brief, the Fourteenth Amendment guarantees birthright citizenship to all children born in the United States, no matter the immigration status of their parents. No amount of contortion on Appellants' part can change this. This Court should reject Appellants' arguments and affirm the decision below and the bedrock constitutional principle of birthright citizenship.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should

be affirmed.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
Anna K. Jessurun
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: May 28, 2025

# APPENDIX[*]

## LIST OF *AMICI*

Ahilan Arulanantham, Professor from Practice, Faculty Co-Director, Center for Immigration Law and Policy, UCLA School of Law

Evan D. Bernick, Associate Professor of Law, Northern Illinois University College of Law

Sam Erman, Professor of Law, Co-director, Program in Race, Law, and History, University of Michigan Law School

Amanda Frost, David Lurton Massee, Jr., Professor of Law, John A. Ewald Jr. Research Professor of Law, Director, Immigration, Migration and Human Rights Program, University of Virginia School of Law

Hiroshi Motomura, Susan Westerberg Prager Distinguished Professor of Law, Faculty Co-Director, Center for Immigration Law and Policy, School of Law, University of California, Los Angeles (UCLA)

Michael D. Ramsey, Warren Distinguished Professor of Law, University of San Diego School of Law

Ilya Somin, Professor of Law, Scalia Law School, George Mason University, Simon Chair in Constitutional Studies, Cato Institute

Leti Volpp, Robert D. and Leslie Kay Raven Professor of Law, UC Berkeley School of Law

---

[*] *Amici* join this brief as individuals; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of their positions.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 6,464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief *amicus curiae* complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 28th day of May, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod


*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on May 28, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 28th day of May, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amici Curiae*