Nos. 25-1169, 25-1170

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Commissioner of Social Security, *Defendants-Appellants*.

_____

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL, on behalf of the People of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Commissioner of Social Security; UNITED STATES OF AMERICA,
*Defendants-Appellants*.

_____

On Appeal from the United States District Court

for the District of Massachusetts

## BRIEF FOR PROFESSORS ERIKA LEE, PAUL FINKELMAN, AND GABRIEL J. CHIN AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

NEEL CHATTERJEE*
ANDREW ONG
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
(650) 752 3100
NChatterjee@goodwinlaw.com
AOng@goodwinlaw.com

ISHIKA DESAI
GOODWIN PROCTER LLP
525 Market Street, 32nd Floor
San Francisco, CA 94105
(415) 733 6000
IDesai@goodwinlaw.com

DENA KIA
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813 8800
DKia@goodwinlaw.com

*Counsel for Amici Curiae*                                        *Counsel of Record

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ...........................................................................4

I.   The Executive Order Will Have a Disproportionate Impact on Asian Americans. ........................................................................4

II.  Federal Laws Prohibited Asians from Immigrating and Naturalizing...............6

  A.   The Naturalization Act of 1790.................................................7

  B.   The Anti-Coolie Act of 1862 ...................................................8

  C.   The Page Act of 1875...........................................................9

  D.   The Chinese Exclusion Act of 1882 and the Geary Act of 1892...............10

  E.   The Immigration Act of 1917 ..................................................11

III. Courts Uphold Laws Denying Asian Immigrants from Participating in the Political Community. ......................................................11

IV.  State Legislation Denied Economic Opportunities for Asian Immigrants and Asian Americans. ...............................................14

  A.   Alien Land Laws ...............................................................15

  B.   Laws Limiting or Banning Job Opportunities.................................16

V.   Legal and Economic Exclusions Legitimized Anti-Asian Violence. ..............19

VI.  The Fourteenth Amendment Makes Birthright Citizenship a Constitutional Right. ...................................................................21

VII. *Wong Kim Ark* Holds that Children of Asian Immigrants Are Entitled to Birthright Citizenship..................................................23

  A.   Wong Kim Ark Is Born to Noncitizen Parents in California.....................23

  B.   Wong Kim Ark Is Denied Entry into the United States..........................24

  C.   The Supreme Court Holds that Wong Kim Ark and All Children Born in the United States Are Citizens. ..............................................25

VIII.    The Executive Order Defies the Fourteenth Amendment and *Wong Kim Ark* … … … … … … . ...................................................26

CONCLUSION ........................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Ah Yup*,
   1 F. Cas. 223 (C.C.D. Cal. 1878) ................................................................. 12

*In re Chang*,
   60 Cal. 4th 1169 (2015) ................................................................ 17, 18, 19

*In re Chang*,
   84 Cal. 163 (1890) ................................................................................ 18, 19

*Dred Scott v. Sandford*,
   60 U.S. 393 (1857) ...................................................................................... 21

*Elk v. Wilkins*,
   112 U.S. 94 (1884) ........................................................................................ 6

*Fong Yue Ting v. United States*
   149 U.S. 698 (1893) .............................................................................. 12, 13

*Henderson* ex rel. *Henderson v. Shinseki*,
   562 U.S. 428 (2011) .................................................................................... 26

*Ozawa v. United States*,
   260 U.S. 178 (1922) .................................................................................... 13

*People v. Hall*,
   4 Cal. 399 (1854) ........................................................................................ 19

*Porterfield v. Webb*,
   263 U.S. 225 (1923) .................................................................................... 16

*Terrace v. Thompson*,
   263 U.S. 197 (1923) .................................................................................... 16

*Toyota v. United States*,
   268 U.S. 402 (1925) .................................................................................... 14

*United States v. Thind*,
   261 U.S. 204 (1923) .................................................................................... 14

*United States v. Wong Kim Ark*
169 U.S. 649, 693 (1898)........................................................... *in passim*

*Webb v. O'Brien*,
263 U.S. 313 (1923).............................................................................16

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886).....................................................................17, 18

**Statutes**

U.S. Const. amend. XIV ............................................................ *in passim*

8 U.S.C. § 1101 .....................................................................................7

8 U.S.C. § 1401(b) ...............................................................................6

Act of April 29, 1902, Pub. L. No. 57-90, 32 Stat. 176 (1902)................10

Act to Prohibit the "Coolie Trade," ch. 27, § 1, 12 Stat. 340 (1862) .................8, 23

Chinese Exclusion Act, Pub. L. No. 47-126, ch. 126, 22 Stat. 58
(1882) ..................................................................................................10

Geary Act, Pub. L. No. 52-60, 27 Stat. 25 (1892) .................................10

Immigration Act of 1917, Pub. L. No. 64-301, ch. 29, § 3, 39 Stat. 874
(1917) ..................................................................................................11

Immigration and Nationality Act of 1952, Pub. L. No. 82-414, ch.
477, § 201(a), 66 Stat. 163 (1952) .......................................................7

Luce-Cellar Act of 1946, Pub. L. No. 79-483, ch. 534, 60 Stat. 416
(1946) ....................................................................................................7

Magnuson Act of 1943, Pub. L. No. 78-199, 57 Stat. 600 (1943) ...............7, 10, 11

Naturalization Act of 1790, Pub. L. No. 1-3, ch. 3, § 1, 1 Stat. 103
(1790) ....................................................................................................8

Naturalization Act of 1870, Pub. L. No. 41-254, § 7, 16 Stat. 256
(1870) ....................................................................................................8

Naturalization Act of 1906, ch. 3592, 34 Stat. 596 (1906)....................13

Page Act of 1875, Pub. L. No. 43-141, ch. 141, 18 Stat. 477 (1875).......................9

1917 Alien Land Law Act (Ariz.), ch. 43, 1917 Ariz. Sess. Laws 56....................15

1921 Alien Land Law Act (La.) La. Const. art. XIX, § 21 (1921).........................15

1921 Alien Land Law Act (Wash.), ch. 50, 1921 Wash. Sess. Laws 156...........................................................................................................15

1922 Alien Land Law Act (N.M.), ch. 117-116, 1922 N.M. Laws 1473...........................................................................................................16

1923 Alien Land Law Act (Idaho), ch. 122, 1923 Idaho Sess. Laws 160...........................................................................................................16

1923 Alien Land Law Act (Mt.), ch. 57-58, 1923 Mt. Sess. Laws 123 .................16

1923 Alien Land Law Act (Or.), ch. 98, 1923 Or. Laws 145.................................16

1935 Alien Land Law Act (Kan.), ch. 67, 1935 Kan. Stat. Ann. 1638 .................16

Act 261, § 1, Gen. Laws Cal. (1913) .....................................................................15

Cal. Const., art. XIX, § 2 (1879)......................................................................15, 17

California Initiative, 1921 Cal. Stat. lxxxvii, §§ 1-14 (Nov. 2, 1920)....................15

Foreign Miners' Tax Act of 1850, ch. 97, 1850 Cal. Stat. 221, 221-23 (repealed 1851) .................................................................................................20

Foreign Miners' Tax Act of 1852, ch. 37, 1852 Cal. Stat. 84, 85 (repealed 1853) .................................................................................................20

**Other Authorities**

Adam B. Cox & Eric A. Posner, *The Second-Order Structure of Immigration Law*, 59 Stan. L. Rev. 809 (2007)....................................................9

Carolyne Im, Alexandra Cahn & Sahana Mukherjee, *What we know about the U.S. H-1B visa* program, Pew Research Center https://www.pewresearch.org/short-reads/2025/03/04/what-we-know-about-the-us-h-1b-visa-program (Mar. 4, 2025) ........................................4

Cong. Globe, 39th Cong., 1st Sess. 498 (1866).....................................................22

Erika Lee, *America for Americans: A History of Xenophobia in the United States* 138 (2019) ....................................................................11

Erika Lee, *Birthright Citizenship, Immigration, and the U.S. Constitution: The Story of* United States v. Wong Kim Ark*, in* Race Law Stories 89 (Rachel F. Moran & Devon W. Carbado eds., 2008) ........................................................................................24, 25

Executive Order 14160 ("Protecting the Meaning and Value of American Citizenship") (Jan. 20, 2025), 90 Fed. Reg. 8449 ................. *in passim*

From Gold Rush to Golden State, Library of Congress, https://www.loc.gov/collections/california-first-person-narratives/articles-and-essays/early-california-history/from-gold-rush-to-golden-state/ (last visited May 20, 2025)..............................................20

Gabriel J. Chin*, The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273 (1996) ..............................................................11

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215 (2021)....................................................23

Gabriel J. Chin & Paul Finkelman*, The "Free White Person" Clause of the Naturalization Act of 1790 As Super-Statute*, 65 Wm. & Mary L. Rev. 1047 (2024) ..................................................................7

Institute of International Education, *Open Doors Report: Top 25 Places of Origin of International Students*, https://opendoorsdata.org/data/international-students/leading-places-of-origin/ (2024) ........................................................................4

John S. Caragozian, Anti-Asian Discrimination Circa 1852, California Supreme Court Historical Society (May 27, 2021), https://www.cschs.org/wp-content/uploads/2021/06/History-Resources-Caragozian-Anti-Asian-Discrimination-Circa-1852.pdf..................20

Kalen Churcher, Rock Springs Massacre, EBSCO (2022), https://www.ebsco.com/research-starters/history/rock-springs-massacre ............................................................................................21

Karthick Ramakrishnan *et al.*, *By The Numbers: Immigration, AAPI Data* https://aapidata.com/featured/by-the-numbers-immigration/ (Jan. 9, 2025)..................................................................................4

Law, Order, and Justice for Some – Discrimination, Oakland Museum of California, http://explore.museumca.org/goldrush/fever16-di.html (last visited May 20, 2025)....................................................20

Merriam-Webster.com Dictionary, "coolie," https://www.merriam-webster.com/dictionary/coolie (2025) ................................................8

Michael Luo, When An American Town Massacred Its Chinese Immigrants, New Yorker Magazine (Mar. 3, 2025), https://www.newyorker.com/magazine/2025/03/10/when-an-american-town-massacred-its-chinese-immigrants. ...........................................21

Moon-Ho Jung, *Outlawing "Coolies": Race, Nation, and Empire in the Age of Emancipation,* 57 Am. Q. 677 (2005). ................................8

Paul Finkelman, *Coping with a New Yellow Peril: Japanese Immigration, the Gentlemen's Agreement, and the Coming of World War II*, 117 W. Va. L. Rev. 1409 (Spring 2015).....................................14

Paul Finkelman, Scott v. Sandford: *The Court's Most Dreadful Case and How It Changed History*, 82 Chi.-Kent L. Rev. 3 (2007) ..........................22

Paul Finkelman, *The First Civil Rights Movement: Black Rights in the Age of the Revolution and Chief Taney's Originalism in* Dred Scott, 24 U. Pa. J. Const. L. 676 (2022) .............................................22

Pew Research Center, *Asian Americans: A Survey Data Snapshot*, https://www.pewresearch.org/race-and-ethnicity/2024/08/06/asian-americans-a-survey-data-snapshot/ (2024)............................................3

Scott Zesch, The Chinatown War: Chinese Los Angeles and the Massacre of 1871 (Oxford University Press, 1st ed. 2012)................................19

Shoba Sivaprasad Wadhia & Margaret Hu, *Decitizenizing Asian Pacific American Women*, 93 U. Col. L. Rev. 325 (2022)..................................9

Stewart Chang, *Feminism in Yellowface*, 38 Harv. J.L. & Gender 235 (2015).....................................................................9

Stop AAPI Hate, *Protect Birthright Citizenship*
    https://stopaapihate.org/protect-birthright-citizenship/ (2025)............................5

Tomasz Homa, *Political community*
    https://www.researchgate.net/publication/351057543_Political_co
    mmunity (Apr. 22, 2021) ........................................................................................7

## INTEREST OF *AMICI CURIAE*[1]

*Amicus* Professor Erika Lee, Ph.D., is the Bae Family Professor of History, Radcliffe Alumnae Professor, and the Carl and Lily Pforzheimer Foundation Director Schlesinger Library on the History of Women in America at Harvard University. Professor Lee focuses her research on immigration and Asian American history in the United States, as well as the histories of race, xenophobia, law, gender, and society.

*Amicus* Professor Paul Finkelman, Ph.D., is a Visiting Professor of Law at the University of Toledo College of Law and President William McKinley Distinguished Professor of Law and Public Policy, emeritus, Albany Law School. Professor Finkelman specializes in American legal history, constitutional law, the law of slavery, law and religion, civil rights and race relations, civil liberties, and American constitutional history.

*Amicus* Professor Gabriel J. Chin is the Edward L. Barrett Jr. Chair of Law, Martin Luther King Jr. Professor of Law, and Director of Clinical Legal Education at University of California, Davis School of Law. Professor Chin is a scholar of immigration law, criminal procedure, and race and law.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amici curiae* state that no counsel for a party authored the brief in whole or in part, and no counsel or a party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than the *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

*Amici* Professors Lee, Finkelman, and Chin have a strong interest in assisting the Court to understand the historical and legal landscape of birthright citizenship, specifically as it relates to Asian immigrants, to ensure that the constitutionally protected right is upheld.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For more than 150 years, the Fourteenth Amendment has guaranteed birthright citizenship to virtually all children born in the United States, without regard to the immigration or legal status of the child's parents. The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The Supreme Court affirmed the foundational tenet of the Citizenship Clause in *United States v. Wong Kim Ark*, holding that "[t]he [Fourteenth] [A]mendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States." 169 U.S. 649, 693 (1898). The Supreme Court reached this conclusion in *Wong Kim Ark* notwithstanding the systematic physical, economic, and political exclusion of Asians in the United States. Asian Americans, who make

up over 7% of the U.S. population,[2] have since relied on the protections of birthright citizenship, as generations of Asian Americans otherwise had no legal pathway to citizenship in this country.[3]

Appellants now seek to ignore the Fourteenth Amendment and the Supreme Court's holding in *Wong Kim Ark* and deny children born in the United States the birthright citizenship to which they are constitutionally entitled.  On January 20, 2025, President Donald J. Trump signed an Executive Order titled, "Protecting The Meaning and Value of American Citizenship" (the "Executive Order"), which provides:

> It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons:  (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

90 Fed. Reg. 8449 § 2 (Jan. 20, 2025).  The Executive Order violates the Fourteenth

---

[2]  Asian Americans: A Survey Data Snapshot, Pew Research Center, https://www.pewresearch.org/race-and-ethnicity/2024/08/06/asian-americans-a-survey-data-snapshot/ (last visited Apr. 28, 2025).

[3] The term "Asian American" is used herein to include persons of East, Southeast, and South Asian descent.

Amendment's right to birthright citizenship and threatens the safeguards and privileges that have long been afforded to immigrant communities.

## ARGUMENT

### I.     The Executive Order Will Have a Disproportionate Impact on Asian Americans.

If the Executive Order is allowed to take effect, Asian Americans will be disproportionally negatively and irreparably affected.  Sixty-five percent of Asian Americans are foreign-born, over 63% of international students are from Asia, and 85% of H-1B workers are from either India or China.[4]  As of 2022, there were approximately 1.7 million undocumented Asian immigrants; 1 out of every 7 undocumented immigrants is Asian.[5]  Denying birthright citizenship to children of undocumented Asian immigrants and children of parents on a student or work visa may render those children stateless and deprive them of fundamental civil rights, including the rights to vote, serve on juries, run for elected office, obtain

---

[4] Karthick Ramakrishnan *et al.*, By The Numbers: Immigration, AAPI Data (Jan. 9, 2025), https://aapidata.com/featured/by-the-numbers-immigration/; Carolyne Im, Alexandra Cahn & Sahana Mukherjee, What we know about the U.S. H-1B visa program, Pew Research Center (Mar. 4, 2025), https://www.pewresearch.org/short-reads/2025/03/04/what-we-know-about-the-us-h-1b-visa-program/; Open Doors Report: Top 25 Places of Origin of International Students, 2000/01 – 2023/24, Institute           of           International           Education           (2024), https://opendoorsdata.org/data/international-students/leading-places-of-origin/.

[5] Ramakrishnan *et al.*, *supra* note 4.

employment in some professions, obtain student loans, receive a passport, and obtain various federal and state benefits.

As citizenship for Asian immigrants was severely restricted until 1952, birthright citizenship became the sole means for Asian Americans to participate in the political community.  "[B]irthright citizenship continues to be one of the most common pathways for Asian Americans . . . to establish roots and build thriving futures in America."[6]  Without birthright citizenship, the millions of Asian Americans in the U.S descended from immigrants would be denied the right to participate in American society.

As set forth below, state-sanctioned discrimination and racially motivated exclusionary laws in the eighteenth,  nineteenth, and twentieth centuries impacted generations of Asian Americans.  While these laws have been discarded, this disenfranchisement of Asian immigrants and Asian Americans deprived Asians of political representation and left them unable to participate in American democracy.

Despite this painful history, the United States has slowly recognized that denying citizenship to categories of people based on race alone is un-American and counterproductive to the American economy and society.  Congress in passing the Fourteenth Amendment, and the Supreme Court in deciding *Wong Kim Ark*, came

---

[6] Protect Birthright Citizenship, Stop AAPI Hate, https://stopaapihate.org/protect-birthright-citizenship/ (last visited Apr. 28, 2025).

to the right conclusions regarding birthright citizenship as belonging to virtually all U.S.-born children,[7] regardless of race, citizenship, or other status of their parents. The Executive Order unconstitutionally seeks to undo more than a century of efforts to secure rights guaranteed by the Fourteenth Amendment that provide Asian Americans the right to political and economic participation. Today, more than 150 years after the ratification of the Fourteenth Amendment, is not the time to revive the experiment that made the Amendment necessary—namely, the exclusion of large hereditary groups from the political community.

## II.  Federal Laws Prohibited Asians from Immigrating and Naturalizing.

Although today Asian immigrants can become naturalized citizens, that right has come about only gradually. From the late eighteenth century through the mid-twentieth century, U.S. immigration and citizenship laws explicitly excluded certain immigrants based on their race and nationality. As a result, Asians—who have been in the United States since the late eighteenth century—were denied both formal legal status and the possibility of inclusion and integration into the political community.[8]

---

[7]  There are only two categories of U.S.-born children to whom the Citizenship Clause does not apply: children born to diplomats and children born to hostile armies in the country. *Wong Kim Ark*, 169 U.S. at 682. Although Native Americans were initially denied birthright citizenship (*Elk v. Wilkins*, 112 U.S. 94, 102 (1884)), Congress statutorily granted it to them in 1924 (8 U.S.C. § 1401(b)).

[8] "Political community" is a term with multiple meanings. According to Professor of Philosophy Tomasz Homa, political community "primarily refers to a civic community . . . that is co-created by its members who are entitled to participate in

This exclusion lasted, in whole and in part, from 1790 until 1952.

Between 1940 and 1946, Congress allowed people from the Philippines, China, and the Indian Subcontinent to naturalize, while people from Japan, other parts of east, central, and southeast Asia, and various islands in the Pacific were not allowed to naturalize. *See* Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 As Super-Statute*, 65 Wm. & Mary L. Rev. 1047, 1110 (2024); *see*, *e.g.*, Magnuson Act of 1943, Pub. L. No. 78-199, 57 Stat. 600 (1943) (repealing the Chinese Exclusion Act and allowing Chinese immigrants to naturalize); Luce-Cellar Act of 1946, Pub. L. No. 79-483, ch. 534, 60 Stat. 416 (1946) (allowing persons from India and the Philippines to naturalize). Finally, the Immigration and Nationality Act of 1952 permitted Asians and all other immigrants to seek U.S. citizenship. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, ch. 477, § 201(a), 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101 (2012)). As recounted below, the passage of the Immigration and Nationality Act of 1952 finally ended decades of discriminatory laws aimed at precluding Asians from becoming citizens.

### A.     The Naturalization Act of 1790

The Naturalization Act of 1790, the first federal statute governing citizenship,

---

its governance and its judicial system (courts), i.e. its citizens[.]" Tomasz Homa, *Political community* (Apr. 22, 2021), https://www.researchgate.net/publication/351057543_Political_community.

restricted naturalization to "[a]ny free white person."  Naturalization Act of 1790, Pub. L. No. 1-3, ch. 3, § 1, 1 Stat. 103 (1790).  After the Civil War, Congress amended the law to allow naturalized citizenship "to aliens of African nativity and to persons of African descent."  *See* Naturalization Act of 1870, Pub. L. No. 41-254, § 7, 16 Stat. 256 (1870).  Asian and other non-White immigrants continued to be denied the right to become U.S. citizens.

### B.     The Anti-Coolie Act of 1862

In 1862, Congress passed "An Act to Prohibit the 'Coolie Trade' by American Citizens in American Vessels," which prohibited U.S. citizens or vessels from transporting "the inhabitants or subjects of China, known as 'coolies,' . . . as servants or apprentices, or to be held to service or labor[.]"[9]  Ch. 27, § 1, 12 Stat. 340 (1862). Although couched as anti-slavery legislation, the Anti-Coolie Act sought to protect the economic interests of White laborers by restricting Asian immigration and to respond to growing anti-Chinese sentiment that was openly and notoriously based on racial animus.

---

[9] The term "coolie" is a derogatory term referring to "an unskilled laborer or porter usually in or from the Far East hired for low or subsistence wages."  *Coolie*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/coolie (last visited Apr. 23, 2025); *see also* Moon-Ho Jung, *Outlawing "Coolies": Race, Nation, and Empire in the Age of Emancipation*, 57 Am. Q. 677, 679 (2005).

### C.    The Page Act of 1875

An Act Supplementary to the Acts in Relation to Immigration (commonly known as the "Page Act of 1875"), Pub. L. No. 43-141, ch. 141, 18 Stat. 477 (1875), specifically "targeted Chinese women, requiring them to obtain certificates of immigration showing that they were not entering the United States 'for lewd and immoral purposes.'"  Adam B. Cox & Eric A. Posner, *The Second-Order Structure of Immigration Law*, 59 Stan. L. Rev. 809, 836 (2007).   The Page Act provided:

> In determining whether the immigration of any subject of China, Japan, or any Oriental country, to the United States, is free and voluntary, . . . it shall be the duty of the consul-general or consul of the United States. . . to ascertain whether such immigrant has entered into a contract or agreement for a term of service within the United States, for lewd and immoral purposes . . . .

Page Act of 1875 § 2.  While couched as anti-prostitution legislation, "the Page Act was discriminatorily applied and aimed to exclude all Chinese women based on a constructed stereotype that Chinese women had a cultural inclination toward prostitution."  Stewart Chang, *Feminism in Yellowface*, 38 Harv. J.L. & Gender 235, 242 (2015).   To that end, "the Asian prostitute was politically utilized in the nineteenth century as a racial 'Other' against which normative citizen and immigrant subjects who could racially and culturally belong in America were defined."  *Id.*

Congress did not repeal the Page Act until 1974.[10]

---

[10] Shoba Sivaprasad Wadhia & Margaret Hu, *Decitizenizing Asian Pacific American Women*, 93 U. Col. L. Rev. 325, 327 n.5 (2022).

### D.     The Chinese Exclusion Act of 1882 and the Geary Act of 1892

The Chinese Exclusion Act of 1882 codified rising anti-Asian sentiments by halting the immigration of laborers from China or of Chinese ancestry, expressing "the opinion of the Government of the United States [that] the coming of Chinese laborers to this country endangers the good order of certain localities within the territory[.]"  Pub. L. No. 47-126, ch. 126, § 1, 22 Stat. 58 (1882).  This Act halted the immigration of "skilled and unskilled [Chinese] laborers and Chinese employed in mining" for a ten-year period and reaffirmed existing racial discrimination in naturalization law by specifically prohibiting Chinese immigrants from becoming naturalized citizens.  *Id.* §§ 1, 14-15.

The Act of May 5, 1892, commonly known as the Geary Act, extended the Chinese Exclusion Act by ten years.  Pub. L. No. 52-60, 27 Stat. 25 (1892). Section 6 of the Geary Act also required Chinese persons lawfully present in the country—and only Chinese persons—to register with the "collector of internal revenue of their respective districts" and carry a "certificate of residence" to prove their lawful entry.  *Id.*  Failure to register rendered the Chinese person's presence unlawful and subjected that person to arrest, imprisonment, and deportation.  *Id.*

In 1902, as the Geary Act was expiring, Congress extended the Chinese Exclusion Act indefinitely.  Act of April 29, 1902, Pub. L. No. 57-90, 32 Stat. 176 (1902).  The Chinese Exclusion Act was not repealed until 1943.  Magnuson Act

of 1943, Pub. L. No. 78-199, 57 Stat. 600 (1943). In addition, until 1965, Chinese were restricted by other provisions of the Immigration and Nationality Act of 1952, such as a limit on Asian immigration from anywhere in the world to 2,000 annually. Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 291 & nn.68-69 (1996).

### E. The Immigration Act of 1917

The Immigration Act of 1917, building in part on the Chinese Exclusion Act, banned all immigrants from the "Asiatic Barred Zone" which spanned from the Middle East to Southeast Asia. Immigration Act of 1917, Pub. L. No. 64-301, ch. 29, § 3, 39 Stat. 874, 875-76 (1917). As a result, an estimated 500 million Asian people were officially barred from immigrating. Erika Lee, *America for Americans: A History of Xenophobia in the United States* 138 (2019).

The Immigration and Nationality Act of 1952 repealed the Immigration Act of 1917.

### III. Courts Uphold Laws Denying Asian Immigrants from Participating in the Political Community.

Courts consistently upheld laws prohibiting Asians from naturalizing. Courts held on numerous occasions that such restrictions were permissible and thus denied Asian immigrants citizenship on grounds that they were not White. Such rulings reinforced the notion that Chinese immigrants were not part of the political

community.

In *In re Ah Yup*, the Chinese-born petitioner sought to become a naturalized citizen. 1 F. Cas. 223, 223 (C.C.D. Cal. 1878). The United States Circuit Court for the District of California denied the petition on grounds that, "[i]n all the acts of congress relating to the naturalization of aliens, from that of April 14, 1802, down to the Revised Statutes, the language has been 'that any alien, being a free white person, may be admitted to become a citizen,' etc." *Id.* The court found that "it [wa]s entirely clear that congress intended by this legislation to exclude Mongolians from the right of naturalization." *Id.* at 224. Because "a native of China . . . is not a white person within the meaning of the act of congress," Ah Yup could not become a U.S. citizen. *Id.*

In *Fong Yue Ting v. United States*, 149 U.S. 698 (1893), the Supreme Court upheld the constitutionality of the Geary Act of 1892, explaining that "[t]he right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country . . . is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country." *Id.* at 707. Chinese migrants "continue to be aliens, having taken no steps towards becoming citizens, and incapable of becoming such under the naturalization laws; and therefore remain subject to the power of Congress to expel them, or to order them to be removed and deported from the country, whenever, in its judgment, their removal is necessary or

12

expedient for the public interest." *Id.* at 724. The reasoning articulated in *Fong Yue Ting* made clear the Supreme Court's belief that Chinese immigrants were inferior to, and were not entitled to the same legal protections as, U.S. citizens.

In *Ozawa v. United States*, 260 U.S. 178 (1922), the Supreme Court expanded its views on what it meant to be White for purposes of naturalization. Takao Ozawa was born in Japan. After residing in the United States for 20 years, he sought citizenship under the Naturalization Act of June 29, 1906, 34 Stats. at Large, Part I, Page 596, which provided "for a uniform rule for the naturalization of aliens." Despite this, the Supreme Court concluded that it was Congress's intent for naturalization to be limited to "aliens, being free white persons and to aliens of African nativity and to persons of African descent," as set forth in section 2169 of the Revised Statutes. *Ozawa*, 260 U.S. at 192-94. Indeed, the Supreme Court recognized the exclusion of non-White aliens from citizenship as "a rule in force from the beginning of the government, a part of our history as well as our law, welded into the structure of our national polity by a century of legislative and administrative acts and judicial decisions[.]" *Id.* at 194. The Supreme Court declared that Ozawa was not White because he was "clearly of a race which [wa]s not Caucasian." *Id.* at 198 ("[T]he words 'white person' are synonymous with the words 'a person of the Caucasian race[.]'").

Similarly, in 1925, the Supreme Court denied naturalization to a Japanese

13

immigrant who had honorably served in the United States Navy in World War I and sought citizenship under a statute that allowed honorably discharged veterans from the war to be naturalized. *Toyota v. United States*, 268 U.S. 402 (1925); *see also* Paul Finkelman, *Coping with a New Yellow Peril: Japanese Immigration, the Gentlemen's Agreement, and the Coming of World War II*, 117 W. Va. L. Rev. 1409, 1456 (Spring 2015).

A year after the *Ozawa* decision, the Supreme Court held that "Whiteness" also excluded persons of Indian descent. *United States v. Thind*, 261 U.S. 204 (1923). Bhagat Singh Thind, an immigrant from the Punjab region of India, applied for citizenship. *Id.* at 210. The Supreme Court held that "the words 'free white persons' [we]re words of common speech, to be interpreted in accordance with the understanding of the common man, synonymous with the word 'Caucasian' only as that word is popularly understood." *Id.* at 214-15. Because Thind was not Caucasian, he was not entitled to citizenship. *Id.* at 215.

## IV.    State Legislation Denied Economic Opportunities for Asian Immigrants and Asian Americans.

People from China and of Chinese ancestry from other countries were not just restricted from immigrating. States and local governments enacted laws prohibiting Chinese and other Asian immigrants who were already in the United States from fully participating in the labor market and the economy. Such laws further established Asian immigrants as the "other" in the political community.

### A.    Alien Land Laws

In the mid-1800s, several states enacted laws denying immigrants of Asian descent the right to own or lease property, thereby prohibiting them from farming their own land and ensuring they remained economically subordinate to their White counterparts.

In 1879, California amended its Constitution to restrict land ownership to only immigrants of "the white race or of African descent."  Cal. Const., art. XIX, § 2, as ratified 1879.  In 1913, California passed the first Alien Land Law, which allowed only "aliens eligible to citizenship [to] acquire, possess, enjoy, transmit, and inherit real property or any interest therein."  Gen. Laws Cal. Act 261. § 1.  Seven years later, California voters passed an initiative that tightened the 1913 Alien Land Law by banning "persons ineligible to citizenship," as well as corporations with a majority of shareholders who were ineligible for citizenship, from leasing agricultural land.  California Initiative, 1921 Cal. Stat. lxxxvii, §§ 1-14 (Nov. 2, 1920).

Between 1917 and 1935, Arizona, Washington, Louisiana, New Mexico, Idaho, Montana, Oregon, and Kansas enacted their own alien land laws with similar language.  *See* 1917 Alien Land Law Act (Ariz.), ch. 43, 1917 Ariz. Sess. Laws 56, 56-58; 1921 Alien Land Law Act (Wash.), ch. 50, 1921 Wash. Sess. Laws 156, 156-60; 1921 Alien Land Law Act (La.), La. Const. art. XIX, § 21 (1921); 1922 Alien

Land Law Act (N.M.), ch. 116-117, 1922 N.M. Laws 1473, 1473; 1923 Alien Land Law Act (Idaho), ch. 122, 1923 Idaho Sess. Laws 160, 160-65; 1923 Alien Land Law Act (Mt.), ch. 57-58, 1923 Mt. Sess. Laws 123, 124-26; 1923 Alien Land Law Act (Or.), ch. 98, 1923 Or. Laws 145, 145-50; 1935 Alien Land Law Act (Kan.), ch. 67, 1935 Kan. Stat. Ann. 1638, 1662-64.

During this period, the Naturalization Acts of 1790 and 1870 remained in effect and continued to make Asian immigrants ineligible for citizenship. *See supra* § II(A). Thus, while these Alien Land Laws appeared to be race-neutral, they in fact targeted Asian immigrants. The Supreme Court upheld the constitutionality of such laws, despite their discriminatory intent and effects. *See, e.g.*, *Webb v. O'Brien*, 263 U.S. 313, 322 (1923) ("The provision of the [1920 California Alien Land Law] which limits the privilege of ineligible aliens to acquire real property or any interest therein . . . is not in conflict with the Fourteenth Amendment."); *Porterfield v. Webb*, 263 U.S. 225, 233 (1923) ("We cannot say that the failure of the California Legislature to extend the prohibited class so as to include eligible aliens who have failed to declare their intention to become citizens of the United States was arbitrary or unreasonable."); *Terrace v. Thompson*, 263 U.S. 197, 211, 216-17 (1923) (upholding validity of Washington's 1921 Alien Land Law).

## B.    Laws Limiting or Banning Job Opportunities

Economic opportunities for Asian immigrants were further reduced by state

and local laws that sought to restrict the types of businesses Asian immigrants could own or operate, and excluded them from certain occupations.

"Anti–Chinese sentiment was a major impetus for the California Constitutional Convention of 1879." *In re Chang*, 60 Cal. 4th 1169, 1172 (2015). In addition to prohibiting Chinese immigrants from owning land, the legislature amended the California Constitution to make it unlawful for corporations to "employ directly or indirectly, in any capacity, any Chinese or Mongolian." Cal. Const., art. XIX, § 2, as ratified 1879.

In 1880, San Francisco sought to limit Chinese persons from operating laundries by passing two ordinances that required laundries constructed of wood to obtain a permit from the Board of Supervisors. *Yick Wo v. Hopkins*, 118 U.S. 356, 366 (1886). The Board of Supervisors had sole discretion over who would receive a permit. *Id.* At the time, people of Chinese descent owned 240 of the 320 laundries in San Francisco—none of them had been granted a permit. *Id.* at 373.

The Supreme Court unanimously held that, despite the race-neutral language of the ordinances, their biased enforcement violated the Equal Protection Clause. *Id.* at 374 ("[T]the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law is not justified. The discrimination is, therefore, illegal, and the public administration which enforces it is a denial of the equal protection of the laws and a

violation of the Fourteenth Amendment of the Constitution."). The Supreme Court made clear that "[t]he rights of the petitioners, as affected by the proceedings of which they complain, are not less, because they are aliens and subjects of the emperor of China." *Id.* at 368.

Chinese immigrants were also precluded from practicing law in many states. *See In re Chang*, 84 Cal. 163, 165 (1890), *abrogated by In re Chang*, 60 Cal. 4th 1169 (2015) ("Only those who are citizens of the United States, or who have *bona fide* declared their intention to become such in the manner provided by law, . . . are entitled to be admitted to practice as attorneys and counselors of this court[.]") (citing Cal Civ. Proc. Code, former § 279, enacted 1872 and repealed by Stats. 1931, ch. 861, § 2, p. 1762). Because the Chinese Exclusion Act prohibited Chinese immigrants from becoming citizens, they were also denied admission to the state bar. *See In re Chang*, 60 Cal. 4th at 1175 (the discriminatory exclusion of noncitizen Chinese immigrants "was . . . a blow to countless others who, like Chang, aspired to become a lawyer only to have their dream deferred on account of their race, alienage, or nationality. And it was a loss to our communities and to society as a whole, which denied itself the full talents of its people and the important benefits of a diverse legal profession.").[11]

---

[11] In *In re Chang*, the California Supreme Court "grant[ed] Hong Yen Chang posthumous admission as an attorney and counselor at law in all courts of the State

## V.    Legal and Economic Exclusions Legitimized Anti-Asian Violence.

The legal and economic exclusion of Asian Americans both reinforced and legitimized acts of anti-Asian violence.  The Chinese Massacre of 1871 was one of the largest mass lynchings in United States history, and the first in a series of targeted riots and killings across the United States.[12]  On October 24, 1871, a mob of 500 people, primarily of White and Latino descent, ambushed Los Angeles' Chinatown neighborhood in a coordinated and racially driven attack.  Within two hours, at least eighteen Chinese men—approximately 10 percent of the Chinese population of Los Angeles at that time—were brutally murdered.

The California Supreme Court's 1854 ruling in *People v. Hall* laid the foundation for this type of Anti-Asian violence.  4 Cal. 399 (1854).  In *People v. Hall*, the California Supreme Court held that Chinese people could not testify against White defendants in court, as they were considered "a race of people whom nature has marked as inferior" and "incapable of progress or intellectual development beyond a certain point[.]"  *Id.* at 404-05.  This legal precedent emboldened anti-Asian violence by effectively granting impunity to Whites who committed crimes against Chinese Americans, affirming the belief that Asian Americans were not

---

of California." 60 Cal. 4th at 1170.  Mr. Chang, who had graduated from Columbia Law School in 1886, had been denied admission to the State Bar of California in 1890 on grounds that he was not a U.S. citizen.  *Id.*; *see In re Chang*, 84 Cal. 163.

[12] Scott Zesch, The Chinatown War: Chinese Los Angeles and the Massacre of 1871 (Oxford University Press, 1st ed. 2012).

entitled to legal protections.  The Page Act of 1875 and the Chinese Exclusion Act of 1882 reinforced such sentiments.  *See supra* §§ II.C, II.D.

The economic exclusion of Asian Americans similarly encouraged discriminatory acts of violence.  Chinese migrants working in California's gold mines in the 1850s were met with rigid resistance.[13]  California imposed Foreign Miners' Taxes[14] on Chinese miners to discourage their participation in the gold rush and limit competition for White miners.[15]  This economic restriction, tacitly approved of by local authorities and the government, fueled resentment and justified White miners harassing and violently expelling Chinese laborers from mining camps.  In the Rock Springs Massacre of 1885, what began as a labor dispute over Chinese migrants' willingness to work for lower wages resulted in a massacre in the Chinatown neighborhood within the then-Wyoming Territory, leaving 28 Chinese

---

[13] Law, Order, and Justice for Some – Discrimination, Oakland Museum of California, http://explore.museumca.org/goldrush/fever16-di.html (last visited May 20, 2025).

[14] Foreign Miners' Tax Act of 1850, ch. 97, 1850 Cal. Stat. 221, 221-23 (repealed 1851); Foreign Miners' Tax Act of 1852, ch. 37, 1852 Cal. Stat. 84, 85 (repealed 1853).

[15] *See, e.g.*, From Gold Rush to Golden State, Library of Congress, https://www.loc.gov/collections/california-first-person-narratives/articles-and-essays/early-california-history/from-gold-rush-to-golden-state/ (last visited May 20, 2025); John S. Caragozian, Anti-Asian Discrimination Circa 1852, California Supreme Court Historical Society (May 27, 2021), https://www.cschs.org/wp-content/uploads/2021/06/History-Resources-Caragozian-Anti-Asian-Discrimination-Circa-1852.pdf

miners dead and 15 others wounded. [16]   The White miners then set close to eighty homes ablaze, effectively eradicating the Chinatown neighborhood in that region.[17] Consistent with California's lack of legal protections for Chinese Americans, the Rock Spring Massacre attackers faced no lasting legal repercussions, as no White person would testify against White miners.[18]

## VI.    The Fourteenth Amendment Makes Birthright Citizenship a Constitutional Right.

On July 28, 1868, Congress passed the Fourteenth Amendment to the U.S. Constitution, the first sentence of which provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1, cl. 1.  In ratifying this Clause, Congress constitutionalized the common law rule of *jus soli*, the principle that one's citizenship is based on place of birth.[19]   The Citizenship Clause repudiated the Supreme Court's infamous decision in *Dred Scott v. Sandford*, 60 (19 How.) U.S. 393 (1857), that individuals of African descent,

---

[16] Michael Luo, When An American Town Massacred Its Chinese Immigrants, New Yorker Magazine (Mar. 3, 2025), https://www.newyorker.com/magazine/2025/03/10/when-an-american-town-massacred-its-chinese-immigrants.

[17] Kalen Churcher, Rock Springs Massacre, EBSCO (2022), https://www.ebsco.com/research-starters/history/rock-springs-massacre.

[18] *Id.*

[19] Systems based on *jus sanguinis*, on the other hand, determine a child's citizenship based on that of their parents.

whether born a free person, manumitted and thus free, or enslaved, could never be U.S. citizens, even though they were able to vote and hold office in a number of states. *See* Paul Finkelman, *The First Civil Rights Movement: Black Rights in the Age of the Revolution and Chief Taney's Originalism in* Dred Scott, 24 U. Pa. J. Const. L. 676 (2022); Paul Finkelman, Scott v. Sandford: *The Court's Most Dreadful Case and How It Changed History*, 82 Chi.-Kent L. Rev. 3 (2007).

In addition to the plain language of the Amendment, Congressional debates evidence Congress's intent that the Fourteenth Amendment would grant citizenship to all U.S. born children—including children of Chinese immigrants. *See* Cong. Globe, 39th Cong., 1st Sess. 498 (1866) ("Mr. COWAN. I will ask whether it will not have the effect of naturalizing the children of Chinese and Gypsies born in this country? Mr. TRUMBULL. Undoubtedly."); *id.* ("Mr. TRUMBULL. If the Senator from Pennsylvania will show me in the law any distinction made between the children of German parents and the children of Asiatic parents, I might be able to appreciate the point, which he makes; but the law makes no such distinction; and the child of an Asiatic is just as much a citizen as the child of a European.").

Moreover, when it drafted and ratified the Fourteenth Amendment, Congress knew that unauthorized migrants lived within the United States, as evidenced by the numerous then existing immigration statutes regulating entry and deportation; most notably, those prohibiting the slave trade. *See generally* Gabriel J. Chin & Paul

Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2227 (2021). Those laws provided for the mandatory, involuntary deportation of those brought to the United States in violation of the slave trade laws. *Id.* at 2226-27, 2235-36. It is virtually undisputed that Congress' intention in drafting the Fourteenth Amendment was to grant citizenship to all formerly enslaved persons born in the United States, all of whom were categorically unauthorized migrants. Yet, their children were granted citizenship under the Fourteenth Amendment.[20]

## VII.    *Wong Kim Ark* Holds that Children of Asian Immigrants Are Entitled to Birthright Citizenship.

The Supreme Court's seminal decision in *Wong Kim Ark* affirmed Congress's intent that birthright citizenship applied to children of noncitizen parents. *Wong Kim Ark* also provides an example of how Chinese immigrants were denied the opportunity to become members of the political community. It is also an important illustration of courts faithfully upholding the law in the face of unconstitutional policy administration by an administration committed to the connection between race and citizenship.

### A.    Wong Kim Ark Is Born to Noncitizen Parents in California.

Wong Kim Ark was born in 1873 in San Francisco to parents who "were

---

[20] Similarly, the Anti-Coolie Act of 1862 created a class of immigrants who were illegally in the nation. Ch. 27, § 1, 12 Stat. 340 (1862).

persons of Chinese descent, and subjects of the emperor of China" but who "at the time of his birth [were] domiciled residents of the United States[.]" *Wong Kim Ark*, 169 U.S. at 649, 650-51. Under existing U.S. naturalization law, Wong Kim Ark's parents, who were long-time San Francisco residents, were ineligible for citizenship. Erika Lee, *Birthright Citizenship, Immigration, and the U.S. Constitution: The Story of* United States v. Wong Kim Ark*, in* Race Law Stories 89, 90 (Rachel F. Moran & Devon W. Carbado eds., 2008) ("Lee"). Wong Kim Ark and his parents maintained "permanent domicile and residence . . . [in] San Francisco[.]" *Wong Kim Ark*, 169 U.S. at 649, 651; Lee at 91.

### B. Wong Kim Ark Is Denied Entry into the United States.

In 1890, anti-Chinese hostilities in San Francisco drove Wong Kim Ark and his parents to leave California for China. Lee at 91-92. While his parents remained in China, Wong Kim Ark returned to California later that year. *Id.* at 92; *Wong Kim Ark*, 169 U.S. at 652. Upon entry, "Wong was recognized as a native-born citizen and quickly re-admitted into the country" where he claimed to be a U.S. citizen. Lee at 92; *Wong Kim Ark*, 169 U.S. at 652.

In 1894, Wong Kim Ark "again departed for China on a temporary visit, and with the intention of returning to the United States[.]" *Wong Kim Ark*, 169 U.S. at 652. But at this point, "the United States was quickly moving towards greater immigration restriction," and "[i]t was widely known that immigration officials

could and did deny entry to those claiming birth in the United States." Lee at 92,
95. Indeed, Wong Kim Ark was denied re-entry in the United States and detained
on "the sole ground that he was not a citizen of the United States." *Wong Kim Ark*,
169 U.S. at 653; Lee at 96. Because he was of Chinese descent, immigration
officials asserted he was not a U.S. citizen, deemed subject to the Chinese Exclusion
Act of 1882 and not permitted to enter the country. *Wong Kim Ark*, 169 U.S. at 699.
He was detained for four months. *Id.*

### C. The Supreme Court Holds that Wong Kim Ark and All Children Born in the United States Are Citizens.

Wong challenged his exclusion as contrary to the Fourteenth Amendment's
Citizenship Clause, asserting that he was a United States citizen by birth. *See
generally Wong Kim Ark*, 169 U.S. In a 6-2 decision in 1898, the Supreme Court
agreed, holding that "a child born in the United States, of parents of Chinese descent,
who, at the time of his birth, are subjects of the emperor of China . . . becomes at the
time of his birth a citizen of the United States." *Id.* at 705. The Supreme Court
explained:

> The right of citizenship never descends in the legal sense, either by the
> common law, or under the common naturalization acts. It is incident to
> birth in the country, or it is given personally by statute. The child of an
> alien, if born in the country, is as much a citizen as the natural-born
> child of a citizen, and by operation of the same principle.

*Id.* at 665 (cleaned up). With this ruling, the Supreme Court made clear that the
Fourteenth Amendment's Citizenship Clause applied to all persons born in the

United States, regardless of their race, or the race, citizenship, or other status of their parents. The Supreme Court thus applied a "readily administrable bright line rule" as it has in other jurisdictional contexts. *Henderson* ex rel. *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). This interpretation avoids the possibility of creating generations of U.S.-born, stateless noncitizens, and casting doubt on the citizenship of every U.S.-born person whose ancestors, in spite of U.S.-birth, might have been noncitizens under the Administration's theory.

## VIII.  The Executive Order Defies the Fourteenth Amendment and *Wong Kim Ark.*

The Executive Order relies on an incorrect presumption that U.S.-born children of parents who are outside the political community should likewise be excluded. 90 Fed. Reg. 8449 § 1 (incorrectly asserting that "[t]he Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof'"). This presumption runs contrary to the Supreme Court's decision in *Wong Kim Ark* and concurrent social policies, and seeks to resurrect an incorrect interpretation of the Fourteenth Amendment that ignores its literal terms and conflates race with membership in the political community. Indeed, as noted above, the Supreme Court in *Wong Kim Ark* focused solely on whether a child of aliens was "born in the country" in determining whether such child is a citizen of the United States. *Wong Kim Ark*, 169 U.S. at 665.

The logic embedded in the Executive Order echoes the exclusionary frameworks upheld by the since-repudiated Chinese Exclusion Act, *Fong Yue Ting*, *Ozawa*, and *Thind*. *See supra* §§ II(D), III. In each instance, citizenship and legal membership were explicitly tied to Whiteness or proximity to it, excluding those deemed racially incompatible with U.S. citizenship. The Executive Order's challenge to birthright citizenship for non-White children perpetuates this racialized gatekeeping. Like *Fong Yue Ting*, it questions the legitimacy of long-term residents; like *Ozawa* and *Thind*, it reinforces the belief that American citizenship must align with Whiteness. Not only is this blatantly unconstitutional, it attempts to reverse more than a century's worth of efforts of ensuring that Asians and Asian Americans are permitted to participate in the political community as equals.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's ruling enjoining the enforcement and implementation of the Executive Order.

Dated: May 28, 2025                    Respectfully Submitted,

                                   By:   */s/ Neel Chatterjee*
                                      Neel Chatterjee*
                                      Andrew Ong
                                      GOODWIN PROCTER LLP
                                      601 Marshall Street
                                      Redwood City, California 94063
                                      (650) 752 3100
                                      NChatterjee@goodwinlaw.com
                                      AOng@goodwinlaw.com

                                      Ishika Desai
                                      GOODWIN PROCTER LLP
                                      525 Market Street, 32nd Floor
                                      San Francisco, California 94105
                                      (415) 733 6000
                                      IDesai@goodwinlaw.com

                                      Dena Kia
                                      GOODWIN PROCTER LLP
                                      620 Eighth Avenue
                                      New York, NY 10018
                                      (212) 813 8800
                                      DKia@goodwinlaw.com

                                      *Counsel for Amici Curiae*

                                              *Counsel of Record

**CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to Fed. R. App. P. 29(a)(5), this brief complies with the type-volume limitations because it contains 6,478 words, less than half the word limit for principal briefs pursuant to Fed. R. App. P. 32(a)(7)(B).

I further certify that, pursuant to Fed. R. App. P. 32(a)(5), and 32(a)(6), the attached *amicus* brief complies with the typeface and type style requirements because it has been prepared in Microsoft Word in a proportionally spaced typeface (Times New Roman) in 14-point font.

*/s/ Neel Chatterjee*
Neel Chatterjee

## CERTIFICATE OF SERVICE

I certify that, on May 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system.  Participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.



*/s/ Neel Chatterjee*
Neel Chatterjee